IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-2392 |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT

Joe M. Fulbright ("Fulbright" or "Plaintiff") complains of his former employer, Union Pacific Railroad Company ("Union Pacific" or "Defendant") seeking damages and injunctive relief for the company's violations of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended (the "ADA").

### INTRODUCTION

1.      In 2014, Union Pacific changed its fitness-for-duty program. The changes required employees in certain positions disclose whether they had certain health conditions, even if the condition did not affect the employee's ability to safely perform his or her job. This requirement was needlessly invasive, and it violated the ADA.

2.      If an employee disclosed one of the listed health conditions, Union Pacific automatically removed the employee from service. Again, doing so violated the ADA.

3.      Next, Union Pacific required the employee to undergo a Fitness-for-Duty evaluation, even if the employee had been safely performing his or her job for years without incident, and even when there was no reason to believe the safe job performance would not continue going forward. Although the ADA calls for an individualized assessment, Union

Pacific did not perform an individualized assessment. Rather, based on its review of medical records mixed in with baseless assumptions about things that could possibly go wrong, Union Pacific would declare that the employee is a safety risk and therefore unfit for duty, or it would decide the employee's condition necessitates severe work restrictions which are incompatible with the employee's actual job.

4.      In February 2016, several Union Pacific employees commenced a class action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The district court of Nebraska certified the class in February 2019. However, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

5.      Fulbright is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Fulbright took a sleep medication for insomnia, and Union Pacific knew that he took it. Fulbright worked for more than five years after he began taking the medication, and there was never a reason to believe it posed a safety risk. To the contrary, better sleep improved Fulbright's safety and performance. But in January 2015, a Union Pacific supervisor suddenly questioned whether the medication might possibly have lingering effects during the next work day that posed a safety concern. Union Pacific removed Fulbright from service pending a Fitness-for-Duty evaluation under the new program. Then, without conducting the individualized inquiry required by the ADA, Union Pacific claimed there was a slight risk Plaintiff might become suddenly incapacitated at work because of the sleep medication. Because of this perceived risk, the company placed Fulbright on severe work restrictions that were inconsistent with the job he had, and his employment was terminated.

6.     Union Pacific discriminated against Fulbright on the basis of his disability. Fulbright was a putative class member in *Harris* before the class was certified and he was an actual class member after certification, and he now timely brings this individual action.

PARTIES

7.     Joe M. Fulbright was a Texas resident at all times relevant to this case, but he now resides in Tennessee.

8.     Union Pacific is a railroad carrier engaged in interstate commerce, and it has operations in Dallas County, Texas.  Its principal place of business is in Omaha, Nebraska.  It may be served with process by serving its registered agent for service of process in Texas, C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136

JURISDICTION AND VENUE

9.     This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331.

10.     Defendant owns and operates hundreds of miles of railroad track in Texas, and it does a substantial amount of business in Texas.  Defendant has sufficient minimum contacts with the State of Texas to allow this Court to exercise personal jurisdiction over the Defendant in this case.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is also proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred in the State of Texas, and because Fulbright would have continued to work in Dallas County (and other counties which comprise the Dallas Division) if not for the unlawful employment practices complained of herein.

3

RELEVANT FACTS

A.    Defendant's Fitness-for-Duty Policies and Practices

12.    Union Pacific reviewed and revised its Medical Rules effective February 1, 2014. A copy of the Medical Rules is attached to the Complaint as Exhibit A.

13.    These rules applied to all Union Pacific employees across the country, and the programs and practices referred to herein as the Fitness-for-Duty program are set forth in the Medical Rules.

14.    Union Pacific's Fitness-for-Duty program is often-invoked and broadly applied. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns that the employee has, or has had in the past, certain other, non-listed health conditions, takes certain medication, or because a manager refers an employee to Health and Medical Services for a Fitness-for-Duty evaluation.

15.    When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

16.    These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

17.     Union Pacific routinely disregards the opinions of an employee's treating doctor, who has actually examined the employee, in favor of the opinions and judgments of company employees who have not examined the employee.

18.     Once Union Pacific receives an employee's medical information, Union Pacific's Health and Medical Services Department (located in Omaha, Nebraska and at the time headed by Chief Medical Officer Doctor John Holland) conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

19.     Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employee's ability to safely perform the essential functions of their jobs.

20.     When issuing these Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain health conditions or treatments in order to assign standardized work restrictions on employees.  This is a far cry from making an objective assessment of what job functions the individual employee in question is or is not able to perform.

21.     As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many (including Fulbright) have lost their livelihoods.

B.    Fulbright's Employment at Union Pacific

22.    Fulbright worked for Union Pacific from 1985 to 2015.  During the last 15 years or more of his employment, he was a Senior Communications Maintainer.

23.    Under the rules set by the applicable union contracts, because of Fulbright's seniority, during the last few years of his employment Fulbright could not be required to work overtime.  Union Pacific could ask him to do so, but he had the right to decline.

