PB-90161

# AGREEMENT BETWEEN THE UNION PACIFIC RAILROAD

# AND THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (TELECOMMUNICATION EMPLOYEES)

UPFULBRIGHT

## EFFECTIVE JANUARY 1, 2003

| Rule | | Page |
|---|---|---|
| Rule 1 | Scope | 4 |
| Rule 2 | Hours of Service | 4 |
| Rule 3 | Shift Work | 8 |
| Rule 4 | Classification of Work/Qualifications | 9 |
| Rule 5 | Rates of Pay | 12 |
| Rule 6 | Skill Differentials | 13 |
| Rule 7 | Monthly Compensated Employees | 13 |
| Rule 8 | Hourly Compensated Employees | 15 |
| Rule 9 | Seniority | 16 |
| Rule 10 | Seniority Classes | 17 |
| Rule 11 | Seniority Districts | 17 |
| Rule 12 | Seniority Rosters | 18 |
| Rule 13 | Working off District | 19 |
| Rule 14 | Bulletining Positions | 19 |
| Rule 15 | Filling Vacancies | 19 |
| Rule 16 | Exercise of Seniority | 20 |
| Rule 17 | Promotion | 20 |
| Rule 18 | Transfers | 20 |
| Rule 19 | Reduction in Force | 21 |
| Rule 20 | Applicants for Employment | 22 |
| Rule 21 | Claims and Grievances | 22 |
| Rule 22 | Discipline - Investigations | 23 |
| Rule 23 | Leave of Absence | 25 |
| Rule 24 | Absent from Work | 25 |
| Rule 25 | Vacations | 26 |
| Rule 26 | Personal Leave | 26 |
| Rule 27 | Bereavement Leave | 27 |
| Rule 28 | Holidays | 27 |
| Rule 29 | Attending Court | 28 |
| Rule 30 | Jury Duty | 28 |
| Rule 31 | Per Diem Allowance | 28 |
| Rule 32 | Travel Allowance | 29 |
| Rule 33 | Personal Injury | 32 |
| Rule 34 | Movement of Household Goods | 32 |
| Rule 35 | Faithful Service | 32 |
| Rule 36 | Paying Off | 33 |
| Rule 37 | Assignment of Work | 33 |
| Rule 38 | Distribution of Agreement | 33 |
| Rule 39 | Conformity to Agreement | 33 |
| Rule 40 | Effective Date of Agreement | 33 |

UPFULBRIGHT

## APPENDICES


Appendix

Union Shop Agreement ........ A
Dues Deduction Agreement ........ A-1
Political Contributions Deduction Agreement ........ A-2
Maintenance of Membership 3/05/81 ........ A-3
Clarify Maintenance of Membership Agreement ........ A-4
Retention of Maintenance of Membership Agreement ........ A-5
National Vacation Agreement ........ B
Daily Vacation Agreement ........ B-1
Daily Vacation Agreement Understanding ........ B-2
Non-Operating National Holiday Provisions ........ C
Health and Welfare Benefits ........ D
Supplemental Sickness Benefits ........ E
National Dental Plan ........ F
National Vision Plan ........ G
Off-Track Vehicle Accident Benefits ........ H
Employee Information ........ I
Bereavement Leave Q & A ........ J
Personal Leave Examples ........ K
Washington Job Agreement May 21,1936 ........ L
September 25, 1964 Mediation Agreement ........ M
Memorandum of Understanding RE: Article VI ........ M-1
Letter of Understanding # 7, November 27, 1991 ........ M-2
Incidental Work Rule, November 27, 1991 ........ N
Guidelines for Administration of Differentials ........ O
Understanding dated July 16, 1963 – Hours of Holiday for Monthly Rated Positions ........ P
Understanding dated November 10, 1975 – Observation of Holiday ........ Q
Understanding dated January 25, 1986 – Overtime Calling Procedures ........ R
Establishment of Uniform Collective Bargaining Agreement On UPRR & MPRR ........ S
Understanding dated October 17, 1986 – Work on Corporation Equipment ........ T
Understanding dated March 17, 1992 – Work on Computers ........ U
Understanding dated November 16, 1996 Incentive Program TSC ........ V
Employees with Preserved Rates Of Pay ........ W
401(K) Agreement 8/5/1992 ........ X
UP Shares Agreement dated 4/30/1998 ........ Y
C.O.R.E. Agreement 11/19/1998 ........ Z




UPFULBRIGHT

***THE OBLIGATION THAT RESTS UPON THE MANAGEMENT TO PROVIDE AND THE EMPLOYEES TO RENDER HONEST, COURTEOUS AND EFFICIENT SERVICE IS RECOGNIZED.***

***A SPIRIT OF COOPERATION BETWEEN THE EMPLOYEES AND THE MANAGEMENT IS ESSENTIAL TO SAFE AND EFFICIENT MAINTENANCE AND OPERATIONS, AND BOTH PARTIES AGREE TO SO CONDUCT THEMSELVES. THE RESPONSIBILITY FOR SUCCESS RESTS EQUALLY WITH THE EMPLOYEES AND THE MANAGEMENT.***

***WHENEVER TERMS ARE USED WITHIN THIS AGREEMENT REFLECT THE MASCULINE GENDER, SUCH TERMS SHALL BE CONSTRUED AS THOUGH THEY ARE ALSO IN THE FEMININE GENDER.***

***EFFECTIVE JANUARY 1, 2003***
***SUPERSEDES AGREEMENT EFFECTIVE JULY 1, 1977, AS AMENDED***

UPFULBRIGHT

## RULE 1. SCOPE.

This Agreement governs the rates of pay, rules and working conditions of Electronic Technicians, Shop Technicians, and Installation Technicians who perform Telecommunications work coming under the scope of this Agreement.

***NOTE: Installation Technicians were formerly titled Linemen.***

## RULE 2. HOURS OF SERVICE.

Eight (8) hours shall constitute a day's work. All employees coming under the provisions of this Agreement, except as otherwise provided in this Schedule of Rules, or as may hereafter be legally established between the Carrier and the Employees, shall be paid on the hourly basis.

### ESTABLISHMENT OF SHORTER WORK WEEK

***NOTE:*** ***The expressions "positions" and "work" used in this rule refer to service, duties or operations necessary to be performed the specified number of days per week, and not to the work week of individual employees.***

(A) GENERAL. The provisions of this Rule are the result of the (so-called) Chicago Agreement of March 19, 1949, which provided for all employees, subject to the exceptions contained in Article II thereof, a work week of 40 hours, consisting of five days of eight hours each, with two consecutive days off in each seven; and that work weeks may be staggered in accordance with the Carrier's operational requirements, but that so far as practicable the days off shall be Saturday and Sunday.

(B) FIVE-DAY POSITIONS. On positions the duties of which can reasonably be met in five days, the days off will be Saturday and Sunday.

(C) SIX-DAY POSITIONS. Where the nature of the work is such that employees will be needed six days each week, the rest days will be either Saturday and Sunday or Sunday and Monday.

(D) SEVEN-DAY POSITIONS. On positions which are filled seven days per week any two consecutive days may be the rest days with the presumption in favor of Saturday and Sunday.



UPFULBRIGHT

(E) REGULAR RELIEF ASSIGNMENTS. All possible regular relief assignments with five days of work and two consecutive rest days will be established to do the work necessary on rest days of assignments in six or seven-day service or combination thereof, or to perform relief work on certain days and such types of other work on other days as may be assigned under this Agreement. Where no guarantee rule now exists such relief assignments will not be required to have five days of work per week. the inclusion or non-inclusion of the foregoing sentence shall be without prejudice to the determination of the question of whether or not a guarantee exists.

Assignments for regular relief positions may on different days include different starting times, duties and work locations for employees of the same class in the same seniority district, provided they take the starting time, duties and work locations of the employee or employees whom they are relieving.

(F) DEVIATION FROM MONDAY-FRIDAY WEEK. If in positions or work extending over a period of five (5) days per week, an operational problem arises which the Carrier contends cannot be met under the provisions of Subpart (B) of this Rule, and requires that some of such employees work Tuesday to Saturday, instead of Monday to Friday, and the employees contend the contrary, and if the parties fail to agree thereon, then if the Carrier nevertheless puts such assignments into effect, the dispute may be processed as a grievance or claim.

(G) NONCONSECUTIVE REST DAYS. The typical work week is to be one with two consecutive days off, and it is the Carrier's obligation to grant this therefore, when an operating problem is met which may affect the consecutiveness of the rest days of positions or assignments covered by Subparts (C), (D) and (E), the following procedure shall be used:

(1) All possible regular relief positions shall be established pursuant to Paragraph (E) of this rule.

(2) Possible use of rest days other than Saturday and Sunday, by agreement or in accordance with other provisions of this Agreement.

(3) Efforts will be made by the parties to agree on the accumulation of rest time and the granting of longer consecutive rest periods.

(4) Other suitable or practicable plans which may be suggested by either of the parties shall be considered and efforts made to come to an agreement thereon.

(5) If the foregoing does not solve the problem, then some of the relief men may be given nonconsecutive rest days.

UPFULBRIGHT

(6) If after all the foregoing has been done there still remains service which can only be performed by requiring employees to work in excess of five days per week, the number of regular assignments necessary to avoid this may be made with two nonconsecutive days off.

(7) The least desirable solution of the problem would be to work some regular employees on the sixth or seventh days at overtime rates and thus withhold work from additional relief men.

(8) If the parties are in disagreement over the necessity of splitting the rest days on any such assignments, the Carrier may nevertheless put the assignments into effect subject to the right of employees to process the dispute as a grievance or claim under the rules of this Agreement, and in such proceedings the burden will be on the Carrier to prove that its operational requirements would be impaired if it did not split the rest days in question and that this could be avoided only by working certain employees in excess of five days per week.

(H) REST DAYS OF FURLOUGHED EMPLOYEES. To the extent furloughed employees may be utilized under applicable rules of this Agreement or practices, their days off need not be consecutive; however, if they take the assignment of a regular employee they will have as their days off the regular days off of that assignment.

(I) BEGINNING OF WORK WEEK. The term **"work week"** for regularly assigned employees shall mean a week beginning on the first day on which the assignment is bulletined to work.

(J) CHANGE IN REST DAYS. Regular assigned rest days shall not be changed except after such advance notice to the employee as is now required under applicable rules.

(K) COMPRESSED WORK HALF, WORK WEEK AND WORK MONTH.

(1) District 6 gangs to which telecommunications employees are assigned may work a consecutive compressed work half. The consecutive compressed half will consist of consecutive workdays that may be regularly assigned with eight (8) or more hours per day (i.e. 8, 9, 10, 11, or 12 hour workdays) and accumulated rest days. Such consecutive compressed half arrangement will equal the number of hours worked as if the assignment was for a normal half with 8-hour workdays. Accumulated rest days for employees assigned to a gang working a consecutive compressed half arrangement will consist of the remaining days in the payroll period.

(2) As an alternative to paragraph (1), the gangs to which telecommunications employees are assigned may work a consecutive compressed workweek. The employees in the gang may commence work earlier than the assigned starting time and/or work beyond the normal quitting time during the work week to equalize hours not worked on the remaining days of the work week. Make-up time accumulated for this purpose to be worked at the applicable pro-rata rate will not exceed four (4) hours per–day on preceding





UPFULBRIGHT

regular workdays. The compressed workweek will equal the number of hours worked as if the assignment was for a normal workweek of forty (40) hours.

(3) Where it would be required to work a fraction of a day on a consecutive compressed work period arrangement under (1) or (2) in order to equal the number of hours in the period, respectively, the remaining hours will be distributed and worked throughout the compressed work period unless agreed to work a partial day at the end thereof.

(4) Rules in effect covering payment for service performed on rest days will apply to those accumulated rest days provided within this rule.

(5) Except for any distributed hours provided for in paragraph (3), time worked prior to or after the assigned daily hours will be paid at the overtime rate in accordance with the overtime provisions of the Agreement.

(6) Observance of holidays will be handled as follows:

(a) Unless agreed otherwise by a majority of the gang members and the appropriate Manager, if a holiday falls on other than a Saturday, the holiday will be observed at the end of the compressed work period and the amount of service hours ordinarily scheduled in line with the terms of this Agreement will be reduced by eight (8).

(b) If a holiday falls on a Saturday, there will be no reduction in the amount of service hours ordinarily scheduled in line with the terms of this Agreement.

(c) With the concurrence of the Manager, accumulated rest days provided herein may be used for workdays to make up time and observe the Thanksgiving and Christmas holidays, but not limited to these holidays, on their normal observed days. Under this same approval process, rest days may be worked in exchange for time off on workdays immediately preceding and/or following such holidays. Any rest days worked under this provision will be in the pay period the holiday is observed and will be paid for at the straight time rate.

(d) Employees who qualify for holiday allowances under existing rules will be compensated eight (8) hours at the straight time rate for the holiday involved.

(e) If required to perform service during the hours at the end of the compressed work period observed as the holiday, employees will be compensated at the overtime rate.





UPFULBRIGHT

(7) For vacation qualifying purposes, employees assigned to a compressed work period arrangement as provided herein will be allowed credit for each day worked during the calendar year as follows:

| Work Hours | Credit |
|---|---|
| 8 | 1 |
| 9 | 1.125 |
| 10 | 1.25 |
| 11 | 1.375 |
| 12 | 1.5 |

(8) Where the hours of the fraction of a day contemplated in paragraph (c) of this Agreement are distributed throughout the compressed work period, there will be no additional vacation credit allowed. If at the end of the calendar year an employee's vacation qualifying days would be adversely affected as a result of this provision, upon presentation of proof of an adverse impact, vacation qualifying days will be adjusted accordingly.

(9) Employees who observe their vacation while assigned to a gang working a compressed work period arrangement will be compensated on the basis of the gang's regular assigned hours, at the pro rata rate and will be charged the number of vacation days based upon the ratio in paragraph 7.

(10) If a gang is working a compressed work period and all or some of the positions in such gang are to be abolished, the Carrier will have satisfied the advance notice requirement of Rule 19 by giving a five (5) working days' notice of abolishment of such positions.

(11) A compressed work period established pursuant to this rule may be terminated by serving a thirty-six (36) hours' advance notice. Such change will not take effect until the first scheduled workday of a work period.

(12) Should any disputes arise regarding the application of this Agreement, the General Chairman and the highest designated Labor Relations officer will meet in an attempt to resolve any and all issues.

**RULE 3. SHIFT WORK.**

(A) When one shift is employed, the starting time shall not be earlier than 7:00 a.m., nor later than 8:00 a.m. The time and length of the lunch period shall be arranged by agreement within the limits of the fifth hour.

(B) Where two shifts are employed the starting time of the first shift shall be governed by Section A above, and the second shift shall start immediately following the close of the first shift, or no later than 8:00 p.m. The spread of the second shift shall consist of eight



UPFULBRIGHT001511



UPFULBRIGHT

consecutive hours including an allowance of twenty minutes for lunch within the limits of the fifth hour.

(C) Where three shifts are employed, the starting time of the first shift shall be governed by Section A, above, and the second and third shifts shall start immediately following the end of the preceding shift. The spread of each shift shall consist of eight consecutive hours including an allowance of twenty minutes for lunch within the limits of the fifth hour.

***NOTE:*** ***Other assigned starting times may be established by agreement between the designated Carrier Manager and the General Chairman.***

## RULE 4. CLASSIFICATION OF WORK AND QUALIFICATIONS.

(A) ELECTRONIC TECHNICIAN

(1) An Electronic Technician shall possess a thorough knowledge of electronic theory, understand the operation of electronic components, and circuits, and must be able to read and understand electronic schematics. Electronic Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, multimeters, frequency counters, watt meters, service monitors, spectrum analyzers, frequency generators, frequency selective level meters, transmission test sets, digital transmission testers, and other types of telecommunications test equipment. Electronic Technicians shall be required to operate any hand and power tools needed to accomplish the work. Electronic Technicians shall possess advanced computer skills. Electronic Technicians will perform their assigned work without direct individual supervision.

(2) An Electronic Technician must possess a two (2) year Associate degree or greater in Electronic Technology from a generally recognized school. An Electronic Technician shall be classified as an Electronic Technician C until the completion of all required training and has obtained a Federal Commission General Radiotelephone Operator license at which time the employee will be promoted to Electronic Technician B. However, any Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator License, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

If a new hire has obtained a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate degree or greater in Electronic Technology from a generally recognized school or equivalent experience, management shall place the new hire as an Electronic Technician B.

(3) An Electronic Technician shall be classified as an Electronic Technician B for four hundred eighty-eight (488) working days of service. An employee completing four hundred eighty-eight (488) working days of service as an Electronic Technician B shall be promoted to position of Electronic Technician A. It is understood the





UPFULBRIGHT

promotion from Electronic Technician B to Electronic Technician A is based only on time in grade.

(4) An Electronic Technician A shall be classified as a Senior Electronic Technician after completion of two hundred forty-four (244) working days as an Electronic Technician A and who has passed the required three (3) of Union Pacific Telecommunications training labs. Senior Electronic Technicians will make themselves available for after hour calls, unless other arrangements have been made with proper authority. Senior Electronic Technicians must further successfully complete any new technology training labs as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman.

Any Senior Electronic Technician who fails to maintain the requirements listed above will revert to their former Electronic Technician position. It is understood that such reversion is not considered discipline and that the Carrier is not subject to any claim on behalf of an Electronic Technician who fails to maintain the requirements listed above. The Senior Electronic Technician program is based on voluntary participation and an employee who has been promoted to Senior Technician may upon thirty (30) days written notification to his manager and local chairman, return to their former Electronic Technician classification. Senior Technicians who elect to return to their former Electronic Technician classification, will not be able to make application for promotion to Senior Technician for a period of one (1) calendar year from the date of reverting to Electronic Technician.

(5) Electronic Technicians' work shall consist of building, installing, assembling, dismantling, inspecting, testing, adjusting, restoring and maintaining, *other than leased*, telephone, telephone switching, and telephone networking equipment (excluding portable equipment such as cellular phones and pagers); public address and intercom systems, electronic and radio communication equipment; industrial closed circuit television equipment, centralized radio control equipment; radios used for two-way communication or control (except application and removal on rolling stock); microwave, multiplex, and related equipment in microwave sites; electronic recording or playback equipment; fiber optic, digital multiplex, and related equipment; automatic car identification and weighing equipment; EOTs, MDS and ATCS equipment, under the supervision of the Telecommunications Department, and wiring, cabling, and conduits related to above Carrier-owned, stationery telecommunications equipment, inside and outside, overhead and underground,and similar work, without individual supervision, in connection with Telecommunication Plants.

***NOTE: It is understood between the parties that the Carrier may allow other entities to put their equipment on Carrier property (including their own fiber optics and their own microwave dishes) as long as that equipment is not being utilized for Railroad operations. Such agreements between the Carrier and outside companies to allow them access to Carrier property for the purpose of installing, maintaining or dismantling such equipment is not in violation of this Agreement.***





UPFULBRIGHT

(B) SHOP TECHNICIAN.

(1) Shop Technicians shall possess a thorough knowledge of electronic theory, understand the operation of electronic components and be able to read and understand mechanical and electrical schematics. Shop Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, oscilloscopes, frequency counters, service monitors, spectrum analyzers, frequency generators and other types of telecommunications test equipment. Shop Technicians shall have basic computer skills.

(2) Shop Technicians shall possess a two-year Associate Degree in Electronic Technology or greater from a generally recognized school. Applicants must demonstrate their technical ability by passing an examination and must demonstrate alignment and troubleshooting techniques.

(3) The Carrier shall have the right to assign the position of Senior Shop Technician, based on seniority and ability, to any Shop Technician who has sufficient practical experience in Shop Technicians' work, who is capable of working on all products, capable of training other Shop Technicians on all products and capable of organizing the work load for Shop Technicians.

(4) Shop Technicians work shall consist of inspecting, testing, adjusting, repairing, *other than leased*, base station analog radios, base station analog radio modules, FOTs, hot box radio repair (including RF link radios), locomotive voice radios (except installation and removal of rolling stock), mobile radios, portable radios, Teklogic equipment, Data South printers, MDS radios, analog multiplex equipment associated with microwave radios, EOTs and EOT module, and similar work, without individual supervision.

(5) Shop Technicians shall be required to operate any hand and power tools needed to accomplish the work. In addition, they shall have skills sufficient to use soldering equipment such as hot air equipment utilized in the repair of surface mount component removal and replacements on printed circuit boards.

(6) Shop Technicians shall also be required, at the direction of the designated Carrier Manager, to assist in construction and/or installation of facilities outside of their seniority district at the straight time rate of pay. Shop Technicians required to work outside of their seniority district under this provision shall be considered on Leave of Absence from their seniority district during the duration of work. The designated Carrier Manager and the General Chairman shall cooperate in granting leaves of absence as in the past.

(C) INSTALLATION TECHNICIAN.

(1) Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring, together with their supports, cable trays, cable ladders, wiring





UPFULBRIGHT

closets, equipment racks; batteries, rectifiers and radio antennas, coax, heliax, wave guide connectors and mounting brackets; microwave and radio tower work; and all similar work in connection with Telecommunication plants.

(2) Installation Technician B employees must complete four hundred - eighty-eight (488) work days of service as Installation Technician B and also satisfactorily complete required training and demonstrate the ability and aptitude to become an Installation Technician A.

***NOTE:*** ***Any individual who has had three (3) years of practical experience in Installation Technician's work and is capable of executing same to a successful conclusion within a reasonable amount of time will be considered as an Installation Technician A.***

(3) Installation Technicians shall be required to operate any hand and power tools needed to accomplish the work. Installation Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, ground meters, time domain reflectometers, optical time domain reflectometers, cable locators, wave guide analyzers, LAN/DATA cabling meters, amp meters, battery testers, SWR meters, optical fiber meters and other types of telecommunications test equipment utilized to accomplish the work, and similar work, without individual supervision.

(D) It is not intended that this Rule 4 has anything contained herein that would infringe upon other crafts' classification of work rule or practices.

**RULE 5. RATES OF PAY AND ENTRY RATES.**

A) RATES OF PAY. Effective January 1, 2003, the rates of pay for the classifications set forth in Rule 4 are as follows:

| | Hourly |
|---|---|
| Senior Electronic Technician ................................$ | 22.07 |
| Electronic Technician A ........................................$ | 19.39 |
| Electronic Technician B ........................................$ | 18.38 |
| Electronic Technician C ........................................$ | 16.85 |
| Shop Technician ....................................................$ | 17.13 |
| Installation Technician A........................................$ | 18.88 |
| Installation Technician B........................................$ | 16.54 |

***NOTE 1:*** ***For employees with preserved rates of pay, please see Appendix W***

***NOTE 2:*** ***None of the above rates include any skill differential however, the above rates reflect cost of living adjustments.***





UPFULBRIGHT

UPFULBRIGHT

**RULE 6. SKILL DIFFERENTIALS.**

(A) Senior/Electronic Technician. Senior & Electronic Technicians with a valid FCC license (or equivalent) who regularly perform repairs and adjustments to electronic equipment shall receive a differential of eighty-five (85) cents per hour for all hours worked.

(B) Shop Technician. Shop Technicians with a valid FCC license (or equivalent) in the Telecommunications Service Center at Council Bluffs shall receive a differential of eighty-five (85) cents per hour for all hours worked within the Telecommunications Communications Center.

(C) Leading Workman. Installation and Shop Technicians may be assigned as a leading workman to lead, direct and work with such other technicians. When assigned as such, will be paid fifty (50) cents per hour over the highest rated employee who is directed. The assignment of employees to such positions will be governed by seniority and ability.

(D) HDC. Electronic Technicians assigned to Harriman Dispatch Center, pursuant to agreement dated July 2, 2001, shall receive a differential of $2.85 per hour for all hours worked.

(E) The differentials set forth in subparts (A), (B) and (D) above shall not be applicable to any employee assigned to perform installation technician covered work.

(F) There shall be no compounding of the differentials identified above, nor with any other differential payable under any Agreement between the parties.

(G) Any differential referenced above, that by its terms is payable to a covered employee for each hour actually spent performing the work for which the differential is granted is not payable for any non-working time for which the employee receives enumeration, except that such differential shall be included in vacation pay with respect
to any employee who is regularly assigned to a position for which that differential is paid for the entire day.

***NOTE: See: Appendix O, National Agreement Language.***

**RULE 7. MONTHLY COMPENSATED EMPLOYEES.**

(A) For monthly rated positions, the monthly rate is based on two hundred and thirteen (213) hours per month and except as hereinafter provided, no overtime is allowed for time worked in excess of eight hours per day on the assigned days of the week. On the other hand, no time is to be deducted unless the employee lays off of his own accord.

(B) Where meals and lodging are not furnished by the Carrier or when the service requirements make the purchase of meals and lodging necessary while away from home point, employees will be paid necessary expenses.

(C) If it is found this Rule does not produce adequate compensation for certain of these positions by reason of the occupants thereof being required to work excessive hours, the salary for these positions may be taken up for adjustment by the General Chairman.

(D)

(1) Employees paid under this Rule shall be assigned one regular rest day per week, Sunday if possible. Rules applicable to other employees of the same craft or class shall apply to service on such assigned rest days.

(2) Work of a non-emergency nature and non-telecommunication related work not covered by the Scope Rule, performed after regular hours, on stand-by days, and holidays will be paid at one and one-half the straight time rate, however, no overtime of a non-emergency nature shall be worked except by direction of proper authority.

(3) All work performed in another seniority district will be paid at one and one-half the straight time rate, except when mutually agreed upon between the General Chairman and the designated Carrier Manager in cases where employees are granted leaves of absence to handle special projects in line with past practice.

(E) Ordinary maintenance or construction work not previously required on Sunday will not be required on the sixth day of the work week.

***NOTE 1:*** ***Employees will be required to report when called by proper authority to perform emergency work.***

***NOTE 2:*** ***Emergency work is defined as trouble calls from user departments involving service and repairs to telecommunications equipment needed for railroad operations and departmental communications service interruptions, failures and alarms, for example, would be considered emergency situations under this Agreement.***

***NOTE 3:*** ***See Appendix W for preserved monthly rated employees.***

(F) Employees paid under this Rule who are required to perform emergency work on holidays will be allowed additional compensation at pro rata rate with a minimum of two (2) hours. If required to work in excess of two (2) hours, a maximum of four (4) hours will be allowed.

***NOTE:*** ***Monthly rated employees who are required to work on the Day After Thanksgiving Holiday will be compensated as per Subsection (F) in addition to eight hours pro rata holiday pay, per the National Rule.***

(G) The pro rata overtime hourly rate for positions covered by this Rule is determined by dividing the monthly rate by two hundred thirteen (213).



UPFULBRIGHT

**RULE 8. HOURLY COMPENSATED EMPLOYEES.**

(A) Persons temporarily employed for emergency work will be compensated on an hourly basis.

(B) Meal Period. Employees required to work during or any part of the lunch period shall receive pay for the length of the lunch period at straight time and will be allowed necessary time to procure lunch [not to exceed thirty (30) minutes] without loss of time.

(C) All overtime continuous with regular bulletin hours will be paid for at the rate of time and one-half until relieved, except as may be provided in rules hereinafter set out.

(D) For continuous service after assigned hours, employees will be paid time and one-half on actual minute basis, with a minimum of one (1) hour for any such service performed.

(E) Employees shall not be required to work more than two hours overtime without being permitted to go to meals. Time taken for meals will not terminate the continuous service period and will be paid for up to thirty (30) minutes.

(F) Employees called or required to report for work, and reporting but not used, will be paid a minimum of four (4) hours at straight time rates.

(G) Employees called or required to report for work and reporting will be allowed a minimum of four (4) hours for two (2) hours and forty (40) minutes work or less.

(H) Where meals and lodging are not furnished by the Carrier or when the service requirements make the purchase of meals and lodging necessary while away from home point, employees will be paid necessary expenses, unless employee is receiving per diem under the provisions of Rule 31.

(I) Employees will be allowed time and one-half on the minute basis for service performed continuously in advance of their regular assigned hours, with a minimum of one hour.

(J) Except as otherwise provided for in this Rule, all overtime for employees beyond sixteen hours service in any twenty-four (24) hour period, computed from starting time of employee's regular shift, shall be paid for at rate of double time.

(K) Work in excess of forty (40) straight time hours in any work week shall be paid for at one and one-half times the basic straight time rate except where such work is performed by an employee due to moving from one assignment to another or to or from a furloughed list, or where days off are being accumulated under Subpart (G) of Rule 2, or where system gang employees are working on a compressed work schedule.

(L)

(1) Employees worked more than five days in a work week shall be paid one and one-half times the basic straight-time rate for work on the first and second rest days of their work week, except (1) where such work is performed by an

UPFULBRIGHT

employee due to moving from one assignment to another or to or from a furloughed list, (2) where days off are being accumulated under Subpart (G) of Rule 2, or (3) where the following double time provision is applicable on the second rest day.

(2) Service performed by a regularly assigned hourly or daily rated employee on the second rest day of his regular assignment shall be paid at double the basic straight time rate, provided the employee (1) has worked all the hours of his assignment in that work week, and (2) has worked on the first rest day of his work week. However, emergency work paid for under the call rules will not be counted as qualifying service hereunder, nor will it be paid for under this provision.

(M) There shall be no overtime on overtime; neither shall overtime hours paid for, other than hours not in excess of eight paid for at overtime rates on holidays or for changing shifts, be utilized in computing the forty (40) hours per week, nor shall time paid for in the nature of arbitraries or special allowances such as attending court, deadheading, travel time, etc., be utilized for this purpose, except when such payments apply during assigned working hours in lieu of pay for such hours, or where such time is included under existing rules in computations leading to overtime.

(N) Work performed by employees on their assigned rest days and on holidays recognized by the parties' national agreement shall be paid for at the rate of time and one-half.

(O) All work performed in another seniority district will be paid at one and one-half the straight time rate, except when mutually agreed upon between the General Chairman and the designated Carrier Manager in cases where employees are granted leaves of absence to handle special projects in line with past practice.

***NOTE 1:*** ***This Rule does not include employees paid on monthly basis. <u>See</u>: Appendix C for "Holiday" provisions relating to the qualification for, and the allowance of, holiday pay for hourly-paid employees.***

***NOTE 2:*** ***When any of the referenced holidays falls on Sunday, the day observed by state, nation or by proclamation shall be considered the holiday.***

## <u>RULE 9</u>. <u>SENIORITY</u>.

(A) Seniority will date from the time the employee's pay starts in seniority class in the seniority district in which employed, except that individuals employed for temporary work will not be accorded a seniority date until completion of ninety (90) working days continuous service; seniority to date from date such continuous service commenced in the seniority district in which it accrued.



UPFULBRIGHT001519



UPFULBRIGHT

(B) When two (2) or more employees commence work on the same day, their respective seniority ranking shall be determined on the basis of their length of continuous service with the Carrier with the employee having the most service ranked first. If service dates are the same, the employees shall be ranked by the last four digits of the Social Security Number, with the employee with the lowest number ranked first.

(C) Effective June 1, 1981, all employees promoted subsequent thereto to official, supervisory, or excepted positions from the craft shall be required to pay an appropriate monthly fee, not to exceed monthly union dues, in order to retain and continue to accumulate seniority. A promoted employee whose payments are delinquent shall be given a written notice by the appropriate General Chairman, with copy to the Director Labor Relations, of the amount owed and thirty (30) days from the date of such notice to cure the delinquency in order to avoid seniority forfeiture.

Employees promoted prior to June 1, 1981, to official, supervisory, or excepted positions from the craft shall retain their current seniority but shall be required to pay an appropriate monthly fee, not to exceed monthly union dues, in order to accumulate additional seniority.

(D) Employees voluntarily leaving the service will, if they re-enter, be considered as new employees.

**RULE 10. SENIORITY CLASSES.**

Seniority classes shall be as follows:

| | |
|---|---|
| CLASS 1 | Senior Electronic Technician<br>Electronic Technician (Class A, B and C) |
| CLASS 2 | Shop Technician |
| CLASS 3 | Installation Technician (Class A and B) |

**RULE 11. SENIORITY DISTRICTS.**

Seniority districts shall be as follows:

| Seniority District No. | Territory: |
|---|---|
| 1 | All tracks east of Echo , Utah (exclusive ) to Logan, Iowa (inclusive) including Cheyenne, Wyoming to Pueblo, Colorado (inclusive) to Green River, Utah (inclusive) to Hayes, Kansas (exclusive) and Sioux City, Iowa (inclusive) south to a line at Falls City, Nebraska (exclusive); Beatrice, Nebraska (exclusive) and Belvidere, Nebraska |





UPFULBRIGHT

(exclusive); from O'Fallons, Nebraska to Joyce, Nebraska, To Egbert, Colorado.

2 South of the California/Oregon state line to and including El Paso, Texas and to Tucumcari, New Mexico (inclusive). From Oakland/Stockton, California east to Argenta Rim, Nevada and from Los Angeles, California east to Nevada/Utah state line.

3 All track in Oregon, Washington, Idaho and Montana and from Argenta Rim, Nevada east to Echo , Utah (inclusive) and Green River, Utah (exclusive): from the Utah/Idaho border south to the Utah/Nevada border; and, from McCommon, Idaho to Granger, Wyoming.

4 Starting at Hayes, Kansas (inclusive), Beatrice, Nebraska (inclusive), Belvidere, Nebraska (inclusive), Falls City, Nebraska (inclusive) and Bloomington, Illinois (exclusive) going south and territory east of El Paso, Texas (exclusive) and east of Tucumcari, New Mexico (exclusive).

5 East of Logan, Iowa (exclusive) to Chicago, Illinois; north of Bloomington, Illinois (inclusive) and north of Nettleton, Missouri (inclusive) and north to Duluth, Minnesota (inclusive).

6 Telecommunications Installation Teams (Entire UP system)

7 Terminal Specialists - System

8 Shop Technicians - Council Bluffs (Seniority Point)

**RULE 12. SENIORITY ROSTERS.**

(A) Seniority rosters showing name, position and seniority date of employees entitled to seniority date in accordance with Rule 9 will be maintained for each seniority district. Seniority rosters will be brought up to date in January of each year and copies furnished Local Chairmen and General Chairman and made available to the employees.

(B) Seniority rosters will be open for correction of error for a period of 90 days from issuance. Upon presentation of proof of error, correction will be made by agreement between the General Chairman and the designated Carrier Officer, and seniority dates established by such agreement will not be subject to further protest.

(C) The seniority of an employee who establishes seniority after December 18, 1987 and who is furloughed for 365 consecutive days will be terminated if such employee has less than three (3) years of seniority at the time of furlough. The "*365 consecutive days*" shall exclude any period during which a furloughed employee receives compensation pursuant to an I. C. C. employee protection order or an employee protection agreement or arrangement.





UPFULBRIGHT

**RULE 13. WORKING OFF ASSIGNED SENIORITY DISTRICT.**

Employees may be required to afford reasonable assistance to employees on adjoining seniority district, otherwise will not be required to work outside of seniority district except in cases of emergency or as provided in Rule 7 (D-3) & 8 (O).

**RULE 14. BULLETINING POSITIONS.**

(A) All vacancies, changes in headquarters or new positions created, except temporary positions of thirty (30) days or less duration, shall be bulletined for a period of ten (10) days before being permanently filled. Positions may be continued as temporary in excess of thirty (30) days without bulletining by agreement with the General Chairman.

(B) Applications for positions bulletined will be made to designated Carrier Officer with copy to the local chairman. Applications must reach the designated Carrier Officer and local chairman on or before midnight of the tenth day after date of bulletin.

**RULE 15. FILLING VACANCIES.**

(A) When new positions are created or bulletined vacancies occur, senior employees shall, if sufficient ability is shown by fair trial, be given preference in filling such new positions or vacancies that may be desirable to them.

(B) Consideration will be given senior qualified employees in filling temporary positions of thirty (30) days or less duration.

(C) When an employee is required to fill the place of another employee receiving a higher rate of pay, he shall receive the higher rate; but if required to fill temporarily the place of another employee receiving a lower rate, his rate will not be changed.

(D) Regularly assigned employee required by the management to relieve another employee for a period of thirty (30) days or less will be allowed expenses while away from his home point on such relief work.

(E) An employee who applies for and is assigned to a bulletined position can not apply for or be assigned to his former position on the bulletin issued due to his vacating such position. If there is no other qualified applicant, the employee who has just vacated the position may be assigned if he makes application for it.

UPFULBRIGHT

**RULE 16. EXERCISE OF SENIORITY.**

(A) The exercise of seniority shall be limited to seniority districts as defined in Rule 11. Seniority may be exercised only in case of vacancy, new position, position abolishment, or reduction in force. When assigned headquarters, working hours, or rest days are changed, the employee affected will have the option of accepting the change or, within five (5) days thereafter, request in writing that the position be bulletined.

Note: A change in headquarters referred to above, is defined as moving the headquarters of a position within the current geographical metropolitan area.

(B) An employee exercising seniority rights under this Rule will lose rights to former position and, if after a fair trial, fails to qualify for the new position, such employee will displace the junior assigned employee in the classification from which seniority was exercised.

(C) Employees transferring when exercising their seniority rights shall do so without expense to the Carrier, but will be furnished free transportation for themselves and dependent members of their families and their household goods, consistent with federal or state laws.

(D) An employee absent on account of sickness, suspension or leave of absence, will upon returning to service, have the right to return to former position if it still exists, or if senior and qualified, may displace a junior employee from position that has been bid in during such absence, provided application is made within four (4) days after returning to service.

**RULE 17. PROMOTION.**

Subject to the employee's compliance with the appropriate Maintenance of Membership and Seniority Retention Agreements, an employee promoted to supervisory or official position, or assigned to special duties, and who subsequently leaves such position due to abolishment or voluntary relinquishment, shall have the right to exercise seniority in the classification and seniority district from which promoted. An employee disqualified from such position may only displace the junior employee in the classification and seniority district from which promoted. An employee exercising seniority as herein provided must provide written notice of such exercise of seniority to the employee's supervisor within twenty-four (24) hours of the shift last worked.

**RULE 18. TRANSFERS.**

(A) Employees transferred from one district to another, with a view of accepting a permanent transfer, will, after thirty (30) days lose their seniority in the district they left, and their seniority in the district to which transferred will begin on the date of transfer, seniority to govern. Employees will not be compelled to accept a permanent transfer to another point.





UPFULBRIGHT

(B) All applications for transfer must be submitted in writing to the employee's supervisor with a copy to the Local Chairman of the seniority district from which transferring and to the employee's supervisor and Local Chairman of the seniority district to which transferring.

**RULE 19. REDUCTION IN FORCE.**

(A) Except as provided for hereinafter, five (5) working days advance notice of reduction in force of regularly assigned positions, or abolition of regular positions will be given to Local Chairman and employees affected. Employees displaced shall exercise their rights to any position to which their seniority entitles them, subject to qualifications. Employees will give written notice to the Local Chairman and the designated Carrier Manager of intention to exercise seniority rights within four (4) days after receiving notice of force reduction.

(B) In restoration of forces, senior laid off employees will be given preference in returning to service. Employees, desiring to protect their seniority rights and avail themselves of this Rule, must file their name and address with the designated Carrier Manager and the Local Chairman prior to the actual time the furlough is effective. Furloughed employees must promptly advise the designated Carrier Manager and the General Chairman of any changes in address. Failure of the employee to comply with the provisions of this Rule shall constitute forfeiture of all service and seniority rights except in case of personal illness or other causes beyond the control of the employee. Employees failing to return to service within ten days after being notified (by mail or telegram sent to the last address given), or give satisfactory reason for not doing so, will automatically forfeit their service and seniority.

