IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-02392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

## Table of Contents


I. Summary..........................................................................................................1

II. Relevant Facts………………………………………………………………….. 1

A. Fulbright's 30 years as an employee of Union Pacific ………………………….. 1

B. Fulbright's sleep disorder and medication……………………………………….. 2

C. Fulbright was qualified for his job, and he did his job safely …………………....5

D. Fulbright passed two fitness-for-duty evaluations in 2014 while taking Trazodone……………………………………………………….. 6

E. The 2015 FFD evaluation …………………………………………………..….. 6

1. Charbonneau removed Fulbright from his job without first conducting an individualized assessment………………………………………………… 7

2. Fulbright complied with all requests made by Union Pacific and Charbonneau…………………………………………………………… 8

3. Union Pacific imposed permanent work restrictions that cost Fulbright his job…………………………………………………………………… 10

4. Fulbright looked for similar jobs, and there were none……………………. 12

III. Summary Judgment Standards ..........................................................................13

IV. Argument and Authorities……………………………………………………….. 13

A. Defendant is liable on Plaintiff's first cause of action, discrimination because of disability ……………………………………………………….. 13

1. The ADA and applicable rules of construction…………………………….. 15

2. Plaintiff had a disability as a matter of law……………………………… 17

a. Plaintiff's sleep disorder was an actual disability…………………….. 17

b. Plaintiff had a record of a substantially limiting impairment………… 18

c. Defendant regarded Plaintiff as impaired………………………………20

3. Plaintiff was qualified for the job ……………………………………….. 21

4. Plaintiff was subject to adverse employment decisions on account of his disability………………………………………………………………. 22

5. Plaintiff is entitled to summary judgment on count one, discrimination because of disability ………………………………………………………… 25

B. Summary judgment on defenses…………………………………………... 26

1. Failure to mitigate ……………………………………………………... 26

2. Direct threat…………………………………………………………….. 28

3. Undue hardship ………………………………………………………… 30

V. Conclusion……………………………………………………………………. 32

**Table of Authorities**

Cases Page(s)

Armitage v. BNSF Ry. Co., Civil Action No. 4:20-cv-00209-O,
2021 U.S. Dist. LEXIS 124947 (N.D. Tex. July 6, 2021)………………………. 21

Branham v. Snow,
392 F.3d 896 (7th Cir. 2004)………………………………………………… 29

Breaux v. Bollinger Shipyards, LLC, No. 16-2331,
2018 U.S. Dist. LEXIS 116351 (E.D. La. Jul. 5, 2018)…………………………14, 21, 30

Burton v. Freescale Semiconductor, Inc.,
798 F.3d 222 (5th Cir. 2015)………………………………………………… 20

Cannon v Jacobs Field Services, N.A.,
813 F.3d 586 (5th Cir. 2016)…………………………………………………18, 20, 21

Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986)……………………………………………………13

Dadian v. Vill. of Wilmette,
269 F.3d 831 (7th Cir. 2001)……………………………………………….. 29

Dark v. Curry County,
451 F.3d 1078 (9th Cir. 2006)……………………………………………… 29

EEOC v. AIC Sec. Investigations,
55 F.3d 1276 (7th Cir. 1995)……………………………………………….. 29

EEOC v. Amego, Inc.,
110 F.3d 135 (1st Cir. 1997)……………………………………………….. 29

EEOC v. Chevron Phillips,
570 F.3d 606 (5th Cir. 2009)……………………………………………….. 14

EEOC v. BNSF Ry. Co.,
902 F.3d 916 (9th Cir. 2018)……………………………………………….. 14, 25

EEOC v. LHC Grp., Inc.,
773 F.3d 688 (5th Cir. 2014)………………………………………………….. 21

EEOC v. Wal-Mart Stores, Inc.,
477 F.3d 561 (8th Cir. 2007)………………………………………………….. 29

Ford Motor Co. v. EEOC,
458 U.S. 219 (1982)…………………………………………………………… 27

Giles v. Gen. Elec. Co.,
245 F.3d 474 (5th Cir. 2001)………………………………………………….. 26

Hardmon v. U.L. Coleman, No. 17-1118,
2021 U.S. Dist. LEXIS 28564 (W.D. La. Feb. 16, 2021)…………………………21

Hixon v. TVA Bd. of Dirs., No. 1:19-CV-120,
2020 U.S. Dist. LEXIS 223935 (E.D. Tenn. Dec. 1, 2020)……………………… 1

Huffman v. Turner Indus. Grp., LLC, CIV.A. 12-1061,
2013 U.S. Dist. LEXIS 71842 (E.D. La. May 21, 2013)………………………… 30

Jarvis v. Potter,
500 F.3d 1113 (10th Cir. 2007)……………………………………………….. 29

LaChance v. Duffy's Draft House, Inc.,
146 F.3d 832 (11th Cir.1998)…………………………………………………. 29

Little v. Tech. Specialty Prods. LLC, No. 4:11-CV-717,
2014 U.S. Dist. LEXIS 34839 (E.D. Tex. Mar. 18, 2014)……………………….. 27

Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,
475 U.S. 574 (1986)…………………………………………………………… 13

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973)…………………………………………………………… 14

Pallatto v. Westmorland County Children's Bureau, No. 2:11cv1206,
2014 U.S. Dist. LEXIS 27008 (W.D. Pa. Mar. 3, 2014)………………………… 16-17

Patterson v. P.H.P. Healthcare Corp.,
90 F.3d 927 (5th Cir. 1996)………………………………………………………. 27

Riel v. Elec. Data Sys. Corp.,
99 F.3d 678 (5th Cir. 1996)………………………………………………………. 30

Rizzo v. Children's World Learning Centers, Inc.,
84 F.3d 758 (5th Cir. 1996)………………………………………………………. 14

Sellers v. Delgado College,
902 F.2d 1189 (5th Cir. 1990)……………………………………………………. 27

Sparks v. Griffin,
460 F.2d 433 (5th Cir. 1972) ………………………………………………… 27

Teague v. Omni Hotels Mgmt. Corp., No. A-19-CV-00940-JRN,
2020 U.S. Dist. LEXIS 243239 (W.D. Tex. May 20, 2020)…………………….. 27

Troutman v. Williamson County, 1:14-CV-986-DAE,
2016 U.S. Dist. LEXIS 41986 (W.D. Tex. Mar. 30, 2016)……………………… 21-22

Williams v. AT&T Mobility Servs.,
186 F. Supp. 3d 816 (W.D. Tenn. 2016)……………………………………… 16, 21

Williams v. Tarrant Cty. Coll. Dist.,
717 Fed. Appx. 440 (5th Cir. 2018)……………………………………………... 20

