IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-02392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**


| Page(s) | Description |
|---|---|
| 3-39 | Deposition of Dr. John Charbonneau (excerpts) |
| 40-58 | Ex. 1 – Medical Comments History |
| 59-60 | Ex. 2 – FFD Request Form |
| 61-84 | Ex. 9 – fax sending medical records |
| 85-102 | Deposition of Terry Neal (excerpts) |
| 103-104 | Ex. 4 – Formal Conferencing/Training |
| 105-121 | Deposition of Jason Ensign (excerpts) |
| 122-146 | Defendant's Third Supplemental Answers to Plaintiff's First Set of Interrogatories |
| 147-148 | Declaration of Chris Ozuna |
| 149-160 | Declaration of Joe Fulbright |
| 161-162 | Ex. 1 - 1/26/09 letter from U.P. nurse to Fulbright |
| 163-164 | Ex. 2 - 1/29/15 letter from U.P. nurse to Fulbright requesting records |
| 165-166 | Ex. 3 - 2/26/15 letter from U.P. nurse to Fulbright requesting records |
| 167 | Ex. 4 - 4/27/15 Dr. D'Souza referral to Texas Medical |
| 168-170 | Ex. 5 - 7/1/15 letter from U.P. to Fulbright re: work restrictions |
| 171-178 | Ex. 6 - Transcript of 4/21/15 call from Charbonneau and Rodino to Fulbright |
| 179-182 | Ex. 7 - Transcript of 5/20/15 call from Rodino to Fulbright |
| 183-184 | Ex. 8 - Transcript of 6/14/15 call from Fulbright to U.P. |
| 185-193 | Ex. 9 - Transcript of 6/29/15 call from Charbonneau and Rodino to Fulbright |

194 Declaration of Donald E. Uloth
195 Ex. 1 - first page of records faxed to U.P. 4/17/14
196-198 Ex. 2 - 8/1/14 letter from one of Fulbright's doctors
199-202 Ex. 3 – Email exchange between D. Uloth and H. Miller

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

On August 27, 2021, I served a copy of this document to Heather M. Miller, counsel for Defendant, by email to hmiller@constangy.com, and to Robert L. Ortbals, Jr., counsel for Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth
Donald E. Uloth

most of the supervisor or manager referrals?
A I believe -- sorry. There's a little bit of feedback. I apologize. I believe that I was doing them then, yes.
Q Okay. For the next little while, I probably will be focusing on pretty much one exhibit, with jumping around a little bit. It's the Medical Comments History, which is about 19 pages. And I don't know if you have that to refer to separately. I will be putting it up on the screen, but I know that you can only see a little bit of the document at a time on the screen.
A I have a 19-page Medical Comments History. It's not marked with an exhibit, but I . . .
Q Okay. Well, I just did the share screen.
MR. ULOTH: Can y'all see what I marked as Deposition Exhibit 1?
A Yes.
Q Okay. Yeah, I did just put a sticker on it, so Deposition Exhibit 1, or Charbonneau Exhibit 1, you can see this is page 1 of 19. And then you have your own hard copy there of the 19-page document?
A Yes.
Q Tell me, this little narrative, if you will, explain what this document is. What are we looking at?
A We use an electronic medical record called

eHealthSafe. We abbreviate it small E, capital H, capital S. So I'll -- if you don't mind, I'll use the term eHS. eHealthSafe is our electronic medical record, and documents that come in or any actions that we as health care providers in Health & Medical Services take, we document in the records.

Now, anytime that I make an entry or one of the nurses makes an entry in eHealthSafe, it is date-stamped and timestamped, and usually you can see on this -- hard to see on the screen, but you'll see towards the left of each block a case number and a service number, and that tells you what that individual entry applies to. So that anytime we take an action, make a recommendation, ask the nurse to do something, we type up a little note in eHealthSafe, and it goes into the system in that case.

But it's possible to print out all of the entries that have been made in eHealthSafe in one document, and that's what we refer to as the 19-page document that you have up. It's called a Medical Comments History. It doesn't include the documents that we have in review, but it reflects our review of them, what we thought about them, what decisions we made and what actions we took.

So it comes out in chronological order

when you -- when you ask the system to print a Medical Comments History. And I don't know how this happens but when I print them, I can get them in chronological order, and that's the only way I can get them. When they show up here at depositions and trials, they're always in reverse chronological order, so it's a little unhandy to work backwards on the sheets, but all the information is there.

Q The documents that you receive and you review in connection with a fitness-for-duty evaluation, are those electronically put into the eHS system?

A Yes. You'll see in some of the exhibits there's a sheet that looks -- it's got a barcode. We call it a barcode cover sheet. And when the employee submits information, if he or she puts that as the first document, then it will route it into the system into his electronic health file.

At that point, it's in just a list of documents, and then the nurse, when she starts working on the case, can pull any documents from that main repository. Anything that applies to that case, they can put right into the case. And that gets back to the comment I made earlier, in the upper left-hand corner of any of these entries or boxes here, you can see there's a case number and a service number.

Q So unless the nurse takes that step and adds it to the eHS system, a document pertaining to an employee's medical condition may not be added to the electronic file; is that correct?

A It will be in the electronic file. It's not automatically in the case that we're working. Part of their job -- I believe they get notified when there's -- new information comes in, so their job is to take it from the main repository and put it in that case specifically.

Q Okay. I'm switching to Exhibit 2 and I'd like to ask you if you can identify this document for me. It's two pages.

A Yes, I have. This is called -- we refer to it as a manager referral form. When a manager wants Health & Medical Services to assess an employee's fitness for duty, we ask for some specific information.

This form was developed to kind of have a standardized kind of initial look at the -- what their concerns were about the employee. And you can see in the second block in the middle of the page, there's a -- there's a number -- yes, that part -- where, you know, we're, in essence, asking them is it one of these problems. And sometimes it is, sometimes it isn't.

I will tell you most often they're

checking a number of blocks, and there's also a place where written comments can be entered. And so this one, you can see there was a concern about sleeping and then there were a number of other comments from his manager.

Q Okay. So you recognize Exhibit 2 as something that you have seen before, right?

A Yes.

Q Do you recall when or how this first came to your attention?

A I can tell you the standard practice would be that the manager initiates the request and completes the form. Again, the nurse will open the case, bring that into the case and then send it to me.

Sometimes they will start the process by asking for information, but, almost uniformly, when I look at a case for the first time, this is already in the case. So this is kind of my starting point. It tells me kind of what the observed behaviors were and what the concerns were for safety. So, again, almost uniformly, this is in the file when I look at the case for the first time.

Q Okay. Well, I jumped back over to Exhibit 1, and it looks like -- I'll just ask you to kind of help me navigate through some of these entries. The entry in the middle of the screen says "Created on: January 27,

Services and decided that, okay, a week with no contact is long enough. And when you can contact him, ask him for the two years of medical records. And until we hear from him and start this process, he's pulled from service, he's removed from service.

Q So, if I understand your testimony, you're saying the reason you decided to pull Mr. Fulbright from service is that you hadn't been able to get him to return a call during the prior week?

A Well, that's part of it, but that isn't what I -- what I was trying to convey. There's a serious safety concern. The gentleman has a sleep problem, he's taking medication which impairs his ability to be there. Theresa has reached out and tried to contact him and he's not responding.

We have no idea at that point how long it's going to take him to respond, but because of the serious safety concern of the underlying medical condition and the medication and the no response, we felt that it was time to remove him from service and ask for records so we could get to the bottom of the problem.

Q So help me out with the information that you had available to you as of 9/15 on February 1, 2015. By this point, you would have seen Exhibit 2, the manager

check it, but, you're right, I can't tell you for certain that I -- that I saw it yet.

Q Okay. But you would have had the notes in the medical comments, Exhibit 1, that precede the time of your 9:15 a.m. note; is that correct? You would have read all those?

A I would have had access to anything that had already been written into that case and service. It is my practice as we start working on a case to look at those entries. I don't have independent recollection right now six years later about whether or not I read them. I don't want to misstate anything.

Q Fair enough. Did you know what medication Mr. Fulbright was taking?

A I don't believe that I did at that point. I don't see that mentioned here in the record.

Q Okay. Did you -- before you made this note on February 1, had you talked to Terry Neal?

A I don't believe I've ever spoken with Mr. Neal.

Q Before February 1, had you talked to Mr. Fulbright?

A I don't believe so, no.

Q And were you aware that Mr. Fulbright was working his regular shift during the week prior to

medicine in order to sleep. The medicine prohibits his ability to fulfill his duties for restoration of service after normal business hours."

Okay. So that is a question of, you know, the medication appears to impact him when he's going to be on call.

MR. ULOTH: I'll object to your answer as not responsive.

Q And please understand, Dr. Charbonneau, I don't mean to be argumentative. That's just a formal objection for the record. Let me clarify or reask my question because you're pointing to something that talks about after normal business hours and my question is different.

When you made the decision to pull Mr. Fulbright from duty, were you aware of any specific information that indicated to you he was unable to remain alert during his normal Monday through Friday business hours work shift?

A Mr. Uloth, I too am not trying to be argumentative, but I didn't finish my last answer and I think it's important that we do. Okay? Because the second comment, if you look at question number 4 below that box is -- we ask for additional information, and he says "I am worried that the medication could impair

Mr. Fulbright further into his normal work shift. Is the medication UPRR approved? I would never ask Mr. Fulbright to work after he has taken his sleep medication. However that puts a hardship on his peers having to cover for his sleep condition."

So there you have a nonmedical person, his -- Mr. Neal, his manager, saying, "I am concerned about just his regular day shift work as well."

And then, finally, down at the bottom, there's a bigger block, if you go to page 2 of this document, it's easier to read on your projection here. "I am concerned about Mr. Fulbright's sleep condition. He must take" --

Q Dr. Charbonneau, I'd like to stop you because I'm paying by the word or by the page here, and I really just want to know this: Can you -- can you tell me a day or a date or time where Mr. Fulbright was impaired during his normal business hours?

A The short answer is no --

Q Thank you.

A -- but I don't have -- I'm just summarizing the information that we use to make that decision. I --

Q And I don't need you to read everything in the documents. It's in the documents. I just wanted to know, when you decided to pull Mr. Fulbright from duty,

isn't it true that you were not aware of a specific safety issue during his normal business hours, correct?

A No, that's not correct. What we have is the frontline manager telling us that he has a concern about that. It's fair to say --

Q I understand that.

A -- he's not a medical professional, and that's one of our problems when we work through manager referral cases. But we had somebody saying that there is a possibility that he might be impaired, please evaluate him.

Q And you understand my question is not about possibility and it's not about concern. Dr. Charbonneau, my question is what evidence of a specific incident where Mr. Fulbright was impaired at work do you have prior to February 1, 2015?

A I did not have any information about a specific incident. I just --

Q Thank you.

A -- had the manager's written concerns, I believe.

Q I appreciate that. And, trust me, this will go faster if we just stick to the questions that I'm asking.

MR. ORTBALS: I'm going to object.

I'm having a little trouble [audio distortion]. Bear with me.

THE REPORTER: Dr. Charbonneau, I can't -- there's a little bit of feedback. I can't hear you. Can you tilt your screen down a little bit so I can see your face? There you go. And -- just when it's got the feedback at first, I'm kind of having to read your lips sometimes.

THE WITNESS: Okay.

A Mr. Uloth, I have it.

Q Okay. Well, that will help. Let me go back to Exhibit 1 briefly before I ask my next question about Exhibit 9. Okay.

On Exhibit 1, page 11 of 19, and I'm going to ask you about this entry by Theresa Rodino on April 13, 11:06:21, she writes received 24 pages of medical information. Is Exhibit 9 the 24 pages referred to in that comment?

A I'm sorry, each time I talk, I hear that feedback. I don't know what it is. I apologize, but it's a little distracting.

This is the only 24-page document that I recall seeing as I was preparing for this deposition. I'm pretty sure that the 24-page document that Theresa refers to is that 24-page Exhibit 9 document.

Q Okay. And I'll read just a line or two on Exhibit 9, first page. "The patient presents for insomnia." And then skipping two sentences, "The patient is experiencing difficulty initiating sleep."

And, going back to Exhibit 1, I just want to ask if those comments are perhaps what made you write a couple of notes. So here's your note on April 13, 9:26:18, and the sentence that starts "It looks like." Do you believe you got that information from what I just read out of Exhibit 9?

A You mean the context of my entry on April 13, 2015?

Q Right. You're -- it seems to me like you've now seen this fax and you're discussing it with Theresa. Is that what's going on here?

A Yes. Again, it's my practice, when the nurses send information to me asking me to review something, to read it and comment about it. So I think it's fair to say that this is reflecting that I had access to these 24 pages.

Q Okay. Let me ask you a little bit about sleep-onset insomnia. What is that?

A Insomnia means not sleeping or can't sleep, and there are various types of it. Sleep onset is one type where people get in bed and they just can't fall

asleep.

So, again, judging from my entry here, it looks like that's the type of insomnia problem that he had. And the duration -- again, keep in mind we ask for two years' worth of medical information. At this point we had about one year of information.

And in the -- in the records, he was taking Trazodone and Benadryl. Now, the Benadryl is a common over-the-counter sleep aid. It's also got another -- other uses, but, you know, we have to be concerned about the combination of the -- of the two medicines. And I admitted here that I didn't know the reason for his use of Benadryl.

And, again, I summarized the other condition -- the other condition here about oral steroids. So, again, this reflects just my summary of what I saw in the records. It was consistent with the general topic that we were talking about for this case, if you will.

Q Okay. Moving to the next, in chronological order, note, which is the one above on page 11, the next entry is another one of your entries at 5:38:46, April 14, 2015, and you start off by referring to a case review discussion. Would that have been the regularly scheduled weekly discussion with Holland, Gengler,

yourself, and possibly one of the fitness-for-duty nurses?

A Usually that would be the case, yes.

Q Okay. You write "The employee is not FFD," meaning it's your opinion that Mr. Fulbright was not fit for duty; is that correct?

A Correct. At this point it was probably, I'll use this term, our opinion. It was out of my discussion with my medical boss and the Director of Clinical Services that he remained not fit for duty. We had already removed him from service, as you know, we talked about that earlier, so what I'm saying here is after the information submission and our case review, that nothing changed. He's staying off work.

Q Why did you think he was not fit for duty?

A Again, that was a continuation of the -- of the previous determination, and also it didn't tell us enough to -- to address all of the manager's original referring concerns.

Q Well, explain, then -- I mean, you had received the fax with the medical records that indicated he was taking Trazodone for insomnia; is that correct?

A Yes.

Q Did you think he was not fit for duty because he was taking Trazodone or was there some other reason

as well?
A Well, as I said, we got about half of the records that we asked for. Number two, this wasn't enough information to explain everything. And, number three, again, consistent with the approach of trying to do this amicably and problem solve, we felt that it would be good to get a sleep medicine evaluation to find out if there's -- weren't some way to ameliorate the -- the -- the concerns here about, you know, his inability to take calls when he had taken his medicine and his reported need to take the medicine, to get to sleep. So we just didn't feel that our medical investigative work was done.
Q You use the term sleep medicine evaluation in your note. Can you tell me what a sleep medicine evaluation is?
A Yes. I will tell you it's a relatively newer area of medicine. We -- when I started, we never did such evaluations, but now there are usually pulmonary medicine doctors or neurologists who get additional evaluation -- excuse me, certification in the field of what we call sleep medicine. And it is to -- they assess people who report problems with sleep, either quality of sleep, duration of sleep, whether it's restorative or not, things like that.

So in this case, the sleep medicine evaluation would be to kind of get a full understanding of the problems at hand and if -- find out if there were some way to overcome the problem of the employee needing to be able to take calls but reporting that he couldn't do it. So it's -- it was an attempt to problem solve.
Q I guess my question is far more pedestrian than that. What is involved? What do they do?
A In the good ones, we see a detailed medical history, clinical examination. Oftentimes a sleep study is part of that, and then a follow-up evaluation to put together the clinical pieces with the diagnostic testing and then determine what appropriate medical treatment is given the employee's circumstances or the patient's circumstances.
Q Okay. Well, you've used a few terms that I'll need to follow up on, but maybe I can get it this way: Is it -- is there a Medicare code for a sleep medicine evaluation?
A I'm pretty sure there is. I don't know it.
Q Is it -- are you familiar with the term polysomnography?
A That -- yeah, a polysomnography, or we abbreviate it PSG, that means a sleep study.
Q Okay. How is a sleep study different from a

sleep medicine evaluation?

A A sleep study is a subset or is part of a sleep medicine evaluation. You know, a lot of -- a lot of patients just say, "You know, I wake up. I'm not rested." Or "I wake up and I'm still foggy" or "it takes me two hours to get going in the morning" or things like that. It's a matter of whether sleep restores your energy level like the way it should. Or, taking Mr. Fulbright's case, "I can't fall asleep, Doc. Why?"

So you go through a detailed, medical evaluation, just like you would for hypertension or heart disease or things like that, wherein you fi- -- you do a general medical evaluation and then you focus in on the problem at hand. That clinical evaluation plus the PSG and maybe trying other kinds of treatment is what goes into a sleep medicine evaluation. And the polysomnography, or PSG, is one piece of a good, detailed sleep medicine evaluation.

Q Okay. So a polysomnography is also called a sleep study, is that what you said?

A Yes.

Q What are the steps of a sleep study?

A Well, there are a number of things that go into it. I mean, again, part of the reason why you

start with the clinical evaluation is that the sleep medicine doctor learns what he or she needs to learn from the PSG.

Now, the PSG can be done at home with, we call it an at-home sleep study, AHSS, or preferably, and certainly in Mr. Fulbright's condition -- or case, we'd want to see an in-lab sleep study because it's just done under more controlled circumstances. It's usually what we call attended. There's a sleep study professional there to hook up all the monitoring that has to go with, you know, their brain waves, their heart rate, whether they're snoring or not, so there's a microphone there, and there's some other parameters that get measured.

So that you get this real detailed look, if you will, at how long it takes them to fall asleep, how fast they fall deeply asleep, and whether or not they ever do, and how -- is their sleep interrupted. And that's the difference between sleep-onset insomnia or, you know, post onset problems with insomnia, are they continually waking up, things like that.

So there are many potential diagnoses. And, again, putting together the clinical evaluation, plus the sleep study tells you kind of where the problem is. And then the sleep medicine doc has the experience to say, "Okay. We can try X or Y or Z or we can

troubleshoot your problem." And they -- you know, they have knowledge of medicines and stuff that can be used.

So, again, it's an important, detailed process just like a cardiologist would do for your heart or an orthopedist would do for your back. It's just a detailed evaluation, a problem-specific evaluation.

Q And that's what I'm trying to get you to explain to me is the detail; what are the steps, what is the process. It sounds like step one is connecting a person to some sort of equipment, monitors, things like that.

A Correct. And usually it's best if it's done in a sleep lab.

Q Okay. And the note here that you made doesn't indicate whether you wanted Mr. Fulbright to go to a lab or something else?

A Well, I think it's common knowledge that in-lab studies are the most reliable and give the best information because they look at the most parameters of sleep and it's under the best controlled circumstances. But, equally important, is the in-clinic evaluation with the sleep medicine doc to try to troubleshoot the situation.

Q Okay. But how is that an evaluation of the sleep medicine, or is it?

A Well, when -- sleep medicine is a term that has to do with the physician specialty of knowing about sleep problems. It's not sleep medication evaluation. Sleep medicine is like pulmonary medicine evaluation or cardiovascular medicine evaluation. The medicine there is defining the specialist who's going to do the evaluation, not the medication that Mr. Fulbright's taking.

Q Okay. So you weren't asking -- or you weren't raising the possibility at this point of having Trazodone evaluated, you were talking about this polysomnography and the clinical evaluation and all of that that you talked about earlier, correct?

A Yes. Again, the clinical evaluation is a start, and then usually it's followed by a formal sleep study, either at home or in a lab. The best ones, because they are the most thorough, happen in lab.

Q Okay. In the note immediately above the last one we were talking about, so I'm still on page 11, and this is the uppermost entry on the page under Activity Comments, I see the letters ROI. Do you know what ROI refers to?

A Yes. Release of information. And it usually applies to a release of information form that we send to the employee to sign so that we can either get

A You know, you already asked me about this -- what was the phrase here -- "and one other issue," I don't know what that is. I don't have independent recollection. I wish I had written it because I think that that next sentence that you're asking me about now refers to that. But, I'm sorry, again, it's six years, I don't have independent recollection.

Q When the call ended on April 21st, 2015, was there anything that Mr. Fulbright was supposed to go do?

A He was supposed to go to his doctor and request the sleep medicine evaluation.

MR. ULOTH: I'm going to suggest we take a short break, five, ten minutes. What do y'all need?

THE WITNESS: Works for me. Whatever you want to do.

MR. ULOTH: Why don't we say ten minutes. My clock just clicked over to 11:27, so I'll turn back on at 11:37. Okay?

THE WITNESS: Super. Thank you.

(A break was taken from 11:27 a.m. to 11:39 a.m.)

THE REPORTER: Back on the record at 11:39 a.m.

Q Dr. Charbonneau, I'm going to continue asking you some questions about Exhibit 1, okay?

A Yes.

A I have -- excuse me. I have what I have documented in this June 29th note.

Q And would you agree with me that he was unable to accomplish what you had asked him to do and he set out to do?

A I would agree -- I don't know what that initial interaction was between Mr. Fulbright and whoever he spoke to at the sleep medicine provider's office. I just -- I wasn't part of that discussion, so I don't know what happened.

Q Why did you proceed with the decision to impose work restrictions rather than trying to accomplish what you had set out to accomplish?

A Because he had put a stop to the plan of getting the evaluation -- excuse me, the sleep medicine evaluation done. We weren't going to go any farther because we needed medical information that, for whatever reason, wasn't going to happen. So at that point it was appropriate to make the fitness-for-duty determination.

Q And you made that determination without all of the best available facts and information, correct?

A What best available facts and information are you talking about, sir?

Q The results of the sleep medicine evaluation that you thought was important.

A We made it on the basis of the then available medical information.
Q Which did not include the results of a sleep medicine evaluation, right?
A That's right.
Q And Mr. Fulbright told you he couldn't afford to pay for that sleep medicine evaluation, correct?
A That's what this note says, yes.
Q And Union Pacific never offered to cover the cost of that evaluation, correct?
A As I said before, I don't know. I would not have the authority to authorize that payment.
Q Why did you decide to impose sudden incapacitation restrictions?
A We do that when there is lack of clarity about the employee's ability to stay awake and alert and upright. And that may sound kind of off-the-cuff, but it's -- it's not. It's -- it's about ability, again, to be awake and alert and fully in control of your senses and things like that at work.
So, in that sense, if somebody had serious cardiovascular disease that might lead to a syncopal episode, they would get sudden incapacitation restrictions. If someone had a seizure disorder, they would get sudden incapacitation restriction. If someone

had, like Mr. Fulbright, a serious underlying condition, he used the term life-threatening condition, and medicine that precludes his working but we don't know the duration of the effects of that medicine, then we don't know if he's always going to be awake and alert and in full control of his senses at work. So --

Q Well --

A -- those are three different categories of medical condition that end up with the same grouping of restrictions.

Q What were the three?

A I think I just used seizure disorder or bad cardiovascular disease or a serious sleep problem such as in this case. I was just using those -- the other two as examples.

Q Joe didn't have a cardiovascular disorder, did he?

A I don't believe so, no.

Q He didn't have a seizure disorder, did she?

A Not to my knowledge.

Q What was his serious sleep problem?

A Well, I mean, he called it a life-threatening sleep condition. Those are his words, not ours. And there are documents here that talk about how, you know, after one or two days of work he's just worn out, can't

A Yes.
Q Did you have any information to the contrary?
A Well, we have information about that medication. We have information about the severity of his sleep disorder, so we had some but an incomplete information set and hence the request for the sleep medicine evaluation.
Q So what information told you that the sleep disorder was not effectively treated by the medication?
A I'm not sure that I can tell you except to say he described his sleep disorder as a life-threatening condition. So it was, obviously, a very severe chronic condition for him, and he was taking a medication that has a fairly long half-life, and so we were just trying to be sure -- again, we tried to take the next step of getting someone who does this for a living to evaluate him, that being the sleep medicine specialist, but it never -- the evaluation never happened.
Q Do you know if Joe was ever reported or written up for being unsafe at work?
A There was a letter from a hearing or something like that wherein he said he had never been written up, had no safety violations, I think was his term, so I was aware of that. I don't have independent confirmation about whether or not that was true.

Q Well, I'm not really asking you to confirm if it's true or not; I'm just asking you to tell me if you're aware of a safety violation by Joe Fulbright at work?

A I am not. But I haven't seen his safety file or folder, but I'm not aware of that, no.

Q You are the one who made the decision to impose work restrictions on Mr. Fulbright, correct?

A In -- probably in consultation with Dr. Holland because, again, we reviewed the case sequentially over time. We felt we didn't have enough information to certify him as fit for duty. We had tried to get there but couldn't, so we felt that that was the appropriate next step.

Q At the time you made that decision to impose sudden work restrictions -- sudden incapacitation work restrictions on Mr. Fulbright, there was no safety violation by Joe Fulbright that had been reported to you; is that correct?

A That's right. Understanding, though, I've already said I never talked to Mr. Neal.

Q Why did you never talk to Mr. Neal?

A Just because I usually don't. The -- as I said earlier, and I used this term, the nurse is kind of the quarterback, and the nurse makes the contacts with

Q I meant category like those other categories you just listed. What category does Trazodone fall in?

A I was telling you, it's an antidepressant medication, but it's not in one of those -- it's not a narcotic, it's not a benzodiazepine.

Q So what category of restricted prescription drugs might Trazodone have fallen in?

A It wouldn't fall into any of those, but it is in the admonition to employees to talk about their prescribed medications and their over-the-counter medications to make sure it doesn't impair them when they're at work.

Q Let me back up. The restricted prescription drugs that Union Pacific has does list some specific drugs by name, correct?

A Yes.

Q And Trazodone has never been one of them?

A That's correct. To the best of my knowledge, that is correct.

Q And is there a category of restriction prescription drugs that would include Trazodone?

A No. Not directly, no.

Q When you determined that Mr. Fulbright could not work safely for a period of 24 hours after taking Trazodone, did you check with anyone about adding

taking Trazodone?

A Our basis, Trazodone was long acting and that he had stated that it made him impaired. So he --

Q When did he say that?

(Video interruption.)

MR. ULOTH: I think we're losing Dr. Charbonneau.

A In the statements about, you know, you could be -- while on the medication, that's why he would never go out and -- I'm sorry?

Q We're -- you're cutting out. Your picture is freezing and we don't hear you, so Christy cannot possibly write down what you're saying.

And I'm trying to ask something simple. I think I'm trying to reiterate something you've said and asked if I've stated it correctly.

I think you told me that you never made a finding or a decision that Joe could not safely work for an entire 24-hour period after taking Trazodone. Is that accurate?

A That is accurate. That is accurate.

Q Thank you. Let me ask another question. Are you aware of any medical journal articles or studies that you find to be authoritative concerning Trazodone?

A I have looked at the FDA information on

decision that I wrote up.

Q So the concern and the reason that Mr. Fulbright was declared not fit for duty was a safety concern, correct?

A That was the underpinnings of this case, correct.

Q What did you think might happen, what bad thing might happen?

A Well, again, keep in mind when we made this decision, they are kind of two major concerns. Number one is his underlying disease, severe insomnia, appeared to be sleep-onset insomnia. So that severe insomnia condition was part of the concern, and the other part was the medication which he was taking. So it was twofold, both the underlying condition and the medication and duration of action of the medication.

Q What were you concerned might happen?

A That he would be impaired at work.

Q And do what?

A Perhaps have an accident while driving, a fall while climbing, things like that.

Q How often did he drive?

A I think he had to drive routinely.

Q Did you have his job description?

A I would have had access to his job

Q So you said that you were worried he might have a crash operating a vehicle or fall if he was climbing. Was there something else that you thought was bad that might happen?

A You know, one could look through his job description and say look at all the different things that a telecommunications worker does. You know, it does involve using both hand tools and power tools. It does involve working around electrical circuitry. We've talked about driving, we've talked about climbing.

There can be lots of things that have -- you know, you have to have -- be awake and alert to do safely. So, you know, it's not any one thing, although driving is a big thing because it's something that if they're traveling out and back that they have to be able to do. And it's a common way people with sleep problems have trouble.

Q Do you know if anyone's ever become suddenly incapacitated because they were taking Trazodone?

A I can't tell you that I know that, no.

Q Do you know if a person has ever had a seizure because they're taking Trazodone?

A I know that's one of the warnings in the FDA and manufacturer patient package insert.

Q Do you know if the risk of seizure from

perspective, he felt like it got him to sleep and therefore was not a problem. Well, that -- that addresses the falling asleep part, but we don't know how long the duration of action was in his case.

Again, I want to reiterate, the sleep medicine evaluation may have been able to give us some additional information in that -- in that realm or in that line. We didn't get it.

Q When you were making your fitness-for-duty determination -- and I believe you said it was based on concerns about safety, right?

A That's correct.

Q Did you do any kind of probability assessment about how likely it was that something bad was going to happen during Joe's shift at work because he had taken Trazodone the night before?

A I can't tell you that there was that kind of science applied to the decision-making, no.

Q So let me ask you a little bit about sudden incapacitation restrictions. What are sudden incapacitation restrictions?

A I think we touched on it earlier, but it has to do with keeping employees out of situations/circumstances in which they would be injured or hurt somebody else, risk to the general public in

A Yes, it's Pam Pachaud.
Q That Mr. Fulbright is medically fit for duty for his regular work, correct?
A Correct.
Q So, connecting all these dots, it's my understanding that in April of 2014, you cleared Mr. Fulbright as fit for duty with the knowledge that he was taking Trazodone. Correct?
A Yes. I probably -- I probably would have known that at the time, yes.
Q And then there was a second fitness-for-duty review after, I think, he had some outpatient surgery on his forearm. Do you recall that?
A Yes.
Q And again you declared Mr. Fulbright to be fit for duty knowing he was taking Trazodone, right?
A Yes. That assumes that I saw that in the record. But, I will admit, I'm pretty compulsive. I look at it, so I would -- I think it's fair to assume that I knew or had that piece of information and would have looked at it.
Q When Mr. Neal did his manager referral, he specifically was saying that he was concerned about medication that Mr. Fulbright took to help him sleep. Do you remember when you were able to determine he was

Q And in the conversations -- you had two conversations total with Joe Fulbright, right?
A Right.
Q And in one or both of those conversations, he told you that the sleep disorder was well controlled by the Trazodone?
A I believe that he felt that it was well controlled, yes.
Q And, as I understand it, it was not simply the fact that he took Trazodone that caused Union Pacific to impose work restrictions on him, correct?
A It was after analysis of all the information that was available to us, not purely because of taking that medication.
Q In fact, you yourself had declared Mr. Fulbright fit for duty in 2014, knowing that he took Trazodone, correct?
A It is true that that medicine was listed in his medical records that I looked at, yes.
Q Okay. So the issue in 2015 was, it seems to me, primarily two things. And I don't mean to exclude anything, so add if I oversimplify. One would be you had information from Terry Neal. You had the manager referral form and he had spoken by phone to Theresa Rodino. And then, two, you never got the sleep medicine

evaluation that you wanted done.

So it sounds to me that it was the combination of those three things. You had -- you knew he took Trazodone, you had information from Terry Neal, and you hadn't gotten the results of the sleep medicine evaluation, and those together resulted in the work restrictions being imposed on Mr. Fulbright. Is that correct or did I leave something huge out?

A Well, there -- there -- there are corollaries to the three things that you said. Number one is we found out that he had a sleep disorder. And, again, his description that it was a very severe sleep disorder and, independently, it caused him to call off work because after a few nights he couldn't continue working.

And, secondly, his pretty strong statement that when he took his medicine, he felt himself impaired to the point that, you know, he -- he -- he referenced this safety meeting with the Texas State Troopers about being impaired due to prescription medicines and things like that.

