**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOE M. FULBRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:20-cv-2392** |
| | ) | |
| **UNION PACIFIC RAILROAD COMPANY** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

## TABLE OF CONTENTS


I. **SUMMARY** ........................................................ 1

II. **STATEMENT OF RELEVANT MATERIAL FACTS** ........................................................ 2

III. **ARGUMENT AND AUTHORITIES** ........................................................ 20

A. **Union Pacific is entitled to summary judgment on Fulbright's disparate-treatment claim under 42 U.S.C. § 12112(a) (First Cause of Action).** ........................................................ 21

B. **Fulbright's fitness-for-duty referral and determination are not direct evidence of disability discrimination.** ........................................................ 21

C. **Fulbright cannot meet his burden of proof under the indirect evidence framework.** ........................................................ 22

IV. **CONCLUSION** ........................................................ 48

## TABLE OF AUTHORITIES

### Cases


Acker v. Gen. Motors, L.L.C., 853 F.3d 784, 791 (5th Cir. 2017) ............................................. 48
Aguilar v. Ocwen Loan Servicing, LLC, No. 3:17-cv-1165-B, 2018 WL 949225, at *6 (N.D. Tex. Feb. 20, 2018 ............................................. 46, 47
Ahmed v. Hussain, No. 4:17-CV-00999-O-BP, 2018 WL 2271179, at *3 (N.D. Tex. Apr. 18, 2018) ............................................. 42, 44
Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 402-03 (5th Cir. 2001) ............................................. 37
Autry v. Fort Bend Indep. Sch. Dist, 704 F.3d 344, 347 (5th Cir. 2013) ............................................. 37
Bailey v. Southwest Gas Co., 275 F.3d 1181, 1186 (9th Cir. 2002) ............................................. 34
Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 709 (5th Cir. 1997) ............................................. 49
Barren v. N.E. Ill. Reg'l Commuter R.R. Corp., No. .13 CV 4390, 2016 WL 861183, at *4-*5 (N.D. Ill. Mar. 7, 2016) ............................................. 33
Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1507-08 (5th Cir. 1988) ............................................. 39
Blackwell v. SecTek, Inc., 61 F. Supp. 3d 149, 159 (D.D.C. 2014) ............................................. 35, 36
Blankinship v. Union Pac. R.R. Co., No. CV-21-00072-TUC-RM, 2021 WL 3290453, at *4 (D. Ariz. Aug. 2, 2021) ............................................. 47
Boersig v. Union Elec. Co., 219 F.3d 816, 822 (8th Cir. 2000) ............................................. 41
Bohner v. Union Pac. R.R. Co., No. 4:19-cv-02581-SEP, 2021 WL 3363063, at *4 (E.D. Mo. Aug. 3, 2021) ............................................. 27, 36, 37, 38
Carrillo v. Union Pac. R.R. Co., No. EP-21-CV-00026-FM, 2021 WL 3023407, at *6-*7 (W.D. Tex. July 16, 2021) ............................................. 47
China Agritech, Inc. v. Resh, 138 S.Ct. 1800, 1810 (2018) ............................................. 46
Christian v. St. Anthony's Med. Ctr., Inc., 117 F.3d 1051, 1052 (7th Cir. 1997) ............................................. 31
Cicalese v. Univ. of Tex. Med. Branch, 924 F.3d 762, 766 (5th Cir. 2019) ............................................. 36, 40
Clark v. Champion Nat'l Sec., Inc., 952 F.3d 570, 582 (5th Cir. 2020) ............................................. 6, 26, 27, 29
Clark v. Charter Communications, L.L.C., 775 Fed. Appx. 764, 765, 767 (5th Cir. 2019) ............................................. 29
Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998) ............................................. 32, 53
Coleman v. Penn. State Police, 561 Fed. Appx. 138, 145 n.13 (3d Cir. 2014) ............................................. 33
Commonwealth Oil/Tesoro Petroleum Corp. Securities Litig., 467 F. Supp. 227, 259 (W.D. Tex. 1979) ............................................. 42, 47
Credeur v. Louisiana, 860 F.3d 785, 792, 794 (5th Cir. 2017) ............................................. 28, 49
Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354 (1983) ............................................. 46
DeFries v. Union Pac. R.R. Co., No. 3:21-cv-205-SB, 2021 WL 3007254, at *2 (D. Or. July 15, 2021) ............................................. 47
Donahue v. Union Pac. R.R. Co., No. 21-cv-00448-MMC, 2021 WL 2458351, at *2 (N.D. Cal. June 16, 2021) ............................................. 47
Fraga v. Alamo Cmty. Coll. Dist., No. 07-930, 2009 WL 10699730, at *2 (W.D. Tex. Nov. 10, 2009) ............................................. 45
Fuzy v. S&B Eng'rs & Constructors, Ltd., 332 F.3d 301, 303 (5th Cir. 2003) ............................................. 6, 35, 52
Ganousis v. E.I. du Pont de Nemours & Co., 803 F. Supp. 149, 155-56 (N.D. Ill. 1992) ............................................. 51
Gober v. Frankel Family Trust, 537 Fed. Appx. 518, 521 (5th Cir. 2013) ............................................. 28
Gonzalez v. City of New Braunfels, 176 F.3d 834, 839 (5th Cir. 1999) (quoting § 12112(b)(6) 41
Hall v. La. Workforce Comm'n, No. 15-00533-BAJ-RLB, 2016 WL 1756897, at *6 (M.D. La. Apr. 29, 2016) ............................................. 44
Hamar v. Ashland, Inc., 211 Fed. Appx. 309, 309 (5th Cir. 2006) ............................................. 48

Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993). .......... 40
Henson v. Bell Helicopter Textron, Inc., 128 Fed. Appx. 387, 391 (5th Cir. 2005) .......... 44
Hill v. Kan. City Area Transp. Auth., 181 F.3d 891, 894 (8th Cir. 1995) .......... 31
Hinojosa v. Jostens Inc., 128 Fed. Appx. 364, 368 (5th Cir. 2005) .......... 32, 53
Hoskins v. GE Aviation, 803 Fed. Appx. 740, 745-46 (5th Cir. 2020) .......... 34
Inclusive Communities Project, 576 U.S. 524 .......... 39, 40
Jiles v. Wright Med. Tech., Inc., 313 F. Supp. 3d 822, 834 (S.D. Tex. 2018) .......... 28, 29, 49
Johnson v. Ry. Express Agency, 421 U.S. 454, 467 (1975) .......... 46, 47, 50
Jones v. Kerrville State Hosp., 142 F.3d 263, 265 (5th Cir. 1998) .......... 28, 30, 49, 50
Kitchen v. BASF, 952 F.3d 247, 252 (5th Cir. 2020) .......... 26, 27
Krehbiel v. Union Pac. R.R. Co., No. 2:19-CV-02002-JAR-JPO, 2019 WL 3387049, at *4 (D. Kan. July 26, 2019) .......... 48
Laurent v. G & G Bus Serv., No. 10 Civ. 4055, 2013 WL 5354733, at *4 (S.D.N.Y. Sept. 25, 2013) .......... 36
Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) .......... 27
Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991) .......... 38
Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1197 (7th Cir. 1997) .......... 42
Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995). .......... 37
McDonald v. Pa. State Police, No. 02:09-cv-00442, 2012 WL 5381403, at *10 (W.D. Pa. Oct. 31, 2012) .......... 30, 31
Menominee Indian Tribe of Wis. v. United States, 136 S.Ct. 750, 755-57 (2016) .......... 50
Mitchell v. Sikorsky Aircraft, 533 Fed. Appx. 354, 360 (5th Cir. 2013) .......... 34
O'Malley v. Calumet GP, LLC, No. 13-CV-60-JED-PJC, 2014 WL 3501540, at *4 (N.D. Okla. July 14, 2014) .......... 33
O'Neal v. City of New Albany, 293 F.3d 998, 1010 n.2 (7th Cir. 2002) .......... 35
Owen v. Union Pac. R.R. Co., 8:19CV462, 2020 WL 6684504, at *1 (D. Neb. Nov. 12, 2020) 27, 37, 39, 43, 52, 53
Pacheco v. Mineta, 448 F.3d 783, 792 (5th Cir. 2006) .......... 42, 43
Parker v. Pulte Homes of Tex., L.P., No. H-09-2743, 2011 WL 767182, at *9 (S.D. Tex. Feb. 25, 2011) .......... 46, 52
Porter v. Alumoweld Co., Inc., 125 F.3d 243, 245-47 (4th Cir. 1997) .......... 35
Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) .......... 36, 39, 40, 43
Ret. Sys. v. ANZ Sec., Inc., 137 S.Ct. 2042, 2051-52 (2017) .......... 46
Ricci v. DeStefano, 557 U.S. 557, 577 (2009) .......... 40
Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 682 (5th Cir. 1996) .......... 49
Rodriguez v. Eli Lily & Co., 820 F.3d 759, 765 (5th Cir. 2016) .......... 26
Sanchez v. City of San Antonio, 794 Fed. Appx. 444, 445 (5th Cir. 2020) .......... 33, 38
Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 171 (2d Cir. 2006) .......... 41
Smith v. Methodist Hosps. of Dallas, No. 3:07-CV-1230-P, 2008 WL 5336342, at *3-*4 (N.D. Tex. Dec. 19, 2008) .......... 1, 31, 51, 54
Spindle v. CKJ Trucking, LP, No. 4:18-CV-818, 2020 WL 1283519, at *2 (E.D. Tex. Mar. 18, 2020) .......... 48
Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 294 (7th Cir. 2015) .......... 33
Stith v. Perot Sys. Corp., 122 Fed. Appx. 115, 118 (5th Cir. 2005) .......... 43
Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 187 (3d. Cir. 2010) .......... 31

Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 813 (6th Cir. 1999)................................ 32, 34
Tavarez v. United Blood Servs., No. 11-CV-673 WJ/ACT, 2012 WL 13080075 ....................... 31
Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007)................................................................ 52
Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1093 (5th Cir. 1996) .................................... 28
Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220 (5th Cir. 2001).......................................... 37
Weber v. BNSF Ry. Co., 989 F.3d 320, 323 (5th Cir. 2021) ............................................ 6, 28, 49
Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 609 (3rd Cir. 2018) ............................................ 46
Whitmire v. Wal-Mart Stores, Inc., 359 F. Supp. 3d 761, 793-95 (D. Ariz. 2019)...................... 31
Williams v. ABM Parking Servs. Inc., 296 F. Supp. 3d 779, 789 (E.D. Va. 2017) ..................... 41
Windhauser v. Bd. of Supervisors for La. State Univ. & Agr. & Mech. Coll., 360 Fed. Appx. 562, 565 (5th Cir. 2010)........................................................................................... 47, 48
Wright v. Arlington Indep. Sch. Dist., 834 Fed. Appx. 897, 901 (5th Cir. 2020).................. 28, 45

## I. SUMMARY

Fulbright alleges that Union Pacific violated the Americans with Disabilities Act by (1) discriminating against him because of his disability based on disparate treatment, (2) failing to accommodate his disability, and (3) subjecting him to unlawful medical inquiries. Union Pacific moves for summary judgment on all of Fulbright's claims.

To establish disability discrimination based on disparate treatment theory, Fulbright must show that: (1) he is disabled; (2) he is qualified for his job; and (3) he suffered an adverse employment action because of his disability. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020). Fulbright's claim fails as a matter of law because he is not a qualified individual under the ADA and cannot meet his burden of proving discriminatory intent. Moreover, Fulbright improperly attempts to base part of this claim on qualification standards, which is a disparate impact claim under the ADA, and, thus, fails to state a disparate treatment claim, and one which Fulbright has not administratively exhausted.