24.    Also, during the last few years of Fulbright's employment, and according to applicable union contracts, persons in Fulbright's position could never be required to be on call after hours or on weekends.  However, Fulbright could volunteer to be on call during certain times.  This meant Fulbright might be one of the first technicians to be called by a dispatcher in Omaha, Nebraska if some problem was reported in the area where Fulbright worked, but he would not be the only person who could be called.  It was not uncommon for the dispatcher to call the first name on his list and if that person didn't answer, he would call the next person.

C.    Fulbright's Sleep Medication and Accommodations

25.    In January 2009, Fulbright began taking a prescription medication to alleviate the symptoms of his insomnia.  The first business day after it was prescribed, Fulbright told a supervisor in the Communications Department, Terry Neal, that he would be taking this medication.  Neal gave Fulbright the phone number of a company nurse, and Fulbright promptly called the company nurse and told her about the prescription.

26.    Fulbright has taken this medication almost every day since January 2009, and it has helped him immensely.  He sleeps better, he is more alert and sharper at work, and his concentration, mood, and attitude are much improved because he takes this medicine.  Taking the medicine has improved his overall performance and ability to do his job.

27.     Of course, the drug is intended to help Fulbright sleep, and for a few hours after he takes it, Fulbright avoids things like driving.  By the next morning, Fulbright is rested and sharp, and he no longer suffers the detrimental effects of the insomnia.

28.     As an accommodation, Fulbright and his supervisors agreed that Fulbright could not be required to take calls or be on call after 7 p.m. on any given day.  The persons involved in making this decision included Fulbright's immediate supervisor, Steve Hale, and Hale's immediate supervisor, Terry Neal.  This was in 2009.

29.     This accommodation may not have been officially reduced to writing, but it was discussed and confirmed several times over several years by and between Fulbright, his supervisors, and other workers in the Communications Department.

30.     On a somewhat regular basis, Fulbright volunteered to be on call over the weekend, and he sometimes even skipped taking his sleep medicine on Friday and Saturday so he could still be available to take calls at night on those days.  But on Sunday night, Fulbright always took the sleep medicine and he was not available for calls after 7:00 p.m.  Terry Neal knew Fulbright always took the medication on Sunday nights because Fulbright told him so and reminded him of this several times.

D.      Terry Neal's Hostility Towards Fulbright

31.     Several months before Fulbright began taking the sleep medication, Terry Neal moved into a supervisory position.  For whatever reason, Neal often did little things to disfavor Fulbright.  For example, Neal might allocate work assignments so that Fulbright worked solo with no assistance on tasks that were normally performed by two or more technicians.  Neal sometimes disproportionately assigned the less desirable tasks to Fulbright, such as outdoor

assignments on hot summer days.  Fulbright was never aware of a specific incident that triggered this mistreatment and he never knew the reason for it, but he soldiered on and kept doing his job.

32.    In July 2012, Fulbright agreed to be on call the weekend of July 7-8.  On Monday, July 9, 2012, Neal accused Fulbright of missing a call from the dispatcher in Omaha the day before, at some time before 7 p.m.  Fulbright was able to show from the phone records that he had not been called, and Neal dropped it.

33.    The next month, on Monday, August 13, 2012, Neal once again claimed Fulbright had failed to answer a call from the dispatcher the day before, which was a Sunday.  This time however, the call was supposedly placed after 7:00 p.m., and Fulbright reminded Neal why he did not take work calls on Sunday nights.

34.    For whatever reason, Neal decided to push back.  Due to Fulbright's seniority, he could not be required to work overtime, and due to the agreed-upon accommodation for the sleep medicine, Fulbright could not be required to take work calls after 7 p.m.  But Neal declared that going forward, Fulbright would have work overtime, and he would have to take calls after 7 p.m., just because Neal said so, and even though Neal knew Fulbright might not be safe to go to work for a few hours after he had taken the sleep medicine.

35.    Neal's action raised a work safety issue, and an ADA discrimination issue.  Discrimination under the ADA includes a failure to accommodate, and Neal's decision effectively ended or at least threatened the accommodation Union Pacific was providing.

E.    Fulbright's Protected Activities – Opposition to Disability Discrimination

36.    Fulbright therefore opposed Neal's discriminatory actions.  He told Neal that he was wrong and he could not require Fulbright to work after 7 p.m. when he had just taken the medication.

37.    Neal persisted over the next few days, so on August 16, 2012, Fulbright called the company's safety hotline to report that one of his superiors was now insisting he would have to work even if he had just taken a drug that made it unsafe for him to do so.

38.    By making this call, Fulbright engaged in a protected activity, opposition to disability discrimination.

39.    Neal's boss was James Bracken, a regional manager in the Communications Department.  Bracken became aware of the safety hotline complaint, and he flew to Fort Worth to meet Neal.  After this meeting, Neal stopped trying to make Fulbright work overtime or work after 7 p.m., for a while at least.  Bracken retired in late 2014, after which Neal's efforts resumed.