(C) The Local Chairman and General Chairman will be furnished a list of men to be restored to service.

(D) When reducing forces, if furloughed employees are needed on other districts, they will be given preference to transfer, with privilege of returning to home district when force is increased, such transfer to be made without expense to the Carrier, seniority and qualifications to govern.

(E) Rules, Agreements or practices, however established, that require advance notice of employees before temporarily abolishing positions or making temporary force reductions are hereby modified to eliminate any requirement for such notices under emergency conditions, such as flood, snow storm, hurricane, tornado, earthquake, fire or labor dispute other than as covered by the ensuing paragraph, provided that such conditions result in suspension of the Carrier's operations in whole or in part. It is understood and agreed that such temporary force reductions will be confined solely to those work locations directly affected by any suspension of operations. It is further understood and agreed that notwithstanding the foregoing, any employee who is affected by an emergency force reduction and reports for work for his position without having been previously notified not to report, shall receive four hours pay at the applicable rate for his position.



UPFULBRIGHT

(F) Rules, Agreements or practices, however established that require advance notice before positions are temporarily abolished or forces are temporarily reduced are hereby modified so as not to require advance notice where a suspension of Carrier's operations in whole or in part is due to a labor dispute between Carrier and any of its employees.

## **RULE 20. APPLICANTS FOR EMPLOYMENT.**

(A) Employment in the craft or class shall be considered temporary for ninety (90) working days, pending approval or disapproval of application, during which period an employee's employment relationship may be terminated without formal investigation by disapproval of application. If the applicant is not notified of the disapproval of application within ninety (90) working days from date thereof, application will be considered approved, but this clause shall not operate to prevent the removal from service of such applicant if subsequent to the expiration of ninety (90) working days it shall be proved that the information given in the application is false, provided such action is taken by the Carrier within two (2) years from the date the employee enters the service.

(B) In addition to the conditions contained in (A), any new employee hired as Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator license, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

## **RULE 21. CLAIMS AND GRIEVANCES.**

(A) All claims or grievances shall be handled as follows:

(1) All claims or grievances must be presented in writing by or on behalf of the employee involved, to the officer of the Carrier authorized to receive same within sixty (60) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Carrier shall, within sixty (60) days from the date same is filed, notify whoever filed the claim or grievance (the employee or his representative) in writing of the reasons for such disallowance. If not so notified, the claim or grievance shall be allowed as presented, but this shall not be considered as a precedent or waiver of the contentions of the Carrier as to other similar claims or grievances.

(2) If a disallowed claim or grievance is to be appealed, such appeal must be in writing and must be taken within sixty (60) days from receipt of notice of disallowance, and the representative of the Carrier shall be notified in writing within that time of the rejection of his decision. Failing to comply with this provision, the matter shall be considered closed, but this shall not be considered as a precedent or waiver of the contentions of the employees as to other similar claims or grievances. It is understood, however, that the parties may, by agreement, at any stage of the



UPFULBRIGHT

handling of a claim or grievance on the property, extend the 60-day period for either a decision or appeal, up to and including the highest officer of the Carrier designated for that purpose.

(3) The requirements outlined in paragraphs (1) and (2) pertaining to appeal by the employee and decision by the Carrier, shall govern in appeals taken to each succeeding officer, except in cases of appeal from the decision of the highest officer designated by the Carrier to handle such disputes. All claims or grievances (including discipline) involved in a decision by the highest designated officer shall be barred unless within nine (9) months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before the appropriate Division of the National Railroad Adjustment Board or a system, group or regional Board of Adjustment that has been agreed to by the parties hereto as provided in Section 3 Second of the Railway Labor Act. It is understood, however, that the parties may by agreement in any particular case extend the nine (9) months period herein referred to.

(B) A claim may be filed at any time for alleged continuing violation of any agreement and all rights of the claimant or claimants involved thereby shall, under this Rule, be fully protected by the filing of one claim or grievance based thereon as long as such alleged violation, if found to be such, continues. However, no monetary claim shall be allowed retroactively for more than sixty (60) days prior to the filing thereof. With respect to claims and grievances involving an employee held out of service in discipline cases, the original notice of request for reinstatement with pay for time lost shall be sufficient.

(C) This Rule recognizes the right of representatives of the Organization to file and prosecute claims and grievances for and on behalf of the employees they represent.

(D) This Agreement is not intended to deny the right of the employees to use any other lawful action for the settlement of claims or grievances provided such action is instituted within nine (9) months of the date of the decision of the highest designated officer of the Carrier.

(E) Prior to the assertion of grievances as herein provided, and while questions of grievances are pending, there will neither be a shut down by the Carrier nor a suspension of work by the employees.

(F) All conferences between local officials and local committees to be held during regular working hours without loss of time to committeemen, except when committeemen are required to leave home point.

**RULE 22. DISCIPLINE - INVESTIGATIONS.**

(A) Except as provided in Rule 20, no employee shall be disciplined without a fair hearing by designated officer of the Carrier. Suspension in proper cases pending a hearing, which shall be prompt, shall not be deemed a violation of this Rule. The employee shall have the right to be represented at the hearing by a duly accredited representative of






UPFULBRIGHT

the craft. At a reasonable time prior to the hearing, such employee and his duly authorized representative will be apprised of the precise charge and given reasonable opportunity to secure the presence of necessary witnesses. If it is found that an employee has been unjustly suspended or dismissed from the service, such employee shall be reinstated with his seniority rights unimpaired and compensated for the wage loss, if any, resulting from said suspension or dismissal and the employee's discipline record shall be cleared of such suspension or dismissal.

(B) Except as provided in Rule 20, no employee who has been in the service of the Carrier ninety (90) working days shall be dismissed for incompetency, neither shall an employee be discharged for any cause without first being given an investigation.

(C) The Carrier will not discriminate against any committeemen who from time to time are delegated to represent other employees, and will grant them leave of absence and free transportation.

(D) An employee who is suspended or dismissed from service and is thereafter awarded full back pay for all time lost as a result of such suspension or dismissal will be covered under the current Health Benefits Plan as if he or she had not been suspended or dismissed in the first place.

(E) If the Carrier's decision to discipline an employee is to be appealed by the duly authorized representative or the employee involved, the duly authorized representative or the employee shall submit a written claim directly to the Carrier's highest designated officer within sixty (60) days from the date the discipline is issued. The written appeal will contain a full statement of the Organization's or employee's objections to the discipline issued and a request to discuss the Carrier's decision in conference with the Carrier's highest designated officer to handle such claims or grievances.

(F) If the discipline issued by the Carrier is appealed by written claim and a conference is requested in writing to discuss the claim or grievance, the General Chairman and the Carrier's Highest Designated Officer or their designees shall meet in conference within sixty (60) days from receipt of such request at a mutually agreeable time and place. Within sixty (60) days from the date of the conference, the Carrier shall notify the duly authorized representative (or the employee in cases where the employee has filed the claim of grievance) of the results of the conference. If not so notified, the appeal shall be allowed as presented, but this shall not be considered as a precedent or waiver of the contentions of the Carrier as to other similar claims or grievances. It is understood, however, that the parties may, by agreement, extend the sixty (60) day periods established herein at any stage of the handling of the claim or grievance.

(G) All discipline claims or grievances shall be barred unless within nine (9) months from the date of the Carrier's highest officer's decision proceedings are instituted by the employee or the duly authorized representative before the appropriate division of the National Railroad Adjustment Board or a system, group, or regional board of adjustment that has been agreed to by the parties hereto as provided in Section 3, Second, of the Railway Labor Act. It is understood, however, that the parties may agree in any particular case to extend the nine (9) month period herein referred to.





UPFULBRIGHT

(H) Paragraphs (E), (F) and (G) shall not apply to requests for leniency and acceptance of discipline.

(I) The one-step appeal process contained in paragraphs (E), (F) and (G) shall remain in effect until such time that either party serves a thirty (30) day notice to the other party indicating their desire to cancel the agreement and revert to the appeal process in Rule 21.

**<u>RULE 23</u>. <u>LEAVE OF ABSENCE</u>.**

(A) When the requirements of the service will permit, employees, on request, will be granted leave of absence for a limited time, with privilege of renewal, an employee absent on leave who engages in other employment will lose his service and seniority rights unless special provisions shall have been made therefor by the designated manager and the General Chairman.

(B) Failure to report for duty at the expiration of leave of absence shall terminate an employee's service and seniority, unless a reasonable excuse for such failure is presented not later than ten (10) days after expiration of leave of absence.

(C) In cases where employees transfer from one craft to another craft, leave of absence shall be for a period of ninety (90) days or ninety (90) days from the date of the transferring employee completes any required probationary or training period, whichever is longer. In those cases where an employee is granted a leave of absence under this provision, the employee shall maintain the appropriate membership dues.

(D) Employees accepting full time positions with their labor organization will be considered on leave of absence and will continue to accumulate seniority. Seniority rights must be asserted within 30 days after release from such position, unless such period is extended by mutual agreement between the parties signatory hereto.

A full time officer of the Organization who returns to active service shall receive credit for the purpose of the continuous service qualification requirements for an annual vacation under applicable vacation rules, for all service time as a full time employee while on leave from the Carrier.

**<u>RULE 24</u>. <u>ABSENT FROM WORK</u>.**

(A) In case an employee is unavoidably kept from work he will not be discriminated against. An employee detained from work on account of sickness or for any other good cause, shall notify the proper authority as soon as possible.

(B) Employees who have absented themselves except in case of illness or other physical disability, without proper leave of absence, which must be in writing if in excess of ten (10) days, will be considered as having resigned from service and seniority rights will be terminated.



UPFULBRIGHT

**RULE 25. VACATIONS.**

Employees shall be granted vacations with pay, or payment in lieu thereof, in accordance with the synthesis of National Vacation Agreements or as hereafter amended.

The following chart, subject to the interpretation of the National Vacation Agreement, will apply:

| Vacation Weeks | Number of Qualifying Years |
|---|---|
| 1 | 1 year (120 working days during preceding calendar year) |
| 2 | 2 or more years of continuous service subject to qualifying years |
| 3 | 8 or more years of continuous service subject to qualifying years |
| 4 | 17 or more years of continuous service subject to qualifying years |
| 5 | 25 or more years of continuous service subject to qualifying years |

***NOTE 1:*** ***See: "National Vacation Synthesis" @ Appendix B.***

***NOTE 2:*** ***See also: Memorandum Agreement dated March 12, 1992 @ Appendix B-1, allowing one week of vacation to be taken on a daily basis rather than as an entire week.***

**RULE 26. PERSONAL LEAVE.**

(A) A maximum of two days personal leave will be provided on the following basis:

(1) Employees who have met the qualifying vacation requirements during eight calendar years under vacation rules in effect on January 1, 1982 shall be entitled to one day of personal leave in subsequent calendar years;

(2) Employees who have met the qualifying vacation requirements during seventeen calendar years under vacation rules in effect on January 1, 1982 shall be entitled to two days of personal leave in subsequent calendar years.

(B) Personal leave days provided in Subpart (A) may be taken upon 48 hours' advance notice from the employee to the proper carrier officer provided, however, such days may be taken only when consistent with the requirements of the carrier's service. It is not intended that this condition prevent an eligible employee from receiving personal leave days except where the request for leave is so late in a calendar year that service requirements prevent the employee's utilization of any personal leave days before the end of that year.

(C) Personal leave days will be paid for at the regular rate of the employee's position or the protected rate, whichever is higher.



UPFULBRIGHT

(D) The personal leave days provided in Subpart A shall be forfeited if not taken during each calendar year. The carrier shall have the option to fill or not fill the position of an employee who is absent on a personal leave day. If the vacant position is filled, the rules of the agreement applicable thereto will apply. The carrier will have the right to distribute work on a position vacated among other employees covered by such agreement.

(E) When an employee takes a personal leave day either immediately preceding or following a holiday then the work day (or day, in the case of other than a regularly assigned employee) immediately following the personal leave day is considered as the qualifying day for holiday purposes.

**RULE 27. BEREAVEMENT LEAVE.**

Bereavement leave, not in excess of three (3) calendar days, following the date of death will be allowed in case of death of an employee's brother, sister, parent, child, spouse or spouse's parent. In such cases, a minimum basic day's pay at the rate of the last service rendered will be allowed for the number of working days lost during bereavement leave. Employees involved will make provision for taking leave with their supervising officials in the usual manner.

***NOTE: See: "Agreed Upon Questions and Answers" @ Appendix J.***

**RULE 28. HOLIDAYS.**

Subject to the provisions of this Agreement, employees shall be granted holidays as set forth below, subject to the provisions of the National Holiday Agreement (see Appendix C).

| | |
|---|---|
| New Year's Day | Thanksgiving Day |
| Presidents' Day | Day after Thanksgiving Day |
| Good Friday | Christmas Eve (the day before Christmas is observed) |
| Memorial Day | Christmas Day |
| Fourth of July | New Year's Eve (the day before New Year's Day is observed) |
| Labor Day | |



UPFULBRIGHT

**RULE 29. ATTENDING COURT.**

When attending court as witness for the Carrier, employees will be reimbursed for actual expenses and paid for eight (8) hours for each day away from work and rest days and holidays when away from home point. When necessary, the Carrier will furnish transportation and will be entitled to certificates for witness fees in all cases.

**RULE 30. JURY DUTY.**

When a regularly assigned employee is summoned for jury duty and required to lose time from his assignment as a result thereof, he shall be paid for actual time lost with a maximum of a basic day's pay at the straight time rate of his position for each day lost less the amount allowed him for jury service for each such day, excepting allowances paid by the court for meals, lodging or transportation, subject to the following qualification requirements and limitations:

(A) An employee must furnish the Carrier with a statement from the court of jury allowances paid and the days on which jury duty was performed.

(B) The number of days for which jury duty pay shall be paid is limited to a maximum of sixty (60) days in any calendar year.

(C) No jury duty pay will be allowed for any day as to which the employee is entitled to vacation or holiday pay.

(D) When an employee is excused from Carrier service account of jury duty, the Carrier shall have the option of determining whether or not the employee's regular position shall be blanked, notwithstanding the provisions of any other rules.

(E) Except as provided in Subpart (F), an employee will not be required to work in his assignment on days in which jury duty: (1) ends within four (4) hours of the start of his assignment; or (2) is scheduled to begin during the hours of his assignment or within four (4) hours of the beginning or ending of his assignment.

(F) On any day that an employee is released from jury duty and four (4) or more hours of his work assignment remain, he will immediately inform his supervisor and report for work if advised to do so.

**RULE 31. PER DIEM ALLOWANCE – DISTRICT 6 ON-LINE POSITIONS**

(A) Employees assigned to District 6 positions may elect during the months of June and December of each calendar year to receive either personal expenses provided in Rule 7 (B) or 8 (H), or receive the daily per diem allowance provided in Section (B) of this Rule. This election must be in writing and given to the employees manager with copy to the local chairman. The election made in December of the preceding year will be applicable January 1 through June 30 and the election made in June will be applicable July 1 through December 31. Such election is irrevocable during the succeeding six-month period. An





UPFULBRIGHT

employee failing to make an election during the designated month will be treated for expenses under their election for the preceding six month period.

(B) Employees who are assigned to a District 6 position and working in excess of thirty-five (35) highway miles (by the most direct route) from their home point may elect to be provided one of the two following daily per diem allowance options:

(1) $52.00 in lieu of expense reimbursement provided for in Rule 7 (B) or 8 (H), or;

(2) $28.50 in lieu expense reimbursement provided for in Rule 7 (B) or 8 (H), other than lodging which is to be handled on expense form in the normal fashion. Employees electing this options will be required to show proof of overnight stay at approved CLC or other authorized hotel for the day per diem is claimed in order to be eligible for this option.

(3) Per diem is payable for each calendar day service is actually performed in lieu of expense reimbursement provided for in Rule 7 (B) or 8 (H). A day of service for the purpose of this allowance is considered to be a preponderance of the regular assigned work day.

**RULE 32 TRAVEL ALLOWANCE – DISTRICT 6 POSITIONS**

District 6 positions may be established with fixed headquarters or as on-line Installation Teams. The following travel provisions will apply to such Installation Teams.

**(A) Headquarters positions**

Employees assigned to District 6 positions established with fixed headquarters, will be allowed necessary expenses when held away from their headquarters. The Company may at its option provide lodging facilities and/or meals. Such expenses will be paid only on those days the employee is working and/or traveling to and from the CLC or other designated suitable lodging facilities.

**(B) On-Line positions**

Employees assigned to on-line District 6 positions will not have a fixed headquarters. The employees' time will begin and end at the work site designed by management. The following provisions will apply to such on-line positions.

(1) (a) Employees assigned to District 6 positions required to operate and transport company equipment outside of assigned hours from the former assembly point to the new assembly point will be compensated pursuant to the applicable agreement rules for such service performed outside of assigned hours.



UPFULBRIGHT

(b) If the employee is required to operate a company vehicle to the new assembly point, the Carrier will provide reasonable assistance in the movement of the employee's personal vehicle to the new assembly point.

(2) (a) For the purposes of allowing employees to make Rest Period trips home between their home station and their assembly points, the Carrier, at its option, may arrange transportation for employees by:

(1) company vehicle;
(2) airline;
(3) rental car;
(4) or any other suitable alternative means of transportation;
(5) authorize the employee to use their personal vehicle and pay Carrier's current authorized mileage reimbursement rate.

NOTE: Mileage rate is paid for each mile actually traveled on a round trip basis for weekend travel by the most direct highway route between the lodging site nearest the assembly point and the employee's home station and from the employees home station to the lodging site nearest the assembly point. The employees must utilize their personal vehicle and actually make the trip to their home station and proof of the trip may be required to receive this reimbursement.

(6) The home station is considered to be the closest city to the employee's residence in the states encompassed by Seniority District

(b) Air transportation may be provided more than once per calendar month, at the Carrier's discretion, to employees working over 400 miles from their home station, as long as a twenty-five (25) calendar day advance notice is given to the employee's Supervisor, reasonable air fare can be obtained and a major airport is located within a reasonable distance from the employee's lodging site and residence. Employees will be responsible for their own travel arrangements to and from the airport. Employees requesting this option must make themselves available for work on at least ninety-five percent (95%) of the regularly scheduled workdays during the work period preceding the use of this air transportation option. During the 30 day period preceding and following the rest period where air transportation is provided, employees will only be allowed one other rest period travel allowance reimbursement in each of the preceding and following thirty (30) calendar day periods.

(c) Travel allowance as provided herein will be allowed in the event of emergency situations such as death in the employee's immediate family as defined in the bereavement rule, imminent life treating illness/injury to an employee's immediate family member or child birth. The intent of this provision is to assist the employee in making trips home, however, it cannot be used more than once per overall event. Employees utilizing this allowance will not be able to use any other weekend travel during the current calendar month.





UPFULBRIGHT

(3) When the air transportation provided in Section (B) above is not utilized, in a sixty (60) calendar day period, the weekend travel allowance referenced in Section (B) above will only be allowed every other weekend and no more than twice in a calendar month subject to the qualifying provisions of Section (4) of this Rule. The Carrier has the prerogative to stagger employees weekend travel to meet operational requirements. Consideration will be given to seniority when staggering weekend travel.

(4) The weekend travel allowance referenced in Section (B) above will not be allowed in cases of an employee:

1. to an employee who moves their home station to enhance the amount of weekend travel allowance they would be eligible for;
2. to an employee exercising their seniority rights either through recall, bidding or displacement;
3. to an employee going home to serve a disciplinary suspension;
4. to an employee who declines to work planned overtime on any of their rest days; or,
5. to an employee who is absent from work on either the last day or the first day of the work period preceding the rest days for which the travel allowance is being claimed.

(5) Weekend travel allowance referred to in Section (B) above will be allowed when a bereavement day(s), personal leave day(s), or holiday(s) or a one-day vacation day falls on the last day or on the first day of the work period the employee is assigned. Additionally, the weekend travel allowance referenced in Section (B) above will be allowed to employees observing vacations in weekly increments providing the employee returns to their home station. A one way allowance based on miles traveled by the most direct highway route will be allowed for the start of the vacation period and a one way allowance based on the miles traveled by the most direct highway route will be allowed at the end of the vacation period, however, this does not apply to employees taking one-day vacations that are not consecutive with the weekend. Also, the weekend travel allowance referenced in Section (B) above will be allowed employees to go to training or company schools (the start of) and for the employee to return to their home station from the training or company school (at the end of) when weekend travel is required.

(6) A Post Office Box will not suffice as a home station for the purpose of the weekend travel allowance referenced in Section (B) above unless the employee has a letter on file from the Post Office that there is not a street address associated with his personal residence.

(7) Employees who do not elect the rest period travel on assigned rest days the allowance under Section (2) above, will be entitled to the provisions of Section A of this Rule.



UPFULBRIGHT

(8) Employees will not be entitled to such reimbursement of expenses or the daily per diem allowance during the rest days they are claiming the travel allowance provided herein.

(9) There shall be no duplication or combination of the reimbursement of actual expenses, per diem and/or travel allowances on any day such allowances are payable. Employees receiving a weekend travel allowance provided in Section (2) above will not be considered to be on duty and/or under pay during the time they are traveling to and from their home station and assembly point.

**(C) Change in designation**

Installation Teams may be changed from fixed headquarters to on-line, and vice versa, on ten (10) days written notice. An employee affected by such change or by a change in headquarters location may make request within five (5) days of such notice that his or her position be readvertised for bid. Such employee will remain on the position until the assignment is made, and the employee will then make a displacement in accordance with Rule 16 (A).

## RULE 33. PERSONAL INJURY.

Employees injured while at work are required to make a detailed written report of the circumstances of the accident as soon as they are able to do so after receiving medical attention. Proper medical attention shall be given at the earliest possible moment, and employees shall be permitted to return to work as soon as they are able to do so, pending final settlement of the case, provided, however, that such injured employees remaining away from work after recovery shall not be held to be entitled to compensation for wage loss after they are able to return to work. All claims for personal injuries shall be handled with the designated department.

## RULE 34. MOVEMENT OF HOUSEHOLD GOODS.

Employees required to relocate to obtain a permanent position under this agreement, due to an involuntary move which necessitates a change of residence, will receive free transportation of their household goods.

## RULE 35. FAITHFUL SERVICE.

Employees who have given long and faithful service in the employ of the Carrier, and who have become unable to handle heavy work to advantage, will be given preference of such light work in their line as they are able to handle.





UPFULBRIGHT

**RULE 36. PAYING OFF.**

Except in those situations where employees have voluntarily elected to be paid by electronic direct deposits or mail service, employees will be paid off during the regular working hours semi-monthly. Where existing state laws provide a more desirable paying off condition, such conditions shall govern. Where there is a shortage equal to one day's pay or more in the pay of an employee, if requested, a voucher will be issued to cover the shortage. Employees leaving the service of the Carrier will be furnished with a time voucher covering all time due.

**RULE 37. ASSIGNMENT OF WORK.**

None but mechanics employed as such shall do mechanic's work. This Rule does not prohibit supervisors in the exercise of their duties to perform work.

**RULE 38. DISTRIBUTION OF AGREEMENT**

The Carrier will have copies of this Agreement printed and available to each employee affected.

**RULE 39. CONFORMITY TO AGREEMENT**

The management agrees that officers and supervisors will see that matter of wages and working conditions are handled in strict conformity with the rules of this Agreement.

**RULE 40. DATE EFFECTIVE AND CHANGES.**

(A) This Agreement shall be effective January 1, 2003 and shall continue in effect until it is changed in accordance with the provisions of the Railway Labor Act.

(B) Should either of the parties to this Agreement desire to revise or modify these rules, thirty days (30) written advance notice, containing the proposed changes, shall be given, and conference held immediately upon expiration of said notice unless another date is mutually agreed upon.

(C) In printing this Agreement to include applicable part of the several national agreements and other memoranda, it is not the intention of the parties to change, or modify, the application and/or interpretation of such agreements and memoranda. Should a dispute arise through the omission of, or slight change in, language used in such agreements or memoranda, the original language shall be controlling, unless such language has been subsequently changed, revised or canceled by agreement between the parties.

(D) It is understood that this Agreement is superseded by and subordinate to federal, state or municipal legislation.



UPFULBRIGHT

**FOR THE UNION PACIFIC RAILROAD COMPANY**:

__/s/ Neal J. Spencer______________________
N. J. SPENCER
GENERAL DIRECTOR-TELECOMMUNICATION SERVICES

__/s/ Dan Moresette_______________________
D. A. MORESETTE
GENERAL DIRECTOR OF LABOR RELATIONS-SHOP CRAFTS

**FOR THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS:**

_/s/ Vic Janecek__________________________
V. L. JANECEK
GENERAL CHAIRMAN

UPFULBRIGHT

(Page intentionally blank)

UPFULBRIGHT

(Page intentionally blank)

UPFULBRIGHT

UNION SHOP AGREEMENT

This Agreement made this 7th day of March, 1953, by and between the Union Pacific Railroad Company, and the Employees thereof represented by the Railway Labor Organization signatory hereto, through the Employees' National Conference Committee, Seventeen Cooperating Railway Labor Organizations, witnesseth:

IT IS AGREED:

SECTION 1.
In accordance with and subject to the terms and conditions hereinafter set forth, all Employees of this Carrier now or hereafter subject to the rules and working conditions Agreements between the parties hereto, except as hereinafter provided, shall, as a condition of their continued employment subject to such Agreements, become members of the organization party to this Agreement representing their craft or class within sixty calendar days of the date they first perform compensated service as such Employees after the effective date of this Agreement, and thereafter shall maintain membership in such organization; except that such membership shall not be required of any individual until he has performed compensated service on thirty days within a period of twelve consecutive calendar months. Nothing in this Agreement shall alter, enlarge or otherwise change the coverage of the present or future rules and working conditions Agreements.

SECTION 2.
This Agreement shall not apply to Employees while occupying positions which are accepted from the bulletining and displacement rules of the individual Agreements, but this provision shall not include Employees who are subordinate to and report to other Employees who are covered by this Agreement. However, such expected Employees are free to be members of the organization at their option.

SECTION 3.
A) Employees who retain seniority under the Rules and Working Conditions Agreements governing their class or craft and who are regularly assigned or transferred to full time employment not covered by such Agreements, or who, for a period of thirty days or more, are 1) furloughed on account of force reduction, or 2) on leave of absence, or 3) absent on account of sickness or disability, will not be required to maintain membership as provided in Section 1 of this Agreement so long as they remain in such other employment, or furloughed or absent as herein provided, but they may do so at their option. Should such Employees return to any service covered by the said Rules and Working Conditions Agreements and continue therein thirty calendar days or more, irrespective of the number of days actually worked during that period, they shall, as a condition of their continued employment subject to such Agreements, be required to become and remain members of the organization representing their class or craft within thirty-five calendar days from date of their return to such service.





UPFULBRIGHT

B) The seniority status and rights of Employees furloughed to serve in the Armed Forces or granted leaves of absence to engage in studies under an educational aid program sponsored by the federal government or a state government for the benefit if ex-service men shall not be terminated by reason of any of the provisions of this Agreement but such Employees shall, upon resumption of employment, be considered as new Employees for the purposes of applying this Agreement.

C) Employees who retain seniority under the rules and working conditions Agreements governing their class or craft and who, for reasons other than those specified in Subsection (A) and (B) of this section, are not in service covered by such Agreements, or leave such service, will not be required to maintain membership as provided in Section 1 of this Agreement so long as they are not in service covered by such Agreements, but they may do so at their option. Should such Employees return to any service covered by the said rules and working conditions Agreements they shall, as a condition of their continued employment, be required, from the date of return to such service, to become and remain members in the organization representing their class or craft.

D) Employees who retain seniority under the rules and working conditions Agreements of their class or craft, who are members of an organization signatory hereto representing that class or craft and who in accordance with the rules and working conditions Agreement of that class or craft temporarily perform work in another class of service shall not be required to be members of another organization party hereto whose Agreement covers the other class of service shall not be required to be members of another organization party hereto whose Agreement covers the other class of service until the date the Employees hold regularly assigned positions within the scope of the Agreement covering such other class of service.

SECTION 4.

Nothing in this Agreement shall require an Employee to become or to remain a member of the organization if such membership is not available to such Employee upon the same terms and conditions as are generally applicable to any other members, or if the membership of such Employee is denied or terminated for any reason other than the failure of the Employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership. For purposes of this Agreement, dues, fees, and assessments shall be deemed to be "Uniformly Required" if they are required of all Employees in the same status at the same time in the same organizational unit.

SECTION 5.

A) Each Employee covered by the provisions of this Agreement shall be considered by a Carrier to have met the requirements of the Agreement unless and until such Carrier is advised to the contrary in writing by the organization. The organization will notify the Carrier in writing by registered mail, return receipt requested, or by personal delivery evidenced by receipt, of any Employee who it is alleged has failed to comply with the terms of this Agreement and who the organization therefore claims is not entitled to continue in employment subject to the k6les and Working Conditions Agreement. The form of notice to be used shall be agreed upon by the individual railroad and the organizations involved and





UPFULBRIGHT

the form shall make provision for specifying the reasons for the allegation of non-compliance. Upon receipt of such notice, the Carrier will, within ten calendar days of such receipt, so notify the Employee concerned in writing by registered mail, return receipt requested, or by personal delivery evidenced by receipt. Copy of such notice to the Employee shall be given the organization. An Employee so notified who disputes the fact that he has failed to comply with the terms of this Agreement, shall within a period of ten calendar days from the date of receipt of such notice, request the Carrier in writing by registered mail, return receipt requested, or by personal delivery evidenced by receipt, to accord him a hearing. Upon receipt of such request the Carrier shall set a date for hearing which shall be held within ten calendar days of the date of receipt of request therefor. Notice of the date set for hearing shall be promptly given the Employee in writing with copy to the organization, by registered mail, return receipt requested, or by personal delivery evidenced by receipt. A representative of the organization shall attend and participate in the hearing. The receipt by the Carrier of a request for a hearing shall operate to stay action on the termination of employment until the hearing is held and the decision of the Carrier is rendered.

In the event the Employee concerned does not request a hearing as provided herein, the Carrier shall proceed to terminate his seniority and employment under the Rules and Working Conditions Agreement not later than thirty calendar days from receipt of the above described notice from the organization, unless the Carrier and the organization agree otherwise in writing..

B) The Carrier shall determine on the basis of the evidence produced at the hearing whether or not the Employee has complied with the terms of this Agreement and shall render a decision within twenty calendar days from the date that the hearing is closed, and the Employee and the organization shall be promptly advised thereof in writing by registered mail, return receipt requested.

If the decision is that the Employee has not complied with the terms of this Agreement, his seniority and employment under the Rules and Working Conditions Agreement shall be terminated within twenty calendar days of the date of said decision except as hereinafter provided or unless the Carrier and the organization agree otherwise in writing.

If the decision is not satisfactory to the Employee or to the organization it may be appealed in writing, by registered mail, return receipt requested, directly to the highest officer of the Carrier designated to handle appeals under this Agreement. Such appeals must be received by such officer within ten calendar days of the date of the decision appealed from and shall operate to stay action on the termination of seniority and employment, until the decision on appeal is rendered. The Carrier shall promptly notify the other party in writing of any such appeal, by registered mail, return receipt requested. The decision on such appeal shall be rendered within twenty calendar days of the date the notice of appeal is received, and the Employee and the organization shall be promptly advised thereof in writing by registered mail, return receipt requested.

If the decision on such appeal is that the Employee has not complied with the terms of this Agreement, his seniority and employment under the Rules and Working Conditions



UPFULBRIGHT

Agreement shall be terminated within twenty calendar days of the date of said decision unless selection of a neutral is requested as provided below, or unless the Carrier and the organization agree otherwise in writing. The decision on appeal shall be final and binding unless within ten calendar days from the date of the decision the organization or the Employee involved requests the selection of a neutral person to decide the dispute as provided in Section 5(C) below. Any request for selection of a neutral person as provided in Section 5(C) below shall operate to stay action on the termination of seniority and employment until not more than ten calendar days from the date decision is rendered by the neutral person.

C) If within ten calendar days after the date of a decision on appeal by the highest officer on the carrier designated to handle appeals under this Agreement the organization or the Employee involved requests such highest officer in writing by registered mail, return receipt requested, a neutral be appointed to decide the dispute, a neutral person to act as sole arbitrator to decide the dispute shall be selected by the highest officer of the Carrier designated to handle appeals under this Agreement or his designated representative, the Chief Executive of the organization or his designated representative. If they are unable to agree upon the selection of a neutral person any one of them may request the Chairman of the National Mediation Board in writing to appoint such neutral. The Carrier, the organization and the Employee involved shall have the right to appear and present evidence at a hearing before such neutral arbitrator. Any decision by such neutral arbitrator shall be made within thirty calendar days from the date of receipt of the request for his appointment and shall be final and binding upon the parties. The Carrier, the Employee, and the organization shall be promptly advised thereof in writing by registered mail, return requested. If the position of the Employee is sustained, the fees, salary and expenses of the neutral arbitrator, shall be borne in equal shares by the Carrier and the organization; if the Employee's position is not sustained, such fees, salary and expenses shall be borne in equal shares by the Carrier, the organization and the Employee.

D) The time periods specified in this section may be extended in individual cases by written Agreement between the Carrier and the organization.

E) Provisions of investigations and discipline rules contained in the Rules and Working Conditions Agreement between a Carrier and the organization will not apply to cases arising under this Agreement.

F) The General Chairman of the organization shall notify the Carrier in writing of the title(s) and address(es) of its representatives who are authorized to serve and receive the notices described in this Agreement. The Carrier shall notify the General Chairman of the organization in writing of the title(s) and address(es) of its representatives who are authorized to receive and serve the notices described in this Agreement.

G) In computing the time periods specified in this Agreement, the date on which a notice is received or decision rendered shall not be counted.

SECTION 6.





UPFULBRIGHT

Other provisions of this Agreement to the contrary notwithstanding, the Carrier shall not be required to terminate the employment of an Employee until such time as a qualified replacement is available. The Carrier may not, however, retain such Employee in service under the provisions of this section for a period in excess of sixty calendar days from the date of the last decision rendered under the provisions of Section 5, or ninety calendar days from date of receipt of notice from the organization in cases where the Employee does not request a hearing. The Employee whose employment is extended under the provisions of this section shall not, during such extension, retain or acquire any seniority rights. The position will be advertised as vacant under the bulletining rules of the respective Agreements but the Employee may remain on the position he held at the time of the last decision, or at the date of receipt of notice where no hearing is requested pending the assignment of the successful applicant, unless displaced or unless the position is abolished. The above periods may be extended by Agreement between the Carrier and the organization involved.

SECTION 7.
An Employee whose seniority and employment under the Rules and Working Conditions Agreement is terminated pursuant to the -provisions of this Agreement or whose employment is extended under Section 6 shall have no time or money claims by reason thereof.

If the final determination under Section 5 of this Agreement is that an Employee's seniority and employment in a craft or class shall be terminated, no liability against the Carrier in favor of the organization or other Employees based upon an alleged violation, misapplication or non-compliance with any part of this Agreement shall arise or accrue during the period up to the expiration of the 60 or 90 day periods specified in Section 6, or while such determination may be stayed by a court, or while a discharged Employee may. be restored to service pursuant to judicial determination. During such periods, no provision of any other Agreement between the parties hereto shall be used as the basis for a grievance or time or money claim by or on behalf of any Employee against the Carrier predicated upon any action taken by the Carrier in applying or complying with this Agreement or upon an alleged violation, miss-application or non-compliance with any provision of this Agreement. If the final determination under Section 5 of this Agreement is that an Employee's employment and seniority shall not be terminated, his continuance in service shall give rise to no liability against the Carrier in favor of the organization or other Employees based upon an alleged violation, misapplication or non-compliance with any part of this Agreement.

SECTION 8.
In the event that seniority and employment under the Rules and Working Conditions Agreement is terminated by the Carrier under the provisions of this Agreement, and such termination of seniority and employment is subsequently determined to be improper, unlawful, or unenforceable, the organization shall indemnify and save harmless the Carrier against any and all liability arising as the result of such improper, unlawful, or unenforceable termination of seniority and employment; provided, however, that this section shall not apply to any case in which the Carrier involved is the plaintiff or the moving



UPFULBRIGHT

party in the action in which the aforesaid determination is made or in which case such carrier acts in conclusion with any Employee; provided further that the aforementioned liability shall not extend to the expense to the Carrier in defending suits by Employees whose seniority and employment are terminated by the Carrier under the provisions of this Agreement.

SECTION 9.
An Employee whose employment is terminated as a result of non-compliance with the provisions of this Agreement shall be regarded as having terminated his Employee relationship for vacation purposes.

SECTION 10.
A) The Carrier party to this Agreement shall periodically deduct from the wages of Employees subject to this Agreement periodic dues, initiation and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership in such organization, and shall pay the amount so deducted to such officer of the organization as the organization shall designate; provided, however, that the requirements of this Subsection (A) shall not be effective with respect to any individual Employee until he shall have furnished the Carrier with a written assignment to the organization of such membership dues, initiation fees and assessments, which assignment shall be revocable in writing after the expiration of one year or upon the termination of this Agreement whichever occurs sooner.

B) The provisions of Subsection (A) of this section shall not become effective unless and until the Carrier and the organization shall, as a result of further negotiations pursuant to the recommendations of Emergency Board No. 98, agree upon the terms and conditions under which such provisions shall be applied; such Agreement to include, but not be restricted to, the means of making said deductions, the amounts to be deducted, the form, procurement and filing of authorization certificates, the frequency of deductions, the priority of said deductions with other deductions now or hereafter authorized, the payment and distributions of amounts withheld and any other matters pertinent thereto.

SECTION 11.
This Agreement, shall become effective on the 31st day of March, 1953, and is in full and final settlement of notices served upon the Carrier by the organizations, signatory hereto, on or about February 5, 1951. It shall be construed as a separate Agreement between the Union Pacific Railroad Company and those Employees represented by each of the organizations signatory hereto. This Agreement shall remain in effect until modified or changed in accordance with the provisions of the Railway Labor Act, as amended.

Signed at Omaha, Nebraska, this 7th Day of March, 1953.

FOR THE CARRIER:
E. J. Connors
Vice President

EMPLOYEES' NATIONAL CONFERENCE COMMITTEE,
SEVENTEEN COOPERATING RAILWAY



UPFULBRIGHT

LABOR ORGANIZATIONS:
G. E. Leighty
Chairman

RAILWAY EMPLOYEES'DEPARTMENT
A. F. of L.
Michael Fox
President

MEMORANDUM AGREEMENT

It is agreed that in the application of the Union Shop Agreement signed this date in Omaha, Nebraska, that any Employee in service of the date of this Agreement who is not a member of the union representing his craft or class and will make affidavit he was a member of a bona fide and recognized religious group, on the date of this Agreement, having scruples against joining a union, will, if he would otherwise be required to join a union member under the Union Shop Agreement, be deemed to have met the requirements of the Union Shop Agreement if he agrees to and does pay initiation fees, periodic dues and assessments to the organization representing his craft or class.

Signed at Omaha, Nebraska, this 7th Day of March, 1953.