Willis v. Conopco, Inc.,
108 F.3d 282 (11th Cir.1997)…………………………………………………… 29

Rules

Fed. R. Civ. P. 30(b)(6).........................................................................................26

Fed. R. Civ. P. 37(c)(1).........................................................................................26

Fed. R. Civ. P. 56(a) ..........................................................................................13

Statutes and Regulations

42 U.S.C. § 12101 ....15

42 U.S.C. § 12102(1) ....1, 15

42 U.S.C. § 12102(1)(A) ....17

42 U.S.C. § 12102(1)(B) ....19

42 U.S.C. § 12102(1)(C) ....20

42 U.S.C. § 12102(3)(A) ....20

42 U.S.C. § 12102(4) ....15

42 U.S.C. § 12102(4)(A) ....15

42 U.S.C. § 12102(4)(B) ....15

42 U.S.C. § 12102(4)(C) ....15

42 U.S.C. § 12102(4)(D) ....16

42 U.S.C. § 12102(4)(E) ....16

42 U.S.C. § 12111(1)(A) ....31

42 U.S.C. § 12111(1)(B) ....31

42 U.S.C. § 12111(4) ....15

42 U.S.C. § 12111(5) ....15

42 U.S.C. § 12111(8) ....1

42 U.S.C. § 12112 ....15

42 U.S.C. § 12112(a) ....13

42 U.S.C. § 12112(b)(6) ....................................................................................13

29 C.F.R. § 1630 ..............................................................................................16

29 C.F.R. § 1630.2(g)(1)(iii)...............................................................................20

29 C.F.R. § 1630.2(j)(1)(i)..................................................................................16

29 C.F.R. § 1630.2(j)(1)(ii).................................................................................16

29 C.F.R. § 1630.2(j)(1)(iii)................................................................................16

29 C.F.R. § 1630.2(j)(1)(v)..................................................................................16

29 C.F.R. § 1630.2(k)(1).....................................................................................18

29 C.F.R. § 1630.2(l)(1)......................................................................................20

Other

Fifth Cir. PJC § 11.12.C......................................................................................28

A doctor at Union Pacific wanted Joe Fulbright to have a sleep study because of his disability, a sleep disorder, but he never explained to Fulbright what he wanted. When Fulbright failed to do what the doctor wanted, the doctor imposed permanent work restrictions because of the sleep disorder, and took away Fulbright's job two years short of his full retirement. Because there is no question of fact here, Fulbright moves for summary judgment on his cause of action for discrimination because of disability, along with three of Union Pacific's defenses.

## I. Summary

Plaintiff moves for summary judgment on the following issues:

(1) That Plaintiff has a "disability" as defined in 42 U.S.C. § 12102(1).

(2) That Plaintiff was qualified for his position and was a "qualified individual" as defined in 42 U.S.C. § 12111(8).

(3) That Defendant took adverse employment actions against Plaintiff because of disability.

(4) That Plaintiff is entitled to summary judgment as a matter of law on the defenses of direct threat, failure to mitigate, and undue hardship.

## II. Relevant Facts

### A. Fulbright's 30 years as an employee of Union Pacific

For roughly thirty years, from 1985 to 2015, Plaintiff worked as an employee of Union Pacific at the company's Davidson Rail Yard in Fort Worth, Texas. Plaintiff was a technician in the Communications Department – he installed, maintained, and repaired various devices and

communications equipment. He did not work on moving trains. His job title for the last fifteen years or more was Senior Communications Technician. App. 149 and 152.

**B. Fulbright's sleep disorder and medication**

On January 23, 2009, a psychiatrist named Marie Kelly prescribed Trazodone to help Fulbright sleep. For several years before this appointment, Fulbright had trouble sleeping, and it was getting worse over time. Most nights it took Fulbright at least an hour, sometimes two hours, to fall asleep. When he did sleep, it was never for very long, usually no more than an hour, and never more than two hours. Fulbright never fell into a really deep and restful sleep. App. 149.

During these years Fulbright was usually awake 3-5 hours each night after going to bed, and he would watch cable news or surf the internet. The next day he would be in a fog, and have difficulty thinking clearly. He postponed simple tasks at home, like taking out the trash, because he was too tired to get up. Fulbright would go to the store and forget to buy the one or two things he needed the most. He stopped doing things he had enjoyed before, like camping and visiting with friends, because he was just too tired, and he became reclusive. When he did have plans with friends, he often forgot, and people got mad at him because they thought he was just ignoring them. App. 149-150.

Fulbright's coworkers at Union Pacific noticed how badly Fulbright was affected by his sleep disorder. Jason Ensign worked alongside Joe Fulbright on a daily basis, both before and after Fulbright began taking Trazodone. App. 107. Ensign testified that before taking Trazodone, Fulbright was having trouble sleeping and it was affecting him at work: he was not

the same "jovial, enthusiastic person that he was." App. 108. Ensign testified: "we were concerned with Joe before he started taking the medication because he was like a different person and he -- no enthusiasm, not – not joking around, having fun." App. 113. Fulbright had been a person Ensign leaned on for guidance and training when he was new to the job, but for a time "that went away and that was concerning for all of us, not just from a professional level but from a personal level." App. 113.

Fulbright would call his coworker Chris Ozuna in the middle of the night when he couldn't sleep, not realizing what time it was. Ozuna noticed that Fulbright became negative and had little patience with people, and he talked as if the world was crashing down on him. App. 147-148. Fulbright forgot doctor appointments, even ones he made a few days earlier. App. 148 and 150. Fulbright often forgot which day it was, and once he missed the Superbowl because he forgot it was Sunday. App. 150.

Because of his trouble sleeping during these years, Fulbright was usually fatigued the next day to the point where he had trouble concentrating and remembering things. App. 149. At work, Fulbright would get a list of tasks for the day, but quickly forget all but one or two and have to be reminded. App. 147. Fulbright would sometimes go to check on a piece of equipment, and then forget what he had gone there to do. His long-term memory was good, and once reminded his work was good. App. 114.

The sleep disorder was substantially limiting with respect to sleeping, thinking, concentrating, and memory, as described in greater detail in Fulbright's declaration. *See* App.

149-151. The psychiatrist did a diagnostic memory test that indicated Fulbright's long-term memory remained good, but his short-term memory was impaired. App. 151.

At the appointment with Dr. Kelly, Fulbright admitted he felt depressed, which he attributed to the lack of sleep. Kelly prescribed Trazodone for the insomnia and Prozac for the depression.[1] App. 151.

On January 26, 2009, Fulbright informed his supervisor (Steve Hale) and Hale's supervisor (Terry Neal), that he would be taking Trazodone to help him sleep. Neal told Fulbright to call a nurse in the company's Health and Medical Services Department ("HMS" or "Medical" for short) to let them know. App. 151.