So it wasn't just that there was a sleep disorder and that he took a medicine, but it was the degree to which he himself stated that his underlying condition and his medication impacted his ability to safely work.

Q And he took the medicine to go to sleep, right?
A Correct.
Q So he shouldn't work while he's asleep, should he?
A We agree about that.
Q And, I guess, the point of him taking the Trazodone was to make him drowsy, right?
A Yes.
Q Okay. And --
A Wait. Mr. Uloth, I answered that reflexly.
As it appears now, it looks like that. But he was also diagnosed with depression, so it could have been used for his depression as well. It was prescribed initially by a psychiatrist, so -- but it looked like, at the time we were interacting with him, primarily it was taken for sleep.
Q Right. I've seen that as well, and I -- but I haven't, like you, heard that as much of a driver, the depression, it was more the insomnia. But, as I understand it -- well, you covered that. We've covered that.
Bear with me. Let's go back to Deposition Exhibit 1, and I have a few boring questions for you. Well, that's 2. Give me one second.

So, Dr. Charbonneau, are you now seeing Exhibit 1, the Medical Comments History?

A Yes.

Q Were the notes that are entered into this document each made at or near the time of the event by somebody with knowledge of the event?

A That would be my assumption. I mean, these things on page 1 are after I was not -- no longer involved in the case, but, I mean, that's the responsible way that we document what we do.

Q Isn't the point of the medical comments to keep a relatively contemporaneous track of the conversations and the events that are going on in connection with the fitness-for-duty review?

A The responsible provider should enter as close to the -- to the event as they can. Sometimes it just doesn't happen, but then the Medical Comments History is a log of everything that has transpired with that employ- -- with that employee between two dates.

They could be multiple cases, multiple services, things like that. So there's the individual document and then there's the greater document that we call a Medical Comments History. Different purposes.

Q And I'm focusing solely on Exhibit 1, the Medical Comments History, okay?

A Yes.

Q So it appears that people; yourself, Theresa Rodino, type in comments usually on the day that whatever they're talking about has transpired. Is that the regular practice?

A I would say it's fair that we -- that's our goal, yes.

Q And that's the -- this record was kept in the course of Union Pacific's regularly conducted business activity?

MR. ORTBALS: Don, if you're just trying to lay the foundation for being a business record, we'll stipulate that it's a business record. We're not -- we're not disputing authenticity or foundation on Exhibit 1.

MR. ULOTH: I'll accept that and that will save me the questions. So with the understanding that we've stipulated this is authentic and it's a business record of Union Pacific . . . is that accurate, Bob?

MR. ORTBALS: Yes.

MR. ULOTH: Okay. I believe I am done with my questions. I'll pass the witness.

MR. ORTBALS: No questions. We'll read and sign.

CONFIDENTIAL

# Medical Comments History

EXHIBIT
Charbonneau Ex 1
exhibitsticker.com

**Employee ID:** 00251592 ( Joe M Fulbright )

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Nov 10, 2016 **Time:** 10:51:32 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Spoke with Tarry Johnnson LR who states that this case is in arbitrationand could come up in 1 day or 5 years. States that Labor Relations doessend correspondences to the Union regarding decisions and requests andcommunication regarding this case. Spoke with Deb Gengler and Dr Hollandregarding this case and why reopened the manager referral case. Notedthat this can be closed since this was not 3 MD Panel and via LR CBA doesnot allow for 3MD panel. This case is in Arbitration through Chicago. tr

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Nov 10, 2016 **Time:** 10:27:03 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

11.10.2016 TC to EE LVM to inform that his request was denied from thissummer, informing purpose of this call is follow up to the request thissummer before closing his case. Wanting to make sure that he had receivedthe accommodations letter invite with 800 number to work with DPM group.tr

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Oct 13, 2016 **Time:** 2:41:53 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

This EE request started out as an email with Babette Griffin SR Managerand 3MD Panel which has now been denied per eHS note made by BridgetteZiemer FFD Nurse. I have a call out to the employee to determine whatcommunications have been made to him and his requests. I will inform himthat the 3MD panel was denied and he can work through his Union Rep butwill ask him what Health and Medical can do at this time point to answerhis questions since the 3MD Panel request is now declined/denied throughLR. Please advise if HMS Sends letter or if LR sends letter regardingthis request. I have a message out to the EE asking that he call todiscuss this case. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Oct 13, 2016 **Time:** 2:37:56 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Setting this status because we need to know what the Employee isrequesting now that Bridgette Ziemer FFD Nurse has noted that the 3MDPanel Request was denied and closed by Labor Relations and CMO and sentthis case back to Manager Referral. LVM asking EE to please call todiscuss his case need to make sure that he has the communication that heneeds regarding this request and what his expectations/ asks are from theHealth and Medical Team. Awaiting call back from EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Oct 12, 2016 **Time:** 11:37:32 AM **Created by:** 00469061 ( Bridgette Ziemer )

**Activity Comments**

3 DR Panel declined per LR and BA Case sent back to manager Referral formanagement on 10-6-2016-bz

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Oct 6, 2016 **Time:** 4:25:34 PM **Created by:** 00469061 ( Bridgette Ziemer )

UPFULBRIGHT

**Activity Comments**

No manager referral per CMO amd LR. bz

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 13, 2016 **Time:** 1:28:02 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

From: ffdmgrrefTo: Mary Jean Lempke/UPC@UP, Ashley L.Waddell/UPC@UPCc: John P. Holland/UPC@UP, Babette A.Griffin/UPC@UPDate: 07/13/2016 01:26 PMSubject: Joe Fulbright ( 00251592) please follow up with Dr Holland regarding your request This is a 3Doctor Panel per your notes in eHSSent by:Theresa A. RodinoHelloJean. Dr Holland closed the activity you sent to him noting that heneeded more information to review for this case. Could you please followup with Dr Holland? It looks like this is a 3 Doctor Panel Request fromLabor Relations and the clock is running on this case forresponse. Thanks Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 13, 2016 **Time:** 1:02:32 AM **Created by:** 00435995 ( John Holland )

**Activity Comments**

It is unclear what action if any is needed for this case. I will conferwith teh FFD Nurse and determine what are the driving factors in thecaseJohn Holland

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 27, 2016 **Time:** 9:39:52 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/27/16 Email to CMO re: Ee request for re-consideration of his workrestrictions (sudden incapacitation) set 6/25/15--EE at this time refusedto pay for a sleep study requested by the AMD. JL

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 27, 2016 **Time:** 9:34:29 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

(late Entry)From: Mary Jean Lempke/UPCTo: John P.Holland/UPC@UPCc: Babette A. Griffin/UPC@UPDate: 06/03/2016 03:41PMSubject: FulBright 251592[attachment "00251592 J FulbrightManager Referral completed form 1-26-15.pdf" deleted by Mary JeanLempke/UPC] [attachment "00251592 J Fulbright MD Clinic Note 11-20-14Insomnia-Trazadone-Chantix ordered.pdf" deleted by Mary Jean Lempke/UPC][attachment "00251592 Fulbright_Joe_Signed_RestrictionReviewForm_06-29-2015.pdf" deleted by Mary Jean Lempke/UPC] [attachment "00251592 JFulbright EHS COMMENTS Jan-July 2015.pdf" deleted by Mary JeanLempke/UPC] [attachment "00251592 J Fulbright Demographic Personal Cover3-31-16.pdf" deleted by Mary Jean Lempke/UPC] [attachment"00251592_Fulbright_Joe_ManagerConcern_05-22-2015.pdf" deleted by MaryJean Lempke/UPC] 6/3/16 Records to CMO for review. JL

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Jun 20, 2016 **Time:** 3:37:06 PM **Created by:** 00422236 ( Daniel Fischer )

**Consultation Date Performed:** Jun 20, 2016 **Performed By:** 00422236 ( Daniel Fischer )

**Consultation Comments**

correction - Terry we spoke about services, yet I rerred him to Babette,FFD.

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Jun 20, 2016 **Time:** 3:08:20 PM **Created by:** 00422236 ( Daniel Fischer )



UPFULBRIGHT

**Consultation Date Performed:** Jun 20, 2016 **Performed By:** 00422236 ( Daniel Fischer )

**Consultation Comments**

return call to manager Jerry Neal at 817-353-7237; RTMW shows closed case.

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 6, 2016 **Time:** 10:47:33 AM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/6/16 Dr. Holland:Per our case discussion on June 3, 2016:BabetteGriffin contact Labor Relations - Tarry Johnson who responded by emailthis case is not a 3 Doctor Panel.JeanLempke, RN BSN

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 6, 2016 **Time:** 10:45:11 AM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/3/16 Case conference with CMO/Babette Griffin/FF Nurse, JL. Babette willdiscuss with Labor Relations the status of this case. From: Tarry D.Johnson/UPCTo: Babette A. Griffin/UPC@UPCc: John P. Holland/UPC@UP, DebA. Gengler/UPC@UP, Terrill L. Maxwell/UPC@UPDate: 06/06/2016 09:58AMSubject: Joe Fulbright (EID#0251592) No Request for 3 Doctor Panel ;Case listed for Arbitration at 2nd Division by UnionMs. Griffin,Asfollow up to our conversation regarding the above referenced employee thismorning, I have reviewed the appeal letters submitted by the Brotherhoodof Railroad Signalmen (BRS) Vice General Chairman Joseph (Harry) Doucet inwhich he alleged a violation of Rules within the Telecom Agreement. TheUnion did not request a 3 Doctor panel review at anytime during the appealprocess for Mr. Fulbright. As a side note the Agreement under which Mr.Fulbright works (Telecom) does not contain the right to a 3 Doctor panelwithin it. This case was listed by the Union for Arbitration at the 2ndDivision. Director Maxwell and I are currently drafting the brief for thisBoard. It is likely that this case will be heard by late summer or earlyfall. If you have any further questions please let me know. Thanks foryour help and time.Tarry Don (T.D.) JohnsonLabor RelationsOfficer 1400 Douglas St. STOP 0710Omaha, NE 68179(402)-544-2084(work)(402)-233-2634 (fax)tdjohnso@up.com6/6/16From: Babette A.Griffin/UPCTo: Mary Jean Lempke/UPC@UPDate: 06/06/2016 10:00AMSubject: Fw: Joe Fulbright (EID#0251592) No Request for 3 Doctor Panel; Case listed for Arbitration at 2nd Division by UnionPlease update ineHSJL

---

**Case Number:** 000001293558 **Service Number:** 1001461283 **Category:** Service

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 6, 2016 **Time:** 10:45:11 AM **Created by:** 00464275 ( Mary Jean Lempke )

**Service Comments**

NO CHANGE IN DECISION THIS IS NOT 3 DOCTOR PANEL REQUEST AND CASE IS IN ARBITRATION THROUGH CHICAGO. LR HAS COMMUNICATED WITH UNION. TR

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Mar 14, 2016 **Time:** 10:43:09 AM **Created by:** 00415681 ( Mary Gallardo )

**Consultation Date Performed:** Aug 26, 2015 **Performed By:** 00415681 ( Mary Gallardo )

**Consultation Comments**

Updates sent to efile on 3/14/16. MG

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Aug 26, 2015 **Time:** 3:17:36 PM **Created by:** 00415681 ( Mary Gallardo )

**Consultation Date Performed:** Aug 26, 2015 **Performed By:** 00415681 ( Mary Gallardo )

**Consultation Comments**

EEO 933438 medical sent to efile, notes emailed to KR. MG

---

**Case Number:** 000001293558 **Service Number:** 1001385036 **Category:** Activity



UPFULBRIGHT

**Case Type:** FFD NON-REGULA **Service Type:** ACCOMMODATION

**Created on:** Jul 31, 2015 **Time:** 7:42:40 AM **Created by:** 00415681 ( Mary Gallardo )

**Activity Comments**

no response

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Jul 9, 2015 **Time:** 1:39:37 PM **Created by:** 00415681 ( Mary Gallardo )

**Consultation Date Performed:** Jul 9, 2015 **Performed By:** 00415681 ( Mary Gallardo )

**Consultation Comments**

RM CID 931539 EEO medical sent to efile. Accomm letter, no voc. Notessent. MG

---

**Case Number:** 000001293558 **Service Number:** 1001385036 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** ACCOMMODATION

**Created on:** Jul 1, 2015 **Time:** 10:09:28 AM **Created by:** 00415681 ( Mary Gallardo )

**Activity Comments**

letter sent

---

**Case Number:** 000001293558 **Service Number:** 1001385036 **Category:** Service

**Case Type:** FFD NON-REGULA **Service Type:** ACCOMMODATION

**Created on:** Jul 1, 2015 **Time:** 10:09:28 AM **Created by:** 00415681 ( Mary Gallardo )

**Service Comments**

NO RESPOSNE

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:58:55 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

6.29.2015 EE spoke with Dr Charbonneau regarding the AMD Medical requestand completed conversation with he has submitted all the information thatis available. EE states that he is not going to see the sleep MD that theclinic he went to wanted to perform a sleep test and he has already beenevaluated for this with Trazadone as the effective medicine that works forhim. Please see the AMD note regarding the specifics of the discussion.The case was left with disccssion with EE that he has restrictions givenhe is continuing on trazadone and EE communicated that he would like tocontinue to work for UPRR and receptive to the accommodations committeefor consideration of a different position at UPRR that can accommodate hisrestrictions. If/when any new medical information made available to EE tosubstantiate request for re-evaluation of his restrictions EE will submitinformation and make request. Started accommodations discussion with EE. (late entry 6/29/2015) TR

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:55:21 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

6.29.2015 EE and Dr C discussed this and at this time EE states that wehave all that we are going to have regarding this question. EE statesthat he does not need a sleep study and that trazadone is the only thingthat works for him. If EE has updated or changed information he willprovide at that time. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:52:05 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

UPFULBRIGHT

From: Theresa A. Rodino/UPCTo: Sheila Gniffke-Pribyl/UPC@UP, Terry H.Owens/UPC@UP, Mary E. Gallardo/ UPC@UPDate: 07/01/2015 08:51AMSubject: Joe. M. Fulbright EID 0251592 requesting accommodation of jobreassignment.EE: Joe. M. Fulbright EID 0251592 requesting accommodationof job reassignment. Please see the Restriction Review Form below signedby management unable to accommodate his restrictions in his current job.See the accommodations tab completed below and medically cleared withrestrictions notification. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:43:02 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

LN to Sheila Gniffke Pribyl, Mary Gallardo and Terry Owens regarding EErequest. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:42:27 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

6.29.2015 Call with EE and AMD regarding determination and restrictions.EE interested in the accommodations committee for job reassignment. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:40:16 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Notification sent to work unit and received the signed restriction reviewfrom by managers with restrictions they are unable to accommodate. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:38:51 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

7.1.2015 received restriction review form unable to accommodate bymanagement. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 29, 2015 **Time:** 4:48:05 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, You and I contacted Mr. Fulbright this afternoon to advise himof the decision to impose sudden incapacitation restrictions.1 Youre-introduced me to Mr. Fulbright. He was aware of me and my position dueto our previous phone call of 4/21/15.2 I advise Mr. Fulbright that wewould pick up where we left off with the previous phone call. That wasacceptable to him.3 I reminded Mr. Fulbright that the plan leaving ourlast call was for him to contact his PCP and request a Sleep MedicineEvaluation. He stated that he had done so. He informed us that he went foran evaluation and was seen by an provider who was not a Sleep Medicinespecialist and could not address the medication issue. That providerwanted Mr. Fulbright to have a sleep study and some other tests before hesaw the specialist. Mr. Fulbright stated that his benefits had beenstopped and that he could not pay for the evaluations (He mentioned a costof $600.00), so nothing more has happened. Further, he made it clear thathe was not looking for someone to "take over my care." He reiterated fromour first call that he had gone to great lengths and significant expenseover the course of about 6 years to find the cause of his insomnia and geton the right treatment so he was not inclined to turn his care over tosomeone else. I advised him that we respected his choice and that wassomething between him and his doctor.4 I then advised the EE that basedupon the fact that there was no new information it was time to go forwardwith the Manager Referral FFD Process. I then summarized the suddenincapacitation restrictions.5 We then offered to answer any questionsthat he might have. He had only one. he wanted to know if we were awarethat he had been off work and not paid. I told him that we were aware thathe was off work. We had no information regarding his pay. Mr. Fulbrightthen explained that since 2010 he had volunteered to take call, with theunderstanding that he could refuse a call if he had taken his medication(Trazadone). He again stated that it is his position that the only thingthat has changed is the position of his new manager. He has had a meetingwith his manager and his union representative and that is theircontinuing position. It is his understanding that he cannot take Trazadoneand

UPFULBRIGHT

continue in his job. We explained that we can only assess the medicalissue, and that is how we determined that sudden incapacitationrestrictions are warranted at this point. He will FU administratively withhis union representative and his manager. Mr. Fulbright had no furtherquestions from me.5 I again advised Mr. Fulbright that we would reviewany subsequent medical information that he makes available to us, and thatwe will schedule another phone conference with him if needed or if herequests one.6 I then dropped off the call.Action:1 Medically FFDwith the previously outlined restrictions.2 He should be referred toDP&M Staff if the EE cannot work within the restrictions.Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 29, 2015 **Time:** 4:03:42 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, I am ready to discuss the restrictions with the EE. You havebeen trying to get in touch with him this afternoon. Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 29, 2015 **Time:** 10:03:31 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- We need to communicate the restrictions to EE, Work Unit has sentback the signed restriction review form they are not able to accommodateEE in his given job with these restrictions. Please review and advise.Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 29, 2015 **Time:** 10:02:04 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

6.29.2015 Signed Restriction Review Form Received. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 29, 2015 **Time:** 9:58:11 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

signed restriction review form. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 29, 2015 **Time:** 9:57:52 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

restriction review form. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 26, 2015 **Time:** 8:23:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

From: Theresa A. Rodino/UPCTo: Terry D. Neal/UPC@UPDate: 06/26/201508:22 PMSubject: Re: employee Joe Fulbright Restrriction Review FormAttached please review and send backHello Mr Neal: If you could pleasehave this review form reviewed, filled out and sent back regardingrestrictions it would be greatly appreciated. Please make sure yourappropriate management is agreed and signed off regarding whether or notyou are able to accommodate these restrictions and we will move forwardwith call to the Employee. Please call me if you have questions. Thankyou, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL



UPFULBRIGHT

CONFIDENTIAL

**Created on:** Jun 26, 2015 **Time:** 8:20:14 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

This is restriction Review Form Sent to Management. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:03:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent restriction form to Terry Neal due to system error.

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:02:28 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent this form since SPAN written by eHS system all over the form makingit unreadable. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:55:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Work Restrictions Sent to Work Unit Management for Review if able toaccommodate in EE given job. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Medical Conclusions

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:54:00 PM **Created by:** 00458844 ( Theresa Rodino )

**Medical Conclusions Comments**

1. Not to operate company vehicles,on-track or mobile equipment, orfork-lifts.2. Not to work on rail trainsor work trains dumping ballast.(Can perform work remaining between therails of the occupied track or tothe field side of the occupied track.Where there are adjacent tracks withless than 19 foot track centers,utilize on-track safety protectionfollowing normal safety and Maintenanceof Way rules).3. Not to operatecranes, hoists, or machinery, if theseactivities might create a risk ofharm to others or a risk of catastrophicinjury to the employee.4. Not towork at unprotected heights, over 4 feetabove the ground (Can work on thebeds of trucks, and occupy bridgesfollowing normal safety rules).5. Notto work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder orhelper job, 2-man section gang).Must have at least 2 additional employeeson gang or at work area in orderto use Train Approach Warning regulations(Lookout).

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 12:41:33 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, Per our case review discussion:A This EE has still notcomplied with the agreement that he would work with his doctor to have aformal sleep medicine evaluation. Please advise him that the sleepmedicine evaluation is still required.B Because Trazadone is so longacting, he cannot take that medication and work for the ensuing 24hours.C We will employ sudden incapacitation restrictions until wereceive information that the EE is no longer taking the Trazadone, or isnot using it within 24 hours of reporting for work.D The employee isgiven the following work restrictions:1. Not to operate company vehicles,on-track or mobile equipment, or fork-lifts.2. Not to work on rail trainsor work trains dumping ballast. (Can perform work remaining between therails of the occupied track or to the field side of the occupied track.Where there are adjacent tracks with less than 19 foot track centers,utilize on-track safety protection following normal safety and Maintenanceof Way rules).3. Not to operate cranes, hoists, or machinery, if theseactivities might create a risk of harm to others or a risk of catastrophicinjury to the employee.4. Not to work at unprotected heights, over 4 feetabove the ground (Can work on the beds of trucks, and occupy bridgesfollowing normal safety rules).5. Not to work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder or helper job, 2-man section gang).Must have at least 2 additional employees on gang or at work area in orderto use Train Approach Warning regulations (Lookout). 6. If a new jobassignment is considered, outside of the Engineering Department, Healthand Medical Services must review the job requirements and determine if theemployee can

UPFULBRIGHT

CONFIDENTIAL

safely perform the essential functions of the job.E Therestrictions will be ongoing until the conditions outlined above have beenmet.F We will close the case if we have no response from the EE within areasonable period of time.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 19, 2015 **Time:** 11:14:51 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, This EE has not provided the medical records that we haverequested and we have not seen the results of a sleep medicine evaluationwhich we agreed to when you and I spoke directly with the EE.Action:1Remains NOT FFD.2 We still need the same information.3 Please calendarthis case for discussion with the CMO next week.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 18, 2015 **Time:** 1:56:09 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

C6/18/15 Document request letter sent:Copy of the last 2 years ofphysician clinic notes (also known as office notes or progress notes) fromthe provider treating you for this condition and the Sleep evaluationstudy records. JL

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 18, 2015 **Time:** 1:49:37 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/18/15 TC to EE re: needing medical records that have beenrequested--Copy of the last 2 years of physician clinic notes (also knownas office notes or progress notes) from the provider. Requested EE RTC toHMS, JL. JL

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jun 18, 2015 **Time:** 9:11:51 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- This EE had sent us this letter in eHS from 5/22/2015 it is letterfrom EE. We have this case on our Manager Referral Case Review fortomorrow morning but please see this letter and advise. We have beenwaiting for information from EE and this letter is his response but it isnow almost 1 month old. With your last review on the same date I believeyou addressed this letter but please advise.Thank you, Theresa

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** May 22, 2015 **Time:** 4:29:24 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We have worked diligently with this EE to get the information weneed. We were both on the call when we asked him to get a sleep evaluationdue to the performance problems that this EE had at work. We cannotcontrol the verbiage that the EE used during a hearing. Our informationneeds to make the final FFD determination have not changed. Pleasereassure the manager that we continue to investigate the medical issue inquestion and nothing more. When we get the sleep evaluation information weshould be able to complete the FFD Process.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** May 22, 2015 **Time:** 4:00:22 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

manager concern. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

UPFULBRIGHT

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 3:59:54 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- we are reviewing this case for the sleep disorder/ medicationconcern and have new note from the manager regarding a statement that EEhad made during a hearing. This is for your review and noted as other /manager concern in eHS medical file. This is the email note from themaanger Terry Neal: From: Terry D. Neal/UPCTo: Theresa A. Rodino/UPC@UP,Neal J. Spencer/UPC@UPDate: 05/20/2015 12:17 PMSubject: Fw: Scan fromIB20280Theresa, Per our conversation today:Below is an excerpt from adocument sent via BRS and Joe Fulbright to Neal Spencer (Gen DirTelecom)As I stated, The reason I referred Joe into the FFD was to get aruling on the sleep medication and Joe's medical condition.I havehighlighted the areas that I referred to in our conversationThank youfor your time and service to ouremployees.*******************************Terry NealManager TelecomFacilities 1658 Rogers RoadFt. Worth, Tx 76107Office: 817 3537237Cell: 817-313-5317

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:40:19 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Call to EE discussed status of his Off Work EE states he has an apt onJune 1 2015 with Sleep specialist and this is for an evaluation not asleep test. EE will request the report and would anticipate HMS receiptof that report 7-10 business days after EE is seen. EE confirms that hehas HMS fax number and will send the report for his RTW determination. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:34:33 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

5.20.2015 Call to EE who states that he is to talk with a sleep medicinespecialist has an appointment on June 1, 2015 for the sleep specialistevaluation to talk about the drug that he is taking. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:31:50 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

5.20.2015 Spoke with EE manager Terry Neal informed that we had aconversation with EE and the UP Company MD. EE is complying and workingwith the company regarding a medical exam that our AMD requested normallythis will take a couple of weeks to set up so would expect the reportaround this time. Informed Terry that I have not spoken with EE sincelast month so will call him today regarding the status of this. Terrystates that EE has sent a note in part with his grievance regarding thismedical condition and that the RR has not been responsive to what the EEnotes in this note as "a life threatening medical condition" Terry statesthat this is the reason that EE was pulled from service and why the WorkUnit asking EE to be evaluated by HMS. Manager asking if we would likethat note from EE? Informed Manager sure that he could send the note,that the EE has spoken with our UP Company MD but Dr Charbonneau wouldalso look at the statement from EE own words regarding his condition.Informed Manager that EE is working with HMS regarding the medical andwould anticipate that we would have the report from the testing that EEwas having done soon and this should answer the questions that the companyMD had prior to his determination for this referral. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 21, 2015 **Time:** 6:20:03 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, You and I spoke directly to this EE this afternoon:1 Youintroduced me and I introduced myself and my position as a consultant toUPRR HMS.2 I briefly summarized the nature of the Manager Referral FFDProcess and the information which the EE had provided to this point.3 Iexplained that we were requesting permission to speak directly with hisPCP to request a Sleep Medicine Evaluation. I told the EE that we wantedto explain the safety considerations to his doctor and the reason that asleep medicine was needed.4 Without my asking for any medicalinformation, the EE explained that he has been dealing with depression andsleep problems for 10-15 years. After much frustration with lack ofefficacy, he found a psychiatrist who figured out that he had a vitaminB-12 deficiency. He reports that this caused a secondary low serotoninlevel in his hypothalamus. As a result, he was started on Trazadone andProzac, and presumably B vitamin



UPFULBRIGHT

supplementation. He has done much betterwith his insomnia ever since. The EE went to great lengths to explain thathe would never report for work, or even drive his car (he cited Texasstate law about that issue) after taking the medication. He states that heis awake and alert during the day because he can sleep well at night. Hetakes the medication anywhere from 3 to 4 up to 8 to 10 nights at a time.He states that he has been working around the on call issue for the 3-4years and states that it has become a problem only due to his currentManager's perspective on the matter. He specifically charged that hisManager had made false statements regarding his being impaired due to themedication, and one other issue. We both reassured the EE that no suchstatements had been made to us and no such information had been sent tous.5 We ended the conversation by telling the EE that we needed a formalSleep Medicine consultation, and that we would be satisfied if he wouldrelay that information to his PCP. In that case, I do not need to speak tohis PCP and no ROI is required.6 The EE agreed to consult his MD andrequest a formal Sleep Medicine Evaluation. We both explained to him thatthe Evaluation had to be performed by a Sleep Medicine Specialist (youtold him that twice).7 That ended our call.Action:1 We will rely onthe EE to get the Sleep Medicine Eval request made to his PCP, as hecommitted to doing this afternoon.2 We will await the report.3 Nochange in the previous plan. We will further the FFD Process after wereview the Sleep Medicine Evaluation. Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 10:38:15 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, I will be happy to visit with you and the EE tomorrow late in theafternoon. Right now, that time appears to work for me. We can discuss thecase briefly on the case review call. Basically, I just want to explainthe situation to the EE's provider and notify the provider why we want tosee a Sleep Medicine consultation. Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 4:15:51 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- EE would like to talk with you before he signs ROI for you to speakwith his MD. He is available at 5:00pm CST tomorrow on 4/21/2015 doesthat time work for you? Please advise. Thanks, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 4:10:50 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.20.2015 several calls to EE asking about the ROI. Informed that ourcompany MD asking to speak with his MD. EE states that he will thinkabout that. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 3:57:34 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.20.2015 Update Manager Terry Neal informed that EE is working with usand current status is that our Company MD would like to speak with EECallto EE at 817-301-3981

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 16, 2015 **Time:** 10:05:30 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.16.2015 Call to EE informed of above and reason for request that EE hasapparent sleep onset insomnia and UP Company MD would like to talk with EEprovider about sleep specialist and what is the tx plan. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 15, 2015 **Time:** 9:34:10 PM **Created by:** 00458844 ( Theresa Rodino )



UPFULBRIGHT00025049

UPFULBRIGHT

**Activity Comments**
ROI mailed to EE. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 15, 2015 **Time:** 1:28:18 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
ROI sent to EE requesting information ROI that UP Company MD may speakwith EE MD regarding his Sleep Disorder. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 14, 2015 **Time:** 5:38:46 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**
Theresa, Per our case review discussion:1 The EE is NOT FFD.2 Pleaseinstruct the EE that he will need to have a Sleep Medicine Evaluation aspart of this FFD Process. It is his responsibility to arrange thisevaluation.3 Please ask the EE to sign a release of information so thatI can talk to his PCP to explain the reasons for the safety concern andthe requirement of the evaluation by the Sleep MedicineSpecialist.Thanks. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 13, 2015 **Time:** 9:26:18 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**
Theresa, It looks lie this EE has been treated for sleep onset insomniafor at least the last one year. He has also had problems with a severeskin rash. Treatment has included Benadryl, but I cannot tell if that wasfor the rash or as an OTC sleep aid. He has also been taking oral steroidsat times.Action:1 Remains NOT FFD.2 We should discuss this case atthe time of our next case review call. I think that we may want toconsider a sleep medicine consultation.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 13, 2015 **Time:** 11:07:00 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
Dr C- We now have 24 pages of medical information for your review.Please review and advise. Thank you, Theresa

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 13, 2015 **Time:** 11:06:21 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
4.413.2015 received 24 pages of medical information. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 13, 2015 **Time:** 11:05:59 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
24 pages of medical information. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 10, 2015 **Time:** 10:04:17 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

UPFULBRIGHT

4.10.2015 Call to EE at phone provided by his fax. LVM informed onlyreceived 4 pages of the 29 page fax and that the only medical informationwas 1 pg to please re-fax or send the rest of his information. tr

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 10, 2015 | **Time:** | 6:59:49 AM | **Created by:** | 00458844 ( Theresa Rodino ) |

**Activity Comments**

4.10.2015 Plan to call EE during business hours, also sending EErequesting medical information only received page 1 of the apparent 4 pageclinic note, asking him to refax. tr

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 7, 2015 | **Time:** | 4:38:52 PM | **Created by:** | 00415695 ( John Charbonneau ) |

**Activity Comments**

Theresa, We discussed this case during our case review call today. As Iwrote immediately above, we need the complete note from this EE's clinicvisit.Thx. Dr C

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 7, 2015 | **Time:** | 3:19:25 PM | **Created by:** | 00415695 ( John Charbonneau ) |

**Activity Comments**

Theresa, The EE has supplied only page #1 of a 4-page note. We cannot actwith inadequate/incomplete information. Let's discuss the case on the casereview call.Thx. Dr C

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 6, 2015 | **Time:** | 1:18:09 PM | **Created by:** | 00458844 ( Theresa Rodino ) |

**Activity Comments**

Dr C- this is the only note that EE has for his medical information.Please review and advise. Thank you, Theresa

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 6, 2015 | **Time:** | 1:17:23 PM | **Created by:** | 00458844 ( Theresa Rodino ) |

**Activity Comments**

4.6.2015 received 1 page clinic note. tr

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Apr 6, 2015 | **Time:** | 1:17:04 PM | **Created by:** | 00458844 ( Theresa Rodino ) |

**Activity Comments**

1 page clinic note. tr

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Case Type:** | FFD NON-REGULA | **Service Type:** | MANAGER REFERRAL | | |
| **Created on:** | Mar 31, 2015 | **Time:** | 6:52:51 PM | **Created by:** | 00458844 ( Theresa Rodino ) |