"A failure-to-accommodate claim requires a showing that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021) (quoting 29 C.F.R. § 1630.2(n)(3)(i)-(vii)). This claim fails as a matter of law because he is not a qualified individual because he cannot perform the essential functions of his job and because his requested accommodation is unreasonable as a matter of law. Moreover, this claim is untimely and has not been administratively exhausted.

As for Fulbright's third claim, "an employer may inquire and make medical examinations if they are shown to be job-related and consistent with business necessity." *Fuzy v. S&B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003) (citing 42 U.S.C. §12112(d)(4)(A)-(B)). This

claim fails because Union Pacific only inquired as related to evaluating Fulbright's fitness for duty based on his manager's concerns about his ability to safely perform his essential job functions, which is both job-related and consistent with Union Pacific's business necessity. Moreover, this claim is time barred.

## II. STATEMENT OF RELEVANT MATERIAL FACTS[1]

***The Parties***

1. Union Pacific is an interstate Class I freight railroad linking 23 states in the western two-thirds of the U.S. by rail. App. 44.

2. Union Pacific maintains its principal place of business in Omaha, Nebraska and employs more than 32,000 employees. App. 44.

3. Union Pacific hired Fulbright in March 1985 as a Communications Maintainer. App. 12 and 51-59.

4. Fulbright' has "problems sleeping" and major depressive disorder, which was diagnosed in 2009 and for which he was prescribed Trazodone and Prozac. App. 8.

5. Fulbright has not performed work for Union Pacific since January 26, 2015 and the last position he held was a Senior Communications Technician. App. 52.

***Fulbright's Employment with Union Pacific***

6. Fulbright has seen and was aware of Union Pacific's Equal Employment Opportunity & Policy Directives ("EEO Policy") and that Union Pacific had a policy that prohibits discrimination or harassment based on disability. App. 13and 113-115.

7. Union Pacific's EEO Policy requires employees to report to Union Pacific's EEO

[1] Union Pacific admits these facts for purposes of summary judgment only and reserves the right to dispute or challenge these facts at trial. Union Pacific has asserted the statement of undisputed material facts consistent with the legal requirement that facts on summary judgment must be viewed in the light most favorable to the plaintiff.

Department any behavior that they believe or are aware of that is discriminatory or harassing. Union Pacific's EEO Policy provides a toll-free number that is maintained on a 24-hour basis, as well as contact information for its EEO Department. App. 114.

8. Fulbright called Union Pacific's Safety Hotline on August 15, 2012 regarding a situation that was resolved to a major degree but does not think he had a reason to go to Union Pacific's EEO Department. App. 13.

9. Fulbright was aware of Union Pacific's Reasonable Accommodation Policy. App. 14.

10. Under Union Pacific's Reasonable Accommodation Policy, an employee may request a reasonable accommodation at any time, orally or in writing, to the EEO Hotline, the same toll-free number set out in Union Pacific's EEO Policy, or by accessing Union Pacific's 24-hour Online Reporting System at ww.tnwinc.com/webreport. App. 130-131.

11. Fulbright recalls that Union Pacific's Reasonable Accommodation Policy may have been posted on bulletin boards around the rail yard, but Fulbright did not bother to read the Reasonable Accommodation Policy and did not feel like he needed an accommodation because he does not believe that his job requires him to be on call. App. 14.

12. Between March 1985 and September 1998, Fulbright held the positions of Communications Maintainer and Senior Communications Technician—both of which are subject to Union Pacific's collective bargaining agreement with the Brotherhood of Railroad Signalmen ("BRS"). App. 52.

13. Fulbright was a member of the BRS. App. 51 and 30.

14. On August 17, 1998, Fulbright refused a call to work, claiming that he had not had enough sleep to be able to work safely. App. 100.

15. On September 1, 1998, Union Pacific terminated Fulbright's employment following an investigation regarding his refusal on August 17, 1998. App. 16 and 100.

16. On May 25, 1999, an agreement (the "Implementing Agreement") was executed between Union Pacific, the BRS, and the International Brotherhood of Electrical Workers ("IBEW"). The Implementing Agreement consolidated telecommunications facilities, work, territories, and seniority districts such that employees represented by the BRS, like Fulbright, were consolidated into Union Pacific's collective bargaining agreement with the IBEW governing telecommunications employees represented by the IBEW. App. 157-190 and 45-46.

17. Fulbright appealed his 1998 dismissal via the union grievance process and on January 24, 2000, the National Mediation Board ("NMB") reinstated Fulbright's employment, stating, however, that Fulbright's "excuses are not persuasive and his testimony seeks to place blame on [Union Pacific] for failing to make the procedures for responding to calls clear to him. [ ] there is no question that [Fulbright] shares a large measure of culpability [ ] and was not so naive regarding the proper procedures [ ]." App. 100-101 and 52.

18. When Fulbright returned to work in 2000, he remained a BRS-represented employee and held a "BRS monthly rated" position as Senior Communications Technician in Fort Worth, Texas, a position he held until he went on medical leave in February 2015. App. 14 , 52, and 158.

19. In accordance with the Implementing Agreement, when Fulbright returned to work in 2000 and going forward until he went on medical leave in February 2015, Fulbright's job title changed from Communications Maintainer to Senior Communications Technician, also referred to as Senior Electronic Technician. App. 45-46, 161, 172, 52, and 31.

20. Under the Implementing Agreement, Fulbright's rate of pay and eligible benefits

remained governed by Union Pacific's collective bargaining agreement with the BRS so long as he remained on a BRS-represented position. App. 45-46 and 161.

21. Under the Implementing Agreement, Fulbright's seniority date with the BRS transferred and dovetailed into a seniority roster with the IBEW, and the IBEW, thereafter, governed seniority, seniority districts, job bulletining, job abolishment, and classification of work and work scope. App. 45-46 and 158.

22. Fulbright's work schedule was Monday through Friday, 7 am to 4 pm, subject to after-hours call outs at night and on weekends and holidays. App. 47-48.

23. As a "monthly rated" employee, Fulbright was paid a monthly rate of pay based on six days per week to cover scheduled work Monday through Friday and account for being available after hours at night, on weekends, and on holidays. App. 45-46.

***The Nature of Fulbright's Work as a Senior Communications Technician***

24. Fulbright's essential job functions as a Senior Communications Technician include repair, maintenance, and installation of various components and systems, including inside and outside wire and cable plant, including CAT 5/6 and Fiber Cables; support systems; LAN/WAN interconnect systems; computer systems, such as routers, switches, and servers; analog and digital radio systems, such as dispatcher, yard, rel, eot repeater, desktop, hand held, mobile, Mds (ctc) and WOR; microwave and fiber optic transmission equipment including multiplexing of such equipment; work station, voice, MDf and data, including horizontal cabling; phone and pbx systems; AEI trackside; weigh and scale systems; camera systems; gate and oasis systems for intermodal; auto ramp facilities; DC systems, such as 12, 24, and 48 vdc rectifiers, converters, inverters, and battery plants. App. 104.

25. Some of Fulbright's work equipment was stored trackside and Fulbright's position

performs work trackside and requires working as a lone worker and as a lookout. App. 15, 105, and 108.

26. Fulbright's position performs work in a rail yard, working in and around rail yard operations, remote control movement of trains, and moving track machines. App. 105 and 47-48.

27. Technicians must be able to climb ladders and perform work while on a ladder. Restoring equipment could involve climbing on ladders. Technicians could climb up to eight or nine feet. App. 105, 15, and 47-48.

28. Technicians must be able to operate a vehicle. App. 105, 107, and 47-48.

29. Fulbright drove a Union Pacific company vehicle for call outs. App. 11 and 47-48.

30. All IBEW and BRS Electronic Technicians are subject to "Emergency Restoration of Service" and must be available for call outs 24 x 7. App. 105, 108, and 35.

31. Emergency work, under the collective bargaining agreement between Union Pacific and the IBEW (Telecommunications Employees), includes trouble calls from user departments involving service and repairs to telecommunications equipment needed for railroad operations and departmental communications service interruptions, failures and alarms. App. 129.

32. Technicians must be available after-hours at night, on weekends, and during holidays. Equipment failures impacting train service must be restored in under 2.5 hours. App. 108

33. Fulbright and the other technicians in his work group came up with a weekend rotation where each technician took turns covering after-hours call outs. For weekends that a technician did not cover on the rotation schedule, they were to mark off to show an off-duty status so that when a dispatcher contacted a technician with a trouble call, they would pass over the off duty technician and contact the on duty technician. App. 32-33.

34. Monthly-rated employees are required to report for work when called by proper authority to perform emergency work, regardless of voluntary weekend coverage. App. 129 and 47-48.

35. Fulbright was expected to safely perform his job. App. 14.

36. Fulbright was told many times that safety was the most important element in performing his job duties. App. 14.

37. Each person is responsible for his own safety. App. 34.

38. Fulbright's work group had "routine safety meetings" and Fulbright attended and participated in safety meetings. App. 17, 7, and 20.

39. From 2008 to 2013, Manager Telecom Facilities Terry Neal supervised Fulbright. App. 6.

40. Steve Hale, a foreman in 2015 who reported to Neal, was listed as Fulbright's manager up until Fulbright last performed work at Union Pacific. App. 34, 31, and 47-48.

***Union Pacific's Medical Fitness-for-Duty Evaluation Process***

41. Union Pacific's fitness-for-duty ("FFD") evaluations ensure that Union Pacific employees are medically and functionally capable of safely working in the railroad environment and that Union Pacific remains in compliance with various health, medical, and safety regulatory standards. The purpose of a medical FFD evaluation is to determine if an individual has a health condition or functional impairment that poses a significant risk to the health or safety of the individual or others, or prevents the individual from performing the essential functions of their job. App. 49-50.

42. The FFD focuses on the safety risks in the railroad environment associated with the employee's individual health condition in light of the employee's essential job functions. Union

Pacific's Health and Medical Services Department ("HMS") works with the employee to gather pertinent medical records. App. 49-50.

43. Supervisors and managers have the ability to refer employee for an FFD evaluation for an employee "based on credible information which raises a concern about the employee's ability to safely perform his/her job duties." App. 49-50.

***Fulbright's Fitness-for-Duty History Before 2015***

44. In 1997, Fulbright's manager referred him for a FFD evaluation because he told his manager that he would probably be missing some calls due to medication he took for severe allergies. Taking 24 hour calls had recently been added to Fulbright's job duties. App. 15 and 154.

45. Dr. James Harding, a doctor that Fulbright saw as related to the 1997 FFD referral, indicated that Fulbright had been working in an on-call capacity in the last month or so, which interfered with his sleep pattern. App. 15 and 125-126.

46. According to Dr. Harding, Fulbright's primary care physician, Dr. Jarvis Bull, had documented "stress anxiety related to a sleep disorder" and recommended medication to help with the sleep disorder. App. 15 and 125-126.

47. Fulbright's on-call schedule was temporarily changed as a result of the 1997 FFD evaluation. App. 16.

48. In 2009, as part of an FFD evaluation for Fulbright's return-to-work, Fulbright and/or his treating physician made statements regarding his then-current medication use, which prompted Union Pacific to remind Fulbright, in writing, of his responsibility for complying with Union Pacific's Drug & Alcohol Policy. App. 127-128.