F.    Terry Neal's Retaliation

40.    The Medical Rules state that a supervisor may initiate a Fitness-for-Duty evaluation.

41.    On Monday, January 26, 2015, Neal once again accused Fulbright of missing a call the day before, on Sunday, after 7 p.m.  This time, Neal went even further – he signed a Supervisor Initiated Fitness-For-Duty Request Form asking the company to do a fitness-for duty evaluation of Fulbright.

42.    The form alleged that Joe had missed after-hours calls because of his sleep medication, ignoring the fact that Fulbright had an accommodation that he was not required to take calls after 7 p.m.  It was like accusing an employee of missing a shift on a day when the employee was not scheduled to work.

43.     Neal also wrote: "I am worried that the medicine could impair Mr. Fulbright further into his normal work shift," and "I am concerned about the medication having lingering effects into his daily duties."

44.     While it may be true that Neal "worried" and was "concerned," it may also be untrue, and Neal's concern was not justified by any facts or observations. The trigger for Neal's worry was an allegedly missed call at a time when Fulbright was not required to take calls. This does not seem to be a reasonable basis for worry and concern, especially when Fulbright had worked for six years without showing lingering effects of the medication while at work. Neal did not say he had ever observed Fulbright impaired during his normal work shift, and if he had ever seen this, he would have included this on the written request to have Fulbright evaluated.

45.     On or about February 3, 2015, Fulbright was informed he was being taken out of service and placed on medical leave for three full months, until May 3, 2015, because of Terry Neal's unfounded concerns regarding the sleep medicine.

46.     According to applicable union contracts, Fulbright was supposed to receive pay while he was on medical leave. However, to get this pay, Terry Neal had to make time entries in the HR or payroll system.

47.     On the next scheduled payday after being placed on medical leave, Fulbright was not paid. Fulbright believes this is because Neal did not enter the time, and Fulbright believes this was not simply an oversight, but rather malicious retaliation for Neal's 2012 complaint to the safety hotline.

G.     Fulbright's Attempt to do the Impossible – to Prove a Negative

48.     Over the next five to six months, Union Pacific essentially sought proof that Fulbright was <u>not</u> a safety risk before they would let him return to work.

10

49.     Fulbright, of course, wanted to return to work as quickly as possible, so he began asking Union Pacific to give him something in writing telling him what steps he needed to take and what he needed to do to facilitate the medical review and move things along.  Union Pacific, however, would never put this in writing.  Instead, they communicated mostly by phone, and then documented the calls with self-serving written descriptions of the calls in an internal memo or email, which was not shared with Fulbright.

50.     In a March phone call, Union Pacific asked Fulbright for his medical records.  It took a few weeks for Fulbright to get his records, and when he did, he was unable to send them to the fax number the company had provided.  Fulbright tried to get a different fax number, but his calls were not returned.

51.     Fulbright did eventually get his medical records to Union Pacific in April 2015.

52.     About a week later, a company doctor (John Charbonneau) spoke to Fulbright by phone and told him he needed to have a sleep evaluation done by a sleep medicine specialist, and the company would need to receive a report from the specialist.

53.     Charbonneau seemed to be unaware of the fact that Fulbright had worked out an accommodation with Union Pacific, that he would not be required to take calls after 7 p.m. if he had taken the sleep medication.  He seemed to want Fulbright to get a doctor to certify that Fulbright could safely work at night after he took the medication, which would be impossible – it's sleep medication, it is supposed to make you drowsy.  Fulbright explained, but couldn't seem to get Charbonneau to understand.

54.     Charbonneau told Fulbright to ask his primary care physician for the name of a sleep medicine specialist because, he said, Fulbright's doctor would know who to send him to.

55.     Fulbright's doctor did not know what to tell him.  She was not immediately aware of a specialist to refer him to, and she doubted whether a specialist would provide a written report.

56.     Fulbright therefore searched on his own for sleep medicine specialist by doing Google searches.  He found a specialist, but the next available appointment was several weeks out, on June 1, 2015.  That specialist wanted Fulbright to see yet another specialist, and Fulbright complied, but the second specialist wanted to charge additional fees for anything in writing about Fulbright and the sleep medication.  Union Pacific terminated Fulbright's health insurance by this time and Fulbright was unable to afford the extra fees.

H.     Union Pacific Terminated Fulbright Because of Disability

57.     Union Pacific obtained records from the sleep medicine specialists, or maybe just from one of them.  On June 29, 2015, Dr. Charbonneau spoke to Fulbright by phone and told him he had not seen the right kind of specialist (which might have been avoided if the company had provided written instructions).  Union Pacific did not offer to provide the names of specialists that it deemed to be suitable.  Union Pacific did not offer to pay the fees the second specialist had asked for to put something in writing.  Union Pacific discontinued the interactive process, to the extent there had ever been one, and made a decision.

58.     By letter dated July 1, 2015, Union Pacific informed Fulbright that its Medical Director had issued a fitness for duty decision, which was enclosed with the letter.  The decision was nothing more than a list of work restrictions – it said nothing about the reasoning behind the decision, or the basis for the restrictions.  The decision did not even say that a medical expert believed Fulbright was a safety risk.