FOR THE UNION PACIFIC RAILROAD COMPANY:
E. J. Connors
Vice President

EMPLOYEES' NATIONAL CONFERENCE COMMITTEE,
SEVENTEEN COOPERATING RAILWAY
LABOR ORGANIZATIONS:
G. E. Leighty
Chairman

RAILWAY EMPLOYEES' DEPARTMENT
A. F. of L.
Michael Fox
President



UPFULBRIGHT

APPENDIX A - 1

AGREEMENT

BETWEEN THE

UNION PACIFIC RAILROAD COMPANY

AND THE

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

In accordance with the Provisions of Article 11 of the National Agreement signed at Washington, D. C. on May 10, 1973, the following Agreement by and between the Union Pacific Railroad Company, hereinafter referred to as the "Carrier", and the employes thereof represented by the International Brotherhood of Electrical Workers, hereinafter referred to as the "Organization", shall be made effective January 1, 1974.

IT IS AGREED:

Section 10(b) of the Union Shop Agreement between Union Pacific Railroad Company and the International Brotherhood of Electrical Workers dated March 7, 1953, is hereby amended in accordance with the May 10, 1973, National Agreement providing that the Carrier will withhold dues, initiation fees and assessments (not including fines and penalties) uniformly required by and payable to the Organization as a condition of acquiring and/or retaining membership in the Organization. No costs will be charged against the Organization or affected employe in connection with the dues deduction.

The designated representative of the Organization shall furnish to the Carrier an initial statement, in alphabetical order, showing deductions to be made from each employe, such statement to be furnished together with individual authorization forms to cover, not later than 15th day of the month in which the deductions become effective. Subsequent deduction amounts may not be changed more often than once every three (3) months, however, the designated representative of the Organization may furnish to the Carrier a supplemental monthly statement showing additions or deletions to the initial statement, in the manner and form specified in Attachment "A". If no changes are furnished by the 15th day of the month, the last previous list on file with the designated Carrier officer shall remain applicable. No such deduction shall be made except from the wages of an employe-member who has executed a "Wage

Assignment Authorization", substantially in the tenor and form of the sample appended hereto as Attachment "B", such authorization having been furnished the Carrier by the designated representative of the Organization. The Organization shall assume the full responsibility for



UPFULBRIGHT

the procurement and proper execution of said forms by employes, and for the delivery of said forms to the Carrier.

Said deductions will be made only from wages earned in the last payroll period of each month and shall be remitted by voucher or check on or before the 25th day of the month next following to the designated representative of the Organization. The Carrier will furnish individual, uniform alphabetical deduction lists (in triplicate) for each local unit each month. Such lists will include the employe's name, in alphabetical order, Social Security Number or employe number, Lodge number and amount of Union dues deducted from the wages of each affected employe.

If earnings of an affected employe-member on that payroll are insufficient to permit deduction of the full amount specified on the deduction list, giving due effect to any and all deductions having priority as hereinafter provided, no deduction will be made and the Carrier shall not be responsible for such collection. The following payroll deductions, as a minimum, will have priority over the deductions called for by the Dues Deduction Agreement:

Federal, State, and Municipal taxes, premiums on any life insurance, hospital-surgical insurance, group accident or health insurance, or group annuities, other deductions required by law, such as garnishments and attachments; amounts due the carrier by the individual on Union Pacific Railroad Employes Hospital Association dues. No deductions will be made from special payrolls.

The deductions provided for herein shall not be effective with respect to any employe-member until the Carrier has been furnished with a properly executed Wage Assignment Authorization covering such monthly membership dues, initiation fees, and assessments. Such assignment shall be revocable in writing at any time after the expiration of one year from the date of its execution, or upon termination of this Agreement, or upon termination of the rules and working conditions agreement between the parties hereto, whichever is sooner. The revocation of a wage assignment shall be substantially in the tenor and form of the sample appended hereto as Attachment "C". Wage Assignment Revocation forms shall be delivered to the designated Carrier officer not later than the 15th day of the month in which the termination of deduction is to become effective.

Except where the Carrier has made a clerical error in the deduction of dues, which shall be promptly adjusted, no part of this Agreement shall be used in any manner whatsoever either directly or indirectly as a basis for a grievance or time claim by or in behalf of an employe; and no part of this or any other agreement between the Carrier and the Organization shall be used as a basis for a grievance or time claim by or in behalf of any employe predicated upon any alleged violation of, or misapplication or non-compliance with, any part of this Agreement.

Except for remitting to the Organization monies properly deductible from the wages of employe-members, as provided for herein, the Organization shall indemnify, defend and save harmless the Carrier from and against any and all claims, demands, liability, losses or damage resulting from the entering into of this Agreement or arising or growing out of any dispute or litigation resulting from any deductions made by the Carrier from the wages of its



UPFULBRIGHT001548



UPFULBRIGHT

employes for or on behalf of the Organization; provided, however, that this provision shall not apply to any case in which the Carrier is the plaintiff or the moving party in the action.

This Agreement is subject to the express agreement of the parties hereto to observe and comply with the provisions of the applicable federal and state laws now in existence or enacted during the term hereof, it being the intention of either party hereto to relieve the other party hereto from complying with any provision of this Agreement which may be in conflict with or violate any applicable state or federal law now in existence or enacted during the term hereof.

This Agreement cancels and supersedes all rules, agreements or understandings inconsistent or in conflict with the foregoing provisions and shall remain in effect until altered, changed or cancelled in accordance with the Railway Labor Act, as amended.

Signed at Omaha, Nebraska, this 9th day of November, 1973.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

/s/ Leo Wisniski
General Chairman

UNION PACIFIC RAILROAD COMPANY

/s/ F. D. Acord
Chief Mechanical Officer

/s/ R. M. Brown
Chief Engineer

/s/ R. M. Brenneman
Superintendent Communications

UPFULBRIGHT

ATTACHMENT "A"

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Mr./Mrs./Ms Title:

Location: Department:

Deduction list covering the month of 119-.

Employe Name PR No. SSA No. Occupation Amount

Total Number of Employes Listed

I hereby certify that the above listed individuals are members of the International Brotherhood of Electrical Workers, and that the deductions as above designated have been authorized by duly executed "wage assignment" forms covering deduction of periodic union dues, initiation fees and assessments, but not including fines and penalties.

Financial Secretary

Street No.

City, State & Zip Code

Lodge No. Date

UPFULBRIGHT

ATTACHMENT "B"

WAGE ASSIGNMENT AUTHORIZATION

Mr./Mrs./Ms: Title:

Union Pacific Railroad Company

Location

Employe name:

Last First Middle

Home Address: SSA No.:

City, State:

Department: Occupation:

I hereby assign to the International Brotherhood of Electrical Workers, that part of my wages necessary to pay my monthly dues, assessments, and initiation fees (not including fines and penalties) in the International Brotherhood of Electrical Workers, as such dues, assessments and initiation fees are reported to the Union Pacific Railroad Company by the Financial Secretary of the involved local lodge of the Organization, or his successors, in monthly statements, certified by him, as provided under the Union Dues Deduction Agreement entered into by and between the Organization and the Union Pacific Railroad Company on November 9, 1973, and I hereby authorize the Union Pacific Railroad Company to deduct from my wages all such sums and pay them over to the Financial Secretary of Local Lodge No. ____, International Brotherhood of Electrical Workers, in accordance with the said Union Dues Deduction Agreement. This authorization may be revoked in writing by the undersigned after the expiration of one (1) year, or upon the termination of the aforementioned Union Dues Deduction Agreement or upon the termination of the Union Agreement between the Company and the Organization, whichever occurs sooner.

Date Signature

Lodge Number



UPFULBRIGHT001551



UPFULBRIGHT

ATTACHMENT "C"

WAGE ASSIGNMENT REVOCATION

Mr./Mrs./Ms-, Title:

Union Pacific Railroad Company

Location

Employe name:

Last First Middle

Home Address: SSA No.:

City, State:

Department: Occupation:

Effective _______________, 20____ I hereby revoke the Wage Assignment Authorization now in effect assigning to the International Brotherhood of Electrical Workers, that part of my wages necessary to pay monthly dues, assessments and initiation fees (not including fines and penalties) now being withheld pursuant to the Union Dues Deduction Agreement between the Organization and Union Pacific Railroad Company, and I hereby cancel the Authorization now in effect authorizing the Union Pacific Railroad Company to deduct such monthly dues, assessments and initiation fees from my wages.

Date Signature



UPFULBRIGHT

APPENDIX A-2

MEMORANDUM OF AGREEMENT
Between The
UNION PACIFIC RAILROAD COMPANY
And The
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

The Union Shop Agreement is amended to provide:

1. Any employe who was promoted to an official, supervisory, or excepted position prior to June 1, 1981, may elect to retain and accumulate seniority within the craft or class represented by the organization party to this Agreement so long as the employe pays the currently applicable membership dues to the organization. In the event an employe elects not to pay dues to retain seniority, the duly authorized representative of the organization party to this agreement shall notify the General Director Labor Relations - Non-Operating Crafts' with a copy to the employe involved. If within thirty (30) calendar days after receipt of such notification the employe has not paid dues to the organization, the employe shall cease to accumulate seniority in the craft or class represented by the organization party to this agreement.

2. Any employe who is promoted to an official, supervisory or excepted position subsequent to June 1, 1981, may elect to retain and accumulate seniority within the craft or class represented by the organization party to this agreement so long as the employe pays the currently applicable membership dues to the organization. In the event such an employe elects not to pay dues to retain seniority, the duly authorized representative of the organization party to this agreement shall notify the Director Labor Relations - Non-Operating Crafts with a copy to the employe involved. If within thirty (30) calendar days after receipt of such notification the employe has not paid dues to the organization, the employe's seniority in the craft or class represented by the organization party to this agreement will be terminated and the employe's name removed from the seniority roster.

3. In the event an employe covered by the provisions of paragraph 1 or 2 above who retains seniority in the craft and class and is subsequently relieved from such position by the carrier (other than through dismissal for cause), the employe shall be entitled to displace an employe as per Rule 18 of the Schedule Agreement effective November 1, 1976, as amended, and Rule 17 of the Communications Department Employes Schedule Agreement effective July 1, 1977, as amended. In the event such an employe voluntarily relinquishes a promoted position, the employe shall be entitled to displace the junior employe on the seniority roster or bid on a bulletined vacancy.

Dated at Omaha, Nebraska, this 5th day of March, 1981.

| For the: INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS | For the: UNION PACIFIC RAILROAD COMPANY |
|---|---|
| /s/ W. E. Tolan<br>General Chairman | /s/ R. D. Rosenbohm<br>Director Labor Relations - Non Operating |



UPFULBRIGHT001553



UPFULBRIGHT

POLITICAL CONTRIBUTION AGREEMENT

ADDENDUM TO DUES DEDUCTION AGREEMENT

Between

UNION PACIFIC RAILROAD COMPANY

and

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS,
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,

BROTHERHOOD RAILWAY CARMEN OF THE
UNITED STATES AND CANADA,

INTERNATIONAL BROTHERHOOD OF FIREMEN AND OILERS

* * * * *

In accordance with the provisions of the Voluntary Payroll Deduction of Political Contributions Agreement signed June 21, 1979, between Carriers represented by the National Railway Labor Conference and the employes of said Carriers represented by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; International Brotherhood of Electrical Workers; Brotherhood Railway Carmen of the United States and Canada; and International Brotherhood of Firemen and Oilers, operating through the Railway Employes' Department, AFL-CIO, the parties hereby amend the following Dues Deduction Agreements International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers of November 19, 1973, International Brotherhood of Electrical Workers of November 9, 1973; Brotherhood Railway Carmen of the United States and Canada of November 15, 1973; and International Brotherhood of Firemen and Oilers of November 9, 1973, as amended, to the extent necessary to provide for the deduction of employes' voluntary political contributions on the following terms and basis:

1. (a) Subject to the terms and conditions hereinafter set forth, the Carrier will deduct from the wages of employes voluntary political contributions upon their written







UPFULBRIGHT

authorization in the form (individual authorization form) agreed upon by the parties hereto, copy of which is attached, designated "Attachment A" and made a part hereof.

(b) Voluntary political contributions will be made monthly from the compensation of employes who have executed a written authorization providing for such deductions. The first such deduction will be made in the month following the month in which the authorization is received. Such authorization will remain in effect for a minimum of twelve (12) months and thereafter until canceled by thirty (30) days advance written notice (Attachment B) from the employe to the Brotherhood and the Carrier by Registered Mail. Changes in the amount to be deducted will be limited to one change in each 12-month period and any change will coincide with a date on which dues deduction amounts may be changed under the Dues Deduction Agreement.

2. The General Chairman or his designated representative shall furnish the Carrier, an initial statement (Attachment C) by lodges, in alphabetical order and certified by him, showing the amounts of deductions to be made from each employe, such statement to be furnished together with individual authorization forms to cover, and payroll deductions of such amounts will commence in the month immediately following. Subsequent monthly deductions will be based on the initial statement plus a monthly statement (Attachment C) showing additions and/or deletions furnished in the same manner as the initial statement required hereinabove. If no changes are reported, the most recent list on file with the Carrier shall be used for the purposes of this section.

3. Monthly voluntary political contribution deductions will be made from wages at the same time that membership dues are deducted from the employe's paycheck.

4. Concurrent with making remittance to the Organization of monthly membership dues, the Carrier will make separate remittance of voluntary political contributions to the officer of the Organization's Political League designated to receive same, together with a list prepared in accordance with the requirements of the Dues Deduction Agreement pertaining to the remittance of monthly membership dues, with a copy to the General Chairman.

5. The requirements of this agreement shall not be effective with respect to any individual employe until the employer has been furnished with a written authorization of assignment of wages of such monthly voluntary political contribution.

Signed at Omaha, Nebraska, this 11th day of October, 1979:





UPFULBRIGHT

FOR THE EMPLOYES:

__/s/ E. A. Ward______________________
PRESIDENT, SYSTEM FEDERATION
NO. 105, AND GENERAL CHAIRMAN,
INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP BUILDERS,
BLACKSMITHS, FORGERS, AND HELPERS

__/s/ Myron B. Jeppson__________________
SECRETARY TREASURER, SYSTEM
FEDERATION NO. 105, AND GENERAL
CHAIRMAN, INTERNATIONAL BROTHER-
HOOD OF FIREMEN AND OILERS

__/s/ W. E. Tolan________________________
GENERAL CHAIRMAN, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS

__/s/ H. L. Buckley______________________
GENERAL CHAIRMAN, BROTHERHOOD
RAILWAY CARMEN OF UNITED STATES
AND CANADA

FOR THE
UNION PACIFIC RAILROAD COMPANY:

__/s/ R. D. Rosenbohn_______________
DIRECTOR OF LABOR RELATIONS
SHOP CRAFTS

UPFULBRIGHT

APPENDIX A-4

November 9, 1982
013-US-12

Mr. V. L. Janecek
General Chairman, IBEW
306 Glenn Rose
North Platte, NE 69101

Dear Sir:

This has reference to agreement signed March 5, 1981, to be effective June 1, 1981, regarding employes promoted to official, supervisory or excepted positions to pay membership dues in order to retain seniority rights and our discussion of this matter yesterday.

In order to eliminate any misunderstandings, the intent, purpose and language of this agreement provides only for the retention and maintenance of seniority and no other benefits are to accrue to any of the employes involved as result of their being required to pay monthly dues to the International Brotherhood of Electrical Workers.

If this understanding meets with your concurrence, please indicate your approval in the space provided below returning original and one copy for my file.

Yours truly,

/s/ R. D. Rosenbohm
Director Labor Relations – Shop Crafts

AGREED:

/s/ V. L. Janecek
General Chairman, IBofEW

UPFULBRIGHT

APPENDIX A-5

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
SYSTEM COUNCIL NUMBER 3 9 UNION PACIFIC SYSTEM

December 21, 1987

CERTIFIED MAIL - RETURN RECEIPT REQUESTED (P 706 119 167)

D. J. Smith
Sr. Director of Labor Relations
Union Pacific Systems
1416 Dodge Street
Omaha, NE 68179

Re: Mediation Agreement, Article VII, Seniority Retention

Dear Sir:

This has reference to the captioned subject matter referred to above.

In accordance with Article VII, Seniority Retention, Section 3 thereof, this will advise that the I.B.E.W. and its members that I represent elect to preserve the existing rules pertaining to employees retaining seniority after promotion to an official, supervisor or accepted positions dated June 1, 1981.

Please govern accordingly.

Yours truly,

/s/ V. L. Janecek

cc: Edward P. McEntee, I.V.P.
Donald G. Davis, General Chairman
Ed Winter, General Chairman





UPFULBRIGHT

APPENDIX B

SHOP CRAFTS NATIONAL VACATION AGREEMENTS

The following represents a synthesis in one document, for the expressed convenience of the parties, of the current provisions of the December 17, 1941 National Vacation Agreement and amendments thereto provided in the National Vacation Agreements of August 21, 1~954, August 19, 1960, November 21, 1964, February 4, 1965, September 27, 1967, September 2, 1969, May 12, 1972, December 4, 1978 and December 11, 1981 with appropriate source identifications.

This is intended as a guide and is not to be construed as constituting a separate Agreement between the parties. If any dispute arises as to the proper interpretations or application of any provision, the terms of the appropriate Vacation Agreement shall govern.

SECTION 1. (A) Effective with the calendar year 1973, an annual vacation of five (5) consecutive work days with pay will be granted to each employee covered by this Agreement who renders compensated service on not less than one hundred twenty (120) days during the preceding calendar year.

(B) Effective with the calendar year 1973, an annual vacation of ten (10) consecutive work days with pay will be granted to each Employee covered by this Agreement who renders compensated service on not less than one hundred ten (110) days during the preceding calendar year and who has two (2) or more years of continuous service and who, during such period of continuous service renders compensated service on not less than one hundred ten (110) days (133 days in the years 1950-1959 inclusive, 151 days in 1949 and 160 days in each of such years prior to 1949) in each of two (2) of such years, not necessarily consecutive.

(C) Effective with the calendar year 1982, an annual vacation of fifteen (15) consecutive work days with pay will be granted to each Employee covered by this Agreement who renders compensated service on not less than one hundred (100) days during the preceding calendar year and who has eight (8) or more years of continuous service and who, during such period of continuous service renders compensated service on not less than one hundred (100) days (133 days in the years 1950-1959 inclusive, 151 days in 1949 and 160 days in each of such years prior to 1949) in each of eight (8) of such years, not necessarily consecutive.

(D) Effective with the calendar year 1982, an annual vacation of twenty (20) consecutive work days with pay will be granted to each Employee covered by this Agreement who renders compensated service on not less than one hundred (100) days during the preceding calendar year and who has seventeen (17) or more years of continuous service and who, during such period of continuous service renders compensated service on not less than one hundred





UPFULBRIGHT

(100) days (133 days in the years 1950-1959, inclusive, 151 days in 1949 and 160 days in each of such years prior to 1949) in each of seventeen (17) of such years, not necessarily consecutive.

(E) Effective with the calendar year 1973, an annual vacation of twenty-five (25) consecutive work days with pay will be granted to each Employee covered by this Agreement who renders compensated service on not less than one hundred (100) days during the preceding calendar year and who has twenty-five (25) or more years of continuous service and who, during such period of continuous service renders compensated service on not less than one hundred (100) days (133 days in the years 1950-1959 inclusive, 151 days in 1949 and 160 days in each of such years prior to 1949) in each of twenty-five (25) of such years, not necessarily consecutive.

(F) Paragraphs (A), (B), (C), (D) and (E) hereof shall be construed to grant to weekly and monthly rated employees, whose rates contemplate more than five days of service each week, vacations of one, two, three, four or five work weeks.

(G) Service rendered under Agreements between a Carrier and one or more of the Non-Operating Organizations parties to the General Agreement of August 21, 1954, or to the General Agreement of August 19, 1960, shall be counted in computing days of compensated service and years of continuous service for vacation qualifying purposes under this Agreement.

(H) Calendar days in each current qualifying year on which an Employee renders no service because of his own sickness or because of his own injury shall be included in computing days of compensated service and years of continuous service for vacation qualifying purposes on the basis of a maximum of ten (10) such days for an Employee with less than three (3) years of service; a maximum of twenty (20) such days for an Employee with three (3) but less than fifteen (15) years of service; and a maximum of thirty (30) such days for an Employee with fifteen (15) or more years of service with the employing Carrier.

(I) In instances where Employees who have become members of the Armed Forces of the United States return to the service of the employing Carrier in accordance with the Military Selective Act of 1967, as amended, the time spent by such Employees in the Armed Forces subsequent to their employment by the employing Carrier will be credited as qualifying service in determining the length of vacations for which they may qualify upon their return to the service of the employing Carrier.

(J) In instances where an Employee who has become a member of the Armed Forces of the United States returns to the service of the employing Carrier in accordance with the Military Selective Service Act of 1967, as amended, and in the calendar year preceding his return to railroad service has rendered no compensated service or had rendered compensated service on fewer days than are required to qualify for a vacation in the calendar year of his return to railroad service, but could qualify for a vacation in the year of his return to railroad service if he had combined for qualifying purposes days on which he was in railroad service in such preceding calendar year with days in such year on which he was in the Armed







UPFULBRIGHT

Forces, he will be granted, in the calendar year of his return to railroad service, a vacation of such length as he could so qualify for under paragraphs (A), (B), (C), (D), or (E) and (1) hereof.

(K) In instances where an Employee who has become a member of the Armed Forces of the United States returns to the service of the employing Carrier in accordance with the Military Selective Service Act of 1967, as amended, and in the calendar year of his return to railroad service renders compensated service on fewer days than are required to qualify for a vacation in the following calendar year, but could qualify for a vacation in such following calendar year if he had combined for qualifying purposes days on which he was in railroad service in the year of his return with days in such year on which he was in the Armed Forces, he will be granted, in such following calendar year, a vacation of such lengths as he could so qualify for under paragraphs (A), (B), (C), (D) or (E) and (1) hereof.

(L) An Employee who is laid off and has no seniority date and no rights to accumulate seniority, who renders compensated service on not less than one hundred twenty (120) days in a calendar year and who returns to service in the following year for the same Carrier will be granted the vacation in the year of his return. In the event such an Employee does not return to service in the following year for the same Carrier he will be compensated in lieu of the vacation he has qualified for provided he files written request therefor to his employing officer, a copy of such request to be furnished to his local or General Chairman.

(From Article III - Vacations - Section 1 of May 12, 1972, Article III - Vacations - December 11, 1981 Agreements)

SECTION 2. Insofar as applicable to the employees covered by this Agreement who are also parties to the Vacation Agreement of December 17, 1941, as amended, Article 15 of such Agreement is hereby further amended to read as follows:

Except as otherwise provided herein this agreement shall be effective as of January 1, 1973, and shall be incorporated in existing agreements as a supplement thereto and shall be in full force and effect for a period of one (1) year from January 1, 1973, and continue in effect thereafter, subject to not less than seven (7) months' notice in writing (which notice may be served in 1973 or in any subsequent year) by any carrier or organization party hereto, of desire to change this agreement as of the end of the year in which the notice is served. Such notice shall specify the changes desired and the recipient of such notice shall then have a period of thirty (30) days from the date of the receipt of such notice within which to serve notice specifying changes which it or they desire to make. Thereupon such proposals of the respective parties shall thereafter be negotiated and progressed concurrently to a conclusion.

(From Article III - Vacations - Section 2 of May 12, 1972 Agreement)

SECTION 3. The terms of this Agreement shall not be construed to deprive any Employee of such additional vacation days as he may be entitled to receive under any existing rule, understanding or custom, which additional vacation days shall be accorded under an in accordance with the terms of such existing rule, understanding or custom.





UPFULBRIGHT

(From Section 3 of December 17,1941 Agreement)

An Employee's vacation period will not be extended by reason of any of the eleven recognized holidays (New Year's Day, Washington's Birthday, Good Friday, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Day After Thanksgiving, Christmas Eve, Christmas and New Year's Eve Day) or any day which by Agreement has been substituted or is observed in place of any of the eleven holidays enumerated above, or any holiday which by local Agreement has been substituted therefor, falling within his vacation period.

(From Article III - Vacations - Section 3, May 12, 1972 Agreement)

SECTION 4. (A) Vacations may be taken from January 1 st to December 31st and due regard consistent with requirements of service shall be given to the desires and preferences of the Employees in seniority order when fixing the dates for their vacations.

The local committee of each Organization signatory hereto and the representatives of the Carrier will cooperate in assigning vacation dates.

(B) The Management may upon reasonable notice of thirty (30) days or more, if possible, but in no event less than fifteen (15) days require all or any number of Employees in any plant, operation, or facility who are entitled to vacations to take vacations at the same time.

The local committee of each Organization affected signatory hereto and the proper representative of the Carrier will cooperate in the Assignment of remaining forces.

(From Sections 4-(A) and 4-(B) of December 17, 1941 Agreement)

SECTION 5. Each Employee who is entitled to vacation shall take same at the time assigned, and, while it is intended that the vacation date designated will be adhered to so far as practicable, the management shall have the right to defer same provided the Employee so affected is given as much advance notice as possible; not less than ten (10) days' notice shall be given, except when emergency conditions prevent. If it becomes necessary to advance the designated ' date, at least thirty (30) days' notice will be given affected Employee.

If a Carrier finds that it cannot release an Employee for a vacation during the calendar year because of the requirements of the service, then such Employee shall be paid in lieu of the vacation the allowance hereinafter provided.

(From Section 5 of December 17,1941 Agreement).

Such Employee shall be paid the time and one-half rate for work performed during his vacation period in addition to his regular pay.

NOTE: This provision does not supersede provisions of the individual collective Agreements that require payment of double time under specified conditions.



UPFULBRIGHT

(From Article I - Vacations - Section 4 of August 21, 1954 Agreement)

SECTION 6. The Carriers will provide vacation relief workers but the vacation system shall not be used as a device to make unnecessary jobs for other workers. Where a vacation relief worker is not needed in a given instance and if failure to provide a vacation relief worker does not burden those Employees remaining on the job, or burden the Employee after his return from vacation, the Carrier shall not be required to provide such relief worker.
(From Section 6 of December 17,1941 Agreement)

SECTION 7. Allowance for each day for which an Employee is entitled to a vacation with pay will be calculated on the following basis:

(A) An Employee having a regular assignment will be paid while on vacation the daily compensation paid by the Carrier for such assignment.

(B) An Employee paid a daily rate to cover all services rendered, including overtime, shall have no deduction made from his established daily rate on account of vacation allowances made pursuant to this Agreement.

(C) An Employee paid a weekly or monthly rate shall have no deduction made from his compensation on account of vacation allowances made pursuant to this Agreement.

(D) An Employee working on a piece-work or tonnage basis will be paid on the basis of the average earnings per day for the last two semi-monthly periods preceding the vacation, during which two periods such Employee worked on as many as sixteen (16) different days.

(E) An Employee not covered by Paragraphs (A), (B), (C), or (D) of this section will be paid on the basis of the average daily straight time compensation earned in the last pay period preceding the vacation during which he performed service.
(From Section 7 of the December 17,1941 Agreement)

"As to an Employee having a regular assignment, but temporarily working on another position at the time his vacation begins, such Employee while on vacation will be paid the daily compensation of the position on which actually working at the time the vacation begins, provided such Employee has been working on such position for twenty days or more."
(From Award of Referee Wayne L Morse, November 12, 1942.)

SECTION 8. The vacation provided for in this Agreement shall be considered to have been earned when the Employee has qualified under Article 1 hereof. If an Employee's employment status is terminated for any reason whatsoever, including but not limited to retirement, resignation, discharge, non-compliance with a union-shop Agreement, or failure to return after furlough he shall at the time of such termination be granted full vacation pay earned up to the time he leaves the service including pay for vacation earned in the preceding year or years and not yet granted, and the vacation for the succeeding year if the Employee has qualified



UPFULBRIGHT

therefor under Article 1. If an Employee thus entitled to vacation or vacation pay shall die the vacation pay earned and not received shall be paid to such beneficiary as may have been designated, or in the absence of such designation, the surviving spouse or children or his estate, in that order of preference.
(From Article IV - Vacations - Section 2 of August 19,1960
Agreement)

SECTION 9. Vacations shall not be accumulated or carried over from one vacation year to another.
(From Section 9 of December 17,1941 Agreement)

SECTION 10. (A) An Employee designated to fill an assignment of another Employee on vacation will be paid the rate of such assignment or the rate of his own assignment, whichever is the greater; provided that if the assignment is filled by a regularly assigned vacation relief Employee, such Employee shall receive the rate of the relief position. If an Employee receiving graded rates, based upon length of service and experience, is designated to fill an assignment of another Employee in the same occupational classification receiving such graded rates who is on vacation, the rate of the relieving Employee will be paid.

(B) Where work of vacation or vacationing Employees is distributed among two or more Employees, such Employees will be paid their own respective rates. However, not more than the equivalent of twenty-five per cent of the work load of a given vacationing Employee can be distributed among fellow Employees without the hiring of a relief worker unless a larger distribution of the work load is agreed to by the proper local union committee or official.

(C) No Employee shall be paid less than his own normal compensation for the hours of his own assignment because of vacations to other Employee.
(From Section 10 of December 17, 1941 Agreement)

SECTION 11. While the intention of this Agreement is that the vacation period will be continuous, the vacation may, at the request of an Employee, be given in installments if the management consents thereto.
(From Section 11 of December 17,1941 Agreement)

SECTION 12 (A) Except as otherwise provided in this Agreement a Carrier shall not be required to assume greater expense because of granting a vacation than would be incurred if an employee were not granted a vacation and was paid in lieu therefor underthe provision hereof. However, if a relief worker necessarily is put to substantial extra expense over and above that which the regular Employee on vacation would incur if he had remained on the job, the relief worker shall be compensated in accordance with existing regular relief rules.

(B) As Employees exercising their vacation privileges will be compensated under this Agreement during their absence on vacation, retaining their other rights as if they had remained at work, such absences from duty will not constitute "vacancies" in their positions under any Agreement. When the position of a vacationing Employee is to be filled and regular relief Employee is not utilized, effort will be made to observe the principle of seniority.





UPFULBRIGHT

(C) A person other than a regularly assigned relief Employee temporarily hired solely for vacation relief purposes will not establish seniority rights unless so used more than 60 days in a calendar year. If a person so hired under the terms hereof acquires seniority rights, such rights will date from the day of original entry into service unless otherwise provided in existing Agreements.
(From Section 12 of December 17,1941 Agreement)

SECTION 13. The parties hereto having in mind conditions which exist or may arise on individual Carriers in making provisions for vacations with pay agree that the duly authorized representatives of the Employees, who are parties to one Agreement, and the proper officer of the Carrier may make changes in the working rules or enter into additional written understanding to implement the purposes of this Agreement, provided that such changes or understandings shall not be inconsistent with this Agreement.
(From Section 13 of December 17,1941 Agreement)

SECTION 14. Any dispute or controversy arising out of the interpretation or application of any of the provisions of this Agreement shall be referred for decision to a committee,, the Carrier members of which shall be the Carriers Conference Committees signatory hereto, or their successors; and the Employee members of which shall be the Chief Executives of the Fourteen Organizations, or their representatives, or their successors. Interpretations or applications agreed upon by the Carrier members and the Employee members of such committee shall be final and binding upon the parties to such dispute or controversy.

This section is not intended by the parties as a waiver of any of their rights provided in the Railway Labor Act as amended, in the event committee provided in this section fails to dispose of any dispute or controversy.
(From Section 14 of December 17,1941 Agreement)

SECTION 15. Except as otherwise provided herein this Agreement shall be effective as of January 1, 1973, and shall be incorporated in existing Agreements as a supplement thereto and shall be in full force and effect for a period of one (1) year from January 1, 1973, and continue in effect thereafter, subject to not less than seven (7) months' notice in writing (which notice may be served in 1973 or in any subsequent year) by any Carrier or organization party hereto, or desire to change this Agreement as of the end of the year in which the notice is served. Such notice shall specify the changes desired and the recipient of such notice shall then have a period of thirty (30) days from the date of the receipt of such notice within which to serve notice specifying changes which it or they desire to make. Thereupon such proposals or the respective parties shall thereafter be negotiated and progressed concurrently to a conclusion. (From Articles III - Vacations - Section 2 of May 12,1972 Agreement)

Except to the extend that articles of the Vacation Agreement of December 17, 1941, are changed by this Agreement, the said Agreement and the interpretations thereof and of the Supplemental Agreement of February 23, 1945, as made by the parties, dated June 10,, 1942, July 20, 1942 and July 18, 1945, and by Referee Morse in his award of November 12, 1942, shall remain in full force and effect.





UPFULBRIGHT

In Sections 1 and 2 of this Agreement certain words and phrases which appear in the Vacation Agreement of December 17, 1941, and in the Supplemental Agreement of February 23,1945, are used. The said interpretations which defined such words and phrases referred to above as they appear in said Agreements shall apply in construing them as they appear in Sections 1 and 2 hereof.
(From Article 1 - Vacations - Section 6, August 21, 1954 Agreement)

UPFULBRIGHT

APPENDIX B - 1

MEMORANDUM OF AGREEMENT
Between The
UNION PACIFIC RAILROAD COMPANY
And The
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

The purpose of this Memorandum is to provide the opportunity for one (1) week of vacation to be taken on a daily basis rather than as an entire week.

IT IS AGREED:

1. Employees represented by the International Brotherhood of Electrical Workers subject to the terms of the National Vacation Agreement of December 17, 1941, as amended, who qualify for a vacation under the provisions of the National Vacation Agreement will be allowed take one (1) week's vacation in five (5) or six (6) separate increments (whichever applies to the employee) of one (1) day vacation during the period January 1st through November 30th of each year. (Employees who are scheduled to take group vacations may split only vacation time which exceeds the length of the group vacation.)

2. An employee electing to take this option must advise his local manager and local chairman of his desire to take one (1) week's vacation (five (5) of six (6) days whichever applies to the employee) on a daily basis. The employee must give up to forty-eight hours' (48') advance notice of his desire to take one (1 ) day's vacation and must have received approval from his manger prior to commencing each one (1) day vacation period. Such vacation will be permitted when consistent with Carrier's service requirements. Vacations requested on the basis provided herein will be given consideration based on the date the vacation request was received by the local manager and local chairman. In cases where more than one (1) vacation request is received at the same time for the same day, seniority will govern.

3. The Carrier shall have the option to fill or not fill the position of an employee who is absent on such vacation day.

4. All other provisions of the National Vacation Agreement, as amended, will apply without change.

5. This Agreement is without prejudice to either party's position concerning



UPFULBRIGHT

Agreements' applicable to vacation.

6. This Memorandum of Agreement shall become effective April 1, 1992, and may only be cancelled upon thirty (30) days' written notice of a desire to cancel the Agreement by either party.

Signed this 12th Day of March, 1992.

FOR THE EMPLOYEES:
/s/ Donald G. Davis
General Chairman - IBEW

/s/ V. L. Janecek
General Chairman - IBEW

/s/ Randy L. Shell
General Chairman - IBEW

FOR THE CARRIER:
/s/ A. C. Hallberg
Director Labor Relations

/s/ D. A. Moresette
Director Labor Relations

/s/ D. J. Smith
General Director Labor Relations

UPFULBRIGHT

APPENDIX B-2

March 12, 1992
640-015
cc: 230-Mstr (IBEW)

MR D G DAVIS
GENERAL CHAIRMAN IBEW
4013 S SPRING ST
INDEPENDENCE MO 64055

MR R L SHELL
GENERAL CHAIRMAN SC 27 IBEW
2101 GRIDER FLD RD
PINE BLUFF AR 71601-9735

MR V L JANECEK
GENERAL CHAIRMAN IBEW
306 GLENN ROSE
NO PLATTE NE 69101

Gentlemen:

This has reference to our discussion covering Agreement this date providing for one (1) week's vacation to be taken on a daily basis.

The reference to six (6) days' vacation in Section 1 of the Agreement was intended for those monthly-rated employees who are entitled to six (6) days' vacation for their workweek. In such cases, one (1) day of the six (6) days' vacation is to be taken on what is recognized as the employee's "stand-by" day.

If the above understanding meets with your approval, please indicate your acceptance in the spaces provided below.

Yours truly,

/s/ D. J. Smith
General Director Labor Relations

AGREED:

/s/ Donald G. Davis
General Chairman, IBEW

/s/ V. L. Janecek
General Chairman, IBEW

/s/ Randy Shell
General Chairman, IBEW



UPFULBRIGHT

## SHOP CRAFTS NATIONAL HOLIDAY PROVISIONS

The following represents a synthesis in one document, for the convenience of the parties, of the current holiday provisions of the National Agreement of August 21, 1954, and amendments thereto provided in subsequent National Agreements with appropriate source identification.

This is intended as a guide and is not to be construed as constituting a separate Agreement between the parties. If any dispute arises as to the proper interpretations or application of any provision, the terms of the appropriate Agreement shall govern.

SECTION 1. Subject to the qualifying requirements contained in Section 3 hereof, and to the conditions hereinafter provided, each hourly and daily rate Employee shall receive eight hours' pay at the pro rata hourly rate for each of the following enumerated holidays:

| | |
|---|---|
| New Years' Day | Labor Day |
| Washington's Birthday | Thanksgiving Day |
| Good Friday | Day After Thanksgiving |
| Memorial day | Christmas Eve |
| Fourth of July | Christmas |
| Day Before New Year's | |

Provided that on railroads on which some holiday other than Good Friday has been substituted, by Agreement, for the Birthday Holiday, unless the Employees now desire to have Good Friday included as a holiday in place of such holiday which has been substituted for the Birthday Holiday such substitution will continue effective, and Good Friday will be eliminated from the holidays enumerated above and from the provisions of this Article 11 which follow.
(From Article 11 - Holidays - Sections 1 (A) and 2(A), May 12, 1972 Agreement, Article III - Holidays, January 29, 1975 Agreement and Article IV - Holidays, December 11, 1981 Agreement)

*The day before Christmas is observed.

(A) Holiday pay for regular assigned Employees shall be at the pro rata rate of the position to which assigned.
(From Article 11 - Holidays - Section I(A), September 2, 1969 Agreement)

(B) For other than regularly assigned Employees, if the holiday falls on a day on which he would otherwise be assigned to work, he shall, if consistent with the requirements of the service, be given the day off and receive eight hours' pay at the pro rata rate of the position which he otherwise would have worked. If the holiday falls on a day other than a day on which

he otherwise would have worked, he shall receive eight hours' pay at the pro rata hourly rate of he position on which compensation last accrued to him prior to the holiday.
(From Article 11 - Holidays - Section 1 (B), September 2, 1969 Agreement)

(C) Subject to the applicable qualifying requirements in Section 3 hereof, other than regularly assigned Employees shall be eligible for the paid holidays or pay in lieu thereof provided for in Paragraph (B) above, provided (1) compensation for service paid him by the Carrier is credited to 11 or more of the 30 calendar days immediately preceding the holiday and (2) he has had a seniority date for at least 60 calendar days or has 60 calendar days of continuous active service preceding the holiday beginning with the first day of compensated service provided employment was not terminated prior to the holiday by resignation, for cause, retirement, death, non-compliance with union shop Agreement, or disapproval of application for employment.
(From Article 11 - Holidays - Section 1 (C), September 2, 1969 Agreement)

(D) The provisions of this section and Section 3 hereof applicable to other than regularly assigned Employees are not intended to abrogate or supersede more favorable rules and practices existing on certain Carriers under which other than regularly assigned Employees are being granted paid holidays.