Fulbright called HMS that day and told a nurse in that department he would be taking Trazodone. It was not on the company's list of prohibited prescription medications, and since he would be taking it on his own time, Fulbright was not asked to or required to do anything further. Union Pacific sent Fulbright a letter reminding him to comply with the company Drug and Alcohol Policy, but that was all. App. 160-161 (the 1/26/09 letter). No work restrictions were imposed. App. 151-152.

Taking Trazodone helped Fulbright immensely. He was able to sleep and not be fatigued the next day, and soon he was back to his old self. App. 108, 152.

[1] Fulbright only took the Prozac for a few weeks. With better sleep he no longer felt depressed, and he did not like the way Prozac made him feel. App. 151.

### C. Fulbright was qualified for his job, and he did his job safely

From January 2009, when he started taking Trazodone, through early February 2015, when he was pulled out of service, Fulbright worked a day shift – Monday through Friday, from 7:30 a.m. to 3:30 p.m. Outside of his normal shift, Fulbright was not required to be on call, with the exception of a voluntary weekend and holiday rotation the technicians had agreed to between themselves.[2] The technician on call for any given weekend was on call from the time the Friday shift ended until the Monday shift began (except, as discussed below, Sunday nights of Fulbright's on-call weekend). App. 89, 153.

The technicians had monthly safety meetings, and at the first safety meeting after Fulbright was prescribed Trazodone, he told all of his coworkers and his supervisors he would be taking Trazodone most nights to help him get to sleep. Furthermore, because the medication was supposed to make him drowsy, Fulbright said it would be best if he did not have to drive for a few hours after taking the medication. Fulbright's coworkers, and the two supervisors (Hale and Neal), agreed that Fulbright would not have to go out on calls if he had taken Trazodone that night. App. 152.

Fulbright did not ask to be removed from the on-call rotation. Instead, he chose not take Trazodone on Friday and Saturday nights so he would be able to respond if Union Pacific called him to drive somewhere to work on something. On Sunday night, however, Fulbright always took Trazodone somewhere around 7-8 p.m. so he would be rested for work. App. 154.

[2] Union Pacific insists that it had the right to call the technicians and any time on any day, and Plaintiff does not dispute this. However, Union Pacific has not produced any evidence that it ever called Fulbright, or any of the other technicians, when they were not on call.

Fulbright explained this to Terry Neal, Steve Hale, and all of his coworkers, and no one said he shouldn't do it this way, and no one asked him to do anything differently. App. 154. Fulbright never received calls on Sunday nights during his on-call weekend, until September 25, 2015. App. 154.

Fulbright worked for six years after he began taking Trazodone. He did his job well, and he did it safely, with a perfect safety record. App. 91-92, 153. Trazodone was never added to the company's list of restricted or prohibited medications. App 29.

**D. Fulbright passed two fitness-for-duty evaluations in 2014 while taking Trazodone**

In 2014, Assistant Medical Director Dr. John Charbonneau evaluated Fulbright's fitness for duty twice. Both times, he cleared Fulbright to work with no restrictions, knowing that Fulbright took Trazodone for insomnia. App. 34 (Charbonneau dep.), 195-198 (records Defendant received in 2014 showing Fulbright took Trazodone for insomnia).

**E. The 2015 FFD evaluation**

Fulbright was on call the weekend of January 23-25, 2015. A little after 7:00 p.m. on Sunday, January 25, 2015, he noticed he had missed a call a few minutes earlier from headquarters in Omaha, so he called the number that showed up on his caller ID. An automated system answered, and Fulbright was unable to reach a live person. He had not yet taken his Trazodone that evening, and he could have responded if necessary, but it was close to his normal bedtime for Sunday of his on-call weekend, so after another twenty minutes or so when he did not get another call, he took Trazodone and went to sleep. App. 154.

The next day, Terry Neal scheduled a meeting with Fulbright, and told him he might want a union representative present.[3] That afternoon, Fulbright and the union representative met with Neal in Neal's office. Neal handed Fulbright a form, a Formal Conferencing/Training, that stated Fulbright missed a call the day before from Omaha NOC (Network Operations Center). App. 103-104 (the form). Neal said this was not disciplinary, he just wanted to have Fulbright checked out by HMS to see if any work restrictions needed to be put in place because of Fulbright's sleep disorder and medication. App. 154.

Neal also gave Fulbright a form officially referring Fulbright to HMS for a fitness-for-duty evaluation. App. 59-60 (Supervisor Initiated Fitness-For-Duty Form). In the meantime, Neal wanted Fulbright to keep working. App. 104 ("Mr. Fulbright is not pulled from service, and will be given time to work with the FFD program."). Neal even told Fulbright he was doing a good job, some of his best work ever. App. 155.

**1. Charbonneau removed Fulbright from his job without first conducting an individualized assessment**

Charbonneau was once again in charge of Fulbright's fitness-for-duty evaluation. Before anyone in HMS even spoke to Fulbright about the evaluation process, Charbonneau declared Fulbright unfit for duty and ordered Fulbright to be removed from service. App. 53 (Medical Comments History, entry made Feb 1, 2015 at 9:15 a.m.). Charbonneau had no objective evidence supporting this decision, only Neal's report of a worry, and Charbonneau did not even talk to Neal before he pulled Fulbright from his job. App. 14 (Charbonneau dep.).

[3] Fulbright had a union job, and he was a member of the Brotherhood of Railroad Signalmen.

On February 3, 2015, Union Pacific informed Fulbright he would not be allowed to work while the fitness-for-duty evaluation was ongoing. He was placed on an unpaid medical leave of absence. App. 155. Union Pacific then asked Fulbright to provide two years of "physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition." App. 155, and 163-166 (two letters asking for the notes).

### 2. Fulbright complied with all requests made by Union Pacific and Charbonneau

Fulbright had not seen Dr. Kelly since 2010 – she retired. After that, he did not have a doctor treating him for his sleep disorder, so there were no physician clinic notes to provide to Union Pacific.[4] Fulbright's primary care doctor at Kaner Medical Group in Euless had taken over prescribing Trazodone for him, so Fulbright asked Kaner for his medical records. It took Kaner several weeks to get them to Fulbright, and Fulbright faxed the records to Union Pacific on April 10, 2015. App. 155-156 (Fulbright decl.) and App. 61-84 (the fax).

Charbonneau reviewed the records and noted that Fulbright had sleep onset insomnia. He decided Fulbright would need a "Sleep Medicine Evaluation." App. 50 (Charbonneau's comments dated April 13 and 14, 2015).[5] On April 21, 2015, Rodino and Charbonneau called Fulbright to let him know. App. 156 (Fulbright decl.) and 171-178 (transcript of the call).