**Activity Comments**

From: Theresa A. Rodino/UPCTo: Terry D. Neal/UPC@UPCc: Deb A.Gengler/UPC@UP, Babette A. Griffin/ UPC@UPDate: 03/31/2015 06:48PMSubject: Joe Fulbright ( 00251592 ) no response to request for MedicalInformation by Health & MedicalHi Terry. We have not received theMedical Information that we had requested. We had sent EE out 2

UPFULBRIGHT

CONFIDENTIAL

letters,one in January and then a follow up request in February with no response.I will consult with our Director Deb Gengler to see what the next step is. Show cause is used for Medical Leave's but this is different scenariobeing a manager referral so will ask for assist and direction from Deb andBabette Griffin.I have called EE again today and left a voice messageasking for the information.Thanks, TheresaTheresa Rodino RN,CCMFitness-for-Duty NurseFrom: Terry D. Neal/UPCTo: Theresa A.Rodino/UPC@UPCc:Neal J. Spencer/UPC@UPDate:03/31/2015 12:47PMSubject: Re: Manager Referral Form attached Hello Theresa,Hasthere been any progress on the Fulbright Medical EvaluationThankYou********************************Terry NealManager TelecomFacilities 1658 Rogers RoadFt. Worth, Tx 76107Office: 817 3537237Cell: 817-313-5317Fax: 402 997 3547

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Mar 31, 2015 **Time:** 6:51:49 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

3.31.2015 Call to EE cell phone, left detailed VM informing that we arewaiting for his medical information from last 2 years. Provided my callback number and fax number asking EE to please call back with statusupdate. LN to DCS and FFD Supervisor asking for direction no responsefrom EE by HMS requests for last 2 months. LN sent to Mgr Terry Nealinforming that EE has not responded to HMS request and asking Director andFFD Supervisor for direction. Awaiting medical records from EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 27, 2015 **Time:** 6:26:27 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

letter resent to EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 26, 2015 **Time:** 9:40:54 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.26.2015 Call to EE at 817-733-0427 answer machine confirms EE name. LVMasking EE for an update regarding where he is at in sending us his medicalrecords. Informed that we still do not have anything. Provided mycontact information again and call back phone number. Awaiting 2yrsMedical Information from EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 11, 2015 **Time:** 9:59:28 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.10.2015 VM from EE states that he is trying to get something in writingregarding what information is needed for his return to work. tr2.11.2015 Call to EE at number he provided 817-733-0427 LVM informing EE that weneed the last 2 years of medical records from his provider(s) to pleasefax his actual doctor notes, medical records to 402-501-0067 and providedmy call back phone number 402-544-6769. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 9, 2015 **Time:** 1:19:39 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.9.2015 CF EE at 12:51 pm 817-733-0427 and VM from EE regarding thismanager referral. 2.9.2015 1:00pm Call back to EE LVM asking EE to pleasecall me to discuss this concern. Provided the information from the letterthat we need the last 2 yrs of medical information and provided the faxnumber for EE to fax the information. Awaiting call from EE to discusswith EE and awaiting medication medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:56:58 PM **Created by:** 00472608 ( Susan Cassiday )


UPFULBRIGHT

**Activity Comments**

Shirley J. Bear (00025372), Stephen T. Hale (00163148), Terry D. Neal(00166451), Scott F. Ochsner (00006978) notified of removal from service.RTC from Terry Neal and informed him. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:28:04 PM **Created by:** 00472608 ( Susan Cassiday )

**Activity Comments**

TC to EE and informed him of AMD and DCS decision to remove him fromservice. Left VM message for manager making referral, Terry Neal. Willsend out notifications. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:24:33 PM **Created by:** 00472608 ( Susan Cassiday )

**Activity Comments**

VM message received on 1/29/15 stating he was returning call fromTheresa. 2/2/15 RTC to EE regarding Manager Referral and AMDrecommendations. EE stated he does not have any issues being awake for hisregular work hours, but when he is on-call it is for 3 nights and he doesnot get good sleep without taking Trazadone. EE stated it is 75mg and hetakes it 3 out of 4 nights, except when he is on-call when he skips it thefirst 2 nights, but by the 3rd night EE stated he has to take it due tobeing too fatigued from lack of sleep. EE questioned need to be removedfrom service. I left VM message and e-mail message to AMD. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:14:31 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Susan, Per our discussion with Deb Gengler, RN today, there is no changeto the previous plan:1 The EE should be pulled from service.2 Pleaserequest the last two years of medical records from the EE.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 1, 2015 **Time:** 9:15:09 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We discussed this case with Dr Holland and Deb Gengler, RN lastweek. The EE is reportedly taking medications which impair his ability toremain alert at work. He has not responded to your request for contact:1This EE is NOT FFD and should be pulled from Duty.2 Per our discuss withthe CMO and DCS, please request the last 2 years of medical records fromall providers who have treated this EE.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 29, 2015 **Time:** 9:36:13 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- we have not been able to connect with this EE yet for the intakeassessment interview. However it is noted that EE is still working. Wehave sent a letter requesting medical information and medication list.Concerns are that EE cannot stay awake during the time that he is to be oncall and EE admits to manager taking medications that cause him to besleepy. Per our discussion and review of this manager referral pleaseadvise if the above is agreeable. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 29, 2015 **Time:** 8:43:47 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

UPFULBRIGHT

1.28.2015 Call to EE LVM asking EE To please call back to discuss.Sending letter to EE requesting last 1 yr of medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jan 27, 2015 **Time:** 6:24:16 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
This is the Manager Referral. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Jan 27, 2015 **Time:** 6:22:40 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**
1.26.2015 CF Manager Terry Neal regarding his concerns that EE who workson call for telecom and restoration of services has missed some calls.That EE reports he takes medications that put him to sleep and prohibithim from waking up for calls after normal business hours. Manager statesthat this is concern especially since this is part of EE job to be oncall. Mgr has concerns that EE may have medical situation and asks forFFD review. tr

---

**Case Number:** 000001293558 **Service Number:** 0000000000 **Category:** Case
**Case Type:** FFD NON-REGULA **Service Type:**
**Created on:** Jan 27, 2015 **Time:** 6:22:40 PM **Created by:** 00458844 ( Theresa Rodino )

**Case Comments**
LOC. PHONE IS 817-301-3981

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 23, 2014 **Time:** 9:28:50 AM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
May RTW w/o restrictions

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 22, 2014 **Time:** 5:37:39 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**
Jayne, Medically FFD for his Full Duty. Pls send the RTWNotification.Thx. Dr C

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 21, 2014 **Time:** 2:56:17 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
1. Joe Fulbright 251592, 53 yoa, lineman2. 8/27 Lt elbow ulnar nervedecompression3. Full duty release - need RTW wire4. JEDuValeus, RN636-795-5991

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation
**Case Type:** **Service Type:**
**Created on:** Oct 21, 2014 **Time:** 1:09:30 PM **Created by:** 00415681 ( Mary Gallardo )
**Consultation Date Performed:** Oct 21, 2014

**Consultation Comments**



UPFULBRIGHT

Onestop request CID 916953 medical sent to efile. MG

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 13, 2014 **Time:** 5:29:23 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

I spoke with EE informed what medical was needed for RTW review and agreedto recommend a short MLOA extension.

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 13, 2014 **Time:** 5:27:39 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

Supplied RTW note for 10/13 but nothing else

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 13, 2014 **Time:** 5:23:28 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

MLOA 9/10/14 - 10/20/14

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation
**Case Type:** **Service Type:**
**Created on:** Oct 13, 2014 **Time:** 3:46:34 PM **Created by:** 00440108 ( Rhonda Ross )
**Consultation Date Performed:** Oct 13, 2014

**Consultation Comments**

LN to DPM - RTWM/S2R: Just received a call from Mr. Fulbright whoindicates he has been released to RTW. There is a RTW release in hisfile. His contact # is 817.301.3981. He would appreciate a call back. Igave him Reggie's office # to contact as well. rlr

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Oct 9, 2014 **Time:** 9:39:44 AM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**

Did not respond to SC#1 ~ send SC#2.

---

**Case Number:** 000001238453 **Service Number:** 1001273902 **Category:** Consultation
**Case Type:** ODI **Service Type:** CASE MGMT DIS. PREVENT & MGMT
**Created on:** Oct 8, 2014 **Time:** 2:19:54 PM **Created by:** 00461750 ( Reginald Hardy Jr )
**Consultation Date Performed:** Oct 8, 2014

**Consultation Comments**

Telephone call to EE to inquire about medical status. EE advises last seenby treating provider 2 weeks ago. RTWM provided contact information tosubmit updated medical information.

---

**Case Number:** 000001238453 **Service Number:** 1001273902 **Category:** Service
**Case Type:** ODI **Service Type:** CASE MGMT DIS. PREVENT & MGMT
**Created on:** Oct 8, 2014 **Time:** 2:12:04 PM **Created by:** 00461750 ( Reginald Hardy Jr )

**Service Comments**

EE RTW FT/FD ON 10/23/2014.

---



UPFULBRIGHT

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Sep 18, 2014 **Time:** 2:52:16 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
SC#1 is due 10/9/14

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Sep 17, 2014 **Time:** 7:43:21 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
9/17/14 ~ He did not supply medical. Therefore I requested SC#1 be sent.

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Sep 17, 2014 **Time:** 7:42:45 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
Please send SC#1

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Sep 13, 2014 **Time:** 11:22:55 AM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
Mr. Fulbright called, left a message asking what medical information isneeded. I returned his call, informed him the needs to supply a currentdiagnosis, Tx plan, medications, level of function and ARTW date.

---

**Case Number:** 000001238453 **Service Number:** 1001258166 **Category:** Activity
**Case Type:** ODI **Service Type:** MEDICAL REVIEW ON DUTY INJURY
**Created on:** Aug 25, 2014 **Time:** 2:38:26 PM **Created by:** 00422380 ( Jayne DuValeus )

**Activity Comments**
MLOA 8/26/14 - 9/10/14

---

**Case Number:** 000001238453 **Service Number:** 0000000000 **Category:** Case
**Case Type:** ODI **Service Type:**
**Created on:** Aug 25, 2014 **Time:** 2:38:26 PM **Created by:** 00422380 ( Jayne DuValeus )

**Case Comments**
LASHANDA'S CASE

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER
**Created on:** Apr 23, 2014 **Time:** 10:29:03 AM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**
Scott F. Ochsner (00006978), Shirley J. Bear (00025372), Stephen T. Hale(00163148)- informed of medical release to RTW-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER
**Created on:** Apr 23, 2014 **Time:** 10:25:20 AM **Created by:** 00447560 ( Pamela Pachaud )



UPFULBRIGHT

**Activity Comments**

Records received on 4/22/2014 supporting full duty release effective3/31/2014

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 22, 2014 **Time:** 5:42:43 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Pam, Medically FFD for his Regular Work, per his MD's release.Thx. Dr C

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 22, 2014 **Time:** 12:20:08 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

clinic note dated 3/27/2014

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 22, 2014 **Time:** 12:19:52 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

clinic note dated 2/3/2014

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 22, 2014 **Time:** 12:18:36 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

EE is a communications tech who was off work since Feb for a rash r/tallergy. Was on a series of steroids and has provided documentationsupporting full duty release effective 3/31/2014. Please review andadvise.-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 17, 2014 **Time:** 1:32:36 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

duplicate medical releases

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 14, 2014 **Time:** 3:35:03 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

4/10/2014-Discussion with ee. Explained that HMS required entire medicalrecord for duration of MLOA. Asked ee to fax asap.-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 14, 2014 **Time:** 3:33:45 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

SOS supporting RTW effective 3/31/2014

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

UPFULBRIGHT

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Apr 9, 2014 **Time:** 2:30:50 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

4/9/2014-Discussion with Terry Neal, informed that HMS has not receivedmedical documentation supporting RTW. He stated he would contact ee anddiscuss.He verified fax number and will provide to ee.-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Mar 13, 2014 **Time:** 4:46:54 PM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

3/13/2014-Discussion with ee. Informed him that HMS did not have anymedical documentation to support MLOA. Advised ee to provide somethingfrom provider to HMSA asap.-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Mar 12, 2014 **Time:** 10:33:14 AM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

3/3/2014-EE instructed to provide HMS with updated medical recordssupporting MLOA.-PP

---

**Case Number:** 000001192646 **Service Number:** 1001205419 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** HEALTH CONDITION - OTHER

**Created on:** Mar 12, 2014 **Time:** 10:31:06 AM **Created by:** 00447560 ( Pamela Pachaud )

**Activity Comments**

2/24/2014-EE has only worked 6 days since 1/1/2014-Manager states he paidee vacation pay until ee exhausted it.-PP

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Mar 3, 2014 **Time:** 9:16:14 AM **Created by:** 00447560 ( Pamela Pachaud )

**Consultation Date Performed:** Mar 3, 2014

**Consultation Comments**

3/3/2014-Received documentation from ee's physician stating that he iscleared to RTW effective 3/3/2014, however, ee states that he is notfeeling ready to RTW. HMS directed ee to f/u with his provider to discussMLOA extension and to provide HMS with documentation asap supportingMLOA.-PP

---

**Case Number:** **Service Number:** 0000000000 **Category:** Consultation

**Case Type:** **Service Type:**

**Created on:** Feb 26, 2014 **Time:** 3:38:43 PM **Created by:** 00447560 ( Pamela Pachaud )

**Consultation Date Performed:** Feb 26, 2014

**Consultation Comments**

2/26/2014-Returned ee's call-unable to leave vm.-EE inquiring if HMSneeded anything other than fax from his doctor to initiate MLOA. PP

---

UPFULBRIGHT

# Supervisor Initiated Fitness-For-Duty Request Form

**Supervisors have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern that the employee can safely perform his/her job duties. Supervisors should complete the information below when requesting Health and Medical Services to complete a Fitness-for-Duty evaluation.**

| | | | |
|---|---|---|---|
| Date | January 26, 2015 | Employee Phone (best contact #) | 817-733-0427 |
| Employee Name | Joe M. Fulbright | Employee ID | 0251592 |
| Employee Job Title | Senior Communications Technician | Employee Job Location | Fort Worth, TX |
| Supervisor Who Observed Behaviors (If Different From Mgr) | | Supervisor Telephone # | 817-353-7237 |
| Manager Making Referral | Terry D. Neal | Manager Employee ID | 0166451 |
| Manager Telephone # | 817-353-7237 | Manager E-mail Address | tdneal@up.com |
| Is The Employee Removed From Service? | ☐ YES X NO | If No, Is Employee Being Provided Alternative Work Duties During Evaluation? | ☐ YES X NO |
| Has The Employee Been Informed Of Their Removal From Service? | ☐ YES ☐ NO X N/A | Have You Discussed These Observations and/or Unsafe Behaviors With The Employee? | X YES ☐ NO |
| | | | |

**I am requesting a Fitness-For-Duty evaluation for the above named employee as evidenced by: (check as many as are applicable):**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Absenteeism | | Confusion | | Decreased Alertness | | Deteriorating Performance |
| | Difficulty Climbing | | Difficulty Lifting | | Difficulty Recalling | | Disorientation |
| | Erratic Behavior | | Fatigue/Weakness | | Shortness of Breath | X | Sleeping |
| | Slurred Speech | | Staggering | | Stumbling | | Sudden Mood Swings |
| | Unsteady Walk | | I am requesting FFD Eval for Mr Fulbright for his sleeping issues. He has to take medicine in order to sleep. The Medicine prohibits his ability to fulfill his duties for Restoration of Service after normal business hours. | | | | |

1. **Provide details of specific behaviors: Descriptions, observations and circumstances of the events leading to the request for the FFD evaluation**: Mr. Fulbright has missed After Hours Call outs due to the sleep medicine he takes. He has told me that he has to take this medication

2. **How long has this been occurring?** 2014, 2015

3. **Has there been a prior behavioral incident(s) or problem(s)?** No, just "sleep medicine/and subject to call rules"

4. **Please provide any additional information which raises your concern that the employee may not be able to safely perform his/her job duties.** I am worried that the medicine could impair Mr. Fulbright further into his normal work shift. Is the medication UPRR approved? I would never ask Mr Fulbright to work after he has taken his sleep medication; however that puts a hardship on his peers having to cover for his sleep condition

| | |
|---|---|
| Does This Represent a Change in The Employee's Past Observed Behaviors? | ☐ YES X NO |
| If Yes, Please Describe: | |
| Were Environmental Conditions Pertinent or Related To The Observed Behaviors (i.e: size of cab; distance between handrails)? | ☐ YES X NO |
| If Yes, Please Describe: | |

EXHIBIT
Charbonneau Ex 2

**Supervisor Initiated Fitness-For-Duty Request Form**

Recap:
I am concerned about Mr. Fulbrights sleep condition. He must take medication in order to sleep. This medication prohibits him from fulfilling his job responsibility for Emergency After Hour Restoration of Service. We have had several conversations about this condition and how it is effecting his job along with his peers (who are having to cover for him) I am also concerned about the medication having lingering effects into his daily duties. I am also concerned whether the medication is UPRR approved. Any future issues with missing calls will result in discipline being assigned. I would like to be proactive and try and to work this out before it comes to discipline.

Terry Neal

EXHIBIT
Charbonneau Ex 9
exhibitsticker.com

UPFULBRIGHT

KANER MEDICAL GROUP
Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

| | |
|---|---|
| PATIENT: | Joe Fulbright |
| DATE OF BIRTH: | REDACTED |
| DATE: | 11/20/2014 03:00 PM |
| VISIT TYPE: | Office Visit |
| DOCUMENT TYPE: | Chart Note |

**History of Present Illness:**
This 53 year old male presents with:
1. insomnia f/u
The patient presents for insomnia. The symptoms are unchanged. The patient does not have: use of alcohol. The patient is experiencing difficulty initiating sleep. The patient denies awakening with choking, awakening with shortness of breath, cataplexy, difficulty concentrating, difficulty maintaining sleep, gasping during sleep, headache upon awakening, irritability or weight gain. Pt is here to get refill on Trazadone was given by Psychiatrist but retired.

**Chronic Problems:**
Insomnia, unspecified
Allergic rhinitis due to pollen
Herpes simplex without mention of complication

**Chronic Problems Addressed Today:**
1. **Insomnia, unspecified.**

**Past Medical History:**
Reviewed, no change. Last documented: 02/26/2014.

**Past Medical/Surgical History:**

| Condition | Year | Procedure/Surgery | Year |
|---|---|---|---|
| | | GB | 1990 |
| left Carpal tunnel syndrome | 2007 | Left Carpal tunnel release | 2007 |
| gallbladder removal | 1990 | cholecystectomy | 1990 |
| Tonsillitis | 1965 | T&A | 1965 |

**Medications started this visit**

| Medication | Directions |
|---|---|
| Chantix Starting Month Box 0.5 mg (11)-1 mg (42) tablets in dose pack | take 1 by Oral route 2 times every |
| trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |
| Symbicort 160 mcg-4.5 mcg/actuation HFA aerosol inhaler | inhale 2 puff by inhalation route 2 times every day in the morning and evening |
| trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

UPFULBRIGHT

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| 11/20/2014 | Chantix Starting Month Box 0.5 mg (11)-1 mg (42) tablets in dose pack | take 1 by Oral route 2 times every |
| 11/20/2014 | Symbicort 160 mcg-4.5 mcg/actuation HFA aerosol inhaler | inhale 2 puff by inhalation route 2 times every day in the morning and evening |
| 11/20/2014 | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

**Medications stopped**

| Start Date | Medication | Directions |
|---|---|---|
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |
| 03/04/2014 | prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |
| 11/20/2014 | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

## Allergies

Reviewed, no changes.

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | diarrhea, abd pain |

**Family History:**
Reviewed, no changes. Last detailed document: 12/17/2012.

## Social History

Reviewed, no changes. Last detailed document date: 02/26/2014.

## Social History

Reviewed, no changes. Last detailed document date: 02/26/2014.

## Review of Systems

| System | Negative | Positive | Comments |
|---|---|---|---|
| Constitutional | Irritability and weight gain. | | |
| HEENT | Gasping during sleep. | | |
| Respiratory | Awakening with shortness of breath. | | |
| Gastrointestinal | Awakenings with choking or heartburn. | | |
| Neuro / Psychiatric | Difficulty concentrating. Cataplexy, difficulty maintaining sleep and headache. | **Difficulty initiating sleep.** | |

## Vital Signs

| Time | BP mm/Hg | Pulse/min | Resp/min | Temp F | Ht ft | Ht in | Wt lb | BMI kg/m2 | BSA m2 |
|---|---|---|---|---|---|---|---|---|---|
| 3:19 PM | 128/80 | 78 | 14 | 98.8 | 5.0 | 10.00 | 310.40 | 44.53 | |

Measured By:

| Time | |
|---|---|
| 3:19 PM | Kenya Ponce |

## Physical Exam

**Constitutional:**
Well developed.
**Respiratory:**
Lungs clear to auscultation. Respiratory effort is normal.
**Cardiovascular:** Regular rate and rhythm. No murmurs, gallops, or rubs.
**Extremities:**
No edema is present.
**Neurological:**
Memory: Intact .
Cranial nerves: II through XII are grossly intact.

**Psychiatric:**
The patient is oriented to time, place, person, and situation.
The patient has normal insight, exhibits normal judgment,
The patient demonstrates the appropriate mood and affect.

**Office Procedures:**

| Status | Ordered | Order | Completed | Timeframe |
|---|---|---|---|---|
| completed | 03/04/2014 | KENALOG 10MG 40 mg Intramuscular | 03/04/2014 | |
| completed | | Tdap | 04/01/2009 | |
| obtained | 04/30/2014 | Guaiac Card | | |
| completed | 05/01/2014 | SPIROMETRY | 05/01/2014 | |

## Orders

| Status | Ordered | Completed | Order | Interpretation |
|---|---|---|---|---|
| ordered | 03/04/2014 | | follow-up visit for preventive care 3 Months | |
| ordered | 03/04/2014 | | ANA REFLEX AUTOIMMUNE AB PROFILE | |
| ordered | 03/04/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/04/2014 | | CMP + e-GFR | |
| ordered | 03/04/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/04/2014 | | RHEUMATOID FACTOR QUANT | |
| ordered | 03/04/2014 | | SEDIMENTATION RATE | |
| ordered | 03/04/2014 | | TSH | |
| ordered | 03/04/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| ordered | 03/04/2014 | | URIC ACID | |
| completed | 03/04/2014 | 03/04/2014 | KENALOG 10MG 40 mg Intramuscular | |
| ordered | 03/27/2014 | | follow-up visit for preventive care 2 Months | |
| obtained | 03/27/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/27/2014 | | CMP + e-GFR | |
| ordered | 03/27/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/27/2014 | | TSH | |
| ordered | 03/27/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |







UPFULBRIGHT

| | | | | |
|---|---|---|---|---|
| ordered | 03/27/2014 | | URIC ACID | |
| obtained | 04/30/2014 | | Guaiac Card | |
| completed | 04/30/2014 | 04/30/2014 | EKG | see detail |
| obtained | 04/30/2014 | | CBC W/AUTO DIFF | |
| obtained | 04/30/2014 | | CMP + e-GFR | |
| obtained | 04/30/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| obtained | 04/30/2014 | | PSA, TOTAL | |
| obtained | 04/30/2014 | | TSH | |
| obtained | 04/30/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| obtained | 04/30/2014 | | URIC ACID | |
| completed | 05/01/2014 | 05/01/2014 | SPIROMETRY | see detail |
| ordered | 07/29/2014 | | Referral: Dr. Bobby Wroten. Evaluate and treat. | |

## Assessment Plan

**Insomnia, unspecified (780.52), Stable.**
**Tobacco Abuse (305.1)**

Provider: Veemal M. D'Souza MD 11/20/2014

Electronically signed by Veemal M. D'Souza MD on 11/20/2014 09:13 PM

UPFULBRIGHT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name: | Joe Fulbright | Kaner Medical Group | | Rate: | 76 | BPM | Interpretation: |
| ID: | 24810 | Req. Physician: | Livingstone MD, David K | PR: | 158 | msec | Sinus Rhythm |
| Sex: | Male | Technician: | Mary Gonzales | QT/QTc: | 354/382 | msec | WITHIN NORMAL LIMITS |
| BP: | 130/84 mmHg | History: | | QRSD: | 80 | msec | good |
| Weight: | 287.3 lbs | Medication: | | P Axis: | 48 | | |
| Height: | 70 inches | Date of Report: | 04/30/14 14:52:09 | QRS Axis: | 46 | | |
| DOB: | REDACT (53 Years) | Reviewed By: | David K Livingstone MD | T Axis: | 44 | | |
| Comments: | | Review Date: | 04/30/14 15:57:09 | | | | |




Speed:25 mm/sec Gain:10 mm/mv MYO:OFF AC:ON DRIFT:ON Midmark Diagnostics Group Page 1 of 1 Version 8.4.2 ECG Analysis Ver. 8.4.2 Print Date 03/30/15 10:49:15



UPFULBRIGHT

CONFIDENTIAL

UPFULBRIGHT

# Spirometry Report

Kaner Medical Group
412 N. Main St Suite 100
Euless TX 76039

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name: | Joe Fulbright | Age: | 53 years | Race: | Caucasian | | |
| ID: | 24810 | Height: | 70 inches | Weight: | 287 lbs. | | |
| Sex: | Male | Indication: | | | | | |
| Smoker: | No. | Medications: | | | | | |
| COPD Risk: | Very High | Lung Age: | > 84 years | | | | |

| | | | |
|---|---|---|---|
| Requested By: | | Performed By: | Mary Gonzales |
| Test Date: | 04/30/14 14:43:05 | Sensor S/N: | 541908 |
| Test Date Post: | | Sensor Calibrated: | 09/30/13 14:53:33 |
| Press./Temp. | 760 mmHg./70 degrees F | Spiro Control Ver: | 8.4.2 |
| Bronchodilator: | | Normals/Interp.: | Crapo/ATS (1991) |

| Measurement | Units | Predicted | Pre-Bronchodilator Trial 1 Actual | 1 % Pred. | 2 Actual | 2 % Pred. | 3 Actual | 3 % Pred. |
|---|---|---|---|---|---|---|---|---|
| FVC | L | 4.90 | **3.07** | **63 %** | **3.11** | **64 %** | **3.08** | **63 %** |
| FEV1 | L | 3.89 | 2.26 | 58 % | 2.35 | 60 % | 2.35 | 61 % |
| FEV1/FVC | % | 79 % | 74 % | 93 % | 75 % | 95 % | 76 % | 96 % |
| FEF25% | L/S | 8.19 | 4.11 | 50 % | 4.12 | 50 % | 4.42 | 54 % |
| FEF50% | L/S | 4.69 | 2.33 | 50 % | 2.76 | 59 % | 2.69 | 57 % |
| FEF75% | L/S | 1.82 | 0.70 | 38 % | 0.79 | 43 % | 0.81 | 45 % |
| FEF25-75% | L/S | 3.75 | 1.75 | 47 % | 2.00 | 53 % | 2.02 | 54 % |
| PEF | L/S | 8.88 | 4.52 | 51 % | 4.70 | 53 % | 4.58 | 52 % |
| Exp. Time | Sec. | | 6.23 | | 5.47 | | 5.27 | |
| V ext. | L | | 0.06 | | 0.06 | | 0.09 | |







Test #1
Test #2 (Best)
Test #3

= Best FVC test

Pre-BD FVC: 4 attempted, 4 accepted, 4 matches.

Interpretation: Moderate restriction. best to stop smoking.

Reviewed By: David K Livingstone MD ______________________ 04/30/14



UPFULBRIGHT000202

CONFIDENTIAL

UPFULBRIGHT

KANER
MEDICAL GROUP
Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

PATIENT: Joe Fulbright
DATE OF BIRTH: REDACTED
DATE: 04/30/2014 02:00 PM
VISIT TYPE: Preventive Medicine
DOCUMENT TYPE: Chart Note

**History of Present Illness:**
This 53 year old male presents with:
1. preventive exam
Pt here for routine PE. Pt not fasting today.
skin has cleared, occ am cough (smoker)

**Chronic Problems:**
Insomnia, unspecified
Allergic rhinitis due to pollen
Herpes simplex without mention of complication

**Past Medical/Surgical History:** (reviewed, updated)

| Condition | Year | Procedure/Surgery | Year |
|---|---|---|---|
| | | GB | 1990 |
| left Carpal tunnel syndrome | 2007 | Left Carpal tunnel release | 2007 |
| gallbladder removal | 1990 | cholecystectomy | 1990 |
| Tonsillitis | 1965 | T&A | 1965 |

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| 03/04/2014 | prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

**Medications stopped**

| Start Date | Medication | Directions |
|---|---|---|
| 04/22/2011 | Prozac 20 mg capsule | take 1 capsule by oral route every day in the morning |

**Allergies**

Reviewed, no changes.

UPFULBRIGHT000203

CONFIDENTIAL

UPFULBRIGHT

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | diarrhea, abd pain |

**Family History:** (reviewed, updated)

| Yes / No | Disease Detail | Family Member | Name | Age |
|---|---|---|---|---|
| Yes | Alzheimer's Disease | Mother | | |
| | bp | Father | | |
| Yes | CAD | Family h/o | | |
| Yes | CAD | Father | | |
| | dm | Father | | |

## Social History (reviewed, updated)

The patient is right-handed.
Primary language is English.

**EDUCATION / EMPLOYMENT / OCCUPATION:**

| Employment | Emp History | Emp Status | Retire Date | Restrictions |
|---|---|---|---|---|
| | Electronic Tech with Rail Road, | | | |

**MARITAL STATUS / FAMILY / SOCIAL SUPPORT:**
Currently married.

**TOBACCO:**
Smoking status: Current every day smoker.

| Use Status | Total Pk Yrs | Type | Per Day | Years Used | Pack Years | Year Quit |
|---|---|---|---|---|---|---|
| current | 760 | cigarettes | 20.00 | 38.00 | 760 | |

| Tried To Quit | Longest Tob-Free | Relapse Reason | Passive Exposure |
|---|---|---|---|
| | | | |

**ALCOHOL:**
There is no history of alcohol use.

## Review of Systems

| System | Negative | Positive | Comments |
|---|---|---|---|
| Constitutional | Fatigue, fever, night sweats, weight gain and weight | | |

CONFIDENTIAL

UPFULBRIGHT

| | | |
|---|---|---|
| | loss. | |
| HEENT | Eye discharge, vision changes and vision loss. Ear drainage, hearing loss and nasal drainage. | |
| Respiratory | Cough, dyspnea and wheezing. | |
| Cardiovascular | Chest pain, claudication and irregular heartbeat/palpitations. | |
| Gastrointestinal | Abdominal pain, constipation, decreased appetite, diarrhea, heartburn, nausea and vomiting. | |
| Genitourinary | Dysuria, hematuria, penile discharge and polyuria. | |
| Metabolic / Endocrine | Cold intolerance, heat intolerance, polydipsia and polyphagia. | |
| Neuro / Psychiatric | Dizziness, gait disturbance and memory impairment. Anxiety and depression. | **Insomnia.** |
| Dermatologic | Change in shape/size of mole(s), pruritus, rash and skin lesion. | |
| Musculoskeletal | Back pain, joint swelling and muscle weakness. | |
| Hematology | Easy bleeding and easy bruising. | |
| Immunology | Environmental allergies and food allergies. | |

## Vital Signs

| Time | BP mm/Hg | Pulse/min | Resp/min | Temp F | Ht ft | Ht in | Wt lb | BMI kg/m2 | BSA m2 |
|---|---|---|---|---|---|---|---|---|---|
| 2:08 PM | 130/84 | 80 | 14 | 98.3 | 5.0 | 10.00 | 287.00 | 41.18 | |

**Measured By:**

| Time |
|---|



UPFULBRIGHT000205

CONFIDENTIAL

2:08 PM Mary Gonzales

UPFULBRIGHT

## Physical Exam

**Constitutional:**
Well developed.

**Eyes:**
Right
Inspection normal.
No injection.
PERRLA.
Fundus is benign.
Left
Inspection normal.
No injection.
PERRLA.
Fundus is benign.