49. In the event an employee's medication adversely affects the employee's alertness, judgment, or ability to safely work, Union Pacific's Drug & Alcohol Policy encourages employees to discuss alternative medications with their physician. App. 127-128.

50. Fulbright is aware he was responsible for complying with Union Pacific's Drug & Alcohol Policy. App. 16.

51. In 2009, Fulbright' was prescribed Trazodone for "problems sleeping" and Prozac for major depressive disorder. App. 8.

52. Once Fulbright's sleep "normalized," he did not have depression anymore and had no depression in 2015. App. 9.

53. Fulbright has described his "problems sleeping" as "a life threatening sleep disorder," but has never attempted to treat his sleep issue with a sleep specialist and instead has done his own research on sleep disorders to conclude that he has a severe sleep disorder, "related to serotonin." App. 93 and 9.

54. In 2015, Fulbright was taking Trazodone for his sleeping problem. App. 8.

55. Fulbright experiences drowsiness for four to six hours when he takes Trazodone. App. 10.

56. Fulbright has experienced daytime drowsiness since taking Trazodone. App. 10.

57. Fulbright never discussed his job duties with the doctor who prescribed Trazodone for his sleeping problem and the doctor never provided him with any documentation that his use of Trazodone was consistent with the safe performance of his job duties. App. 16.

58. A physician has never certified that Fulbright's use of Trazodone is consistent with the safe performance of his job duties. App. 16.

***Fulbright's 2015 Fitness-for-Duty Evaluation***

59. Fulbright told Neal that he could not drive under the influence of his medication. App. 19.

60. Fulbright was on call the weekend of November 15-16, 2014. App. 18.

61. Fulbright missed two after-hours calls on the weekend of November 15-16, 2014. Neal understood that when Fulbright took his sleep medicine, driving was out of the question, and so he dispatched another technician to cover the two calls. App. 116.

62. Fulbright was on call the weekend January 24-25, 2015. App. 19.

63. Fulbright missed two consecutive after-hours calls on Sunday, January 25, 2015. Neal instructed dispatch to contact another technician. Fulbright called Neal the next morning and self-reported that he did not hear the calls due to taking sleep medicine. App. 117-118.

64. Neal met with Fulbright on January 26, 2015 to discuss Fulbright's missed call over the weekend. Fulbright's union representative was also present during the meeting between Neal and Fulbright. Even though a missed call is a rule violation, Neal told Fulbright that he did not want to pursue discipline. App. 117-118, 36, 21, and 22.

65. During the January 26, 2015 discussion, Neal provided Fulbright with a copy of his meeting notes, which stated that he was making a manager referral for an FFD evaluation for Fulbright, "to clarify if there is a sleep disorder or condition." Neal also provided Fulbright with a copy of the Supervisor Initiated Fitness-for-Duty Request Form. App. 22 and 117-118.

66. After the conference with Fulbright, Neal completed the manager referral form and referred Fulbright to HMS for an FFD evaluation for Fulbright's medication and his sleep issues. Neal referred Fulbright for an FFD evaluation because he was worried Fulbright's sleep medicine could impair Fulbright into his normal work shift. Neal was worried because Fulbright had told him that he takes sleep medication and it works for eight hours, that he could not drive his vehicle

when he was taking the medicine, but after eight hours he could drive and come to work and was fine. Neal referred Fulbright because he is not a doctor and does not know how long Fulbright's medication lasts or the effects of it lingering in Fulbright's body. App. 37.

67. Neal requested the FFD evaluation for Fulbright's "sleeping issues," stating that Fulbright has to take medicine in order to sleep but that the medicine prohibits his ability to fulfill his duties for Emergency Restoration of Service after hours. Fulbright's inability to cover his after-hours duties—because he has taken his sleep medication—puts a hardship on his peers having to cover for his sleep condition. App. 61-62.

68. On January 29, 2015, HMS formally initiated Fulbright's FFD evaluation process. HMS nurse Theresa Rodino called Fulbright, left him a voicemail, and sent Fulbright a letter requesting a copy of Fulbright's "last 1 years physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition." App.63-64_.

69. Fulbright returned Rodino's call on January 29, 2015, but they did not talk. App. 92.

70. On February 2, 2015, Rodino and Fulbright had a phone call during which he disclosed that he does not get good sleep without taking Trazodone, which he takes at a dosage of 75 mg, 3-4 nights per week. Fulbright questioned being removed from service pending the FFD determination. App. 92.

71. Per Fulbright's questioning of being removed from service, Dr. John Charbonneau, a Union Pacific Associate Medical Director and board-certified Occupational Medicine physician, reconsidered the decision to remove Fulbright from service pending an FFD determination, but decided to stand by the original decision based on the safety concerns raised by the manager referral. App. 40.

72. On February 3, 2015, HMS placed Fulbright on a medical leave of absence pending his FFD determination. App. 65.

73. In the case of a manager referral, when a concern has been raised by a manager, usually who is not medically trained, HMS does not assume there is a medical cause for the observed behaviors. It is standard practice for HMS to request the last one to two years of medical records from an employee and the FFD evaluation continues from there. App. 40 and 49-50.

74. On February 9, 2015, Rodino called Fulbright and left him a voicemail regarding HMS' request for two years of medical records and where to send the information. App. 91.

75. On February 10, 2015, Fulbright contacted Rodino and left her a voicemail asking for something in writing regarding the information HMS needed for his return to work. App. 91.

76. Rodino returned Fulbright's call on February 11, 215, again reiterating the request for the last two years of records and again providing information for where to send the records, as well as her own contact information. App. 91.

77. On February 26, 2015, HMS resent its January 29, 2015 written request for Fulbright's medical records, this time requesting a copy of Fulbright's "last 2 years physician clinic notes [ ] from the provider treating you for this condition." App. 66-67.

78. On March 31, 2015, Rodino called Fulbright's cell phone and left a detailed voicemail that HMS was still waiting on the requested medical information for the last two years. Rodino left her call back number and fax number, asking Fulbright to please call her back with a status update. App. 91.

79. On April 1, 2015, the BRS, on Fulbright's behalf, filed a grievance claiming that Union Pacific removed Fulbright from service without just cause. App. 94-99.

80. On April 6, 2015, HMS received a one-page clinic note from Fulbright, which appeared by page no. 1 of a four-page note. HMS cannot act with inadequate or incomplete information. App. 90.

81. On April 10, 2015, Rodino left Fulbright a voicemail, informing him that HMS had only received four pages, only one of which had any medical information, of what may be a 29-page fax. Rodino also sent him a written letter informing him of the same. App. 90 and 68-69.

82. On April 13, 2015, HMS received 24 pages of medical information for Fulbright, indicating that Fulbright had been treated for sleep onset insomnia for at least one year. App. 89.

83. Following an internal case review discussion, Dr. Charbonneau asked Rodino to instruct Fulbright that he would need to have a sleep medicine evaluation as part of his FFD evaluation process. App. 89.

84. Sleep medicine evaluations assess people who report problems with sleep, either quality of sleep, duration of sleep, and whether it is restorative sleep. In Fulbright's case, the sleep medicine evaluation would have been to get a full understanding of the problems at hand and potentially identify a way for Fulbright to overcome the sleep issue so that he could be able to take after-hours calls. App. 41.

85. A sleep medicine evaluation may include a detailed medical history, clinical examination, and a sleep study, with a follow-up evaluation to put together the clinical pieces with the diagnostic testing, which then allows a determination of appropriate medical treatment for the employee/patient's circumstances. App. 41.

86. A sleep study is different from a sleep medicine evaluation in that a sleep study may be subset or part of a sleep medicine evaluation. App. 41.

87. A sleep medicine evaluation is not a sleep medication evaluation, "sleep medicine" is a term that describes the physician's specialty in sleep problems. The "medicine" defines the specialist who will do the evaluation, not the medication that Fulbright is taking. App. 42.

88. Dr. Charbonneau had also asked Rodino to ask Fulbright to sign a release form to allow Dr. Charbonneau to speak to his primary care physician to explain the reasons for the safety concern and why he was requesting an evaluation by a sleep medicine specialist. App. 89.

89. On April 15, 2015, Rodino sent a blank release form to Fulbright. On April 16, 2015, Rodino called Fulbright and informed him of the request for him to sign a release so that Dr. Charbonneau could speak with his provider and explained the reason for the request, that being that Fulbright has apparent sleep onset insomnia and Dr. Charbonneau would like to talk with Fulbright's document about a sleep specialist and treatment plan. App. 88-89.

90. On April 20, 2015, Rodino made several calls to Fulbright asking about the release form. Fulbright asked to talk with Dr. Charbonneau first. App. 88.

91. On April 21, 2015, Dr. Charbonneau, Rodino and Fulbright conferred via phone. After introductions, Dr. Charbonneau summarized the Manager Referral FFD process and the information Fulbright had provided up to that point. Then, Dr. Charbonneau explained that they were requesting permission to speak directly to his provider to request a sleep medicine evaluation, which would allow an opportunity to explain the safety considerations to his doctor and the basis for the evaluation. App. 87.

92. During his call with Dr. Charbonneau and Rodino, Fulbright disclosed-unsolicited-that he'd been dealing with depression and sleep problems for 10-15 years, found a psychiatrist who determined that he had a B-12 deficiency, which caused a secondary low serotonin level, prompting prescriptions of Trazodone and Prozac. Fulbright explained that he would never report

for work or drive his car after taking the medication. He stated that he takes the medication from 3-4 nights up to 8-10 nights at a time. Fulbright stated that he had been working around the on-call issue for 3-4 years. App. 88.

93. Dr. Charbonneau and Rodino assured Fulbright no statements had been made to them about Fulbright being impaired due to the medication. They reiterated the request for a formal sleep medicine consultation. Feeling that Fulbright generally did not want to sign a release, they added that they would be satisfied if Fulbright personally relayed the information to his provider rather than requiring Fulbright's release. Fulbright agreed to consult with his personal provider and request a sleep medicine evaluation. Dr. Charbonneau and Rodino both explained to Fulbright that the evaluation had to be performed by a sleep medicine specialist. App. 43 and 88.

94. On April 27, 2015, Fulbright's physician referred him to Texas Medical Diagnostics ("TMD") for a sleep medicine evaluation by a sleep specialist. App. 23.

95. On May 20, 2015, Fulbright informed Rodino that he had an appointment on June 1, 2015 with a sleep specialist. App. 87.

96. At his June 1, 2015 appointment, Fulbright told TMD that Union Pacific was worried about his medicine causing sleepiness. App. 24.

97. TMD ordered Fulbright to do a home sleep study test to make sure the maintenance portion of the insomnia was not secondary to an underlying sleep breathing disorder. App. 24 and 191.

98. TMD also requested a maintenance of wakefulness test to objectively assess Fulbright's level of alertness after using Trazodone. App. 191.

99. Fulbright did not follow through with the recommendations of TMD, stating that he did not have the money and his health insurance had been terminated. App. 24.

100. However, Fulbright's insurance was reinstated and working again two or three weeks after June 1, 2015 appointment with TMD. App. 27.

101. Fulbright never provided any records from TMD to Union Pacific. Fulbright thought that they sent them directly to Union Pacific, but Fulbright never verified. App. 24.

102. On June 18, 2015, HMS called Fulbright and sent Fulbright a letter requesting an update on the status of the requested sleep evaluation. App. 85 and 70-71.

***Union Pacific's FFD Determination and Fulbright's Medical Restrictions***

103. By June 26, 2015, Union Pacific had not received the medical records requested or the results of a sleep medicine evaluation. App. 85.