59.    The letter went on to say the Communications Department "was unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position."  Fulbright was referred to the Disability Management Department for "assistance."

60.    The assistance turned out to be nothing more than someone telling Fulbright there were no open positions he could do given the work restrictions that had been imposed on him.

61.    Union Pacific terminate Fulbright's employment in 2015.

62.    Fulbright has sustained economic losses, including lost income and other benefits of employment.  Fulbright has also incurred other non-economic damages, including emotional distress.

63.    Union Pacific engaged in the discriminatory and retaliatory conduct described above with reckless or deliberate disregard for the rights and safety of Fulbright.

I.    Plaintiff has Exhausted Administrative Prerequisites and has Timely Filed this Case

64.    On July 28, 2015, Fulbright dual filed a charge of discrimination with the EEOC and the Fort Worth Human Relations Commission.

65.    When Fulbright filed his charge, there was a class action lawsuit on file concerning Union Pacific's Fitness-for-Duty program.  The case was originally filed in the United States District Court for the Western District of Washington, but it was transferred to the United States District Court for the District of Nebraska.  The case was *Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

66.    On June 7, 2016, the EEOC issued a Dismissal and Notice of Rights to Fulbright.

67.    Because he was a putative class member in the *Harris* case, Fulbright's claims under the ADA were tolled during the pendency of litigating the class-wide claims pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

68.     This district court in *Harris* certified a class action, which included Fulbright, in February 2019.  However, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

69.     Because of *Crown Cork* tolling, Fulbright had ninety (90) days from the date of the Eighth Circuit's order to file a lawsuit. Sixty (60) more days were added because the parties to the *Harris* case entered into a tolling agreement extending the statute of limitations by sixty days.   Therefore, as long as Fulbright files his lawsuit on or before August 21, 2020, his lawsuit is timely filed and is not barred by limitations.

70.     Having properly exhausted his administrative remedies, Fulbright now timely files this Complaint.

J.      Fulbright Meets all Requirements to assert these ADA Claims

71.     At all times relevant to this case, Fulbright was an "employee" of Defendant as the term "employee" is defined in Title I of the ADA.

72.     At all times relevant to this case, Union Pacific was Fulbright's "employer" as the term "employer" is defined in Title I of the ADA.

73.     At all times relevant to this case, Union Pacific has employed more than 500 employees.

FIRST CAUSE OF ACTION
DISABILITY DISCRIMINATION – DISPARATE TREATMENT

74.     The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

75.     At all relevant times, Fulbright was an individual with one or more disabilities under the ADA under at least one and possibly all three of the foregoing definitions.

14

76.    At all relevant times, Fulbright had the requisite skill, experience, education and other job-related requirements of his position, and he was therefore a qualified individual under the ADA.  Plaintiff is and was therefore a qualified individual as defined in the ADA.

77.    At all relevant times, Fulbright could perform the essential functions of his position, with or without reasonable accommodations.

78.    Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

79.    Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112 (b)(6).

80.    Union Pacific discriminated against Fulbright on the basis of disability by issuing work restrictions because of his disability, removing him from his job because of his disability, by refusing to allow Plaintiff to resume working, and by terminating his employment.

81.    Because Union Pacific violated 42 U.S.C. § 12112, Fulbright has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiff is also entitled to attorneys' fees and costs incurred in connection with these claims.

82.    Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of Fulbright. As a result, Fulbright is entitled to punitive damages.

SECOND CAUSE OF ACTION
DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE

83.    Fulbright is, and at all relevant times was, a qualified individual with one or more disabilities.

84.    Discriminating against a qualified individual with a disability includes:

[N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 122112(b)(5)(A).

85.    Union Pacific discriminated against Fulbright by failing to provide him reasonable accommodations in 2012 and again in 2015.

86.    Because Union Pacific violated the ADA, Fulbright has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Fulbright is also entitled to attorney's fees and costs incurred in connection with these claims.

87.    Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of Fulbright. As a result, Fulbright is entitled to punitive damages.

THIRD CAUSE OF ACTION
UNLAWFUL MEDICAL INQUIRIES

88.     At all relevant times was, Fulbright was an employee of Union Pacific, and Union Pacific was his employer.

89.     Section 12112(d)(4)(A) of the ADA provides:

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

90.     Union Pacific violated 42 U.S.C. § 12112(d)(4)(A) by requiring a medical examination of Fulbright and making prohibited inquiries of Fulbright that were not job-related and consistent with business necessity.

91.     Because Union Pacific violated 42 U.S.C. § 12112(d)(4)(A), Fulbright has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Fulbright is also entitled to attorney's fees and costs incurred in connection with these claims.

FOURTH CAUSE OF ACTION
UNLAWFUL RETALIATION

92.     At all relevant times was, Fulbright was an employee of Union Pacific, and Union Pacific was his employer.

93.     Plaintiff opposed the disability discrimination by Terry Neal in 2012 and thereafter when Neal did away with or tried to do away with Plaintiff's accommodations, which was disability discrimination as a failure to accommodate.