NOTE: This rule does not disturb Agreements or practices now in effect under which any other day is substituted or observed in place of any of the above enumerated holidays.
(From Article 11 - Holidays - Section 1 (D), September 2, 1969 Agreement)

SECTION 2 (A). Monthly rates, the hourly rates of which are predicated upon 169-1/3 hours, shall be adjusted by adding the equivalent of 56 pro rata hours to the annual compensation (the monthly rate multiplied by 12) and this sum shall be divided by 12 in order to establish a new monthly rate. The hourly factor will thereafter be 174 and overtime rates will be computed accordingly.

Weekly rates that do not include holiday compensation shall receive a corresponding adjustment.
(From Article 11 - Holidays - Section 2(A), August 21, 1954 Agreement)

(B) All other monthly rates of pay shall be adjusted by adding the equivalent of 28 pro rata hours to the annual compensation (the monthly rate multiplied by 12) and
this sum shall be divided by 12 in order to establish a new monthly rate. The sum of presently existing hours per annum plus 28 divided by 12 will establish a new hourly factor and overtime will be compute accordingly.

Weekly rates not included in Section 2(A) shall receive a corresponding adjustment.
(From Article 11 - Holidays - Section 2(B), August 21, 1954 Agreement)

Article 11, Section 6 of the Agreement of August 21, 1954, which was added by the Agreement of November 21, 1964, and the Agreement of February 4, 1965, is eliminated. However, the adjustment in monthly rates of monthly rated Employees which was made





UPFULBRIGHT

effective January 1, 1965, pursuant to Article 11 of the Agreement of November 21, 1964, and the Agreement of February 4, 1965, by adding the equivalent of 8 pro rata hours to their annual compensation (the monthly rate multiplied by 12) and dividing this sum by 12 in order to establish a new monthly rate, continues in effect. Effective January 1, 1972, weekly rates shall be adjusted by adding the equivalent of 8 pro rata hours to the annual compensation and a new weekly rate established in the same manner as under Article 11, Section 2 of the August 21, 1954 Agreement. The hourly factor will be correspondingly increased and overtime rates will be computed accordingly. This adjustment will not apply to any weekly rates of pay which may have been earlier adjusted to include pay for the birthday holiday.
(From Article 11 - Holidays - Section l(D), May 12, 1972 Agreement)

Effective January 1, 1973, the monthly rates of monthly rated Employees shall be adjusted by adding the equivalent of 8 pro rata hours to their annual compensation (the monthly rate multiplied by 12) and this sum shall be divided by 12 in order to establish a new monthly rate. Weekly rates shall be adjusted by adding the equivalent of 8 pro rata hours to the annual compensation and a new weekly rate established in the same manner as under Article 11, Section 2 of the August 21, 1954 Agreement. The hourly factor will be correspondingly increased and overtime rates will be computed accordingly.
(From Article 11 - Holidays - Section 2(D), May 12, 1972 Agreement)

Effective January 1, 1976, after application of the cost-of-living adjustment effective that date, the monthly rates of monthly rated employees shall be adjusted by adding the equivalent of 8 pro rata hours pay to their annual compensation (the rate multiplied by 12) and this sum shall be divided by 12 in order to establish a new monthly rate. That portion of such 8 pro rata hours' pay which derives from the cost-of-living allowance will not become part of basic rates of pay except as provided in Article 11, Section 1 (D) of the Agreements of January 29, 1975, March 12, 1975, and June 23, 1975. The sum of presently existing hours per annum plus 8, divided by 12, will of applying cents-per-hour adjustments in such monthly rates of pay and computing overtime rates.

A corresponding adjustment shall be made in weekly rates and hourly factors derived therefrom.

(From Article III - Holidays - Section 5, June 16, 1976
Agreement)

SECTION 3. A regular assigned Employee shall qualify for the holiday pay provided in Section 1 hereof if compensation paid him by the Carrier is credited to the workdays immediately preceding and fo!'owing such holiday or if the Employee is not assigned to work but is available for service on such days. If the holiday falls on the last day of a regularly assigned Employee's workweek, the first workday following his rest days shall be considered the workday immediately following. If the holiday falls on the first workday of his workweek, the last workday of the preceding workweek shall be considered the workday immediately preceding the holiday.



UPFULBRIGHT

Except as provided in the following paragraph, all others for whom holiday pay is provided in Section 1 hereof shall qualify for such holiday pay if on the day preceding and the day following the holiday they satisfy one or the other of the following conditions:

(i) Compensation for service paid by the Carrier is credited; or

(ii) Such Employee is available for service.

NOTE: "Available" as used in subsection (11) above is interpreted by the parties to mean that an Employee is available unless he lays off of his own accord or does not respond to a call, pursuant to the rules of the applicable Agreement, for service.

For the purpose of Section 1, other than regularly assigned Employees who are relieving regularly assigned Employees on the same assignment on both the workday preceding and the workday following the holiday will have the workweek of the incumbent of the assigned position and will be subject to the same qualifying requirements respecting service and availability on the workdays preceding and following the holiday as apply to the Employee whom he is relieving.

NOTE: Compensation paid under sick-leave rules or practices will not be considered as compensation for purposes of this rule.
(From Article 11 - Holidays - Section 2, September 2,1969
Agreement)

An Employee who meets all other qualifying requirements will qualify for holiday pay for both Christmas Eve and Christmas Day if on the "workday" or the "day," as the case may be, immediately preceding the Christmas Eve holiday he fulfills the qualifying requirements applicable to the " workday" or the "day" before the holiday and on the "workday" or the "day," as the case may be, immediately following the Christmas Day holiday he fulfills the qualifying requirements applicable to the "workday" or the "day" after the holiday.

An Employee who does not qualify for holiday pay for both Christmas Eve and Christmas day may qualify for holiday pay for either Christmas Eve or Christmas Day under the provisions applicable to holidays generally.
(From Article III - Holidays - Section 4, June 16, 1976 Agreement)

SECTION 4. Provisions in existing Agreements with respect to holidays in excess of the ten holidays referred to in Section 1 hereof shall continue to be applied without change.
(From Article 11 - Holidays, Sections 1 (B) and 2(C), May 12, 1972 Agreements and Article III - Holidays - Section 3(B), June 16,1976 Agreement)

SECTION 5. (A) Existing rules and practices thereunder governing whether an Employee works on a holiday and the payment for work performed on a holiday are extended to apply to Good Friday, Day After Thanksgiving, Christmas Eve, and New Year's Eve Day in the same manner as to other holidays listed or referred to therein.
(From Article 11 - Holidays - Sections 1 (C) and 2(B), May 12, 1972 Agreements and Article III - Holidays - Section 3(A), June 16, 1976 Agreement)





UPFULBRIGHT

(B) All rules, regulations or practices which provide that when a regularly assigned Employee has an assigned relief day other than Sunday and one of the holidays specified therein falls on such relief day, the following assigned days will be considered his holiday, are hereby eliminated.
(From Article 11 - Holidays - Section l(C), May 12, 1972 Agreement)

(C) Under no circumstances will an Employee be allowed, in addition to his holiday pay, more than one time and one-half payment for service performed by him on a holiday which is also a workday, a rest day, and/or a vacation day.

NOTE: This provision does not supersede provisions of the individual collective Agreements that require payment of double time for holidays under specified conditions.
(From Article 11 - Holidays - Section l(C), May 12, 1972 Agreement)

(D) Except as provided in this Section 5, existing rules and practices thereunder governing whether an Employee works on a holiday and the payment for work performed on a holiday are not changed hereby.
(From Article 11 - Holidays - Section l(C), May 12, 1972 Agreement)

SECTION 6. Article 11, Section 6 of the Agreement of August 21, 1954, which was added by the Agreement of November 21, 1964, and the Agreement of February 4,1965, is eliminated. ---(See Section 2 for additional provisions)
(From Article 11 - Holidays - Section l(D), May 12, 1972 Agreement)

SECTION 7. When any of the eleven (11) recognized holidays, enumerated in Section 1 of this Article 11, or any day which by Agreement, or by law or proclamation of the State or Nation, has been substituted or is observed in place of any of such holidays, falls during an hourly or daily rated Employee's vacation period, he shall, in addition to his vacation compensation, receive the holiday pay provided for therein provided he meets the qualification requirements specified. The "workdays" and "days" immediately preceding and following the vacation period shall be considered the 11 workdays" and "days" preceding and following the holiday for such qualification purposes.

(From Article 11 - Holidays - Sections 1 (E) and 2(C), October 7, 1971, and May 12, 1972 Agreements and Article III - Holidays - Section 3(B), June 16, 1976 Agreement)



UPFULBRIGHT

APPENDIX D

**EMPLOYEE AND DEPENDENTS HOSPITAL, SURGICAL AND MEDICAL BENEFITS AND EMPLOYEE GROUP LIFE INSURANCE**

Employee and dependents covered by this Agreement are included under the coverage of National Health & Welfare Agreements.

UPFULBRIGHT

APPENDIX E

## SUPPLEMENTAL SICKNESS BENEFIT PLAN

Employees covered by this Agreement are covered by a National Supplemental Sickness Benefit Plan and a summary of the plan is outlined in booklet form.

UPFULBRIGHT

APPENDIX F

**EMPLOYEE AND DEPENDENT COVERAGE**
**UNDER NATIONAL DENTAL PLAN**

Employees covered by this Agreement are included in a National Dental Plan and benefits are set forth in booklet form.

UPFULBRIGHT

APPENDIX G

**EMPLOYEE AND DEPENDENT COVERAGE UNDER NATIONAL VISION PLAN**

Employees covered by this Agreement and their eligible dependents are included in the Railroad Employees National Vision Plan and benefits are set forth in booklet form and published by Vision Service Plan.

UPFULBRIGHT

OFF-TRACK VEHICLE ACCIDENT BENEFITS

NATIONAL AGREEMENTS DATED
MAY 12,1972 AND DECEMBER 4,1978 ARTICLE VIII -

Where employees sustain personal injuries or death under the conditions set forth in paragraph (A) below, the carrier will provide and pay such employees, or their personal representative, the applicable amounts set forth in paragraph (B) below, subject to the provisions of other paragraphs in this Article.

(A) COVERED CONDITIONS-

This Article is intended to cover accidents involving employees covered by this agreement while such employees are riding in, boarding, or alighting from off-track vehicles authorized by the carrier and are

(1) Deadheading under orders or
(2) Being transported at carrier expense

(B) PAYMENTS TO BE MADE -

In the event that any one of the losses enumerated in subparagraphs (1), (2) and (3) below results from an injury sustained directly from an accident covered in paragraph (A) and independently of all other causes and such loss occurs or commences within the time limits set forth in subparagraphs (1), (2) and (3) below, the carrier will provide, subject to the terms and conditions herein contained, and less any amounts payable under group Policy Contract GA-23000 of The Travelers Insurance Company or any other medical or insurance policy or plan paid for in its entirety by the carrier, the following benefits: (1) ACCIDENTAL DEATH OR DISMEMBERMENT

The carrier will provide for loss of life or dismemberment occurring within 120 days after date of an accident covered in paragraph (A):

| | |
|---|---|
| Loss of Life | $150,000 |
| Loss of Both Hands | $150,000 |
| Loss of Both Feet | $150,000 |
| Loss of Sight of Both Eyes | $150,000 |
| Loss of One Hand and One Foot | $150,000 |
| Loss of One Hand Sight of One Eye | $150,000 |
| Loss of One Foot and Sight of One Eye | $150,000 |
| Loss of One Hand or One Foot or Sight of One Eye | $ 75,000 |

"Loss" shall mean, with regard to hands and feet, dismemberment by severance through or above wrist or ankle joints; with regard to eyes, entire and irrecoverable loss of sight.





UPFULBRIGHT

Not more than $150,000 will be paid under this paragraph to any one employee or his personal representative as a result of any one accident.

(2) MEDICAL AND HOSPITAL CARE
The carrier will provide payment for the actual expense of medical and hospital care commencing within 120 days after an accident covered under paragraph (A) of injuries incurred as a result of such accident, subject to limitation of $3,000 for any employee for any one accident, less any amounts payable under Group Policy Contract GA-23000 of The Travelers Insurance Company or under any other medical or insurance policy or plan paid for in its entirety by the carrier.

(3) TIME LOSS
The carrier will provide an employee who is injured as a result of an accident covered under paragraph (A) hereof and who is unable to work as a result thereof commencing within 30 days after such accident 80% of the employee's basic full-time weekly compensation from the carrier for time actually lost, subject to a maximum payment of $150.00 per week for time lost during a period of 156 continuous weeks following such accident provided, however, that such weekly payment shall be reduced by such amounts as the employee is entitled to receive as sickness benefits under provisions of the Railroad Unemployment Insurance Act.

(4) AGGREGATE LIMIT -
The aggregate amount of payments to be made hereunder is limited to $1,000,000 for any one accident and the carrier shall not be liable for any amount in excess of $1,000,000 for any one accident irrespective of the number of injuries or deaths which occur in or as a result of such accident. If the aggregate amount of payments otherwise payable hereunder exceeds the aggregate limit herein provided, the carrier shall not be required to pay as respects each separate employee a greater proportion of such payments than the aggregate limit set forth herein bears to the aggregate amount of all such accidents.

(C) PAYMENT IN CASE OF ACCIDENTAL DEATH:
Payment of the applicable amount for accidental death shall be made to the employee's personal representative for the benefit of the persons designated in, and according to the apportionment required by the Federal Employers Liability Act (45 U.S.C. 51 ET SEQ., as amended), or if no such person survives the employee, for the benefit of his estate.

(3) EXCLUSIONS:
Benefits provided under paragraph (B) shall not be payable for or under any of the following conditions:
(1) Intentionally self-inflicted injuries, suicide or any attempt thereat, while sane or insane;

(2) Declared or undeclared war or any act thereof;

(3) Illness, disease, or any bacterial infection other than bacterial infection occurring in consequence of an accidental cut or wound;

UPFULBRIGHT

(4) Accident occurring while the employee is under the influence of alcohol or drugs, or if an employee passenger who is under the influence of alcohol or drugs in any way contributes to the cause of the accident;
(5) While an employee is a driver or an occupant of any conveyance engaged in any race or speed test;

(6) While an employee is commuting to and/or from his residence or place of business.

(E) OFFSET:

It is intended that this Article IV is to provide a guaranteed recovery by an employee or his personal representative under the circumstances described, and that receipt of payment thereunder shall not bar the employee or his personal representative from pursuing any remedy under the Federal Employers Liability Act or any other law; provided, however, that any amount received by such employee or his personal representative under this Article may be applied as an offset by the railroad against any recovery so obtained.

(F) SUBROGATION:

The carrier shall be subrogated to any right of recovery an employee or his personal representative may have against any party for loss to the extent that the carrier has made payments pursuant to this Article.

The payments provided for above will be made, as above provided, for covered accidents on or after (Date).

It is understood that no benefits or payments will be due or payable to any employee or his personal representative unless such employee, or his personal representative, as the case may be, stipulates as follows:
"in consideration of the payment of any of the benefits provided in Article IV of the Agreement of (Date)

(Employee or Personal Representative) agrees to be governed by all of the conditions and provisions said and set forth by Article IV."

SAVINGS CLAUSE
This Article IV supersedes as of (Date) any agreement providing benefits of a type specified in paragraph (B) hereof under the conditions specified in paragraph (A) hereof; provided, however, any individual railroad party hereto, or any individual committee representing employees party hereto, may- be advising the other party in writing by (Date)-, elect to preserve in its entirety an existing agreement providing accident benefits of the type provided in this Article IV in lieu of this Article IV.





UPFULBRIGHT

APPENDIX I

EMPLOYEE INFORMATION

The carrier will provide each General Chairman with a list of the employees who are hired or terminated, together with their home addresses and, if available, Social Security Numbers, otherwise the employees' identification numbers. This information will be limited to the employees covered by the collective bargaining agreement of the respective General Chairmen. The date will be supplied within 30 days of the end of the month in which the employee is hired or terminated, except as to such railroads which can not meet the 30-day requirement, the matter will be worked out with the General Chairman.

UPFULBRIGHT

## BEREAVEMENT LEAVE

Agreed Upon Questions and Answers:

Q-1: How are the three calendar days to be determined?
A-1: An employee will have the following options in deciding when to take bereavement leave:

(a) three consecutive calendar days, commencing with the day of death, when the death occurs prior to the time an employee is scheduled to report for duty;

(b) three consecutive calendar days, ending the day of the funeral service; or

(c) three consecutive calendar days, ending the day following the funeral service.

Q-2: Does the three calendar days allowance pertain to each separate instance, or do the three calendar days refer to a total of all instances?
A-2: Three days for each separate death; however, there is no pyramiding when the second death occurs within the three-day period covered by the first death.

Example: Employee has a work week of Monday to Friday -- off-days of Saturday and Sunday. His mother dies on Monday and his father dies on Tuesday. At the maximum, the employee would be eligible for bereavement leave on Tuesday, Wednesday and Thursday.

Q-3: An employee working from an extra board is granted bereavement leave on Wednesday, Thursday and Friday. Had he not taken bereavement leave he would have been available on the extra board, but would not have performed service on one of the days on which leave was taken. Is he eligible for two days or three days of bereavement pay?
A-3: A maximum of two days.

Q-4: Will a day on which a basic day's pay is allowed account bereavement leave serve as a qualifying day for holiday purposes?
A-4: No; however, the parties are in accord that bereavement leave non-availability should be considered the same as vacation non-availability and that the first work day preceding or following the employee's bereavement leave, as the case may be, should be considered as the qualifying day for holiday purposes.

Q-5: Would an employee be entitled to bereavement leave in connection with the death of a half-brother or half-sister, stepbrother or stepsister, stepparents or stepchildren?
A-5: Yes as to half-brother or half-sister, no as to stepbrother or stepsister, stepparents or stepchildren. However, the rule is applicable to a family relationship covered by the rule through the legal adoption process.





UPFULBRIGHT

APPENDIX K

PERSONAL LEAVE EXAMPLES

The following examples are intended to demonstrate the intention of the parties concerning application of the qualifying requirements set forth in Article X Personal Leave of the December 12, 1981 National Agreement:

Example No. 1

Employee "A" was hired during the calendar year 1974 and rendered compensated service on a sufficient number of days in such year to qualify for a vacation in the year 1975. He also rendered compensated service on the required number of days in the years 1976 through 1981, but not during the year 1975.

This employee would not be entitled to one day of personal leave in -the year 1982 because of not having met the qualifying vacation requirements during eight calendar years prior to January 1, 1982.

Example No. 2

Employee "B" also was hired during the calendar year 1974 and rendered compensated service on a sufficient number of days in such year to qualify for a vacation in the year 1975. He also rendered compensated service on the required number of days in each of the years 1975 through 1981.

This employee would be entitled to one day of personal leave in the year 1982 by virtue of having met the qualifying vacation requirements during eight calendar years prior to January 1, 1982.

Example No. 3

Employee "C" was hired during the calendar year 1973 and rendered compensated service on a sufficient number of days in such year to qualify for a vacation in the year 1974. He also rendered compensated service on the required number of days in the years 1974 through 1980, but not during the year 1981.

This employee, despite the fact that he did not render compensated service on the required number of days in the year 1981, would be entitled to one day of personal leave in the year 1982 by virtue of having met the qualifying vacation requirements during eight calendar years prior to January 1, 1982.

UPFULBRIGHT

APPENDIX L

AGREEMENT OF MAY, 1936, WASHINGTON, D.C.

This Agreement is entered into between the Carriers listed and defined in Appendices "A", "B" and "C" attached hereto and made a part hereof, represented by the duly authorized Joint Conference Committee signatory hereto, as Party of the First Part, and the Employees of, said Carriers, represented by the organizations signatory hereto by their respective duly authorized executives, as Party of the Second Part, and, so far as necessary to carry out the provisions hereof, is also to be construed as a separate Agreement by and between and in behalf of each of said Carriers and its Employees who are now or may hereafter be represented by any of said organizations which now has (or may hereafter have during the life of this Agreement) an Agreement with such carrier concerning rates of pay, rules or working conditions.

The Signatories hereto, having been respectively duly authorized as aforesaid to negotiate to a conclusion certain pending issues concerning the treatment of Employees who may be affected by Coordination as hereinafter defined, hereby agree:

SECTION 1. That the fundamental scope and purpose of this Agreement is to provide for allowances to defined Employees affected by Coordination as hereinafter defined, and it is the intent that the provisions of this Agreement are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from such Coordination. Therefore, the parties hereto understand and agree that fluctuations, rises and falls and changes in volume or character of employment brought about solely by other causes are not within the contemplation of the parties hereto, or covered by or intended to be covered by this Agreement.

SECTION 2 (A) The term "Coordination" as used herein means joint action by two or more Carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities.

(B) The term "Carrier" as used herein when it refers to other than parties to this Agreement means any carrier subject to the provisions of Part 1 of the Interstate Commerce Act; when it refers to a party to this Agreement it means any company or system listed and described in Appendices "A", "B" or "C" as a single carrier party to this Agreement.

(C) The term "Time of Coordination" as used herein includes the period following the effective date of a Coordination during which changes consequent Upon Coordination are being made effective; as applying to a particular Employee it means the date in said period when that Employee is first adversely affected as a result of said Coordination.

SECTION 3(A) The Provisions of this Agreement shall be effective and shall be applied whenever two or more Carriers parties hereto undertake a Coordination; and it is understood





UPFULBRIGHT

that if a Carrier or Carriers parties hereto undertake a Coordination with a Carrier or Carriers not parties hereto, such Coordination will be made only upon the basis of an Agreement approved by all of the Carriers parties thereto and all of the organizations of Employees involved (parties hereto) of all of the Carriers concerned. No Coordination involving classes of Employees not represented by any of the organizations parties hereto except in accord with the provisions of this Agreement or Agreement arising hereunder.

(B) Each carrier listed and established as a separate carrier of the purposes of this Agreement, as provided in Appendices "A", " B" and "C", shall be regarded as a separate carrier for the purpose hereof during the life of this Agreement; provided, however, that in the case of any Coordination involving two or more railroad Carriers which also involves the Railway Express Agency, Inc., the latter company shall be treated as a separate carrier with respect to its operations on each of the railroads involved.

(C) It is definitely understood that the action of the parties hereto in listing and establishing as a single carrier any system which comprises more than one operating company is taken solely for the purposes of this Agreement and shall not be construed or used by either party hereto to limit or affect the rights of the other with respect to matters not falling within the scope and terms of this Agreement.

SECTION 4. Each Carrier contemplating a Coordination shall give at least ninety days written notice of such intended Coordination by posting a notice on bulletin boards convenient to the interested employees of each such carrier and by sending registered mail notice to the representatives of such interested employees. Such notice shall contain a full and adequate statement of the proposed changes to be effected by such Coordination, including an estimate of the number of Employees of each class affected by the intended changes. The date and place of a conference between representatives of all the parties interested in such intended changes for the purpose of reaching Agreements with respect to the application thereto or the terms and conditions of this Agreement, shall be agreed upon within ten (10) days after the receipt of said notice, and conference shall commence within thirty (30) days from the date of such notice.

SECTION 5. Each plan of Coordination which results in the displacement of Employees or rearrangement of forces shall provide for the selection of forces from the Employees of all of the Carriers involved on bases accepted as appropriate for application in the particular case; and any assignment of Employees made necessary by a Coordination shall be made on the basis of an Agreement between the Carriers and the organizations of the Employees affected, parties hereto. In the event compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced Employee, and if his compensation in his current position is less in any month in which he performs work than the aforesaid average compensation he shall be paid the difference, less compensation for any time lost on account of voluntary absences to the extent that he is not available for service equivalent to his average monthly time during the test period, but he shall be compensated in addition thereto at the rate of the position filled for any time worked in excess of the average monthly time paid for during the test period.

UPFULBRIGHT

SECTION 7 (A) Any Employee of any of the Carriers participating in a particular Coordination shall be accorded an allowance (hereinafter termed a Coordination allowance), based on length of service, which (except in the case of an Employee with less than one year of service) shall be a monthly allowance equivalent in each instance to sixty per cent (60%) of the average monthly compensation of the Employee in question during the last twelve months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of the Coordination. This Coordination allowance will be made to each eligible Employee while unemployed by his home road or in the Coordinated operation during a period beginning at the date he is first deprived of employment as a result of the Coordination and extending in each instance for a length of time determined and limited by the following schedule:

| LENGTH OF SERVICE | PERIOD FOR PAYMENT |
|---|---|
| 1 Yr. and less than 2 Yrs. | 6 Months |
| 2 Yrs and less than 3 Yrs. | 12 Months |
| 3 Yrs. and less than 5 Yrs. | 18 Months |
| 5 Yrs. and less than 10 Yrs. | 36 Months |
| 10 Yrs. and less than 15 Yrs. | 48 Months |
| 15 Yrs. and Over | 60 Months |

In the case of an Employee with less than one year of service, the total Coordination allowance shall be a lump sum payment in an amount equivalent to sixty (60) days pay at the straight time daily rate of the last position held by him at the time he is deprived of employment as a result of the Coordination.

(B) For the purposes of this Agreement the length of service of the Employee shall be determined from the date he last acquired an employment status with the employing Carrier and he shall be given credit for one month's service for each month in which he performed any service (in any capacity whatsoever) and twelve such months shall be credited as one year's service. The employment status of an Employee shall not be interrupted by furlough in instances where the Employee has a right to and does return to service when called. In determining length of service of an Employee acting as an officer or other official representative of an Employee organization he will be given credit for performing service while so engaged on leave of absence from the service or a carrier.

(C) An Employee shall be regarded as deprived of his employment and entitled to a Coordination allowance in the following cases:

1 When the position which he holds on his home road is abolished as result of Coordination and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the Coordinated operation, or

2 When the position he holds on his home road is not abolished but he loses that position as a result of the exercise of seniority rights by an Employee whose position is abolished as a result of said Coordination, or by other Employees, brought about as a proximate consequence of the Coordination, and if he is unable by the exercise of his





UPFULBRIGHT

seniority rights to secure another position on his home road or a position in the Coordinated operation.

An Employee shall not be regarded as deprived of employment in case of his resignation, death, retirement or pension or on account of age or disability in accordance with the current rules and practices applicable to Employees generally, dismissal for justifiable cause in accordance with the rules, or furloughed because of reduction in forces due to seasonal requirements on the service; nor shall any Employee be regarded as deprived of employment as a result of a particular Coordination who is not deprived of his employment within three years from the effective date of said Coordination.

(E) Each Employee receiving a Coordination allowance shall keep the employer informed of his address and the name and address of any other person by whom he may be regularly employed.

(F) The Coordination allowance shall be paid to the regularly assigned incumbent of the position abolished. If the position of an Employee is abolished while he is absent from service, he will be entitled to the Coordination allowance when he is available for service. The Employee temporarily filling said position at the time it was abolished will be given a Coordination allowance on the basis of said position until the regular Employee is available for service and thereafter shall revert to his previous status and will be given a Coordination allowance accordingly if any is due.

(G) An Employee receiving a Coordination allowance shall be subject to call to return to service after being notified in accordance with the working Agreement, and such Employee may be required to return to the service of the employing Carrier for other reasonably comparable employment for which he is physically and mentally qualified and which does not require a change in his place of residence, if his return does not infringe upon the employment rights of other Employees under the working Agreement.

(H) If an Employee who is receiving a Coordination allowance returns to service the Coordination allowance shall cease while he is so reemployed and the period of time during which he is so reemployed shall be deducted from the total period for which he is entitled to receive a Coordination allowance. During the time of such reemployment however he shall be entitled to protection in accordance with the provisions of Section 6.

(I) If an Employee who is receiving a Coordination allowance obtains railroad employment (other than with his home road or in the Coordinated operation) his Coordination allowance shall be reduced to the extent that the sum total of his earnings in such employment and his allowance exceeds the amount upon which his Coordination allowance is based; provided that this shall not apply to Employees with less than one year's service.

(J) A Coordination allowance shall cease prior to the expiration of its prescribed period in the event of:

UPFULBRIGHT

1. Failure without good cause to return to service in accordance with working Agreement after being notified of position for which he is eligible and as provided in paragraphs (G) and (H).
2. Resignation.
3. Death.
4. Retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to Employees generally.
5. Dismissal for justifiable cause.

SECTION 8. An Employee affected by a particular Coordination shall not be deprived of benefits attaching to his previous employment, such as free transportation, pensions, hospitalization, relief, etc., under the same conditions and so long as such benefits continue to be accorded to other Employees on his home road, in active service or on furlough as the case may be, to the extent that such benefits can be so maintained under present authority of law or corporate action or through future authorization which may be obtained.

SECTION 9. Any Employee eligible to receive a Coordination allowance under Section 7 hereof may, at his option at the time of Coordination, resign and (in lieu of all other benefits and protections provided in this Agreement) accept in a lump sum separation allowance determined in accordance with the following schedule:

| LENGTH OF SERVICE | SEPARATION ALLOWANCE |
|---|---|
| 1 Yr. and less than 2 Yrs | 3 Months Pay |
| 2 Yrs. and less than 3 Yrs | 6 Months Pay |
| 3 Yrs. and less than 5 Yrs | 9 Months Pay |
| 5 Yrs. and less than 10 Yrs | 12 Months Pay |
| 10 Yrs. and less than 15 Yrs | 12 Months Pay |
| 15 Yrs. and Over | 12 Months Pay |

In the case of Employees with less than one years' service, five days' pay, at the rate of the position last occupied, for each month in which they performed service will be paid as the lump sum.

A) Length of service shall be computed as provided in Section 7.

(B) One months' pay shall be computed by multiplying by 30 the daily rate of pay received by the Employee in the position last occupied prior to time of Coordination.

SECTION 10 (A) Any Employee who is retained in the service of any Carrier involved in a particular Coordination (or who is later restored to service from the group of Employees entitled to receive a Coordination allowance) who is required to change the point of his employment as result of such Coordination and is therefore required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects and for the traveling expenses of himself and members of his family, including living expenses for himself and his family and his own actual wage loss during the time necessary



UPFULBRIGHT

for such transfer, and for a reasonable time thereafter, (not to exceed two working days), used in securing a place of residence in his new location. The exact extent of the responsibility fo the Carrier under this provision and the ways and means of transportation shall be agreed upon in advance between the Carrier responsible and the organization of the Employee affected. No claim for expenses under this Section shall be allowed unless they are incurred within three years from the date of Coordination and the claim must be submitted within ninety (90) days after the expenses are incurred.

(B) If any such Employee is furloughed within three years after changing his point of employment as a result of Coordination and elects to move his place of residence back to his original point of employment, the Carrier shall assume the expense of moving his household and other personal affects under the conditions imposed in paragraph (A) of this section.

(C) Except to the extent provided in paragraph (B) changes in place of residence subsequent to the initial changes caused by Coordination and which grow out of the normal exercise of seniority in accordance with working Agreements are not comprehended with working Agreements are not comprehended within the provisions of this section.

SECTION 11 (A). The following provisions shall apply, to the extent they are applicable in each instance, to any Employee who is retained in the service of any of the Carriers involved in a particular Coordination (or who is later restored to such service from the group of Employees entitled to receive a Coordination allowance) who is required to change the point of his employment as a result of such Coordination and is therefore required to move his place of residence:

1. If the Employee owns his own home in the locality from which he is required to move, he shall at his option be reimbursed by his employing Carrier for any loss suffered in the sale of his home for less than its fair value. In each case the fair value of the home in question shall be determined as of a date sufficiently prior to the Coordination to be unaffected thereby. The employing Carrier shall in each instance be afforded an opportunity to purchase the home at such fair value before it is sold by the Employee to any other party.

2. If the Employee is under a contract to purchase his home, the employing Carrier shall protect him against loss to the extent of the fair value of any equity he may have in the home and in addition shall relieve him from any further obligations under his contract.

3. If the Employee holds an unexpired lease of a dwelling occupied by him as his home, the employing Carrier shall protect him from all loss and cost in securing the cancellation of said lease.

(B) Changes in place of residence subsequent to the initial change caused by Coordination and which grow out of the normal exercise of seniority in accordance with working Agreements are not comprehended within the provisions of this Section.

(C) No claim for loss shall be paid under the provisions of this Section which is not preserved within three years after the effective date of the Coordination.

UPFULBRIGHT

(D) Should a controversy arise in respect to the value of the home, the loss sustained in its sale, the loss under a contract for purchase, loss and cost in securing termination of lease, or any other question in connection with these matters, it shall be decided through joint conference between the representatives of the Employees and the Carrier on whose line the controversy arises and in the event they are unable to agree, the dispute may be referred by either party to a board of three competent real estate appraisers, selected in the following manner: One to be selected by the representatives of the Employees and the Carrier, respectively; these two shall endeavor by Agreement within ten days after their appointment to select the third appraiser, or to select some person authorized to name the third appraiser, and in the event of failure to agree then the Chairman of the Interstate Commerce Commission shall be requested to appoint the third appraiser. A decision of a majority of the appraisers shall be required and said decision shall be final and conclusive. The salary and expenses of the third or neutral appraiser, including the expenses of the appraisal board, shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the salary of the appraiser selected by such party.

SECTION 12. If any Carrier shall rearrange or adjust its forces in anticipation of a Coordination, with the purpose or effect of depriving an Employee of benefits to which he should be entitled under this Agreement as an Employee immediately affected by a Coordination, this Agreement shall apply to such an Employee as of the date he is so affected.

SECTION 13. In the event that any dispute or controversy arises (except as defined in Section 11) in connection with a particular Coordination, including an interpretation, application or enforcement of any of the provisions (or of the Agreement entered into between the Carriers and the representatives of the Employees relating to said Coordination as contemplated by this Agreement) which is not composed by the parties thereto within thirty days after same arises, it may be referred by either party for consideration and determination to a Committee which is hereby established, composed in the first instance of the signatories to this Agreement. Each party to this Agreement may name such persons from time to time as each party desires to serve on such committee as its representatives in substitution for such original members. Should the committee be unable to agree, it shall select a neutral referee and in the event it is unable to agree within 10 days upon the selection of said referee, then the members on either side may request the National Mediation Board to appoint a referee. The case shall again be considered by the committee and the referee and the decision of the referee shall be final and conclusive. The salary and expenses of the referee shall be borne equally by the parties to the proceedings; all other expenses shall be paid by the party incurring them.

SECTION 14. Any Carrier not initially a party to this Agreement may become a party by serving notice of its desire to do so by mail upon the members of the committee established by Section 13 hereof. It shall become a party as of the date of the service of such notice or upon such later date as may be specified therein.



UPFULBRIGHT

SECTION 15. This Agreement shall be effective June 18, 1936, and be in full force and effect for a period of five years from that date and continue in effect thereafter with the privilege that any Carrier or organization party hereto may then withdraw from the Agreement after one year from having served notice of its intention so to withdraw; provided, however, that any rights of the parties hereto or of individuals established and fixed during the term of this Agreement shall continue in full force and effect, notwithstanding the expiration of the Agreement or the exercise by a Carrier or an organization of the right to withdraw therefrom.

This Agreement shall be subject to revision by mutual Agreement of the parties hereto at any time, but only after the serving of a sixty (60) days notice by either party upon the other.

For The Participating Carriers:

Signatures Not Reproduced

For The Participating Organizations of Employees:

Signatures Not Reproduced

Signed At Washington, D.C.
May 21, 1936.

UPFULBRIGHT

APPENDIX M

# SEPTEMBER 25, 1964 MEDIATION AGREEMENT

CASE NO. A-7030

This Agreement made this 25th day of September, 1964, by and between the participating Carriers listed in Exhibits A, B and C attached hereto and made a part hereof and represented by the National Railway Labor Conference and the Eastern, Western and South-Eastern Carriers' Conference Committees and the Employees of such Carriers shown thereon and represented by the Railway Labor Organizations signatory hereto, through the Railway Employees' Department, AFL-CIO,

Witnesseth:

IT IS AGREED:
ARTICLE I - EMPLOYEE PROTECTION

SECTION 1-

The purpose of this rule is to afford protective benefits for Employees who are displaced or deprived of employment as a result of changes in the operations of the Carrier due to the causes listed in Section 2, hereof, and, subject to the provisions of this Agreement, the Carrier has and may exercise the right to introduce technological and operational changes except where such changes are clearly barred by existing rules or Agreements.

Any job protection Agreement which is now in effect on a particular railroad which is deemed by the authorized Employee representatives to be more favorable than this Article with respect to a transaction such as those referred to in Section 2 hereof, may be preserved as to such transaction by the representatives so notifying the Carrier within thirty days from the date of receipt of notice of such transaction, and the provisions of this Article will not apply with respect to such transaction.

None of the provisions of this Article shall apply to any transactions subject to approval by the Interstate Commerce Commission, if the approval order of the Commission contains equal or more favorable Employee protection provisions, or to any transactions covered by the Washington Job Protection Agreement.

SECTION 2-

The protective benefits of the Washington. Job Protection Agreement of May, 1936, shall be applicable, as more specifically outlined below, with respect to Employees who are deprived of employment or placed in a worse position with respect to compensation and rules governing working conditions as a result of any of the following changes in the operations of this individual Carrier:





UPFULBRIGHT

A. Transfer of work;
B. Abandonment, discontinuance for 6 months or more, or consolidation of facilities or services or portions thereof;
C. Contracting out of work;
D. Lease or purchase of equipment or component parts thereof, the installation, operation, servicing or repairing of which is to be performed by the lessor or seller,
E. Voluntary or involuntary discontinuance of contracts;
F. Technological changes; and,
G. Trade-in or repurchase of equipment or unit exchange.

SECTION 3-
An Employee shall not be regarded as deprived of employment or placed in a worse position with respect to his compensation and rules governing working conditions in case of his resignation, death, retirement, dismissal for cause in accordance with existing Agreements, or failure to work due to disability or discipline, or failure to obtain a position available to him in the exercise of his seniority rights in accordance with existing rules or Agreements, or reductions in forces due to seasonal requirements, the layoff of temporary Employees or a decline in a Carrier's business, or for any other reason not covered by Section 2 hereof. In any dispute over whether an Employee is deprived of employment or placed in a worse position with respect to his compensation and rules governing working conditions due to causes listed in Section 2 hereof or whether it is due to the causes listed in Section 3 hereof, the burden of proof shall be on the Carrier.

SECTION 4-
The Carrier shall give at least sixty (60) days (ninety (90) days in cases that will require a change of Employee's residence) written notice of the abolition of jobs as a result of changes in operations for any of the reasons set forth in Section 2 hereof, by posting a notice on bulletin boards convenient to the interested Employees and by sending certified mail notice to the General Chairmen of such interested Employees. Such notice shall contain a full and adequate statement of the proposed changes in operations, including an estimate of the number of Employees of each class affected by the intended changes, and a full disclosure of all facts and circumstances bearing on the proposed discontinuance of positions. The date and place of a conference between representatives of the Carrier and the General Chairman or his representative, at his option, to discuss the manner in which and the extent to which Employees may be affected by the changes involved, shall be agreed upon within ten (10) days after the receipt of said notice, and conference shall commence within thirty (30) days from the date of such notice.