On this phone call, Charbonneau asked Fulbright to tell his primary care doctor he was supposed to have a "sleep medicine evaluation" done by a "sleep medicine specialist." App. 173

---

[4] Fulbright explained this to Charbonneau the first time they spoke, on April 21, 2015. App. 171.
[5] There is no Medicare code for a "sleep medicine evaluation." *See* https://www.cms.gov/Medicare/Coding/ICD9ProviderDiagnosticCodes/codes. There appears to be no precise meaning of the term "sleep medicine evaluation."

and 176-177. Charbonneau did not explain the term sleep medicine evaluation, and Fulbright assumed it meant an evaluation of the sleep medicine, the Trazodone. App. 155-157. Charbonneau did not say he wanted a sleep study, or testing of any kind. Charbonneau never asked Fulbright for permission to speak to his doctor, and if he had, Fulbright would have been fine with that and provided her phone number. App. 156.

Fulbright then did what he had been asked to do. He made an appointment and met with his primary care doctor on April 27, 2015. App. 157. She referred Fulbright to Texas Medical Diagnostic, Inc. ("Texas Medical") for an evaluation, not for testing. App. 157 (Fulbright decl.) and 167 (the referral form). There was a line on the form Fulbright's doctor could have checked for "Complete Sleep Testing," but Charbonneau had not requested this. App. 157. Fulbright called Texas Medical, and he explained by phone he needed to see a sleep medicine specialist for a sleep medicine evaluation. Texas Medical scheduled him to come in on June 1, 2015. App. 157.

On May 20, 2015, Theresa Rodino called Fulbright to check on the status of the sleep medicine evaluation. Fulbright explained he was going to Texas Medical on June 1, 2015 for an evaluation, not testing. During the call, Rodino checked Charbonneau's notes and read them aloud, and she then confirmed that Fulbright was doing what he had been asked to do. App. 179-182 (transcript of the call). Rodino also made a note in the Medical Comments History "this is for an evaluation not a sleep test." App. 48 (Rodino's comment on May 20, 2015 at 10:40:19 AM).

Fulbright went to the appointment at Texas Medical on June 1, 2015. The person he met with first was not the specialist he was expecting to see. This person had Fulbright fill out some forms. He then told Fulbright that before seeing the specialist, he would have to undergo an overnight sleep study, where he would be connected to various monitors while he slept. He also said this was going to cost Fulbright around $600.00. App. 157-158.

Fulbright had not been paid for about four months, and he did not have the money available to pay for this testing. Furthermore, because Dr. Charbonneau did not tell Fulbright to have a sleep study, or undergo any testing, Fulbright saw no reason to pay the money and have the testing done, so he did not schedule anything further with Texas Medical at the time. App. 157-158.

On June 14, 2015, Fulbright called Union Pacific's medical department to let them know he had been to the appointment at Texas Medical, and he provided the phone number so HMS could get records of the visit. App. 183-184 (transcript of the call). The person Fulbright spoke to did not ask for any details about the visit, and based on the Medical Comments History, she did not make a note to the file about this call. App. 47 (the page where any comment near the date of the call would appear if there was one).

**3. Union Pacific imposed permanent work restrictions that cost Fulbright his job**

On June 26, 2015, without having conducted an individualized assessment of Fulbright, Charbonneau decided to impose permanent work restrictions, which he referred to as "sudden incapacitation restrictions." App. 47-48 (Medical Comments History, June 26, 2015 comment by Charbonneau). Charbonneau's notes in the Medical Comments History suggest he was not

aware that Fulbright was doing (or trying to do) what he had been asked. App. 46 (entry on June 26, 2015 stating: "This EE still has not complied with the agreement that he would work with his doctor to have a formal sleep medicine evaluation.").

Charbonneau and Rodino called Fulbright on June 29, 2015 to inform him of the company's decision. App. 185-193. Charbonneau started by asking if Fulbright had made any headway on getting the requested evaluation. Fulbright explained he had gone to meet with a specialist for an evaluation of the medicine, but they first wanted to do a sleep study and charge $600. Fulbright reminded Charbonneau: "And that's not what we talked about. We talked about evaluating that one medicine." App. 186. Fulbright also said he did not have the money for a sleep study and tests, and for these two reasons (was not asked to, and could not afford) he was not going to do those things. App. 186.

We now know that Charbonneau did want Fulbright to have a sleep study and testing. In his deposition, Charbonneau testified that to him, a "sleep medicine evaluation" is not an evaluation of the sleep medicine. App. 21-22 (Charbonneau dep.). Rather, it involves a sleep study (also called a polysomnography) where the person is hooked up to equipment that monitors brain waves, heart rate, whether they are snoring, along with some other things. App. 17-21 (Charbonneau dep.).

But Charbonneau never explained this to Fulbright, he just proceeded as planned the decision to impose work restrictions. App. 187. In his deposition, when asked why he imposed the work restrictions without getting the information he thought he needed for the fitness-for-

duty decision, Charbonneau said Fulbright "had put a stop to the plan of getting … the sleep medicine evaluation done. App. 24.

Charbonneau is wrong on this point – Fulbright never objected to having a sleep medicine evaluation. During the second call with Charbonneau, Fulbright even offered to go back to his primary care doctor and try "to find a doctor that will do an evaluation of that medicine." App. 186. Fulbright did not unilaterally put a stop to anything – he cooperated with everything he was asked to do. If he had been asked to undergo a sleep study there is no reason to think he would not have complied (if he could pay for it, or if the cost was covered for him). App. 158 ("If Charbonneau had told me he wanted me to have a sleep study, I would have agreed to do that so I could get back to work.").

Charbonneau imposed permanent work restrictions on Fulbright without any objective evidence supporting the need for the restrictions, and without ever conducting an individualized assessment of Fulbright, or the effects of his medication. App. 46 (Medical Comments History) and 187 (the call to Fulbright). Charbonneau then hung up, leaving it to Rodino to explain that Charbonneau's decision meant Fulbright had lost his job. App. 190 (Fulbright's work unit said they were not able to accommodate him with the work restrictions Charbonneau imposed).

**4. Fulbright looked for similar jobs, and there were none**

Fulbright tried to find a similar job, but he found nothing. App. 159-160 (Fulbright decl.). Due to technological advances in the industry, railroads were laying off technicians like Fulbright rather than hiring to fill open positions. App. 110-111 and 119-120 (Ensign dep.).

There is no evidence indicating a comparable position was ever available for Fulbright to apply for.