**Ears:**
Right:
Unremarkable to inspection. Canal normal in caliber, no excessive cerumen, no drainage. Normal tympanic membrane.
Hearing grossly intact.
Left:
Unremarkable to inspection. Canal normal in caliber, no excessive cerumen, no drainage. Normal tympanic membrane.
Hearing grossly intact.

**Nose / Mouth / Throat:**
**External Nose:** is unremarkable
**Lips/Teeth/Gums:** Normal teeth and gums
**Tonsils:** No tonsillar hypertrophy or exudates
**Oropharynx:** No pharyngeal erythema or exudates or mucosal lesion

**Neck / Thyroid:**
Inspection reveals symmetry. Palpation reveals trachea midline and mobile. No thyromegaly or thyroid nodules detected.

**Lymphatic:** No cervical or supraclavicular adenopathy.

Breast
**Bilateral:**
Breasts are symmetric with no dimpling.

**Respiratory:**
Auscultation can be described as bilateral diffuse wheezing-mild. Respiratory effort is normal.

**Cardiovascular:** Regular rate and rhythm. No murmurs, gallops, or rubs.

**Abdomen:**
Bowel sounds present, no bruits.
Inspection has detected obese.
There is no abdominal tenderness.
No hepatic enlargement.
No splenic enlargement.
Negative for hernia.

Genitourinary
Penile shaft is normal.
Scrotum normal, no masses or tenderness.
Testes symmetric and non-tender. No testicular masses.

UPFULBRIGHT000206

CONFIDENTIAL

UPFULBRIGHT

Negative for hernia.

**Rectum:**

Normal sphincter tone.

Prostate appears normal.

Integumentary

No impressive skin lesions present.

**Musculoskeletal:**

Normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.

**Extremities:**

No edema is present.

**Neurological:**

Memory: Intact .

Cranial nerves: II through XII are grossly intact.

Sensory: No sensory loss .

Deep Tendon Reflexes: DTR's preserved and symmetric .

**Psychiatric:**

The patient is oriented to time, place, person, and situation.

The patient has normal insight, exhibits normal judgment,

The patient demonstrates the appropriate mood and affect.

**Lab Studies:**

| Status | Lab Study | Timeframe | Date | Comments | Interpretation | Value |
|---|---|---|---|---|---|---|
| ordered | CBC W/AUTO DIFF | 1 Week | 05/07/2014 | | | |
| ordered | CMP + e-GFR | 1 Week | 05/07/2014 | | | |
| ordered | LIPID PROFILE WITH CALC NON-HDL CHOL | 1 Week | 05/07/2014 | | | |
| ordered | PSA, TOTAL | 1 Week | 05/07/2014 | | | |
| ordered | TSH | 1 Week | 05/07/2014 | | | |
| ordered | UA, MICROSCOPIC, REFLEX TO CULTURE | 1 Week | 05/07/2014 | | | |
| ordered | URIC ACID | 1 Week | 05/07/2014 | | | |

**Office Procedures:**

| Status | Ordered | Order | | Completed | Timeframe |
|---|---|---|---|---|---|
| completed | 03/04/2014 | KENALOG 10MG | 40 mg Intramuscular | 03/04/2014 | |
| completed | | Tdap | | 04/01/2009 | |
| ordered | 04/30/2014 | Guaiac Card | | | |

Orders

UPFULBRIGHT000207

CONFIDENTIAL

| Status | Ordered | Completed | Order | Interpretation |
|---|---|---|---|---|
| ordered | 03/04/2014 | | follow-up visit for preventive care 3 Months | |
| ordered | 03/04/2014 | | ANA REFLEX AUTOIMMUNE AB PROFILE | |
| ordered | 03/04/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/04/2014 | | CMP + e-GFR | |
| ordered | 03/04/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/04/2014 | | RHEUMATOID FACTOR, QUANT | |
| ordered | 03/04/2014 | | SEDIMENTATION RATE | |
| ordered | 03/04/2014 | | TSH | |
| ordered | 03/04/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| ordered | 03/04/2014 | | URIC ACID | |
| completed | 03/04/2014 | 03/04/2014 | KENALOG 10MG 40 mg Intramuscular | |
| ordered | 03/27/2014 | | follow-up visit for preventive care 2 Months | |
| obtained | 03/27/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/27/2014 | | CMP + e-GFR | |
| ordered | 03/27/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/27/2014 | | TSH | |
| ordered | 03/27/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| ordered | 03/27/2014 | | URIC ACID | |
| ordered | 04/30/2014 | | Guaiac Card | |
| ordered | 04/30/2014 | | EKG | |
| ordered | 04/30/2014 | | CBC W/AUTO DIFF | |
| ordered | 04/30/2014 | | CMP + e-GFR | |
| ordered | 04/30/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 04/30/2014 | | PSA, TOTAL | |
| ordered | 04/30/2014 | | TSH | |
| ordered | 04/30/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| ordered | 04/30/2014 | | URIC ACID | |

## Assessment Plan

**Routine Medical Exam (V70.0), Routine.**
Further diagnostic evaluations ordered today include EKG to be performed. The patient is to have Guaiac Card performed.

Provider: David K. Livingstone MD 04/30/2014

Electronically signed by David K. Livingstone MD on 05/01/2014 03:01 PM

UPFULBRIGHT

UPFULBRIGHT000208

CONFIDENTIAL

UPFULBRIGHT

KANER
MEDICAL GROUP
Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

| | |
|---|---|
| PATIENT: | Joe Fulbright |
| DATE OF BIRTH: | REDACTED |
| DATE: | 03/27/2014 09:30 AM |
| VISIT TYPE: | Office Visit |
| DOCUMENT TYPE: | Chart Note |

**History of Present Illness:**
This 53 year old male presents with:
1. rash
The patient presents for rash. The symptom(s) are described as improving. Affected area(s) are scattered on the body. The patient describes the affected area(s) as itchy. Denies aggravating factors. Relieving factors include oral steroids and topical steroids. Associated symptoms include crusting and pruritus.
shot helped, felt out of mind while pred effects were new, better, still needs B12, needs FMLA form

**Chronic Problems:**

**Past Medical/Surgical History:** (reviewed, updated)

| Condition | Year | Procedure/Surgery | Year |
|---|---|---|---|
| Bilat Carpal tunnel syndrome | 2009 | Bilat Carpal tunnel release | 2009 |
| gallbladder removal | 1990 | cholecystectomy | 1990 |
| Tonsillitis | 1965 | Tonsillectomy | 1965 |

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| 03/04/2014 | prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

**Allergies**

Reviewed, no changes.

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | |

**Family History:** (reviewed, updated)

| Yes/- | Disease Detail | Family Member | Name | Age |
|---|---|---|---|---|



UPFULBRIGHT000209

CONFIDENTIAL

| No | | |
|---|---|---|
| Yes | Alzheimer's Disease | Mother |
| Yes | CAD | Family h/o |
| Yes | CAD | Father |

UPFULBRIGHT

**Social History** (reviewed, updated)

The patient is right-handed.
Primary language is English.

**EDUCATION / EMPLOYMENT / OCCUPATION:**

| Employment | Emp. History | Emp Status | Retire Date | Restrictions |
|---|---|---|---|---|
| | Electronic Tech with Rail Road, | | | |

**MARITAL STATUS / FAMILY / SOCIAL SUPPORT:**
Currently married.

**TOBACCO:**
Smoking status: Current every day smoker.

| Use Status | Total Pk Yrs | Type | Per Day | Years Used | Pack Years | Year Quit |
|---|---|---|---|---|---|---|
| current | 760 | cigarettes | 20.00 | 38.00 | 760 | |

| Tried To Quit | Longest Tob Free | Relapse Reason | Passive Exposure |
|---|---|---|---|
| | | | |

**ALCOHOL:**
There is a history of alcohol use.

Review of Systems

| System | Negative | Positive | Comments |
|---|---|---|---|
| Constitutional | Fatigue, fever and night sweats. | | |
| HEENT | Eye discharge, vision changes and vision loss. Ear drainage, hearing loss and nasal drainage. | | |
| Respiratory | Cough, dyspnea and wheezing. | | |

UPFULBRIGHT000210

CONFIDENTIAL

UPFULBRIGHT

| | | |
|---|---|---|
| Cardiovascular | Chest pain, claudication and irregular heartbeat/palpitations. | |
| Gastrointestinal | Abdominal pain, constipation, diarrhea and vomiting. | |
| Genitourinary | Dysuria, hematuria, penile discharge and polyuria. | |
| Metabolic / Endocrine | Cold intolerance, heat intolerance, polydipsia and polyphagia. | |
| Neuro / Psychiatric | Gait disturbance. Anxiety and depression. | |
| Dermatologic | Pruritus and rash. | **Crusting.** |
| Musculoskeletal | Joint swelling and muscle weakness. | |
| Hematology | Easy bleeding and easy bruising. | |
| Immunology | Environmental allergies and food allergies. | |

## Vital Signs

| Time | BP mm/Hg | Pulse/min | Resp/min | Temp F | Ht ft | Ht in | Wt lb | BMI kg/m2 | BSA m2 |
|---|---|---|---|---|---|---|---|---|---|
| 9:33 AM | 132/82 | 80 | 16 | 98.8 | 5.0 | 10.00 | 296.70 | 42.57 | |

**Measured By:**

| Time | [illegible] |
|---|---|
| 9:33 AM | Mary Gonzales |

## Physical Exam

**Constitutional:**

Well developed.

**Eyes:**

Right

No injection.

Left

No injection.

**Ears:**

Right:

Unremarkable to inspection.

Left:

UPFULBRIGHT000211

CONFIDENTIAL

Unremarkable to inspection.

**Respiratory:**
Lungs clear to auscultation. Respiratory effort is normal.

**Cardiovascular:** Regular rate and rhythm. No murmurs, gallops, or rubs.

**Abdomen:**
Inspection has detected obese.

**Musculoskeletal:**
Normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.

**Neurological:**
Memory: Intact
Cranial nerves: II through XII are grossly intact.

**Psychiatric:**
The patient is oriented to time, place, person, and situation.
The patient demonstrates the appropriate mood and affect.

**Lab Studies:**

| Status | Lab Study | Timeframe | Date | Comments | Interpretation | Value |
|---|---|---|---|---|---|---|
| ordered | CBC W/AUTO DIFF | -Today | 03/27/2014 | | | |
| ordered | CMP + e-GFR | 2 Months | 05/27/2014 | | | |
| ordered | LIPID PROFILE WITH CALC NON-HDL CHOL | 2 Months | 05/27/2014 | | | |
| ordered | TSH | 2 Months | 05/27/2014 | | | |
| ordered | UA, MICROSCOPIC, REFLEX TO CULTURE | 2 Months | 05/27/2014 | | | |
| ordered | URIC ACID | 2 Months | 05/27/2014 | | | |

**Office Procedures:**

| Status | Ordered | Order | | Completed | Timeframe |
|---|---|---|---|---|---|
| completed | 03/04/2014 | KENALOG 10MG | 40 mg Intramuscular | 03/04/2014 | |

Orders

| Status | Ordered | Completed | Order | Interpretation |
|---|---|---|---|---|
| ordered | 03/04/2014 | | follow-up visit for preventive care 3 Months | |
| ordered | 03/04/2014 | | ANA REFLEX AUTOIMMUNE AB PROFILE | |
| ordered | 03/04/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/04/2014 | | CMP + e-GFR | |
| ordered | 03/04/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/04/2014 | | RHEUMATOID FACTOR, QUANT | |
| ordered | 03/04/2014 | | SEDIMENTATION RATE | |
| ordered | 03/04/2014 | | TSH | |
| ordered | 03/04/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |

UPFULBRIGHT000212





UPFULBRIGHT

CONFIDENTIAL

| | | | |
|---|---|---|---|
| ordered | 03/04/2014 | | URIC ACID |
| completed | 03/04/2014 | 03/04/2014 | KENALOG 10MG 40 mg Intramuscular |
| ordered | 03/27/2014 | | follow-up visit for preventive care 2 Months |
| ordered | 03/27/2014 | | CBC W/AUTO DIFF |
| ordered | 03/27/2014 | | CMP + e-GFR |
| ordered | 03/27/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL |
| ordered | 03/27/2014 | | TSH |
| ordered | 03/27/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE |
| ordered | 03/27/2014 | | URIC ACID |

## Assessment Plan

**Allergic urticaria (708.0), Improved.**
**<u>COMMENTS:</u>**
cont fluids
**Other atopic dermatitis and related conditions (691.8), Improved.**
He is to schedule a follow-up visit for preventive care 2 Months .

Provider: David K. Livingstone MD 03/27/2014

Electronically signed by David K. Livingstone MD on 03/28/2014 08:57 AM

UPFULBRIGHT

UPFULBRIGHT000213

CONFIDENTIAL

UPFULBRIGHT

KANER MEDICAL GROUP

Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

| | |
|---|---|
| PATIENT: | Joe Fulbright |
| DATE OF BIRTH: | REDACTED |
| DATE: | 03/04/2014 04:15 PM |
| VISIT TYPE: | Office Visit |
| DOCUMENT TYPE: | Chart Note |

**History of Present Illness:**
This 53 year old male presents with:
1. rash
The patient presents for rash. Affected area(s) include back. The patient describes the affected area(s) as itchy. Associated symptoms include cracking, dry skin and pruritus. Pertinent negatives include bleeding, crusting, edema, erythema (skin), fatigue and painful rash.

Pt having severe break out on his back and side, states he does not think this is allergy related, thinks it is related to herpes simplex. States he was put on Valtrex years ago and this cleared it up. States this itches and it he rubs to get the itch gone it causes swelling.
also many food allergies, reacts on trunk and feet,

**Chronic Problems:**

**Past Medical/Surgical History:** (reviewed, updated)

| Condition | Year | Procedure/Surgery | Year |
|---|---|---|---|
| Bilat Carpal tunnel syndrome | 2009 | Bilat Carpal tunnel release | 2009 |
| gallbladder removal | 1990 | cholecystectomy | 1990 |
| Tonsillitis | 1965 | Tonsillectomy | 1965 |

**Medications started this visit**

| Medication | Directions |
|---|---|
| prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| 03/04/2014 | prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

**Medications stopped**

| Start Date | Medication | Directions |
|---|---|---|
| | prednisone 20 mg tablet | take 1 tablet by oral route 3 times every day |

**Allergies**

UPFULBRIGHT000214

CONFIDENTIAL

Reviewed, no changes.

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | |

**Family History:** (reviewed, updated)

| Yes / No | Disease Detail | Family Member | Name | Age |
|---|---|---|---|---|
| Yes | Alzheimer's Disease | Mother | | |
| Yes | CAD | Family h/o | | |
| Yes | CAD | Father | | |

## Social History (reviewed, updated)

The patient is right-handed.
Primary language is English.

**EDUCATION / EMPLOYMENT / OCCUPATION:**

| Employment | Emp. History | Emp Status | Retire Date | Restrictions |
|---|---|---|---|---|
| | Electronic Tech with Rail Road. | | | |

**TOBACCO:**

Smoking status: Current every day smoker.

| Use Status | Total Pk Yrs | Type | Per Day | Years Used | Pack Years | Year Quit |
|---|---|---|---|---|---|---|
| current | 760 | cigarettes | 20.00 | 38.00 | 760 | |

| Tried To Quit | Longest Tob Free | Relapse Reason | Passive Exposure |
|---|---|---|---|
| | | | |

**ALCOHOL:**

There is a history of alcohol use.

Review of Systems

| System | Negative | Positive | Comments |
|---|---|---|---|
| Constitutional | Chills, fatigue, fever, night sweats, weight gain and weight loss. | | |
| HEENT | Eye discharge, vision changes and vision loss. | | |

UPFULBRIGHT

UPFULBRIGHT000215

CONFIDENTIAL

UPFULBRIGHT

| | | |
|---|---|---|
| | Ear drainage, hearing loss and nasal drainage. | |
| Respiratory | Cough, dyspnea and wheezing. | |
| Cardiovascular | Chest pain, claudication, edema and irregular heartbeat/palpitations. | |
| Gastrointestinal | Abdominal pain, constipation, diarrhea and vomiting. | |
| Genitourinary | Dysuria, hematuria, penile discharge and polyuria. | |
| Metabolic / Endocrine | Cold intolerance, heat intolerance, polydipsia and polyphagia. | |
| Neuro / Psychiatric | Dizziness, extremity weakness, gait disturbance, headache and numbness in extremities.<br>Anxiety and depression. | |
| Dermatologic | Crusting, erythema, painful rash, pruritus, rash and swelling. | **Dry skin, Skin cracking.** |
| Musculoskeletal | Joint swelling and muscle weakness. | |
| Hematology | Easy bleeding and easy bruising. | |
| Immunology | Environmental allergies and food allergies. | |

## Vital Signs

| Time | BP mm/Hg | Pulse/min | Resp/min | Temp F | Ht ft | Ht in | Wt lb | BMI kg/m2 | BSA m2 |
|---|---|---|---|---|---|---|---|---|---|
| 4:41 PM | 150/78 | 76 | 18 | 98.9 | 5.0 | 10.00 | 300.30 | 43.08 | 2.59 |

**Measured By:**

| Time | |
|---|---|
| 4:41 PM | Charity R. Schulz |

## Physical Exam

**Constitutional:**



UPFULBRIGHT000216

CONFIDENTIAL

UPFULBRIGHT

Well developed.

**Eyes:**

Right

No injection.

Left

No injection.

**Ears:**

Right:

Unremarkable to inspection.

Left:

Unremarkable to inspection.

**Respiratory:**

Lungs clear to auscultation. Respiratory effort is normal.

**Cardiovascular:** Regular rate and rhythm. No murmurs, gallops, or rubs.

**Abdomen:**

Symmetric - no distention.

Integumentary

First visible lesion: The lesion is 30 cm. in size. The type of lesion is healing rash. The status is healing.

**Musculoskeletal:**

Normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.

**Extremities:**

No edema is present.

**Neurological:**

Memory: Intact .

Cranial nerves: II through XII are grossly intact.

**Psychiatric:**

The patient is oriented to time, place, person, and situation.

The patient demonstrates the appropriate mood and affect.

**Lab Studies:**

| Status | Lab Study | Timeframe | Date | Comments | Interpretation | Value |
|---|---|---|---|---|---|---|
| ordered | ANA REFLEX AUTOIMMUNE AB PROFILE | 3 Months | 06/04/2014 | | | |
| ordered | CBC W/AUTO DIFF | 3 Months | 06/04/2014 | | | |
| ordered | CMP + e-GFR | 3 Months | 06/04/2014 | | | |
| ordered | LIPID PROFILE WITH CALC NON-HDL CHOL | 3 Months | 06/04/2014 | | | |
| ordered | RHEUMATOID FACTOR, QUANT | 3 Months | 06/04/2014 | | | |
| ordered | SEDIMENTATION RATE | 3 Months | 06/04/2014 | | | |

UPFULBRIGHT000217

CONFIDENTIAL

| | | | |
|---|---|---|---|
| ordered | TSH | 3 Months | 06/04/2014 |
| ordered | UA, MICROSCOPIC, REFLEX TO CULTURE | 3 Months | 06/04/2014 |
| ordered | URIC ACID | 3 Months | 06/04/2014 |

**Office Procedures:**

| Status | Ordered | Order | Completed | Timeframe |
|---|---|---|---|---|
| ordered | 03/04/2014 | KENALOG 10MG 40 mg Intramuscular | | |

## Orders

| Status | Ordered | Completed | Order | Interpretation |
|---|---|---|---|---|
| ordered | 03/04/2014 | | follow-up visit for preventive care 3 Months | |
| ordered | 03/04/2014 | | ANA REFLEX AUTOIMMUNE AB PROFILE | |
| ordered | 03/04/2014 | | CBC W/AUTO DIFF | |
| ordered | 03/04/2014 | | CMP + e-GFR | |
| ordered | 03/04/2014 | | LIPID PROFILE WITH CALC NON-HDL CHOL | |
| ordered | 03/04/2014 | | RHEUMATOID FACTOR, QUANT | |
| ordered | 03/04/2014 | | SEDIMENTATION RATE | |
| ordered | 03/04/2014 | | TSH | |
| ordered | 03/04/2014 | | UA, MICROSCOPIC, REFLEX TO CULTURE | |
| ordered | 03/04/2014 | | URIC ACID | |
| ordered | 03/04/2014 | | KENALOG 10MG 40 mg Intramuscular | |

## Assessment Plan

**Other atopic dermatitis and related conditions (691.8). Symptomatic.**
SEDIMENTATION RATE, CBC W/AUTO DIFF, LIPID PROFILE WITH CALC NON-HDL CHOL, URIC ACID, TSH, RHEUMATOID FACTOR, QUANT, ANA REFLEX AUTOIMMUNE AB PROFILE, UA, MICROSCOPIC, REFLEX TO CULTURE and CMP + e-GFR to be performed 3 Months. Medications ordered today include KENALOG 10MG 40 mg Intramuscular to be administered. He is to schedule a follow-up visit for preventive care 3 Months .
**Allergic urticaria (708.0). Symptomatic.**
**COMMENTS:**
use H2 blocker and antihist at next onset

Provider: David K. Livingstone MD 03/04/2014

Electronically signed by David K. Livingstone MD on 03/06/2014 09:28 AM

UPFULBRIGHT000218

UPFULBRIGHT

CONFIDENTIAL

KANER
MEDICAL GROUP
Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

PATIENT: Joe Fulbright
DATE OF BIRTH: REDACTED
DATE: 02/26/2014 02:30 PM
VISIT TYPE: Office Visit
DOCUMENT TYPE: Plan

**History of Present Illness:**
This 53 year old male presents with:
1. rash
The patient presents for rash. This episode began 2 Months Ago. The symptom(s) are described as moderate, worse and occurs daily. Affected area(s) include the entire body. The patient describes the affected area(s) as itchy, oozing and red. Associated symptoms include erythema (skin), painful rash and pruritus. Pertinent negatives include bleeding and cracking.

**Chronic Problems:**

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| | prednisone 20 mg tablet | take 1 tablet by oral route 3 times every day |
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

## Allergies

New allergies added during this encounter. Active list below.

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | |

## Vital Signs

| Time | BP mm/Hg | Pulse/min | Resp/min | Temp F | Ht ft | Ht in | Wt lb | BMI kg/m2 | BSA m2 |
|---|---|---|---|---|---|---|---|---|---|
| 2:27 PM | 144/90 | 96 | 14 | 98.2 | | | 306.50 | | |

**Measured By:**

| Time | |
|---|---|
| 2:27 PM | Kenya Ponce |

UPFULBRIGHT

UPFULBRIGHT000219

CONFIDENTIAL

UPFULBRIGHT

## Assessment Plan

**Other atopic dermatitis and related conditions (691.8), Symptomatic.**

pt given a note to return to work in 3 days. He will be referred to the allergy clinic for further treatment and evaluation

**Allergic urticaria (708.0), Symptomatic.**

Comments: F/u with Dr Livingstone for a physical

Provider: Veemal M. D'Souza MD 02/26/2014

Electronically signed by Veemal M. D'Souza MD on 02/26/2014 08:26 PM

UPFULBRIGHT000020

A. Through the call list and their on-duty/off-duty status.

Q. Okay. Explain to me how that would work. Now, if I'm a -- if I'm a dispatcher sitting in Omaha and I've got a report that there's a printer at a certain location in Fort Worth that needs attention, mechanics, what are the mechanics of how that dispatcher would know who to call?

A. It was our networks operation center. They weren't called dispatchers.

Q. Okay.

A. The networks operations center would get a call from a customer that a telephone was out in Ney Yard. They would pull up the Ney Yard call list and they would have the -- there would be four to five gang numbers on that call list for 1 through 5.

They would look at the number one and they would look and see if he is on duty or off duty. If he is off duty, it rolls to the number 2. If he is on duty, then the number 2 on the call list will take the call. If he's off duty, then it rolls to number 3.

So if the technicians that were not on that weekend rotation all marked off duty and the one technician that was on call, then he got the

call through the call rotation, the call list, and it rotating down to the on-call technician.

Q. How would a technician mark off duty?

A. They go into their tie-up. There was a tie-up screen for every technician and they go on their tie-up screen and mark on duty or off duty. They can mark on vacation, on duty, off duty, and they had places in there to put any type of documentation, you know, notes and telephone numbers.

Q. What's a tie-up screen?

A. Just exactly what it sounds like. A place that they would go on a computer to tie up.

Q. So marking off was something that was done on a computer system at Union Pacific?

A. Yes, sir.

Q. Did technicians ever neglect to mark off on the weekends that wasn't their volunteer weekend?

A. People make mistakes. It happens.

Q. And the rotation process that you've been describing, was that in place continuously from 2012 through 2015?

A. Yes.

Q. So if the caller -- I used the word "dispatcher," and you said that wasn't the right

term. What was the right term?

A. It's fine. You can use dispatcher.

Q. Okay. If the dispatcher went through that progression that you described and got down to somebody who is not marked off and called that person and wasn't able to reach them, was there a policy or procedure of what was supposed to happen next?

A. They would leave that -- if they got all the way down the list, they would leave that person a voicemail and then they would call me.

Q. Well, I mean, before they go all the way down the list. I'm still at Step 1 where they, you know, go through the list until they find the first person who's not marked off and that's the first person they call, and I'm asking what happens if that person doesn't pick up the phone line.

A. If everybody else is marked off like they should be and he's the only person marked on duty, then they would leave him a voicemail and call me.

Q. Okay. Would they call you immediately after leaving the voicemail or wait for some period of time?

A. It may vary. But it would be shortly after that depending on the criticality of the call.

Alzheimer's or whatever her issue was? Do you remember?

A. No.

Q. Do you recall a time where Fulbright really didn't want overtime because he was busy taking care of his mom?

A. He never discussed it with me that I can remember.

Q. Okay. All right.

In the last paragraph, the sentence that begins "he did make it clear," do you remember this being discussed --

A. No.

Q. -- in 2009?

A. No.

Q. You have said that all of the technicians were subject to call for emergencies, but is it correct that after the division between the restore and install tech, the install technicians were not going to be on call -- if you know, does on call have a specific meaning for you?

A. Yes, it does.

Q. What does that term mean to you?

A. On call means that you are making yourself available for after-hour emergencies.

Q. And is that different from being subject to call if a really bad emergency came up?

A. If a really bad emergency came up, it was all hands on deck.

Q. That's -- that's kind of what I'm getting at. It sounds like the things we read and what you've testified to, that if one of the technicians had volunteered to cover calls for the weekend, then the other technicians would not be on call, correct?

A. They're not on call, but that does not mean that they are not responsible to come out if needed. And it has happened that off-duty personnel were called in to assist with on-call personnel.

Q. Okay. But just to clarify, then, the way the rotation worked, the tech who had volunteered to take calls for that weekend would be the only one who was on call for that weekend; is that right?

A. That would be correct.

Q. But anybody could be called if an emergency arose --

A. Yes.

Q. -- also correct?

Okay. I think I get it.

You talked about safety, and I understand safety was a priority for the railroad,

correct?
A. Yes.
Q. Did Union Pacific have rules or policies that told you if you saw something unsafe that you had to report it somehow or document it somehow?
A. Yes.
Q. Do you recall where those rules were written down?
A. Yes. We had a standard core of operations.
Q. The general code of --
A. General code of -- yeah, of operations.
Q. GCOR?
A. Yeah. There were --
Q. Is that right?
A. -- about four different subtitles in our rule book. They had the GCOR, they had the engineering, and they were actually even working on a communication tab.
Q. Are you saying that somewhere in the GCOR it would say that your job as an employee would be to report safety concerns?
A. I don't know where it was in the book. I would assume that it was in the GCOR, but I don't know where in the rule book it would say that.

Q. Okay. But you agree that the policy at Union Pacific was if you see something unsafe or even if it might be unsafe, then you should speak up or document it somehow?

A. That is correct. And a lot of times that was in our safety meetings unless it was just abundantly somebody was going to get hurt here, that was brought out -- that was supposed to be brought out immediately.

If it was something other than that, then it was brought out in safety meetings.

Q. Do you know if Joe Fulbright had anything on his record about being unsafe?

A. No.

Q. Is that you don't know if he did, or are you saying --

A. I don't recall. I don't remember him ever being on -- being brought up as unsafe for any reason or --

Q. And that's my question, whether you have a specific recollection that he got written up for a safety violation or that he was frequently the subject of complaints. That's not the case, right?

A. On safety.

Q. Right.

A. Yes, that's correct.
Q. Give me a second to get to another document here.
This one I actually was able to mark as an exhibit. So I'm showing you what I marked as Neal Deposition Exhibit 2. I skipped 1 for now.
(Exhibit 2 marked/introduced.)
Q. (BY MR. ULOTH) And my first question is just going to be whether you remember ever having seen this thing before. And now that I've shown you the whole page, I'll zoom in on it a little bit.
Did you remember ever seeing this before?
A. No.
Q. This is dated -- looks to be 2012 August 16. And if you would, read where -- read the narrative, the six or seven lines next to narrative and let me know when you've read it?
A. (Reviewing document.) Okay. I'm ready.
Q. Do you remember anything about the events that are described there in the narrative?
A. No, sir, I do not.
Q. Do you remember discussing Joe Fulbright with Bracken around this time frame, August of 2012?
A. Discussing Bracken with Joe Fulbright?

reason now to doubt that you were aware of the medication Fulbright took back in 2014?

A. November 2014, two months prior to when I remember, you know, truly knowing about it. So I'm looking two months prior.

Q. Okay. And this last sentence you said "work within the medical department." Do you know if Mr. Fulbright followed up on your request?

A. I don't remember.

Q. Do you remember talking to him about him asking for FMLA based on, you know, that's how he handled your request?

A. I don't remember what he did after this. All I know is that in January, two months later, evidently it escalated that we needed -- we needed to sit down and discuss what was going on. And at that time we determined that he needed to be evaluated, you know, by medical.

Q. Okay. Well, let's talk about that.

I'm showing you now what I marked as Neal Exhibit 4.

(Exhibit 4 marked/introduced.)

Q. (BY MR. ULOTH) Are you seeing that on your screen?

A. Yes, sir.

Q. And I'll zoom in. But my first question is going to be whether you recognize this document.
A. Yes.
Q. Okay. And that's your signature above the line that says "manager signature"?
A. Yes.
Q. So this is a document that you presented to Mr. Fulbright on January 26, 2015, correct?
A. Yes.
Q. And do you remember that being a Monday?
A. No.
Q. Okay. What -- what is a formal conferencing training?
A. It is -- the way I remember, there were different steps within a discipline process, whether it be just an informal conference, a formal conference, a conference with training. And this -- a conference with training, if deemed necessary, then we can, you know, recommend, you know, alternative training for the employee.
Q. I believe then that you have just said that a formal conferencing/training document is one method or step in the discipline process; is that correct?
A. Yes.

Q. And so by writing up this document and signing it and giving it to Fulbright, it was -- it was a disciplinary measure; is that correct?

A. Not necessarily. It could have been, but it could have not been depending on the circumstance.

Q. And as the circumstances unfolded, was it disciplinary or was it not disciplinary?

A. It was not disciplinary. And in that meeting, I had Mr. Fulbright's union representative with us. I had no one representing me or as my witness, so it was just the three of us -- the three of us sitting in the room.

And after it came to light and I said this is not a disciplinary action at the time, I talked with the union representative and Joe Fulbright and said, you know, we probably need to go to medical on this and I will, you know, fill out the paperwork on my end, but Joe needs to contact medical.

And I said I don't need anybody getting hurt or, you know, here, so I said Joe, just go home. And I specifically -- I remember saying I will pay you while the medical does their initial evaluation. Once I get the initial evaluation back

from medical, then you do what you have to do with your, you know -- oh, I can't remember the term. Where you get paid for not working. Disability. But I will pay you. I said this is not a discipline. You can go home, take your keys, take your vehicle, go home, and let's get medical started on this.

And both agreed at that time. Even the union rep said he never heard of anybody being able to -- to go home and get paid while medical evaluates the issue. So it turned out not to be any type of discipline handed out. It just -- we really needed to get to the bottom of what was going on and what -- how this medication affected Joe Fulbright.