104. After an internal case review, Dr. Charbonneau determined that without further information and because Trazodone is so long-acting, Fulbright was restricted as follows until he provides information that he is no longer taking Trazodone or not using Trazodone within 24 hours of reporting for work:

- Not to operate company vehicles, on-track or mobile equipment, or fork-lifts;
- Not to work on rail trains or work trains dumping ballast;
- Not to operate cranes, hoists, or machinery;
- Not to work at unprotected heights, over four feet above the ground;
- Not to work on 1-man or 2-man gangs; and
- Must have at least two additional employees on gang or at work area in order to use Train Approach Warning regulations (lookout). App. 85-86.

105. Rodino sent the same restrictions to Neal to assess whether the restrictions could be reasonably accommodated in Fulbright's current job as a Senior Communications Technician. App. 85 and 72-74.

106. On June 29, 2015, Dr. Charbonneau and Rodino called Fulbright to discuss the FFD determination and medical restrictions with Fulbright. When Dr. Charbonneau reminded Fulbright of the plan for him to contact his primary care physician to request a referral for a sleep medicine evaluation, Fulbright told Dr. Charbonneau that he had gone for an evaluation with a provider who was not specialist and could not address the medication issue. He also informed Dr. Charbonneau that he didn't go through with the plan because his benefits had been stopped and he could not pay for the evaluations. App. 84, 25, and 24.

107. Neal completed the Restriction Review Form and returned it to HMS on July 1, 2015. Neal determined that Fulbright's restrictions interfered with his essential job functions and could not be reasonably accommodated because doing so would require removing an essential job function and/or lowering performance or production standards. App. 75-78.

108. For example, Neal could not accommodate the restriction that Fulbright not operate a company vehicle because driving a company vehicle is required for Fulbright's position. Likewise, Neal could not accommodate the restriction that Fulbright not work at unprotected heights over four feet because Fulbright's position may require work on ecomms and projects that necessitate working on a ladder. Neal could also not accommodate the restriction that Fulbright not work as a one-man or on a two-man gang because working as a "lone worker" is required when working on trackside AEI and CTC equipment. App. 77.

109. On June 7, 2021, Dr. Richard Schwab submitted his expert report in this matter. In addition to the findings and conclusions stated in his opinion concerning Fulbright, Dr. Schwab found that Union Pacific appropriately placed restrictions on Fulbright in light of the fact that Fulbright did not follow through on the requested sleep medicine evaluation and due to Union

Pacific's concerns about Fulbright's sleep disorders, including chronic sleep onset insomnia, potential adverse effects of Trazodone on daytime functioning, and likely sleep apnea. App. 132.

110. Dr. Schwab opined that Fulbright had chronic insomnia, mostly sleep onset, and that while Trazodone is commonly used to treat insomnia, it can cause daytime sleepiness. Dr. Schwab found the fact that Fulbright had reported to TMD that he takes daytime naps for 1.5 hours as likely related to residual effects of Trazodone or, alternatively, unrecognized (undiagnosed and, therefore, untreated) sleep apnea. App. 133.

111. Dr. Schwab further opined that had Fulbright followed through with the recommended actions proposed by TMD, the results would have allowed Union Pacific to make a more informed medical decision about Fulbright's fitness for duty, but that without these results, Union Pacific made their FFD determination based on Fulbright's clinical presentation, placing appropriately indicated restrictions. App. 133.

112. Dr. Schwab concluded that Fulbright "had multiple sleeps disorders (including chronic insomnia, the untoward effects of taking Trazodone, and a very high probability of having sleep apnea), and each of these adversely affected his daytime functioning." Dr. Schwab deemed the sleep evaluation suggested by Union Pacific as medically indicated, as well as TMD's recommended sleep study and maintenance of wakefulness test, and that in the absence of such information combined with Union Pacific's concerns, Union Pacific appropriately placed medical restrictions. App. 134.

***Union Pacific's Attempts to Accommodate Fulbright***

113. On July 1, 2015, Director Disability Management Terry Owens sent Fulbright a letter regarding the FFD decision, Fulbright's specific restrictions, and information regarding

vocational assistance and options for returning to work in a position that complied with his medical restrictions. App. 79-83.

114. Fulbright contacted someone – one time – in Union Pacific's Disability Management Department to discuss vocational options, but he was not interested because he would have had to give up his rights to litigate to get a job. App. 25.

115. Fulbright admits that he could not think of anyone at Union Pacific who said his job had been terminated, but that Union Pacific only told him his medical restrictions could not be accommodated in his current job. App. 26.

116. Fulbright has not had any communication with Union Pacific regarding his employment status since the single call he made to Union Pacific's Disability Management Department to discuss vocational options. App. 26.

***Fulbright's Charge of Discrimination***

117. On or about August 11, 2015, Fulbright dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Fort Worth Human Relations Commission ("FWHRC"). App. 109-112.

118. Fulbright's charge alleged disability discrimination and retaliation based on claims that Fulbright complained in 2012 that Neal had discriminated against him due to his disability and in January 2015 Neal falsely accused him of being impaired at work and failing to answer a call, in February 2015 he was removed from service for a medical evaluation, and in June 2015 he was told he no longer had a job in communications due to the results of a medical evaluation even though the company had never contacted him to complete a medical evaluation. App. 111-112.

119. Fulbright's discrimination charge was limited to claims of disability discrimination based on a disparate treatment theory and retaliation. Fulbright's charge did not allege that Union Pacific denied him a reasonable accommodation. App. 111-112.

120. The class action complaint in *Harris v. Union Pac. R.R. Co.*, No. 8:16-CV-00381 (D. Neb.), filed on November 25, 2015 and amended on February 19, 2016, asserted class claims of (1) disparate treatment; (2) disparate impact; and (3) unlawful medical inquiry. App. 212-216.

121. A failure-to-accommodate claim was pleaded in *Harris*, but only behalf of the specifically, individually named Fulbrights and not on behalf of the purported ADA class. App. 215-216.

122. The FWHRC investigated Fulbright's charge and on April 26, 2016, issued its determination, finding no reasonable cause to believe that Union Pacific violated the ADA (or the City of Fort Worth's Fair Employment Ordinance No. 7278 or the Texas Commission on Human Rights Act). The FWHRC determined that Fulbright is not a qualified individual, in that there was insufficient evidence that Fulbright is able to perform the essential functions of his job with or without reasonable accommodation, given the nature of his medical restrictions. App. 119-122.

123. On June 7, 2016, the EEOC "adopted the findings of the state or local fair employment practices agency that investigated this charge" and dismissed Fulbright's charge and issued him a Notice of Rights. App. 123.

124. The *Harris* plaintiffs abandoned their class claim for unlawful medical inquiry when they moved for class certification on August 7, 2018. App. 260 and 286.

125. Fulbright filed the present complaint on August 20, 2020. App. 281.

## III. ARGUMENT AND AUTHORITIES[2]

[2] Union Pacific incorporates the standard for summary judgment set forth in *Williams v. City of Richardson*, No. 3:16-CV-2944-L-BK, 2020 WL 2487058, at *1 (N.D. Tex. Feb. 5, 2020).

**A. Union Pacific is entitled to summary judgment on Fulbright's disparate-treatment claim under 42 U.S.C. § 12112(a) (First Cause of Action).**

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). "In a discriminatory-termination action under the ADA, the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*." *Clark*, 952 F.3d at 579 (brackets in original and quotation omitted). Here, Fulbright cannot meet his burden under either evidentiary framework.

**B. Fulbright's fitness-for-duty referral and determination are not direct evidence of disability discrimination.**

"[D]irect evidence is rare." *Id*. (brackets in original and quotation omitted). It is evidence that, "if believed, it proves the fact of 'discriminatory animus without inference or presumption.'" *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (quoting *Rodriguez v. Eli Lily & Co.*, 820 F.3d 759, 765 (5th Cir. 2016)).

Here, Fulbright was referred for an FFD evaluation due to concerns that he could not safely perform his duties as a Senior Communications Technician. Fulbright was not returned to his position after Neal reviewed the medical restrictions issued by Dr. Charbonneau as part of the FFD determination and concluded there were no reasonable accommodations allowing Fulbright to safely perform the essential functions of his job. SOF ¶ 107-108. Referring Fulbright for an FFD evaluation to ensure he could safely perform his essential job functions—and later concluding that Fulbright could not do so within certain medical restrictions—is not the same as taking action out of prejudice against his medical condition. An inferential leap is required to arrive at the conclusion that Union Pacific took any of these actions out of discriminatory animus against Fulbright's

alleged disability. Thus, Fulbright cannot produce direct evidence to support his case. *See, e.g.*, *Clark*, 952 F.3d at 579-82 (finding no direct evidence of disability discrimination); *Kitchen*, 952 F.3d at 252 (no direct evidence of disability discrimination based on employee's alcoholism where employee was discharged for failing a breath alcohol test); *Bohner v. Union Pac. R.R. Co.*, No. 4:19-cv-02581-SEP, 2021 WL 3363063, at *4 (E.D. Mo. Aug. 3, 2021) (finding no direct evidence of disability discrimination where plaintiff was referred by his manager for a FFD evaluation and not permitted to return to work after being issued medical restrictions during the FFD evaluation); *Owen v. Union Pac. R.R. Co.*, 8:19CV462, 2020 WL 6684504, at *1 (D. Neb. Nov. 12, 2020) (applying *McDonnell Douglas* when the plaintiff suffering from arthritis was issued an FFD evaluation after supervisor saw him stumble at jobsite).

**C. Fulbright cannot meet his burden of proof under the indirect evidence framework.**

To establish a *prima facie* case of disability discrimination, Fulbright must show that: (1) he is disabled; (2) he is qualified for his job; and (3) he suffered an adverse employment action because of his disability. *Clark*, 952 F.3d at 582 (quotation omitted). If Fulbright establishes a *prima facie* case, a burden of production shifts to Union Pacific to state a legitimate, nondiscriminatory reason for its actions. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Once Union Pacific does so, the burden shifts back to Fulbright to provide substantial evidence showing that Union Pacific's stated reasons were pretext for discrimination. *Id*.

Here, Fulbright's disparate-treatment claim fails as a matter of law because he is not a qualified individual under the ADA and cannot meet his burden of proving discriminatory intent.

***1. Fulbright was not qualified for his position because he was incapable of performing the essential function of being on call for after-hours work.***

"A qualified individual 'is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds.'" *Jiles*

*v. Wright Med. Tech., Inc.*, 313 F. Supp. 3d 822, 834 (S.D. Tex. 2018) (quoting 42 U.S.C. § 12111(8)). "To avoid summary judgment, [Fulbright] must show (1) 'that he could perform the essential functions of the job in spite of his disability' or (2) 'that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job.'" *Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)). "If the disabled person must be exempted from performance of an essential function of the job, then [ ]he is not otherwise qualified and not protected by the ADA." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998).

To determine whether a function is essential, courts "look to several factors, such as the 'employer's judgment as to which functions are essential' and 'the consequences of not requiring the incumbent to perform the function.'" *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 325 (5th Cir. 2021) (quoting 29 C.F.R. § 1630.2(n)(3)(i)-(vii)). "The text of the ADA and its regulations require [the Court] to 'give greatest weight' to the 'employer's judgment factor,' though [courts] must 'evaluate the employer's words alongside its policies and practices.'" *Id.* (quoting *Credeur v. Louisiana*, 860 F.3d 785, 792, 794 (5th Cir. 2017)).