94.     Under the ADA it is unlawful for an employer to retaliate against an employee who has opposed discriminatory acts by the employer that violate the ADA.

95.    Union Pacific unlawfully retaliated against Fulbright because he opposed the company's disability discrimination against him.

96.    Because Union Pacific violated the ADA, Fulbright has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Fulbright is also entitled to attorney's fees and costs incurred in connection with these claims.

97.    Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of Fulbright. As a result, Fulbright is entitled to punitive damages.

FIFTH CAUSE OF ACTION
EQUITABLE AND INJUNCTIVE RELIEF, INCLUDING REINSTATEMENT

98.    Union Pacific has intentionally engaged in the unlawful employment practices described in this Complaint.

99.    This Court may therefore enjoin Union Pacific from engaging in such unlawful employment practices, and order affirmative relief, such as reinstatement of Fulbright and other employees, with or without back pay, and other equitable relief as this Court deems appropriate.

100.    Fulbright therefore requests an award of injunctive relief ordering Union Pacific to reinstate him to the position he held at the time of his termination in 2015, with back pay and full restoration of all seniority and benefits of employment.

101.    Fulbright further requests an award of injunctive relief prohibiting Union Pacific from further engaging in the unlawful employment practices described in this Complaint, including the unlawful use of the Fitness-for-Duty program as a weapon to discriminate against persons with disabilities and as justification for making unlawful medical inquiries of its employees.

JURY DEMAND

102.    Plaintiff demands a trial by jury on all claims asserted in this Complaint for which a trial by jury is allowed by law.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

a.   Judgment finding that the practices of Union Pacific described in this Complaint constitute violations of the ADA;

b.   Judgment enjoining Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages described in this Complaint;

c.   Judgment awarding Plaintiff all compensable damages, including all economic losses, lost past and future income and benefits of employment, emotional distress and compensatory damages;

d.   Judgment awarding all costs of court, expert witness fees, and attorney's fees recoverable by law;

e.   Judgment awarding punitive damages;

f.   Judgment awarding such other relief under the ADA to which Plaintiff is entitled by law;

g.   Judgment awarding all pre-judgment and post-judgment interest to which Plaintiff is entitled by law;

h.   Judgment awarding such other and further relief to which Plaintiff is entitled;

i.   Judgment awarding such other and further relief that the Court finds to be warranted.

Respectfully submitted

/s/ Donald E. Uloth
Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

**Medical Rules**

Roles and Responsibilities

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Medical Rules

The Medical Rules are established to determine employees' Fitness-for-Duty. Health and Medical Services determines "Fitness for Duty" as the medical and functional, (i.e., physical, mental, and cognitive) ability to:

> In addition to the Medical Rules, employees must also be aware of **Related Policies and Programs.**

Safely perform a job, with or without reasonable accommodations, and

Meet medical standards established by regulatory agencies in accordance with federal and state laws.

The Medical Rules apply to post-offer applicants and all employees. Application of these rules is based on regulatory requirements and safety standards established by Union Pacific.

## Medical Rules

**Roles and Responsibilities**

**Fitness-for-Duty Evaluations**

**Health and Medical Services Fitness-for-Duty Decisions**

**Medical Records and Confidentiality of Medical Information**

**Dispute Resolution**

**Appendix A: Definitions**

**Appendix B: Reportable Health Events**



EXHIBIT
A

# Roles And Responsibilities

The responsibilities of Health and Medical Services, Employees and Post-Offer Applicants with regard to the Medical Rules are outlined below.

ˉTop

Health and Medical Services

Employees

Post-Offer Applicants

## Health And Medical Services

Health and Medical Services (HMS) is responsible for establishing the scope, content, frequency, and delivery of medical evaluations. HMS is the final authority for determining an employee's Fitness-for-Duty designation. HMS will respond to supervisor concerns regarding an employee's ability to safely perform duties. HMS may delegate responsibilities to medical professionals not employed by Union Pacific. Delegated responsibilities may include but are not limited to the following:

Performance of medical tests and evaluations; and/or

Determination of medical status, and/or

Determination of functional level

ˉTop

## Employees

All employees are responsible for:

Reporting to work fit for duty to safely perform their jobs with or without reasonable accommodations

Notifying the supervisor when the employee becomes aware of or is concerned that a medical condition or symptom(s) exists which may affect his/her ability to safely perform his/her job

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS

Providing, upon request, information from the employees health care provider including, but not limited to: medical documentation pertaining to medical tests, examinations, and/or evaluations, including lists of all prescription and over-the-counter medications taken by the employee. Employee may be required to provide information on a periodic basis for monitoring of continued fitness-for-duty.

Providing, upon request, a statement from the employee's healthcare provider whether or not, or in what circumstances, any prescriptions or OTC medications currently taken by the employee is likely to impair the employee's perceptual abilities or alertness, or impair mental or physical functioning

Performing all work in conformance with any medical restrictions that HMS has placed upon the employee

Meeting the requirements, in a timely manner, of all federal and state laws and regulations applicable to the employee with regard to medical evaluations and testing and the use of personal protective equipment

Providing accurate information to Health and Medical Services regaring health status and medical treatment

**Dispatchers and Operating Department field employees (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), all Telecom employees (agreement and nonagreement) and Supply Department Field employees (agreement and nonagreement) must also:**

Notify HMS as soon as practicable if he/she experiences any of the health events listed in Appendix B of these Medical Rules. A reportable health event is defined as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea

The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.