SECTION 5-
Any Employee who is continued in service, but who is placed, as a result of a change in operations for any of the reasons set forth in Section 2 hereof, in a worse position with respect to compensation and rules governing working conditions, shall be accorded the benefits set forth in Section 6(A), (B) and (C) of the Washington Job Protection Agreement of May, 1936, reading as follows:

UPFULBRIGHT

" Section 6(A). No Employee of any of the Carriers involved in a particular Coordination who is continued in service shall, for a period not exceeding five years following the effective date of such Coordination, be placed, as a result of such Coordination, in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of such Coordination so long as he is unable in the normal exercise of his seniority rights under existing Agreements, rules and practices to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at the time of the particular Coordination, except however, that if he fails to exercise his seniority rights to secure another available position, which does not require a change in residence, to which he is entitled under the working Agreement and which carries a rate of pay and compensation exceeding those of the position which he elects to retain, he shall there-after be treated for the purposes of this section as occupying the position which he elects to decline.

(B) The protection afforded by the foregoing paragraph shall be made effective whenever appropriate through what is hereby designate as a 'displacement allowance' which shall be determined in each instance in the manner hereinafter described. Any Employee entitled to such an allowance is hereinafter referred to as a 'displaced' Employee.

(C) Each displacement allowance shall be a monthly allowance determined by computing the total compensation received by the Employee and his total time paid for during the last twelve (12) months in which he performed service immediately preceding the date of his displacement (such twelve (12) months being hereinafter referred to as the 'test period') and by dividing separately the total compensation and the total time paid for by twelve, thereby producing the average monthly compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced Employee, and if his compensation in his current position is less in any month in which he performs work than the aforesaid average compensation he shall be paid the difference, less compensation for any time lost on account of voluntary absences to the extent that he is not available for service equivalent to his average monthly time during the test period, but he shall be compensated in addition thereto at the rate of the position filled for any time worked in excess of the average monthly time paid for during the test period."

SECTION 6-
Any Employee who is deprived of employment as a result of a change in operations for any of the reasons set forth in Section 2 hereof shall be accorded a monthly dismissal allowance in accordance with the terms and conditions set forth in Section 7(A) through (J) of the Washington Job Protection Agreement of May, 1936, reading as follows:

"Section 7(A). Any Employee of any of the Carriers participating in a particular Coordination who is deprived of employment as a result of said Coordination shall be accorded an allowance (hereinafter termed a Coordination allowance), based on length of service, which (except in the case of an Employee with less than one year of service) shall be a monthly allowance equivalent in each instance to sixty per cent (60%) of the average monthly compensation of the Employee in question during the last twelve months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result





UPFULBRIGHT

of the Coordination. This Coordination allowance will be made to each eligible Employee while unemployed by his home road or in the coordinated operation during a period beginning at the date he is first deprived of employment as a result of the Coordination and extending in each instance for a length of time determined and limited by the following schedule:

| LENGTH OF SERVICE | PERIOD OF PAYMENT |
|---|---|
| 1 Yr. and Less Than 2 Yrs. | 6 Months |
| 2 Yrs. and Less Than 3 Yrs. | 12 Months |
| 3 Yrs. and Less Than 5 Yrs. | 18 Months |
| 5 Yrs. and Less Than 10 Yrs. | 36 Months |
| 10 Yrs. and Less Than 15 Yrs. | 48 Months |
| 15 Yrs. and Over | 60 Months |

In the case of an Employee with less than one year of service, the total Coordination allowance shall be a lump sum payment in an amount equivalent to sixty (60) days pay at the straight, time daily rate of the last position held by him at the time he is deprived of employment as a result of the Coordination.

(B) For the purposes of this Agreement the length of service of the Employee shall be determined from the date he last acquired an employment status with the employing Carrier and he shall be given credit for one month's service for each month in which he performed any service (in any capacity whatsoever) and twelve such months shall be credited as one year's service. The employment status of an Employee shall not be interrupted by furlough in instances where the Employee has a right to and does return to service when called. In determining length of service of an Employee acting as an officer or other official representative of an Employee organization he will be given credit for performing service while so engaged on leave of absence from the service of a Carrier.

(C) An Employee shall be regarded as deprived of his employment and entitled to a Coordination allowance in the following cases:

1. When the position which he holds on his home road is abolished as a result of Coordination and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation, or

2. When the position he holds on his home road is not abolished but he loses that position as a result of the exercise of seniority rights by an Employee whose position is abolished as a result of said Coordination, or by other employees, brought about as a proximate consequence of the Coordination, and if he unable by the exercise of his seniority rights to secure another position on his home road or a position in the coordinated operation.

(D) An Employee shall not be regarded as deprived of employment in case of his resignation, death, retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employees generally, dismissal for justifiable cause in accordance with the rules, or furloughed because of reduction in forces due to seasonal requirements of the service; nor shall any Employee be regarded as deprived of

UPFULBRIGHT

employment as the result of a particular Coordination who is not deprived of his employment within three years from the effective date of said compensation.

(E) Each Employee receiving a Coordination allowance shall keep the employer informed of his address and the name and address of any other person by whom he may be regularly employed.

(F) The Coordination allowance shall be paid to the regularly assigned incumbent of the position abolished. If the position of an Employee is abolished while he is absent from service, he will be entitled to the Coordination allowance when he is available for service. The Employee temporarily filling said position at the time it was abolished will be given a Coordination allowance on the basis of said position until the regular Employee is available for service and thereafter shall revert to his previous status and will be given a Coordination allowance accordingly if any is due.

(G) An Employee receiving a Coordination allowance shall be subject to call to return to service after being notified in accordance with the working Agreement, and such Employee may be required to return to the service of the employing Carrier for other reasonably comparable employment for which he is physically and mentally qualified and which does not require a change in his place of residence, if his return does not infringe upon the employment rights of other employees under the working Agreement.

(H) If an Employee who is receiving a coordination allowance returns to service the Coordination allowance shall cease while he is so reemployed and the period of time during which he is so reemployed shall be deducted from the total period for which he is entitled to receive a Coordination allowance. During the time of such reemployment however he shall be entitled to protection in accordance with the provisions of Section 6.

(I) If an Employee who is receiving a Coordination allowance obtains railroad employment (other than with his home road or in the coordinated operation) his Coordination allowance shall be reduced to the extent that the sum total of his earnings in such employment and his allowance exceeds the amount upon which his Coordination allowance is based; provided that this shall not apply to employees with less than one year's service.

(J) A Coordination allowance shall cease prior to the expiration of its prescribed period in the event of:

1. Failure without good cause to return to service in accordance with working Agreement after being notified of position for which he is eligible and as provided in paragraphs (G) and (H).
2. Resignation.
3. Death.
4. Retirement on pension or on account of age or disability in accordance with the current rules and practices applicable to employees generally
5. Dismissal for justifiable cause."



UPFULBRIGHT

SECTION 7-
Any Employee eligible to receive a monthly dismissal allowance under Section 6 hereof may, at his option at the time he becomes eligible, resign and (in lieu of all other benefits and protections provided in this Agreement)' accept in a lump sum a separation allowance determined in accordance with the provisions of Section 9 of the Washington Job Protection Agreement of May, 1936, reading as follows:

"Section 9. Any Employee eligible to receive a Coordination allowance under Section 7 hereof may, at his option at the time of Coordination, resign and (in lieu of all other benefits and protections provided in this Agreement) accept in a lump sum a separation allowance determined in accordance with the following schedule:

| LENGTH OF SERVICE | SEPARATION ALLOWANCE |
|---|---|
| 1 Yr. and Less Than 2 Yrs. | 3 Months' Pay |
| 2 Yrs. and Less Than 3 Yrs. | 6 Months' Pay |
| 3 Yrs. and Less Than 5 Yrs. | 9 Months' Pay |
| 5 Yrs. and Less Than 10 Yrs. | 12 Months' Pay |
| 10 Yrs. and Less Than 15 Yrs. | 12 Months' Pay |
| 15 Yrs. and Over | 12 Months' Pay |

In the case of Employees with less, than one year's service, five days' pay, at the rate of the position last occupied, for each month in which they performed service will be paid as the lump sum.

(A) Length of service shall be computed as provided in Section 7.

(B) One month's pay shall be computed by multiplying by 30 the daily rate of pay received by the Employee in the position last occupied prior to time of Coordination."

SECTION 8-
Any Employee affected by a change in operations for any of the reasons set forth in Section 2 hereof shall not be deprived of benefits attaching to his previous employment, such as free transportation, pensions, hospitalization, relief, etc., under the same conditions and so long as such benefits continue to be accorded to other Employees of the Carrier, in active service or on furlough as the case may be, to the extent that such benefits can be so maintained under present authority of law or corporate action or through future authorization which may be obtained.

SECTION 9-
Any Employee who is retained in the service of the Carrier, or who is later restored to service after being eligible to receive a monthly dismissal allowance, who is required to change the point of his employment as a result of a change in the Carrier's operations for any of the reasons set forth in Section 2 hereof, and is, therefore, required to move his place of residence, shall be accorded the protective benefits set forth in Section 10 of the Washington Job Protection Agreement of May, 1936, reading as follows:



UPFULBRIGHT

SECTION 10 (A) Any Employee who is retained in the service of any Carrier involved in a particular Coordination (or who is later restored to service from the group of employees entitled to receive a Coordination allowance) who is required to change the point of his employment as result of such Coordination and is therefore required to move his place of residence, shall be reimbursed for all expenses of moving his household and other personal effects and for the traveling expenses of himself and members of his family, including living expenses for himself and his family and his own actual wage loss during the time necessary for such transfer, and for a reasonable time thereafter, (not to exceed two working days), used in securing a place of residence in his new location. The exact extent of the responsibility of the Carrier under this provision and the ways and means of transportation shall be agreed upon in advance between the carrier responsible and the organization of the Employee affected. No claim for expenses under this Section shall be allowed unless they are incurred within three years from the date of Coordination and the claim must be submitted within ninety (90) days after the expenses are incurred.

(B) If any such Employee is furloughed within three years after changing his point of employment as a result of Coordination and elects to move his place of residence back to his original point of employment, the Carrier shall assume the expense of moving his household and other personal effects under the conditions imposed in paragraph (A) of this section.

(C) Except to the extent provided in paragraph (B) changes in place of residence subsequent to the initial changes caused by Coordination and which grow out of the normal exercise of seniority in accordance with working agreements are not comprehended within the provisions of this section."

SECTION 10-

Any Employee who is retained in the service of the Carrier, or who is later restored to service after being eligible to receive a monthly dismissal allowance, who is required to change the point of his employment as a result of a change in the Carrier's operations for any of the reasons set forth in Section 2 hereof, and is, therefore, required to move his place of residence, shall be accorded the protective benefits set forth in Section 11 of the Washington Job Protection Agreement of May, 1936, reading as follows:

Section 11 (A) The following provisions shall apply, to the extent they are applicable in each instance, to any Employee who is retained in the service of any of the Carriers involved in a particular Coordination (or who is later restored to such service from the group of Employees entitled to receive a Coordination allowance) who is required to change the point of his employment as a result of such Coordination and is therefore, required to move his place of residence:

1. If the Employee owns his own home in the locality from which he is required to move, he shall at his option be reimbursed by his employing Carrier for any loss suffered in the sale of his home for less than its fair value. In each case the fair value of the home in question shall be determined as of a date sufficiently prior to the Coordination to be unaffected thereby. The employing Carrier shall in each instance be afforded an opportunity to purchase the home at such fair value before it is sold by the Employee to any other party.



UPFULBRIGHT

2. If the Employee is under a contract to purchase his home, the employing Carrier shall protect him against loss to the extent of the fair value of any equity he may have in the home and in addition shall relieve him from any further obligations under his contract

3. If the Employee holds an unexpired lease of a dwelling occupied by him at his home, the employing Carrier shall protect him from all loss and cost in securing the cancellation of his said lease.

(B) Changes in place of residence subsequent to the initial change caused by Coordination and which grow out of the normal exercise of seniority in accordance with working agreements are not comprehended within the provisions of this section.

(C) No claim for loss shall be paid under the provisions of this section which is not presented within three years after the effective date of the Coordination.

(D) Should a controversy arise in respect to the value of the home, the loss sustained in its sale, the loss under a contract for purchase, loss and cost in securing termination of lease, or any other question in connection with these matters, it shall be decided through joint conference between the representatives of the Employees and the Carrier on whose line the controversy arises and in the event they are unable to agree, the dispute may be referred to either party to a board of three competent real estate appraisers, selected in the following manner:

One to be selected by the representatives of the Employees and the Carrier, respectively; these two shall endeavor by Agreement within ten days after their appointment to select the third appraiser, or to select some person authorized to name the third appraiser, and in the event of failure to agree then the Chairman of the Interstate Commerce Commission shall be requested to appoint the third appraiser. A decision of majority of the appraisers shall be required and said decision shall be final and conclusive. The salary and expenses of the third or neutral appraiser, including the expenses of the appraisal board, shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the salary of the appraiser selected by such party."

SECTION 11-
When positions are abolished as a result of changes in the Carrier's operations for any of the reasons set forth in Section 2 hereof, and all or part of the work of the abolished positions is transferred to another location or locations, the selection and assignment of forces to perform the work in question shall be provided for by Agreement of the General Chairman of the craft or crafts involved and the Carrier establishing provisions appropriate for application in the particular case; provided however, that under the terms of the Agreement sufficient Employees will be required to accept employment within their classification so as to insure a force adequate to meet the Carrier's requirements. In the event of failure to reach such Agreement, the dispute may be submitted by either party for settlement as hereinafter provided.

UPFULBRIGHT

SECTION 12-
Any dispute with respect to the interpretation or application of the foregoing provisions of Sections 1 through 11 of this Article (except as defined in Section 10) with respect to job protection, including disputes as to whether a change in the Carrier's operations is caused by one of the reasons set forth in Section 2 hereof, or is due to causes set forth in Section 3 hereof, and disputes as to the protective benefits to which an Employee or Employees may be entitled, shall be handled as hereinafter provided.

ARTICLE II, SUBCONTRACTING, OF THE SEPTEMBER 25,1964 NATIONAL AGREEMENT, AS AMENDED, IS FURTHER AMENDED AS FOLLOWS TO IMPLEMENT THE REPORT AND RECOMMENDATIONS OF PRESIDENTIAL EMERGENCY BOARD NO. 219, AS INTERPRETED AND CLARIFIED BY SPECIAL BOARD 102-29, AND THAT REPORT AND RECOMMENDATIONS AS WELL AS THE QUESTIONS AND ANSWERS THAT INTERPRET AND CLARIFY THEM ARE SPECIFICALLY INCORPORATED HEREIN BY REFERENCE.

ARTICLE II - SUBCONTRACTING
The work set forth in the classification of work rules of the crafts parties to the Agreement or, in the scope rule if there is no classification of work rule, and all other work historically performed and generally recognized as work of the crafts pursuant to such classification of work rules or scope rules where applicable, will not be contracted except in accordance with the provisions of Sections 1 through 4 of this Article 11. The maintenance and repair of equipment which has been historically (not necessarily exclusively) maintained and repaired by a carrier's own employees, no matter how purchased or made available to the carrier, shall not be contracted out by the carrier except in the manner specified. In determining whether work falls within either of the preceding sentences, the practices at the facility involved will govern.

Section 1 -Applicable Criteria
Subcontracting of work, including unit exchange, will be done only when genuinely unavoidable because (1) managerial skills are not available on the property but this criterion is not intended to permit subcontracting on the ground that there are not available a sufficient number of supervisory personnel possessing the skills normally held by such personnel; or (2) skilled manpower is not available on the property from active or furloughed employees; or (3) essential equipment is not available on the property; or (4) the required time of completion of the work cannot be met with the skills, personnel or equipment available on the property; or (5) such work cannot be performed by the Carrier except at a significantly greater cost, provided the cost advantage enjoyed by the subcontractor is not based on a standard of wages below that of the prevailing wages paid in the area for the type of work being performed and provided further that if work which is being performed by railroad employees in a railroad facility is subcontracted under this criterion, no employees regularly assigned at that facility at the time of the subcontracting will be furloughed as a result of such subcontracting. Unit exchange as used herein means the trading in or old or worn equipment or component parts, receiving in exchange new, upgraded or rebuilt parts, but does not include the purchase of new equipment or component parts. As to the purchase of component parts which a Carrier



UPFULBRIGHT

had been manufacturing to a significant extent, such purchases will be subject to the terms and conditions of this Article ll.

Section 2 - Advance Notice - Submission Of Data -Conference
If the Carrier decides that in the light of the criteria specified above it is necessary to subcontract work of a type currently performed by the employees, it shall give the general chairman of the craft or crafts involved notice of intent to contract out and the reasons therefor, together with supporting data sufficient to enable the General Chairman to determine whether the contract is consistent with the criteria set forth above.

Advance notice shall not be required concerning minor transactions. A minor transaction is defined for purpose of notice as an item of repair requiring eight (8) man-hours or less to perform (unless the parties agree on a different definition) and which occurs at a location where mechanics of the affected craft, specialized equipment, spare units or parts are not available or cannot be made available within a reasonable time.

The General Chairman or his designated representatives will notify the Carrier within ten days from the postmarked date of the notice of any desire to discuss the proposed action. Upon receipt of such notice the Carrier shall give such representative of the organization at least ten days advance notice of a conference to discuss the proposed action.

If no agreement is reached at the conference following the notification, either party may submit a demand for an expedited arbitration within five working days of the conference. Except in emergencies, the carrier shall not consummate a binding subcontract until the expedited procedures have been implemented and the arbitrator has determined that the subcontract is permissible, unless the parties agree otherwise. For this purpose, an "emergency" means an unforeseen combination of circumstances, or resulting state, which calls for prompt or immediate action involving safety of the public, employees, and carriers' property or avoidance of unnecessary delay to carriers' operations.

Section 3 - Request For Information When No Advance Notice Given
If the General Chairman of a craft requests the reasons and supporting data for the subcontracting of work for which no notice of intent has been given, in order to determine whether the contract is consistent with the criteria set forth above, such information shall be furnished him promptly. If a conference is requested by the General Chairman or his designated representative, it shall be arranged at a mutually acceptable time and place. Any dispute as to whether the contract is consistent with the criteria set forth in Section 1 may be processed to a conclusion as hereinafter provided.

Section 4 - Establishment Of Subcontracting Expedited Arbitration Panels
The parties shall establish expedited panels of neutral arbitrators at strategic locations throughout the United States, either by carrier or region. Each such panel shall have exclusive jurisdiction of disputes on the carrier's system or in the applicable geographical region, as the case may be, under the provisions of Article 11, Subcontracting, as amended by a group of cases on a rotating basis. Arbitrators appointed to said panels shall serve for terms of two years provided they adhere to the prescribed time requirements concerning their

UPFULBRIGHT

responsibilities. These arbitrators shall be compensated for their services directly by the parties.

Section 5 - Consist
Six neutral arbitrators shall be selected for each subcontracting expedited arbitration panel, unless the parties shall agree to a different number.

Section 6 - Location
Hearings and other meetings of arbitrators from the subcontracting expedited arbitration panels shall be at strategic locations.

Section 7 - Referees
If the parties are unable to agree on the selection of all of the arbitrators making up a panel within 30 days from the date the par-ties establish a panel of neutral arbitrators, the NMB shall be requested to supply a list of 12 arbitrators within 5 days after the receipt of such request. By alternate striking of names, the parties shall reduce the list to six arbitrators who shall constitute the panel. Neither party shall oppose or make any objection to the NMB concerning a request for such a panel.

Section 8 - Filling Vacancies
Vacancies for subcontracting expedited arbitration panels shall be filled by following the same procedures as contained in Section 7 above.

Section 9 - Content Of Presentations
The arbitrator shall not consider any evidence not exchanged by the parties at least 48 hours before the commencement of the hearing. Other rules governing the scope and content of the presentations to the Panels shall be established by further agreement of the parties or by the arbitrator if the parties fail to reach an agreement.

Section 10 - Procedure At Board Meetings
Upon receipt of a demand under Section 2 of this Article, the arbitrator shall schedule a hearing within three working days and conduct a hearing within five working days thereafter. The arbitrator shall conclude the hearing not more than 48 hours after it has commenced.

The arbitrator shall issue an oral or written decision within two working days of the conclusion of the hearing. An oral decision shall be supplemented by a written one within two weeks of the conclusion of the hearing unless the parties waive that time requirement. Any of these time limits may be extended by mutual agreement of the parties. Procedural rules governing the record and hearings before the Panels shall be determined by further agreement of the parties or by the arbitrator if the parties fail to reach an agreement

Section 11 .- Remedy
(a) If there is a claim for wage loss on behalf of a named claimant, arising out of an alleged violation of this Article, which is sustained, the arbitrator's decision shall not exceed wages lost and other benefits necessary to make the employee whole.



UPFULBRIGHT

(b) If the arbitrator finds that the carrier violated the advance notice requirements of Section 2 (in non-emergency situations), the arbitrator shall award an amount equal to that produced by multiplying 50% of the man-hours billed by the contractor by the weighted average of the straight-time hourly rates of pay of the employees of the carrier who would have both failed to consult and wrongfully contracted out work, the multiplier shall be 10% rather than 50%. The amounts awarded in accordance with this paragraph shall be divided equally among the claimants, or otherwise distributed upon an equitable basis, as determined by the arbitrator.

Section 12 - Final And Binding Character
Decisions of the Board shall be final and binding upon the parties to the dispute. In the event an Award is in favor of an employee or employees, it shall specify a date on or before which there shall be compliance with the Award. In the event an Award is in favor of a carrier the Award shall include an order to the employee or employees stating such determination. The carrier agrees to apply the decision of an arbitrator in a case arising on the carrier's property which sustains a grievance to all substantially similar situations and the Organization agrees not to bring any grievance which is substantially similar to a grievance denied on the carrier's property by the decision of the arbitrator.

Decisions of arbitrators rendered under this Article shall be subject to judicial enforcement and review in the same manner and subject to the same provisions which apply to awards of the National Railroad Adjustment Board.

Section 13 - Disputes Referred To Other Boards
Disputes arising under Article 1, Employee Protection, Article 111, Assignment of Work - Use of Supervisors, Article IV, Outlying Points, and Article V, Coupling, Inspection and Testing shall not be subject to the jurisdiction of any Subcontracting Expedited Arbitration Panel.

Disputes under Article 11 need not be progressed in the "usual manner" as required under Section 3 of the Railway Labor Act, but can be handled directly with the highest officer in the interest of expeditious handling. This Article sets up special time limits to govern the handling of cases before the expedited arbitration panels, thus providing special procedures which are intended to supersede the provisions of the standard Time Limit Rule. Therefore, such disputes being processed to a conclusion through the expedited arbitration panels are not subject to the provisions of the standard Time Limit Rule.

If there should be any claims filed for wage loss on behalf on a named claimant arising out of an alleged violations of Article 11 - Subcontracting, such claims for wage loss should be filed promptly and within sixty days of the filing of the alleged violation of Article 11 - Subcontracting, with the same carrier officer as to whom such violation of Article 11 was directed by the General Chairman of the craft or crafts involved, or his representative. If such claim is a continuous one, it cannot begin to run prior to the date the claim is presented.

Failure to handle as set forth in the preceding paragraph shall not be considered as a precedent or waiver of the contentions of the carriers or employees as to other similar claims.

UPFULBRIGHT

Article VI of the September 25, 1964 Agreement, as amended, is further amended to delete (a) all references to Article 11 -Subcontracting, and (b) Section 14 - Remedy (and to renumber the subsequent sections accordingly).

ARTICLE III - ASSIGNMENT OF WORK - USE OF SUPERVISORS

None but mechanics or apprentices regularly employed as such shall do mechanics' work as per the special rules of each craft except foremen at points where no mechanics are employed. However, craft work performed by foremen or other supervisory Employees employed on a shift shall not in the aggregate exceed 20 hours a week for one shift, 40 hours a week for two shifts, or 60 hours for all shifts.

If any question arises as to the amount of craft work being performed by supervisory Employees, a joint check shall be made at the request of the General Chairmen of the organizations affected. Any disputes over the application of this rule shall be handled as provided hereinafter.

An incumbent supervisor who assumed his present position prior to October 15, 1962, at a point where no mechanic is employed, may be retained in his present position. However, his replacements shall be subject to the preceding paragraphs of this rule.

ARTICLE IV - OUTLYING POINTS

At points where there is not sufficient work to justify employing a mechanic of each craft, the mechanic or mechanics employed at such points will so far as they are capable of doing so, perform the work of any craft not having a mechanic employed at that point. Any dispute as to whether or not there is sufficient work to justify employing a mechanic of each craft, and any dispute over the designation of the craft to perform the available work shall be handled as follows: at the request of the General Chairman of any craft the parties will undertake a joint check of the work done at the point If the dispute is not resolved by Agreement it shall be handled as hereinafter provided and pending the disposition of the dispute the Carrier may proceed with or continue its designation.

Existing rules or practices on individual properties may be retained by the organizations by giving a notice to the Carrier involved at any time within 90 days after the date of this Agreement.

ARTICLE V - COUPLING, INSPECTION AND TESTING

In yards or terminals where carmen in the service of the Carrier operating or servicing the train are employed and are on duty in the departure yard, coach yard or passenger terminal from which trains depart, such inspecting and testing of air brakes and appurtenances on trains as is required by the Carrier in the departure yard, coach yard, or passenger terminal, and the related coupling of air, signal and steam hose incidental to such inspection, shall be performed by the carmen.





UPFULBRIGHT

ARTICLE VI - RESOLUTION OF DISPUTES

SECTION 1 - ESTABLISHMENT OF SHOP CRAFT SPECIAL BOARD OF ADJUSTMENT
In accordance with the provisions of the Railway Labor Act, as amended, a Shop Craft Special Board of Adjustment, hereinafter referred to as "Board" is hereby established for the purpose of adjusting and deciding disputes which may arise under Article 1, Employee Protection, of this Agreement. The parties agree that such Board shall have exclusive authority to resolve all disputes arising under the terms of Article I of this Agreement. Awards of the Board shall be subject to judicial review by proceedings in the United States District Court in the same manner and subject to the same provisions that apply to awards of the National Railroad Adjustment Board.

(ARTICLE VI - RESOLUTION OF DISPUTES - Section 1 from
ARTICLE V - Part B. of December 4,1978 Agreement)

SECTION 2 - CONSIST OF BOARD
Whereas, Article VI of the September 25, 1964 Agreement provides for the resolution of disputes arising under Article I of said Agreement and Section 2 of Article VI sets forth the procedure for the composition of the Board established for the purpose of resolving such disputes; and under the terms of said section the Board is to consist of two members appointed by the organizations party to the Agreement, two members appointed by the carriers party to the Agreement and a fifth member, a referee, appointed from a panel of referees; and

Whereas, in November of 1964 following an exchange of letters it was further agreed by the parties to the Agreement to modify the terms of Section 2 of Article VI by providing that instead of two members each party would appoint three members with the understanding that in any function, two of three members thus appointed would serve; and

Whereas, in the Memorandum of Agreement dated May 31,1974 and Mediation Agreement dated December 4, 1978, it was agreed by the parties to the agreement to further modify the appointment and functioning of partisan members by providing that instead of three members each party would appoint six members; two of the six persons designated to represent the organizations party to the Agreement would be appointed by International Association of Machinists and Aerospace Workers and Sheet Metal Workers' International Association respectively and the remaining four members would be appointed on behalf of the other four organizations party to the Agreement by the Railway Employees' Department, AFL-CIO; and whereas, on October 1, 1980, the Railway Employee's Department, AFL-CIO, was dissolved by appropriate action and ceased to have any status as an affiliation of Shop Craft Organizations or to have any authority to speak for or represent any organization or brotherhood; and

Whereas, the parties understand the importance of maintaining grievance machinery for the handling of disputes arising under the September 25, 1964 National Agreement in order to provide a means for the peaceful resolution of minor grievances under the Railway Labor Act; and

UPFULBRIGHT

Whereas, in view of these considerations the organizations party to the Agreement have agreed upon a temporary procedure which is acceptable to the carriers party to the Agreement, for the appointment and functioning of partisan members of the Board under Section 2 of VI.

NOW, THEREFORE, it is agreed that effective October 1, 1980, partisan members of the Board under Section 2 of Article VI shall be appointed and function as follows:

1. Six members shall be appointed by the organizations party to the Agreement and six members shall be appointed by the carriers party to the Agreement. Of the six persons designated to represent the organizations party to the Agreement one shall be appointed by each of the following signatories: International Association of Machinists and Aerospace Workers; Sheet Metal Workers International Association; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; Brotherhood Railway Carmen of the United States and Canada; International Brotherhood of Electrical Workers, and International Brotherhood of Firemen and Oilers.

2. Each of the twelve partisan members of the Board so appointed shall have the right to sit in all proceedings of the Board. The organizations and the carriers party to the Agreement further agree, however, that in the handling of dispute cases before the Board a smaller panel of the twelve members may function and constitute a quorum for the resolution of such disputes, provided first, that at least one organization and one carrier member shall sit and function in all dispute cases before the Board; second, that regardless of the number of members sitting and functioning in dispute cases, the unit method of voting shall prevail and six votes shall be cast on behalf of the carrier and organization members respectively; third, that in any dispute involving employees represented by one of the signatory organization, the appointee of that organization shall sit and function as a member of the Board.

It is agreed further that all disputes and grievances arising under Article I of the September 25, 1964 Agreement shall be handled on appeal from the property in accordance with the terms of this Agreement while it is in effect including those presently pending before Special Board of Adjustment 570, as well as any subsequently appealed to the Board.

This Memorandum of Agreement is a temporary measure intended to provide the parties with a continuing means for the peaceful resolution of such minor grievances under the Railway Labor Act pending further consideration of matters arising form the dissolution of Railway Employees Department.

(Section 2 of ARTICLE VI - RESOLUTION OF DISPUTES -from MEMORANDUM OF AGREEMENT dated November 17,1980)

SECTION 3 - APPOINTMENT OF BOARD MEMBERS
Appointment of the members of the Board shall be made by the respective parties within thirty days from the date of the signing of this agreement



UPFULBRIGHT

SECTION 4 - LOCATION OF BOARD OFFICE
The Board shall have offices in the City of Chicago, Illinois.

SECTION 5 - REFEREES - EMPLOYEE PROTECTION
The parties agree to select a panel of six potential referees for the purpose of disposing of disputes before the Board arising under Articles I of this Agreement. Such selections shall be made within thirty (30) days from the date of the signing of this Agreement If the parties are unable to agree upon the selection of the panel of potential referees within the 30 days specified, the National Mediation Board shall be requested to name such referees as are necessary to fill the panel within 5 days after the receipt of such request.

SECTION 6- TERM OF OFFICE OF REFEREES
The parties shall advise the National Mediation Board of the names of the potential referees selected, and the National Mediation Board shall notify those selected, and their successors, of their selection, informing them of the nature of their duties, the parties to the agreement and such information as it may deem advisable, and shall obtain their consent to serve as a panel member. Each panel member selected shall serve as a member until January 1, 1966, and until each succeeding January 1 thereafter unless written notice is served by the organizations or the carriers parties to the agreement, at least 60 days prior to January 1 in any year that he is no longer acceptable. Such notice shall be served by the moving parties upon the other parties to the agreement, the members of the Board and the National Mediation Board. If the referee in question shall then be acting as a referee in any case pending before the Board, he shall serve as a member of the Board until the completion of such case.

SECTION 7. FILLING VACANCIES - REFEREES
In the event any panel member refuses to accept such appointment, dies, or becomes disabled so as to be unable to serve, is terminated in tenure as herein above provided, or a vacancy occurs in panel membership for any other reason, his name shall immediately be stricken from the list of potential referees. The- members of the Board shall, within thirty days after a vacancy occurs, meet and select a successor for each member as may be necessary to restore the panel to full membership. If they are unable to agree upon a successor within thirty days after such meeting, he shall be appointed by the National Mediation Board.

SECTION 8 - JURISDICTION OF BOARD
The Board shall have exclusive jurisdiction over disputes between the parties growing out of grievances concerning the interpretation or application of Article 1, Employee Protection

SECTION 9 - SUBMISSION OF DISPUTE
Any dispute arising under Article 1, Employee Protection, of this Agreement, not settled in direct negotiations may be submitted to the Board by either party, by notice to the other party and to the Board.

(Sections 3, 4,5,6, 7,8, and 9, of ARTICLE VI - RESOLUTION OF DISPUTES - from September 25,1964 Agreement)

UPFULBRIGHT

SECTION 10 - TIME LIMITS FOR SUBMISSION
Within 60 days of the postmarked date of such notice, both parties shall send 15 copies of a written submission to their respective members of the Board. Copies of such submissions shall be exchanged at the initial meeting of the Board to consider the dispute.

SECTION 11 - CONTENT OF SUBMISSION
Each written submission shall be limited to the material submitted by the parties to the dispute on the property and shall include:
(A) The question or questions in issue;
(B) Statement of facts:
(C) Position of Employee or Employees and relief requested;
(D) Position of company and relief requested.

SECTION 12 - FAILURE OF AGREEMENT - APPOINTMENT OF REFEREE
If the members of the Board are unable to resolve the dispute within twenty days from the postmarked date of such submission, either member of the Board may request the National Mediation Board to appoint a member of the panel of potential referees to sit with the Board. The National Mediation Board shall make the appointment within five days after receipt of such request and notify the members of the Board of such appointment promptly after it is made. Copies of both submissions shall promptly be made available to the referee.

SECTION 13 - PROCEDURE AT BOARD MEETINGS
The referee selected shall preside at meetings of the Board and shall be designated for the purpose of a case as the Chairman of the Board. The Board shall hold a meeting for the purpose of deciding the dispute within 15 days after the appointment of a referee. The Board shall consider the written submission and relevant agreements, and no oral testimony or other written material will be received. A majority vote of all members of the Board shall be required for a decision of the Board. A partisan member of the Board may in the absence of his partisan colleague vote on behalf of both. Decisions shall be made within thirty days from the date of such meeting.

Sections 11, 12, and 13 of ARTICLE VI - RESOLUTION OF DISPUTES - from September 25,1964 Agreement)

SECTION 14 - FINAL AND BINDING CHARACTER
Decisions of the Board shall be final and binding upon the parties to the dispute. In the event an Award is in favor of an employee or employees, it shall specify a date on or before which there shall be compliance with the Award. In the event an Award is in favor of a carrier the Award shall include an order to the employees stating such determination.

(Section 14 of ARTICLE VI - RESOLUTION OF DISPUTES from ARTICLE X - Part B. of December 4,1978 Agreement)

SECTION 15 - EXTENSION OF TIME LIMITS



UPFULBRIGHT001609

UPFULBRIGHT

The time limits specified in this Article may be extended only by mutual agreement of the parties.

SECTION 16 - RECORDS
The Board shall maintain a complete record of all matters submitted to it for its consideration and all findings and decisions made by ft.

SECTION 17 - PAYMENT OF COMPENSATION
The parties hereto will assume the compensation, travel expense of the Board members selected by them. Unless other arrangements are made, the office, stenographic and other expenses of the Board, including compensation and expenses of the neutral members thereof, shall be shared equally by the parties.

SECTION I8 - DISPUTES REFERRED TO ADJUSTMENT BOARD
Disputes arising under Article 111, Assignment of Work - Use of Supervisors, Article IV, Outlying Points, and Article V, Coupling, Inspection and Testing, of this agreement, shall be handled in accordance with Section 3 of the Railway Labor Act, as amended.

(Sections 15, 16, 17, and the first paragraph of Section 18 of
ARTICLE VI - RESOLUTION OF DISPUTES -
from September 25,1964 Agreement)

Under the provisions of Article VI, Section 18, disputes arising under Article III - Assignment of Work, Article IV - Outlying Points, and Article V - Coupling, Inspection and Testing, are to be handled in accordance with Section 3 of the Railway Labor Act. It is clear that with respect to such disputes subject to handling under Section 3 of the Act any claim or grievance is subject to the time limits and procedural requirements of the Time Limit on Claims Rule.

A different situation exists with respect to disputes arising under Article I - Employee Protection. Article VI Provides a "Shopcraft Special Board of Adjustment" for the purpose of adjusting and deciding disputes arising out of that Article (Article VI, Section 1), and specifically provides (Article VI, Section 8) that the Board shall have 77 exclusive jurisdiction over disputes between the parties growing out of grievances concerning the interpretation or application of that Article.

During our negotiations, it was understood by both parties that disputes under Article I need not be progressed in the "usual manner" as required under Section 3 of the Railway Labor Act, but could be handled directly with the highest officer in the interest of expeditious handling. Sections 10 through 13 set up special time limits to govern the handling of submissions to the Special Board, thus providing special procedures which are intended to supersede the provisions of the standard Time Limit Rule. Therefor, such disputes being processed to a conclusion through the Shop Craft Special Board are not subject to the provisions of the standard Time Limit Rule.

This understanding is a supplement to Article VI of the September 25, 1964 Agreement and will become effective as of this date.

UPFULBRIGHT

(ARTICLE VI - Section 18, 2nd through 5th paragraphs from MEMORANDUM OF UNDERSTANDING dated January 7,1965)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UPFULBRIGHT

APPENDIX M-1

Memorandum of Understanding RE Article VI, of Mediation Agreement of September 25, 1964 by and between the participating Carriers listed in Exhibits A, B and C of said Agreement represented by the National Railway Labor Conference and the Eastern, Western and South-Eastern Carriers' Conference Committees, and the Employees of such Carriers shown thereon and represented by the Railway Labor Organizations signature thereto, through the Railway Employees' Department, AFL-CIO.

Under the Provisions of Article VI, Section 19, disputes arising under Article III - Assignment of Work, Article IV - outlying Points, and Article V - Coupling, Inspection and Testing, are to be handled in accordance with Section 3 of the Railway Labor Act. It is clear that with respect to such disputes subject to handling under Section 3 of the Act any claim or grievance is subject to the time limits and procedural requirements of the time limit on claims rule.

A different situation exists with respect to disputes arising under Article I - Employee Protection, and Article 11 - Subcontracting, Article VI provides a "Shop Craft Special Board of Adjustment" for the purpose of adjusting and deciding disputes arising out of those two Articles (Article VI, Section 8) that the Board shall have exclusive jurisdiction over disputes between the parties growing out of grievances concerning the interpretation or application of those two Articles.

During our negotiations, it was understood by both parties that disputes under Articles I and 11 need not be progressed in the "Usual Manner" as required under Section 3 of the Railway Labor Act, but could be handled directly with the highest officer in the interest of expeditious handling. Sections 10 through 13 set up special time limits to govern the handling of submissions to the Special Board, thus providing special procedures which are intended to supersede the provisions of the Standard Time Limit Rule. Therefore, such disputes being processed to a conclusion through the Shop Craft Special Board are not subject to the provisions of the Standard Time Limit Rule.

However, if there should be any claims filed for wage loss on behalf of a named claimant arising out of an alleged violation of Article 11 - Subcontracting (See Section 14 of Article VI), such claims for wage loss should be filed promptly and within sixty days of the filing of the alleged violation of Article 11 - Subcontracting, with the same Carrier officer as to whom such violation of Article 11 was directed by the General Chairman of the Craft or Crafts involved, or his representative. If such claim is a continuous one, it cannot begin to run prior to the date the claim is presented. If the alleged violation of Article 11 - Subcontracting, is then submitted to the Shop Craft Special Board of Adjustment, it will be considered that the Special Procedural Provisions of Article V1 have been compiled with.