## III. Summary Judgment Standards

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the movant meets this burden, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*

## IV. Argument and Authorities

### A. Defendant is liable on Plaintiff's first cause of action, discrimination because of disability

Plaintiff moves for summary judgment on each element of his first cause of action, discrimination because of disability in violation of 42 U.S.C. § 12112(a).[6] If the Court finds each element is proved as a matter of law, then Plaintiff requests entry of summary judgment

[6] Plaintiff is not seeking summary judgment on the claim within count one based on 42 U.S.C. § 12112(b)(6)(using qualification standards that screen out).

finding Defendant is liable on this claim. If the Court finds there is a question of fact on any one element, Plaintiff requests summary judgment on the other elements on which there is no fact question.

To prove this claim, Plaintiff must show that at the time of the adverse actions complained of: (1) he had a disability (actual, record of, or regarded as); (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability. *Cannon v Jacobs Field Services, N.A.*, 813 F.3d 586, 590 (5th Cir. 2016) (listing the elements of proof for this claim); *EEOC v. Chevron Phillips*, 570 F.3d 606, 618 (5th Cir. 2009) (the relevant period is the time of the adverse actions complained of). The adverse actions at issue in this case were taken during the first six months of 2015.

It is not necessary to employ the *McDonnell Douglas*[7] burden-shifting analysis in this case because the motive for the adverse actions in question is undisputed. *See EEOC v. BNSF*, 902 F.3d 916, 927 (9th Cir. 2018) (no need for the burden-shifting analysis "where it is clear that an action was taken because of an impairment or perception of an impairment"); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996) (no need for the *McDonnell Douglas* analysis because there was direct evidence the employer made the employment decision because of a disability); *Breaux v. Bollinger Shipyards, LLC,* No. 16-2331, 2018 U.S. Dist. LEXIS 116351, at *30 (E.D. La. Jul. 5, 2018) (same).

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### 1. The ADA and applicable rules of construction

The Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA") protects the rights of persons who have disabilities. In the employment context, the ADA prohibits an employer from discriminating against an employee because of his or her disability if that person is able to do the job in spite of the disability. 42 U.S.C. § 12112.

At all times relevant to this motion (*i.e.* the first half of 2015) Union Pacific was an employer and Plaintiff was the company's employee. 42 U.S.C. § 12111(4) (definition of employee); 42 U.S.C. § 12111(5) (definition of employer).

The term "disability" has a three-part definition. It means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff will show he had a disability under all three prongs of the definition.

The ADA includes rules of construction to assist with the terms used in the definition of disability.[8] The ADA says to construe the term disability "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."[9] Likewise, "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008."[10] If a disability is substantially limiting with respect to even one major life activity, that person meets the definition of disability.[11]

---

[8] 42 U.S.C. § 12102(4)
[9] 42 U.S.C. § 12102(4)(A).
[10] 42 U.S.C. § 12102(4)(B).
[11] 42 U.S.C. § 12102(4)(C).

"An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."[12] When determining whether an impairment is substantially limiting, a court should ignore the "ameliorative effects of mitigating measures" such as medication.[13]

The EEOC has drafted regulations that provide further guidance on the meaning of several key terms, including "substantially limits" and "major life activities." *See* 29 C.F.R. § 1630. Like "disability," the term "substantially limits" should be construed broadly, "in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). Substantially limits "is not meant to be a demanding standard." *Id.* "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

The Court's focus in an ADA case should be whether the Defendant has complied with its obligations, and "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii). Expert testimony is usually not needed. 29 C.F.R. § 1630.2(j)(1)(v). *See also Williams v. AT&T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 824-6 (W.D. Tenn. 2016) (rejecting Defendant's claim expert testimony was required to show causation, and granting summary judgment for plaintiff based on depression and anxiety); *Pallatto v. Westmorland County Children's Bureau*,

[12] 42 U.S.C. § 12102(4)(D).
[13] 42 U.S.C. § 12102(4)(E).

No. 2:11cv1206, 2014 U.S. Dist. LEXIS 27008, *30 (W.D. Pa. Mar. 3, 2014) ("Medical testimony is not necessarily required to establish a disability.").

Applying these standards to the facts of this case shows Fulbright had a disability under all three definitions.

**2. Plaintiff had a disability as a matter of law**

**a. Plaintiff's sleep disorder was an actual disability**

In 2015, Plaintiff had an actual disability – an impairment that substantially limited one or more of his major life activities. More specifically, Plaintiff had a sleep disorder that was substantially limiting with respect to several major life activities when it was not treated by medication. *See, e.g.*, App. 149-151 Fulbright decl.).

The facts regarding Fulbright's sleep disorder, and how it was substantially limiting, are summarized above and will not be repeated here. The evidence proves his sleep disorder was substantially limiting with respect to the major life activities of sleeping, concentrating, thinking, and working.[14]

Trazodone was effective, and it treated Plaintiff's sleep disorder, but the disorder was still there and it would have been substantially limiting without the medication. App. 152-153. This evidence proves Plaintiff had a sleep disorder that was substantially limiting with respect to more than one major life activities. Plaintiff therefore requests partial summary judgment in his favor finding that he had a disability as defined by 42 U.S.C. § 12102(1)(A).

[14] Sleeping, concentrating, thinking, and working are major life activities. *See* 42 U.S.C. § 12102(2)(A).

**b. Plaintiff had a record of a substantially limiting impairment**

According to the EEOC regulations: "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). The regulations instruct that "record of" should be construed broadly, and a person "will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment."

The records Defendant had in February 2015, when Charbonneau decided Fulbright was a safety risk and should not be allowed to work any longer, included (a) records from his two fitness-for-duty evaluations in 2014 showing Fulbright took Trazodone for insomnia, [cite], and (b) the supervisor's referral stating Fulbright had sleeping issues and might be impaired the next day at work. App. 195-198 (records from 2014) and App. 59-60 (the supervisor referral). Most people in the general population do not need sleep medicine to help them sleep, and combined with the supervisors comment about possible impairment, these records indicated an impairment that was substantially limiting, or that Charbonneau misclassified to be substantially limiting. He was concerned enough that on February 1, 2015 he wrote: "This EE is NOT FFD and should be pulled from Duty." App. 53.

Charbonneau later received additional records that prompted him to write: "It looks li[k]e this EE has been treated for sleep onset insomnia for at least one year," and: "Remains NOT FFD." App. 50. On April 21, 2015, Charbonneau spoke to Fulbright by phone, and told

Fulbright the records he had recently received "clearly documents that … for at least a year, you've had a problem with what we call sleep onset insomnia and have required some medication for that." App. 172. Fulbright's impairment concerned Charbonneau enough that he wanted Fulbright to see a specialist for a sleep medicine evaluation. App. 50 and 176-177.