Q. Are you saying that you told Mr. Fulbright to go home and not report to work the next day?

A. Yes.

Q. And --

A. With pay.

Q. How were you going to arrange it so that it was with pay?

A. I put his time in for him.

Q. What -- what would I need to look at to see to verify that in terms of documentation that I could ask the railroad to turn over for us?

had with Mr. Fulbright on January 26th, you had a -- you had another form written up and ready to go to hand him, did you not?

A. Another form?

Q. Yeah.

A. I'm not sure what you're talking about.

Q. Do you recognize Neal Exhibit 5?

(Exhibit 5 marked/introduced.)

Q. (BY MR. ULOTH) And I could zoom in if that will help.

A. Yeah, that would be helpful. I know it's a fit-for-duty. I didn't have that ready to go. That was filled out afterwards.

Q. Okay. But you do recognize Neal Exhibit 5?

A. Yes.

Q. And can you just explain in lay terminology what this form is?

A. It is a -- it's the manager's response for Joe's medical. After our conference and he -- we decided that it would be in everybody's best interest if Joe referred to medical department for his medication. So he has to contact medical, and then as a manager I have to fill out this form and send it in to medical to get everything started.

Q. And I'm going to go down to the box. I think you can see the little hand moving on the screen.

A. Yes.

Q. And this is to the right of something that says "unsteady walk" --

A. No.

Q. -- but that's not checked?

A. No.

Q. Where it -- the stuff in the -- the stuff written in the box that begins "I am requesting FFD eval," is that something that you typed into the form?

A. No. I do not believe so. I guess it must have. I'm reading. Yes. I -- that's a -- I filled that in.

Q. Okay. And the X's like where it says X next to yes and X next to sleeping, you would have put those X's there?

A. Yes, sir.

Q. And then going down a little bit where there's four numbered paragraphs, it looks like the typing that's in a little bit lighter shade, those are words that you typed in here; is that correct?

A. I'm looking. Right below your cursor?

Q. To the right of the cursor --
A. Oh, right there. Okay. Let me read, please. (Reviewing document.)
Yes. I wrote those.
Q. Look at No. 4. It begins "Please provide," and you wrote -- let me read this first sentence. "I am worried that the medicine could impair Mr. Fulbright further into his normal work shift."
That's what you wrote, correct?
A. Yes.
Q. Why were you worried that the medicine could impair Mr. Fulbright into his normal work shift?
A. Well, during the conversation, Mr. Fulbright told me that he takes the sleep medication and it works for eight hours. Okay. And then he can drive -- he can get into his vehicle and drive. He stated that he could not drive his vehicle during, when he was taking the medicine, but after eight hours the medicine wears off and he could drive his vehicle and come to work and he was fine.
I'm not a doctor. I don't know how long this medication lasts. I don't know the

effects of it lingering in his body. I at that point felt that he needed to go to medical and have somebody evaluate what he's taking and how it affects him.

Q. Had you observed him impaired during his normal work shift?

A. No.

Q. Had anybody reported to you that he might have been impaired during his normal work shift?

A. No.

Q. So the referral and the statement "I am worried" was, as you explained, because you're not a doctor and you're not an expert --

A. That is correct.

Q. -- is that right?

Okay. The next sentence "Is the medication UPRR approved." Did you know what medication he was taking?

A. I -- no. I'm sure Mr. Fulbright told me what the medication was, but to this day I could not give you what he was taking. I do not know what it is.

Q. Okay. And then I flipped forward to the second page of this deposition exhibit, and there's a box where it says "recap." And are those all

things that you typed into the form?

A. Yes.

Q. After you sent this form in, do you remember talking to anyone in the medical department about Mr. Fulbright and the manager referral?

A. I don't recall talking to anyone. I'm sure that I did have to, but I don't remember talking to anybody in particular.

Q. Do you remember telling somebody in the medical department that the medication impaired Mr. Fulbright's ability to remain alert at work?

A. No.

Q. And do you recall whether Mr. Fulbright continued to work for the rest of the week after you had given him the formal conferencing and training?

A. No, I do not. In my recollection I believe he went home that day.

Q. Do you remember discussing with Mr. Fulbright possible outcomes, things that you might be able to do after the evaluation to adjust his hours or work schedule?

A. No. I don't recall that.

Q. You don't recall offering that it might be possible that there would be a restriction Joe doesn't work at night?

Q. So the arm healed and he came back. It just -- he wasn't allowed that temporary measure of light duty in the meantime?
A. Yes, sir.
Q. Okay. Had -- did you write up any other technicians for missing calls?
A. Sure. Yes, sir.
Q. Do you remember any specifics?
A. No, not off the top of my head.
Q. Do you remember the names of any technicians that you wrote up for missing calls?
A. I can't come up with a single -- you know, single action there, so I -- I wouldn't want to throw a name out there without being for sure.
Q. Do you remember if any of them were actually disciplined as opposed to just the kind of document that you gave to Mr. Fulbright?
A. I never fully investigated an employee under -- that I initiated that went any further than a conference, whether it be an informal conference or a formal conference.
Q. Have you been working at all since your -- since you left Union Pacific?
A. No, sir. I have the best job in the world, and I love it.

## FORMAL CONFERENCING/TRAINING

Date: 01/26/15
Name: Joe M. Fulbright
Employee ID: 0443299

Check One:
__ Conference result of Employee option
X Conference result of Mutual Consent All Parties
__ Training result of Employee Option
__ Training result of Mutual Consent All Parties

Mr./Ms. Joe M. Fulbright
This is to confirm our conference on Jan 26, 2015 at 3:45 AM/PM
At the Radio Shop Davidson Yard in connection with events described below.
Location

Description of Event:

- Failure to take after hour call on 01/25/15. Ticket #05352044 Omaha NOC called Joe Fulbright twice at 7:35 pm and left vm, Called again at 8:13 and left Vm. NOC called manager Terry Neal, who instructed to call Edgar Hines. Terry Neal called Joe Fulbright at 8:11 and left message. Did Call back in 24 min Phone Record
- Terry Neal received a call from Joe Fulbright around 6:15 am on Jan 26, Joe stated he did not hear manager call due to taking sleep medicine. Manager Neal told Fulbright that we would be written up on formal conference, and he might want a Union Rep Present

Rules discussed:

**1.16:Subject to Call**

Employees subject to call must indicate where they can be reached and must not be absent from their calling place without notifying those required to call them.

**Rule Updated Date**

April 7, 2010

X I agree to have a conference.
__ I decline to have a conference
__ I agree to C.O.R.E Training.
__ I decline C.O.R.E Training

Employee signature

Manager signature

Mgr Telecom
Title

NOTE: This letter is NOT a form of discipline and will not be used in any subsequent disciplinary proceedings as evidence the employee previously allegedly violated the rules cited (except as explained at NOTE on Page 4 of this policy

UPFULBRIGHT

UP-OSHA0047

EXHIBIT
Neal Ex. 4

Topics for discussion:

- Missed Call
- Issue of Sleep Medication on nights were Joe is subject to afterhours calls
- I do not want to pursue discipline, We need to clarify if there is a sleep disorder or condition and what restrictions are needed. Therefore I am Manager Referring Mr. Fulbright into the Fit For Duty Program. Mr. Fulbright is not pulled from service, and will be given time to work with the FFD program. Joe must keep me informed when he needs to take off or leave early for the program.

UPFULBRIGHT

P R O C E E D I N G S

JASON BRADLEY ENSIGN,

Having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ULOTH:

Q. Would you just tell us your full name, please.

A. Jason Bradley Ensign.

Q. And, Mr. Ensign, it's my understanding you worked with Joe Fulbright at Union Pacific at some time. Correct?

A. Yes, sir.

Q. Well, before I get into that, would you give me a brief rundown of your professional work life, if you will? What kind of jobs have you held since getting out of school?

A. Okay. So I separated from the military in 2001. After that I immediately started working for Motorola as a field service engineer maintaining public safety municipalities, so police department, fire department. I was then hired locally by Union Pacific Railroad for their Davidson yard location there in Fort Worth, Texas, which is where I was living at the time, as an electronic tech -- senior electronic tech. I did that for eight and a half years. I was -- then finished up my degree going to school at night and started

working for BNSF Railway, so that's the other large Class I railroad in the United States. I was not in agreement with them. I was a supervisor, part of management, and I worked with them for about another seven years and then I was recruited by Canadian National Railway to take over their operations center in Chicago, Illinois.

So I relocated to Chicago, Illinois, worked with them for two years, got their PTC up and running, Positive Train Control was the technology that I was working with, and unfortunately myself and 700 other people were laid off in the first round of layoffs and so I relocated to a warmer climate to beautiful Melbourne, Florida. There I started off as a lead system engineer designing electronics for the railroad industry. So still involved in the railroad industry and I recently got promoted. I'm the senior program manager over the big commuter project here in Florida, All Aboard Florida. It's a high speed rail project.

Q. Sounds interesting.

A. It can be.

Q. Thanks for that summary. Let me focus you back on when you went to work at Union Pacific. Do you recall approximately what year or when you started at Union Pacific?

A. Yes, sir. It would have been 2003 to almost 2011, I believe.
Q. Okay. And you mentioned senior electronic or senior communication technician. Which was it?
A. Yes. Senior electronic technician.
Q. Was that your position the whole time you worked there?
A. Yes, sir.
Q. And was Joe Fulbright one of the other senior electronic technicians?
A. Yes, sir.
Q. Did you work -- work with him or was he just somewhere -- you know, somewhere else on the Davidson yard?
A. No, we worked together daily.
Q. Okay. Can you give me an idea, just a simple summary, the way you would explain it to somebody who doesn't know anything about railroads or technology, what was your job?
A. So maintaining any kind of -- it expanded during our time there because of the advancements in technology, but it -- anything communication related, being a network router, or a lot of our work had to deal with RF controlled signalling devices called CDC, so we maintained those. We also maintained dispatcher radios.

So radios that would be out in the field that would be utilized to the dispatchers to talk to train crews as they traverse across their -- their territory.

Q. Okay. I appreciate that. Now, at some point during your employment at Union Pacific, did Mr. Fulbright ever tell you that he was going to -- you know, that he had started taking a prescription medication?

A. Yes. So he'd explained some medical issues that he was having and having trouble sleeping. And we kind of noticed -- you know, he was -- once these issues started getting worse, we noticed that he wasn't the jovial, enthusiastic person that he was, but they put him on the trazodone and I believe that's what improved his sleep. And we -- once he was on the trazodone, it was a short amount of time, a few weeks, we started seeing a improvement in his demeanor and work performance and it was -- he was back to the old Joe, I guess.

Q. After he told you he was taking the trazodone and once he got back to the old Joe, as you put it, did he ever seem to be impaired or out of it in any way?

A. No, not at all. He was one of my -- so Joe and I have similar backgrounds as far as RF communication. I would say he's much more knowledgeable than me, so I

leaned on him a lot for knowledge and kind of training and getting me -- trying to get up to speed to the level that he was at, but, no, I never saw anything to where I thought he was impaired or performing subpar.

Q. What about safely? Did you ever see him do anything that made you fear for his safety or for the safety of others?

A. No, I would request him as my -- so anytime we're performing on track maintenance, that means that I'm going to be following the track. My body, head, arm somewhere is going to be on the track. We have to have a safety lookout and because of the trust and professionalism I had with Joe, I would always request him as my safety lookout. So if that gives you some insight, I'm literally putting my life and my safety in his hands. That's how much I -- I trusted him as a colleague.

Q. I'm going to switch to a little bit different topic. In the period before you left, maybe a couple of years before -- I really don't have an exact date for you, but maybe you can help me out. It's my understanding that the allocation of duties of the technicians was modified a little bit.

A. Yes, sir.

Q. Are you -- are you familiar -- do I need to

with me, he would try to find reasons to put me on probation because we were under union protection, right, and he would try to find reasons to put us on probation so we would lose that protection to kind of hold -- hold our feet to the fire. You know, you don't have this protection now, I can fire you -- the exact words, I can fire you -- if you don't have protection, I can fire you if I don't like the color of shirt you are wearing. And I was like, this is a toxic environment. I don't need to be in this.

Q. Did Mr. Neal -- Terry Neal ever tell you not to help Fulbright?

A. Not that I remember, sir. He may have and it -- like I said, it's just been a long time.

Q. Okay. Do you remember -- did Joe contact you after he lost his job at Union Pacific?

A. It was sometime after that, yeah, I think he contacted me. We -- he has contacted me since he lost his job.

Q. Has he asked you for help finding him other work?

A. Just to -- if -- if I hear anything, to let him know.

Q. Did you hear of anything that he might be suited for?

A. No, sir. Unfortunately, no.

Q. What -- what's been the trend in the industry since 2015?

A. So -- and here's the big -- it's what cost me my job was -- they call it PSR, precision scheduled railroading. It's -- all the major Class I's are kind of going through iterations of it. And it started off with huge layoffs. Whenever I was laid off there was, I believe, 700 other people that were laid off. So the -- the availability of work has been pretty limited in the rail industry.

MR. ULOTH: If we can I'd like to take a short five-minute break just to see if I have any other questions to ask you. Is that okay?

THE WITNESS: Fair enough.

MR. ULOTH: Okay. Can we take five, everyone?

THE REPORTER: Sure.

MS. MILLER: Sure.

MR. ULOTH: Okay.

MS. MILLER: Back on at 1:31?

MR. ULOTH: Yes, ma'am.

(Recess taken)

MR. ULOTH: All right. Jodi, whenever you're ready.

THE REPORTER: I just started it.

MR. ULOTH: Okay. Mr. Ensign, I believe we are back on the record and I appreciate you letting me take that break, but I don't have any further questions for you so I'm going to pass the witness.

MS. MILLER: Thank you, Mr. Uloth.

EXAMINATION

BY MS. MILLER:

Q. Jason, I do have a couple of -- I'm sorry. Is it okay if I call you Jason or would you prefer Mr. Ensign?

A. Nah, Jason is cool.

Q. All right. Thank you. I do have a couple of things I just want to follow up on, some -- some of the questions Mr. Uloth asked you and per some of the answers that you provided. And just for the sake of sort of being consistent with the prior record before the break I'm just going to go in the same order that Mr. Uloth asked you those questions and you provided certain answers.

A. Okay.

Q. Towards the beginning of the questioning with Mr. Uloth -- and -- and -- and I'm going to do my best to recap the question/answer as close to the record as possible. I know Mr. Uloth will jump in if I happen to

misstate any prior testimony or questioning. And then we can have Jodi read that back as necessary if that's what we need to do.

Earlier in the deposition Mr. Uloth asked you whether Mr. Fulbright had ever told you that he had started taking prescription medication and in answer to that you talked about that he had started taking trazodone and then you stated that you had -- that you saw improvement in his demeanor and work performance. What did you mean by that?

A. So, I mean, just like any of us, if I don't get a good night's sleep I'm often grumpy, not as social, maybe not as energetic at work and so that -- we were seeing kind of -- and we all -- you know, we worked close together so we were concerned with Joe before he started taking the medication because he was like a different person and he -- no enthusiasm, not -- not joking around, having fun. And he was -- he was a person prior to that that I'd kind of leaned on for -- for help and guidance and helping train. And so we saw a period of time where that went away and that was concerning for all of us, not just from a professional level but from a personal level. Cared about the guy. But then we saw him start the medication, it was -- getting more fully rested and we kind of saw the old Joe

come back again.
Q. Okay. Thank you. But in regards to his work performance specifically that you said that you saw an improvement in, what did you mean?
A. Oh, just -- so more enthusiastic about helping out colleagues, jumping on calls, getting our comms -- our installations done in a timely fashion. I just saw a big improvement.
Q. So are you saying that prior to that, that his calls were -- his responses were untimely or that he wasn't jumping on calls?
A. I wouldn't say untimely. Just not as -- the -- the time it would take him to do something would be longer, right? He would -- he would always do what he needed to do to get the job done, but just not with the speed that we were used to.
Q. Not the speed that you were used to? Is that the same as the speed that was expected?
A. I'm not sure what the expectations were.
Q. Okay. All right. Now, I'm going to jump -- jump topics here a little bit again just kind of going through the track of Mr. Uloth's questioning also. During your deposition he asked you about the -- the group meetings. Was it ever discussed during these group meetings openly that Mr. Fulbright was taking

trazodone? And you mentioned in some safety meetings. Do you recall when these safety meetings occurred that it was discussed openly that Mr. Fulbright was taking trazodone?

A. Do I recall that specifically? Is that what you're asking?

Q. Yes.

A. Yeah, I mean, it was open forum. Right? We were -- because we worked -- in those meetings we would openly discuss anything safety related. Right? And that's why I brought the -- the topic of, hey, if I get woke up in the middle of the night, am I in violation of this cardinal rule by responding to this call. And so that -- to the best of my knowledge, that's when that was kind of brought up that, hey, Joe's on this medication. You know, it's -- when he's on it it's probably not the best that he would drive.

Q. Let me -- let me rephrase the question slightly to clarify what it is that I'm asking. When I say, do you recall when these safety meetings occurred, I'm asking do you recall a date reference as to when these safety meetings occurred that it was discussed openly that Mr. Fulbright --

A. Do I recall a date that happened 12 years ago? No.

Q. Do you remember a rough timeframe?
A. 12 years ago.
Q. Okay. Exactly? Like just only 12 years ago?
A. It was when I was employed there.
Q. Okay.
A. Before I left, so I'm --
Q. All right. And stepping aside from the when, tell me exactly how it was discussed that Mr. Fulbright was taking trazodone.
A. Oh, it was brought up when we were talking about being able to respond to tickets or calls whenever we were woke up in the middle of the night, right, because it was -- it was -- it all seemed to surround around the cardinal rule of not being able to operate a company vehicle unless you're fully rested, well and feel safe to do so.
Q. Do you recall who brought it up?
A. It was a topic of the safety meeting, so it was whoever the -- the safety manager was at the time. I believe that may have been John McKenzie. I'm not sure. But it was --
Q. So you're saying the fact it was discussed openly that Mr. Fulbright was taking trazodone was a safety meeting topic?
A. No, no, no. No. The topic was the cardinal

rules as it applies to us being able to operate company vehicles.

Q. And you --

A. Nothing's -- go ahead.

Q. You recall who brought it up as related to that topic that Mr. Fulbright was taking trazodone?

A. I don't remember.

Q. I'm sorry. It slightly cut out. It sounded like you said, I don't remember.

A. I don't remember who brought it up.

Q. Thank you. That was just a -- like a glitch in the feed there.

And so how was it openly discussed? It was not so much the rule that was the topic of the meeting, but Mr. Fulbright taking trazodone?

A. What do you mean, how was it brought up?

Q. No, I asked you that. You answered that. Thank you.

A. Okay.

Q. How was it discussed in terms of what was discussed?

A. What -- what was discussed was that we have to obey the cardinal rules, that they're a terminable offense.

Q. I understand that. We've established that.

I'm talking about what was discussed as related to Mr. Fulbright taking trazodone?

A. What I just said. If you're not fully rested and you don't feel well to operate a company vehicle you shouldn't do so.

Q. So you're saying that it was discussed that him taking trazodone as it related to that particular rule, that you decided that was just sort of the -- that was it?

A. Yes.

Q. Okay. How many meetings did you discuss that cardinal rule that this was discussed openly? Do you recall?

A. As it pertains to Joe or just that cardinal rule in particular?

Q. As it pertains to Joe.

A. Just that one meeting is when I -- is -- is all I recall.

Q. And that one meeting was 12 years ago?

A. Roughly, yes.

Q. Okay. Mr. Uloth showed you a document and asked you, is this a statement that you signed a few years back and you said yes. And we can bring that document back up if you need to see it again. My question is -- that you said yes, that you agreed with

Mr. Uloth was asking you what had -- what had changed in the industry since 2015 and this was related to a question right before that where he asked you if you were helping Mr. Fulbright find work. And then part of your answer to what's changed in the industry since 2015, you mentioned precision scheduled railroading and that availability of work has been limited. How so? How has availability of work been limited since precision scheduled railroading in your personal opinion?

A. Do -- do you know anything about PSR?

Q. Yes, I do. Thank you.

A. Okay. So they laid a bunch of people off and so before if -- if they're wanting to increase -- or bring the work force back up, first they have to re-call those people that they laid off before they can offer it to any -- anyone new. So that kind of limits the availability for someone that wasn't laid off during that time period.

Q. So as related to helping Mr. Fulbright find work, if you ever heard of anything, how is that connected, that the availability of work has been limited since PSR to opportunities for Mr. Fulbright that you might advise him of?

A. I didn't see any positions opened.

Q. What kind of positions were you looking for?
A. Electronic technician positions.
Q. Did he give you any type of parameters in terms of geography or anything?
A. Not that I remember. No.
Q. So did you interpret that as meaning he'd go -- go anywhere geographically?
A. He just -- he just wanted to work again.
Q. Okay. All right. One more question. Well --
A. Okay.
Q. There might be some follow-ups. There's never just one more question, as Mr. Uloth knows.
In regards to working on call, the rotations that were discussed during the prior deposition record here, you said that if you weren't on the rotation, if it wasn't your week, you could do whatever you want. Was there ever a situation in which you actually could be called even if it wasn't your week on the rotation?
A. You weren't required to answer.
Q. Could you be called though?
A. You could -- I -- they could probably call -- I don't see how they would know to call you because the -- so every -- all the calls originated from Omaha and they would have a list of who was on call during that time.

Is it possible that they could call you when you -- when you weren't on call that week? I guess. But the understanding was that there was no repercussion for you not answering those calls.

Q. Could -- could -- was there ever a situation or could there be a situation, I guess, when there's a circumstance that requires kind of all hands on deck, you know, some catastrophic emergency situation that even though it's not your week, you could be called?

A. The only time I recall that was there was a hurricane down in the Houston area, but, of course, we had advance -- we knew the hurricane was coming. We kind of knew stuff was going to get destroyed, so they were looking for people to -- not just leave them on call but be available for work for that, but that was a natural disaster kind of thing. That wasn't a -- a normal occurrence of work.

Q. Okay.

MS. MILLER: I don't think I have any more questions. Thank you.

THE WITNESS: Okay.

MR. ULOTH: Nor do I. So Mr. Ensign, we appreciate your time and we can wrap it up and go off the record. Thank you.

THE WITNESS: All right. Thank you, sir.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOE M. FULBRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:20-cv-2392** |
| | ) | |
| **UNION PACIFIC RAILROAD COMPANY** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S THIRD SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Union Pacific Railroad Company ("Union Pacific") by and through its undersigned counsel, hereby serves the following third supplemental answers and objections to Plaintiff Joe M. Fulbright's ("Plaintiff" or "Fulbright") First Set of Interrogatories, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, as follows:

**RESERVATION OF RIGHTS WITH REGARD TO ANSWERS**

(A) The following answers represent the best information ascertained by Union Pacific and are based upon information obtained from records, files and individuals within its possession, custody, control or employ. Union Pacific reserves the right at any time to revise, correct, add to, or clarify any of the answers provided herein.

(B) The answers provided herein are subject to the right of Union Pacific to object on any ground, at any time, to a demand for further response to these or other interrogatories, requests for admissions, and requests for production of documents, or other discovery procedures involving or relating to the subject matter herein.

(C) Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Union Pacific reserves the right to answer an interrogatory by specifying the business records from which the answer may be derived or ascertained where the burden of deriving or ascertaining the answer is substantially the same for Plaintiff as it is for Union Pacific.

By answering these interrogatories, Union Pacific does not concede the relevancy or admissibility of the information provided.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Identify, by name, residence address, and personal (not work) phone number, each person who has knowledge of facts relevant to this case, and provide a brief description of each person's connection to the case and the subjects on which you believe they have knowledge. Include all persons named in your responses to these interrogatories.

**ANSWER:** Union Pacific refers Plaintiff to the individuals disclosed in its Initial Disclosures under Rule 26(a)(1), and any supplements thereto. Union Pacific reserves the right to supplement this answer as additional individuals become known to it.

**FIRST SUPPLEMENTAL ANSWER – MAY 21, 2021**: Union Pacific refers Plaintiff to the individuals disclosed in its Initial Disclosures under Rule 26(a)(1), and any supplements thereto. The individuals Union Pacific identified in its Initial Disclosures are both (1) individuals likely to have discoverable information that Union Pacific may use to support its claims or defenses and (2) individuals with knowledge of relevant facts. Union Pacific reserves the right to supplement this answer if additional individuals become known to it during the course of discovery.

**INTERROGATORY NO. 2:** Describe the essential functions of the job Plaintiff last held, and identify any documents describing any of the essential functions of that job. If you contend that being on call was an essential function, please also identify the documents that describe this essential function.

**ANSWER:** Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically to Union Pacific's Electronic Technician Job Description previously produced at UPFULBRIGHT000681-686.

**INTERROGATORY NO. 3:** Name each person who had a say in deciding to place Fulbright on medical leave in early February 2015, and explain why Fulbright was not allowed to continue working during the fitness-for-duty evaluation.

**ANSWER:** Union Pacific objects to Interrogatory No. 3 in its use of the phrase "each person who had a say" as vague and ambiguous. To the extent this interrogatory seeks information regarding the identity of those involved with the decision to remove Plaintiff from service pending a fitness for duty evaluation, Union Pacific identifies the following individuals:

1. Dr. John Charbonneau conducted the medical evaluation of Plaintiff.
2. Terry Neal completed a Supervisor Initiated Fitness-for-Duty Request Form regarding Plaintiff and reviewed Plaintiff's restrictions and determined that they could not be accommodated.

Union Pacific further states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Medical Comments History and Medical Records previously

produced at UPFULBRIGHT000085-268 to ascertain the restrictions placed on Plaintiff as a result of his medical condition.

**INTERROGATORY NO. 4:** Provide the names of each person involved in your fitness-for-duty evaluation of Plaintiff, describe what each of these persons did in connection with the evaluation, and name the person or persons who made the final determination.

**ANSWER:** Union Pacific objects to Interrogatory No. 4 in its use of the phrase "who made the final determination" as vague and ambiguous in that it fails to describe what "determination" the individual this interrogatory seeks information regarding, ultimately rendering the request unintelligible. To the extent this interrogatory seeks information regarding the identity of those involved with the decision to remove Plaintiff from service pending a fitness for duty evaluation, Union Pacific identifies the following individuals:

1. Dr. John Charbonneau conducted the medical evaluation of Plaintiff.
2. Terry Neal completed a Supervisor Initiated Fitness-for-Duty Request Form regarding Plaintiff and reviewed Plaintiff's restrictions and determined that they could not be accommodated.
3. Any individual identified in Plaintiff's Medical Comments History, including any Fitness-for-Duty nurse identified therein was "involved" (as Defendant understands the term) in Plaintiff's Fitness-for-Duty process.

Union Pacific further states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific identifies the following individuals:

1. Dr. John Charbonneau conducted the medical evaluation of Plaintiff and issued Plaintiff medical restrictions in making the fitness-for-duty determination.

2. Terry Neal completed a Supervisor Initiated Fitness-for-Duty Request Form regarding Plaintiff, reviewed Plaintiff's restrictions from Dr. John Charbonneau, and determined that they could not be accommodated in Plaintiff's current role.

3. Any individual identified in Plaintiff's Medical Comments History, including any Fitness-for-Duty nurse identified therein was "involved" (as Defendant understands the term) in Plaintiff's Fitness-for-Duty process.

Union Pacific further states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264.

**INTERROGATORY NO. 5:** For each person involved in the fitness-for-duty evaluation of the Plaintiff, identify the Bates numbers of the documents that each person had available to them in connection with the evaluation.

**ANSWER:** Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically to Union Pacific's Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**INTERROGATORY NO. 6:** Name each person who had a say in deciding to impose the work restrictions that were communicated to Plaintiff on or about July 1, 2015, and explain why each restriction was necessary.

**ANSWER:** Union Pacific objects to Interrogatory No. 6 in its use of the phrase "each person who had a say" as vague and ambiguous. To the extent this interrogatory seeks information regarding the identity of those involved in imposing work restrictions on Plaintiff as a result of his medical condition, Union Pacific states that Dr. Charbonneau issued Plaintiff's restrictions. Union Pacific further states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** To the extent this interrogatory seeks information regarding the identity of those involved in imposing work restrictions on Plaintiff as a result of his medical condition, Union Pacific states that Dr. Charbonneau issued Plaintiff's restrictions. Union Pacific further states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**INTERROGATORY NO. 7:** Describe the facts supporting your affirmative defense number 3: "Plaintiff was not qualified because he could not safely perform the essential functions of his position with or without a reasonable accommodation because he would be a direct threat to the safety of himself or others."

**ANSWER:** Union Pacific objects to Interrogatory No. 7 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this

litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 7 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific refers Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, the Medical Rules previously produced at UPFULBRIGHT000906-918, and the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific objects to Interrogatory No. 7 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 7 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific refers Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, the Medical Rules previously produced at UPFULBRIGHT000906-918, and a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264.

**SECOND SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific states that Plaintiff was not qualified because he could not safely perform the essential functions of his position with or without a reasonable accommodation because he would be a direct threat to the safety of himself or others. In particular, Union Pacific issued medical restrictions in June 2015, after Plaintiff was unwilling to undergo a sleep medicine evaluation requested by Union Pacific, because Plaintiff's medication, Trazodone, is so long-acting that Plaintiff cannot take the medication and work for the ensuing 24 hours. The known and well-documented side effects of Trazodone, which was in fact prescribed to treat Plaintiff's insomnia by assisting him in falling and staying asleep, are not compatible with the essential functions of his job as a Senior Electronic Technician. Should Plaintiff report to work within 24 hours of having taken his prescribed insomnia medication and still be under the influence of such medication due to its long-acting effects, the side effects Plaintiff may experience pose immense safety risk. For example, safely operating heavy equipment and working at unprotected heights, both of which are essential functions and basic requirements of a Senior Electronic Technician, require astute situational awareness. If Plaintiff became confused or unsteady during either activity, due to the side effects of Trazodone, he risks losing situational awareness which creates significant safety risk for himself and those working around him and those working under or around any heavy moving equipment being operated by Plaintiff. To the extent Interrogatory No. 7 is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, Union Pacific states that based on the documentation available and discovery exchanged to date, Plaintiff has not ceased and does not intend to cease taking Trazodone and he has declined to undergo a formal sleep medicine evaluation to explore other treatment options. Accordingly, as long as Plaintiff

continues to take Trazodone and work within 24 hours of taking his medication, he is not qualified because in the absence of eliminating essential job functions or evidence that Plaintiff has ceased taking Trazodone, he cannot safely perform his essential job functions and is a direct threat to the safety of himself and others. Union Pacific further states that information in support of the above answer and responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Medical Rules previously produced at UPFULBRIGHT000906-918, a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264, the General Code of Operating Rules previously produced at UPFULBRIGHT001260-1502, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 8:** Describe the facts supporting your affirmative defense number 7: “Plaintiff failed to mitigate his damages... [etc.]”