The Fifth Circuit has held that being on call—requiring after-hours availability—is an essential job function. *Gober*, 537 Fed. Appx. at 521. In *Gober*, the plaintiff was a maintenance foreman for an apartment complex. *Id.* at 519. He was restricted by his cardiologist from working more than eight hours per day and from working on weekends. *Id*. The plaintiff told his employer that he could not be on call because his eight-hour workday restriction prevented him from responding to after-hours requests to return to the property. *Id.* at 520. On learning this, the employer fired plaintiff because being on call was an essential job function and could not be accommodated. *Id*. In contending that being on call was not an essential function of his job, the

plaintiff argued that there was a difference between being on call and being in the on-call rotation, but the evidence showed that maintenance foremen were expected to report to the property after hours when necessary, even if they were not on the on-call rotation. *Id.* at 521-22. Moreover, even though the evidence demonstrated that reporting to work after hours was infrequent, it was "nonetheless, an essential function of this position." *Id.* at 522. Because being on call and able to report in person to the property was an essential job function, the employer was not required to relieve the plaintiff of that duty, modify the duty, or reassign other employees to the duty. *Id*. Accordingly, the plaintiff was not a qualified individual. *Id.* at 521-22; *see also Jiles*, 313 F. Supp. 3d at 839-40 (plaintiff was not a qualified individual where overtime was an essential job function).

Similarly, the Fifth Circuit has held that "maintaining consciousness is a basic element of any job." *Clark*, 952 F.3d at 583-84. Consequently, a specialist with narcolepsy, who was responsible for dispatching technicians to repair network outages for a telecommunications employer, was not a qualified individual because she could not "fulfill her tasks when she might sleep through a time-sensitive network alert or an urgent call from a technician addressing an outage." *Clark v. Charter Communications, L.L.C.*, 775 Fed. Appx. 764, 765, 767 (5th Cir. 2019).

Here, Fulbright's position as Senior Communications Technician required him to respond to after-hours calls and be available 24x7 for emergency restoration of service. SOF ¶¶ 30, 32-34. Moreover, all monthly-rated employees, like Fulbright, must report for work when called to perform emergency work, regardless of assigned coverage under a voluntary weekend rotation. SOF ¶¶ 33-34. In sum, Fulbright's position required him to be on call and report for work when call; being on call and reporting when called is an essential job function of his position as Senior Communications Technician. Union Pacific was, therefore, not required to relieve Fulbright of that duty, modify that duty, or reassign other employees to that duty.

***2. Fulbright was also not a qualified individual because he could not safely perform the essential functions of his job within his medical restrictions.***

As stated, "[i]f the disabled person must be exempted from performance of an essential function of the job, then [ ]he is not otherwise qualified and not protected by the ADA." *Jones*, 142 F.3d at 265. In Fulbright's case, Neal determined that Fulbright's medical restrictions conflicted with his essential job functions and could not be reasonably accommodated without removing or exempting him from having to perform certain essential functions of the Senior Communications Technician position. SOF ¶ 107. For example, Fulbright's position required operating a company vehicle, whereas his restrictions prohibited him from operating a company vehicle. SOF ¶¶ 104, 108. Fulbright's position required performing work on a ladder, up to eight or nine feet, however his restrictions prohibited him from working at unprotected heights over four feet above ground. SOF ¶¶ 104, 108. Also, working alone is required in Fulbright's position, yet his restrictions prohibited him from working alone or even on 2-man crews. SOF ¶¶ 104, 108. Fulbright is not a qualified individual under the ADA because to enable him to perform the essential functions of his job within his medical restrictions, Union Pacific would have had to exempt him from multiple essential job functions.

***3. Fulbright did not suffer an adverse action because of his disability.***

***a. Side effects of medication do not implicate a disability.***

Courts have recognized "that an alleged disability due to the side effects of a medication is different than a disability resulting from the underlying health problem the medication was meant to treat." *McDonald v. Pa. State Police*, No. 02:09-cv-00442, 2012 WL 5381403, at *10 (W.D. Pa. Oct. 31, 2012). "For a treatment's side effects to constitute an impairment under the ADA, it is not enough to show just that the potentially disabling medication or course of treatment was prescribed or recommended by a licensed medical professional." *Sulima v. Tobyhanna Army Depot*, 602 F.3d

177, 187 (3d. Cir. 2010). "Instead … the medication or course of treatment must be required in the 'prudent judgment of the medical profession,' and there must not be an available alternative that is equally efficacious that lacks similarly disabling side effects." *Id.* (quoting *Christian v. St. Anthony's Med. Ctr., Inc.*, 117 F.3d 1051, 1052 (7th Cir. 1997)). "The concept of 'disability' connotes an involuntary condition, and if one can alter or remove the 'impairment' through an equally efficacious course of treatment, it should not be considered 'disabling.'" *Id.*; *see also Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1995) ("But we find no evidence in the record that Hill's physical condition *compelled* her to take a combination of medications that persistently affected her ability in 1995 to stay awake on the job." (emphasis in original)).

Consequently, courts have regularly concluded that medication side effects are not disabling under the ADA. *See, e.g.*, *Sulima*, 602 F.3d at 187 ("Therefore, because Sulima did not demonstrate that the medications that were causing his problems were medically necessary, their side effects cannot be considered impairments within the meaning of the ADA."); *Hill*, 181 F.3d at 894 (drowsiness caused by medication was not disabling); *Whitmire v. Wal-Mart Stores, Inc.*, 359 F. Supp. 3d 761, 793-95 (D. Ariz. 2019) (side effects of smoking medical marijuana not disabling); *McDonald*, 2012 WL 5381403, at *10-*11 (employer "merely refused to certify McDonald as a police officer due to concern over the side effects of his Avinza medication. McDonald has not demonstrated that Avinza was the only efficacious medication."); *Tavarez v. United Blood Servs.*, No. 11-CV-673 WJ/ACT, 2012 WL 13080075, at *6 (D.N.M. July 12, 2012) (side effects that medication might have on plaintiff do not qualify as a disability); *Smith v. Methodist Hosps. of Dallas*, No. 3:07-CV-1230-P, 2008 WL 5336342, at *3-*4 (N.D. Tex. Dec. 19, 2008) (medication causing drowsiness was not disabling).

In Fulbright's case, during his FFD evaluation, TMD requested that Fulbright participate in a sleep study and a maintenance of wakefulness test to objectively assess his level of alertness after having used Trazodone. SOF ¶¶ 94, 97-98. Fulbright did not comply with either request and, as a result, has not demonstrated that his use of Trazodone and any side effects he experiences from the Trazodone can be considered impairments under the ADA. Likewise, it remains unknown whether any alternative treatments exist that could effectively address his underlying "sleep problems." Nonetheless, because Fulbright did not follow through with the recommendations of TMD to participate in a maintenance of wakefulness test and sleep study, Fulbright did not even allow Union Pacific the opportunity to consider the side effects he experienced from taking Trazodone or whether an alternative treatment for his sleep problems was available. Fulbright has simply not demonstrated that his use of Trazodone is disabling or that its side effects are impairments under the ADA.

***b. Referring Fulbright for an FFD evaluation and issuing him medical restrictions as a result of the FFD are not adverse employment actions.***

The ADA expressly "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630 App. § 1630.14(c); *see also Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005). "[A]n examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999); *see also Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims…"); *Barren v. N.E. Ill. Reg'l Commuter R.R. Corp.*, No. .13 CV 4390, 2016 WL 861183,

at *4-*5 (N.D. Ill. Mar. 7, 2016) (placing employee on medical disqualification status not an adverse action).

Similarly, the ADA allows employers—like Union Pacific—to lawfully consider physician-imposed medical restrictions and whether an applicant or employee can perform the essential functions of the position within those restrictions. *See, e.g.,* 29 C.F.R. § 1630.14(c); *Sanchez v. City of San Antonio*, 794 Fed. Appx. 444, 445 (5th Cir. 2020) (employee was not qualified individual where doctor's report stated employee was unable to return to work by the date of his employment termination); *Stern v. St. Anthony's Health Ctr.,* 788 F.3d 276, 294 (7th Cir. 2015) (Employer "is 'entitled to rely on a physician's recommendation' that the employee is not able to safely perform an essential function of his job.") (citation omitted); *O'Malley v. Calumet GP, LLC*, No. 13-CV-60-JED-PJC, 2014 WL 3501540, at *4 (N.D. Okla. July 14, 2014) ("It is well established that, in determining whether an employee is qualified to perform the essential functions of his job, an employer is entitled to rely on medical determinations made by physicians."); *Coleman v. Penn. State Police*, 561 Fed. Appx. 138, 145 n.13 (3d Cir. 2014) (employer entitled to trust its own physician's risk assessment over that provided by employee's treating physician).

Here, Neal referred Fulbright for an FFD evaluation because he was concerned that Fulbright's self-reported use of sleep medicine could impair Fulbright into his normal work shift. SOF ¶ 66. Neal is not a doctor; Neal only knew that Fulbright had missed multiple after-hours calls because, according to Fulbright, he took sleep medication and did not hear the calls. SOF ¶¶ 61, 63, 66. Neal's concern about the potentially lingering effects of Fulbright's medication during Fulbright's normal work shift were legitimate and entirely reasonable, particularly given Fulbright's essential duties - being on-call, working along the railroad's right-of-way, working

alone, working around heavy moving equipment, operating a company vehicle, climbing ladders and working at unprotected heights. SOF ¶¶ 24-34. And, as an overarching requirement, Fulbright was expected to safely perform his job and responsible for his own safety. SOF ¶¶ 35, 37

When a manager refers an employee for an FFD evaluation, HMS does not assume there is a medical cause underlying the referral or that the employee is unable to perform his or her job. SOF ¶ 73. However, based on the information submitted by Neal, the limited documentation eventually submitted by Fulbright, combined with his conversations with HMS and taking his job duties into consideration, Dr. Charbonneau requested that Fulbright see a sleep specialist for a sleep medicine evaluation. SOF ¶ 83. Union Pacific's request was a medically reasonable approach. Fulbright, however, failed to comply with the request and in the absence of the requested information, Union Pacific was entitled to trust its own risk assessment in making its FFD determination and issuing work restrictions based on the information it had at the time.

***c. Issuing medical restrictions following Fulbright's failure to provide requested medical information was not an adverse action because of his disability.***

Just as employers can lawfully require medical evaluations under the ADA, it is also lawful for them to act in response to an employee's failure to provide the requested medical information. *See, e.g.*, *Hoskins v. GE Aviation*, 803 Fed. Appx. 740, 745-46 (5th Cir. 2020) (no discriminatory discharge based on disability where employee failed to provide requested medical documentation); *Mitchell v. Sikorsky Aircraft*, 533 Fed. Appx. 354, 360 (5th Cir. 2013) (discharging plaintiff for failing to provide requested medical information was legitimate and non-retaliatory); *Bailey v. Southwest Gas Co.*, 275 F.3d 1181, 1186 (9th Cir. 2002) ("It was not unlawful for Southwest to require that Bailey explain her use of soporific medicine while at work, and her refusal to provide additional information was not a protected activity."); *Sullivan*, 197 F.3d at 813 ("And while the

district's subsequent suspending of Sullivan is an adverse job action, it was based on his refusal to undergo the valid examinations, which is not a discriminatory reason.")