If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS

ˉTop

## Post-Offer Applicants

**Post-offer Applicants are responsible for:**

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS to determine if the applicant is fit for duty. The Pre-Placement Medical Evaluation and an appropriate Physical Ability Test may be performed after a conditional job offer has been made and before the applicant reports to work

Some costs associated with additional medical testing and evaluations deemed necessary by HMS to determine medical fitness

Providing accurate information to HMS regarding health status and medical treatment

| Issued | 3/1/2011 |
|----------|----------|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Fitness-For-Duty Evaluations

Union Pacific maintains the final authority for determining whether an employee is fit for duty. To determine Fitness-for-Duty, employees may be required to participate in medical tests and evaluations.

Evaluations completed by Health and Medical Services (HMS) may include, but are not limited to various components such as: (1) regulatory medical certification requirements; (2) drug screen; (3) medical, psychological and/or functional evaluations, (4) obtaining additional medical records for review by HMS, and (5) other information as deemed necessary by HMS.

A Fitness-for-Duty evaluation may be initiated by HMS and/or a Supervisor. Employees requesting a Medical Leave may also be required to complete a Fitness-for-Duty Evaluation prior to returning to work or in the event of a change in a Reportable Health Event.

Top

Health and Medical Services Initiated Fitness-for-Duty
Supervisor Initiated
Employee Requested Medical Leave and Reporting Requirements

## Health And Medical Services Initiated Fitness-For-Duty

### REGULATORY MEDICAL EVALUATIONS

Employees with designated job assignments may be required to have Regulatory Medical Evaluations, based on requirements of federal and/or state government regulations.

Applicable government regulations to be used by HMS as references in carrying out regulatory evaluations, may include, but not be limited to, the following:

**Federal Motor Carrier Safety Administration (FMCSA)**
Compliance with commercial motor vehicle licensing requirement

**Federal Aviation Administration (FAA)**
Compliance with FAA Regulations for Pilots

**Federal Railroad Administration (FRA)**
Compliance with medical certification requirements for Locomotive Engineers, Conductors, and Remote Control Locomotive Operators
Compliance with other FRA medical requirement for covered employees
Compliance with Hearing Conservation Program requirements for covered employees

**Occupational Safety and Health Administration (OSHA)**
Compliance with regulations on worker exposure to potential workplace hazards
Compliance with specific medical certification requirements, including but not limited to, hazardous materials workers and use of respirators and other personal protective equipment

New medical regulatory requirements that come into effect, and apply to Union Pacific employees, will automatically be included in these rules. HMS will apply applicable regulatory requirements regarding medical evaluations for employees. HMS may use additional guidelines or other materials produced by government agencies, or other sources, as references in carrying out regulatory evaluations. For certain jobs or tasks covered by regulatory medical requirements, HMS may utilize medical Fitness-for-Duty requirements that are more rigorous or stringent than the minimal requirements of a regulation.

**Job Transfer**

An employee who transfers from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective bargaining agreement will be evaluated for Fitness-for-Duty before beginning the new job if the transfer is:

   a. To a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position - agreement and nonagreement), and/or

   b. To a position requiring regulatory certification, and/or

   c. To other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job

**Pre-placement (post offer) and Return to Work After 1-Year Absence**

All post-offer applicants will be required to participate in a Pre-Placement Evaluation after a conditional job offer is made,

MyUP

and before the applicant begins work. All post-offer applicants will be subject to a drug screen and evaluations deemed appropriate by HMS. In addition, some employees may also be subject to Regulatory Medical Evaluations based on requirements of federal and/or state government regulations.

An employee absent from work for a period of 12 months or longer for any medical or non-medical reason, must undergo the requirements of a pre-placement (post-offer) evaluation for the position before returning to work. Absences include, but are not limited to:

   a. On-Duty Injury

   b. Off-Duty injury or illness

   c. Employee Assistance Program participation

   d. Reserve Board assignment

   e. Furlough

   f. Personal leave

   g. Military service

**Other**

Additional Fitness-for-Duty Evaluations are conducted whenever it is deemed necessary to determine an Employee's Fitness for Duty on a case-by-case basis.

'Top

## Supervisor Initiated

Supervisor's have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern about the employee's ability to safely perform his/her job duties. The Supervisor may remove the employee from service during the review period.

'Top

## Employee Requested Medical Leave And Reporting Requirements

### AGREEMENT EMPLOYEES

The purpose of the Medical Leave Evaluation is to determine the medical appropriateness of an employee's requested leave, due to a medical condition of the employee and ensuring the employee is medically and functionally able to perform his/her job.