Failure to handle as set forth in the preceding paragraph shall not be considered as a precedent or waiver of the contentions of the Carriers or Employees as to other similar claims.

This understanding is a supplement to Article VI of the September 25, 1964 Agreement and will become effective as of this date.

FOR THE CARRIERS
J. E. Wolfe
Chairman, National
Railway Labor
Conference

FOR THE ORGANIZATIONS
Michael Fox
President, Railway
Employees' Department,
AFL-CIO

January 7, 1965

UPFULBRIGHT

APPENDIX M-2

November 27, 1991

#7

Mr. E. P. McEntee, Int'l. Vice President
International Bro. Of Electrical Workers
10400 W. Higgins Road, Suite 720
Rosemont, Illinois 60018

Dear Mr. McEntee:

This is to confirm our understanding regarding the resolution of disputes under Article 11 of the September 25, 1964 Agreement, as amended by Article VI of this Imposed Agreement.

If the parties have not established a forum or forums for before-the-fact arbitration of contracting out disputes by July 29,1991, any such dispute will proceed on an after-the-fact basis, i.e., the carrier will be free to proceed forthwith with the contracting-out and any dispute may be progressed to a Public Law Board on an expedited basis, or any other forum on which the parties may mutually agree.

The parties shall meet promptly to reach agreement on language to implement the recommendations of Presidential Emergency Board 219, as interpreted and clarified by Special Board 102-29, on the procedures for arbitrating contracting-out disputes. If complete agreement on language is not reached by the parties on December 15, 1991, the parties shall refer any areas of disagreement to Special Board 102-29 for resolution.

Please indicate your agreement by signing your name in the space provided below.

Very truly yours,

/s/ Charles 1. Hogkins

I agree:

/s/ Edward P. McEntee



UPFULBRIGHT

APPENDIX N

ARTICLE V - INCIDENTAL WORK RULE
(imposed Agreement dated 11 /27/91)

Section 1

The coverage of the Incidental Work Rule is expanded to include all shopcraft employees represented by the organization party hereto and shall read as follows:

Where a shopcraft employee or employees are performing a work assignment, the completion of which calls for the performance of "incidental work" (as hereinafter defined) covered by the classification of work or scope rules of another craft or crafts, such shopcraft employee or employees may be required, so far as they are capable, to perform such incidental work provided it does not comprise a preponderant part of the total amount of work involved in the assignment. Work shall be regarded as "incidental" when it involves the removal and replacing or the disconnecting and connecting of parts and appliances such as wires, piping, covers, shielding and other appurtenances from or near the main work assignment in order to accomplish that assignment, and shall include simple tasks that require neither special training nor special tools. Incidental work shall be considered to comprise a preponderant part of the assignment when the time normally required to accomplish it exceeds the time normally required to accomplish the main work assignment.

in addition to the above, simple tasks may be assigned to any craft employee capable of performing them for a maximum of two hours per shift. Such hours are not to be considered when determining what constitutes a "preponderant part of the assignment".

If there is a dispute as to whether or not work comprises a "preponderant part" of a work assignment the carrier may nevertheless assign the work as it feels it should be assigned and proceed or continue with the work and assignment in question; however, the Shop Committee may require that the assignment be timed by the parties to determine whether or not the time required to perform the incidental work exceeds the time required to perform the main work assignment. If it does, a claim will be honored by the carrier for the actual time at pro rata rates required to perform the incidental work.

Section 2

Nothing in this Article is intended to restrict any of the existing rights of a carrier.

UPFULBRIGHT

Agreed Upon Guidelines for Administration of Differentials -

The parties wish to avoid misunderstandings about the implementation and application of the December 20, 1993 Letter Agreement differentials (hereinafter differentials) and have adopted the following to provide guidance on key points of administration.

Q. Who is entitled to receive the differentials?
A. Journeymen (including upgraded mechanics) who actually perform the listed work.

Q. How does the differential apply where the position is that of journeyman and some welding, federal periodic locomotive inspection or lead mechanic work is required?
A. When performing welding, federal inspector or lead mechanic work for four (4) hours or less in any one day, the employe will be paid the differential on an hourly basis with a minimum of one (1) hour; for more than four (4) hours in any one day, the differential will apply for that day. This same principle applies with respect to employes covered by the Section 2 differentials (high voltage) when performing the work set forth in that provision.

NOTE The Section 4 differential is payable on the basis of all hours worked. An employe covered by that provision who is compensated on a monthly basis shall be paid such differential for those hours on which service is actively performed.

Q. Is a railroad restricted in any manner with respect to correcting any instances in which differential payments have been made erroneously?
A. No.

Q. Will application of the differentials require the establishment, advertisement or rebulletining of any position?

A. No.

Q. When must a employe's qualifications be know to the railroad or established?
A. An examination or test to establish qualifications may be required as a prerequisite to assignment to a position subject to a differential of an employe who has not previously been qualified on such work by performance or otherwise.

FOR THE INT'L BRO. OF
ELECTRICAL WORKERS:
/s/ Norman D. Schwitalla
International Vice President

FOR THE CARRIERS:
/s/ R. F. Allen
Chairman -- National Carriers'
Conference Committee



UPFULBRIGHT

APPENDIX P

July 16, 1963

013-298-6&7

Mr. L. J. Wisniski
General Chairman, IBofEW
5636 Spring Street
Omaha, NE 68127

Dear Mr. Wisniski:

Referring to your discussion with Mr. Froyd on July 11, 1963, and your request that holidays be considered on a calendar-day basis rather than being computed from the starting time of the regular work week, which is being used for the rest day for monthly compensated employes covered by the IBofEW Agreement.

The regular weekday starting hour, which in our case is normally 8 A.M., is considered as a starting period for each of those days; therefore, Saturday starts at 8 A.M. Saturday and continues until 8 A.M. Sunday. Sunday starts at 8 A.M. Sunday and continues for the next 24 hours until the next starting time on Monday.

Am agreeable to the holidays being on a calendar-day basis, and the distribution of hours will be from 12 midnight until 12 midnight for all monthly compensated employes covered by the IBofEW Agreement.

If this meets with your approval, please sign in the space provided and retain one copy of this letter for your file.

Yours truly,

/s/ G. R. Van Eaton

AGREED:

/s/ L. J. Wisniski

UPFULBRIGHT

APPENDIX Q

AGREEMENT
between the
UNION PACIFIC RAILROAD COMPANY
and
INTERNATIONAL BROTHERHOOD of ELECTRICAL WORKERS

IT IS AGREED:

Employes in Communications Gangs under Seniority District No. 5 who are stationed in crews which may be other than their normal place or residence may be permitted to work on a designated holiday as hereinafter provided:

Where such holiday falls on a day other than the first or last day of their work week, subject to ten-day advance approval by the Director of Communications, such holiday will be worked at straight time rate of pay and observance of the holiday will be the last work day of that work week. In the event the holiday falls on Tuesday or Thursday, the Director of Communications can, if circumstances warrant, direct the employes to work on the preceding Saturday at straight time rate in lieu of returning to work on Monday or Friday. Under the foregoing arrangement, all employes in the gang shall observe the holiday on the same date.

This Agreement and holidays designated or provided for herein are in substitution of and being observed in place of holidays enumerated in the National Agreements designating the Specified National Holidays.

This Agreement shall become effective November 10, 1975, and shall continue in effect thereafter until terminated, subject to the condition that it shall terminate fifteen (15) days after written notice is served by either party upon the other.

Signed this 10th day of November, 1975.

FOR THE UNION PACIFIC RAILROAD:

/s/ Huah M. Robertsgn
Director - Communications

/s/ R. D. Rosenbohm
Director Labor Relations –Shop Crafts

FOR THE EMPLOYES:

W. E. Tolan
General Chairman, International
Brotherhood of Electrical Workers





UPFULBRIGHT

APPENDIX R

January 25, 1982

Mr. V. L. Janecek
General Chairman, IBEW
306 Glenn Rose
North Platte, NE 69191

Dear Sir:

This has reference to the agreement signed this date providing for the reclassification of monthly rated positions in the Communication Department to hourly rated positions.

In making this change it is understood that overtime will be kept to the minimum necessary to meet the requirements of the service and will be apportioned in a manner satisfactory to the General Chairman with a view of distributing overtime equally. When it becomes necessary for employees to work overtime they shall not be laid off during regular working hours to equalize the time.

It is understood and agreed that the amount of overtime to be worked will be determined by the Company and representatives of the Organization will cooperate with Local Management to establish overtime calling procedures that will assure qualified employes are available to protect the service and perform emergency work as required.

Yours truly,

/s/ R. D. Rosenbohm

AGREED:

/s/ V. L. Janecek
General Chairman

UPFULBRIGHT

APPENDIX S

MEMORANDUM OF AGREEMENT
Between
UNION PACIFIC RAILROAD COMPANY
COMMUNICATIONS DEPARTMENT
and
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

In order to establish a uniform collective bargaining agreement for Communications Department employees between the Union Pacific Railroad Company (including Missouri Pacific Railroad) and the International Brotherhood of Electrical Workers:

IT IS AGREED:

ARTICLE I - COLLECTIVE BARGAINING AGREEMENTS

Section 1. The current collective bargaining agreement for Communications Department employees between the Missouri Pacific Railroad Company and the International Brotherhood of Electrical Workers, effective August 1, 1977, as amended, including existing agreements, understandings, and practices, will be cancelled effective November 30, 1986, except as provided herein in Article V.

Section 2. Effective December 1, 1986, all employees in the Communications Department covered by the former collective bargaining agreement between the Missouri Pacific Railroad Company and the International Brotherhood of Electrical Workers will be governed by the collective bargaining agreement between the Union Pacific Railroad Company and the International Brotherhood of Electrical Workers effective July 1, 1977, as amended, including existing agreements, understandings, and practices, except as provided in Attachment "A".

ARTICLE II - SENIORITY DISTRICTS

Section 1. Existing rules covering seniority district territories in the Communications Department are hereby amended to provide for seniority districts as follows:

EXISTING SENIORITY DISTRICTS

Union Pacific
Railroad Company

| Seniority District No. | Territory |
|---|---|
| Eastern District | East of Ogden to Council Bluffs, Including Cheyenne to Denver to Kansas City, and Omaha to |





UPFULBRIGHT

| | | |
|---|---|---|
| | | Kansas City |
| 2 | South Central District | Los Angeles to McCammon Including Ogden, San Francisco to Salt Lake |
| 3 | Northwest District | Granger and Northwest (including McCammon and Elkhorn Microwave Site) |
| 4 | Communications Department Gangs | Union Pacific Railroad |
| 5 | Terminal Specialists | Union Pacific Railroad |
| 7 | Communications Gang Foremen | Union Pacific Railroad |

Missouri Pacific Railroad Company

| | |
|---|---|
| System Roster | Missouri Pacific Railroad, excluding territory identified as the former Chicago Eastern Illinois Railroad, Texas and Pacific Railway Company, and the Southern /Gulf/Texas Districts. |

SENIORITY DISTRICTS EFFECTIVE DECEMBER 1. 1986

| Seniority District No. | | Territory |
|---|---|---|
| 1. | | East of Ogden to Council Bluffs including Cheyenne to Denver to Menoken Junction and Omaha to Walcott Junction |
| 2. | | Los Angeles to McCammon including Ogden, San Francisco to Salt Lake |
| 3. | | Granger and Northwest (including McCammon and Elkhorn Microwave Site) |
| 4. | | Missouri Pacific Railroad, excluding territory identified as the former Chicago Eastern Illinois Railroad, Texas and Pacific Railway Company, and the Southern /Gulf/Texas Districts |
| 5. | Communication Department | Union Pacific Railroad |

UPFULBRIGHT

| | | |
|---|---|---|
| | Gangs | (incl. territory in Seniority Dist. No. 4) |
| 6 | Terminal Specialists | Union Pacific Railroad |
| 7 | Communications Gang Foremen | Union Pacific Railroad (incl. territory in Seniority Dist. No. 4) |

The attached color-coded map of the Union Pacific Railroad Company and Missouri Pacific Railroad identifies the seniority districts in effect December 1, 1986. Seniority Districts Nos. 5, 6, and 7 encompass Seniority District Nos. 1, 2, 3, and 4, except Seniority District No. 6 does not encompass Seniority District No. 4.

Section 2. On the effective date of this Agreement, the Missouri Pacific Railroad seniority roster for Communications Department employees will become Seniority District Roster No. 4 using the most current names and seniority dates contained on the Missouri Pacific Railroad seniority roster.

Section 3. Existing monthly-rated positions on the Missouri Pacific Railroad Company will be reclassified as hourly-rated positions as shown on Attachment "A". An employee assigned to a monthly-rated position of communications Maintainer on the effective date of this Agreement must elect one of the following options within sixty (60) days from the effective date of this Agreement.

To continue to be paid at the existing monthly rate under rules applicable to monthly-rated positions until such time as the employee voluntarily vacates the reclassified position held on the effective date of this agreement on new Seniority District Roster No. 4.

2. To be paid as hourly-rated employees under applicable Collective Bargaining Agreement rules.

An employee failing to make an election will be considered as having elected Option 1.

Subsequent to the sixty (60) day period, such employees may elect upon fifteen (15) days advance written notice to the General Director Communications- Facilities with copy to the General Chairman to elect Option 2. The change will become effective on the first pay period after the 1 5th day notice. It is understood, however, that employees covered by this section electing Option 2 will thereafter be paid as hourly-rated employees under applicable agreement rules.

Section 4. All now positions and vacancies will be established at the hourly rate of pay applicable under the Collective Bargaining Agreement.

ARTICLE III - OPERATION CHANGES



UPFULBRIGHT001621



UPFULBRIGHT

Except as necessary to meet service requirements, existing monthly-rated positions initially reclassified to hourly-rated positions pursuant to the terms of this agreement will not be rebulletined and the sixth day of the workweek will be the first rest day of the positions. Initial changes requiring different starting times or rest days on positions to meet service requirements as a result of an employee electing Option 2, Article 11, Section 3, will be made by local bulletin, and incumbents of those positions affected will be required to exercise seniority rights at home point. All subsequent changes will be made pursuant to the existing bulletin and assignment rules of the current Collective Bargaining Agreement.

ARTICLE IV - CREDITING SERVICE

Communications Department employees covered by this Agreement will be treated as though service on the Missouri Pacific Railroad and the Union Pacific Railroad Company was continuous for the purpose of eligibility for vacation, personal leave and other present or future benefits which are granted on the basis of qualifying years of service, irrespective of whether the employee is working on the Missouri Pacific Railroad or the Union Pacific Railroad Company.

ARTICLE V - MISSOURI PACIFIC RAILROAD AGREEMENTS RETAINED

The provisions of Agreements between the International Brotherhood of Electrical Workers and the Missouri Pacific Railroad dated January 9, 1974 (Check-Off Agreement), August 14, 1980 (Dues Deduction Agreement) and August 16, 1983 (Maintenance of Membership Agreement) will remain in effect until amended or cancelled by the parties involved.

ARTICLE VI - EFFECT OF THIS AGREEMENT

The provisions Of this Agreement are not intended to infringe of the work rights of any other craft as established on the Missouri Pacific Railroad.

This agreement is effective December 1, 1986, and shall remain in effect until changed or modified in accordance with the provisions of the Railway Labor Act, as amended.

Signed this 17th day of November, 1986.

FOR THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS:

/s/ D. G. Davis
General Chairman, IBofEW
/s/ V. L. Janecek
General Chairman, IBofEW

FOR UNION PACIFIC RAILROAD COMPANY:

/s/ D. J. Smith
Senior Director Labor Relations-Shop Crafts

UPFULBRIGHT

October 17, 1986

013-280-1

Mr. D. G. Davis
General Chairman, IBEW
4013 South Spring Street
Independence, MO 64055

Mr. V. L. Janecek
General Chairman, IBEW
306 Glenn Rose
North Platte, NE 69101

Gentlemen:

This has reference to our recent discussions pertaining to the use of Union Pacific Railroad Communications Department employees in connection with Communications projects performed for subsidiary units of Union Pacific Corporation.

Based upon our discussion, both of you indicated your concurrence in allowing employees you represent in the Communications Department to perform work on Union Pacific Corporation's communications equipment and facilities. However, it was recognized that such work does not fall under your craft's jurisdiction and that by using such employees to perform this work, there will be no attempt to claim such work as belonging to IBofEW employees.

Furthermore, it is clearly understood the Union Pacific Corporation subsidiaries have the undisputed right to utilize their own forces to perform the work, or to have the work contracted to other parties.

It was agreed that his handling of work indicated above will not be considered as a precedent, nor be cited in the future as a basis for claiming such work. Will you please indicate your acceptance of the above understandings by placing your signatures in the spaces provided below.

Yours truly,

/s/ D. J. Smith

AGREED:

/s/ D. G. Davis
General Chairman, IBofEW

/s/ V. L. Janecek
General Chairman, IBofEW





UPFULBRIGHT

APPENDIX U

March 17, 1992

280-1

Mr. Don Davis
General Chairman, IBEW
4013 South Spring St.
Independence, Mo 64055

Mr. V. L. Janecek
General Chairman, IBEW
306 Glen Rose Ave.
North Platte, NE 69101

Gentlemen:

In conference on March 17, 1992, we again discussed the proposed agreement which will utilize employes you represent to perform work on all types of computer (input/output devices) based data processing equipment.

After considerable discussion, it was understood that installation and service of the computer based data processing equipment will proceed o the following basis:

(1) It is the intent to use Electronic Technicians and/or Equipment Installers covered by the IBEW contract to install and service on-site computers (mainframe computers are excluded at this time) and computer-based data processing equipment in preference to outside vendors.

(2) It is understood that any work performed on this equipment outside bulletined hours will be at the appropriate overtime rate regardless of whether the employee is monthly or hourly rated.

(3) There will be no elimination of jobs or any employe be required to relocate as a consequence of implementation of this Agreement.

(4) This understanding may only be cancelled upon thirty (30) day written notice of a desire to cancel the understanding by either party.

(5) If cancelled, this understanding will not be cited as a precedent for grievance resolution, negotiating or any other purpose.

UPFULBRIGHT

If the foregoing accurately reflects our understanding, please so indicate by each signing in the space provided below, retaining a copy for your files and returning the original to me.

Very truly yours,

/s/ D. J. Smith
General Director Labor Relation NonOps

/s/ A. C. Hallberg
Director of Labor Relations
Maintenance of Way & Signal

/s/ F. J. Sevenants
General Director
Telecommunication Services

AGREE:

/s/ Don Davis
General Chairman, IBEW

/s/ Vic Janecek
General Chairman, IBEW

UPFULBRIGHT

APPENDIX V

November 16, 1996

480-060-006
480-060-005

Mr. V L Janecek
General Chairman, IBEW
620 North Custer
North Platte , NE 69101

Dear Sir:

This is in reference to our discussions regarding the Carrier's decision to implement an Incentive Plan at the Telecommunications Service Center at Council Bluffs, Iowa.

Through joint effort with the employees of the TSC, we intend on implementing an incentive plan that can reward the employees of the TSC based on reaching certain objectives. The program hopefully will encourage each employees of the TSC to become more aware of business objectives and the importance of providing a quality product at a competitive price.

The team believes that the incentive program will provide the stimulus to accomplish the overall goals of the Center and the Company. The incentive program provides a clear win-win situation for both the employees and the Company to share in.

Since the program provides cash incentives at this time for reaching identified goals, it is agreed that the implementation of such program will not set any precedent nor be cited in any other negotiation local or national. It is understood and agree that the Company or the Organization may cancel the program at any time upon serving a thirty (30) day notice on the other party.

If you are agreeable to implementing the program based on the above understanding, please sign in the space provided below.

Yours truly,

/s/ Dan Moresette

AGREED:

/s/ Vic Janecke
General Chairman, IBEW

UPFULBRIGHT

**EMPLOYEES WITH PRESERVED RATES OF PAY**

| ETA Preserved CNW - Rate $19.95 | Work Location | Seniority Date |
|---|---|---|
| Postuchow, K.W. | Butler, WI | 9/1/90 |
| Whitelaw, J.W. | Chicago, IL | 8/2/83 |
| Schneider, C.J. | Des Moines, IA | 4/4/83 |
| Henry, G.O. | Proviso, IL | 4/1/93 |
| Huszagh, R. | Proviso, IL | 12/19/94 |
| Carroll, D.B. | Proviso, IL | 11/1/89 |
| Cashatt, S.W. | W. Chicago, IL | 3/4/93 |

| ETA Preserved DRGW - Rate $4,247.13/mo. | Work Location | Seniority Date |
|---|---|---|
| Gerleman, S.L. | Denver, CO | 1/16/84 |
| Capps, D.L. | Denver, CO | 6/4/84 |
| Valdez, D.L. | Denver, CO | 4/2/84 |
| Williams, W.E. | Grand Junction, CO | 12/13/76 |
| Cox, M.A. | Grand Junction, CO | 5/28/74 |
| Phillips, L.E. | Phippsburg, CO | 4/2/79 |
| Donaldson, L.D. | Salt Lake City, LIT | 6/13/77 |
| Bycroft, J.E. | Salt Lake City, UT | 5/16/81 |
| White, G.J. | Salt Lake City, LIT | 10/1/75 |
| Brode, W.R. | Salt Lake City, LIT | 12/18/80 |
| Gallegos, L.L. | Sharon Springs, KS | 3/29/93 |

| ETB Preserved SPSSW – Rate $4,035.97/mo. | Work Location | Seniority Date |
|---|---|---|
| Shulte, D.T. | Dalhart, TX | 1/7/97 |
| Meiklejohn, M.C. | Pratt, KS | 1/6/97 |

| ETA Preserved SPIOSL – Rate $4,269.83/mo. | Work Location | Seniority Date |
|---|---|---|
| McMellen, A. L. | Springfield, IL | 10/15/73 |

| ETA Preserve - Rate $21.57/hr | Work Location | Seniority Date |
|---|---|---|
| Westcoft, R. J. | Bakersfield, CA | 9/21/70 |
| Nugent, S.R. | Boone, IA | 8/3/72 |
| Nelson, L.D. | Boone, IA | 5/1/68 |
| Phillips, J.M. | Butler, W1 | 8/20/75 |
| Heise, H.G. | Chester, IL | 11/1/67 |
| White, V.L. | Cheyenne,WY | 8/25/66 |
| Maxwell, R.M. | Cheyenne, WY | 1/18/82 |
| Hansen D.L. | Cheyenne, WY | 9/10/79 |
| Kester, K.A. | Clinton, IA | 6/22/77 |





UPFULBRIGHT

| | | |
|---|---|---|
| Oerman, R.L. | Coffeyville, KS | 12/5/80 |
| Hottinger, K. R. | Colton, CA | 9/23/74 |
| Lightfoot, III J. L. | Colton, CA | 1/14/80 |
| Casper, J.T. | Dallas, TX | 4/4/77 |
| Rice, G.L. | De Soto, I L | 7/19/71 |
| Strook, W.J. | Denver, CO | 5/16/75 |
| Watson, L. K. | Denver, CO | 10/16/68 |
| Leesley, D.A. | Denver, CO | 12/1/73 |
| Nemechek, T.W. | Des Moines, IA | 8/1/71 |
| Stefaniak, T.E. | Dupo, IL | 7/1/69 |
| Jewell, K.A. | Elko, NV | 6/2/80 |
| Hejlik, D.F. | Fremont, NE | 2/16/71 |
| Fletcher, F.J. | Green River, WY | 3/5/71 |
| Urban, R.R. | Kansas City, MO | 7/26/82 |
| Jackson, J.F. | Kansas City, MO | 10/25/80 |
| Wiggins, F.D. | Kansas City, MO | 8/27/74 |
| Hurt, M.D. | Kansas City, MO | 5/17/76 |
| Achatz, M.S. | La Grande, OR | 8/20/73 |
| Prins, G.R. | Mason, City, IA | 2/2/81 |
| Morrow, D.R. | Milford, LIT | 10/18/79 |
| Moats, M.D. | Nampa, ID | 12/10/79 |
| Broderick, J.M. | Nampa, ID | 10/20/75 |
| Dress, D.E. | North Platte, NE | 4/20/81 |
| Pilakowski, P.G. | North Platte, NE | 2/1/82 |
| Essells, G.D. | North Platte, NE | 4/12/76 |
| Stone, W.E. | North Platte, NE | 6/4/68 |
| Jensen,S.C. | Omaha, NE | 7/5/83 |
| Clark, G.R. | Omaha, NE | 11/11/71 |
| Volentine, D.M. | Omaha, NE | 5/16/89 |
| Baden, M.C. | Omaha, NE | 8/2/82 |
| Kotchian, W.F. | Omaha, NE | 2/1/82 |
| Krueger, K.A. | Omaha, NE | 8/2/82 |
| McColloch, P.J. | Omaha, NE | 8/2/82 |
| Stark, C. E. | Palmdale, CA | 10/18/71 |
| Beebe, D.R. | Peoria, IL | 1/6/73 |
| Ecklund, C.C. | Phippsburg, CO | 5/31/76 |
| Hawthorne, C.C. | Pine Bluff, AR | 10/4/82 |
| Wilson, J.C. | Pocatello, ID | 2/1/82 |
| Woolsey, D.J. | Pocatello, ID | 8/22/80 |
| Mayo, D.W. | Poplar Bluff, MO | 6/12/78 |
| Lee, C.E. | Proviso, IL | 2/16/80 |
| Vlasak, W.F. | Proviso, IL | 12/5/77 |
| Brennan, D.H. | Proviso, IL | 2/28/70 |
| Kautzmann, D.R. | Proviso, IL | 9/28/77 |
| Bryant, D.S. | Rawlins, WY | 9/6/79 |
| Fairclough, S. M. | San Jose, CA | 1/17/77 |
| Strang, A.D. | Seattle, WA | 9/1/70 |
| Hanna, M.D. | St. Louis, MO | 8/4/76 |
| Gwyn, W.A. | St. Louis, MO | 6/16/69 |
| Tate, A. | St. Louis, MO | 12/19/72 |
| Ignaszewski, R.L. | St. Paul | 10/19/69 |

UPFULBRIGHT

| | | |
|---|---|---|
| Peck, R. L. | Stockton, CA | 10/11/71 |
| McCauley, J.K. | Stockton, CA | 10/6/69 |
| Hickey, J.W. | Trenton, MO | 8/19/71 |
| Krieter, B.J. | W. Chicago, IL | 6/10/63 |
| Aubry, S.L. | Waukegan, IL | 10/30/69 |
| Spatziani, L.H. | Yermo, CA | 3/17/69 |

| Lead ETA Preserved CNW - Rate $20.48 | Work Location | Seniority Date |
|---|---|---|
| King, M.A. | Chicago, IL | 9/1/89 |
| Mauser, M.H. | St. Paul, MN | 1/15/86 |

UPFULBRIGHT

APPENDIX X

# A G R E E M E N T

Between The

Union Pacific Railroad Company

And The

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

=================================================================

## 401(k) RETIREMENT THRIFT PLAN

(1) Consistent with all applicable laws, the Carrier will offer to eligible employees covered by this Agreement a 401(k) Retirement Plan subject to the following conditions:

(a) The Plan will be the existing Union Pacific Employee 401(k) Retirement Thrift Plan which was effective July 1, 1990.

(b) Employee participation in the Plan is voluntary.

(c) Employees may contribute to the Plan by use of payroll deduction.

(d) The Plan is non-contributory on the Carrier's part but the Carrier will pay the administrative costs of the Plan.

(e) An eligible employee is defined as an employee in active service with one (1) year or more of continuous service with the Carrier.

(2) This Agreement is effective January 1, 1993.

(3) This Agreement may be changed only by the mutual consent of the parties.

Signed this 5th day of August, 1992

FOR INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

/s/ Donald Davis
GENERAL CHAIRMAN, IBEW

/s/ Randy Schell
GENERAL CHAIRMAN, IBEW

/s/ Vic Janecek
GENERAL CHAIRMAN, IBEW

FOR UNION PACIFIC RAILROAD COMPANY:

/s/ D. A. Moresette
DIRECTOR LABOR RELATIONS

/s/ D. J. Smith
GENERAL DIRECTOR LABOR RELNS

UPFULBRIGHT

APPENDIX Y

AGREEMENT
between
UNION PACIFIC RAILROAD COMPANY
and the
INTERNATIONAL BROTHERHOOD OF
ELECTRICIAL WORKERS

*****************************************************************

UP SHARES

Consistent with all applicable laws, the Carrier will offer to all eligible employees covered by this Agreement, the opportunity to participate in the ownership of Union Pacific Corporation through a one-time stock option program called "UP Shares." This opportunity is subject to the following conditions:

1. *"UP Shares" is a voluntary program and employee participation is optional.*

2. *Rules and regulations governing this program are set forth in a brochure which will be available to the employees. The Carrier will also make available questions and answers concerning "UP Shares" to the employees.*

3. *An eligible employee is defined as an employee in active service on April 30, 1998. Active service is defined as performing service or being eligible to perform service for the Carrier. Employees who are out of service for any reason (dismissal, leave of absence, etc.) and therefore ineligible to perform service on April 30, 1998, will be treated as active employees and eligible to participate in the "UP Shares" program if they return to active service prior to the date the option vests and are in active service on the date the option vests.*

This Agreement shall be changed only by the mutual consent of the parties and is not subject to provisions of either Section 3 or Section 6 of the Railway Labor Act.

This Agreement is effective April 30, 1998.

Signed this 13th day of May, 1998.

FOR: THE NATIONAL CONFERENCE
OF FIREMEN & OILERS

_/s/ Robert Ramirez____________
GENERAL CHAIRMAN - IBEW

_/s/ Vic Janecek_______________
GENERAL CHAIRMAN – IBEW

FOR: THE UNION PACIFIC
RAILROAD COMPANY

__/s/ Dan Moresette__________
DIRECTOR - LABOR RELATIONS

APPENDIX Z



UPFULBRIGHT

AGREEMENT

Between the

UNION PACIFIC RAILROAD COMPANY

And the

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS

*****************************************************************************************************
CONTINUING OPERATING RULES EDUCATION (C.O.R.E.)
*****************************************************************************************************

In a joint effort by management and labor to promote safety, improve employee performance and to ensure that all employees are well schooled on matters pertaining to compliance with Safety and Operating Rules, the Company has announced the availability of a voluntary educational program which, when appropriate, will serve as an alternative to discipline administered under the Carrier's UPGRADE Policy.

The program may include classroom instruction as well as on-the-job training as determined by the Carrier.

THEREFORE, IT IS AGREED:

Section 1. (A) The use of an educational program as an alternative to discipline as administered under UPGRADE shall be at the mutual consent of the Superintendent or equivalent and the employee involved.

(B) The offer of education as an alternative to discipline will be made in those instances involving an Operating Rule(s) infraction where the preliminary review indicates that the employee(s) will benefit from classroom instruction and/or on-the-job training.

Section 2. (A) The C.O.R.E. Program, which may consist of classroom instruction, on-the-job training, and/or at a selected Company Training Center, will concentrate on the rules involved in the violation as well as other rules that may be appropriate. It is also anticipated the class/training will cover the importance of compliance with Safety and Operating Rules and the importance of establishing and maintaining a good work record.

(B) The classes will be from one to five days in duration and will not exceed eight hours per day. Classes at a Training Center may be considered as part of, or as an extension of the educational program.

UPFULBRIGHT

(C) Upon completion of the class, the employee will be required to take and pass a written examination with a minimum test score of 85%. An employee failing the examination may be required to repeat the class. A second failure will activate formal disciplinary proceedings in connection with the Operating Rules incident initially placing the employee under this Agreement.

Section 3. (A) Classes will ordinarily be held at the employee's seniority point. This does not, however, preclude classes being held at other locations should conditions warrant. The Carrier will limit the class to 10 participants as nearly as practicable.

(B) There will be an instruction team (or teams) made up of craft representatives, supervisors and managers as determined by the Carrier. In addition, an alternate for each team member will be selected who will act as a substitute in the absence of the regular instructor. The Organization signatory hereto shall submit within thirty days of the effective date of this Agreement a list of members of the Organization who, in the judgment of the Organization, are best qualified to act as instructors. The Carrier shall select the instructors, and alternates, who shall participate in the Program from the lists submitted by the Organizations.

(C) Employees participating as instructors will serve in that capacity for 24 months, the last month of which will be devoted to training of newly selected instructors in order to provide for a smooth and orderly transition. The instructor will have the option to extend his participation for an additional term subject to the approval of the Carrier.

(D) An instructor may be relieved of his duties as an instructor by agreement between the Carrier and the Organization representing the instructor.

(E) Employees of this Organization participating as instructors shall be paid for at the assigned rate of pay and for all expenses incurred while participating in the C.O.R.E. Program. They will not be considered as Carrier officers nor as non-agreement personnel while serving as instructors.

(F) The Carrier shall train the instructors and shall assist in developing the program. The Carrier shall also provide the classroom and office space and equipment necessary to properly administer the program.

Section 4. (A) The employees who are required to attend class at a location other than their seniority point will be reimbursed for transportation at the Carrier's mileage rate on a round trip basis and will be provided lodging at a Company approved facility. A second round trip will be paid if required to repeat the class or take additional training pursuant to Section 2(B).

(B) Employees who reside at a location other than their seniority point and distance precludes driving on a daily basis may request lodging, if available, at a Company designated facility.



UPFULBRIGHT

(C) Employees who are required to attend a training class at a Training Center other than at their seniority point, will be reimbursed for expenses for meals, lodging and necessary transportation as arranged by the Training Center.

Section 5. An employee who has elected to participate in the program may withdraw at any time by notifying the individual agreeing to the C.O.R.E. training, in which event the formal discipline procedures will be activated as described in Section 2(c). Any applicable time limits requiring the holding of a formal investigation prior to a certain number of days, are expressly waived if an employee requests C.O.R.E. Training.

Section 6. The parties recognize that this C.O.R.E. Program may attract voluntary participation from employees who may not be charged with or involved in a rules violation and who desire to further their understanding of the Operating Rules. These employees will be allowed to participate in the Program when the manpower situation permits, on a space-available basis on their own time and at their own expense. This participation shall have no bearing or effect on any future disciplinary action in which such employee may subsequently be involved, or upon the employee's right to use the Program under the terms of this Agreement.

Section 7. Except as provided in Section 6 above, a notation showing participation in C.O.R.E. training will be made in the employee's record. That notation will show the date of the triggering incident and the rules involved. The notation, however, is not discipline and can have no disciplinary effect except as provided for in Section 2(c).

Section 8. This Agreement shall become effective August 15, 1999, and thereafter may be terminated by the serving of thirty (30) days' written notice by any party upon the others.

Signed this 14th day of September, 1999.

**FOR THE**
**INTERNATIONAL BROTHERHOOD**
**OF ELECTRICAL WORKERS (IBEW)**

/s/ V. L. Janecek
General Chairman, IBEW

/s/ R. Rarmirez
General Chairman, IBEW

/s/ S. P. Rarmirez
General Chairman, IBEW

**FOR THE**
**UNION PACIFIC RAILROAD COMPANY:**

/s/ D. A. Moresette
General Director of Labor Relations

UPFULBRIGHT

ATTACHMENT A

AGREEMENT
Between the
UNION PACIFIC RAILROAD COMPANY
and the
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS

*************************************************************

In order to establish a progression career path for Telecommunications Department employees working under the collective bargaining agreement between the Union Pacific Railroad Company and International Brotherhood of Electrical Workers:

IT IS AGREED:

It is in the best interest to provide measures to allow employees in the telecommunications craft training, experience and skills for advancement to higher level positions within the craft. Additionally, it is important that employees possess the necessary skills and training to undertake the implementation of new technology in the future. Therefore, it is the parties' intent to make the following changes to the Collective Bargaining Agreement dated January 1, 2003, to be effective January 1, 2009:

I. Changes to Rules 4 and 5

**RULE 4. CLASSIFICATION OF WORK AND QUALIFICATIONS.**

(A) ELECTRONIC TECHNICIAN

(1) An Electronic Technician shall possess a thorough knowledge of electronic theory, understand the operation of electronic components, and circuits, and must be able to read and understand electronic schematics. Electronic Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, multimeters, frequency counters, watt meters, service monitors, spectrum analyzers, frequency generators, frequency selective level meters, transmission test sets, digital transmission testers, and other types of telecommunications test equipment. Electronic Technicians shall be required to operate any hand and power tools needed to accomplish the work. Electronic Technicians shall possess advanced computer skills. Electronic Technicians will perform their assigned work without direct individual supervision.

(2) An Electronic Technician must possess a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school. An Electronic Technician shall be classified as an Electronic

UPFULBRIGHT

Technician C until completing all required training and obtaining a Federal Communication Commission General Radiotelephone Operator license, at which time the employee will be promoted to Electronic Technician B. However, any Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator License, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

If a new hire has obtained a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, management shall place the new hire as an Electronic Technician B.

An Installation Technician A or Lead Installation Technician who obtains a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, may make application for a new or vacant position within any Electronic Technician district roster. If no bids are received by the current district roster employees or by an Electronic Technician desiring to transfer from another seniority district, then the senior Installation Technician A or Lead Installation Technician applying for such position will be awarded the position and placed on the applicable roster as an Electronic Technician B. Existing rules and understandings relating to transfers will apply to the establishment of seniority in this instance.

A District Installation Technician who obtains a Federal Communication Commission General Radiotelephone Operator license, has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, and has two hundred forty-four (244) working days of service as a District Installation Technician will be reclassified to an Electronic Technician B at his or her current location. A District Installation Technician so reclassified will have his or her rate of pay preserved until promoted to Electronic Technician A.

(3) An Electronic Technician shall be classified as an Electronic Technician B for four hundred eighty-eight (488) working days of service. An employee completing four hundred eighty-eight (488) working days of service as an Electronic Technician B shall be promoted to position of Electronic Technician A. It is understood the promotion from Electronic Technician B to Electronic Technician A is based only on time in grade.



UPFULBRIGHT

(4) (a) Employees holding the position of Senior Electronic Technician as of December 31, 2008 will be grandfathered in that position subject to the conditions of being available for after hour calls, unless other arrangements have been made with proper authority and successfully completing any new technology training labs related to their work as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman.

Any grandfathered Senior Electronic Technician who fails to maintain the requirements listed above will revert to their former Electronic Technician position. It is understood that such reversion is not considered discipline and that the Carrier is not subject to any claim on behalf of an Electronic Technician who fails to maintain the requirements listed above. A grandfathered Senior Electronic Technician may upon thirty (30) days written notification to his manager and local chairman, return to his or her former Electronic Technician classification.

(b) As of January 1, 2009, the position of Senior Electronic Technician will be a bid position, filled based on business need as determined at the sole discretion of management. A Senior Electronic Technician will be responsible for an assigned location or territory and will be required to direct the work of Installation Technicians and/or Electronic Technicians on their assigned projects or territory.

Senior Electronic Technicians will make themselves available for after hour calls, unless other arrangements have been made with proper authority, and must successfully complete any new technology training labs related to their work as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman. Additionally qualified applicants must demonstrate the ability to be self-directed and be focused on leading those assigned to work under their direction.

Senior Electronic Technician positions will be filled by seniority and qualifications in the following order:

i. Electronic Technician on the District Roster;
ii. Electronic Technician on other rosters;
iii. Qualified Installation Technician or Shop Technician;
iv. External qualified candidate, subject to meeting the requirements of 4(C)(3).