Charbonneau's next action again shows that he classified Fulbright as someone with a substantially limiting impairment. Charbonneau imposed "sudden incapacitation restrictions" on Fulbright. App. 46 (Charbonneau's comment dated June 26, 2015). On June 29, 2015, Charbonneau told Fulbright the restrictions were "for someone who might, could or might be impaired from medication." App. 187. In his deposition, Charbonneau explained that these work restrictions were for someone who might not be able to stay awake, alert, and upright. App. 25-26.

Based on comparable evidence, a district court granted summary judgment in favor of the plaintiff on "record of" disability. *See Williams v. AT&T Mobility Servs., LLC*, 186 F. Supp. 3d at 826. In that case: "Plaintiff's undisputed facts show that AT&T was aware that Plaintiff was in treatment for depression in April, May, June, and July 2014." The district court therefore found: "as a matter of law that AT&T had a record of Plaintiff's mental impairment, and, therefore, she was disabled as defined by the ADA." *Id.* at 825-6. The evidence in this case is analogous and proves, as a matter of law, that Fulbright had a disability under 42 U.S.C. § 12102(1)(B).

**c. Defendant regarded Plaintiff as impaired**

To prove disability under the regarded as prong of the definition, a plaintiff need only show that the employer was aware of an impairment or erroneously believed the employee had an impairment. After the 2008 amendment to the ADA, it is no longer necessary for the plaintiff to prove what the employer knew or believed about the severity of the impairment in question.[15] Rather, an individual is "regarded as" having a disability if the individual is subjected to a prohibited act "because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). *See also* 29 C.F.R. §§ 1630.2(g)(1)(iii) and 1630.2(l)(1); *Cannon*, 813 F.3d at 591–92; *Burton v. Freescale Semiconductor, Inc*., 798 F.3d 222, 230 (5th Cir. 2015); *Williams v. Tarrant Cty. Coll. Dist.*, 717 Fed. Appx. 440, 447 (5th Cir. 2018).

It is undisputed that Union Pacific knew about Fulbright's impairment. Terry Neal specifically referred Fulbright for an evaluation "for his sleeping issues." App. 59. Charbonneau knew Fulbright had insomnia, which Charbonneau described as sleep onset insomnia that was treated with Trazodone. App. 172. In the Medical Comments History, there are multiple notes showing the employees in Health and Medical Services, including Charbonneau, were aware of Plaintiff's sleep disorder. App. 44-53.

This evidence proves that Defendant was aware of the impairment, proving as a matter of law that Plaintiff had a disability under the regarded as definition in 42 U.S.C. § 12102(1)(C).

[15] This change in the statute is clear, yet some courts still get it wrong more than ten years after the ADA was amended. This Court should therefore be skeptical of any cases cited suggesting that a plaintiff still has to show the employer believed the impairment was substantially limiting.

**3. Plaintiff was qualified for the job**

"To be a qualified employee, [a plaintiff] must be able to show that he could either (1) 'perform the essential functions of the job in spite of his disability,' or (2) that 'a reasonable accommodation of his disability would have enabled him to perform the essential functions of his job.'" *Cannon*, 813 F.3d at 592 (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)).

Some courts have held that in cases where the plaintiff's job inherently requires that he perform safely, the plaintiff must prove the ability to perform safely as part of proving this element of the claim (*i.e.* qualified).[16] For purposes of this motion Plaintiff, will assume he has this burden, and the evidence shows that Plaintiff safely did his job for six years after he started taking Trazodone. Plaintiff never worked at night after taking Trazodone, and there is no evidence he was ever unsafe at work the next day.

Proof that an employee has performed the essential functions of a position of a position over time has been accepted as evidence by several courts. *See, e.g., Armitage v. BNSF Ry. Co.*, Civil Action No. 4:20-cv-00209-O, 2021 U.S. Dist. LEXIS 124947, *12-13 (N.D. Tex. July 6, 2021) (train dispatcher's 15-plus years of safe performance accepted as evidence he was qualified); *Hardmon v. U.L. Coleman*, No. 17-1118, 2021 U.S. Dist. LEXIS 28564, *8-9 (W.D. La. Feb. 16, 2021) (ten years on the job accepted as evidence plaintiff was qualified for the position); *Breaux*, 2018 U.S. Dist. LEXIS 116351 at *32 (welder safely performed the same job for six years without incident); *Troutman v. Williamson County*, 1:14-CV-986-DAE, 2016 U.S.

[16] This is discussed in greater detail below, in the section addressing the direct threat defense.

Dist. LEXIS 41986, *15 (W.D. Tex. Mar. 30, 2016) (no issue of fact on qualified where plaintiff with sleep apnea worked in the job for six years); *Huffman v. Turner Indus. Grp., LLC*, CIV.A. 12-1061, 2013 U.S. Dist. LEXIS 71842, *40 (E.D. La. May 21, 2013) (accepting evidence that plaintiff worked safely as a welder for six years was evidence plaintiff was qualified).

Fulbright safely did his job without an incident, or even a rumor of a safety concern. App. 153. Charbonneau was not aware of a day or date when Fulbright was impaired during business hours, App. 11, and Charbonneau was not aware of any safety violation by Fulbright at work. App. 28. Terry Neal testified that he was not aware of Fulbright ever being unsafe App. 90. The company had a policy requiring employees to speak up if they saw something unsafe, and no safety concerns were ever raised concerning Fulbright. App. 90-91.

Jason Ensign testified that when his job required him to put his life and safety in the hands of a coworker, he wanted that coworker to be Joe Fulbright. App. 109. Neal never observed Fulbright impaired at work, and no one reported to him that Neal was impaired at work. App. 100. On January 26, 2015 when Neal made the referral to medical for the evaluation, he told Fulbright he was doing a good job, some of his best work ever. App. 155.

The evidence therefore proves Fulbright could safely perform the essential functions of his job. Plaintiff is therefore entitled to summary judgment in his favor on this element of his cause of action.

**4. Plaintiff was subject to adverse employment decisions on account of his disability.**

It is undisputed that both of the adverse actions at issue in this case were because of Fulbright's disability. Terry Neal's supervisor referral form indicated he was reporting Fulbright

because of Fulbright's "sleeping issues" and Neal's worry about possible effects of the medication he took for the sleeping issues. App. 59. On February 1, 2015, Charbonneau removed Fulbright from service "because of the serious safety concern of the underlying medical condition and the medication and the no response,[17] we felt that it was time to remove him from service and ask for records so we could get to the bottom of the problem." App. 8.