**ANSWER:** Union Pacific objects to Interrogatory No. 8 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation.

Union Pacific further objects to this Interrogatory because it seeks information in Plaintiff's possession or equally available to Plaintiff. Plaintiff is the best and most reliable source of information regarding his efforts to mitigate his alleged damages in this case. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**FIRST SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific objects to this Interrogatory because it seeks information in Plaintiff's possession or equally available to Plaintiff. Plaintiff is the best and most reliable source of information regarding his efforts to mitigate his alleged damages in this case. To the extent Interrogatory No. 8 is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, Union Pacific states that Plaintiff has produced insufficient documentation to support any argument that he used reasonable diligence to mitigate his damages. Specifically, Plaintiff has produced documentation indicating that during a 12-day period in February 2016, he created online user accounts with LiveCareer and Indeed, submitted a resume to Lockheed Martin, and applied for a handful of jobs with various employers. Plaintiff also produced documentation indicating that on one single day in March 2016, he applied to a job and that on one day in May 2016, he submitted his resume to the Fort Worth Transportation Authority and applied to a job. Plaintiff's documentation (JF000195-214 and JF000226-227), which is the entirety of evidence produced by Plaintiff to date regarding Plaintiff's attempts to mitigate his damages, demonstrates, at best, a speckled effort during a 12-day period in February 2016, on one day in March 2016, and on one day in May 2016. Seeing as several years passed between the time of Plaintiff's last efforts and when Plaintiff filed this lawsuit, Plaintiff has failed to demonstrate any modicum of reasonable

diligence on his part to find a comparable job. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**SECOND SUPPLEMENTAL ANSWER – MAY 21, 2021**: Plaintiff has produced insufficient documentation to support any argument that he used reasonable diligence to mitigate his damages. Specifically, Plaintiff has produced documentation indicating that during a 12-day period in February 2016, he created online user accounts with LiveCareer and Indeed, submitted a resume to Lockheed Martin, and applied for a handful of jobs with various employers. Plaintiff also produced documentation indicating that on one single day in March 2016, he applied to a job and that on one day in May 2016, he submitted his resume to the Fort Worth Transportation Authority and applied to a job. Plaintiff's documentation (JF000195-214 and JF000226-227), which is the entirety of evidence produced by Plaintiff to date regarding Plaintiff's attempts to mitigate his damages, demonstrates, at best, a speckled effort during a 12-day period in February 2016, on one day in March 2016, and on one day in May 2016. Seeing as several years passed between the time of Plaintiff's last efforts and when Plaintiff filed this lawsuit, Plaintiff has failed to demonstrate any modicum of reasonable diligence on his part to find a comparable job. Union Pacific will supplement this answer if more information becomes available in the course of discovery.

**INTERROGATORY NO. 9:** Describe the facts supporting your affirmative defense number 12: "Union Pacific alleges that each purported cause of action in the Complaint is barred, in whole or in part, because if Plaintiff is determined to have made any requests for accommodation, such proposed accommodations would have created an undue hardship to the operation of Union Pacific's business."

**ANSWER:** Union Pacific objects to Interrogatory No. 9 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 9 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician Job Description previously produced at UPFULBRIGHT000681-686. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific objects to Interrogatory No. 9 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 9 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician Job Description previously produced at

UPFULBRIGHT000681-686 and a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**SECOND SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** To the extent Union Pacific interprets Plaintiff's claim that management had at one time agreed or supposedly decided that Plaintiff could defer calls to work overtime or otherwise be excused from attendance or working hours requirements (because he was unsafe to work due to being under the influence of Trazodone when expected or called to work) as a request for accommodation going forward, Union Pacific states that based on the documentation available and discovery exchanged to date, such an accommodation, if deemed one, creates an undue hardship to the operation of Union Pacific's business insofar as it requires Union Pacific to identify a replacement worker on those occasions when Plaintiff will not or cannot accept an overtime call or otherwise report for duty as scheduled, expected, or required. As Plaintiff is a union employee and work assignments are largely, if not entirely, governed by a bona fide seniority system, requiring another union employee to cover unexpected work assignments disadvantages that employee. Additionally, the medical restrictions issued by Union Pacific in June 2015 could not be accommodated without eliminating one or more essential functions of the Senior Electronic Technician position, which also would cause undue hardship insofar as Union Pacific would have to identify and coordinate qualified manpower who could cover any essential functions that were eliminated for Plaintiff but that are still required responsibilities of a Senior Electronic Technician. Union Pacific further states that information in support of the above answer and responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician Job Description previously produced

at UPFULBRIGHT000681-686, a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264, the General Code of Operating Rules previously produced at UPFULBRIGHT001260-1502, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 10:** Describe the facts supporting your affirmative defense number 18: "Plaintiff posed a direct threat to the health and safety of himself and/or others that could not be eliminated by reasonable accommodation."

**ANSWER:** Union Pacific objects to Interrogatory No. 10 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 10 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific refers Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, the Medical Rules previously produced at UPFULBRIGHT000906-918, and the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific objects to Interrogatory No. 10 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 10 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific refers Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, the Medical Rules previously produced at UPFULBRIGHT000906-918, and a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264.

**SECOND SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific states that Plaintiff posed a direct threat to the health and safety of himself or others because the known and well-documented side effects of Trazodone, which was in fact prescribed to treat Plaintiff's insomnia by assisting him in falling and staying asleep, are not compatible with the essential functions of the Senior Electronic Technician position. Eliminating the direct threat would require that Union Pacific eliminate essential job functions or that Plaintiff eliminate and cease using Trazodone within 24 hours of reporting for work and making himself available for overtime calls or other emergency response, as required for the position, without being under the influence of Trazodone. Eliminating essential job functions is not a reasonable accommodation. Likewise, based on the documentation available and discovery exchanged to date, Plaintiff has not

ceased and does not intend to cease taking Trazodone and he has declined to undergo a formal sleep medicine evaluation in efforts to explore other treatment options that may be compatible with the essential functions of the Senior Electronic Technician position. Moreover, given that Plaintiff's medical restrictions, those issued by Union Pacific in June 2015, could not be accommodated in his then-current position as Senior Electronic Technician, Union Pacific invited Plaintiff to explore potential job reassignment as an accommodation, but Plaintiff was largely non-responsive and reassignment did not occur. Union Pacific further states that information in support of the above answer and responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Medical Rules previously produced at UPFULBRIGHT000906-918, a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264, the General Code of Operating Rules previously produced at UPFULBRIGHT001260-1502, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 11:** Describe the facts supporting your affirmative defense number 19: "To the extent Union Pacific made a disability-related inquiry, sought medical information, or required a medical examination of the Plaintiff during his employment, such inquiry or examination was job-related and consistent with business necessity."

**ANSWER:** Union Pacific objects to Interrogatory No. 11 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific further objects to Interrogatory No. 11 to the extent it might be interpreted as calling for the disclosure of information protected by attorney-client privileges or as calling in whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, and the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268.

**FIRST SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific states that any medical or disability-related inquiry of Plaintiff that sought medical information or required medical examination was made as related to known medical conditions or treatments reported by Plaintiff and for the sole purpose of determining his fitness for duty for his particular job as a Senior Electronic Technician. Union Pacific made such inquiries or requests based on its reasonable belief that Plaintiff's medical condition (a sleep issue) or medical treatment for an underlying condition (prescribed insomnia medication), that which Plaintiff reported, may either cause him to be unable to safely perform the essential functions of his job or may cause impairment that poses a direct threat to the health and safety of himself and others. Union Pacific's inquiries

and requests were limited to seeking information regarding Plaintiff's underlying medical condition and respective treatment, within the scope of a fitness-for-duty evaluation, relative to Plaintiff's job and consistent with business necessity. Union Pacific further states that information in support of the above answer and responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000085-268, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 12:** Describe the facts supporting your affirmative defense number 20: "To the extent the Union Pacific applied qualification standards to the position in question and such standards screen out, or tend to screen out, qualified individuals on the basis of disability, such standards are job related for the position in question and consistent with business necessity."

**ANSWER:** Union Pacific objects to Interrogatory No. 12 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific objects to Interrogatory No. 12 to the extent it might be interpreted as calling in

whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, and the Medical Rules previously produced at UPFULBRIGHT000906-918.

**FIRST SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific states that it did not apply a qualification standard to Plaintiff's position as a Senior Electronic Technician because a lawful medical evaluation under the ADA is not a qualification standard under the ADA's meaning. Regardless, Union Pacific's medical standards that are used by its Health and Medical Services Department to determine if medical restrictions should be placed on an employee due to a specific health condition that poses significant risk for sudden incapacitation or functional impairment impacting workplace safety, are consistent with scientific evidence about sudden incapacitation risk related to specific health conditions (sleep disorders, like insomnia, included), and are generally consistent with guidance from the Federal Motor Carriers Safety Administration. Union Pacific further states that information in support of the above answer and responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Medical Rules previously produced at UPFULBRIGHT000906-918, a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union

Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 13:** Describe the facts supporting your affirmative defense number 21: "To the extent Union Pacific applied safety-based qualification standards to the position in question and such standards screen out, or tend to screen out, qualified individuals on the basis of disability, such standards were necessary to eliminate a significant risk to the health or safety of the Plaintiff and/or others and the risk could not have been eliminated or reduced by a reasonable accommodation."

**ANSWER:** Union Pacific objects to Interrogatory No. 13 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and, as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific objects to Interrogatory No. 13 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, and the Medical Rules previously produced at UPFULBRIGHT000906-918.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific objects to Interrogatory No. 13 to the extent it is a contention interrogatory under Fed. R. Civ. Pro. 33 and,

as this is Plaintiff's first set of interrogatories and only minimal discovery has been exchanged between the parties at such an early stage in this litigation, such an interrogatory is not yet ripe for answer. Moreover, requiring an answer to this interrogatory would inherently require Union Pacific to articulate theories that are not yet fully developed, invade attorney work product privilege, and may require repeated supplementation. Union Pacific objects to Interrogatory No. 13 to the extent it might be interpreted as calling in whole or in part for a legal conclusion. Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Restricted Prescription Medications previously produced at UPFULBRIGHT000895-905, the Medical Rules previously produced at UPFULBRIGHT000906-918, and a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264.

**SECOND SUPPLEMENTAL ANSWER – FEBRUARY 12, 2021:** Union Pacific states that it did not apply a qualification standard to Plaintiff's position as a Senior Electronic Technician because a lawful medical evaluation under the ADA is not a qualification standard under the ADA's meaning. Regardless, Union Pacific's medical standards that are used by its Health and Medical Services Department to determine if work restrictions should be placed on an employee due to a specific health condition that poses significant risk for sudden incapacitation or functional impairment impacting workplace safety, are consistent with scientific evidence about sudden incapacitation risk related to specific health conditions (sleep disorders, like insomnia, included), and are generally consistent with guidance from the Federal Motor Carriers Safety Administration. Union Pacific further states that information in support of the above answer and

responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to the Electronic Technician job description previously produced at UPFULBRIGHT000681-686, the Medical Rules previously produced at UPFULBRIGHT000906-918, a portion of the Medical Comments History and Medical Records previously produced at UPFULBRIGHT000182-264, the General Code of Operating Rules previously produced at UPFULBRIGHT001260-1502, and certain provisions of the Agreement between Union Pacific and the International Brotherhood of Electrical Workers, Telecommunication Employees previously produced at UPFULBRIGHT001503-1662. Union Pacific will supplement this answer as more information becomes available in the course of discovery.

**INTERROGATORY NO. 14:** What income and benefits of employment would Plaintiff have received from February 6, 2015 and (a) the present, (b) date of trial, if he had remained employed and working full time in the position he last held? In your answer, identify any documents that include information supporting you response, and describe any changes to compensation and benefits that would have affected Plaintiff during these times.

**ANSWER:** Union Pacific states the information responsive to this interrogatory can be derived or ascertained from business records, and Union Pacific therefore invokes Fed. R. Civ. P. 33(d), specifically referring Plaintiff to his wage history previously produced at UPFULBRIGHT000010-17 and Collective Bargaining Agreement previously produced at UPFULBRIGHT0000687-894. Union Pacific also notes that Plaintiff served as a union employee, and thus his compensation and benefits are subject to a Collective Bargaining Agreement that is

inherently subject to renegotiation. Union Pacific will supplement this answer if more responsive information becomes available in the course of discovery.

**INTERROGATORY NO. 15:** Who replaced Plaintiff? If no one person replaced him, identify the persons who took over the duties Plaintiff had been performing until he was placed on medical leave in February 2015.

**ANSWER:** Union Pacific objects to the term "replaced" as vague and ambiguous. Union Pacific cannot determine any specific individuals who replaced Plaintiff. Plaintiff's job duties were performed by other existing employees in Plaintiff's same position following his termination.

**FIRST SUPPLEMENTAL ANSWER – JANUARY 12, 2021:** Union Pacific cannot determine any specific individuals who replaced Plaintiff. Plaintiff's job duties were performed by other existing employees in Plaintiff's same position following his termination.

Dated: May 21, 2021.

Respectfully submitted,

***/s / Heather M. Miller***

Heather M. Miller (TX #24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816-472-6400
Facsimile: 816-329-5954
hmiller@constangy.com

Derek McKee (TX #24108765)
Constangy, Brooks, Smith & Prophete, LLP

1201 Elm Street, Suite 2550
Dallas, Texas 75270
Telephone: 214.646.8625
Facsimile: 214.749.0078
dmckee@constangy.com

Robert L. Ortbals, Jr. (MO Bar #56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Blvd, Ste. 1325
St. Louis, MO 63105
Telephone: (314) 338-3740
Facsimile: (314) 727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of May, 2021 the foregoing was sent via electronic mail to the following:

Donald E. Uloth
18208 Preston Rd., Suite D-9 #261
Dallas, TX 75252
Don.Uloth@uloth.pro

ATTORNEY FOR PLAINTIFF

***/s/ Heather M. Miller***
Attorney for Defendant

VERIFICATION

STATE OF NEBRASKA )
) ss
COUNTY OF DOUGLAS)

Tammy Potter, being first duly sworn according to law, and upon oath, declares:

1. That Affiant is Senior Manager of Legal Support for Union Pacific Railroad Company upon which the attached Interrogatories were served and upon whose behalf Affiant makes this declaration.

2. That Affiant is authorized on behalf of Union Pacific Railroad Company to make this declaration and that Affiant has read the foregoing Third Supplemental Answers to Plaintiff's First Set of Interrogatories propounded to Defendant Union Pacific Railroad Company in the action entitled *Joe Fulbright v. Union Pacific Railroad Company.*

3. That the Interrogatories seek information from Union Pacific Railroad Company, and that no one individual employee of this corporation has personal knowledge of the information so as to permit that one individual fully and completely respond to all subjects addressed within these Interrogatories.

4. That while Affiant does not have personal knowledge of the facts cited therein, the information was collected and the answers were made only after a reasonable search for information relating to the subject Interrogatories.

5. Therefore, on information and belief, Affiant believes the attached Third Supplemental Answers to Plaintiff's First Set of Interrogatories to be complete and accurate to the best of Affiant's knowledge, based upon the information available at this time.

FURTHER AFFIANT SAYETH NAUGHT.

IN WITNESS HEREOF, Union Pacific Railroad Company has caused the attached Responses to be executed on its behalf this 20 day of May, 2021 by:

Tammy Potter

On behalf of Union Pacific Railroad Company

SUBSCRIBED TO AND SWORN before me this 20th day of May, 2021.

GENERAL NOTARY - State of Nebraska
MICKI ZOUCHA
My Comm. Exp. June 28, 2021

Micki Zoucha

Notary Public

DECLARATION OF CHRISTOPHER OZUNA

1. My name is Christopher Ozuna. I am over twenty-one (21) years of age and I am competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I first met Joe Fulbright in August 2008 when I began working for Union Pacific. We were both technicians, and we worked together continuously through January 2015.

3. Early on our professional relationship grew into a friendship, and I learned that Joe had a problem sleeping. It was obvious that he was fatigued at work.

4. Before he started taking Trazodone, Joe had trouble with his short-term memory. At the start of our shift Terry Neal assigned tasks for the day to each technician, but Joe would almost always forget even just a few minutes later. For example, Neal might assign Joe to repair an EOT (end of train) radio-communication device, to check on a company truck radio (communication radio), check on-site radio devices (that allowed train dispatchers to communicate with moving locomotives) and to check on printer issues that customers reported. Joe Fulbright would remember only one or two of the tasks he needed to accomplish, and then I would have to remind him of the rest of the work that needed to be completed. I recall this because I was not a senior electronic technician at the time, and Joe trained me on the railroad's RF systems (radio frequency). Once reminded of the next task Joe's work was excellent – his long term memory was still good and he always did his job.

5. Joe's daily life was also affected in other ways. Joe called me a couple of times a week during the night when I was sleeping, and he often did not realize the time – it might be 1:00 a.m. and Joe thought it was 9:00 p.m.

6. Joe was taking care of his mother at the time (between August 2008 and the time he started taking Trazodone) and he often had to reschedule her medical doctor appointments because he would forget about them. Three times when I was visiting Joe at his house, someone came to turn off one the utilities (electric, water) and he had to pay the provider right then and there to keep services from being terminated. This was not due to lack of funds but completely forgetting to pay them, and he would have to pay the bill plus extra fees every time.

7. From the time I met Joe until he was put on his medication, Joe was negative, had little patience with people, and talked as if the world was crashing down on him. However, after a month or so of him taking his sleeping medication, his everyday attitude completely changed for the better. He was joyful, he enjoyed people's company, and he had more energy. The late phone calls stopped and he was now sleeping and not up at all hours of the night.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9th, 2021.

Christopher Ozuna

DECLARATION OF JOE M. FULBRIGHT

1. My name is Joe M. Fulbright. I am over twenty-one (21) years of age and I am competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I began working as an employee of Union Pacific in March 1985 as a Communication Maintainer. At some point during the 1990's, I was promoted to the position of Senior Communications Technician, and I held this position from the late 1990's through June 2015.

3. On Friday, January 23, 2009, I saw Dr. Marie Kelly, a psychiatrist in Fort Worth, Texas, because I was having trouble sleeping. For many years before this appointment, I was having trouble getting to sleep and staying asleep. Most nights it took me at least an hour, sometimes two hours, to fall asleep. When I did sleep, it was never for very long, usually no more than an hour, and never more than two hours. I would never fall into a really deep and restful sleep. Because of my trouble sleeping, I was usually fatigued the next day to the point where I had trouble concentrating and remembering things. The following are some things I remember for the period from 2005 until January 2009 when I started taking Trazodone.

4. During these years, I was awake and out of bed anywhere from 3-5 hours per night after going to bed. I watched a lot of cable news on CNN and Fox News, and I spent a lot of time in the middle of the night just surfing the internet for things to kill time hoping I could get back to sleep. I also began research on the internet trying to find out why I couldn't sleep and if something might be wrong with me. I used to like the outdoors, camping, or just visiting with friends, but TV and the internet became my biggest pastimes because I was just too tired to do anything, and I became reclusive.

5. Sometimes a friend would call and we would talk, but I would not even remember what we had talked about the next time I talked to that person. I remember one year, I missed watching the Super Bowl because I got my days mixed up and didn't remember it was Sunday. Mixing up days happened a lot, and it seemed I was often a day off, so even when I did have something planned with someone to get out of the house and do something, I sometimes missed it because I didn't know what day it was. People got mad at me because they thought I was just ignoring them.

6. Several times I would think that I need to get up to do something, like take out the trash, but not feel like doing it and think to myself I'll do it later, only I would forget or just not do it because it was too much effort.

7. At work, my desk was covered with Post-It notes to remind me to do things, but I often forgot anyway. It was not unusual for me to go check on something, like checking the batteries on a device or a signal at an antenna, and then when I got there I did not remember what I came to do. The supervisor would give us a list of assignments in the morning, and just a few minutes later I might only remember only one of the tasks, coworkers had to remind me.

8. I was taking care of my mother back then. She had Alzheimer's, and I handled all of her medical appointments. Several times I just forgot, and we missed appointments, even a few times when I scheduled the appointment just a few days in advance.

9. Most days I was just tired and in a fog, and it was hard to think clearly. I remember at my father's funeral in 2008, I locked my keys in my car, for the third time in just the last few months. Another time I drove to Quest Auto Parts in Euless to buy something, but when I got there I realized I forgot to bring my wallet. Many times I would go to the grocery

store for something, buy some things, and then get home only to realize I did not buy the one or two things I most needed.

10. At the January 2009 appointment with Dr. Kelly, she did a couple of things to check my short and long term memory. She asked me to name as many U.S. Presidents as I could going back from the present, and I remembered quite a lot of them. She also did a thing where she told me the names of five common household items, then she read a story, after which she asked me to list back the items. I could only remember one. She concluded my long term memory was good, but short term was horrible. She asked me if I felt depressed. I told her yes because I'm hardly getting any sleep.

11. This sleep disorder disrupted my ability to lead a normal life as compared to most people, and as compared to how my life had been when I was younger, before I started having trouble sleeping.

12. At the January 23, 2009 appointment, Dr. Kelly prescribed Trazodone for the sleep disorder and Prozac for depression. The Trazodone helped almost immediately, and I was able to fall asleep and stay asleep for several hours at a time, which I could not do before. I did not like the way the Prozac made me feel, and once I started sleeping better, I no longer felt depressed, so I stopped taking the Prozac after just a few weeks.

13. On my next day at work after seeing Dr. Kelly, which was January 26, 2009, I told my immediate supervisor, Steve Hale, and his supervisor, Terry Neal, that I would be taking Trazodone at night to help me sleep. I may have mentioned the Prozac as well. Neal told me to call a nurse in the company's Health and Medical Services Department ("HMS" or "Medical" for short) to let them know. I called HMS that day, and I told a nurse in that department I would be taking Trazodone. It was not on the company's list of prohibited prescription medications, and

since I would be taking it on my own time, I was not asked to or required to do anything further. I got a letter reminding me to comply with Union Pacific's Drug and Alcohol Policy, and a true and correct copy of this letter is attached as Exhibit 1 (UPFULBRIGHT 1074-1075), but Union Pacific did not impose any work restrictions.

14. I worked at the Davidson Yard in Fort Worth, Texas along with six or seven other technicians who had the same job as me. We had monthly safety meetings, which were always led by Terry Neal. In the first safety meeting after I started taking Trazodone, I let everybody who did not already know (I had told some people already) that I would be taking Trazodone most nights to help me get to sleep. I explained that it made me drowsy so I could get to sleep, so it would be best if I did not have to get in a vehicle and drive somewhere to respond to after-hours calls from Union Pacific at night if I had already taken Trazodone. Terry Neal and everyone else agreed that I would not have to go out on calls if I had taken Trazodone already that night. I would never have gone to work or answered a trouble call from work during the 6-8 hours after taking Trazodone, and I never had to because I was never called.

15. I took Trazodone most nights for the next several years, until I lost my job in 2015 and could no longer afford the prescription. Trazodone helped me immensely, and with the benefit of better sleep, I was rested and I had more energy during the day. My concentration and thinking were clearer, and what I would call normal, like I was before the trouble sleeping started. I stopped having so much trouble remembering things and feel like I was back to normal in that regard as well.

16. However, I know that my sleep disorder did not go away, it was just being treated with the Trazodone, and if I was not taking the Trazodone the disorder would have still been substantially limiting in the ways I described above during 2015. I know this because, from

2009 through 2015 when I lost my job, I would sometimes go for one or two nights at a time not taking the Trazodone. On most of those nights, I would have trouble sleeping similar to what I experienced before I started taking Trazodone in 2009, and I would have some of the fatigue and concentration problems that I had before I started taking Trazodone. Because of this experience, I know that without the help of the Trazodone, in 2015 my sleep disorder was substantially limiting with respect to sleeping, concentrating, thinking, and remembering when not treated by the medication.

17. From January 2009 when I began taking Trazodone, through early February 2015 when I was pulled out of service, I was able to do my job, and do it well, and do it safely. During this period, I was never disciplined for performance, or warned about poor or substandard performance. My job performance and safety were never questioned, not even by a coworker. I was never written up or even verbally warned or questioned about safety, not even by a coworker. No one ever claimed that I was impaired in any way -- not by sleepiness, by medication, by anything -- while on the job. I was qualified to perform the essential functions of my job, which I know to be true because I did the job, I did it well, and I did it safely, for the entire six-year period that I worked at Union Pacific after being prescribed Trazodone.

18. During the years I was taking Trazodone, from late January 2009 through early February 2015, I was working a regular Monday through Friday day shift, roughly 7:30 a.m. to 3:30 p.m. At all other times when I was not on duty, I was not on call, with the exception of the volunteer rotation that the other technicians and I had. We took turns covering the weekends from the end of our shift on Friday afternoon through the start of our shift Monday morning, with the exception for me of Sunday nights.

19. On my on-call weekend, I did not take Trazodone on Friday or Saturday nights so I would not feel sleepy if I had to drive somewhere to fix or maintain something that needed attention. The same was true for holidays when I covered those, I did not take Trazodone on the first two nights. However, I always took Trazodone on Sunday night (or night three) so I would be rested for the work week. I explained this to Terry Neal, Steve Hale, and all of my coworkers, and no one said I shouldn't do it this way, and no one asked me to do anything differently.

20. During this six-year period, I do not remember ever being called to go work on something after 7 p.m., with one exception. I was on call the weekend of January 23-25, 2015. A little after 7:00 p.m. on January 25, 2015, I noticed I had missed a call a few minutes earlier from headquarters in Omaha, so I called the number that showed up on my caller ID. An automated system answered, and I was unable to reach a live person. I had not yet taken Trazodone that evening, and I could have responded if necessary, but it was close to my normal bedtime for Sunday of my on-call weekend, so after another twenty minutes or so when I did not get another call, I took Trazodone and went to sleep.

21. The next day, Terry Neal scheduled a meeting with me, and he said I might want a union representative present. That afternoon, I met with Terry Neal in his office, along with my union representative, Jim Espinoza. Neal handed me a two-page document called Formal Conferencing/Training. Neal told me this was not disciplinary, but I disagreed with something that it said, so I made a handwritten note on the document before I signed it. A true and correct copy of this document is included in this Appendix at App. 103-104 just after the excerpts of Terry Neal's deposition; it was marked as Exhibit 4 to his deposition, and is Bates numbered UPFULBRIGHT 951-952.

22. Neal also told me he was referring me to the company's medical department (HMS) for an evaluation. He said he was not removing me from service pending the results of the evaluation, which was also stated in writing on the Formal Conferencing/Training form. Neal even told me two or three times in this conversation that I was doing a good job, some of my best work ever. Neal explained that he just wanted something in writing from HMS indicating they were aware of my sleep disorder and medication, and saying whether there were any changes or work restrictions required. At the end of the meeting, Neal handed me a Supervisor Initiated Fitness-For-Duty Request Form. A true and correct copy of this document is included in this Appendix at App. 59-60 just after the excerpts of Dr. Charbonneau's deposition; it was marked as Exhibit 2 to his deposition, and is Bates numbered UPFULBRIGHT 182-183.

23. The following week, as I was getting home from work on February 3, 2015, I received a call from a company nurse telling me I would no longer be allowed to work while the fitness-for-duty evaluation was going on. I was placed on a medical leave, and I was not paid.

24. Thereafter, during the fitness-for-duty evaluation, Union Pacific asked me to provide "physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition." Attached to my declaration as Exhibits 2 and 3 are two letters that I received asking for these records Bates numbered UPFULBRIGHT 186-187 and 190-191 respectively). I had not seen Dr. Kelly since 2010, she retired, so there really wasn't anyone treating me for the sleep condition except for my primary care doctor, Veemal D'Souza at Kaner Medical Group, who refilled my Trazodone prescription. I therefore asked Kaner for their records. It took them several weeks to get them to me, and I faxed everything to Union Pacific on April 10, 2015.

25. Union Pacific had previously obtained my medical records from Kaner and other doctors in 2014 when they did two fitness-for-duty evaluations. With the records from these prior evaluations and what I faxed in April 2015, Union Pacific had all my physician clinic notes from Kaner and D'Souza going back a full two years from when they were requested. In other words, I provided Union Pacific with all medical records they asked me to provide.

26. On April 21, 2015, I received a phone call from Theresa Rodino and Dr. John Charbonneau. By this time I had started to record all my calls with HMS so I would have a record of what we discussed. I recorded each of the telephone calls mentioned in the remaining paragraphs of my declaration, and I recently had them transcribed. I then carefully reviewed each transcript while listening to the recording that I made, and I corrected the transcripts where necessary for accuracy and completeness. The transcripts attached to my declaration as Exhibits 6, 7, 8, and 9 are true and accurate written texts of the words spoken during each of the respective calls. A true and correct transcript of the April 21, 2015 call with Theresa Rodino and Dr. John Charbonneau is attached to this declaration as Exhibit 6.

27. During this April 21, 2015 call, I explained to Charbonneau that my psychiatrist who originally prescribed Trazodone retired, so I was not sure what information they wanted from Dr. D'Souza. Charbonneau said he wanted me to tell my primary care doctor that I was supposed to have a "sleep medicine evaluation" done by a "sleep medicine specialist," and if I carry that message to my doctor, he would not need to speak to her. He never asked me for permission to speak to my doctor and if he had, I would have been fine with that and given him her phone number.

28. I was not familiar with the term sleep medicine evaluation, but it sounded like he was asking for an evaluation of the sleep medicine, the Trazodone. Charbonneau did not explain

the term, he just said he wanted "some documentation that supports the nature of the problem, the risks and benefits are of the medicine you take, and things like that." He never said he wanted a sleep study, or testing of any kind. I agreed that I would do what he had asked.

29. And I did what Charbonneau had asked me to do. I made an appointment to see my primary care physician, Dr. Veemal D'Souza, and I went to see her on April 27, 2015. I told her what Charbonneau told me to say, that I was supposed to go to a sleep medicine specialist for a sleep medicine evaluation.

30. D'Souza told me to make an appointment to see a sleep medicine specialist at Texas Medical Diagnostic, Inc. ("Texas Medical"). She signed a form giving me the referral, and a true and correct copy of this form is attached to this declaration as Exhibit 4, which is Bates numbered UPFULBRIGHT 2104.

31. I called Texas Medical and explained by phone that I needed to see a sleep medicine specialist for a sleep medicine evaluation. The person I spoke to scheduled me for their next available appointment, which was for June 1, 2015.

32. On May 20, 2015, I received a phone call from Theresa Rodino. A true and correct transcript of this phone call is attached to this declaration as Exhibit 7.

33. On June 1, 2015, I went to my appointment at Texas Medical. The person I met with had me fill out some paperwork, and he told me that before seeing a specialist I had to undergo some sort of overnight sleep testing where I would be connected to various monitors while I slept. He also said the testing would cost about $600.00. This made no sense to me because I had only been asked to have the medicine evaluated. I had not been paid for about four months, and I did not have the money available to pay for this testing. Furthermore, because Dr.

Charbonneau did not tell me to have a sleep test or undergo any testing, I did not see any reason to pay the money and have the testing done when that's not what he told me to do.

34. On June 14, 2015 I called the medical department (HMS). I recorded this conversation and have recently had it transcribed. A true and correct transcript of this phone call is attached to this declaration as Exhibit 8.

35. On June 29, 2015, I received a phone call from Theresa Rodino and Dr. John Charbonneau. A true and correct transcript of this phone call is attached to this declaration as Exhibit 9.

36. I have never spoken to John Charbonneau except for the two phone calls described above on April 21 and June 29, 2015. I have never communicated with him in writing.

37. If Charbonneau had told me he wanted me to have a sleep study, I would have agreed to do that so I could get back to work. But Charbonneau did not explain, and he did not say anything about having the company cover the cost of the testing. Rather, when he called me on June 29, 2015, he had already made up his mind, and he proceeded to tell me that he was imposing sudden incapacitation work restrictions on me. Rodino then explained that I would not be allowed to return to my job.

38. Charbonneau did say he would consider any additional medical information should I provide any, but he did not explain to me what he believed he was missing that might change the outcome. If he had explained, if he told me I might be able to come back to work if I had a sleep study done, I would have done it if at all possible, anything to get my job back. At that time, I was just two years short of full retirement, so I would not have refused any reasonable request.

39. I later got a letter from Union Pacific informing me of work restrictions the company was imposing on me, and stating that I was not allowed to return to my job because of the work restrictions. A true and correct copy of this form is attached to this declaration as Exhibit 5. I have not worked a single day for the railroad since then.

40. After Union Pacific removed me from my position, I looked for work. I contacted Jason Ensign, a person I had worked with at Union Pacific until he left in about 2012 for a job with BNSF Railway Company. I asked him if BNSF had any opening that I might qualify for. They did not at the time, so I asked Ensign to keep an eye out for such jobs and to let me know if anything became available. I followed up with Ensign from time to time, and he has not been aware of any open jobs similar to what I did at Union Pacific.