In Fulbright's case, Dr. Charbonneau requested that Fulbright see a sleep specialist for a sleep medicine evaluation to assess whether his use of Trazodone impacts his ability to safely perform his job or whether alternative treatments might be available. SOF ¶¶ 84-87. Fulbright refused to participate in recommended testing. In fact, even though he saw a specialist, he never provided HMS with the specialist's notes regarding the recommended testing. SOF ¶¶ 96-103, 106. In the absence of the requested evaluation, Dr. Charbonneau had only Fulbright's word and personal opinion and two years' worth of medical records to consider. ¶ SOF 104. When Dr. Charbonneau discussed the restrictions with Fulbright, Fulbright made it clear that he was refusing the requested sleep medicine evaluation. SOF ¶ 106. Issuing work restrictions based on that limited information and in light of Fulbright's refusal was not unlawful.

***d. Fulbright paying for medical testing is not prohibited under the ADA.***

Under the ADA, "an employer may inquire and make medical examinations if they are shown to be job-related and consistent with business necessity." *Fuzy v. S&B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003) (citing 42 U.S.C. §12112(d)(4)(A)-(B)). Nothing in this statutory text requires an employer to pay all costs associated with the examination. *See, e.g.*, *Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 159 (D.D.C. 2014) (ADA does not specify who must pay for medical inquiries).

Several courts have not found issue with an employee paying for medical testing under the ADA. *See O'Neal v. City of New Albany*, 293 F.3d 998, 1010 n.2 (7th Cir. 2002) (requiring applicant to obtain $1,500 medical test as part of permissible post-offer medical examination); *Porter v. Alumoweld Co., Inc.*, 125 F.3d 243, 245-47 (4th Cir. 1997) (employee's unwillingness



7676039v.2

to undergo requested fitness-for-duty examination, at employee's own expense, precluded ADA discriminatory discharge claim); *Blackwell*, 61 F. Supp. 3d at 159-60 (requiring employee to pay out-of-pocket copay for medical test not an adverse action under ADA); *Laurent v. G & G Bus Serv.*, No. 10 Civ. 4055, 2013 WL 5354733, at *4 (S.D.N.Y. Sept. 25, 2013) (requiring job applicant to pay for a pre-employment medical exam not an adverse employment action); *Bohner*, 2021 WL 3363063, at *7 (claim that Union Pacific unlawfully forced employee to pay for medical examination failed "because he offers no relevant case law suggesting it is unlawful to require an employee to pay for a medical examination.")

Here, Union Pacific asked Fulbright to see a sleep specialist for a sleep medicine evaluation. Fulbright refused to follow through with the specialist's recommended evaluations, in part, because he claimed he did not have the money or insurance to cover. SOF ¶ 106. However, Fulbright saw a specialist on June 1, 2015 and has testified that his insurance was reinstated two or three weeks later. SOF ¶ 100. Yet, he had told Dr. Charbonneau nearly four weeks later that his health insurance had been cut off. SOF ¶ 106. Regardless, Union Pacific is not required to pay for an employee's medical testing as part of the employee's FFD evaluation under the ADA.

#### ***4. Regardless, Union Pacific had legitimate, nondiscriminatory reasons for its actions and Fulbright cannot prove pretext for discriminatory intent.***

Regarding an employee as disabled "does not, by itself, establish liability;" rather, Fulbright must prove discrimination *on the basis of disability*. 29 C.F.R. § 1630.2(l)(3) (emphasis added). In other words, Bohner must prove Union Pacific's discriminatory intent, i.e., pretext designed to mask discrimination. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-55 (2003); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019)**Error! Bookmark not defined.** (disparate-treatment claims require "proof and finding of discriminatory motive.")

To prove pretext in the face of an employer's non-discriminatory explanation, Fulbright "must produce substantial evidence of pretext." *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402-03 (5th Cir. 2001); *see also Owen*, 2020 WL 6684504, at *7 ("Proving pretext 'requires more substantial evidence' than is required to make a prima facie case because evidence of pretext is viewed in light of [the employer's] justification.") Pretext may be established "by showing that a discriminatory motive more likely motivated [an] employer's decision, such as through evidence of disparate treatment, or the [the employer's] explanation is unworthy of credence." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). The Fifth Circuit has repeatedly made clear that on summary judgment "the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Autry v. Fort Bend Indep. Sch. Dist*, 704 F.3d 344, 347 (5th Cir. 2013). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).

When presented with circumstances similar to Fulbright's, the U.S. District Court for the District of Nebraska stated the following with respect to a plaintiff being referred by his manager for an FFD evaluation:

> But even if the Court assumes [plaintiff] has established a prima facie case of disability discrimination, **his claim fails because Union Pacific stated a legitimate, nondiscriminatory reason for removing [plaintiff] from service—his safety—and [plaintiff] does not adduce any probative evidence of pretext**. [Fulbright's] coworker and supervisors reported he was stumbling and struggling at times on the jobsite and they were concerned for him. Union Pacific says it pulled him from service and ordered an FFD to investigate whether [plaintiff] could safely do his job.

*Id*. (emphasis added); *see also Bohner*, 2021 WL 3363063, at *5 (manager concerns about plaintiff's ability to safely perform his job was legitimate, non-discriminatory reason for initiating an FFD evaluation). Similar to the plaintiff in *Owen*, here, Fulbright was removed from service

after Neal referred him for an FFD evaluation when Fulbright had missed multiple after-hours calls because of his sleep medication and based on concerns that his sleep medication may have lingering effects during his normal work shift. SOF ¶¶ 61, 63, 66, 72. Like *Owen*, Fulbright cannot deny that Neal reported his concerns to Union Pacific or that Union Pacific "could legitimately act" on those concerns. 2020 WL 6684504, at *7; SOF ¶¶ 66-67.

The same is true for Union Pacific's decision not to reinstate Fulbright as a Senior Communications Technician. After the FFD evaluation, Neal relied on the medical restrictions issued by Dr. Charbonneau and concluded Fulbright could not safely perform his essential job functions and there were no reasonable accommodations that would enable Fulbright to do so. Relying on a doctor's restrictions demonstrating that Fulbright could not perform the essential job functions was a legitimate, nondiscriminatory reason for declining to reinstate Fulbright to service as a Senior Communications Technician. *See Sanchez*, 794 Fed. Appx. at 445 (affirming summary judgment where plaintiff's medical restrictions prevented him from performing essential job functions); *Bohner*, 2021 WL 3363063, at *5 (medical determination that plaintiff could not perform the essential functions of his job was a legitimate, nondiscriminatory reason for not returning him to work). Fulbright presents no evidence demonstrating that this good-faith reliance was pretext for intentional discrimination based on his disability.

All Fulbright can prove is that Union Pacific relied on its doctors' medical judgments about his condition—which fails to demonstrate discriminatory intent. It is lawful under the ADA for an employer to rely on medical determinations in making decisions about an employee's ability to perform their job. It is not necessary for Union Pacific to establish that it was right or correct in relying on its doctors' medical judgments—only that it believed them in good faith. *See, e.g., Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("even an incorrect belief that an

employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination); *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988) (employment discrimination laws "are not intended to be a vehicle for judicial second-guessing of business decisions, or … to transform the courts into personnel managers"); *Owen,* 2020 WL 6684504, at *7 ("In reviewing an employer's stated reasons for its actions and an employee's evidence of pretext, the Court must keep in mind that [federal] courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (quotations omitted).

Fulbright is required to prove discriminatory intent. He is unable to offer any evidence doing so. Thus, the court should grant summary judgment in Union Pacific's favor.

**I. Fulbright cannot bring a claim under 42 U.S.C. § 12112(b)(6) under a disparate-treatment theory (First Cause of Action).**

Fulbright's first cause of action alleges "disparate treatment" based on Union Pacific allegedly imposing qualification standards and other criteria that screen out individuals with disabilities. *See* Doc. 40, ¶¶ 77, 79. A claim based on qualification standards under the ADA is a disparate-impact claim, and, thus, Fulbright has failed to state a claim for disparate treatment based on this provision. Moreover, this claim has not been administratively exhausted, and, thus, should be dismissed.

**A. A claim based on qualification standards is a disparate-impact claim.**

The U.S. Supreme Court has made clear that disparate-treatment and disparate-impact claims under the ADA rely on different theories and standards to prove discrimination. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 52–55 (2003). Disparate treatment requires the employee to prove that the employer acted with discriminatory intent based on the employee's protected characteristic. *Id.* at 52–53; *see also Dept't of Hous. & Cmty. Affiars v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015); *Ricci v. DeStefano,* 557 U.S. 557, 577

(2009); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)**Error! Bookmark not defined.**. The Fifth Circuit also recognizes that disparate-treatment claims require "proof and finding of discriminatory motive." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019).

In contrast, disparate impact involves facially neutral employment practices that have a disproportionately adverse effect on a protected group and cannot be justified by business necessity. *Raytheon*, 540 U.S. at 52-53; *see also Inclusive Communities Project*, 576 U.S. 524 ("In contrast to a disparate-treatment case, 'where a plaintiff must establish that the defendant had a discriminatory intent or motive,' a plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect …' and are otherwise unjustified by a legitimate rationale.") (citation omitted).

Fulbright's claim that Union Pacific imposed a qualification standard that screens out individuals with disabilities is a disparate-impact claim. Disability discrimination under the ADA includes:

> [U]sing qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity[.]

42 U.S.C. § 12112(b)(6). The Court in *Raytheon**Error! Bookmark not defined.*** put § 12112(b)(6) claims squarely under the disparate-impact category. Indeed, the Court explained that disparate-impact claims are cognizable under the ADA and cited "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out *an individual* with a disability"—the above language lifted directly from § 12112(b)(6)—as an example. *Raytheon**Error! Bookmark not defined.***, 540 U.S. at 53 (emphasis added). This is consistent with the EEOC's interpretive guidance that § 12112(b)(6) is a disparate-impact provision. *Compare*

29 C.F.R. § 1630.15(a) (defense to disparate-treatment claims) *with* § 1630.15(b)-(c) (defenses to unlawful qualification standards and other disparate-impact claims); *see also* 29 C.F.R. Pt. 1630 App. § 1630.15(b)-(c) (discussing disparate-impact defenses to unlawful qualification standards claims).

Similarly, in *Gonzalez v. City of New Braunfels**Error! Bookmark not defined.***, the Fifth Circuit recognized that "[u]nder the ADA, if a plaintiff can prove that his employer has imposed eligibility requirements that tend to screen out the disabled, that employer will be deemed to have 'discriminated' unless it can demonstrate that the particular eligibility standard or criterion in question is 'job-related' and 'consistent with business necessity.'" 176 F.3d 834, 839 (5th Cir. 1999) (quoting § 12112(b)(6)). The court construed this claim as a disparate-impact claim. *Id*. Unlike a Title VII disparate-impact claim, under the ADA, a plaintiff can support his claim by "demonstrating an adverse impact on himself rather than on an entire group." *Id.* at 839 n.26. To make a *prima facie* claim of disparate-impact discrimination under § 12112(b)(6), a plaintiff must (1) identify the challenged employment practice or policy, and pinpoint the defendant's use of it; (2) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability; and (3) demonstrate a causal relationship between the identified practice and the disparate impact. *Id*. Thus, "the ADA, unlike Title VII, provides a screen out disparate impact theory under § 12112(b)(6) that applies to individuals." *Williams v. ABM Parking Servs. Inc.*, 296 F. Supp. 3d 779, 789 (E.D. Va. 2017) (relying on *Gonzalez**Error! Bookmark not defined.***).