Pursuant to Union Pacific policies, an employee must provide adequate medical documentation to verify the need for a medical leave:

Leaves less than 30 days can be approved by the appropriate supervisor without Health and Medical Services review.

Leaves requested for 30 days or more or a leave which becomes extended beyond 30 days, shall be referred to Health and Medical Services for review prior to approval by supervisor.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy on the Employees site for FMLA associated absences also processed by Health and Medical Services.

**Additional requirements for agreement Telecom employees, Supply Department field employees, and Operating Department field employees** (including all Transportation, Engineering Services and Mechanical employees)

All agreement Telecom employees, Supply Department field Employees, and Operating Department field employees (including Transportation, Engineering Services, and Mechanical employees) **must report** the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If an agreement Telecom employee, Supply Department field employee or Operating Department field employee (including all Transportation, Engineering Services, and Mechanical employees) has a reportable health event, at work or off work, the employee must:

**Stay off of work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty

evaluation prior to employee returning to his/her job.

## NONAGREEMENT EMPLOYEES

All Nonagreement Employees requiring a medical absence should:

See the Short-Term/Long-Term Disability (STD/LTD) policy for Nonagreement for health related absences.

**Additional Requirements for nonagreement Telecom employees, nonagreement Supply Department field employees, and Dispatchers and nonagreement Operating Department field employees** (including all Transportation, Engineering Services, and Mechanical)

All nonagreement Telecom employees, nonagreement Supply Department field employees and Dispatchers and nonagreement Operating Department field employees (including all Transportation, Enginnering Services, and Mechanical) must report the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a Short Term Disability or other medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If nonagreement Telecom employees, nonagreement Supply Department field employees, Dispatchers and nonagreement Operating Department field employees (including all Transportation, Engineering Services, and Mechanical) have a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to work.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty evaluation prior to employee returning to his/her job.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy for FMLA associated absences also processed by Health and Medical Services.

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

# Health And Medical Services Fitness-For-Duty Decisions

After a Fitness-for-Duty evaluation is complete, Health and Medical Services determines if the employee/applicant is medically and functionally able to safely perform his/her job and makes the following designations:

Fit for Duty

Fit for Duty - With Restrictions

1. A medical work restriction assigned by Health and Medical Services, may include a requirement that the applicant/employee agree to ongoing monitoring of a specific health condition, with ongoing reporting of such information to Health and Medical Services. The treatment for the specific health condition is conducted by the employee's health care provider.

2. Union Pacific determines whether work restrictions can or cannot be reasonably accommodated.

Not Fit for Duty

Health and Medical Services will notify supervisors of the Fitness-for-Duty designation.

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Medical Records And Confidentiality Of Medical Information

In the regular course of business, Health and Medical Services maintains confidential medical records for post-offer applicants and employees in accordance with applicable federal and state laws. Copies of documentation existing in those files are not released to anyone outside Health and Medical Services, except in the following instances:

When an employee submits a written request to Health and Medical Services which includes his/her name, employee ID, specific documents required, address where the records may be mailed, and the employee's signature.

When Health and Medical Services receives a release of medical information form signed by the employee stating that the employee has agreed the holder of the release may receive specific documentation contained in the employee's confidential Health and Medical Services medical file.

When Health and Medical Services receives a subpoena or other court order instructing the release of specific records.

When relevant documents from an employee's confidential Health and Medical Services medical record are required in order to prepare an appropriate defense of Union Pacific or any of its personnel.

When necessary to evaluate an employee's claim relating to a personal injury or illness if the employee is represented by legal counsel.

When necessary to provide medical information to an external medical practitioner performing an evaluation at Health and Medical Service's request.

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

## Dispute Resolution

If Health and Medical Services and the employee's treating medical practitioner disagree on the employee's current medical diagnosis, then the employee may appeal in accordance with applicable collective bargaining agreement(s).

In such an instance, the employee must provide documentation from his/her treating medical practitioner stating the medical justification and procedure(s) used to make the diagnosis.

Upon the Company's receipt of the appropriate medical release authorizing discussion of the employee's medical conditions or case with the appropriate labor union representative and Union Pacific Labor Relations Department representative, the labor union representative, or his designee, may discuss representative(s). If circumstances warrant, Health and Medical Services may request re-evaluation of the employee's case.

Health and Medical Services is the final authority for determining an employee's Fitness-for-Duty designation.