If management determines that an individual filling a bulletined Senior Electronic Technician position does not demonstrate the aptitude



UPFULBRIGHT

for the position within ninety (90) working days, the Senior Electronic Technician may be disqualified from the position. Prior to the disqualification of the Senior Electronic Technician, the manager will meet with the employee and the Organization's representative to discuss corrective actions that are required by the Senior Electronic Technician. If after a reasonable time, not more than ninety (90) working days, satisfactory progress has not been made, the Senior Electronic Technician may be removed from the position without the right of a formal investigation, and allowed to exercise seniority pursuant to Rule 16.

(5) (No Changes)

(B) <u>SHOP TECHNICIAN</u>.

(1) Shop Technicians shall possess a thorough knowledge of electronic theory, understand the operation of electronic components and be able to read and understand mechanical and electrical schematics. Shop Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, oscilloscopes, frequency counters, service monitors, spectrum analyzers, frequency generators and other types of telecommunications test equipment. Shop Technicians shall have basic computer skills.

(2) Shop Technicians shall possess a two-year Associate Degree in Electronic Technology or greater from a generally recognized school. Applicants must demonstrate their technical ability by passing an examination and must demonstrate alignment and troubleshooting techniques.

(3) The Carrier may bid and assign the position of Senior Shop Technician, based on seniority and ability, to any Shop Technician who has A+ Certification, sufficient practical experience in Shop Technicians' work, who is capable of working on all products, capable of training other Shop Technicians on all products and capable of organizing the work load for Shop Technicians.

(4) Shop Technicians work shall consist of inspecting, testing, adjusting, repairing, *other than leased*, base station analog radios, base station analog radio modules, FOTs, hot box radio repair (including RF link radios), locomotive voice radios (except installation and removal of rolling stock), mobile radios, portable radios, Teklogic equipment, Data South printers, MDS radios, analog multiplex equipment associated with microwave radios, EOTs and EOT module, and similar work, without individual supervision.



UPFULBRIGHT

(5) Shop Technicians shall be required to operate any hand and power tools needed to accomplish the work. In addition, they shall have skills sufficient to use soldering equipment such as hot air equipment utilized in the repair of surface mount component removal and replacements on printed circuit boards.

(6) Shop Technicians shall also be required, at the direction of the designated Carrier Manager, to assist in construction and/or installation of facilities outside of their seniority district at the straight time rate of pay. Shop Technicians required to work outside of their seniority district under this provision shall be considered on Leave of Absence from their seniority district during the duration of work. The designated Carrier Manager and the General Chairman shall cooperate in granting leaves of absence as in the past.

(7) Shop Technicians who possess the necessary qualifications will be considered for higher level vacancies at other locations within the craft. Employees requesting consideration will make written request to the General Director Telecommunications with copy to the local chairman.

(C) INSTALLATION TECHNICIAN.

(1) Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring, together with their supports, cable trays, cable ladders, wiring closets, equipment racks; batteries, rectifiers and radio antennas, coax, heliax, wave guide connectors and mounting brackets; microwave and radio tower work; and all similar work in connection with Telecommunication plants.

(2) Installation Technicians hired on or after the date of this Agreement shall possess a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience and pass an initial hiring exam. If a question arises as to the extent of an individual's experience local management and the local chairman will meet to determine if the individual has the requisite experience. If an impasse is reached the General Director Telecommunications and General Chairman will review the individual's qualifications for final determination.

(3) Installation Technicians hired on or after the date of this Agreement will be required to obtain a CDL license and become certified to climb poles and towers within one hundred and twenty (120) working days of being assigned to the position. Necessary training and certification will be conducted during assigned working hours without loss of pay. This section



UPFULBRIGHT

does not eliminate the requirement for Installation Technicians hired previous to the date of this Agreement to have or maintain a CDL license or climbing certification if they had previously been required to have such for their assigned position.

(4) An Installation Technician A may bid for District Installation Technician position(s). The senior applicant will be awarded the position and placed on the applicable roster as a District Installation Technician. Existing rules and understandings relating to transfers will apply to the establishment of seniority in this instance.

Installation Technician B employees must complete four hundred - eighty-eight (488) work days of service as Installation Technician B and also satisfactorily complete required training and demonstrate the ability and aptitude to become an Installation Technician A.

*NOTE:* *Any individual who has had three (3) years of practical experience in Installation Technician's work and is capable of executing same to a successful conclusion within a reasonable amount of time will be considered as an Installation Technician A.*

(5) Installation Technicians shall be required to operate any hand and power tools needed to accomplish the work. Installation Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, ground meters, time domain reflectometers, optical time domain reflectometers, cable locators, wave guide analyzers, LAN/DATA cabling meters, amp meters, battery testers, SWR meters, optical fiber meters and other types of telecommunications test equipment utilized to accomplish the work, and similar work, without individual supervision.

(D) <u>DISTRICT INSTALLATION TECHNICIAN.</u>

(1) District Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring together with their supports, cable trays, cable ladders, wiring closets, equipment racks; batteries, rectifiers and radio antennas, coax, helix, wave guide connectors and mounting brackets; microwave and radio tower work; including the installation and removal of telecommunications equipment (other than leased) mutually identified and agreed upon by the General Director Telecommunications and the General Chairman; and all similar work in connection with Telecommunication plants.



UPFULBRIGHT

(2) District Installation Technicians must meet the qualifications for Installation Technicians in Rule 4, Section C.

(E) It is not intended that this Rule 4 has anything contained herein that would infringe upon other crafts' classification of work rule or practices.

**RULE 5. RATES OF PAY.**

A) RATES OF PAY. Effective January 1, 2009, the rates of pay for the classifications set forth in Rule 4 are as follows:

| | | Hourly |
|---|---|---|
| Senior Electronic Technician (bulletined) | $ | ***28.74*** |
| Senior Electronic Technician (grandfathered) | $ | 27.74 |
| Electronic Technician A | $ | 25.00 |
| Electronic Technician B | $ | 23.66 |
| Electronic Technician C | $ | 21.09 |
| District Installation Technician | $ | 24.00 |
| Senior Shop Technician | $ | 24.30 |
| Shop Technician (with A+ certification) | $ | 23.30 |
| Shop Technician (no A+ certification) | $ | 22.80 |
| Installation Technician A | $ | 24.00 |
| Installation Technician B | $ | 20.71 |

*NOTE 1: For employees with preserved rates of pay, please see Appendix W.*

*NOTE 2: None of the above rates include any skill differential, however, the above rates reflect cost of living adjustments.*

RULE 10. SENIORITY CLASSES.

Seniority classes shall be as follows:

CLASS 1 Senior Electronic Technician
Electronic Technicians (Class A, B and C)
District Installation Technicians

CLASS 2 Shop Technicians

CLASS 3 Installation Technician (Class A and B)



UPFULBRIGHT

II. Understanding concerning BRS-represented employees

When the positions of Senior Electronic Technician in Seniority District 4 are bulletined and a BRS-represented employee fills the position, it will be a BRS-represented position, subject to the same rules and agreements as applies to all BRS-represented positions. There will not be any BRS-represented positions except for those in Seniority District 4.

III. Changes to Rule 11

Seniority District 3 to read: "...east to Echo, Utah (inclusive of all telecom systems up to and including the Echo microwave site) and Green River..."

IV. Changes to Rule 31

Amend B(1) to $57.00 in lieu of expense reimbursement.
No change to B(2) ($28.50)

V. Letter of Understanding for Rule 32 (B) On-Line positions

When employees assigned to District 6 On-Line positions are lodged per Carrier instruction at a hotel that is over thirty-five (35) miles from the work site, the employees' time will begin and end at the hotel, subject to thirty day notice of cancellation by the Company.

VI. COLA Letter of Understanding

Electronic Technicians at Stockton, Oakland and Sacramento, California, will be eligible for a Five Hundred Dollar ($500) cost-of-living allowance, subject to thirty day notice of cancellation by the Company, in addition to those currently covered by the Letter of Understanding dated February 1, 2007.

VII. Shop Tech Productivity Bonus

The Shop Tech productivity bonus program will end effective January 1, 2009.

VIII. Implementation

Issues of interpretation or disputes arising from this Agreement and attachments will be handled with the General Chairman and General Director of Labor Relations in accordance with the provisions of the Collective Bargaining Agreement.

Original Signed on December 3, 2008.



UPFULBRIGHT

Agreed on this 3rd day of December, 2008.

FOR THE INTERNATIONAL BROTHER HOOD OF ELECTRICAL WORKERS:

General Chairman, IBEW

FOR UNION PACIFIC RAILROAD COMPANY:

General Director Labor Relations

General Director Telecom

UPFULBRIGHT

Side Letter #1

December 3, 2008

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Sir:

This letter is with regard to the Agreement signed on this date, effective January 1, 2009, covering positions, work, progression and pay for employees covered by the Collective Bargaining Agreement dated January 1, 2003.

Rule 4 (C) covers the description of work for Installation Technicians. During negotiations regarding this cited Agreement, it was understood by the parties that tower site work (tower and building) currently being performed by Installation Technicians may not precisely fall into the language of Rule 4 (C) (1), but that the performance of such work is not in violation of the Collective Bargaining Agreement.

If this accurately reflects our understanding, please indicate your approval by signing below.

Sincerely,

AGREED:

General Chairman IBEW

UPFULBRIGHT

Side Letter #2

December 3, 2008

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Sir:

This letter is with regard to the Agreement signed on this date, effective January 1, 2009, covering positions, work, progression and pay for employees covered by the Collective Bargaining Agreement dated January 1, 2003.

Rule 4 (A) (4) (a) and (b) covers the position of Senior Electronic Technicians. During negotiations regarding this cited Agreement, it was agreed that incumbent Electronic Technicians would be allowed to progress to the Senior Electronic Technician position at the grandfathered rate until April 1, 2009, pursuant to the January 1, 2003 provisions.

If this accurately reflects our agreement, please indicate your approval by signing below.

Sincerely,

AGREED:

General Chairman IBEW





UPFULBRIGHT

Side Letter #3

December 3, 2008

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Sir:

This letter is with regard to the Agreement signed on this date, effective January 1, 2009, covering positions, work, progression and pay for employees covered by the Collective Bargaining Agreement dated January 1, 2003.

It is agreed that, in the event a District Installation Technician position is abolished, the incumbent will be allowed to displace on the Installation Technician system roster while furloughed on the District Technician roster.

If this accurately reflects our agreement, please indicate your approval by signing below.

Sincerely,

AGREED:

General Chairman IBEW

UPFULBRIGHT

Side Letter #4

December 3, 2008

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Sir:

This letter is with regard to the Agreement signed on this date, effective January 1, 2009, covering positions, work, progression and pay for employees covered by the Collective Bargaining Agreement dated January 1, 2003.

It is agreed that the changes made to the Seniority District 3 in Rule 11 were not intended to adversely impact incumbent(s) at Green River, WY, who may have performed work at the Echo microwave site in the past. Should said incumbent(s) at Green River determine that he or she has been adversely impacted due to this change, he or she may bring this issue to the General Chairman for review with the General Director Labor Relations.

Likewise, it is agreed that the changes made with the Shop Tech rate of pay were not intended to adversely impact incumbent Shop Techs, recognizing that the productivity bonus was unilaterally implemented by the Carrier. Should said incumbent Shop Tech(s) determine that he or she has been adversely impacted due to this change, he or she may bring this issue to the General Chairman for review with the General Director Labor Relations.

If this accurately reflects our agreement, please indicate your approval by signing below.

Sincerely,

AGREED:

General Chairman IBEW

UPFULBRIGHT

Andrea R. Gansen
General Director

December 8, 2008

280-4

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Mr. Wisniski:

This is in reference to our Agreement effective January 1, 2009, and Side Letter #2 to that Agreement, dated December 3, 2008.

It is the understanding of the parties that the incorporation of the new positions of District Installation Technicians and responsibilities of a Senior Electronic Technician bid position will be rolled out in a phased approach, rather than being done all at once on a system-wide basis. Furthermore, the parties agree to meet to discuss any issues and to review the implementation of this Agreement within 60 to 90 days after the effective date.

Additionally, it is understood that under the provisions of Side Letter #2, incumbent Electronic Technicians will be allowed to elect, in writing, their desire to progress to the Senior Electronic Technician position at the grandfathered rate until April 1, 2009. This election should be made in writing to their manager and the General Director of Telecom (Neal Spencer) with a copy to me at this address.

Sincerely,

Andrea Gang

CC: Neal Spencer



UPFULBRIGHT

**Andrea R. Gansen**
General Director

December 22, 2008

280-4

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Mr. Wisniski:

This is in reference to Section V our Agreement effective January 1, 2009, regarding cost-of-living allowances for Electronic Technicians at Stockton, Oakland and Sacramento, California.

It is the understanding of the parties that this Agreement extends to the Electronic Technicians headquartered at Roseville, as they were contemplated to be part of this Agreement by including Sacramento.

Sincerely,

CC: Neal Spencer

UNION PACIFIC RAILROAD 1400 Douglas Street Stop 0710 Omaha, NE 68179 (402) 544-3073

UPFULBRIGHT

Andrea R. Gansen
General Director

January 28, 2009

File: 280-4

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
N. Richland Hills, TX 76180

Dear Mr. Wisniski:

This has reference to our discussion regarding open issues as result of the changes made to the Collective Bargaining Agreement by agreement dated December 3, 2008. In order to address these issues, the Carrier and Organization have agreed as follows:

1. In accordance with Rule 4 Subsection A(4)(b), effective January 1, 2009, Senior Electronic Technician positions will be filled by seniority and qualifications in the following order:
   i. Electronic Technicians on the District Roster;
   ii. Electronic Technicians (on other rosters);
   iii. Qualified Installation Technician or Shop Technician;
   iv. External qualified candidate, subject to meeting the requirements of 4(c)(3).

2. Electronic Technicians with preserved rates who bid and are assigned to a Senior Electronic Technician position will keep their preserved rate unless they elect to convert to the hourly rate.

3. Language in Rule 4 (A)(4)(a) [Senior Technicians who elect to return to their former Electronic Technician classification, will not be able to bid to a Senior Technician for a period of one (1) calendar year from the date of reverting to Electronic Technician] will be struck from the Agreement.

4. Establish Senior Shop Technician rate of $24.30 per hour, adding requirement for A+ Certification, effective February 1, 2009. Incumbent Lead Shop Technicians will be allowed to elect to fill Senior Shop Technician position or exercise seniority. Senior Shop Technician positions not filled by an incumbent Lead Shop Technician will be bulletined and filled pursuant to the Collective Bargaining Agreement.

5. The Shop Technician preserved rate will be increased to $25.20 per hour, effective February 1, 2009.

If you are agreeable to the foregoing please signify your concurrence below. With these changes, the Agreement dated December 3, 2008, is amended as shown in Attachment A. All previous Side Letters and Understandings regarding the December 3, 2008 Agreement still apply.

Sincerely,

Agreed:

General Chairman IBEW



UPFULBRIGHT

REC'D
NOV 4 2009
Labor Relations

**Andrea R. Gansen**
General Director

October 8, 2009

Files: 280-4
280-32

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
N. Richland Hills, TX 76180

Dear Mr. Wisniski:

This has reference to our discussion regarding open issues as result of the changes made to the Collective Bargaining Agreement by agreement dated December 3, 2008, as amended January 28, 2009. In order to address these issues, the Carrier and Organization have agreed as follows:

1. Rule 4 Subsection A(2) will be amended to allow a District Installation Technician to be reclassified as an Electronic Technician B after two hundred and forty-four (244) days of service, rather than four hundred and eighty-eight (488) days of service.

2. Rule 4, Subsection C(4) will be amended to remove the requirement that an employee must be an Installation Technician A for two hundred and forty-four (244) days in order to be eligible to bid to a District Installation Technician position.

3. It is understood that Installation Technicians and District Installation Technicians will be expected to retain the qualifications that were required when they were Installation or District Installation Technicians when they advance to Electronic Technician positions, subject to the actual physical requirements of their assignment and applicable law.

4. Letter of Understanding for Rule 32 (B) On-Line positions that when employees assigned to District 6 On-Line positions are lodged per Carrier instruction at a hotel that is over thirty-five (35) miles from the work site, the employees' time will begin and end at the hotel, subject to thirty day notice of cancellation by the Company.

If you are agreeable to the foregoing please signify your concurrence below. With these changes, the Agreement dated December 3, 2008, amended January 28, 2009, is amended as shown in Attachment A. All previous Side Letters and Understandings regarding the December 3, 2008 Agreement still apply. The amendments made above will be effective November 1, 2009.

Sincerely,

[signature]

Agreed:

[signature]
General Chairman IBEW



UPFULBRIGHT

UNION PACIFIC RAILROAD
1400 Douglas Street, STOP 0710
Omaha, Nebraska 68179

**Sharon Boone** General Director Non-Ops

REC'D
JUL 23 2012
Labor Relations

June 29, 2012

280-4, 280-8

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Re: PTC Senior Electronic Technicians

Dear Sir:

This has reference to our discussions regarding the unique need for PTC Senior Electronic Technicians to perform **wayside remote radio and master base** radio installations in support of Positive Train Control (PTC) implementation on the Union Pacific Railroad. In order to expedite this project and set expectations to meet the compressed time frame for installing these radios, the Organization and Carrier agree as follows:

1. The Carrier may establish bid PTC Senior Electronic Technician positions that will have an assigned headquarters on either Seniority Districts 2 or 3. Such positions will be categorized as Class 1 positions.

2. The seniority of employees assigned to PTC Senior Electronic Technician positions is unaffected by the terms and conditions set forth herein. This Agreement does not, in and of itself, grant or extend any seniority rights or privileges at any location where an employee does not presently possess seniority pursuant to existing Agreement provisions. Similarly, this Agreement does not limit or extinguish any seniority rights or obligations, except for what may be specifically set forth in this Agreement, held by employees prior to the effective date of this Agreement.

3. PTC Senior Electronic Technician positions are additions to current staff. As such, vacancies created as a result of qualified employees bidding on and assigned to a PTC Senior Electronic Technician position will be backfilled consistent with current system vacancy procedures, i.e. as promptly as possible.

4. Employees assigned to PTC Senior Electronic Technician positions will be expected to travel and perform radio installation work anywhere within Seniority Districts 2 and 3. When performing such work, the PTC Senior Electronic Technician will be considered "on-line" for that purpose and governed by the "on-line" provisions of Rules 31 and 32 of the Collective Bargaining Agreement when required to travel away from their bulletined headquarters.





UPFULBRIGHT

5. The PTC wayside remote and master base radio installation project is considered a special project pursuant to Rule 8 Section O. Therefore, employees assigned to PTC Senior Electronic Technician positions will be considered on leave of absence from their bulletined headquartered position while performing work under this Agreement.

6. Employees filling a PTC Senior Electronic Technician position will receive Two Dollars ($2.00) per hour for each hour worked during the period assigned to the PTC radio installation project. The Two Dollar ($2.00) allowance is not subject to future general wage increases or cost of living allowances.

7. Rule 8 (O) penalties will not apply to these positions while performing PTC radio installations pursuant to this Agreement. Upon the completion of a PTC radio installation assignment, as determined by the Carrier, the PTC Senior Electronic Technician will be released from the provisions of this Agreement and revert back to a Senior Electronic Technician headquartered at the location originally bid per Paragraph 1, above.

8. PTC Senior Electronic Technicians who work off their assigned seniority district during the PTC radio installation project will receive Three Dollars ($3.00) per hour for work performed while off their district, in addition to the differential identified in paragraph 6, above, as well as any meals and lodging expenses covered by the terms of the Collective Bargaining Agreement.

9. PTC Senior Electronic Technician positions may be required to work a consecutive compressed work half or work week as provided in Rule 2 (K) of the Collective Bargaining Agreement. Such arrangement is limited to this PTC radio installation project work only.

10. This Agreement is entered into to address a unique circumstance. This Agreement will not prejudice the position of either party, will not be referenced in connection with any other case, agreement negotiation (local or national) and may be cancelled upon thirty (30) days written notice by either party to the other.

If you are in agreement with the terms above, please indicate your concurrence by signing and returning an original copy.

Yours truly,

Sharon Boone

AGREED:

Jim Wainio

General Chairman, IBEW



UPFULBRIGHT

REC'D
FEB 11 2013
Labor Relations

AGREEMENT
Between the
UNION PACIFIC RAILROAD COMPANY
and the
INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS
SYSTEM COUNCIL #2

****************************************************************

In order to establish a progression career path for Telecommunications Department employees working under the collective bargaining agreement between the Union Pacific Railroad Company and International Brotherhood of Electrical Workers:

IT IS AGREED:

It is in the best interest to provide measures to allow employees in the telecommunications craft training, experience and skills for advancement to higher level positions within the craft. Additionally, it is important that employees possess the necessary skills and training to undertake the implementation of new technology in the future. Therefore, it is the parties' intent to make the following changes to the Collective Bargaining Agreement dated January 1, 2003, to be effective March 1, 2013:

I. Changes to Rules 4, 5 and 10

**RULE 4. CLASSIFICATION OF WORK AND QUALIFICATIONS.**

(A) ELECTRONIC TECHNICIAN

(1) An Electronic Technician shall possess a thorough knowledge of electronic theory, understand the operation of electronic components, and circuits, and must be able to read and understand electronic schematics. Electronic Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, multimeters, frequency counters, watt meters, service monitors, spectrum analyzers, frequency generators, frequency selective level meters, transmission test sets, digital transmission testers, and other types of telecommunications test equipment. Electronic Technicians shall be required to operate any hand and power tools needed to accomplish the work. Electronic Technicians shall possess advanced computer skills. Electronic Technicians will perform their assigned work without direct individual supervision.

(2) An Electronic Technician must possess a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized



UPFULBRIGHT

school. An Electronic Technician shall be classified as an Electronic Technician C until completing all required training and obtaining a Federal Communication Commission General Radiotelephone Operator license, at which time the employee will be promoted to Electronic Technician B. However, any Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator License, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

If a new hire has obtained a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, management shall place the new hire as an Electronic Technician B.

An Installation Technician A or Lead Installation Technician who obtains a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, may make application for a new or vacant position within any Electronic Technician district roster. If no bids are received by the current district roster employees or by an Electronic Technician desiring to transfer from another seniority district, then the senior Installation Technician A or Lead Installation Technician applying for such position will be awarded the position and placed on the applicable roster as an Electronic Technician B. Existing rules and understandings relating to transfers will apply to the establishment of seniority in this instance.

A District Installation Technician who obtains a Federal Communication Commission General Radiotelephone Operator license, has a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience, and has two hundred forty-four (244) working days of service as a District Installation Technician will be reclassified to an Electronic Technician B at his or her current location. A District Installation Technician so reclassified will have his or her rate of pay preserved until promoted to Electronic Technician A. The establishment of seniority as an Electronic Technician under this provision, the seniority date on the appropriate Class 1 roster will be the date the employee was promoted to District Installation Technician.

A District Installation Technician or Installation Technician who advances to an Electronic Technician position is required to maintain the qualifications required under Rule 4, C (3), subject to the actual physical requirements of their assignment and applicable law.



UPFULBRIGHT

(3) An Electronic Technician shall be classified as an Electronic Technician B for four hundred eighty-eight (488) working days of service. An employee completing four hundred eighty-eight (488) working days of service as an Electronic Technician B shall be promoted to position of Electronic Technician A. It is understood the promotion from Electronic Technician B to Electronic Technician A is based only on time in grade.

(4) (a) Employees holding the position of Senior Electronic Technician as of December 31, 2008 will be grandfathered in that position subject to the conditions of being available for after hour calls, unless other arrangements have been made with proper authority and successfully completing any new technology training labs related to their work as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman.

Any grandfathered Senior Electronic Technician who fails to maintain the requirements listed above will revert to their former Electronic Technician position. It is understood that such reversion is not considered discipline and that the Carrier is not subject to any claim on behalf of an Electronic Technician who fails to maintain the requirements listed above. A grandfathered Senior Electronic Technician may upon thirty (30) days written notification to his manager and local chairman, return to his or her former Electronic Technician classification.

(b) As of January 1, 2009, the position of Senior Electronic Technician will be a bid position, filled based on business need as determined at the sole discretion of management. A Senior Electronic Technician will be responsible for an assigned location or territory and will be required to direct the work of Installation Technicians and/or Electronic Technicians on their assigned projects or territory.

Senior Electronic Technicians will make themselves available for after hour calls, unless other arrangements have been made with proper authority, and must successfully complete any new technology training labs related to their work as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman. Additionally, qualified applicants must demonstrate the ability to be self-directed and be focused on leading those assigned to work under their direction.

Senior Electronic Technician positions will be filled by seniority and qualifications in the following order:



UPFULBRIGHT

i. Electronic Technicians on the District Roster;
ii. Electronic Technicians on other rosters;
iii. Qualified Installation Technician or Shop Technician;
iv. External qualified candidate, subject to meeting the requirements of Rule 4(C)(3).

If management determines that an individual filling a bulletined Senior Electronic Technician position does not demonstrate the aptitude for the position within ninety (90) working days, the Senior Electronic Technician may be disqualified from the position. Prior to the disqualification of the Senior Electronic Technician, the manager will meet with the employee and the Organization's representative to discuss corrective actions that are required by the Senior Electronic Technician. If after a reasonable time, not more than ninety (90) working days, satisfactory progress has not been made, the Senior Electronic Technician may be removed from the position without the right of a formal investigation, and allowed to exercise seniority pursuant to Rule 16.

(5) (No Changes)

(B) SHOP TECHNICIAN. (No Changes)

(C) INSTALLATION TECHNICIAN.

(1) Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring, together with their supports, cable trays, cable ladders, wiring closets, equipment racks; batteries, rectifiers and radio antennas, coax, heliax, wave guide connectors and mounting brackets; microwave and radio tower work; and all similar work in connection with Telecommunication plants.

(2) Installation Technicians hired on or after the date of this Agreement shall possess a two (2) year Associate Degree or greater in Electronic Technology from a generally recognized school or equivalent experience and pass an initial hiring exam. If a question arises as to the extent of an individual's experience local management and the local chairman will meet to determine if the individual has the requisite experience. If an impasse is reached the General Director Telecommunications and General Chairman will review the individual's qualifications for final determination.

(3) Installation Technicians hired on or after the date of this Agreement will be required to obtain a CDL license and become certified to climb poles and towers within one hundred and twenty (120) working days of



UPFULBRIGHT

being assigned to the position. In addition to the conditions contained in Rule 20 (A), any new employee hired as an Installation Technician who fails to complete these requirements within the one hundred and twenty (120) working days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier. The one hundred and twenty (120) working days may be extended by mutual agreement of the Carrier and Organization, in writing, due to unusual circumstances which caused the new employee to have no opportunity to complete these requirements within the allotted time limits. Necessary training and certification will be conducted during assigned working hours without loss of pay. This section does not eliminate the requirement for Installation Technicians hired previous to the date of this Agreement to have or maintain a CDL license or climbing certification if they had previously been required to have such for their assigned position.

(4) An Installation Technician A may bid for District Installation Technician position(s). The senior applicant will be awarded the position and placed on the applicable roster as a District Installation Technician. If there are no Installation Technician As that bid for District Installation Technician position(s), Installation Technician Bs may bid and be considered for such position(s). Installation Technician Bs will be considered in seniority order for assignment to the District Installation Technician position, all other factors being equal. Existing rules and understandings relating to transfers will apply to the establishment of seniority in this instance.

Installation Technician B employees must complete four hundred - eighty-eight (488) work days of service as Installation Technician B and also satisfactorily complete required training and demonstrate the ability and aptitude to become an Installation Technician A.

*NOTE:* Any individual providing sufficient verifiable documentation of three (3) years of practical experience in Installation Technician's work and is capable of executing same to a successful conclusion within a reasonable amount of time will be considered as an Installation Technician A. All documentation must be submitted to the appropriate Company manager within ninety (90) working days of hire.

(5) Installation Technicians shall be required to operate any hand and power tools needed to accomplish the work. Installation Technicians must be familiar and competent in the operation of test equipment such as, but



UPFULBRIGHT

not limited to, voltmeters, ground meters, time domain reflectometers, optical time domain reflectometers, cable locators, wave guide analyzers, LAN/DATA cabling meters, amp meters, battery testers, SWR meters, optical fiber meters and other types of telecommunications test equipment utilized to accomplish the work, and similar work, without individual supervision.

(D) DISTRICT INSTALLATION TECHNICIAN.

(1) District Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring together with their supports, cable trays, cable ladders, wiring closets, equipment racks; batteries, rectifiers and radio antennas, coax, helix, wave guide connectors and mounting brackets; microwave and radio tower work; including the installation and removal of telecommunications equipment (other than leased) mutually identified and agreed upon by the General Director Telecommunications and the General Chairman; and all similar work in connection with Telecommunication plants.

(2) District Installation Technicians will be classified as such on the Class 1 Roster.

(3) District Installation Technicians must meet the qualifications for Installation Technicians in Rule 4, Section C.

(E) It is not intended that this Rule 4 has anything contained herein that would infringe upon other crafts' classification of work rule or practices.

**RULE 5. RATES OF PAY.**

A) RATES OF PAY. Effective July 1, 2012, the rates of pay for the classifications set forth in Rule 4 are as follows:

| | Hourly |
|---|---|
| Senior Electronic Technician (bulletined) | $ 32.75 |
| Senior Electronic Technician (grandfathered) | $ 31.61 |
| Electronic Technician A | $ 28.49 |
| Electronic Technician B | $ 26.95 |
| Electronic Technician C | $ 24.03 |
| District Installation Technician | $ 27.35 |
| Senior Shop Technician | $ 27.69 |
| Shop Technician (with A+ certification) | $ 26.55 |
| Shop Technician (no A+ certification) | $ 25.99 |



UPFULBRIGHT

Installation Technician A.................................. $ 27.35
Installation Technician B.................................. $ 23.59

NOTE 1: *For employees with preserved rates of pay, please see Appendix W.*

NOTE 2: *None of the above rates include any skill differential, however, the above rates reflect cost of living adjustments.*

**RULE 10. SENIORITY CLASSES.**

Seniority classes shall be as follows:

CLASS 1 Senior Electronic Technician
Electronic Technicians (Class A, B and C)
District Installation Technicians

CLASS 2 Shop Technicians

CLASS 3 Installation Technician (Class A and B)

II. Implementation

Issues of interpretation or disputes arising from this Agreement and attachments will be handled with the General Chairman and General Director of Labor Relations in accordance with the provisions of the Collective Bargaining Agreement.

Please acknowledge your agreement by signing in the space provided below.

Yours truly,

S.F. Boone

Jim Wisniski

UPFULBRIGHT

March 1, 2013
#1

Mr. Jim Wisniski
General Chairman, IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76180

Dear Sir:

This refers to the language regarding the position of Senior Electronic Technician in Rule 4, Section A (4) (b) of the Agreement dated March 1, 2013.

Rule 4, Section A (4) (b) referenced above provides, in pertinent part, that the position of Senior Electronic Technician will be a bid position, filled based on business needs as determined at the sole discretion of management.

It is understood any bid Senior Electronic Technician who fails to maintain the requirements listed in Section I (A) of the above referenced Agreement will revert to the status of an Electronic Technician. It is understood that such reversion is not considered discipline and that the Carrier is not subject to any claim on behalf of an Electronic Technician who fails to maintain the requirements listed in Section I (A).

Please acknowledge your agreement by signing in the space provided below.

Yours truly,

S. F. Boone

Jim Wisniski



UPFULBRIGHT

UNION PACIFIC RAILROAD
1400 Douglas Street, STOP 0710
Omaha, Nebraska 68179

P 402 544 4514

Toby M. Rees Director - Non Ops

June 24, 2015

230-37

Mr. Jim Wisniski
General Chairman IBEW
8000 Main Street, Suite A
North Richland Hills, TX 76182

Dear Sir:

This refers to our discussions regarding the parties' intent to change the mechanism in which documents related to disciplinary proceeding are provided to the Organization pursuant to the following rules of the governing IBEW Collective Bargaining Agreements:

| | |
|---|---|
| UPRR (November 1, 1976): | Rule 35 |
| SPRR-WL (April 16, 1942): | Rule 38 |
| SPRR-WL, M/W (January 1, 1956) | Rule 39 |
| SPRR-EL (April 15, 1967) | Rule 32 |
| DRGW (July 31, 1980): | Rule 31 |
| CNW (December 1, 1985): | Rule 26 |
| Communications (January 1, 2003): | Rule 21 |

Based on our discussions, the Organization is agreeable to receiving all Notices of Investigation, postponements, transcripts and exhibits and Discipline Assessment Letters via electronic mail effective July 1, 2015.

The Carrier will electronically deliver all discipline documents covered by the above referenced rules of the Collective Bargaining Agreements to the emails as provided by the Organization. Therefore, please provide all pertinent email addresses to this office prior to the July 1, 2015 effective date.

It is further agreed that the date of receipt for such electronic documents will be the date the documents are sent.

If the above reflects our understanding, please sign in the space provided below to indicate your concurrence.

Sincerely,

AGREED:

General Chairman IBEW

Cc: Sharon Boone, General Director Labor Relations
Kali Landmark, Manager Labor Relations
Tarry Johnson, Labor Relations Officer



UPFULBRIGHT

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**UNION PACIFIC RAILROAD COMPANY,**<br>**Defendant.** | **Case No. 3:20-CV-2392-BK** |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S AMENDED FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Union Pacific Railroad Company ("Union Pacific" or "Defendant") responds to Plaintiff Joe Fulbright's Amended First Request for Production of Documents as follows:

**RESERVATION OF RIGHTS WITH REGARD TO RESPONSES**

(A) The following responses represent the best information ascertained by Union Pacific and are based upon information obtained from records, files and individuals within its possession, custody, control or employ. Union Pacific reserves the right at any time to revise, correct, add to, or clarify any of the responses provided herein.

(B) The responses provided herein are subject to the right of Union Pacific to object on any ground, at any time, to a demand for further response to these or other interrogatories, requests for admissions, and requests for production of documents, or other discovery procedures involving or relating to the subject matter herein.

(C) By responding to this request for production of documents, Union Pacific does not concede the relevancy or admissibility of the information provided.

## GENERAL OBJECTIONS

Union Pacific objects to Plaintiff's definitions as overly broad and unduly burdensome. Union Pacific further objects to Plaintiff's instructions to the extent that they purport to impose obligations that exceed those that are permissible under the Federal Rules of Civil Procedure.

## DOCUMENTS REQUESTED

**ORIGINAL REQUEST NO. 1**: Produce all documents setting the terms and conditions of Plaintiffs employment from January 1, 2009 through December 31, 2015. This includes, but is not limited to:

a. All job descriptions that applied to Plaintiff during this time period;
b. Applicable Collective Bargaining Agreements, understandings, interpretations, side letters, and any other documents amending or modifying or clarifying the terms of the applicable agreements;
c. Seniority rules that applied to Plaintiff;
d. Overtime policies and rules that applied to Plaintiff;
e. Documents describing the 2009 establishment of the Restore Technician and Install Technician positions and listing the persons who took these positions.
f. All policies and procedures that imposed obligations Plaintiff was required to comply with, including any on-call and overtime requirements that were applicable to Plaintiff.
g. All Communications to Plaintiff informing him of any obligations he was expected to comply with.

**RESPONSE**: Union Pacific objects to this request as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks disclosure of, and could be interpreted to require Union Pacific to search an unlimited number of sources to identify every possible "communication to Plaintiff" for 6 years of Plaintiff's Union Pacific career in which anyone may have communicated with Plaintiff and reduced such communication to Plaintiff in a documented format and that may be interpreted as "any obligations he was expected to comply with." Therefore, and to the extent that Plaintiff was a union employee during the entirety of the request's time period and, as a union employee "the terms and conditions of Plaintiffs employment" are determined by national collective bargaining agreements (CBAs) negotiated

under the federal Railway Labor Act (RLA), Union Pacific will produce Union Pacific's Electronic Technician job posting and the applicable CBAs, though Union Pacific further notes that the latter are equally available to Plaintiff per Plaintiff's union membership.

**AMENDED REQUEST NO. 1**: Produce all documents setting the terms and conditions of Plaintiffs employment from January 1, 2009 through December 31, 2015. This includes, but is not limited to:

a. All job descriptions that applied to Plaintiff during this time period;
b. Applicable Collective Bargaining Agreements, understandings, interpretations, side letters, and any other documents amending or modifying or clarifying the terms of the applicable agreements;
c. Seniority rules that applied to Plaintiff;
d. Overtime policies and rules that applied to Plaintiff;
e. Documents describing the 2009 establishment of the Restore Technician and Install Technician positions and listing the persons who took these positions.
f. All policies and procedures that imposed obligations Plaintiff was required to comply with, including any on-call and overtime requirements that were applicable to Plaintiff.

**AMENDED RESPONSE**: Union Pacific will comply with this request. Accordingly, Union Pacific refers Plaintiff to the following documents that it previously produced: the Electronic Technician job description at UPFULBRIGHT000681-686; certain provisions of the Collective Bargaining Agreement between Union Pacific and the Brotherhood of Railroad Signalmen at UPFULBRIGHT000687-894; the General Code of Operating Rules at UPFULBRIGHT001260-1502; and certain provisions of the Collective Bargaining Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees at UPFULBRIGHT001503-1662. Union Pacific further states the job of "Restore Technician" does not exist under either aforementioned Collective Bargaining Agreements or side letters accompanying those agreements.

are equally available to Plaintiff to the extent that copies of the same would have been submitted to the BRS or IBEW and are therefore conceivably accessible to Plaintiff as a union member.

**AMENDED RESPONSE:** Union Pacific will comply with this request. Union Pacific directs Plaintiff to documents regarding Plaintiff's labor claims, which were produced at UPFULBRIGHT000269-495. Union Pacific states, however, that such documents are equally available to Plaintiff to the extent that copies of the same would have been submitted to the BRS or IBEW and are therefore conceivably accessible to Plaintiff as a union member.

Dated this 12th day of February, 2021.

Respectfully Submitted,

*/s/ Heather M. Miller*

Heather M. Miller (TX #24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816-472-6400
Facsimile: 816-329-5954
hmiller@constangy.com

Derek McKee (TX #24108765)
Constangy, Brooks, Smith & Prophete, LLP
1201 Elm Street, Suite 2550
Dallas, Texas 75270
Telephone: 214.646.8625
Facsimile: 214.749.0078
dmckee@constangy.com

Robert L. Ortbals, Jr. (MO Bar #56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Blvd, Ste. 1325
St. Louis, MO 63105
Telephone: (314) 338-3740
Facsimile: (314) 727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of February, 2021, the foregoing was sent by electronic mail to the following:

Donald E. Uloth
Law Office of Donald E. Uloth
18208 Preston Rd., Suite D-9 #261
Dallas, TX 75252
Don.Uloth@uloth.pro

ATTORNEY FOR PLAINTIFF

*/s/ Heather M. Miller*
Heather Miller, Senior Counsel

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**UNION PACIFIC RAILROAD COMPANY,**<br>**Defendant.** | **Case No. 3:20-CV-2392-BK** |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendant Union Pacific Railroad Company ("Union Pacific" or "Defendant") responds to Plaintiff Joe Fulbright's Second Request for Production of Documents as follows:

**RESERVATION OF RIGHTS WITH REGARD TO RESPONSES**

(A) The following responses represent the best information ascertained by Union Pacific and are based upon information obtained from records, files and individuals within its possession, custody, control or employ. Union Pacific reserves the right at any time to revise, correct, add to, or clarify any of the responses provided herein.

(B) The responses provided herein are subject to the right of Union Pacific to object on any ground, at any time, to a demand for further response to these or other interrogatories, requests for admissions, and requests for production of documents, or other discovery procedures involving or relating to the subject matter herein.

(C) By responding to this request for production of documents, Union Pacific does not concede the relevancy or admissibility of the information provided.

**REQUEST NO. 14.** Documents explaining the creation of the Restore Technician position and Installation Technician position at the location where Plaintiff worked.

**RESPONSE**: Union Pacific will comply with this request, although it notes that the position of "restore technician" is not referenced, described, or otherwise delineated under the UP-IBEW Agreement, which was previously produced at UPFULBRIGHT001503 – 1662, and which sets out the various technician job titles/positions and respective responsibilities for those positions.

**REQUEST NO. 15**. For the period from January 23, 2009 through July 1, 2015, job postings that Plaintiff or any of his coworkers (meaning Communication Technicians and Electronic Technicians at the same facility where Plaintiff worked) bid on, and documents reflecting the outcome of the bids (who got/did not get the positions).

**RESPONSE**: Union Pacific objects to Request No. 15 as irrelevant, overly broad, unduly burdensome and not proportional to the needs of the case. This request seeks documents from January 23, 2009 through July 1, 2015, despite that the allegations in this action focus only on a fitness-for-duty determination made in June 2015, which effectively would require Union Pacific to produce irrelevant and over-inclusive information about other individuals who have no connection to Plaintiff other than that they are peer union members.

**REQUEST NO. 16**. For the period from January 23, 2009 through July 1, 2015, documents showing who else was in Plaintiff's gang at any time during this period.

**RESPONSE**: Union Pacific will comply with this request by providing the names and seniority dates of Electronic Technicians working at Union Pacific's Fort Worth, Texas location

Dated this 19th day of February, 2021.

Respectfully submitted,

*/s/ Heather M. Miller*
Heather M. Miller (TX #24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816-472-6400
Facsimile: 816-329-5954
hmiller@constangy.com

Derek McKee (TX #24108765)
Constangy, Brooks, Smith & Prophete, LLP
1201 Elm Street, Suite 2550
Dallas, Texas 75270
Telephone: 214.646.8625
Facsimile: 214.749.0078
dmckee@constangy.com

Robert L. Ortbals, Jr. (MO Bar #56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Blvd, Ste. 1325
St. Louis, MO 63105
Telephone: (314) 338-3740
Facsimile: (314) 727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of February, 2021, the foregoing was sent by electronic mail to the following:

Donald E. Uloth
Law Office of Donald E. Uloth
18208 Preston Rd., Suite D-9 #261
Dallas, TX 75252
Don.Uloth@uloth.pro

*/s/ Heather M. Miller*
Heather Miller, Senior Counsel

CONFIDENTIAL

HR Reporting System

**Work History**
**Name: JOE M FULBRIGHT**
**Empl Id: 0251592**

| EFF DATE | CHANGE TYPE | EMPL STATUS | JOB TYPE | POSITION TITLE | WORK LOCATION | UNION | DEPARTMENT | JOB CODE |
|---|---|---|---|---|---|---|---|---|
| 07/09/2015 | Agr-Layoff-Medically Disqual | OFF WORK | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/03/2015 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 10/24/2014 | Agr Return from Leave of Abs | ACTIVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 08/26/2014 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/24/2014 | Agr Return from Leave of Abs | ACTIVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/25/2014 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 03/01/2011 | Agr Return from Leave of Abs | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/22/2011 | Agr LOA-Fam Medic Leave | LEAVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 09/29/2010 | Both-Data Redesignation | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/26/2010 | Both-Data Redesignation | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 06/23/2009 | Agr Return from Leave of Abs | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/16/2009 | Agr LOA-On Duty Pers Injury | LEAVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/07/2006 | Both-Version 8.8 Upgrade | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 01/26/2005 | Agr Change/Pos Title/Loc | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 07/01/2004 | Agr Change/Pos Title/Loc | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | TRNSP SOUTHERN RGN | A38898 |
| 04/24/2000 | Agr Bid | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | TRNSP SOUTHERN RGN | A38898 |
| 09/02/1998 | Agr Discharge-Rule Violations | TERMINATED | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A38898 |
| 02/17/1998 | Agr Bid | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A38898 |
| 02/16/1998 | Agr Assignment Pending | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 04/01/1996 | Agr Bid | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 11/05/1993 | Agr Change/Pos Title/Loc | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 06/01/1993 | Agr Change/Pos Title/Loc | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 07/01/1991 | GENERAL INCREASE | ACT-A | AGR | COMM MAINT LIC | FT WORTH, TX | BRS | Information Technologies | |
| 04/07/1988 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MAINT LIC | FT WORTH, TX | UNKNOWN | Information Technologies | A41308 |
| 05/01/1987 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MAINT LICENSED | FT WORTH, TX | UNKNOWN | Information Technologies | A41308 |
| 07/02/1986 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMMUNICATIONS DEPT | FT WORTH, TX | UNKNOWN | Information Technologies | A91265 |
| 07/16/1985 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MNTR | FT WORTH, TX | UNKNOWN | INA-MISSOURI PACIFIC-HISTORY | A91261 |
| 03/25/1985 | Agr New Hire | ACTIVE | AGR | COMM MNTR | FT WORTH, TX | UNKNOWN | INA-MISSOURI PACIFIC-HISTORY | A91261 |

**Report Generated on 09/22/20 12:29:52 by LADM279**
**Data copyright Union Pacific Railroad 2020**

UPFULBRIGHT

**Created on:** Jun 26, 2015 **Time:** 8:20:14 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

This is restriction Review Form Sent to Management. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:03:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent restriction form to Terry Neal due to system error.

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:02:28 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent this form since SPAN written by eHS system all over the form makingit unreadable. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:55:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Work Restrictions Sent to Work Unit Management for Review if able toaccommodate in EE given job. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Medical Conclusions

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:54:00 PM **Created by:** 00458844 ( Theresa Rodino )

**Medical Conclusions Comments**

1. Not to operate company vehicles,on-track or mobile equipment, orfork-lifts.2. Not to work on rail trainsor work trains dumping ballast.(Can perform work remaining between therails of the occupied track or tothe field side of the occupied track.Where there are adjacent tracks withless than 19 foot track centers,utilize on-track safety protectionfollowing normal safety and Maintenanceof Way rules).3. Not to operatecranes, hoists, or machinery, if theseactivities might create a risk ofharm to others or a risk of catastrophicinjury to the employee.4. Not towork at unprotected heights, over 4 feetabove the ground (Can work on thebeds of trucks, and occupy bridgesfollowing normal safety rules).5. Notto work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder orhelper job, 2-man section gang).Must have at least 2 additional employeeson gang or at work area in orderto use Train Approach Warning regulations(Lookout).

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 12:41:33 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, Per our case review discussion:A This EE has still notcomplied with the agreement that he would work with his doctor to have aformal sleep medicine evaluation. Please advise him that the sleepmedicine evaluation is still required.B Because Trazadone is so longacting, he cannot take that medication and work for the ensuing 24hours.C We will employ sudden incapacitation restrictions until wereceive information that the EE is no longer taking the Trazadone, or isnot using it within 24 hours of reporting for work.D The employee isgiven the following work restrictions:1. Not to operate company vehicles,on-track or mobile equipment, or fork-lifts.2. Not to work on rail trainsor work trains dumping ballast. (Can perform work remaining between therails of the occupied track or to the field side of the occupied track.Where there are adjacent tracks with less than 19 foot track centers,utilize on-track safety protection following normal safety and Maintenanceof Way rules).3. Not to operate cranes, hoists, or machinery, if theseactivities might create a risk of harm to others or a risk of catastrophicinjury to the employee.4. Not to work at unprotected heights, over 4 feetabove the ground (Can work on the beds of trucks, and occupy bridgesfollowing normal safety rules).5. Not to work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder or helper job, 2-man section gang).Must have at least 2 additional employees on gang or at work area in orderto use Train Approach Warning regulations (Lookout). 6. If a new jobassignment is considered, outside of the Engineering Department, Healthand Medical Services must review the job requirements and determine if theemployee can

UPFULBRIGHT

safely perform the essential functions of the job.E Therestrictions will be ongoing until the conditions outlined above have beenmet.F We will close the case if we have no response from the EE within areasonable period of time.Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 19, 2015 **Time:** 11:14:51 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, This EE has not provided the medical records that we haverequested and we have not seen the results of a sleep medicine evaluationwhich we agreed to when you and I spoke directly with the EE.Action:1Remains NOT FFD.2 We still need the same information.3 Please calendarthis case for discussion with the CMO next week.Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 1:56:09 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

C6/18/15 Document request letter sent:Copy of the last 2 years ofphysician clinic notes (also known as office notes or progress notes) fromthe provider treating you for this condition and the Sleep evaluationstudy records. JL

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 1:49:37 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/18/15 TC to EE re: needing medical records that have beenrequested--Copy of the last 2 years of physician clinic notes (also knownas office notes or progress notes) from the provider. Requested EE RTC toHMS, JL. JL

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 9:11:51 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- This EE had sent us this letter in eHS from 5/22/2015 it is letterfrom EE. We have this case on our Manager Referral Case Review fortomorrow morning but please see this letter and advise. We have beenwaiting for information from EE and this letter is his response but it isnow almost 1 month old. With your last review on the same date I believeyou addressed this letter but please advise.Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 4:29:24 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We have worked diligently with this EE to get the information weneed. We were both on the call when we asked him to get a sleep evaluationdue to the performance problems that this EE had at work. We cannotcontrol the verbiage that the EE used during a hearing. Our informationneeds to make the final FFD determination have not changed. Pleasereassure the manager that we continue to investigate the medical issue inquestion and nothing more. When we get the sleep evaluation information weshould be able to complete the FFD Process.Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 4:00:22 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

manager concern. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

UPFULBRIGHT

1.28.2015 Call to EE LVM asking EE To please call back to discuss.Sending letter to EE requesting last 1 yr of medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 27, 2015 **Time:** 6:24:16 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

This is the Manager Referral. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 27, 2015 **Time:** 6:22:40 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

1.26.2015 CF Manager Terry Neal regarding his concerns that EE who workson call for telecom and restoration of services has missed some calls.That EE reports he takes medications that put him to sleep and prohibithim from waking up for calls after normal business hours. Manager statesthat this is concern especially since this is part of EE job to be oncall. Mgr has concerns that EE may have medical situation and asks forFFD review. tr

---

**Case Number:** 000001293558 **Service Number:** 0000000000 **Category:** Case

**Case Type:** FFD NON-REGULA **Service Type:**

**Created on:** Jan 27, 2015 **Time:** 6:22:40 PM **Created by:** 00458844 ( Theresa Rodino )

**Case Comments**

LOC. PHONE IS 817-301-3981

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity

**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY

**Created on:** Oct 23, 2014 **Time:** 9:28:50 AM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

May RTW w/o restrictions

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity

**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY

**Created on:** Oct 22, 2014 **Time:** 5:37:39 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Jayne, Medically FFD for his Full Duty. Pls send the RTWNotification.Thx. Dr C

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity

**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY

**Created on:** Oct 21, 2014 **Time:** 2:56:17 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

1. Joe Fulbright 251592, 53 yoa, lineman2. 8/27 Lt elbow ulnar nervedecompression3. Full duty release - need RTW wire4. JEDuValeus, RN636-795-5991

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Oct 21, 2014 **Time:** 1:09:30 PM **Created by:** 00415681 ( Mary Gallardo )

**Consultation Date Performed:** Oct 21, 2014

**Consultation Comments**



UPFULBRIGHT

# Supervisor Initiated Fitness-For-Duty Request Form

**Supervisors have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern that the employee can safely perform his/her job duties. Supervisors should complete the information below when requesting Health and Medical Services to complete a Fitness-for-Duty evaluation.**

| | | | |
|---|---|---|---|
| Date | January 26, 2015 | Employee Phone (best contact #) | 817-733-0427 |
| Employee Name | Joe M. Fulbright | Employee ID | 0251592 |
| Employee Job Title | Senior Communications Technician | Employee Job Location | Fort Worth, TX |
| Supervisor Who Observed Behaviors (If Different From Mgr) | | Supervisor Telephone # | 817-353-7237 |
| Manager Making Referral | Terry D. Neal | Manager Employee ID | 0166451 |
| Manager Telephone # | 817-353-7237 | Manager E-mail Address | tdneal@up.com |
| Is The Employee Removed From Service? | ☐ YES X NO | If No, Is Employee Being Provided Alternative Work Duties During Evaluation? | ☐ YES X NO |
| Has The Employee Been Informed Of Their Removal From Service? | ☐ YES ☐ NO X N/A | Have You Discussed These Observations and/or Unsafe Behaviors With The Employee? | X YES ☐ NO |
| | | | |

**I am requesting a Fitness-For-Duty evaluation for the above named employee as evidenced by: (check as many as are applicable):**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Absenteeism | | Confusion | | Decreased Alertness | | Deteriorating Performance |
| | Difficulty Climbing | | Difficulty Lifting | | Difficulty Recalling | | Disorientation |
| | Erratic Behavior | | Fatigue/Weakness | | Shortness of Breath | X | Sleeping |
| | Slurred Speech | | Staggering | | Stumbling | | Sudden Mood Swings |
| | Unsteady Walk | | I am requesting FFD Eval for Mr Fulbright for his sleeping issues. He has to take medicine in order to sleep. The Medicine prohibits his ability to fulfill his duties for Restoration of Service after normal business hours. | | | | |

**1. Provide details of specific behaviors: Descriptions, observations and circumstances of the events leading to the request for the FFD evaluation: Mr. Fulbright has missed After Hours Call outs due to the sleep medicine he takes. He has told me that he has to take this medication**

**2. How long has this been occurring? 2014, 2015**

**3. Has there been a prior behavioral incident(s) or problem(s)? No, just "sleep medicine/and subject to call rules"**

**4. Please provide any additional information which raises your concern that the employee may not be able to safely perform his/her job duties. I am worried that the medicine could impair Mr. Fulbright further into his normal work shift. Is the medication UPRR approved? I would never ask Mr Fulbright to work after he has taken his sleep medication; however that puts a hardship on his peers having to cover for his sleep condition**

| | |
|---|---|
| Does This Represent a Change in The Employee's Past Observed Behaviors? | ☐ YES X NO |
| If Yes, Please Describe: | |
| Were Environmental Conditions Pertinent or Related To The Observed Behaviors (i.e: size of cab; distance between handrails)? | ☐ YES X NO |
| If Yes, Please Describe: | |

UPFULBRIGHT

**Supervisor Initiated Fitness-For-Duty Request Form**

Recap:
I am concerned about Mr. Fulbrights sleep condition. He must take medication in order to sleep. This medication prohibits him from fulfilling his job responsibility for Emergency After Hour Restoration of Service. We have had several conversations about this condition and how it is effecting his job along with his peers (who are having to cover for him) I am also concerned about the medication having lingering effects into his daily duties. I am also concerned whether the medication is UPRR approved. Any future issues with missing calls will result in discipline being assigned. I would like to be proactive and try and to work this out before it comes to discipline.

Terry Neal

UPFULBRIGHT

# Technician Dispatch

Here are some details for successful tech dispatching:

1) The SCIM has to be ONE of the five Telecom categories: DATA, TRANS, TRAINOPS, RADIO, VOICE.
2) The location is MOST important. In filling out the location tab, I would refrain from trying to use MNEMONICS. Rather, if you type in the 1st few letters of the city and then the state, you should receive a pop-up box with the "available" choices of sublocations for the given city. Obviously, there will be more entries available for North Platte than for South Morrill.
3) This should bring up a call list of the technicians available for that location for that problem (again the SCIM).

**Basic Checks:**
**A)** Review the call list presented starting at the top and select the 1st tech that is ON-DUTY.
**B)** The record that appears on the DISPATCH tab in TRM may have some comments from the tech. Beware of these as the techs are not always diligent in updating these and they may well be quite old.
**C)** Use one of the below processed based on the severity of the ticket and if during normal working hours or after hours.
**E)** If no technician list is provided, the default is the location's responsible manager. This is an option if needed but I would verify your Location and SCIM to ensure that a proper call-list should have been provided.

**Modified section 9/7/2011**
**(Critical - Priority ONE / TWO):**
**You must verbally speak to a tech to constitute "dispatch" status. If you are not able to verbally contact a tech and have to leave a message then do so and mark the ticket manually as "notify" and keep track of the time. See section C.**
**A)** If after hours and a problem must be covered then the ticket should be a severity 01.
**B)** Review the call list presented starting at the top and select the 1st tech that is ON-DUTY. Some techs mark off on weekends and, of course, vacation.
**B) If after hours** the tech might be tied up at another location. Check the tieup information and try that number/location first. Followed by any other instructions they may have noted. Then try the home number then work cell phone and in some cases a tech will list personal cell as well. **If normal hours** - try tech cell number then office number. In both cases if you are not able to contact a tech and have option to leave a message then leave urgent message with info about the outage etc..
**C)** Allow the tech 20 minutes to responsd after you have tied the last number. If no response after 20 minutes move to next tech and repeat the process for that tech.
**D)** If you exhaust the call list the manager should be called to locate a tech and/or arrange coverage.
The respective Manager is always a resource if having trouble locating a technician.
**Special note**: depending on the criticality of the outage we may have to escalate to the manager prior to exhausting the call list. As always this will be a judgement call. If you have other difficulties or are in doubt, error on the safe side and contact the manager.

**(Non-Critical - Priority 3, 4, 5,):**
**A)** Review the call list presented starting at the top and select the 1st tech that is ON-DUTY. Some techs mark off on weekends and, of course, vacation.
**B)** Use the auto notify function of the ticket system. .

UPFULBRIGHT

CONFIDENTIAL

www.up.com

BUILDING AMERICA®

UPFULBRIGHT

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe Fulbright | 00251592 | 12/24/2010 | 12/01/2010 | 12/15/2010 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Single | 01 | $0.00 |
| Texas | Single | 01 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| TEXAS PEOPLE FCU | ****7508 | $220.06 |
| **Total Net Pay** | | **$220.06** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $448.81 | $65,235.00 |
| Pre-Tax Deductions | ($200.00) | ($2,400.00) |
| Tax Withholdings | ($28.75) | ($17,507.88) |
| After Tax Deductions | $0.00 | ($1,102.48) |
| **Total** | $220.06 | $44,224.64 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $448.81 | $65,235.00 |
| Pre-Tax Deductions | ($200.00) | ($2,400.00) |
| **Total** | $248.81 | $62,835.00 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| Other Earnings | 16.00 | $448.81 | 416.00 | $11,581.42 |
| Overtime | | $0.00 | 45.96 | $1,815.81 |
| Personal Leave | | $0.00 | 8.00 | $215.78 |
| Straight Time | | $0.00 | 1,704.00 | $47,321.64 |
| Vacation | | $0.00 | 152.00 | $4,300.35 |
| **Total** | 16.00 | $448.81 | 2,325.96 | $65,235.00 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $200.00 | $2,400.00 |
| **Total** | $200.00 | $2,400.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| 1/2 Price Shoe | $0.00 | $68.20 |
| BRS #141 | $0.00 | $1,034.28 |
| **Total** | $0.00 | $1,102.48 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $248.81 | $0.00 | $62,835.00 | $10,250.43 |
| TX EE RR Rtmt Medicare | $248.81 | $3.61 | $62,835.00 | $911.11 |
| TX EE Railroad Rtmt Tier1 | $248.81 | $15.43 | $62,835.00 | $3,895.77 |
| TX EE Railroad Rtmt Tier2 | $248.81 | $9.71 | $62,835.00 | $2,450.57 |
| **Total** | | $28.75 | | $17,507.88 |

### Cash Earnings Details

| Description | | Rate | Current Hours | Current Amount |
|---|---|---|---|---|
| Other Earnings | Monthly-Rated 6-Undistrib | | 16.00 | $448.81 |
| **Total** | | | 16.00 | $448.81 |



**UNION PACIFIC RAILROAD COMPANY** 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

CONFIDENTIAL

www.up.com

BUILDING AMERICA®

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe Fulbright | 00251592 | 12/23/2011 | 12/01/2011 | 12/15/2011 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Single | 01 | $0.00 |
| Texas | Single | 01 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| EECU | ****8120 | $1,926.90 |
| **Total Net Pay** | | **$1,926.90** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,805.08 | $59,371.19 |
| Pre-Tax Deductions | ($200.00) | ($2,200.00) |
| Tax Withholdings | ($678.18) | ($14,890.40) |
| After Tax Deductions | $0.00 | ($861.90) |
| **Total** | $1,926.90 | $41,418.89 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,805.08 | $59,371.19 |
| Pre-Tax Deductions | ($200.00) | ($2,200.00) |
| **Total** | $2,605.08 | $57,171.19 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| Other Earnings | 16.00 | $431.55 | 344.00 | $9,528.30 |
| Overtime | | $0.00 | 33.34 | $1,317.21 |
| Personal Leave | 16.00 | $431.55 | 16.00 | $431.55 |
| Straight Time | 72.00 | $1,941.98 | 1,596.00 | $44,198.93 |
| Vacation | | $0.00 | 136.00 | $3,895.20 |
| **Total** | 104.00 | $2,805.08 | 2,125.34 | $59,371.19 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $200.00 | $2,200.00 |
| **Total** | $200.00 | $2,200.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| BRS #141 | $0.00 | $861.90 |
| **Total** | $0.00 | $861.90 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $2,605.08 | $429.40 | $57,171.19 | $9,430.55 |
| TX EE RR Rtmt Medicare | $2,605.08 | $37.77 | $57,171.19 | $828.98 |
| TX EE Railroad Rtmt Tier1 | $2,605.08 | $109.41 | $57,171.19 | $2,401.19 |
| TX EE Railroad Rtmt Tier2 | $2,605.08 | $101.60 | $57,171.19 | $2,229.68 |
| **Total** | | $678.18 | | $14,890.40 |

### Cash Earnings Details

| Description | | Rate | Current Hours | Current Amount |
|---|---|---|---|---|
| Other Earnings | Monthly-Rated 6-Undistrib | | 16.00 | $431.55 |
| Personal Leave | Personal Leave-Personal | | 16.00 | $431.55 |
| Straight Time | Straight Time-Undistrib | | 72.00 | $1,941.98 |
| **Total** | | | 104.00 | $2,805.08 |

UPFULBRIGHT

CONFIDENTIAL



UPFULBRIGHT

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe M Fulbright | 00251592 | 12/24/2012 | 12/01/2012 | 12/15/2012 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Single | 01 | $0.00 |
| Texas | Single | 01 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| EECU | ****8120 | $1,664.55 |
| **Total Net Pay** | | **$1,664.55** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,393.82 | $74,090.82 |
| Non-Cash Earnings | $0.00 | $0.00 |
| Pre-Tax Deductions | ($198.00) | ($2,388.00) |
| Tax Withholdings | ($531.27) | ($19,447.56) |
| After Tax Deductions | $0.00 | ($959.89) |
| **Total** | $1,664.55 | $51,295.37 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,393.82 | $74,090.82 |
| Non-Cash Earnings | $0.00 | $100.00 |
| Pre-Tax Deductions | ($198.00) | ($2,388.00) |
| **Total** | $2,195.82 | $71,802.82 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| Back Pay | | $0.00 | | $3,212.23 |
| Holiday Pay | | $0.00 | 16.00 | $509.80 |
| Lump Sum | | $0.00 | | $566.64 |
| No Pay | 32.00 | $0.00 | 72.00 | $0.00 |
| Other Earnings | 24.00 | $797.94 | 408.00 | $12,014.71 |
| Overtime | | $0.00 | 25.84 | $1,077.97 |
| Personal Leave | | $0.00 | 16.00 | $450.99 |
| Straight Time | 48.00 | $1,595.88 | 1,696.00 | $49,725.63 |
| Vacation | | $0.00 | 228.00 | $6,532.85 |
| **Total** | 104.00 | $2,393.82 | 2,461.84 | $74,090.82 |

### Reimbursements

| Description | Current | YTD |
|---|---|---|
| | | |
| **Total** | | |

### Non-Cash Earnings

| Description | Current | YTD |
|---|---|---|
| Cash Recognition (2) | $0.00 | $100.00 |
| **Total** | $0.00 | $100.00 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $198.00 | $2,388.00 |
| **Total** | $198.00 | $2,388.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| BRS #141 | $0.00 | $959.89 |
| **Total** | $0.00 | $959.89 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $2,195.82 | $321.56 | $71,802.82 | $12,590.39 |
| TX EE RR Rtmt Medicare | $2,195.82 | $31.84 | $71,802.82 | $1,041.14 |
| TX EE Railroad Rtmt Tier1 | $2,195.82 | $92.23 | $71,802.82 | $3,015.72 |
| TX EE Railroad Rtmt Tier2 | $2,195.82 | $85.64 | $71,802.82 | $2,800.31 |
| **Total** | | $531.27 | | $19,447.56 |



UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

CONFIDENTIAL



| Statement of Earnings and Deductions | | | | |
|---|---|---|---|---|
| **Name** | **Employee ID** | **Pay Date** | **Period Begin** | **Period End** |
| Joe M Fulbright | 00251592 | 12/24/2012 | 12/01/2012 | 12/15/2012 |

| Cash Earnings Details | | | | |
|---|---|---|---|---|
| **Description** | | **Rate** | **Current Hours** | **Current Amount** |
| No Pay | FMLA Without Pay | | 32.00 | $0.00 |
| Other Earnings | Monthly Rated 6th Day | $33.25 | 24.00 | $797.94 |
| Straight Time | Straight Time | $33.25 | 48.00 | $1,595.88 |
| **Total** | | | 104.00 | $2,393.82 |

UPFULBRIGHT

CONFIDENTIAL

www.up.com

BUILDING AMERICA®

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe M Fulbright | 00251592 | 12/24/2013 | 12/01/2013 | 12/15/2013 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Married | 01 | $0.00 |
| Texas | Married | 01 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| EECU | ****8120 | $1,967.54 |
| **Total Net Pay** | | **$1,967.54** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,739.60 | $69,675.75 |
| Non-Cash Earnings | $0.00 | $0.00 |
| Pre-Tax Deductions | ($198.00) | ($2,376.00) |
| Tax Withholdings | ($574.06) | ($18,776.38) |
| After Tax Deductions | $0.00 | ($1,105.08) |
| **Total** | $1,967.54 | $47,418.29 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,739.60 | $69,675.75 |
| Non-Cash Earnings | $0.00 | $200.00 |
| Pre-Tax Deductions | ($198.00) | ($2,376.00) |
| **Total** | $2,541.60 | $67,499.75 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| Holiday Pay | | $0.00 | 24.00 | $745.97 |
| No Pay | 16.00 | $0.00 | 184.00 | $0.00 |
| Other Earnings | 16.00 | $547.92 | 392.00 | $12,108.77 |
| Overtime | | $0.00 | 15.67 | $688.02 |
| Personal Leave | | $0.00 | 16.00 | $477.64 |
| Safety Meetings | | $0.00 | 16.00 | $508.33 |
| Straight Time | 64.00 | $2,191.68 | 1,580.00 | $48,546.53 |
| Vacation | | $0.00 | 212.00 | $6,600.49 |
| **Total** | 96.00 | $2,739.60 | 2,439.67 | $69,675.75 |

### Reimbursements

| Description | Current | YTD |
|---|---|---|
| | | |
| **Total** | | |

### Non-Cash Earnings

| Description | Current | YTD |
|---|---|---|
| Cash Recognition (2) | $0.00 | $200.00 |
| **Total** | $0.00 | $200.00 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $198.00 | $2,376.00 |
| **Total** | $198.00 | $2,376.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| BRS #141 | $0.00 | $1,105.08 |
| **Total** | $0.00 | $1,105.08 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $2,541.60 | $267.80 | $67,499.75 | $10,642.66 |
| TX EE RR Rtmt Medicare | $2,541.60 | $36.86 | $67,499.75 | $978.75 |
| TX EE Railroad Rtmt Tier1 | $2,541.60 | $157.57 | $67,499.75 | $4,184.98 |
| TX EE Railroad Rtmt Tier2 | $2,541.60 | $111.83 | $67,499.75 | $2,969.99 |
| **Total** | | $574.06 | | $18,776.38 |

UPFULBRIGHT



UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

www.up.com

BUILDING AMERICA®

| Statement of Earnings and Deductions | | | | |
|---|---|---|---|---|
| Name | Employee ID | Pay Date | Period Begin | Period End |
| Joe M Fulbright | 00251592 | 12/24/2013 | 12/01/2013 | 12/15/2013 |

| Cash Earnings Details | | | | |
|---|---|---|---|---|
| Description | | Rate | Current Hours | Current Amount |
| No Pay | FMLA Without Pay | | 16.00 | $0.00 |
| Other Earnings | Monthly Rated 6th Day | $34.25 | 16.00 | $547.92 |
| Straight Time | Straight Time | $34.25 | 64.00 | $2,191.68 |
| **Total** | | | 96.00 | $2,739.60 |

UPFULBRIGHT



UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

www.up.com

BUILDING AMERICA®

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe M Fulbright | 00251592 | 12/24/2014 | 12/01/2014 | 12/15/2014 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Married | 04 | $0.00 |
| Texas | Married | 04 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| USAA FEDERAL SAVINGS BANK | ****0538 | $2,032.97 |
| **Total Net Pay** | | **$2,032.97** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,725.20 | $42,781.54 |
| Non-Cash Earnings | $0.00 | $0.00 |
| Pre-Tax Deductions | ($198.00) | ($1,386.00) |
| Tax Withholdings | ($494.23) | ($8,375.97) |
| After Tax Deductions | $0.00 | ($670.91) |
| **Total** | $2,032.97 | $32,348.66 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $2,725.20 | $42,781.54 |
| Non-Cash Earnings | $0.00 | $200.00 |
| Pre-Tax Deductions | ($198.00) | ($1,386.00) |
| **Total** | $2,527.20 | $41,595.54 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| No Pay | 24.00 | $0.00 | 166.50 | $0.00 |
| Other Earnings | 16.00 | $545.04 | 216.13 | $7,020.55 |
| Overtime | | $0.00 | 13.34 | $597.01 |
| Personal Leave | | $0.00 | 16.00 | $558.33 |
| Straight Time | 64.00 | $2,180.16 | 857.50 | $27,494.54 |
| Vacation | | $0.00 | 224.00 | $7,111.11 |
| **Total** | 104.00 | $2,725.20 | 1,493.47 | $42,781.54 |

### Reimbursements

| Description | Current | YTD |
|---|---|---|
| | | |
| **Total** | | |

### Non-Cash Earnings

| Description | Current | YTD |
|---|---|---|
| Cash Recognition (2) | $0.00 | $200.00 |
| Non-Cash Recognition (2) | $0.00 | $0.00 |
| **Total** | $0.00 | $200.00 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $198.00 | $1,386.00 |
| **Total** | $198.00 | $1,386.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| BRS #141 | $0.00 | $670.91 |
| **Total** | $0.00 | $670.91 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $2,527.20 | $189.71 | $41,595.54 | $3,363.71 |
| TX EE RR Rtmt Medicare | $2,527.20 | $36.65 | $41,595.54 | $603.14 |
| TX EE Railroad Rtmt Tier1 | $2,527.20 | $156.68 | $41,595.54 | $2,578.92 |
| TX EE Railroad Rtmt Tier2 | $2,527.20 | $111.19 | $41,595.54 | $1,830.20 |
| **Total** | | $494.23 | | $8,375.97 |

### Cash Earnings Details

| Description | | Rate | Current Hours | Current Amount |
|---|---|---|---|---|
| No Pay | FMLA Without Pay | | 24.00 | $0.00 |
| Other Earnings | Monthly Rated 6th Day | $34.07 | 16.00 | $545.04 |
| Straight Time | Straight Time | $34.07 | 64.00 | $2,180.16 |
| **Total** | | | 104.00 | $2,725.20 |

UPFULBRIGHT



UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

CONFIDENTIAL

www.up.com

BUILDING AMERICA®

## Statement of Earnings and Deductions

| Name | Employee ID | Pay Date | Period Begin | Period End |
|---|---|---|---|---|
| Joe M Fulbright | 00251592 | 02/10/2015 | 01/16/2015 | 01/31/2015 |

| W-4 Type | Marital Status | Withholdings | Additional Amt |
|---|---|---|---|
| Federal | Married | 04 | $0.00 |
| Texas | Married | 04 | $0.00 |

| Bank Name | Account ID | Deposit Amt |
|---|---|---|
| USAA FEDERAL SAVINGS BANK | ****0538 | $2,533.96 |
| **Total Net Pay** | | **$2,533.96** |

### Net Pay Summary [1]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $3,368.43 | $8,652.34 |
| Pre-Tax Deductions | $0.00 | ($198.00) |
| Tax Withholdings | ($735.81) | ($1,752.61) |
| After Tax Deductions | ($98.66) | ($197.32) |
| **Total** | $2,533.96 | $6,504.41 |

### Federal Taxable Wage Summary [2]

| Description | Current | YTD |
|---|---|---|
| Cash Earnings | $3,368.43 | $8,652.34 |
| Pre-Tax Deductions | $0.00 | ($198.00) |
| **Total** | $3,368.43 | $8,454.34 |

### Cash Earnings

| Description | Current Hours | Current Amount | YTD Hours | YTD Amount |
|---|---|---|---|---|
| No Pay | | $0.00 | 8.00 | $0.00 |
| Other Earnings | 16.00 | $518.22 | 32.00 | $1,063.26 |
| Straight Time | 64.00 | $2,072.88 | 188.00 | $6,196.36 |
| Vacation | 24.00 | $777.33 | 43.00 | $1,392.72 |
| **Total** | 104.00 | $3,368.43 | 271.00 | $8,652.34 |

### Pre-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| H&W Contrib Pret Med | $0.00 | $198.00 |
| **Total** | $0.00 | $198.00 |

### After-Tax Deductions

| Description | Current | YTD |
|---|---|---|
| BRS #141 | $98.66 | $197.32 |
| **Total** | $98.66 | $197.32 |

### Tax Summary

| Description | Current Wages | Current Withholding | YTD Wages | YTD Withholding |
|---|---|---|---|---|
| Federal Tax | $3,368.43 | $313.08 | $8,454.34 | $691.59 |
| TX EE RR Rtmt Medicare | $3,368.43 | $48.84 | $8,454.34 | $122.59 |
| TX EE Railroad Rtmt Tier1 | $3,368.43 | $208.84 | $8,454.34 | $524.17 |
| TX EE Railroad Rtmt Tier2 | $3,368.43 | $165.05 | $8,454.34 | $414.26 |
| **Total** | | $735.81 | | $1,752.61 |

### Cash Earnings Details

| Description | | Rate | Current Hours | Current Amount |
|---|---|---|---|---|
| Other Earnings | Monthly Rated 6th Day | $32.39 | 16.00 | $518.22 |
| Straight Time | Straight Time | $32.39 | 64.00 | $2,072.88 |
| Vacation | Vacation | $32.39 | 24.00 | $777.33 |
| **Total** | | | 104.00 | $3,368.43 |

UPFULBRIGHT



UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street, MS 1730 Omaha, NE 68179 (402) 544-4729

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-2392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S AMENDED COMPLAINT**

Joe M. Fulbright ("Fulbright" or "Plaintiff") complains of his former employer, Union Pacific Railroad Company ("Union Pacific" or "Defendant") seeking damages and injunctive relief for the company's violations of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended (the "ADA").

PARTIES

1. Joe M. Fulbright was a Texas resident at all times relevant to this case, but he now resides in Tennessee.

2. Union Pacific is a railroad carrier engaged in interstate commerce, and it has operations in Dallas County, Texas. Its principal place of business is in Omaha, Nebraska. Defendant has entered its appearance in this case.

JURISDICTION AND VENUE

3. This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331.

4. Defendant owns and operates hundreds of miles of railroad track in Texas, and it does a substantial amount of business in Texas. Defendant has sufficient minimum contacts with

job, not even with accommodations. That is what happened to Plaintiff, and it cost him his job roughly two years short of being eligible for full retirement benefits.

A. Fulbright's Employment at Union Pacific

13. Fulbright worked for Union Pacific from 1985 to 2015. During the last 15 years or more of his employment, he was a Senior Communications Maintainer.

14. Before 2014, Communications Department employees were not classified as safety-sensitive workers, but the Medical Rules were revised in 2014 and these employees were added to the list.

15. During his last 5-6 years of his employment, Fulbright spent close to 100% of his working hours seated at a work bench or in front of a computer terminal. Therefore, even though Union Pacific claims that working safely was an essential function of his position, in reality it was not.

16. Under applicable union contracts and work rules, Fulbright's seniority during his last few years of employment meant that he could not be required to work overtime (Union Pacific could ask him to do so, but he had the right to decline) and meant he could not be required to be on call after hours or on weekends. However, Fulbright could volunteer to be on call, and he did do so roughly one weekend per month.

C. Fulbright's Sleep Medication and Accommodations

17. In 2009 or possibly earlier, Fulbright was diagnosed with major depressive disorder and insomnia. Each was substantially limiting with respect to major life activities, when unmedicated at least, such as normal brain function and sleeping.

18. In January 2009, Fulbright began taking a prescription medication (Trazodone) to alleviate the symptoms of his insomnia. The first business day after it was prescribed, Fulbright

told a supervisor in the Communications Department, Terry Neal, that he would be taking this medication for his insomnia. Neal gave Fulbright the phone number of a company nurse, and Fulbright promptly called the nurse and told her about the prescription and his insomnia. Union Pacific had a list of prohibited medications, but Trazodone was not on the list, and Union Pacific allowed Fulbright to continue working with no restrictions.

19. The benefits from the Trazodone were immediate and substantial. Fulbright could taste food again whereas he could not before. He slept better, so he was more alert and sharper at work, and his concentration, mood, and attitude were much improved due to the medicine. Taking the medicine improved his overall performance and ability to do his job, and he took it most nights from January 2009 through the end of his employment at Union Pacific.

20. Of course, the drug was intended to help Fulbright sleep, and for a few hours after taking it, Fulbright avoided things like driving. But by the next morning, Fulbright was rested and sharp, and he no longer suffered the detrimental effects of the insomnia.

21. Fulbright was not written up, disciplined, or even warned about any safety violations from January 2009 through the end of his employment.

22. In 2009, as an accommodation, Fulbright and his supervisors agreed that Fulbright could not be required to take calls if he had already taken his sleep medication that night. This accommodation may not have been officially reduced to writing, but it was discussed and confirmed several times over several years by and between Fulbright and his supervisors. Fulbright's coworkers in the Communications Department were aware of this accommodation because it was discussed several times during meetings.

23. On weekends when Fulbright volunteered to be on call, he usually skipped taking Trazodone on Friday and Saturday so he could respond if called, even though such calls were

Respectfully submitted

/s/ Donald E. Uloth

Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd., Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

On February 1, 2021, I served a copy of this document to Heather M. Miller, counsel for Defendant, by email to hmiller@constangy.com, to Derek McKee, counsel for Defendant, by email to dmckee@constangy.com, and to Robert L. Ortbals, Jr., counsel for Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth

Donald E. Uloth