The June 2015 decision to impose permanent work restrictions on Fulbright was also due to Fulbright's disability. As Charbonneau explained in his deposition, he imposes sudden incapacitation restrictions "when there is a lack of clarity about a person's ability to stay awake and alert and upright… If someone had, like Mr. Fulbright, a serious underlying condition, he used the term life-threatening condition, and medicine that precludes his working but we don't know the duration of the effects of that medicine, then we don't know if he's always going to be awake and alert and in full control of his senses at work." App. 25-26. When listing the reasons for his June 2015 decision to impose work restrictions, Charbonneau stated: "Number one is we found out that he had a sleep disorder." App. 36. Charbonneau thought Fulbright might "have an accident while driving, a fall while climbing, things like that." App. 31.

This evidence shows there is no fact question to submit to a jury, and thus no need for a trial on this issue. The third element of this claim is proved as a matter of law – Defendant took adverse actions against Fulbright on account of his disability.

[17] Regarding the "no response" comment, Charbonneau may not have been aware that Fulbright had responded to HMS two days before Charbonneau removed Fulbright from service on February 1, 2015. Fulbright's return call on January 29, 2015 was not noted in the Medical Comments History until February 3, 2015. App. 53 (entry on Feb 3, 2015 at 4:24).

Defendant may argue that Fulbright is somehow at fault. In his deposition, Charbonneau testified that Fulbright failed to cooperate with the fitness-for-duty evaluation, and this alleged failure to cooperate justified his decision to impose work restrictions. However, the two phone calls between Charbonneau and Fulbright were recorded, and they conclusively negate this contention.

On the first phone call, Charbonneau asked Fulbright to have a sleep medicine evaluation done, without explaining what he meant by this term. He did not tell Fulbright to have a sleep study, or undergo testing. To the contrary, Charbonneau told Fulbright: "We just need to get some documentation that supports the nature of the problem, <u>the risks and benefits are of the medicine you take</u>, and things like that." App. 176 (emphasis added). Union Pacific did not send Fulbright anything in writing telling him what they wanted, so Charbonneau's statements during this phone call were the only thing Fulbright had to go by.

On the second phone call, Fulbright reminded Charbonneau what they had discussed before: "We talked about evaluating that one medicine, the Trazodone." App. 186. Fulbright explained he was against having a sleep study and testing for two reasons: (1) Charbonneau had not asked him to do these things, and (2) the cost. App. 186. If Charbonneau wanted a sleep study done, he should have told Fulbright, but he never did.

Regarding the cost of the sleep study, Union Pacific expected Fulbright to pay for that himself. App. 41. These facts are somewhat analogous to *EEOC v. BNSF Ry. Co.*, 902 F.3d 916 (9th Cir. 2018). In that case, BNSF offered Russell Holt a job, subject to a background check and passing a physical. *Id.* at 919. During the physical, BNSF decided they wanted Holt to have

an MRI done because of a back injury a few years earlier. *Id.* at 920. Holt could not pay for it, and BNSF would not let him start the job they had offered him unless he had the MRI done at his own expense. *Id.*

The Ninth Circuit found that an employer who requires a costly medical exam as a pre-condition to employment has to pay for that exam. *Id.* at 926-7. The court also found that by refusing to let Holt come to work unless he had the MRI, the company regarded Holt as disabled until he proved otherwise. *Id.* at 924. Similarly, by refusing to let Fulbright return to work unless he had some sort of study or testing done, Charbonneau and Union Pacific considered Fulbright's sleep disorder to be disqualifying unless Fulbright proved otherwise. Union Pacific regarded Fulbright as impaired.

The facts are clear – Union Pacific took adverse employment actions against Fulbright because of his disability. This leaves nothing to ask a jury to decide at trial, and Union Pacific is liable on this element of the claim as a matter of law.

**5. Plaintiff is entitled to summary judgment on count one, discrimination because of disability**

There is no material question of fact regarding any required element on count one. Plaintiff therefore requests entry of summary judgment finding Defendant liable for violating 42 U.S.C. § 12112(a). In the alternative, Plaintiff seeks summary judgment on those elements the Court finds to be proved as a matter of law.

**B. Summary judgment on defenses**

Plaintiff moves for summary judgment on the defenses of failure to mitigate, direct threat, and undue hardship. *See* Doc. 43 (Amended Answer) at pp. 11-14, ¶¶ 3 and 13 (direct threat), ¶ 6 (failure to mitigate), and ¶ 8 (undue hardship).

Plaintiff sought discovery regarding these defenses by notifying Defendant he intended to take a 30(b)(6) deposition, and one of the topics for the deposition was the factual basis of the affirmative defenses. *See* Doc. 47-1 at App. 9. Defendant objected to presenting a witness for deposition on this topic and argued it should only have to answer contention interrogatories. *See* Doc. 47-1 at App. 21-22. The parties later agreed Defendant would not have to present a deposition witness if Defendant agreed to answer additional contention interrogatories that did not count against the 25-interrogatory limit. App. 199-202 (emails between counsel).

Plaintiff served, and Defendant has answered, contention interrogatories asking Defendant to describe the facts supporting each of the defenses addressed below. Pursuant to Fed. R. Civ. P. 37(c)(1), Defendant may not use information as evidence in response to this motion that has not been provided in discovery. Defendant has provided no evidence on key elements on which it has the burden of proof, meaning summary judgment is now warranted on these defenses.

**1. Failure to mitigate**

Because back pay is considered to be an equitable remedy, a plaintiff seeking back pay in an employment case has a duty to mitigate his damages. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001) (ADA case). The duty to mitigate requires a plaintiff to use reasonable

diligence to seek substantially similar employment. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 (5th Cir. 1996) (*citing Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982). To be substantially equivalent, the position in question must be "'employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the [plaintiff was] discriminatorily terminated.'" *Id.* (*quoting Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)).

Failure to mitigate is an affirmative defense on which the Defendant bears the burden of proof. *See, e.g., Little v. Tech. Specialty Prods. LLC*, No. 4:11-CV-717, 2014 U.S. Dist. LEXIS 34839, *6 (E.D. Tex. Mar. 18, 2014) ("Failure to mitigate is an affirmative defense and Defendants had the burden of proof on this issue."). A Defendant asserting failure to mitigate must prove there were substantially similar jobs available that the plaintiff could have discovered and applied for. *Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972). When such proof is lacking, a plaintiff is entitled to summary judgment on this defense. *See e.g., Teague v. Omni Hotels Mgmt. Corp.*, No. A-19-CV-00940-JRN, 2020 U.S. Dist. LEXIS 243239, *18 (W.D. Tex. May 20, 2020) (where there was no evidence Plaintiff "failed to apply to some substantially equivalent job opening … Plaintiff is entitled to summary judgment on that issue.").

Plaintiff served a contention interrogatory asking Defendant to describe the facts supporting this affirmative defense. Defendant did not identify any positions it contends were substantially similar that Plaintiff could have applied for. App. 130-132.

Furthermore, there is evidence that technological advances in the industry were displacing jobs like the one Fulbright had at Union Pacific, and union workers being laid off from those jobs

would have been entitled to preference under their union contracts to be reinstated to such positions. Thus, it unlikely Plaintiff would have been hired, even if something did become available. App. 110-111 and 119-120 (Ensign dep.).

Plaintiff fulfilled his obligation to look for work. He contacted a former coworker who had gone to work for another large railroad (Burlington Northern), and asked him to keep an eye out for any openings in positions for which Plaintiff was qualified. There never were such openings. App. 110-111. Plaintiff searched online for other railroad jobs, even jobs that would have required him to relocate. App. 120 and 159. Plaintiff created accounts with two major online job-search sites, Monster and Indeed, uploaded his resume, and actively searched for work, even non-railroad jobs. App. 159. It is therefore undisputed that Plaintiff looked for work, but there were no substantially similar jobs that he could have applied for. Because Defendant cannot meet its evidentiary burden for this defense, summary judgment should be granted.

**2. Direct threat**

The ADA lists direct threat as a defense, but federal courts are divided on the question whether it is an affirmative defense. The United States Supreme Court and the Fifth Circuit Court of Appeals have not ruled on the issue. The Fifth Circuit Pattern Jury Charges place the burden of proof on the employer. *See* Fifth Cir. PJC § 11.12.C ("Defendant [name] must prove…").

Three Circuit Courts of Appeals have held, or appear to treat, direct threat as an affirmative defense.[18] The Eleventh Circuit is the only Circuit Court of Appeals to rule that direct threat is the employee's burden, requiring the employee to prove he is not a threat to himself or others.[19]

The First and Tenth Circuits have held the burden of proof depends on the essential functions of the job in question. If the job inherently requires the employee to safely perform essential functions, then these Circuits hold the employee has the burden to prove he can safely perform them. Otherwise, direct threat is a defense which must be proved by the employer. *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007); *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997).

This Court does not need to rule on this issue because, even if Plaintiff has the burden of proof, it is met in this case. It is undisputed that even after he started taking Trazodone in 2009, Plaintiff safely did his job for six years without an incident or even a rumor of a safety concern. *See supra* at pp. 21-22.

Furthermore, it is undisputed that the adverse employment actions in question were not taken because Plaintiff was considered to be a direct threat. Defendant claims the threat and safety concern was due to the Trazodone Plaintiff took. App. 33 and 127. However, an

---

[18] *Dark v. Curry County,* 451 F.3d 1078, 1091 (9th Cir. 2006) ("Under the ADA, an employer is entitled to defend [an] adverse employment action on the ground that 'an individual [poses] a direct threat to the health or safety of other individuals in the workplace." (citing 42 U.S.C. § 12113(b)); *Branham v. Snow,* 392 F.3d 896, 906 (7th Cir. 2004) (quoting *Dadian v. Vill. of Wilmette,* 269 F.3d 831, 841 (7th Cir. 2001) (citing *U.S. E.E.O.C. v. AIC Sec. Investigations*, 55 F.3d 1276, 1283–84 (7th Cir. 1995)); *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571–72 (8th Cir. 2007).

[19] *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir.1998) (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir.1997)).

employer cannot establish a direct threat defense with evidence that a medication *can* have adverse side effects, there must be evidence it *did* in fact have such effects on the individual employee in questions. *See, e.g.*, *Breaux*, 2018 U.S. Dist. LEXIS 116351 at *42 (suboxone can cause "'sedation, analgesia, and other symptoms of central nervous system depression,'" but employer lacked evidence it had these effects on plaintiff); *Hixon v. TVA Bd. of Dirs.*, No. 1:19-CV-120, 2020 U.S. Dist. LEXIS 223935, *20 (E.D. Tenn. Dec. 1, 2020) (rejecting the direct threat defense where there was evidence Marinol might have adverse effects, but no evidence it did so to plaintiff).

Charbonneau testified that he never reached a conclusion whether Plaintiff could or could not safely perform, because he had insufficient evidence. App. 9, 30. Rather, without the results of the sleep study he never asked for, he just assumed Plaintiff might have an accident while driving, or fall while climbing. App. 31, 33. Assumptions without objective medical evidence are insufficient to raise a question of fact on a direct threat defense. Summary judgment on the direct threat defense is therefore warranted.

**3. Undue hardship**

Undue hardship is an affirmative defense to an ADA claim, so the burden of proving it is on the employer. *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996). The ADA defines undue hardship as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. § 12111(1)(A). The subsection (B) factors include the nature and cost of the accommodation in relation to the size, resources,

nature, and structure of the employer's operation. Proof regarding the difficulty and/or cost is therefore required to avoid summary judgment on this defense.

Plaintiff served a contention interrogatory asking Defendant to describe the facts supporting its undue hardship defense. App. 132. Defendant's answer stated that the accommodation would require Defendant "to identify a replacement worker on those occasions when Plaintiff will not or cannot accept an overtime call or otherwise report for duty as scheduled, expected, or required." App. 134.

This is insufficient to raise a triable question of fact for a jury on this issue. Defendant provided no evidence regarding the difficulty or cost the railroad would incur if Fulbright was unable or unwilling to respond to a call he received outside of his normal working hours. According to Terry Neal, if the person at the corporate Network Operations Center was unable to reach the first technician he called, the caller would simply go to the next person on the list. [Neal 33-35] If Fulbright missed a call, the company would not have to analyze, strategize, or search for who to call next, because there was a predetermined call order. There is no evidence that this would be an undue hardship on Union Pacific.

Defendant's interrogatory answer also argued that accommodation would require the elimination of essential functions, but Defendant did not specify what function or functions. Furthermore, Defendant has not provided any evidence about the cost or difficulty associated with unidentified accommodations. Without such evidence, Defendant cannot show there is a question of fact on this affirmative defense, and summary judgment should be granted disposing of the undue hardship defense.

**V. Conclusion**

Union Pacific discriminated against Fulbright in violation of the ADA by removing him from service and imposing permanent work restrictions. Defendant has no evidence with which to raise a question of fact on its defenses, and the Plaintiff respectfully submits the Court should grant his motion and enter partial summary judgment against Union Pacific as requested in this motion.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

On August 27, 2021, I served a copy of this document to Heather M. Miller, counsel for Defendant, by email to hmiller@constangy.com, and to Robert L. Ortbals, Jr., counsel for Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth
Donald E. Uloth