41. I also created accounts on Monster and on Indeed, I uploaded my resume, and I used those sites to look for all kinds of jobs, even non-railroad jobs. I even applied for several jobs – I can't remember all the jobs I applied for over the years, and I did not keep documents reflecting every computer screen I went to or job that I applied for. I even looked for work in other areas outside the Dallas/Fort Worth region, and in other states. I never found an open position that was similar to the job and the work that I did for Union Pacific.

42. In 2016 or so I received three job offers for much-lower paying positions outside of the railroad industry, one as a roofer, one parking cars, and one making cold calls by phone. I didn't take any of the jobs because the medical benefits I had at the time would have been canceled if I did, and my wife and I needed those benefits. I also knew that if I worked outside of the railroad industry that I would lose my railroad retirement benefits, and the social security benefits that I would receive after I turned 65 would be substantially less.

43. I have done internet searches and have made phone calls to former coworkers looking for jobs in the railroad industry. I have not been able to find any open positions for anything similar to what I did at Union Pacific.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 25, 2021.

Joe M. Fulbright

CONFIDENTIAL

Copy

UPFULBRIGHT

January 26, 2009

Joe M. Fulbright
810 Oakwood Dr.
Euless, TX 76040-5260

EID: 0251592

Dear Mr. Fulbright,

Recently your medical conditions were reviewed by Union Pacific Railroad Health Services for return to work consideration. You and/or your treating physician made statements regarding your current medication use. As a Union Pacific Railroad employee, you are responsible for complying with the Union Pacific Railroad Drug and Alcohol Policy. If you need a copy of this policy booklet, please contact your manager. Policy 5.3 Prescribed and over-the-counter drugs (49 CFR Part 219.103) states:

5.3.1 49 CFR Part 219.103 does not prohibit the use of a controlled substance (on Schedules II through V of the controlled substance list) prescribed or authorized by a medical practitioner, or possession incident to such use, if the treating medical practitioner or physician designated by the railroad has made a good faith judgment, with notice of the employee's assigned duties and on the basis of the available medical history, that use of the substance by the employee at the prescribed or authorized dosage level is consistent with the safe performance of the employee's duties/ The substance is used at the dosage prescribed or authorized; and in the event the employee is being treated by more than one medical practitioner, at least one treating medical practitioner has been informed of all medications authorized or prescribed and has determined that use of the medications is consistent with the safe performance of the employee's duties (and the employee has observed any restrictions imposed with respect to use of the medications in combination).

Policy 5.4 UP Policy which states:

5.4.1 Union Pacific requires employees to have a written copy of their treating medical practitioner's evaluation/determination (as above) available upon request of their manager or the Medical Review Officer (MRO).

5.4.2 Any use of another person's prescribed medicine is prohibited.

5.4.3 Any use of so-called "medical marijuana" is prohibited.

It is your responsibility to comply with Union Pacific's Drug and Alcohol Policy. If you have questions regarding your medication, please consult with your treating physician(s). If your medications are adversely

Fulbright Declaration
Ex. 1 (page 1 of 2)

EXHIBIT
Charbonneau Ex. 12
exhibitsticker.com

affecting your alertness, judgment, or ability to safely work, please discuss this with your physician to explore alternative medications which you may be able to use.

Very truly yours,

Stephanie Mahaney, RN, for
Dr. Timothy McCormick

UPFULBRIGHT

Fulbright Declaration
Ex. 1 (page 2 of 2)

**Union Pacific Railroad**
Health and Medical Services

**January 29, 2015**

**Joe M. Fulbright**
**807 Oakwood Drive**
**Euless, TX 760405260**

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

In accordance with UPRR Safety Rule 90.4, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence.** Please provide the following information within the next ten (10) business days.

**[X]** Copy ofyour last 1 years physician clinic notes (also known as office notes or progress notes) from the
provider treating you for this condition.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Theresa A. Rodino
Fitness For Duty Nurse

UPFULBRIGHT

Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: [redacted]
Fax: [redacted]
Email: TARODINO@UP.COM

CC:

UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

~~January 29, 2015~~ February 26, 2015 (TR)

Joe M. Fulbright
807 Oakwood Drive
Euless, TX 760405260

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

In accordance with UPRR Safety Rule 90.4, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence**. Please provide the following information within the next ten (10) business days.

**[X]** Copy ofyour last ~~1~~ 2 (TR) years physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Theresa Rodino (TR)

Theresa A. Rodino
Fitness For Duty Nurse

www.up.com

BUILDING AMERICA

Fulbright Declaration
Ex. 3 (page 1 of 2)

UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: [redacted]
Fax: [redacted]
Email: TARODINO@UP.COM

CC:

UPFULBRIGHT

**PHYSICIAN PRESCRIPTION FOR SLEEP TESTING**

# Texas Medical Diagnostic, Inc.®

**SLEEP LAB**

**1912 Central Dr. Suite C, Bedford, TX**

*Toll Free Phone (800) 657-1920*

Fulbright Declaration
Ex. 4 (page 1 of 1)

[illegible] (Demographics, Insurance Card, History & Physical), & Epworth Sleepiness Scale

Patient Name: (Last) Fulbright (First) Joe (MI)__

DOB: REDACTED Male X Female __

Best Daytime Phone #: ________ Best Evening Phone #: ________

**Symptoms:**

- [ ] [illegible] of loud snoring and/or sudden awakening, struggling to breathe (witnessed by partner)
- [ ] [illegible] while driving/during periods of inactivity
- [ ] Poor sleep quality/restless sleep
- [ ] Patient has obstructive sleep apnea and is currently on CPAP/BiPAP therapy

**Diagnosis:**

- [ ] Excessive daytime sleepiness/Hypersomnolence (307.43)
- [ ] Unspecified Sleep Disturbances (327.20)
- [ ] Obstructive Sleep Apnea (327.23)
- [ ] Restless Leg Syndrome (333.99)
- [ ] Narcolepsy (347.00)
- [ ] REM Behavioral Disorder (327.42)
- [x] Other: Isomnia

**Services Requested:**

- [ ] Complete Sleep Testing-Includes Polysomnography (95810) & CPAP Titration (95811)
- [ ] Polysomnography Only (95810)
- [ ] CPAP Titration Only (95811) ( Include copy of previous diagnostic PSG )
- [ ] Multiple Sleep Latency Testing (95805)
- [ ] Maintenance of Wakefulness Testing (95805)

**Consultations:**

- [x] YES Consultations and/or Follow-up with Sleep Specialist
- [ ] NO Consultations and/or Follow-up with Sleep Specialist
- [ ] Wrist Ox Serial #: ____ If positive, continue with other services requested
  - [ ] Special Instructions/Other: ____

DME - Please indicate equipment provider for set-up if you have a specific preference: ____

**Letter of Medical Necessity**

Today's office visit indicates that the above listed symptoms are consistent with the presence of a sleep disorder, potentially a life-threatening one. These findings warrant the medical necessity of sleep testing and evaluation of this patient to assess the presence and severity of obstructive sleep apnea or other related sleep disorders.

Signature: V M D'Souza MD Date: 4/27/15

Print Physician Name: Veemal Dsouza NPI: 1306898911

Address: 412 N. Main St, Suite 100 City: Euless State: TX Zip: 76039

Phone: 817-358-5800 Fax: 817-546-8672 Email: ________

Marketer: GBM

FAXED

**PLEASE SIGN AND FAX**
**(817) 820-0430 OR (214) 638-4426**
**TOLL FREE FAX (877) 820-0430 OR EMAIL: tmdsleep@sts-tmd.com**

UP FULBRIGHT

UNION PACIFIC RAILROAD
1400 Douglas Street, STOP 0350
Omaha, Nebraska 68179-0350

P [redacted]

Health & Medical Services

July 1, 2015

Joe Fulbright
807 Oakwood Drive
Eulesis, TX 76040

EID 0251592

Dear Mr. Fulbright:

The Union Pacific Medical Director has recently reviewed your medical condition and has issued a fitness for duty decision to your supervising department. A copy of that decision, listing your specific restrictions, is enclosed. Your supervising department has been unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position. As a result, you have been referred to the UPRR Disability Management Department (DP&M) for assistance.

I have enclosed a copy of a document entitled, "What are my options now that I am unable to return to my railroad job?" Please review this information carefully. Each employee's situation is different and some of the options listed may not apply to you and your unique circumstance.

Understanding that this may be a difficult time for you, assistance is available to you as you consider your options and you begin to develop a plan for your vocational future. The DP& M staff at UPRR is all experienced certified vocational rehabilitation professionals who can sit down with you and help you plan your next steps.

If you are interested in talking with one of the Union Pacific Railroad DP&M staff regarding your vocational future, please call the following toll free number 1-800-992-3901 between the hours of 7am and 7pm central time, Monday-Friday, and indicate your interest. You will be asked for your name, employee ID number and other basic contact information. Following your call, a member of the UPRR Disability Management staff will be in contact with you, typically within 5-10 business days after your call.

If we do not hear from you within 30 days from the date of this letter, we will assume that you are not in need of assistance and we will close out our referral. Thank you.

Sincerely,

Terry Owens

Terry Owens, MRC, LPE, CRC
Director Disability Management

cc: Theresa Rodino
Amanda Wright
Dan Fischer

UPFULBRIGHT

Union Pacific Railroad
Health and Medical Services

# HEALTH & MEDICAL SERVICES STATUS UPDATE

July 01, 2015

**To:** Michelle R. Thomason [redacted], Scott F. Ochsner [redacted], Shirley J. Fennen [redacted], Stephen T. Hale [redacted], Terry D. Neal [redacted]

**From:** Theresa A. Rodino/ Occ Health Nurse
**On behalf of Union Pacific Chief Medical Officer**

**Subject:** **Fitness for Duty Determination**

**Regarding:** Joe M. Fulbright

**Employee ID #:** 00251592

**Job Title:** Sr Comm Technician

**Regarding Health & Medical Service:** MANAGER REFERRAL ☑ Off Duty ☐ On Duty/Occupational

**Based on medical information available to Health & Medical Services at this time, the employee is:**

Medically Cleared with ☐ Temporary ☑ Permanent Restrictions (related to this service) effective July 01, 2015

| Restrictions: | Start Date | End Date |
|---|---|---|
| Operation of Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Operation of Cranes, Hoists, or Machinery - Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Work Without Adherence to HMS Protocol - Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Work at Unprotected Heights Over 4 Feet Above the Work Surface-Prohibited | Jun 26, 2015 | Dec 31, 9999 |

**Additional Employee Information:**

| Current Exam Restrictions: | Start Date | End Date |
|---|---|---|
| REG CDL | Jun 26, 2015 | Dec 31, 9999 |
| REG CRANE | Jun 26, 2015 | Dec 31, 9999 |

If the above fields are not populated HMS does not have any current information on file.

**Comment:**

For questions, please contact, Theresa A. Rodino at 402-544-3640.

CC:

UPFULBRIGHT

**Business References:** BU004_Template Letter – RTW With Restrictions Accommodated
BU005_Template Letter – RTW With Restrictions Not Accommodated

UPFULBRIGHT

Telephone call on April 21, 2015

Theresa Rodino:

Hello, Mr. Fulbright?

Joe Fulbright:

Yes.

Theresa Rodino:

Hi it's Theresa with UP health and medical.

Joe Fulbright:

Yes.

Theresa Rodino:

And I have Dr. Charbonneau on the other line, and I'm sorry we're a little bit late. I had another call I had to make before yours. Is this still a good time for you?

Joe Fulbright:

Yes.

Theresa Rodino:

Okay. Here we go. I'm going to put him on the phone.

Joe Fulbright:

Okay. Dr. Charbonneau?

John Charbonneau:

Yes.

Theresa Rodino:

Oh, hi. It's Theresa again. I have Mr. Fulbright on the line, and Mr. Fulbright, you wanted to talk about the, the release of information, getting that signed with Dr. Charbonneau, to be able to speak to your doctor about your, your case.

Joe Fulbright:

Well, yeah. What I was wanting to get clear is this doctor that took over the prescription of the medication that my psychiatrist had originally prescribed for me, she doesn't have much in, by the way of evaluation of anything, other than being able to prescribe the drugs after my doctor retired. So I'm not sure what they want from her.

Theresa Rodino:

And this is the Dr. D'Souza? The one that…

Joe Fulbright:

Right.

Theresa Rodino:

… we're asking for the release from?

Joe Fulbright:

Right.

Theresa Rodino:

Okay.

John Charbonneau:

First of all, good afternoon Mr. Fulbright. Thanks for the opportunity to visit with me about this. I want to introduce you, myself to you, tell you what I do and who I am. And then I'll tell you the reasons for the request that you sign the release of information. And then if you're not comfortable with it, I think I'm going to be comfortable with that. I'll just tell you what we need and why we need it. Is that okay?

Joe Fulbright:

Yes, that's fine.

John Charbonneau:

Okay. First of all, my name is John Charbonneau. I'm a board certified occupational medicine doc. I have been working in the field for 38 years. And I've been a consultant to Health and Medical Services for 26 years. I work with Theresa as a fitness for duty nurse and some of the other nurses, and basically our job can be summed up by saying that we work on fitness for duty issues. We try to make sure that when employees are coming back, either from injuries or from off-duty medical illnesses, things like that, that they're ready to be back to work. That the medical supports that. Okay?

In some cases, such as yours, we get a request from a manager to, based on variable amounts of information, about whether or not it's safe for someone like you to be at work. And that's how Theresa and I became involved in requesting information from you. You were kind enough to make about a year's worth, as I recall, of medical information available, and it clearly documents that you've got about... I don't know how long it's been going on... but for at least a year, you've had a problem with what we call sleep onset insomnia and have required some medication for that.

Joe Fulbright:

Yeah. Four years... four years ago was when I first was prescribed that medication. I've been taking it continuously since that time, almost every night.

John Charbonneau:

Okay. Has it been Trazodone all of that time?

Joe Fulbright:

Yeah. Trazodone, at least three out of four nights, and for long stretches, eight and sometimes 10 nights in a row.

John Charbonneau:

Yeah. And as you know, Trazodone is an old anti-depressant medicine.

Joe Fulbright:

Right.

John Charbonneau:

We don't use for depression a whole lot anymore, but it is a great sleeping medicine. It's a very effective sleeping medicine. Again, I don't know everything about your circumstances, but I know that it's been prescribed to help you fall asleep.

And if Theresa and I understand the issues right, there is a concern, perhaps shared by you, but certainly on the part of your management, that if you have to take those medicines on a night when you're still on-call, are you going to be able to answer the bell, so to speak. And also will you be able... we'll be taking to medicine on board, that's supposed to make you drowsy and put you to sleep.

So, that's where we were when we discussed this case. Theresa and I both have superiors to whom we report and we discussed it with them and we decided that the best perceptive way to handle this, was to ask you to have a sleep evaluation.

And that's when the issue came up about, okay, we don't want his doctor to think that we're second-guessing them, because we only know a little bit about your situation. Your doctor knows more than we do about it. But we wanted to make, help them understand why we were requesting that you have a formal sleep medicine evaluation, and our hope from that, Mr. Fulbright is that you'll get whatever medication regimen or whatever you need, that will allow you to do your regular work. And then we're all done with this situation.

I just wanted to convey to your doctor that we weren't second guessing them, and secondly explain the reason for the sleep medicine evaluation. Just because there is, you know, some safety issue in that. That's it. If you want to carry that message to your doctor, we're good with that. I don't have to speak with your doctor. So, that's where we are. Please ask any questions you have.

Joe Fulbright:

Well, I think y'all need to understand some history about this. Four years ago, when I went to a psychiatrist, you know, I had to learn everything I could about my medical condition. And I think it's important to understand how thoroughly we went over this problem, and how well my doctor was able to understand what had happened to me.

I had gone through about a 10 to 15 year severe shortage of B12. And that causes, you know, it causes neurological degradation, all over your body and in your brain, and what, whatever it did, the psychiatrist, one of the first things she said was that’s, you know, B vitamin deficiencies are a fast track to mental illness. And since there was no, there were no problems with my personality. There were no personality disorders. It was the hypothalamus. That part of the brain that seems to have took the hit, and that regulates sleep, body temperature. I read through all the stuff that it regulates. My appetite was strange enough, but when I was put on Prozac and Trazodone, within two weeks, the Prozac started to have an effect with me, but Trazodone was immediate. You know, it was the first night I took it.

Joe Fulbright (cont'd):

The Prozac, after about four weeks of taking it, I could taste food again. And I don't know what you know about serotonin, but that's one of the more common things people notice when serotonin levels are made normal again in the brain. And I really noticed that. And I had all this input and you know, seeing my psychiatrist over a period of about a year, and we verified all this stuff you know... that it was, uh, it had something to do with the relationship of serotonin and the brain. And it was normalized to some degree. I don't know how much, but I was able to sleep.

I went from being just almost, you know, dysfunctional, to being evaluated by not only my psychiatrist, but everybody that I took, everybody that, you know, that I worked with, were noticing an improvement on these drugs. And so over four years, you have to understand that I was evaluated continuously by people around me, family members, everybody, including three doctors.

And there is no question that that's what's causing me to be functional now and to maintain a sleep schedule where I don't have something like narcolepsy, where I fall asleep during the day, is something that allows me to sleep at night.

And the real issue here is I was totally approved to take this drug, knowing that they could not call me while I was on this drug, four years ago. Now I've got a manager now that's got some kind of problem with some of his other people and they, I don't know if they've complained, or whatever, but the understanding was that even on a call weekend, I would try not to it for two nights in a row. But the third night, he understands I'm going to have to take it. And he's trying to say that, that I'm either going to give up this medicine, so that I can take calls, or I'm not going to have a job there.

And you have to understand that my job... I have assigned work hours during the day. My job doesn't depend on me being called out to do my job. We answer calls typically for emergency restoration of service. But over the years, through medical accommodations, some people can't do it at night. And, like I told my boss, the medical accommodation for the modification of their job, where they didn't take calls, wasn't provided by the Union Pacific Railroad. It was provided by employees like me that came out and covered their calls. That's how their medical accommodation was provided.

I've basically got a boss that's told me that if I start having the same medical problems everybody else had out there in the history of working there at 54-years-old, that I'm not going to be able to work there. And that's the real issue here.

He's saying, "During the day, you know, you've got to keep up with these 20-year-olds and at night, you're going to take the same amount of calls all the rest of the people have." So there's some real issues here where... I got, I got pretty upset about this thing the first time I talked to the medical department, because my boss somehow slipped in, or somebody in the medical department, slipped in an accusation that I was coming out under the influence of this drug, where... to the point where I was impaired. Nobody has ever seen me on property impaired from anything other than the residual effects of a drug that allowed me to be much more awake and alert. Like sleep. You know, it allows me to sleep really good.

And somebody originally told me from the medical department, "Hey, we have concerns that you might be impaired while you're on property with this drug," but nobody's seen me on property impaired. If he would have seen me, he would have drug tested me. I would have been pulled out of service, pending a drug test, whatever. None of that was done.

So I hear this accusation now that I was on company property impaired, when in fact, the accommodation I have is to make sure that I'm not on property impaired. So, you know, somebody is trying to kind of twist this thing around and I think y'all have a big problem with this manager that told

Joe Fulbright (cont'd):

you he wanted the evaluation. He's not, I don't think he's telling you, I don't think he's telling you the truth about all this.

John Charbonneau:

Mr. Fulbright, I think there's a lot of information you've just shared with us. So that's good. I appreciate you doing so.

John Charbonneau:

What I'm not sure of is that anyone has told me or Theresa, and Theresa, you correct me, because you've talked to more people than I have. I'm not sure anyone has said that you have been out there impaired. I think the concern is that if you get called in, after having taken some medication, you might be. That's the only aspect, you know, of that that's akin to what you just described. Theresa, am I wrong in that statement?

Theresa Rodino:

No, no. And I think sometimes non-medical people, they may use that word in a different way, you know, impaired. That a medication could impair you from doing your normal work. And not that anybody's accusing you that you have said that, but I didn't see that at all in the manager referral. Just that concern from what you told the manager.

Joe Fulbright:

Okay. Well it come, you know, maybe it comes down to this issue then. He's saying that if I take a medication on my own time at home, because I might be called, I have to stop taking it, or I don't have a job there. And that's ridiculous.

Theresa Rodino:

And I haven't heard that either. I haven't heard that, because you have to take it you might not have a job.

John Charbonneau:

That's not been part of my information Mr. Fulbright.

Joe Fulbright:

No. He met with me, see, before this happened, and a Union representative, and that's one of the things he said. "I can't have you taking this medication, missing calls." That was stated specifically... that's almost an exact quote.

Well, that's not going to work for me at all. And as far as a medical evaluation, doing a physical and all this, none of that tests for serotonin levels. None of that... any of that has anything to do with how well I sleep at night.

You're not going to be able to test for this. It was the input, you know from somebody that knows how to evaluate a person. Like I said before, that has, you know borderline levels of serotonin, a brain chemical, that's hard to even test for. I don't know there is a test for that. It's when you notice the subtle things.

I was diagnosed with depression, I think Marie Kelly was the psychiatrist that treated me. She at one point stated that it probably is depression. And, you know it's a form of, at least temporarily, degenerative condition in the brain, that has to do with brain chemicals.

And that, you know, they want, I was told originally, I'm going to have to do this medical evaluation with blood being drawn and test for all this stuff. That's not going to do a single thing to determine my fitness for duty. In fact, on property, he said that my job was excellent. I was doing an excellent job and there was, you know he let on nothing about the impairment that I guess he makes reference to in some of my other paperwork. He's concerned that I may be impaired while I'm on property, I believe, is the way he states that.

Theresa Rodino:

I think the concern for us was just the sleeping issues and Dr. C, I think that's what we're reviewing here. And Mr. Fulbright, is, you know, that the medication could prohibit your ability to fulfill your duties for the restoration of service after normal business hours. So it's for the sleeping, the medical sleep issues for us to address. That's what we're tasked with.

Joe Fulbright:

Right, and here's the issue the manager has. If I take anything that's going to help me sleep, it's going to be illegal for me to drive in the state that I live in. That's been made very clear. If you know something's impairing your alertness, in the state of Texas, and you drive under the influence, you are in violation of the law. Period.

Now it was a safety meeting about, I don't know, two years ago, that I went to, where they invited the Department of Public Safety, the county law enforcement there, to give us a discourse on what constituted impaired driving. Over-the-counter, prescription drugs, anything you know impairs you, it's illegal to drive under the influence of it.

Theresa Rodino:

Well, Mr. Fulbright, in order to move your case along and to get the questions answered that we need to get answered for your fitness for duty, Dr. Charbonneau, what I understood you to say, is that if Mr. Fulbright goes to his physician and request this, that that would answer your question.

John Charbonneau:

Yes.

Theresa Rodino:

So I guess, to bring this to a, to where we need to go from here, what's the next step?

John Charbonneau:

Well, again, Mr. Fulbright may have come to the conclusion that if... to help sort it out, that we're going to ask you to get a sleep medicine evaluation. A consultation. And again, that's something that we would like you to talk with your doctor about. And you can use local resources, so just so we can see if there are any ways to work around it. And I'm not trying to tell you, you have to change your medicine. We just need to get some documentation that supports the nature of the problem, the risks and benefits are of the medicine you take, and things like that. So that's why we request that, and as I said to start

this, if you'll carry that forward to your doctor and get a sleep medicine evaluation, I don't need to talk to your doctor.

Joe Fulbright:

Okay. Well, that's what I'll do. I'll schedule appointment with my doctor. My doctor's not a sleep expert or a psychiatrist. My psychiatrist is retired and I'll talk with her about this medicine. I'll find out what she would be comfortable with to give you an evaluation of how well I'm doing on this medicine.

Theresa Rodino:

And it's called a sleep and medicine evaluation.

Joe Fulbright:

Okay.

Theresa Rodino:

Right, Dr. Charbonneau?

John Charbonneau:

Right. There's a group of doctors, most of them belong to the... it's called then AASM, American Academy of Sleep Medicine. There are a couple of certifying agencies. So again, we want you seen by a Sleep Medicine Specialist. Mr. Fulbright, is there a big city near you? I'm sorry, I don't know where you live.

Joe Fulbright:

What was that?

Theresa Rodino:

He said, are you in Fort Worth? Is that where you live?

Joe Fulbright:

No, I live in between Dallas and Fort Worth, in a little town called Euless.

Theresa Rodino:

Euless.

John Charbonneau:

Okay. Yeah. I mean, with those two major metropolitan areas, there'll be plenty of sleep medicine docs around... and your doctor will have a consultant that he or she usually uses, so... but it won't be a problem. If you give your primary care doctor the okay of getting a sleep medicine evaluation.

Theresa Rodino:

By a specialist. So, yea you'd ask for a referral.

Joe Fulbright:
Okay.

Theresa Rodino:
Okay.

Joe Fulbright:
Okay. Thank you.

Theresa Rodino:
All right.

John Charbonneau:
Thank you Mr. Fulbright.

Joe Fulbright:
Okay. Bye-bye.

Theresa Rodino:
Thank you Mr. Fulbright, thanks Dr. Charbonneau.

John Charbonneau:
Thanks.

Theresa Rodino:
Bye-bye.

John Charbonneau:
Bye.

Telephone call on May 20, 2015

Joe Fulbright:

Okay, you said this is Theresa?

Theresa Rodino:

Yep, with health and medical. I'm the nurse for fitness for duty. Was just checking to see where we're at and how you're doing? I think you were setting up a test through your doctor.

Joe Fulbright:

Well, I was going to talk to a sleep medicine specialist, and she got that set up. And earliest appointment they had was the 1st of this next month.

Theresa Rodino:

Oh, okay. All right. Well, let me put this in here because I could not remember. Sleep medicine specialist, the first available appointment is the first, I'll just put here the first week of June. Did they give you a date yet?

Joe Fulbright:

June 1st.

Theresa Rodino:

Oh, okay. I know that it takes about a month. So June 1st, it took you a little bit over that.

Joe Fulbright:

What's that?

Theresa Rodino:

I said I think it took you a little bit longer than that, because it seemed like we talked with you last April. So, but it usually does take at least a month to get in. First available...this appointment...

Joe Fulbright:

Yeah. I had to go to another town because the only one they had here locally was even two or three weeks later. So I got one for another town.

Theresa Rodino:

Okay. And is that just to meet with a sleep specialist? That's not for the actual test?

Joe Fulbright:

Well, they're not supposed to do any tests. I was supposed to talk to them about the drug I was on.

Theresa Rodino:

Let me check my agenda, make sure. That might be right. I was thinking that you were having a test too. Let me see what he put on here, with Dr. Charbonneau is down here April 21st. Okay, now this is from Dr. Charbonneau. He says on here, oh, you're going to have a sleep medicine evaluation.

Joe Fulbright:

Yes.

Theresa Rodino:

And then he just wants to wait on that report from the sleep medicine evaluation. Let me see what it says, Dr. Charbonneau, he says "We had a conference call with the employee. I summarized the nature of the manager referral and the process." And then of course he asked about talking to your doctor. Employee explained that he's been dealing with depression and sleep problems for 10 to 15 years. Frustration with a deficiency, he found a psychiatrist that found out he had a vitamin B12 deficiency, low serotonin in the hypothalamus, started on Trazodone and Prozac and presumably B12... Or B vitamin B supplements.

He's done much better with the insomnia ever since... Until he… Stated that he would never report to work or even drive his car after taking the medicine. States that he's awake, alert during the day because he can sleep well at night. Takes the medicine anywhere from three to four up to eight to 10 nights at a time. I just want to make sure that I get everything in here that the doctor wanted you to have. I have to read through the notes. I'm sorry. We both, okay... I'm going to start from... He charged that his management made false statements about him being impaired due to the medication, but we noted that no such statements have been made to us. Number five, we need an... Okay, the end of the conversation is that we need a formal sleep medicine consultation and would be satisfied if he would relay that information to his primary care doctor.

And this was in lieu of Dr. Charbonneau, the company doctor, speaking your doctor, but you did that. So number six, the employee is to consult his doctor and request a formal sleep medicine evaluation. Okay. We explained to him that the evaluation has to be fulfilled by a sleep medicine specialist, which you're doing. And that was it. So we just need that report.

Joe Fulbright:

Okay.

Theresa Rodino:

Isn't that interesting? All right.

Joe Fulbright:

Okay, thank you very much.

Theresa Rodino:

No, yeah, I just wanted to make sure. Okay. And so the appointment is on the 1st, normally it takes your doctor anywhere from five to 10 days to get me that report. So if you could go ahead and request it as soon as possible, when you meet with them. And then our doctor can make a determination for your return to work. So what else? If you have any questions where you're at, because it looks like your

Theresa Rodino (cont'd):

medical leave ended May 3rd. So it sounds like if you have your appointment on June 1st, I should extend that. Right? Let me change the... Did you say your appointment is June 1st?

Joe Fulbright:

Yes.

Theresa Rodino:

So if we go out seven days, that'd be June 8th, 10 days would be the June 10th. Why don't we just say June 15th to be safe? Does that sound okay?

Joe Fulbright:

Yeah, whatever y'all have to do.

Theresa Rodino:

To extend your leave, your medical leave? Because they had you in a medical leave. Normally I'll put you in TP status, but I'll just keep going the way that you have been going. It extends your benefits, that type of thing. So, especially since we talked with our doctor, I'm going to say this. We'll just do it till June 15th, because I'm sure that you'll have the report by then. And I would think we'd have a determination for your return to work after doctor gets that report.

Joe Fulbright:

Okay.

Theresa Rodino:

All right. Now do you have any questions for me or anything that we need to do?

Joe Fulbright:

Um, no.

Theresa Rodino:

Okay. All right. Well, give me a call if there is. And you have the fax number to fax the report to us as soon as you get it. So we'll be watching for that, okay?

Joe Fulbright:

Okay.

Theresa Rodino:

Let me know if there's anything that comes up or you have some questions, okay?

Joe Fulbright:

Okay. Thank you, Theresa.

Theresa Rodino:

Thank you. Bye-bye.

[Theresa Rodino hangs up]

Joe Fulbright:

And that's Theresa, I guess, with health medical services for the Union Pacific Railroad. It's Wednesday, May 20th, 10:39.

Telephone Call on June 14, 2015

Joe Fulbright:

Okay. Yeah, I'm calling about, they told me to go to a diagnostic center to have my sleep medicine evaluated. I've done that. And they had the release for the Union Pacific Railroad that wanted the information, and I have their number here.

Speaker 2:

Okay, and UP was requesting this information?

Joe Fulbright:

Yes.

Speaker 2:

Okay. And so which that diagnostic center did you go to, sir?

Joe Fulbright:

It's Texas Medical Diagnostics.

Speaker 2:

Okay. And their number?

Joe Fulbright:

Their number is (817) 820-0427.

Speaker 2:

Okay. And then may I grab your employee ID number as well?

Joe Fulbright:

It's 0251592.

Speaker 2:

Okay, let me just get you verified really quickly and then I will let our nurse know that's managing this for you, okay? Last four of your social?

Joe Fulbright:

It's 4726.

Speaker 2:

Address and telephone number as well, please.

Joe Fulbright:

The address is 807 Oakwood Drive, Euless, Texas. And the zip, zip code is 76039.

Speaker 2:

Perfect. Okay, let me put you on a short hold here for a moment. I'll be right back.

[on hold music plays]

Okay sir, thanks for holding. So Pam is the nurse who will be handling this for you. I'm going to get information over to her. Would you like her to call you back then once she receives the information from the Texas Medical Diagnostics Center?

Joe Fulbright:

Yes, please.

Speaker 2:

Okay. And then is it better to call your cell or your home?

Joe Fulbright:

Uh, cell phone.

Speaker 2:

Okay, let me just get that changed here. Okay, I have this sent over to Pam, and I would anticipate her either giving you a call later this afternoon or first thing tomorrow morning, okay?

Joe Fulbright:

Okay. Thank you.

Speaker 2:

Anything else I might be able to help you with?

Joe Fulbright:

That's it.

Speaker 2:

Okay, you have a great day then.

[Speaker 2 hangs up]

Joe Fulbright:

See, that wasn't so hard, was it? And that is June 14th, 2015.

Telephone call on June 29, 2015

Joe Fulbright:

Hello.

Theresa Rodino:

Oh, hello. Mr. Fulbright?

Joe Fulbright:

Yes.

Theresa Rodino:

Hi, this is Theresa again, with UP Health and Medical Services.

Joe Fulbright:

Yes.

Theresa Rodino:

And I have Dr. Charbonneau on the line. Dr. Charbonneau is the UP company doctor, he's our associate medical director that's been reviewing your case, and I think that you spoke with him before. And I'm going to go ahead and put myself on mute and I'll turn over the call to Dr. Charbonneau and he'll talk to you about your determination. Okay?

Joe Fulbright:

Okay.

Theresa Rodino:

Okay, here we go. Dr. Charbonneau?

John Charbonneau:

Good morning, Mr. Fulbright. John Charbonneau here, okay?

Joe Fulbright:

Yeah, how are you doing, John?

John Charbonneau:

Good, good. We, um, last spoke on April 21st in preparation for Theresa and I calling you to get that note. I guess I'm going to just, outline, keep my comments kind of restricted to what we've done since the last time you and I and Theresa spoke, if that's okay with you.

Joe Fulbright:

Yeah, that's fine.

John Charbonneau:

Okay. When we spoke on April 21st, when we left that call, we had a plan to ask you to ask your physician to refer you to a sleep medicine doctor for an evaluation. So I guess the first question I have for you is, have you made headway on that or you plan on going forward with, with that evaluation?

Joe Fulbright:

Yes, I went and had an appointment and made the appointment and called back the medical department and gave them their telephone number so that they could arrange to get that information from them. My medical benefits have run out, so I can't pay them for another appointment. And the last thing they told me is they will not do a write up on their determine, you know, anything they think about the medicine. They're not going to do a write up on any of it without, you know, more work done. Well, they want about, they want a sleep study done, which is not happening. They want, you know, to take over, I guess, my medical care on this issue. And they don't just do write ups based on you paying them $75 for an appointment to come in and have a medicine evaluated. They want about $600 and I don't have any benefits anymore, and I'm not paying for that.

John Charbonneau:

Okay. Mr. Fulbright, just so, I want to make sure that I understand what you just said. So you're telling me, if my understanding is correct, you have your initial evaluation of the sleep medicine doctor that's in-office. Is that true?

Joe Fulbright:

I had a meeting with a doctor and that doctor told me that he wasn't qualified to make the evaluation on my medicine. And he told me the doctor that worked there that did, and we explained to them before we ever went there, that's what this appointment was for. To evaluate that medicine. They didn't have the doctor on hand that would eventually do the write up and the evaluation. They had me talk to another doctor wait in the room for 30 minutes, talk to another doctor that told me that all he's going to do is schedule me more appointments with this other doctor. And he's going to want to do all these tests and a, and a sleep study and, you know, all this stuff that's unnecessary. And that's not what we talked about. We talked about evaluating that one medicine, and I, I'm not going through all that. I'm not paying for that. I don't have any money to pay for that anymore.

Theresa Rodino:

Right, and Mr. Fulbright, I will put you on a medical leave so your benefits will be okay. So I'll go ahead and do that today. I didn't know your benefits had run out. This is the first I heard of that.

Joe Fulbright:

But yeah, I can go back there and ask them for the evaluation, but from what they're telling me, I would have to go to my doctor and get another referral to find a doctor, start trying to find a doctor that will do an evaluation of that medicine, because they won't do it unless I go through who know, schedule a month out of sleep study and start doing, you know, letting them taking over my medical treatment for a sleep disorder. And I'm not doing that. See they, you know, for people that don't know and don't understand, my sleep disorder is related to brain chemicals like serotonin. It's not related to interrupted breathing. It's not related to anything like that.

Joe Fulbright (cont'd):

So I already know where my problem's coming from. And the treatment that I'm on is, is something that took about six years to find. I had to pay for it out of pocket, because most psychiatrists will not accept our insurance. They've run them through too many hoops and they won't pay them even $150 for an appointment that most of them demand. So I had to pay for that. And that was about a six year battle to find a doctor that knew what was wrong with me. And these people are on the wrong track. They want to do the breathing study and the EKG while you sleep to find out everything that's going on. I don't need that.

John Charbonneau:

Okay. Mr. Fulbright, the last time when we talked you offered, and we appreciated it very much, and the history that you have with depression, sleep disturbance, things like that, vitamin deficiency. So that's why I kind of wanted to move forward because you very eloquently explained that last time, so that fine. And you know what, we're not trying to tell you what to do. It's you, that's up to you and your physician. They're just telling you what they needed to help us with our decision. Now, so let me just explain that because we haven't received any follow-up information, we went forward with what we feel is an appropriate fitness-for-duty determination. And what that is, is because of that medicine and the effects, and you explained last time about how you managed that quite a bit.

We are going to implement what we call sudden incapacitation restrictions. That's for someone who might, could or might be impaired from medication and things like that. But again, you've explained to us well how you used the medication. So this call was just to find out if there has been any movement or any additional information, and for Theresa and I to let you know about what we call sudden incapacitation restrictions. We will direct a list of them at some point but if you think about it, but I think you mentioned that Texas state law precludes driving while impaired on any medication be it a legal or an illegal drug, and so the sudden incapacitation restrictions that we use are kind of in keeping with that frame of reference meaning that they keep you out of activity that might be impacted by medication effects. There again, you can think of them about operating equipment, working above a certain level off the ground, things like that. There's a list of them. And we will always review additional information that you make available to us, and just like this call, we'll be happy to have another review with you after we, after you submit it. So if you have any other questions for me, I'll be happy to try to answer them. If not, Theresa can talk to you about some nuts and bolts details about keeping your MLOA current and things like that.

Joe Fulbright:

Okay. Well, the only question I have is, were you all under the impression that I was being pulled out and still being paid?

John Charbonneau:

Well, we knew that you were pulled from service, yes.

Theresa Rodino:

We don't really deal with the, whether or not you're paid or not. We look at the medical.

Joe Fulbright:

Okay. Well, I need to understand why, I still have the question. Why was I pulled out of service when I was never on company property impaired? We don't have anybody that would state they saw me impaired. I wasn't drug tested. What kind of procedure is this?

John Charbonneau:

I can give you what I think is the appropriate answer, and that is, we feel the medical facts as they are presented to us. You provided some information. There were some records and things like that that were provided and so what we have to do is kind of cover the bases from a standpoint of safety being at work. And the report came to us that, you know, after the few days that you don't the medicine, when you do take it, you know, you don't feel that you can safely work, and I have no reason to disagree with that. So that's the perspective from which we have to assess the ____.

Joe Fulbright:

Okay, well, here's, let me fill you in with a little bit of details why, I'm really upset about this. My supervisor was the one that did the write up and I have it in writing that he's concerned that I'm impaired while I'm at work. Now I was evaluated, like I said before, four years under this type of medicine. It only, it only affects me at night. I take it about 10 hours before I have to get up and go to work. And there is no, you know, when, once you figure out within the first week how much of this medicine to take, there, there is no residual effect from this medicine the next day. And this is hundreds of users report the same thing taking this medicine. I've looked into it. It's one of the best medicines for helping people like me sleep and it's prescribed, well, I think you went over that last time, you mentioned that you knew that. Well, there's no reason for anybody to believe that I've ever been out on company property under the influence of anything that would impair me other than maybe having to be up with my mom in the middle of the night. I take care of my mom and I had family medical leave act for that. You know, all of us come out sometimes when something woke us up in the middle of the night. All of us work like that.

Theresa Rodino:

Mr. Fulbright, I was thinking that your referral was because when you took the medicine and you're supposed to be on call, and you might get called out to restore service after normal business hours. And I think that we even had that conversation too, that you weren't able to do some of the after-hours calls when you take that medicine. Is that right?

Joe Fulbright:

Well, on Sunday night, that's when I start making, taking the medicine again on my weekend, when they, you know I volunteered to stand by for the people that are on call. I'm on a job where I'm not on call. They divided the jobs up in a strange way where I'm an install tech and I'm not subject to call on that job.

Theresa Rodino:

I thought you had after hours call? That there were after hours call outs?

Joe Fulbright:

Yeah, they do. I volunteered to try and cover a weekend as long as they understood. And this goes back to about 2010, when all this started, as long as they didn't make an issue out of this medicine I'm taking. And it was well understood. We talked about it in safety meetings and job assignment meetings that I would not be expected to come out while taking this medicine. Well, for two nights in a row, I don't take it. Friday and Saturday night is how I've been doing it. And sometimes I can sleep pretty good and sometimes I can't without it. But by Sunday night after I've been off of it for two days, I need to take it.

John Charbonneau:

You know, excuse me, Mr. Fulbright, I'm sorry to interrupt you. Got allergies acting up. It's clear that there are two kind of components to this. You expressed, that you just expressed now to Theresa and me when we talked last time. But let me summarize the things, these two things. Number one, there's a medical issue here. And that medical issue is for a problem with chronic ongoing problems with sleep and the medication that you and your doctor manage that condition with. And that's kind of what Theresa and I just called to talk to you about. And you have very, again articulately, expressed the fact that there's maybe you know, what's the word a labor-management issue here about just understanding what went on in 2010, that Theresa and I had no information about that hopefully there should be some record of. And that's something that you and your manager need to talk about, or you and your representative and your manager need to talk about. Because that's not something that Theresa and I can do anything about. You know we weren't involved back in 2010. So I guess for that piece of things I would recommend that you talk to your manager about it, if you agree that that's appropriate, because that's just not something that Theresa and I can impact.

Joe Fulbright:

Yeah, me and my manager with my union rep have had numerous conversations about this very issue. And finally, he made it very clear in the last meeting about three or four days before I was pulled out of service by medical department, that I'm not going to take this medicine and miss calls, period. So he drew the line there and said that I can't take this medicine if I'm going to work there.

John Charbonneau:

Your supervisor said that?

Joe Fulbright:

Yes.

John Charbonneau:

Okay. Well, I mean, it sounds to me, you know, I only do the medical case in this, but there is an administrative piece that you and your union rep need to carry forward if you choose to accept. It's not, again, it's not something that Theresa and I can impact, but, you know, you have a collective bargaining agreement and those kinds of things, your union representation is going to do exactly that, represent you.

Joe Fulbright:

Yeah, I understand that. I don't expect y'all to resolve this.

John Charbonneau:

Well, that's about all I have. Theresa will talk with you about the administrative piece of this going forward and the medical leave of absence and things like that and then we'll continue to look any information you submit if there is a follow up call will do it, okay?

Joe Fulbright:

Okay, thank you.

John Charbonneau:

All right, thank you, Mr. Fulbright. Thanks, Theresa.

Theresa Rodino:

Thank you, Dr. Charbonneau. And Mr. Fulbright, if you'll stay on the phone, I'll talk to you about what the specific restrictions are and then moving to accommodations. Thanks, Dr. Charbonneau.

[Charbonneau leaves the call]

Theresa Rodino:

Okay, now I have the specific restrictions on here as far as what they are, and Dr. Charbonneau talking a little bit about them. First one's not the operate company vehicles, on track or mobile equipment, or forklifts. The second one is not to operate cranes, hoists, or machinery. And then the next one is not to work on rail trains or work trains, dumping ballast. And he has on here can perform work remaining between the rails of the occupied track or to the field side of the occupied track where there are adjacent tracks with less than 19 front track centers, utilize on track safety protection, following normal safety and maintenance of way rules.

So basically it's talking about where you're at in location to live track. Okay. The next restriction is not to work at unprotected heights over four feet above the work surface. It says on here that you can work on the beds of trucks and occupy bridges, following normal safety rules. And then the next one, and I don't know that this pertains to you, but he wrote this on here, not to work on one man or two man gangs, switch oiler inspector, welder or helper job or two man section gang. Must have at least two additional employees on a gang or work area in order to use the train approach warning regulation, or he puts in parentheses, look out. So those are your restrictions. We did send those to the work unit to see if they could accommodate that, if you could do your regular job, what you do now, given those restrictions and see what they have on here.

They say that these do interfere with your essential job function. And so in here it says accommodation would remove, would require removal of an essential function. So they're not able to accommodate you with these restrictions in your current job. So what that means is that we can work with you through the DPM group, the accommodations group for another position, given these restrictions, another position here at UP, given these restrictions. Now, I did hear what you said about that your benefits are no longer active and that shouldn't have happened. So I'll go ahead and get that rectified and send a note to Stephanie Mahaney, make sure that we get that turned back on for you. But do you have any questions about your restrictions?

Joe Fulbright:

No.

Theresa Rodino:

No. Something happened here, let me get back here. Okay. So let me go ahead as I already have this form back from the work unit. Let's just go ahead and fill out the accommodations screen. This is the disability prevention management group, or voc-rehab's another name for them. You were in the Southern region. I'm trying to think of who your return to work manager is, because that's normally the person that would work with you. But what we'll do is we'll go ahead and put in an accommodation request. They will send a letter to you that has an 800 phone number on it. And as soon as you get that letter, give them a call so that they can start the process. They don't guarantee you another job, but they move you up to the front of the line to see what other positions might be available for you given these restrictions. And again, like Dr. Charbonneau said, if anything changes with your medical piece or you want to have this restrictions revisited, we can just submit your medical information and we will take another look at them.

Joe Fulbright:

Okay,

Theresa Rodino:

Let me see. Give me just a quick second, let me get to that screen, I hope he's out of there. But I know one of the questions are, is do you agree with your restrictions? And it's just a yes, no. If it's no, they want me to enter a reason.

Joe Fulbright:

No, I don't agree with that at all.

Theresa Rodino:

Okay.

Joe Fulbright:

Well, you know, I think it's outrageous. It's ridiculous. I've proven I can safely do that job in the four years and I know when I'm incapacitated and don't need to be on company property and don't need to drive. And I don't need work restrictions.

Theresa Rodino:

Okay. I don't need restrictions. Okay. And then I know another question is, are you willing to relocate if they had a different job open for you?

Joe Fulbright:

No. I've got to be here to take care of my mom.

Theresa Rodino:

Okay.

Joe Fulbright:

You know, I was under family medical leave act to take care of my mom. That's another reason why I didn't want any overtime. I had restricted my overtime work after hours because of that too. And he, you know, my manager just had to run over all of it and throw me off the property, cut my paycheck off.

Theresa Rodino:

And I don't know, I, you know, you have a union rep that you're working with because as far as the pay is concerned, I don't know how that works. And Dr. Charbonneau has the block, okay, so I put on here, no on the relocation. And I'll go ahead and ask for accommodations for job reassignment for you. And again, as soon as you get that letter, give that phone number a call. And I think that there's one other question. The doctor has your case blocked so I can't get in there, but let me, I'm going to pull somebody else up here real quick. I just want to make sure I get all the questions so that we can move forward with your case and you can start accommodations. Give me five seconds.

Joe Fulbright:

The only accommodation I've asked for and needed out there, I'm 55 years old. And everybody that hits as old as 40 years old that does installation work on track machines and some of the other roughneck work we do out in the sun always has somebody helping them. My boss is mad over this medicine and virtually threatening me with discipline if I don't quit taking it. And one of the things he started doing, I guess at some point, I don't know for sure that that's what he did, but he, he sends me out by myself to do them and he's violating my seniority by forcing me to do the installs and doesn't want the young people doing them. Well that's ridiculous.

Theresa Rodino:

And that was the next question. That was it, is what was your seniority date?

Joe Fulbright:

My seniority date is 03/25/1985.

Theresa Rodino:

1985. And that's for telecoms?

Joe Fulbright:

Yes.

Theresa Rodino:

Okay. And do you have any other seniority date?

Joe Fulbright:

No, that's it.

Theresa Rodino:

Okay. All right. I'll put that in there. And I don't know, you don't know, or maybe you do, who your return to work manager is?

Joe Fulbright:

My return to work manager?

Theresa Rodino:

Yes, for the Southern region?

Joe Fulbright:

No, I don't. I don't know who that is.

Theresa Rodino:

Okay, I don’t either. Well, and it doesn't matter. As soon as you get that, that letter in the mail from UP, and you certainly can have these restrictions too, or your determination, the doctor will put the note in. But as soon as you get the letter in the mail for the accommodations, it's an 800 number that will be on there. I don't have the number because we have to send this to the committee and then they send you out the letter, but you should have it yet this week. Make sure and give that number a call to start the process so that we can continue to move forward.

Joe Fulbright:

Okay. Thank you.

Theresa Rodino:

All right. Thanks, Mr. Fulbright. You take care. Bye bye.

**DECLARATION OF DONALD E. ULOTH**

1. My name is Donald E. Uloth. I am over twenty-one (21) years of age and I am competent to make this Declaration. I have personal knowledge of the facts set forth herein, and they are all true and correct.

2. I am counsel for Joe Fulbright in this case, Joe Fulbright v. Union Pacific Railroad Company, Civil Action No: 3:20-cv-02392-BK. Attached to this declaration as Exhibits 1 and are true and correct copies of pages that were Bates numbered UPFULBRIGHT 130, and 161-163, and produced by Defendant in this case.

3. Attached as Exhibit 3 are true and correct copies of emails between Heather Miller, counsel for Defendant, and me.

4. The pages of deposition excerpts included with this Appendix as App. 3-39 (Charbonneau), 85-102 (Neal), and 105-121 (Ensign) are all true and correct copies of pages from the original deposition transcript, and the exhibits from the Charbonneau and Neal depositions that are included in this Appendix (App. 40-84, and 103-104) are true and correct copies of the exhibits that were shown to the deponent during his respective deposition.

5. I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2021.

Donald E. Uloth

UPFULBRIGHT

KANER MEDICAL GROUP

Family Medicine that Cares about the Family

412 Northeast Main St Suite 100
Euless, TX 76039
817-358-5800

PATIENT: Joe Fulbright
DATE OF BIRTH: REDACTED
DATE: 03/27/2014 09:30 AM
VISIT TYPE: Office Visit
DOCUMENT TYPE: Chart Note

**History of Present Illness:**
This 53 year old male presents with:
1. rash

The patient presents for rash. The symptom(s) are described as improving. Affected area(s) are scattered on the body. The patient describes the affected area(s) as itchy. Denies aggravating factors. Relieving factors include oral steroids and topical steroids. Associated symptoms include crusting and pruritus.
shot helped, felt out of mind while pred effects were new, better, still needs B12, needs FMLA form

**Chronic Problems:**

**Past Medical/Surgical History:** (reviewed, updated)

| Condition | Year | Procedure/Surgery | Year |
|---|---|---|---|
| Bilat Carpal tunnel syndrome | 2009 | Bilat Carpal tunnel release | 2009 |
| gallbladder removal | 1990 | cholecystectomy | 1990 |
| Tonsillitis | 1965 | Tonsillectomy | 1965 |

**Active Medications**

| Start Date | Medication | Directions |
|---|---|---|
| | Benadryl Allergy 25 mg tablet | take 2 tablet by oral route every 4 - 6 hours as needed |
| 03/04/2014 | prednisone 20 mg tablet | take 1 tablet by oral route 2 times every day |
| | trazodone 50 mg tablet | take 2 tablet by oral route every bedtime after meals |

**Allergies**

Reviewed, no changes.

| Allergen/Ingredient | Brand | Reaction |
|---|---|---|
| CLINDAMYCIN | | |

**Family History:** (reviewed, updated)

| Yes/? | Disease Detail | Family Member | Name | Age |
|---|---|---|---|---|

# PHYSICAL MEDICINE ASSOCIATES

PRACTICE LIMITED TO
PHYSICAL MEDICINE & REHABILITATION & ELECTRODIAGNOSIS

August 1, 2014

Bobby J. Wroten, MD
UNT Health-Bone and Joint Institute
Ben Hogan Center
800 5th Avenue, Suite 400
Fort Worth, TX 76104

## ELECTRODIAGNOSTIC CONSULTATION

Re: **Fulbright, Joe M.**
Date of Birth: REDACTED
Referring Physician: Bobby J. Wroten, MD
Date of Service: 08/01/2014

Dear Dr. Wroten:

We appreciate the opportunity of assisting in the care of your patient, Joe M. Fulbright. Your expression of confidence is greatly appreciated.

**ELECTRODIAGNOSTIC IMPRESSION:**

1. **There is evidence suggestive of a left ulnar nerve sensory neuropathy. The exact location is not quite clear. It could be slightly distal to the elbow or mid forearm. No motor involvement noted. No active axonal loss, although there are some changes in the motor unit action potentials of the ulnar innervated muscles tested.**

2. **Prolonged left median nerve sensory latency at the wrist (as seen in carpal tunnel syndrome).**

3. **Motor latency was not studied. This patient has history of carpal tunnel release. As you know, in some cases, the values do not reverse to normal.**

**COMMENTS:**

1. **The symptoms that this patient provides are primarily in the left IV and V digits. There is a significant drop in the amplitude of the sensory latency proximal to the wrist. He has an ulnar dorsal cutaneous response which is within normal limits. This would probably place the site of the neuropathic process distal to the elbow.**

2. **He has an area of discoloration in the mid to proximal forearm an area where he leans on a chair on a regular basis. This could be also the area of the neuropathic process. I took the liberty to advise this gentleman to avoid leaning on his arm.**

901 COLLEGE AVENUE
FT. WORTH, TEXAS 76104
817-336-7422
FAX 817-338-0919

901-A MEDICAL CENTER DRIVE
ARLINGTON, TEXAS 76012
817-461-8343
FAX 817-861-8079

UPFULBRIGHT

Re: Fulbright, Joe M.
Bobby J. Wroten, MD
August 1, 2014 – Page 2

3. **This patient reports symptoms in the left ulnar nerve, minimal on the right. He has a history of bilateral carpal tunnel releases. The suspicion of a peripheral polyneuropathy, in spite of the fact that he denies symptoms in his lower limbs, should be considered.**

**RECOMMENDATIONS:**

1. **Electrodiagnostic testing on the lower limbs may help further evaluate this gentleman, if you deem clinically indicated.**

2. **Consider High-frequency US examination of the forearm may be of help to further evaluate this patient if you deem indicated.**

**HISTORY:**
**Age/gender:** 53-year-old right-handed gentleman. History of bilateral carpal tunnel releases four years ago.
**Symptoms:** Left hand numbness and tingling as well as pain in left medial elbow.
**Onset:** Two months ago.
**Location:** Numbness is primarily in the IV and V digits in hypothenar area.
**Radiation:** None.
**Progression:** None.
**Exacerbating activities/positioning:** Repetitive work with his hands at work.
**Numbness:** Yes. The predominant symptoms.
**Dysesthesias:** No.
**Pain:** Only soreness at the elbow.
**Weakness:** Yes, with decreased grip.
**Trauma:** None.
**Constant:** It varies in intensity but is present to some degree at all times.
**Sleep disturbance:** No, because of the left arm. He suffers of chronic insomnia and currently is on trazodone.
**Previous episodes:** None.
**Opposite limb:** Minimal symptoms on the right.
**Other:** He denies paresthesias in his feet. He reports having chronic insomnia and takes trazodone 100 mg three times a week.

**PMH:**
He tells me he is healthy.
Allergies: Environmental.

**SMH:**
Work: Works installing electrical equipment. He is an electrical technician.
Smoke: One pack of cigarettes per day.
ETOH: 3-4 oz. a week.

**REVIEW OF SYSTEMS:**
**Implanted electrical device:** None.
**Anticoagulants / Bleeding Disorder:** None.
**C-spine surgery:** None.



UPFULBRIGHT

Re: Fulbright, Joe M.
Bobby J. Wroten, MD
August 1, 2014 – Page 3

**PHYSICAL EXAMINATION:**
Weight 312. Height 5 ' 10 ". BP: 175/104. P: 92. BMI 44.8.
The patient was advised regarding his BMI as well as his blood pressure. Apparently, this is just an unusual reading for him.
**General:** The patient is awake, alert, oriented, pleasant and cooperative.
**Edema:** None.
**Deformities:** Discoloration of the medial forearm, the area where he tells me he leans on his chair.
**Manual muscle testing:** 5/5
**Sensory examination:**
**Pinprick:** Somewhat decreased in the IV and V digits of the left hand in hypothenar eminence. The rest of the examination was grossly normal and comparable to the other side.
**Muscle stretch reflexes:** Bi: 2+ Tr: 2+ Br: 2+
**Distal pulses:** 2+
**Capillary refill:** Less than 2 seconds.
**ROM:** No limitations noted in the upper limbs.
**Temperature to touch:** Normal
**Tinel's:** Mild on the left elbow area. Negative on the right. Maintaining sustained forward flexion of both elbows did not trigger any of the symptoms. **Froment:** Negative.
**Atrophy:** No evidence of atrophy by inspection.

**ELECTRODIAGNOSTIC STUDIES:**
Please see attached report.

ABNORMAL FINDINGS:
1. Significant drop in the amplitude of the left ulnar nerve when stimulated below and above the elbow.
2. Some changes of the motor unit action potentials noted in ulnar innervated muscles tested.

Thank you for allowing us to participate in the care of Joe M. Fulbright. If we can be of further assistance, please do not hesitate to contact us.

Sincerely,

Victor H. Flores, MD
Diplomate of American Board of
Physical Medicine and Rehabilitation
Diplomate of American Board of
Electrodiagnostic Medicine

Electronically signed by Victor H. Flores, MD 8/6/2014 8:37:43 AM

VHF/bb

UPFULBRIGHT

**don.uloth@uloth.pro**

| | |
|---|---|
| **From:** | don.uloth@uloth.pro |
| **Sent:** | Friday, April 16, 2021 12:25 PM |
| **To:** | 'Miller, Heather M.'; 'McKee, Derek'; 'Ortbals Jr. Robert L.' |
| **Cc:** | 'Fitzgerald, Becky' |
| **Subject:** | RE: 30(b)(6) deposition notice to Union Pacific |

Heather:

Yes, that should resolve topic 8. I will send the one additional interrogatory today.

Donald E. Uloth
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 #261
Dallas, TX 75252
(214) 989-4396
don.uloth@uloth.pro

**From:** Miller, Heather M. <hmiller@constangy.com>
**Sent:** Friday, April 16, 2021 12:21 PM
**To:** don.uloth@uloth.pro; McKee, Derek <dmckee@constangy.com>; Ortbals Jr. Robert L. <rortbals@constangy.com>
**Cc:** Fitzgerald, Becky <rfitzgerald@constangy.com>
**Subject:** RE: 30(b)(6) deposition notice to Union Pacific

Don,

We're doing some final touches to defendant's position in the Joint Status Report. I realized via the blank placeholder you left for Topic 8, that we need to close the loop. So, to confirm, per your below email that you are seeking one interrogatory that does not count towards the 25 interrogatory limit, that is fine by us. With that confirmed, can we agree that the issue of Topic 8 is resolved?

Let us know. We should have the draft back to you very shortly.

Thanks,

Heather

**Heather M. Miller**
**Senior Counsel**

Constangy, Brooks, Smith & Prophete, LLP
Direct: 816.329.5917
E-mail: hmiller@constangy.com •View Bio/VCard
2600 Grand Boulevard
Suite 750
Kansas City, MO 64108-4600
Main: 816.472.6400 • Fax: 816.472.6401
***

Uloth Declaration
Ex. 3 (page 1 of 4)

**From:** don.uloth@uloth.pro [mailto:don.uloth@uloth.pro]
**Sent:** Thursday, April 1, 2021 11:34 AM
**To:** Miller, Heather M.; McKee, Derek; Ortbals Jr. Robert L.
**Cc:** Fitzgerald, Becky
**Subject:** RE: 30(b)(6) deposition notice to Union Pacific

Excellent question! Now that I've checked, I think the answer is one (#5 limitations).

Don Uloth

---

**From:** Miller, Heather M. <hmiller@constangy.com>
**Sent:** Thursday, April 1, 2021 10:00 AM
**To:** don.uloth@uloth.pro; McKee, Derek <dmckee@constangy.com>; Ortbals Jr. Robert L. <rortbals@constangy.com>
**Cc:** Fitzgerald, Becky <rfitzgerald@constangy.com>
**Subject:** RE: 30(b)(6) deposition notice to Union Pacific

Don,

Thanks for the clarification. That's exactly why I set out in my email our understanding of what you were seeking – to get us on the same page. So, with your clarified explanation in mind, please let us know the number of interrogatories you are asking for to not count towards the 25 interrogatory limit.

Thanks,

Heather

**Heather M. Miller**
**Senior Counsel**

Constangy, Brooks, Smith & Prophete, LLP
Direct: 816.329.5917
E-mail: hmiller@constangy.com •View Bio/VCard
2600 Grand Boulevard
Suite 750
Kansas City, MO 64108-4600
Main: 816.472.6400 • Fax: 816.472.6401
***

---

**From:** don.uloth@uloth.pro [mailto:don.uloth@uloth.pro]
**Sent:** Wednesday, March 31, 2021 4:30 PM
**To:** Miller, Heather M.; McKee, Derek; Ortbals Jr. Robert L.
**Cc:** Fitzgerald, Becky
**Subject:** RE: 30(b)(6) deposition notice to Union Pacific

Heather:

We're not on the same page here. What I asked for was X number of interrogatories that will not count towards the limit f 25, X being however many additional affirmative defenses I did not ask about in the first set of interrogatories.

Donald E. Uloth
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 #261
Dallas, TX 75252

Uloth Declaration
Ex. 3 (page 2 of 4)

(214) 989-4396
don.uloth@uloth.pro

**From:** Miller, Heather M. <hmiller@constangy.com>
**Sent:** Wednesday, March 31, 2021 11:49 AM
**To:** don.uloth@uloth.pro; McKee, Derek <dmckee@constangy.com>; Ortbals Jr. Robert L. <rortbals@constangy.com>
**Cc:** Fitzgerald, Becky <rfitzgerald@constangy.com>
**Subject:** RE: 30(b)(6) deposition notice to Union Pacific

Good morning, Don,

Thank you for the update.

For the sake of clarity, am I correct in assuming that when you say that you've not heard from UP as to whether it agrees to answer contention interrogatories in lieu of presenting a representative for deposition, you are referring to the issue of Plaintiff's 30(b)(6) topic no. 8, which we discussed during our last call? Specifically, that topic no. 8 seeks a UP rep to speak to the factual basis for each affirmative defense asserted in UP's answer, whereas UP proposed that providing such information via interrogatory answers would be more appropriate. If we're talking about the same thing, then yes, after vetting the issue with our client, UP is agreeable to providing such information via interrogatories in lieu of presenting a corporate rep for deposition. Likewise, UP agrees that the rule limiting a party to 25 interrogatories will not apply here, but only to the extent that Plaintiff may require additional interrogatories respective to the number of affirmative defenses set out in UP's answer for which Plaintiff seeks information regarding the factual basis.

Thanks again,

Heather

**Heather M. Miller**
**Senior Counsel**

Constangy, Brooks, Smith & Prophete, LLP
Direct: 816.329.5917
E-mail: hmiller@constangy.com •View Bio/VCard
2600 Grand Boulevard
Suite 750
Kansas City, MO 64108-4600
Main: 816.472.6400 • Fax: 816.472.6401
***

**From:** don.uloth@uloth.pro [mailto:don.uloth@uloth.pro]
**Sent:** Tuesday, March 30, 2021 4:30 PM
**To:** Miller, Heather M.; McKee, Derek; Ortbals Jr. Robert L.
**Subject:** 30(b)(6) deposition notice to Union Pacific

All:

Attached is a deposition notice for April 20, 3 weeks from today. Tomorrow I plan to send you a draft of a motion to compel a 30(b)(6) deposition, along with a draft of the joint report to be filed along with the motion. As long as we get these filed before April 20, I will agree to withdraw the deposition notice.

I still have not heard whether Defendant agrees to answer contention interrogatories in lieu of presenting a representative for deposition. Please let me know.

Donald E. Uloth

Uloth Declaration
Ex. 3 (page 3 of 4)

Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 #261
Dallas, TX 75252
(214) 989-4396
don.uloth@uloth.pro

Uloth Declaration
Ex. 3 (page 4 of 4)