The majority of other circuits have also treated § 12112(b)(6) as a disparate-impact provision. *See, e.g., Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (distinguishing claims alleging discriminatory application of qualification standards from disparate-treatment claims); *Boersig v. Union Elec. Co.*, 219 F.3d 816, 822 (8th Cir. 2000)

(discussing § 12112(b)(6) claim as "invoking a disparate-impact theory of ADA liability"); *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997) (§ 12112(b)(6) sets forth disparate-impact approach to proving discrimination).

Consequently, Fulbright's qualification-standard claim is a disparate-impact claim. Accordingly, Fulbright cannot state a disparate-treatment claim under § 12112(b)(6), and, thus, it should be dismissed. Moreover, he has not exhausted his administrative remedies for disparate-impact claims.

**B. Fulbright's disparate-impact claim has not been administratively exhausted.**

In *Pacheco v. Mineta*, the Fifth Circuit held that the employee failed to exhaust his disparate-impact claim because his discrimination charge did not identify a neutral employment policy that would form the basis of a disparate-impact claim and the charge only alleged disparate treatment. 448 F.3d 783, 792 (5th Cir. 2006)**Error! Bookmark not defined.**. "A neutral employment policy is the cornerstone of any EEO disparate-impact investigation, since the EEO must evaluate both the policy's effects on protected classes and any business justifications for the policy." *Id*. There, the employee's discrimination charge alleged that he hadn't been promoted because of racial discrimination, but his lawsuit alleged both disparate treatment and disparate impact. *Id.* at 786–87. In affirming dismissal of the disparate-impact claim, the court held that:

> [a] disparate-impact investigation could not reasonably have been expected to grow out of Pacheco's administrative charge because of the following matters taken together: (1) it facially alleged disparate treatment; (2) it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only.

*Id.* at 792.

Here, "the Court must determine whether Fulbright's charge provides enough information such that a resulting EEOC investigation would have touched upon the facially neutral, but actually discriminatory, employment policy Fulbright alleges resulted in disparate impact." *Ahmed v.*

*Hussain*, No. 4:17-CV-00999-O-BP, 2018 WL 2271179, at *3 (N.D. Tex. Apr. 18, 2018). Indeed, to make a *prima facie* case under § 12112(b)(6) Fulbright must identify the challenged employment practice or policy, and pinpoint the defendant's use of it. *Gonzalez**Error! Bookmark not defined.*** 176 F.3d at 839 n.26. But like the employee in *Pacheco**Error! Bookmark not defined.***, Fulbright's discrimination charge was limited to disparate-treatment allegations that Union Pacific falsely accused him of being impaired at work, removed him from service, and told him he no longer had a job because of his disability. App. 109-112 *Raytheon**Error! Bookmark not defined.***, 540 U.S. at 53 (case limited to disparate-treatment theory where applicant alleged that company refused to hire him because of a regard-as disability or his record-of disability). Despite his Amended Complaint identifying Union Pacific's fitness-for-duty program and Medical Rules as the neutral policy or practice supporting his disparate-impact claim, Fulbright's charge remains void of any allegations about the program, Medical Rules, or any other neutral employment policy or practice. *Compare* Doc. 40, ¶¶ 6-12, 77, 79, *with* App. 109-112. Likewise, despite his claim that Union Pacific uses qualification standards that screen out or tend to screen out individuals with disabilities, his charge does not contain a single allegation about Union Pacific's supposed "qualification standards." *Compare* Doc. 40, ¶¶ 77, 79, *with* App. 109-112. Nor does Fulbright's charge contain any allegations that an employment policy exists that adversely effects a protected class—all of Fulbright's arguments center on certain actions involving himself only. *See* App. 109-112. *Owen v. STMicroelectronics, Inc.*, No. 3:15-CV-1186-B, 2016 WL 2757368, at *3-*4 (N.D. Tex. May 12, 2016)**Error! Bookmark not defined.**.

Fulbright has not exhausted his disparate-impact claim, and, thus, his claim under § 12112(b)(6) should be dismissed. *See, e.g., McClain**Error! Bookmark not defined.***, 519 F.3d at 273–74 (holding employee did not exhaust disparate-impact claims); *Stith v. Perot Sys. Corp.*,

122 Fed. Appx. 115, 118 (5th Cir. 2005) ("Because [plaintiff] did not include disparate impact discrimination in her EEOC complaint and has, therefore, failed to exhaust her administrative remedy, she cannot recover on that theory."); *Ahmed**Error! Bookmark not defined.***, 2018 WL 2271179, at *3 (recommending dismissal of unexhausted disparate-impact claim); *Hall v. La. Workforce Comm'n*, No. 15-00533-BAJ-RLB, 2016 WL 1756897, at *6 (M.D. La. Apr. 29, 2016)**Error! Bookmark not defined.** (employee did not exhaust disparate-impact claim).

**II. Fulbright's failure-to-accommodate claim fails as a matter of law.**

Fulbright alleges that Union Pacific discriminated against him "by failing to provide him reasonable accommodations in 2012, and again in 2015." *See* Doc. 40, ¶ 84. Denial of an accommodation is a discrete act for which a charge of discrimination must be filed within 300 days. *Busari-Ibe*, 2012 WL 12090207, at *3. For his 2012 accommodation allegations, Fulbright failed to do so. For his 2015 allegations, Fulbright was required to file his failure-to-accommodate claim within 90 days of receiving his right-to-sue notice. He did not do so. Instead, Fulbright attempts to excuse his failure by relying on equitable tolling under *American Pipe**Error! Bookmark not defined.*** and its progeny. Tolling, however, is not available for this claim because it was not asserted on a class-wide basis, and, thus, is time-barred. Regardless, Fulbright's discrimination charge also did not administratively exhaust this claim and the claim fails on the merits. Thus, the Court should grant Union Pacific summary judgment.

**A. Fulbright did not timely file his failure-to-accommodate claim.**

Regarding the alleged denial of an accommodation in 2012, Fulbright alleges that as of August 16, 2012, he was told that he would have to go out on calls at night even if he had taken sleep medicine and it could be unsafe for him to do so. *See* Doc. 40, ¶¶ 24-27, 84. Thus, Fulbright had until June 12, 2013 to file a charge regarding this alleged denial of an accommodation. But he did not file a discrimination charge until August 11, 2015.

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts complained of in timely filed charges." *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. Appx. 387, 391 (5th Cir. 2005). Alleged failures to accommodate are discrete acts that "do not qualify under the continuing violation exception to the ADA's actionable period restrictions." *Id.*; *see also Fraga v. Alamo Cmty. Coll. Dist.*, No. 07-930, 2009 WL 10699730, at *2 (W.D. Tex. Nov. 10, 2009) (failure to accommodate a walking impairment was a time-barred discrete act). Consequently, Fulbright's claim based on the alleged failure to accommodate in 2012 is time barred.

Regarding the 2015 accommodation allegations, a plaintiff alleging employment discrimination must file a civil action no more than 90 days after he receives the statutory right-to-sue notice from the EEOC. *Taylor v. Books-A-Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). "If the parties dispute the date of receipt, if the date is unknown, or if the plaintiff fails to allege the date of receipt, we presume that the plaintiff received the EEOC's letter, at most, seven days after it was mailed." *Wright v. Arlington Indep. Sch. Dist.*, 834 Fed. Appx. 897, 901 (5th Cir. 2020). The 90-day window is strictly construed and is "a precondition to filing suit in district court." *Taylor*, 296 F.3d at 379 (quoting *Dao**Error! Bookmark not defined.***, 96 F.3d at 788–89 (5th Cir.1996)).

It is undisputed that the EEOC issued and mailed Fulbright its right-to-sue notice on June 7, 2016. *See* Doc. 40, ¶ 56. Thus, with the 7-day mailing presumption, the latest Fulbright could timely file suit was September 12, 2016. Fulbright, however, filed this action nearly four years later. SOF ¶ 125. He attempts to excuse his lateness by asserting that his claims were tolled during the now de-certified *Harris**Error! Bookmark not defined.*** class action. *See* Doc. 40, ¶¶ 55-65.

But there is no tolling available for Fulbright's failure-to-accommodate claim because it was not pleaded on a class-wide basis in *Harris*.

In *American Pipe & Constr. Co. v. Utah*, the Supreme Court held that putative class members could otherwise untimely intervene because the filing of an underlying class action—which ultimately was not certified—tolled the statute of limitations on their claims against American Pipe. 414 U.S. 538, 541-44, 560-61 (1974). The Court has since clarified that *American Pipe* tolling is equitable tolling "designed to modify a statutory time bar where its rigid application would create injustice." *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 137 S.Ct. 2042, 2051-52 (2017). "Fulbrights have no substantive right to bring their claims outside of the statute of limitations. That they may do so, in limited circumstances, is due to a judicially crafted tolling rule that itself does not abridge, enlarge, or modify any substantive right." *China Agritech, Inc. v. Resh*, 138 S.Ct. 1800, 1810 (2018); *see also ANZ Sec.*, 137 S.Ct. at 2051-52 ("Nothing in the *American Pipe**Error! Bookmark not defined.*** opinion suggests that the tolling rule it created was mandated by the text of a statute or federal rule. Nor could it have."). Accordingly, *American Pipe* tolling "need not be applied mechanically" and "it should not be applied where doing so would result in an abuse of *American Pipe**Error! Bookmark not defined.**." Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 609 (3rd Cir. 2018)**Error! Bookmark not defined.** (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983)**Error! Bookmark not defined.**).

"The purpose of *American Pipe**Error! Bookmark not defined.*** tolling is to further the purpose of class actions without defeating the purpose of statutes of limitations." *Aguilar v. Ocwen Loan Servicing, LLC*, No. 3:17-cv-1165-B, 2018 WL 949225, at *6 (N.D. Tex. Feb. 20, 2018) (citing *Am. Pipe*, 414 U.S. at 555). "A key consideration in *American Pipe**Error! Bookmark not defined.*** was that the putative class member seeking to intervene had the exact

same cause of action as the named plaintiff who originally brought the class action." *Id.* (citing *Johnson v. Ry. Express Agency*, 421 U.S. 454, 467 (1975)). "This factor was more than a mere abstract or theoretical consideration because the prior filing in each case necessarily operated to avoid the evil against which the statute of limitations was designed to protect." *Johnson**Error! Bookmark not defined.***, 421 U.S. at 467. In *Johnson*, the Court "was apparently unswayed by the fact that both of the plaintiff's claims were based on the same set of factual circumstances" and stated "[o]nly where there is complete identity of the causes of action will the protections [against the running of the statute of limitations] necessarily exist." *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litig.*, 467 F. Supp. 227, 259 (W.D. Tex. 1979) (quoting *Johnson**Error! Bookmark not defined.***, 421 U.S. at 467 n.14).

> Thus, under the *American Pipe**Error! Bookmark not defined.*** rationale, if the class action giving rise to tolling is supposed to put the defendant on notice of claims that might be brought by putative class members after certification is denied, *American Pipe* tolling cannot extend to causes of action not raised in the class action because the class action will not have provided the defendant notice of claims other than those asserted in the class action.

*Aguilar**Error! Bookmark not defined.***, 2018 WL 949225, at *6.

The *Harris**Error! Bookmark not defined.*** class action asserted class claims of disparate treatment (Count I), disparate impact (Count II), and unlawful medical inquiry (Count III). App. 215-216. While a failure-to-accommodate claim was pleaded in *Harris**Error! Bookmark not defined.***, it was only done so on behalf of the 6 individual named plaintiffs—not on behalf of the ADA class. App. 215-216. "A failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment." *Windhauser v. Bd. of Supervisors for La. State Univ. & Agr. & Mech. Coll.*, 360 Fed. Appx. 562, 565 (5th Cir. 2010).

Numerous courts have concluded that failure-to-accommodate claims brought by *Harris* putative class members should be dismissed as untimely because the claim was not asserted on a

class-wide basis in *Harris***Error! Bookmark not defined.**, and, thus, is not tolled under *American Pipe***Error! Bookmark not defined.**. *See, e.g.*, *Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2021 WL 3023407, at *6-*7 (W.D. Tex. July 16, 2021) (finding failure-to-accommodate claim time-barred because *Harris* did not provide Union Pacific with fair notice of the claim); *Blankinship v. Union Pac. R.R. Co.*, No. CV-21-00072-TUC-RM, 2021 WL 3290453, at *4 (D. Ariz. Aug. 2, 2021) (same); *DeFries v. Union Pac. R.R. Co.*, No. 3:21-cv-205-SB, 2021 WL 3007254, at *2 (D. Or. July 15, 2021) (same); *Donahue v. Union Pac. R.R. Co.*, No. 21-cv-00448-MMC, 2021 WL 2458351, at *2 (N.D. Cal. June 16, 2021) (same); *Krehbiel v. Union Pac. R.R. Co.*, No. 2:19-CV-02002-JAR-JPO, 2019 WL 3387049, at *4 (D. Kan. July 26, 2019)**Error! Bookmark not defined.** (holding *American Pipe***Error! Bookmark not defined.** tolling did not apply to a *Harris* putative class member's untimely failure-to-accommodate claim and dismissing the claim).

**B. Further, Fulbright has not exhausted his administrative remedies for a failure-to-accommodate claim.**

As discussed above, Fulbright's discrimination charge was limited to disparate-treatment and retaliation allegations that Union Pacific falsely accused him of being impaired at work, removed him from service, and told him he no longer had a job because of his disability. App. 109-112. Fulbright's charge neither alleges nor suggests an allegation that Fulbright requested a reasonable accommodation, much less that Union Pacific denied Fulbright a reasonable accommodation. *See Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017) ("Employees who require accommodation due to disability are responsible for requesting a reasonable accommodation.") Disparate-treatment and failure-to-accommodate claims "represent distinct categories of disability discrimination under the ADA." *Hamar v. Ashland, Inc.*, 211 Fed. Appx. 309, 309 (5th Cir. 2006). "An EEOC charge alleging only acts supporting a claim of

discriminatory discharge does not exhaust a claim of failure to reasonably accommodate." *Spindle v. CKJ Trucking, LP*, No. 4:18-CV-818, 2020 WL 1283519, at *2 (E.D. Tex. Mar. 18, 2020).[3] Thus, Fulbright failed to exhaust his administrative remedies and his failure-to-accommodate claim should be dismissed.

**C. Regardless, Fulbright's failure-to-accommodate claim fails.**

"A failure-to-accommodate claim requires a showing that: '(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Weber*, 989 F.3d at 323 (quoting *Credeur*, 860 F.3d at 792). "As a matter of law, it is an unreasonable accommodation for the employer to have to exempt the employee from performance of an essential function of the job." *Jones*, 142 F.3d at 265. "The ADA 'does not require an employer to transfer from the disabled employee any of the essential functions of his job,' and a court cannot determine that a plaintiff can perform the essential functions of his or her job with reasonable accommodation 'if the only successful accommodation is for [the plaintiff] not to perform those essential functions.'" *Jiles*, 313 F. Supp. 3d at 842 (quoting *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997)). It is Fulbright's burden to demonstrate that Union Pacific failed to implement a reasonable accommodation. *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

Here, Fulbright's failure-to-accommodate claim fails because, as discussed above, he is not a qualified individual because he cannot perform the essential functions of his job. Moreover,

[3] Citing *Windhauser***Error! Bookmark not defined.**, 360 Fed. Appx. at 565 ("A failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment."); *Hamar***Error! Bookmark not defined.**, 211 Fed. Appx. at 309 (affirming dismissal of ADA reasonable-accommodation claim because the EEOC charge asserted only employment discrimination); *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) ("Therefore, [failure to reasonably accommodate and disability discrimination] are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from a claim that an employee was terminated because of a disability.")

the only potential accommodation suggested by Fulbright is that he be exempted from on-call duties when he takes his Trazodone. *See* Doc. 40, ¶ 75. But this suggested accommodation requires Union Pacific to remove an essential function of Fulbright's job, and, thus, is unreasonable as a matter of law. *Jones*, 142 F.3d at 265. Moreover, it is undisputed that Union Pacific would have had to assign the on-call hours to other technicians to conform with Fulbright's suggested accommodation, but Union Pacific is not required to transfer Fulbright's responsibilities that are essential functions to other employees. *Jiles*, 313 F. Supp. 3d at 842. Thus, Fulbright's failure-to-accommodate claim fails as a matter of law, and, thus, the Court should grant summary judgment.

**III. Fulbright's unlawful medical inquiry claim is time-barred and fails as a matter of law.**

Fulbright was required to file his unlawful medical inquiry claim within 90 days of receiving his right-to-sue notice. He did not do so. *See* Doc. 40, ¶ 56; App. 123. Instead, Fulbright attempts to excuse his failure by relying *American Pipe***Error! Bookmark not defined.** tolling. For purposes of this motion, however, even if the Court presumes that Fulbright's unlawful medical inquiry claim was tolled by the filing of the *Harris***Error! Bookmark not defined.** class allegations—which Union Pacific does not concede—tolling ended when the *Harris* named plaintiffs moved for class certification only for their claim of disparate treatment and not for unlawful medical inquiry. In other words, Fulbright was required to file a lawsuit asserting his unlawful medical inquiry claim within 90 days of August 7, 2018 and his failure to do so bars his claim.

To invoke tolling under *American Pipe***Error! Bookmark not defined.**, a plaintiff must fit within the class that the putative class action complaint sought to certify. *Menominee Indian Tribe of Wis. v. United States*, 136 S.Ct. 750, 755-57 (2016)**Error! Bookmark not defined.**; *Jones v. Unum Life Ins. Co. of Am.*, No. 4:0600547 JLH, 2006 WL 3462130, at *3 (E.D. Ark. Nov. 29,

2006)**Error! Bookmark not defined.**. The Supreme Court has explained that for tolling to apply the class action must "notif[y] the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe**Error! Bookmark not defined.***, 414 U.S. at 555. "[T]he tolling effect given to the timely prior filings in *American Pipe**Error! Bookmark not defined.*** … depended heavily on the fact that those filings involved exactly the same cause of action subsequently asserted." *Johnson**Error! Bookmark not defined.***, 421 U.S. at 467. "Only where there is complete identity of the causes of action will the [tolling] protections suggested by petitioner necessarily exist." *Id.* at 467 n.14.

In *Smith v. Pennington*, 352 F.3d 884, 894 (4th Cir. 2003)**Error! Bookmark not defined.**, the Fourth Circuit held that "when a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition." There, the plaintiff's memorandum in support of certification defined the class more narrowly than the complaint. Groups of intervenors later sought to join the litigation, but the Fourth Circuit affirmed that their claims were not subject to tolling because they were not within the class the plaintiff sought to certify. *Id.* at 895-96.

This case is no different. On August 7, 2018, the *Harris**Error! Bookmark not defined.*** plaintiffs moved for class certification but narrowed the description of the proposed class. App. 212-216. They only sought "certification of Count I, ADA disparate treatment, of the Amended Complaint[.]"App. 281. Thus, once they filed their motion to certify, all claims *except* disparate treatment became "outside the scope" of the litigation. Further, individuals with unlawful medical inquiry claims were not part of the "potential plaintiffs who may participate in the judgment" since

any judgment for absent class members would have been limited to the ADA disparate treatment cause of action. *American Pipe***Error! Bookmark not defined.**, 414 U.S. at 555. Thus, even though the amended complaint in *Harris***Error! Bookmark not defined.** included an unlawful medical inquiry claim, once the named plaintiffs voluntarily abandoned it in the motion to certify, class members could no longer avail themselves to the benefit of tolling. *See Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149, 155-56 (N.D. Ill. 1992) (explaining that once counsel moved to certify a narrower class, individuals who no longer met the narrower definition "were placed on legal notice that they could not look to the pending [class actions] to protect their interests and that they would therefore have to go it alone by bringing their own lawsuits.").

Because his right-to-sue notice had already issued, Fulbright had 90 days from August 7, 2018, until November 5, 2018, to file a lawsuit asserting his unlawful medical inquiry claim. He did not. Thus, his claim is time-barred and should be dismissed.

**A. Regardless, Fulbright was not subjected to an impermissible medical examination or inquiry.**

Under the ADA, "an employer may inquire and make medical examinations if they are shown to be job-related and consistent with business necessity." *Fuzy*, 332 F.3d at 303 (citing 42 U.S.C. §12112(d)(4)(A)-(B)) "[C]ourts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine … whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Parker v. Pulte Homes of Tex., L.P.*, No. H-09-2743, 2011 WL 767182, at *9 (S.D. Tex. Feb. 25, 2011) (quotation omitted).

Again, the *Owen* case is instructive. There, the plaintiff was referred for an FFD evaluation after his manager was presented with "collective concerns" about his ability to safely perform his

job. 2020 WL 6684504 at *8. His foreman and supervisor reported to his manager that he was "stumbling," "struggling to move around, sitting often, and having some trouble breathing," which prompted the manager to request that he undergo an FFD evaluation under Union Pacific's FFD policy. *Id*. Because Union Pacific "had objectively valid concerns about [plaintiff's] ability to safely do his job," the *Owen* court granted summary judgment in Union Pacific's favor and held the plaintiff's FFD evaluation "was job-related, vital to Union Pacific's business, and 'no broader or more intrusive than necessary.'" *Id*. (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Here, Fulbright's position entailed essential job functions that inherently require heightened safety-consciousness – such as, responding to emergency service calls, working alone, working along the railroad's right-of-way, working around heavy moving equipment (including locomotives and railcars), operating a company vehicle – and was referred for an FFD evaluation by Neal after Fulbright had missed multiple after-hours calls because of his self-reported use of sleep medication. SOF ¶¶ 24-37, 61, 63, 65-67. Thus, even if Fulbright disputes Neal's concerns, "Union Pacific has demonstrated a legitimate, nondiscriminatory reason" to request that Fulbright undergo an FFD evaluation, and he "has not presented any probative evidence to reasonably call that reason into question." *Owen*, 2020 WL 6684504 at *9.

"The ADA permits employers 'to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims.'" *Owen*, 2020 WL 6684504 at *8 (quoting *Cody*, 139 F.3d at 599); *see also Hinojosa*, 128 Fed. Appx. at 368. Union Pacific referring Fulbright for an FFD evaluation based on concerns about his ability to safely perform his essential job functions "was job-related [and] vital to Union Pacific's business." *Id*. at *8. Thus, Fulbright's impermissible medical examination claim fails and summary judgment should be entered in Union Pacific's favor.

## IV. CONCLUSION

For all these reasons, the Court should grant Union Pacific summary judgment on all of Fulbright's claims.

Respectfully submitted this 10th day of September, 2021.

*/s/ Heather M. Miller*
Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that on the 10th day of September, 2021, I electronically transmitted the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to all counsel of record.

*/s/ Heather M. Miller*
An Attorney for Defendant