The table below outlines specific circumstances and associated process steps for when there is a disagreement regarding an employee's diagnosis:

| IF... | THEN ... |
| --- | --- |
| Re-evaluation by a medical practitioner, selected by Health and Medical Services indicates the employee's medical diagnosis is consistent with the Health and Medical Service's decision. | Health and Medical Services issues a Fitness for Duty decision and the supervisor confirms if reasonable accommodation is possible (if applicable). |
| Re-evaluation by a medical practitioner, selected by Health and Medical Services, indicates the employee's medical diagnosis is NOT consistent with the Health and Medical Service's decision. | Health and Medical Services completes a new medical review and issues an updated Fitness-for-Duty statement and advises the supervisor. The supervisor then notifies the employee. |
| The employee or union representative notifies the supervisor that he/she is not satisfied with re-evaluation results. | The supervisor notifies the appropriate Union Pacific Labor Relations representative. Labor Relations will then arrange a joint conference between the employee's union representative, appropriate treating medical practitioner and Health and Medical Services. (The employee may also be requested to participate if requested by Health and Medical Services.) |
| Consensus is reached at a joint conference between the employee, union representative, employee's appropriate treating medical practitioner and Health and Medical Services representative regarding employee's current diagnosis. | Health and Medical Services issues an updated Fitness for Duty statement to the supervisor, and the supervisor confirms whether reasonable accommodation is possible when work restrictions are applicable. |

## Request To Establish Medical Boards

If consensus is not reached during the joint conference, the employee's union representative may present a request to the appropriate Union Pacific Railroad Labor Relations representative, asking to establish a special medical board in accordance with applicable collective bargaining agreement(s), if any. In general, unless specific collective bargaining agreement provisions require otherwise, a special medical board review is conducted in the following manner:

Each physician selected to participate in the special medical board review must: 1) hold a Doctor of Medicine or Doctor of Osteopathic Medicine degree from an accredited medical school; 2) has practiced medicine for at least five years; and 3) is licensed by a State(s) to practice medicine.

Three physicians are chosen, one each by: 1) Union Pacific Railroad; 2) the Union/Employee; and by 3) joint Union Pacific Railroad and Union/Employee agreement.

A written document is prepared describing the appointment of a special medical board, timeframes for conducting the medical board hearing, limitation of evidentiary record to medical records/history of the involved employee and acceptance of its decision as it pertains specifically to the employee's medical diagnosis as binding, is signed by the employee, the employee's union representative, and the appropriate Union Pacific Railroad official(s).

The employee reports for the scheduled medical evaluation(s).

Within 15 days after evaluation of the employee, the special medical board issues a joint report of finding(s) and decision. One copy of the report is provided to: 1) the Union Pacific Railroad Health and Medical Services Department; 2) the employee's union representative, and 3) the employee.

Once the special medical board makes a finding regarding employee's medical diagnosis, Health and Medical Services will issue an updated Fitness for Duty statement and upon issuance of such statement, the special medical board will

automatically terminate. Health and Medical Services is the final authority in determining an employee's Fitness for Duty designation.

All claims for lost time will be handled in accordance with the employee's applicable Collective Bargaining Agreement provisions.

Union Pacific pays for the cost and expenses of its medical representative on the medical board; the union or employee pays for the cost and expenses of its medical representative on the medical board and each party (Union Pacific and Union/Employee) pays 50% of the cost and expenses of the 3rd medical representative on the board.

| Issued | 3/1/2011 |
|--------|----------|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

# Appendix A: Definitions

The following definitions apply to the Medical Rules:

**EMPLOYEE** – Individual employed by Union Pacific Railroad.

**FITNESS FOR DUTY** – Ability to medically and functionally (including physical, mental, and or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws.

**HEALTH AND MEDICAL SERVICES (HMS)** – Employees and contracted personnel who provide professional services and make decisions on behalf of Union Pacific's Health and Medical Services.

**POST-OFFER APPLICANT** – Individual who has received a conditional offer of employment, and who is not currently working for Union Pacific. A post-offer applicant is required to undergo a Pre-Placement Medical Screening.

**REASONABLE ACCOMODATIONS** – As required by federal and state law, Union Pacific will make reasonable accommodations for persons with statutorily protected disabilities when this will permit the person to perform the essential functions of the job and does not impose an undue hardship on the company.

**REPORTABLE HEALTH EVENT** – Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees -agreement and nonagreement), Telecom employees (agreement and nonagreement), and Supply Department Field employees (agreement and nonagreement) must report to Health and Medical Services any new diagnosis, recent events, and/or change in the following conditions, cardiac, seizure or loss of consciousness, significant vision or hearing changes, diabetes treated with insulin, and/or severe sleep apnea. (See Appendix B for more information)

**SUPERVISOR** – Employee's first-line supervisor and other supervisors in the employing department.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

## Appendix B: Reportable Health Events

The Union Pacific Medical Rules state that Dispatchers and employees in Operating Department field positons (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), Telecom employees (agreement and nonagreement) and Supply Department field employees (agreement and nonagreement) must report the health events to Health and Medical Services listed at the bottom of the page so that a Fitness-for-Duty evaluation can be done to determine if the employee can safely perform his/her job.  If an employee has a "Reportable Health Event", at work or off work, then the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event, and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

Reportable health event is defined as a new diagnosis, recent event, or change in a prior stable condition, for one of the following:

**A. Cardiovascular Conditions Including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).

2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.

3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.

4. Stroke or Transient Ischemic Attack (TIA).

5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)

6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness Including:**

1. A seizure of any kind.

2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).

3. Treatment with anti-seizure medication to prevent seizures.

4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change Including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).

2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).

3. Significant hearing loss or surgery on the inner ear.

4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.

2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |