**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOE M. FULBRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:20-cv-2392** |
| | ) | |
| **UNION PACIFIC RAILROAD COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**APPENDIX IN SUPPORT OF DEFENDANT UNION PACIFIC RAILROAD COMPANY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**


| Page Numbers | Description |
|---|---|
| 1-28 | Excerpts from Deposition of Joe Fulbright (04/15/2021) |
| 29-37 | Excerpts from Deposition of Terry Neal (04/27/2021) |
| 38-43 | Excerpts from Deposition of Dr. John Charbonneau (03/25/2021) |
| 44 | Declaration of Tammy Potter Decl. of Tammy Potter |
| 45-46 | Declaration of Terrill Maxwell |
| 47-48 | Declaration of Stephen Hale |
| 49-50 | Declaration of Dr. John Charbonneau |
| 51-59 | HR Reporting System at UPFULBRIGHT000001 – 000009 |
| 113-115 | EEO Policy at UPFULBRIGHT000935-937 |
| 130-131 | RA Policy at UPFULBRIGHT001753-1754 |
| 100 | NMB Case No. 29, Award No. 29 at UPFULBRIGHT000344 |
| 157-190 | Implementing Agreement at JF402-435 |
| 101-102 | NMB Case No. 29, Award No. 29 at UPFULBRIGHT000345 – 000346 |

| | |
|---|---|
| 158 | Implementing Agreement at JF403 |
| 161 and 172 | Implementing Agreement at JF406 and 417 |
| 161 | Implementing Agreement at JF406 |
| 158 and 179 | Implementing Agreement at JF403 and 424 |
| 104 | ET Job Description at UPFULBRIGHT000681 |
| 105 and 108 | ET Job Description at UPFULBRIGHT000682 and 000685 |
| 105 and 107 | ET Job Description at UPFULBRIGHT000682 and 000684 |
| 129 | IBEW CBA at UPFULBRIGHT001517 |
| 154 | Referral form at UPFULBRIGHT001041 |
| 125-126 | Harding letter at UPFULBRIGHT001050-1051 |
| 127-128 | January 2009 D&A letter at UPFULBRIGHT001073-1074 |
| 93 | Plaintiff's statement attached to labor claim at UPFULBRIGHT000273 |
| 116 | 11/17/2014 Email at UPFULBRIGHT000946 |
| 117-118 | 1/26/15 Formal Conference at UPFULBRIGHT000951-952 |
| 61-62 | Neal Manager Referral at UPFULBRIGHT000182-183 |
| 63-64 | 1/29/15 letter at UPFULBRIGHT000185-186 |
| 92 | Medical Comments at UPFULBRIGHT000263 |
| 65 | 2/5/15 letter at UPFULBRIGHT000188 |
| 91 | Medical Comments at UPFULBRIGHT000262 |
| 66-67 | 2/26/15 letter at UPFULBRIGHT000190-191 |
| 94-99 | 4/1/2015 BRS grievance at UPFULBRIGHT000315-320 |
| 90 | Medical Comments at UPFULBRIGHT000261 |
| 68-69 | 4/10/2015 letter at UPFULBRIGHT000222-223 |

| | |
|---|---|
| 89 | Medical Comments at UPFULBRIGHT000260 |
| 88-89 | Medical Comments at UPFULBRIGHT000259-260 |
| 87 | Medical Comments at UPFULBRIGHT000258 |
| 191 | TMD notes at JF440 |
| 86 | Medical Comments at UPFULBRIGHT000257 |
| 70-71 | 6/1/2015 letter at UPFULBRIGHT230-231 |
| 85 | Medical Comments at UPFULBRIGHT000256 |
| 85-86 | Medical Comments at UPFULBRIGHT000256-257 |
| 72-74 | Blank restriction review form at UPFULBRIGHT00232-234 |
| 84 | Medical Comments at UPFULBRIGHT000254 |
| 75-78 | Completed restriction review form at UPFULBRIGHT235-238 |
| 132 | Schwab Report at UPFULBRIGHT002497 |
| 133 | Schwab Report at UPFULBRIGHT002498 |
| 134 | Schwab Report at UPFULBRIGHT002499 |
| 79-83 | 7/1/2015 letter at UPFULBRIGHT000243-247 |
| 109-112 | EEO Charge at UPFULBRIGHT000919-922 |
| 192-235 | *Harris* First Amended Petition |
| 119-122 | FWHRC Determination at UPFULBRIGHT0001013-1016 |
| 123 | EEOC NRTS at UPFULBRIGHT001017 |
| 236-280 | Exhibits E and F from Defendant's Motion to Partially Dismiss |
| 281 | Complaint |

Respectfully submitted this 10th day of September, 2021.

/s/ Heather M. Miller
Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I certify that on the 10th day of September, 2021, I electronically transmitted the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to all counsel of record.

/s/ Heather M. Miller
An Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOE M. FULBRIGHT )
)
Plaintiff, )
)
)
V. ) Civil Action No.
) 3:20-cv-2392
)
UNION PACIFIC RAILROAD )
COMPANY )
)
Defendant. )

* * * * * * * * * * * * * * * * * * *

REPORTER'S CERTIFICATION
VIDEOCONFERENCE AND VIDEO DEPOSITION OF
JOE FULBRIGHT
APRIL 15, 2021
(Reported Remotely)

* * * * * * * * * * * * * * * * * * *

VIDEOCONFERENCE AND VIDEO DEPOSITION OF JOE FULBRIGHT, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and -numbered cause on the 15th of April, 2021, at 9:04 a.m., before Brandy Cooper, CSR in and for the State of Texas, reported by machine shorthand. The witness is located at his residence in Collinwood, Tennessee,



pursuant to the Federal Rules of Civil Procedure, the First Emergency Order Regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:

DONALD E. ULOTH (Via Videoconference)
Law Office of Donald E. Uloth
18208 Preston Road, Suite D-9 #261
Dallas, Texas 75252
(214) 989-4396
don.uloth@uloth.pro

FOR THE DEFENDANT:

ROBERT L. ORTBALS, JR. (Via Videoconference)
DEREK MCKEE (Via Videoconference)
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
(314) 338-3740
rortbals@constangy.com

ALSO PRESENT VIA VIDEOCONFERENCE:

RANDY WRIGHT - Videographer
SARA LITTLETON - Paralegal with Defendant



I N D E X

Appearances . . . . . . . . . . . . . . . . Page 3
Exhibit Index . . . . . . . . . . . . . . . . Page 5
Stipulations . . . . . . . . . . . . . . . . Page 8
Examination by Mr. Ortbals . . . . . . . . . . Page 9
Signature and Corrections . . . . . . . . . . Page 154
Reporter's Certificate . . . . . . . . . . . Page 155

Page 13

Q. Are there any other times where you've testified under oath?
A. No, I don't believe so.
Q. Okay. Without telling me what the two of you talked about, did you meet with your attorney before coming to your deposition today?
A. I've never met with my attorney.
Q. Even over the phone or by videoconference?
A. Yes, we've talked over the phone.
Q. Okay.
A. We tested out the video to make sure it worked. I didn't get it till last week.
Q. Did you review any documents to prepare for your deposition today?
A. No, not specifically. I just had my -- just my memory of my notes.
Q. What notes did you look at?
A. Handwritten notes, just a recap of the timeline that I had previously turned in. I think the Union Pacific already has those.
Q. Okay. So those are notes that you've turned over in this case?
A. Yes.
Q. Is there anything else you looked at to prepare for today?

Page 14

A. In the last two weeks, I can't remember. I've -- I probably have. I don't know what it would be.
Q. Is there anything else you've done to prepare for today?
A. Well, yeah. I took the light out of the ceiling because it was causing too much glare. I haven't done much to prepare at all.
Q. Okay. Have you discussed this case with any of your relatives?
A. My wife knows I have a case.
Q. Anybody other than your wife?
A. No, not relatives.
Q. Okay. Have you discussed this case with any friends?
A. No friends that I've discussed it with, no.
Q. Have you discussed this case with any current Union Pacific employees?
A. No.
Q. Have you discussed this case with any former Union Pacific employees?
A. I've gotten statements from two, so I guess that would qualify as...
Q. Who are those two individuals?
A. Would be Chris Ozuna and Jason Ensign.

Page 15

Q. And when did you -- the statements that you got from Chris Ozuna, was that a written statement?
A. Yes, I believe it was. It was probably e-mailed.
Q. He e-mailed that to you directly?
A. I believe so. May have been a text message, but I believe he e-mailed it to me.
Q. When was it that he e-mailed or texted you that statement?
A. That would have been maybe two years ago.
Q. And was the statement within the body of the e-mail itself, or was it an attachment to an e-mail in another document?
A. It was a simple statement, not attached to any other document.
Q. And did you reach out to Chris to ask him to send you this statement?
A. Yes, I contacted Chris.
Q. How -- did you contact him by e-mail, or how did you contact him?
A. I think by phone.
Q. Okay. And what was Chris' job at Union Pacific?
A. He was a communications employee within the IT Department.

Page 16

Q. Okay. Did he work on the same team you did?
A. Yes, for a period of time, he did.
Q. What period of time were the two of you working together?
A. I'm not sure of exact years, but it was like 2008 to 2013, something like that. And I may be off by a year.
Q. And what led to the two of you no longer working together?
A. Chris bid on a PTC job, specifically a field job installing the PTC equipment out in the field, so he was no longer considered part of my work group.
Q. Okay. And then do you know when he left Union Pacific?
A. I think -- I think it was within the last couple of months.
Q. Who was your supervisor when you and Chris were working together?
A. That would have been Terry Neal.
Q. And so when you called Chris about getting a statement, was that the first time you had spoken with him since you left work with him?
A. No.
Q. Okay. Have you spoken with Chris about your concerns related to Union Pacific before this phone

Page 21

Q. Okay. Anything else Terry Neal said at that meeting about these two different job groups?
A. They discussed -- they discussed a pay increase for the restore tech jobs. I don't know if they ever got it. They discussed that.
Q. And you don't know if that was ever actually implemented, though?
A. No, I don't.
Q. You were an agreement employee; is that right?
A. Yes.
Q. And pay increases were things that were covered by your collective bargaining agreement; is that right?
A. Yes. I'm -- yes.
Q. Now, what was your reason for reaching out to Chris Ozuna about two years ago to get a statement from him?
A. The reason was as a witness to who bid the two restore tech jobs, who were responsible for calls.
Q. And what was going on at that time that you were interested in learning that information?
A. What was going on at that time? I'm sorry. I don't -- what was going on with me? I mean --
Q. Yeah. Why -- I mean, why did you need to find out at that point in time who the two people were who had bid on restore tech jobs?

Page 22

A. Well, it was -- it looked like the company was contending that I had bid a restore tech job.
Q. Why do you say that?
A. Terry Neal had said I missed a call on Sunday, after-hours call.
Q. And that happened in 2015; is that right?
A. I believe it was the early part of 2015.
Q. Okay. And so I'm curious, though. Then what was going on two years ago, four years after the fact, that would lead you to get a witness statement?
A. Well, I was basically told that I didn't have a job anymore on the basis of the Medical Department, being turned over to the Medical Department.
Q. Right. But that was also in 2015; is that right?
A. Yes.
Q. So again, what was happening two years ago, approximately, that led you to ask for a statement from a witness?
A. Oh, I was trying to gather the evidence that I never bid on a restore tech job.
Q. Right. But why did that matter two years ago?
A. Well, it was important because -- it was important to my case at that time. I had already talked to a law firm about representing me.

Page 23

Q. Okay. And when you talk about case, you're talking about the case -- this case that you brought against Union Pacific?
A. Yes.
Q. Did you reach out to Mr. Ozuna to obtain a statement in conjunction with your Union grievance?
A. I don't remember if, during my -- I don't remember if we handed any statement to the Union.
Q. Okay. Is there anything else that you've discussed with Chris Ozuna regarding this case?
A. No. That's pretty much it.
Q. And then when did you reach out to Jason Ensign about providing a statement?
A. It was the same time period, two or three years ago.
Q. When did you work with Jason at Union Pacific?
A. I can't remember when Jason hired on, but he was there until, I believe, 2013, maybe 2014. He may have hired on as early as 2009, 2010. I don't know.
Q. And he was also a communications maintainer?
A. Yes.
Q. Working in your group under Terry Neal?
A. Yes.
Q. And what was your reason for getting a statement from Jason?

Page 24

A. Well, Jason had recollection and memory of the jobs being divided into two work groups. I forget if Jason bid on the restore tech job, but he knew that the install techs would be split under a different manager and the restore techs would be under another manager. And they had different job responsibilities. He recalled that.
Q. Who was the manager who the install techs were assigned under?
A. It was Steve Hale.
Q. Any other manager who oversaw the install techs?
A. Well, the other manager, Terry Neal, who Steve Hale reported to worked in the yard and routinely talked to the install techs.
Q. Anybody else that oversaw the install techs?
A. No. I think it would have been Steve Hale who we reported to. His boss, Terry Neal, talked to all of us pretty regularly. I mean, he was at our safety meetings. And the rest -- the other managers were out of town. We didn't see them much.
Q. And are you referring to managers who Terry Neal would have reported to?
A. Yes.
Q. So then who oversaw the restore tech?

Page 29

Q. Do you have any other formal education or training?
A. On the job with companies that would send us to seminars and schools.
Q. Do you hold any type of vocational license?
A. FCC license.
Q. What did you have to do to obtain that?
A. You have to take an FCC test. I had to go to Dallas in a classroom setting and take a test that basically took about two hours regarding rules and regulations by the FCC and basic electronics testing. That's what the test consisted of mainly.
Q. When was that?
A. I'm thinking -- I can't remember the exact years. '81, '82, I believe I took that test. May have been as late as '83. I don't think so.
Q. Any other licenses that you hold?
A. No, not that I know -- not that I can remember.
Q. Have you ever sued anyone before?
A. In the mid-'90s, I signed over a hearing case that involved the Union Pacific Railroad. I don't know if they were sued or settled out of court or what. That was with a personal injury lawyer back sometime, I think, in the early '90s.
Q. And you don't recall giving any testimony

Page 30

related to that case?
A. I never gave any formal testimony related to that case.
Q. Any other lawsuits you've filed?
A. No. I've never filed a lawsuit.
Q. Has anyone ever sued you?
A. No, no one's ever sued me.
Q. Have you ever declared bankruptcy?
A. No.
Q. Have you ever been arrested?
A. No.
Q. Have you ever been convicted of a crime?
A. No.
Q. Have there been any other times where you've been in a courtroom, other than what we've already talked about?
A. Yes. Jury duty.
Q. Okay. Anything else?
A. No, I don't believe so. I may have been in a courtroom, but I can't remember if it would -- maybe probate or something.
Q. What medical conditions are you claiming are disabling in this lawsuit?
A. Well, I had -- I have problems sleeping.
Q. What do you mean by that?

Page 31

A. Well, I had a condition where I had to be treated for sleep -- for sleep -- lack of sleep.
Q. Do you still have that condition?
A. To some degree.
Q. What do you mean by to some degree?
A. Well, I -- well, like last night, I slept two hours until two o'clock, and then I fell back asleep again at about 3:30 and slept two hours. It was broken up. I don't sleep very long.
Q. Are you still being treated for your sleeping problem?
A. No.
Q. When did you stop being treated for your sleeping problem?
A. The last time I saw a doctor for medication for my sleeping problem, is that what you're asking?
Q. Sure. Sure.
A. That would have been maybe 2015.
Q. And back in 2015, you were taking trazodone for your sleeping problem?
A. Yes.
Q. Are you still taking trazodone?
A. I still have the drug, but I don't take it very regularly. I can't afford it anymore.
Q. Your lawsuit also lists major depressive

Page 32

disorder as a disability you are suffering from; is that right?
A. Yes. I believe my doctor said that I had that condition.
Q. And what doctor was that?
A. Marie Kelly. Psychiatrist, Marie Kelly.
Q. What period of time did you treat with Marie Kelly?
A. I believe that was -- I don't have my records in front of me, but I believe it was 2008, 2009 or 2009, somewhere around there.
Q. And when did you stop seeing Marie Kelly?
A. Oh, within -- I think within six months to a year. I made six or seven appointments with her.
Q. Why did you stop seeing her?
A. She pretty much checked me out on this medication to see how I was doing and did the follow-ups on it to see that it was working good for me, and then it wasn't necessary to see her anymore.
Q. And are you referring to trazodone?
A. Trazodone -- yes, trazodone and Prozac.
Q. Do you still take Prozac?
A. No. I quit taking Prozac within six months of starting it.
Q. And why is that?

Page 33

A. I discussed that with Marie Kelly. She told me that, You may not have to take Prozac the rest of your life. You can try stopping it after a few months. Once your sleep gets kind of stabilized and normalized where you can get more than two hours of sleep at a time, you can -- you can go off of that and you can take trazodone anytime you need to because it's not addicting.
And I -- Prozac, I'd rather not take that the rest of my life. And I didn't see any benefit from taking it that I noticed.
Q. Did you treat with any provider for major depressive disorder after Marie Kelly?
A. Not for depression.
Q. Were you no longer experiencing depression after treating with Marie Kelly?
A. Once my sleep was normalized, I didn't have depression anymore.
Q. And that was true, that you had no depression in 2015 when you were removed from service?
A. No, I was not depressed.
Q. You just had the sleep issue at that time?
A. Yes.
Q. What's your understanding of what your sleep issue has been diagnosed as?
A. You mean a medical name for it?

Page 34

Q. Yeah. Have the doctors told you a diagnosis they've given you for it?
A. I don't remember a name for it. It was just -- I'm sure she said -- it was related to serotonin, and I don't know what name -- I don't know if she ever gave me a name for it.
Q. And the she you're referring to is Marie Kelly?
A. Yes.
Q. Did you ever attempt to treat your sleep issue with a sleep specialist?
A. No.
Q. And why not?
A. I did probably a year or two, off and on, of research finding out about sleep disorders back before mine was treated and pretty knew I didn't have sleep apnea, which is a type of interfered breathing. I had a girlfriend I slept with at the time, and she said, you know, I didn't have that. She knew. She stayed up reading half the night. And I didn't have sleep apnea and -- but I had this severe sleep disorder. And the best I could read and tell were, some people -- some people have better luck going to psychiatrists because it's related to serotonin. And I had read from, you know, different medical journals and things online about that, and they are some of the best sleep doctors there

Page 35

are. And they don't -- I don't know if they call them sleep specialists, but that's what I found searching online. I knew I didn't have apnea. And I believe I had talked to a general practitioner medicine years earlier, and he said that's pretty much what sleep clinics do, is specialize in sleep apnea.
Q. What research did you do to determine you didn't have sleep apnea?
A. Well, I just read about sleep apnea, the symptoms. A lot of the symptoms you won't notice because you roll over and cough and choke and have trouble breathing that wakes you up in the middle of the night. I didn't believe I had that. My problem was getting asleep, and that's different than sleep apnea.
THE WITNESS: Can we take a break here for a few minutes?
MR. ORTBALS: Yeah. Absolutely.
THE WITNESS: Okay. I just need about four or five minutes. I don't know if y'all like 15-minute breaks or whatever.
THE REPORTER: Off the record?
MR. ORTBALS: Yeah, we can do a 10 or 15-minute break. That's fine.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Stand by. We're going

Page 36

off the video record. The time is 10:13 a.m.
(Break was taken.)
THE VIDEOGRAPHER: We are back on the video record. The time is 10:30 a.m.
Q. (BY MR. ORTBALS) Okay. We're back on the record after a short break. Mr. Fulbright, I'll remind you you are still under oath.
In 2015, when you were removed from service at Union Pacific, how was your sleep issue impacting you at that time?
A. While I was taking my medicine, it wasn't impacting me at all. I got along with five, six hours of sleep pretty well.
Q. So even on your medication, you were only getting five to six hours of sleep a night?
A. Yes. That was plenty of sleep for me.
Q. When you first started noticing -- well, actually, let me ask you this: When was it that you first experienced a sleep problem?
A. My sleep problem slowly got worse from probably the mid-'90s and finally reached a problem -- a serious problem, I would say, in -- by 2007, 2006.
Q. How was your sleep problem impacting you at that time?
A. Extreme fatigue during the day of mental and

physical. It was as bad two nights in a row with no sleep and two to three hours of sleep the third night. I remember going through that.
Q. What period of time did you go through that sleep pattern?
A. Probably from about 2006, 2007, like I said, up until I was treated, approximately 2009, I guess.
Q. And when Marie Kelly prescribed you trazodone, did she describe the side effects of it for you at all?
A. Let me try to remember. I read -- I know I read about the side effects as soon as I got home. I made sure I read all I could about these drugs, and I did read about the side effects. I don't remember if she told me. All I remember --
Q. What do you --
A. She did tell me that the side effects typically lasted from about one week to the first two weeks you took the drug. I also read that online.
Q. Did you experience any side effects with trazodone?
A. Yes.
Q. What were those?
A. The very first week I took it -- the very first week I took it, it was strange -- a strange dream state, strange dreams, I would say.



Q. How long did that last for?
A. That lasted one week for me.
Q. Any other side effects?
A. No.
Q. Were there any restrictions on your activities while taking trazodone?
A. I don't understand. Are you saying were there any restrictions put on me for taking trazodone?
Q. No. That's not exactly my question. My question is -- let me ask it to you this way: Are there any activities that you don't do after you take your trazodone?
A. Well, I only took it when I didn't have any activities to do. It made you fatigued and yawn and want to go to sleep, and obviously, I wouldn't take a long trip or something or do something, you know -- you hear them always say, you know, don't operate machinery under the influence of something, it makes you drowsy. I wouldn't do that.
Q. And the trazodone does make you drowsy; is that right?
A. Oh, yes.
Q. How long do you experience the drowsiness for?
A. It's four to six hours. If somebody was to shake me awake after five or six hours, sometimes, you



know, I -- it wouldn't put me back to sleep, so it seemed to last about four to six hours.
Q. Would you be capable of safely working after taking the trazodone?
A. You're talking about within an hour of taking it or --
Q. Yeah, after you've taken the medication.
A. It would depend on what I was doing. I wouldn't want to drive like that.
Q. Any other activities you would try to avoid immediately after taking trazodone?
A. Well, not off the top of my head. It never really came up that I was really trying to do anything after taking trazodone, much of anything, so I don't know how impaired I would be if I tried to do a lot of things.
Q. Have you experienced any daytime drowsiness since taking the trazodone?
A. Daytime drowsiness or fatigue? Is it, like, just regular fatigue from --
Q. Well, let's do it -- how about daytime drowsiness? Have you experienced any of that from taking the trazodone?
A. Since taking trazodone, yeah. A lot of times, I don't take it now. I have a little bit of it left.



And yeah, back at the time my mom was alive, I was her caretaker, and some nights, I would have to be up taking care of her. And I could do that under the influence of trazodone, but I was exhausted while I did it. And when the Railroad would call you out and have you work all night, there were nights when I didn't take it, so they could call me if they wanted to. If you don't get any sleep, obviously, you're fatigued the next day.
Q. What circumstances were you on call for the Railroad?
A. Well, on a voluntary basis, Friday night, Saturday night and Sunday night, several months after they issued the guidelines for separating the employees into two work groups. I volunteered to help out the people on call by taking calls -- not taking my medicine for two nights in a row, I would try to help them on the weekend, and they called me out at night a few times.
Q. And did that weekend on-call schedule rotate between your group?
A. Yes. The two men that bid the restore tech jobs, I was in a rotation with them for weekends.
Q. And the other install techs were in that rotation as well; is that right?
A. No, they were not.
Q. Was that -- so it was just you and the two

Page 45

Q. So then when you were on call, did you have the option to decline a call?
A. Well, I wouldn't -- you -- I -- you can't -- I would never volunteer for a thing and then refuse a call. I mean, you're kind of messing up the system when you do that. We could -- I wouldn't do that. I don't know of anybody that ever refused a call that agreed to be on call for a certain time.
Q. And the period of time that you're on call, is that on-duty time?
A. Depends on how Terry had you marked up, and you never really knew, in my case, when he marked me off duty and when he didn't. It was supposed to have been -- I think we discussed 7:00 to, you know, five or six o'clock the next morning or -- standard start shift time during the week would have been 7:00, I think.
Q. Now, what was the discussion about not having you work on-call hours at night?
A. Well, the discussion was when I first brought it up. I'm the one that brought up the whole idea of me being in the call rotation. And I said the only time I could do it is when I didn't take any medicine or was under the influence of the medicine. I wouldn't take calls then. I didn't volunteer for that. So it was -- there was a restriction at night.

Page 46

Q. So then are you saying you never took nighttime calls?
A. No. I would -- I would not take my medicine Friday and Saturday night. I could generally get by two nights without, you know, building up this deficit of sleep over days. I could sleep two or three hours and I could take calls, say -- I felt like safely at night and did take a few at night during that time, I believe. But by Sunday night, I had to take my medicine. And I think Sunday nights, I don't remember ever taking a call.
Q. So you felt like you couldn't safely take a call while on your trazodone?
A. Well, I didn't think of it in those terms. The terms I thought of it in was, anything that makes you drowsy, you're not supposed to drive. That's a company rule. And it made me drowsy enough to sleep.
Q. And were you driving a company vehicle for your cars -- for your calls?
A. Yes.
Q. So when you had the discussion about not taking calls while you were taking your medication, what did Terry Neal say in response?
A. Well, when I first brought it up, he said, No, there's only going to be two people on call; that's

Page 47

going to be the restore techs.
And I said, Well, you know, I said, It would be nice if these guys could get some help so they could do whatever they wanted during the day, you know, two weekends out of the month -- month or whatever instead of just one.
And Terry Neal said, Well, we can't do it that way. Systemwide, they changed us to where we were divided into these two groups.
So at first, they said no, but after three meetings and I convinced Terry to talk to -- I guess it was Lynn Andrews, they agreed to do it.
Q. And so for those weekends you were on call, did you notify somebody if you were under the influence of your medication?
A. No. That wasn't necessary. We had discussed, from 7:00 p.m. on, I would be taking my medicine. And the first few years -- they never called me the first two years. They never called during that time. So somebody was probably marking me on and off duty from daytime to nighttime.
Q. And then what -- did something change after those first couple of years?
A. Well, what do you mean -- what changed? I mean, my condition changed or --

Page 48

Q. No. Well, you just testified that for the first couple of years, you didn't think you got any calls after 7:00 p.m.; is that right?
A. Yes. It was around that time. I mean, they may have called. I don't know.
Q. So was there a period when that changed?
A. Well, there seemed to be a period when Terry expected me to take calls all during the night around 2012, I think.
Q. How did you become aware that that was Terry's expectation around 2012?
A. Well, at some point in 2012, Terry asked for a conference with me up in his office and said I had missed a call.
Q. Was anybody else in this conference with you and Terry?
A. No. Just me and Terry.
Q. And what did you say in response to that?
A. Well, I told Terry that I believe he was contending I missed a call during the day on Sunday, and I told Terry my phone never rang. And I said I have -- I was silting in a room with my mom on a Sunday, had both a home telephone and my cell phone and the phone never rang.
Q. What did he say in response to that?

A. Well, at some point, Jim Bracken, his boss, got involved.
Q. Terry Neal's boss?
A. Yes.
Q. And how did Jim Bracken get involved?
A. I assume he was notified. You know, I just assume he was notified because he's the one that called me regarding the issue of the safety complaint I had made, and he talked to me about the situation in Fort Worth.
Q. What did Jim say during his call to you?
A. Well, he asked me what this was about, and I explained it to him in the terms that I just explained it here. I said, Terry's trying to make me a restore tech, and I'm -- you know, I have to take this medicine.
He didn't object to anything I said. And I don't know if he scheduled a trip to Fort Worth after that incident or it was another incident, but shortly thereafter, within a month or two, he was in Fort Worth and talked to me and Terry.
Q. Did he talk to the two of you together?
A. No. Separately.
Q. What did you and Jim Bracken discuss when he met with you personally?
A. Well, we discussed Terry had been -- Terry had



been apparently in charge of marking whoever was on duty, on and off duty. And he was -- also had some of the calls on certain weekends where OSS was calling him before he would call a tech. I didn't know about that at the time. And he was rearranging the call to fit whatever he wanted to give whoever he wanted the overtime, and he was trying to change things where it was mandatory for me to come out at night. And I told him that's -- you know, That's crazy. I'm not even on a restore tech job. You -- you know, I'm entitled to a job assignment. That would violate all my seniority to do something like that.
I had 28 years of seniority. I was a senior man in Texas. You had to let me have a defined job assignment. And he was just trying to mix and match terms, and I would have been the only install tech who was mandatorily on call for anytime after hours. None of our install techs were on call at that time.
So he was trying to change my job where it was in direct conflict with my health guidelines that were on my time. And Bracken went up there and he stopped it somehow because for another, I think, two years, it was never an issue. They didn't call me at night anymore.
Q. What did Jim say in response to what you had to



say?
A. He told me that he would take care of it. He knew -- I don't know if he was pretending to take my side in it or he was being honest and did take my side in it. I don't know. I didn't hear the conversation with Terry. But after that, it was not an issue. We didn't have any trouble for two years -- approximately two years.
Q. Now, you started working for Union Pacific in March of 1985; is that right?
A. Yes.
Q. As a communications maintainer?
A. Yes.
Q. And did you work that same position the entire time you were at Union Pacific?
A. Position regarding what, job responsibility or that title, communication maintainer? I had that title the whole time I was working there.
Q. How did the job responsibilities change?
A. You're talking about when we divided up? We already discussed dividing it up between install tech and restore tech.
Q. Before the division between install techs and restore techs, did all the communication maintainers do the same job?



A. Yes. It was -- yeah, it was pretty much the same job.
Q. And all of the communications maintainers were subject to being on call 24/7; is that right?
A. No. Nobody was on call 24/7. They would let -- they would get a voluntary agreement to cover Sunday if they let us rotate.
Q. Okay.
A. And also, the after-hours seniority went by -- the after-hours overtime went by seniority. You could -- you know, you could demand to be put on call or, in my case, I had already -- I think -- it may have been later, but they gave me a -- they gave consideration to my seniority that I didn't want overtime after my mom -- I became the primary caretaker for my mom in about 2000 -- 2009. And they didn't call me -- they were calling the other techs because I declined the overtime and didn't want the overtime. Told them in a meeting, I just don't want any overtime. I'm taking care of my mom.
So they didn't call me before we made the divisions of install tech and restore tech. They could if they wanted to, but they didn't.
Q. So they had the right to place you on call. They didn't out of respect for you taking care of your

Page 57

mom?
A. No. They said specifically my seniority entitled me to -- well, they didn't say it. They acquiesced to a meeting where we discussed it. My seniority allowed me preference to overtime, is the way it's written, and that includes all overtime. Restoration of service, after hours, all of it is classified as overtime. And I had preference to that. And I don't know if he nodded his head or whatever, but when I told him about 2008, 2009 -- it was before we made the division that my mom had Alzheimer's and I became her primary care person or -- I don't know what you call it, guardian, but shortly thereafter, months after, I filed FMLA, which restricted my overtime too. It had those restrictions in there, so that they would understand -- we were told by management, you know, If you're in that position, then you file FMLA.
So I did, and that also restricted my after-hours overtime so that I could be with my mom.
Q. Well, was all after-hours work classified as overtime?
A. Yes.
Q. I've just posted what's been marked as Deposition Exhibit 1. Are you able to see that on your screen?

Page 58

(Exhibit No. 1 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) Okay. Have you seen your equal employment opportunity policy before?
A. At some point, I've seen this before, I think.
Q. Were you aware, when you were employed with Union Pacific, that they had a policy prohibiting discrimination or harassment based on your disability?
A. Yes.
Q. Were you aware that any person who believed they were being discriminated or harassed based on their disability could report that to the EEO Department by using the toll-free 24-hour number?
A. You're saying did I report it to the EEO Department?
Q. I'm saying were you aware that you could report it to the EEO Department?
A. I don't remember. I don't remember what I was thinking during that time.
Q. Did you report any discrimination to the EEO Department?
A. I reported on the safety hotline what I thought was a situation where I definitely had the right to be treated on my own time and not be forced to do something dangerous. And it was resolved to a major degree. So I

Page 59

didn't -- I don't think I had a reason to go to EEO Department.
Q. Were you aware that the equal employment policy included a policy covering the reasonable accommodation of disabilities?
A. I don't know if I understood it in those words, but I understood that I had a right to work there, even if I had a disability.
Q. Did you ever call the EEO Department to request an accommodation for your sleep issues?
A. No. Terry had me call whoever it was I filed the paperwork with on my mom for the -- what do you call it -- Family Medical Leave Act. And I don't remember which department that was. And I called them, and they said, You didn't have enough time in the previous year to file on yourself, but your mom's was in good standing.
Well, it didn't matter because that restricted my overtime anyway.
Q. So you inquired about FMLA leave for your sleep problem?
A. Yes. Terry ordered me to do that, so I made that call.
Q. Do you remember who it was you talked to?
A. No.

Page 60

Q. Or what department you called?
A. I thought it was Personnel, you know, as best I can remember. I've got some paperwork to show who it was I called and who it was I was talking to.
Q. Was that just handwritten notes?
A. No. It's communication from them talking about my Family Medical Leave Act for my mom. It was approved by a department within the Railroad.
Q. And that's the same number you called to talk about FMLA for your sleep problem?
A. Yes.
Q. Did you do anything to dispute whether or not you had FMLA eligibility?
A. No. They simply told me I didn't have enough time in for the year before to file FMLA on myself. That's specifically what they told me. You have to have a certain amount of time in, and I had missed time taking care of my mom. I think I also had medical issues where I was out with hives or some other medical condition where I didn't have enough time in.
Q. I've just shared what's been marked as Deposition Exhibit 2. Are you able to see that on your screen?
(Exhibit No. 2 was marked.)
A. Reasonable Accommodation Policy?

Page 61

Q. (BY MR. ORTBALS) Yes, sir.
A. Yes, I see that.
Q. Were you aware that Union Pacific had a Reasonable Accommodation Policy in place?
A. Well, I think so. I think I was aware of that at that time without necessarily reading this. This may have been posted on bulletin boards around the yard or something. I didn't bother to read it. I didn't feel like I needed an accommodation, really.
Q. And why is that?
A. Well, my job didn't require me to be on call. I was volunteering to be on call. If they didn't -- if they wanted to fight me and throw me out of the call rotation, they could have.
Q. Did you receive annual training on Union Pacific's discrimination policies?
A. No.
Q. Did you have to go -- undergo regular training modules?
A. Yes.
Q. Did any of those include Union Pacific's discrimination policy?
A. I -- you know, in the last 20 years, I couldn't tell you if I went to one of them, but I don't think it was an annual thing.

Page 62

Q. Okay.
A. The only accommodation they had to supply me was letting me sleep enough to where I...
Q. Was your job a safety-sensitive job?
MR. ULOTH: Objection, that's vague.
Q. (BY MR. ORTBALS) You can answer the question, sir.
A. What's that? Excuse me. What just happened?
Q. You can go ahead and answer the question.
MR. ULOTH: I had objected to the question as vague.
A. Okay. I don't -- I don't think officially it was. I mean, there were FRA guidelines, I think, for what constituted hours-of-service jobs based on being somewhat described like you just said, and I don't believe I was on one of those jobs. That would subject us to random drug testing, and we were not subject to that.
Q. (BY MR. ORTBALS) Outside of the FRA, do you know if Union Pacific considered your job to be safety-sensitive?
MR. ULOTH: Objection, calls for speculation.
Q. (BY MR. ORTBALS) You can answer.
A. I don't know what they considered. They --

Page 63

who, my boss, their policy? I don't know.
Q. Were you expected to perform your job in a manner that assured the safety of yourself, your coworkers and the public?
MR. ULOTH: Objection to the form of the question.
Q. (BY MR. ORTBALS) You can answer the question.
A. Was I expected to be safe at work, yes.
Q. Was there a general code of operating rules that applied to your job?
A. Yes, we had a rule book that I think was called the General Code of Operating Rules.
Q. Okay. And under that rule book, safety was the most important element in performing your duties; is that right?
A. I don't know if it says that in the rule book, but we were told that many times.
Q. I've just shared what's been marked as Deposition Exhibit 3. Are you able to see that document, sir?
(Exhibit No. 3 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) Have you seen Exhibit 3 before?
A. I think I have. I think this is IBEW

Page 64

Classification of Maintainers.
Q. Okay. And you would have fallen within that?
A. I think -- I think that the bottom one, communication maintainer, BRS monthly rated. This isn't -- I don't -- I don't understand what I'm looking at here. There is one that says, Senior ET grandfathered, IBEW and BRS.
Q. Uh-huh.
A. I don't think the IBEW were grandfathered. They might have been.
Q. Okay.
A. But I was in a different class that's not mentioned here, and that is senior communication maintainer, BRS monthly rated grandfathered, not senior electronic technician.
Q. Okay. What did it mean to be monthly rated?
A. You're paid so much a month, and depending on how many hours are in that month, some months vary in days, they divide that monthly rate and give you something like an hourly rate per six days a week.
Q. So you were paid a monthly rate based on six hour -- six days a week?
A. Yes.
Q. Okay. And that was even after the separation between install techs and repair techs; is that right?

Page 69

Q. And could restoring equipment involve climbing ladders?
A. Yes. We weren't certified to climb. We could climb up to -- I forget what it was, eight or nine feet.
Q. And would some of the equipment that you were storing be track-side?
A. Yes.
Q. And what were you supposed to do for on-track safety during these calls?
A. Well, depending on how close you were to the track. I don't remember. There was a distance of ten or 15 feet. If your track-side equipment was closer than that, you needed full PPE; a vest, a hardhat. You needed all that to get close to the track. Most of our track-side equipment was further away from the track than that, including the gate to get into the site. Most of it was gated. You generally wore ear plugs and didn't have to wear a hardhat until they issued a general mandate. At what level it came down in our department, I don't know, but they wanted you wearing a hardhat whenever you got out of the van, and we started doing that. So we had -- we had guidelines almost everywhere except when we were in buildings if there was no loud noises going on in the building.
Q. I've just shared what's been marked as

Page 70

Deposition Exhibit 4. Have you seen this document before?
(Exhibit No. 4 was marked.)
A. I'd have to see the whole document. You're showing part of it here. I don't know. I'm not sure.
Q. (BY MR. ULOTH) Do you recall being referred for a Fitness-For-Duty exam in 1997?
A. Oh, yes, yes.
Q. And the Fitness-For-Duty referral indicates that you told the manager that you probably would be missing some calls due to medication. Do you recall that?
A. Yes.
Q. And what is it that you told the manager at that time?
A. Well, the manager was aware that I had severe allergies at certain times of the year. That's a -- you know, I -- that's a medical condition I reported when I hired on, that I took this allergy medicine that was very powerful back then. Later on, I took shots and didn't have that condition anymore after about six months of allergy shots. But that medication, Drixoral, I think it's called, Drixoral, it has several names. It's a green pill. And that was my final go-to when I just couldn't stop my allergies. And I told them, you

Page 71

know, If I took that stuff, I don't know what would happen to me.
I hated that stuff. And I did miss a call because of that I think -- well, I didn't miss the call. I talked to him and let the -- I told him the condition I was in, and he said I didn't have to come out.
Q. I've just shared what's been marked Deposition Exhibit 5. Are you able to see that on your screen?
(Exhibit No. 5 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) Okay. Have you seen Deposition Exhibit 5 before?
A. I'm almost sure I have because this is what they would have given me as a notification of evaluation, that I was going to be evaluated by a doctor.
Q. The Fitness-For-Duty evaluation you were referred to in 1997?
A. Yes.
Q. Okay. And at the top of Page 2 of Exhibit 5, you were notified that you were being temporarily moved from service pending the results of your medical review; is that right?
A. Yes.
Q. Okay. And is that what indeed happened, you

Page 72

were temporarily removed from service?
A. Yes, with pay.
Q. Okay. I've just shared what's been marked as Deposition Exhibit 6. Are you able to see that on your screen?
A. Virginia Woodfork, Attorney --
Q. No. Sorry. Wrong thing. All right. Let's do this again.
(Exhibit No. 6 was marked.)
Q. (BY MR. ORTBALS) All right. Now I've just shared what's been marked as Deposition Exhibit 6. Are you able to see that on your screen?
A. Yes.
Q. Okay. Have you seen Deposition Exhibit 6 before?
A. I remember the name, James M. Harding, and I believe that is the doctor I saw.
Q. Okay. And in the first paragraph of the first page of Exhibit 6, it indicated that during the past month or so, you had been in an on-call capacity, which had interfered with your sleep pattern; is that right?
A. Yes. They were calling me out like every other night and sometimes twice a night.
Q. Okay. And your regular doctor had recommended some medication to help you sleep; is that right?

Page 73

A. Yes.
Q. Okay. And that medication had sedating affects; is that right?
A. I don't even remember. It's been so long. I don't remember what that did to me.
Q. Okay.
A. I don't -- I don't know if I took it for a period of a couple -- I can't even remember. That's been so long ago.
Q. Okay. Did your on-call schedule change as a result of the Fitness-For-Duty evaluation?
A. They changed it for like two weeks or something like that. They said, We're not calling for two weeks, or something. I don't remember exactly what they said. I think I saw it in writing what they said, but I couldn't remember it.
Q. Okay. I've just shared what's been marked as Deposition Exhibit 7. Do you see that on your screen?
(Exhibit No. 7 was marked.)
A. Yes, I see that.
Q. (BY MR. ORTBALS) Okay. Have you seen this document before?
A. I'm pretty sure I have, yes.
Q. Okay. And if we turn to the third page of Exhibit 7, your employment was terminated in 1998 for

Page 74

refusing to accept an after-hours call; is that right?
A. No.
Q. No?
A. I didn't refuse anything. I told my supervisor over the telephone my condition, and he decided not to dispatch me out on the call.
Q. What was your condition at the time?
A. Tired from allergy medication, the Drixoral that I had taken.
Q. Okay. Your employment was discharged; is that correct?
A. Yes. They assessed discipline in that case and later lost the investigation because of lack of any insubordination on my part. That was the charge, insubordination. They lost that case.
Q. Sir, you were out of work for a year and a half as a result of this discharge?
A. About a year and a half. I got a half of year of back pay. They didn't -- I guess they don't have top give you all your back pay.
Q. All right. Were you given any type of last-chance agreement when you were brought back?
A. No agreement that I know of.
Q. Okay.
A. I don't know. They might have had, me to agree

Page 75

to -- you know, I don't know. It's been a long time ago. They did have to pay part of the back pay, though. They did lose the case. They sustained no charges against me.
Q. Okay. I've shared what's been mark as Deposition Exhibit 9. Have you seen this document before?
(Exhibit No. 9 was marked.)
A. Yes, I think so.
Q. (BY MR. ORTBALS) And this is a letter to you dated January 26th, 2009; is that correct?
A. Yeah. I don't -- I'll remember it if I read the whole thing, whether I've seen it or not.
Q. Okay. Okay. Were you aware that you were responsible for complying with Union Pacific's drug and alcohol policy?
A. Oh, yes.
Q. Did you ever have a physician make a determination as to whether your use of trazodone was consistent with the safe performance of your duties?
A. Well, yes. I met with my psychiatrist. She did follow-ups to see how I did on the drug. And what a doctor will do is simply ask a person, How does this drug affect you? How is it working for you? Is it working for you?

Page 76

And she also did memory tests, cognitive function tests to see if I had improved where I could -- you know, safely be said to be sleeping properly. So yes, a doctor -- a doctor, as much as I know of, certified that I was much improved being on trazodone.
Q. Did she provide you any documentation that your use of trazodone was consistent with the safe performance of your job duties?
A. Well, no. We never discussed my job duties. We discussed my condition.
Q. Okay. Has any physician certified that your use of trazodone was consistent with the safe performance of your job duties?
A. Please say that one more time.
Q. Sure. Has any physician certified that your use of trazodone was consistent with the safe performance of your job duties?
A. No. A nurse did that when I first reported it.
Q. What nurse was that?
A. I don't know her name. I had a number that Terry, my supervisor at the time, before I was put under -- before I was put under the install group, he told me as soon as I reported that drug to him that I would have to call a company nurse. He gave me a slip of -- a Post-It note with her name on it. I called her.

Page 77

She said, You take it at home on your own time. It's not an issue.
And I have no idea what she did with the information after that. Did she get a doctor involved? I don't know. That -- she said that that was my obligation to report the drug, and since I took it on my own time, it wouldn't be an issue.
Q. Okay. So you told the nurse you took it on your own time?
A. Yes. I did not take it during my work shift.
Q. Did you tell the nurse that you had on-call hours that might be impacted by your taking of trazodone?
A. I don't think I -- I don't think she -- I don't think she asked a single question about that. She just said that you were required to report it. And she may have told me it wasn't on the list of drugs you couldn't take while you were in service on duty. She may have mentioned that, but she said, You're taken care of, you reported it.
And it was like she was in a hurry, and that was the end of the call.
Q. And you don't recall any discussion about on call or after-hours service?
A. Well, no. She didn't ask about any of that.

Page 78

Q. And you didn't disclose any of that?
A. Well, no. I was just reporting a drug I was taking.
Q. I've shared what I've marked as Deposition Exhibit 11.
THE REPORTER: Bob, you skipped 8 and now 10. I don't know if you meant to.
MR. ORTBALS: Yeah, that's intentional.
THE REPORTER: Okay.
(Exhibit No. 11 was marked.)
Q. (BY MR. ORTBALS) Have you seen Deposition Exhibit 11 before?
A. I don't think I've seen this at all.
Q. Okay. If this indicates that you called the safety hotline August 15th of 2012, is that consistent with your memory?
A. I believe that's correct.
Q. And this indicates that you reported that you take medicine to sleep at night, And has been taking it for the last four years; is that right?
A. Yes.
Q. Is that consistent with what you reported on the safety hotline?
A. I believe that's correct.
Q. Okay. And then you reported Terry Neal was

Page 79

notified four years ago about you taking it and didn't there a problem with it; is that right?
A. Yes. The exact date's in my notes. I reported it to him on a Friday that I had been prescribed the drug, and he said to call the nurse. I think I called her either the same day or Monday and reported it.
Q. And that's the conversation with the nurse we just talked about?
A. Yes.
Q. Okay. Did Terry Neal say anything else about your use of trazodone?
A. No, nothing.
Q. Did you tell Terry Neal that it would impact your ability to take after-hours calls?
A. No. Terry Neal, at the time, was giving the overtime to the junior men, I think, because I was taking care of my mom. I hadn't filed FMLA yet. But in those meetings before I had filed FMLA, we had routine safety meetings, and I told him I would be taking care of my mom and no longer wanted any overtime. And that pretty much took care of the thing in his mind. He didn't question it at all. He didn't think it was significant.
Q. And then Exhibit 11 indicates that because you were on this medicine, you absolutely cannot hear the

Page 80

phone at night, and your supervisor said if you can't answer your phone at night, you're going to have to change this job -- or he's going to have to change your job; is that right?
A. I think --
MR. ULOTH: Let me assert an objection. That was compound and vague.
Q. (BY MR. ORTBALS) You can answer the question.
A. Closer to my memory of what Terry said in 2012 with Chris Ozuna present in that meeting, Terry said, I cannot have you taking that medicine and missing calls.
Q. Okay.
A. That was in '12.
Q. Did you report that Terry Neal wanted you to drive 20 miles out in a company vehicle at night under the influence of the medication?
A. I reported to the safety hotline that after taking the medication, it was obvious Terry Neal didn't care if I took the medication or not, he was expecting me to come out.
Q. And you didn't feel like you could safely do that; is that right?
A. I didn't feel like it would be within the company guidelines of what they considered safe under -- they had a rule about that, 74.2, I believe.

Page 81

Q. And what was your understanding of that rule?
A. Says you have to be fully rested to drive a company vehicle. They required us to violate that rule nearly the whole time I had been out there, but under certain drugs, it was even more imperative that you shouldn't be tired, I would have thought. And they would call maintainers out two and three times a night and require them to drive that vehicle. But irregardless (sic) of that, I'm -- you know, I'm just reporting to the safety hotline number what I thought his expectations were, and I thought they were unreasonable.
Q. Why was it unreasonable?
A. Well, it was unreasonable that -- it was unreasonable and unsafe to call me after I had taken the medicines and imply that I could be investigated or disciplined and use, you know -- try to intimidate me into maybe saying I didn't take the medicine and going ahead and coming out because I was not allowed to, as he put it, miss a call. I was on the restore tech job. I would understand if I did that job.
Q. Do you know what's meant by the last sentence in the narrative, He feels that this is retaliation and harassment because he is upset with other employees and is taking it out on him?

Page 82

A. Where do I -- I don't see that.
Q. The last sentence of the narrative section.
A. Oh, I see. He feels that he is upset with other employees and is taking it out on -- I don't remember making a statement to them that Terry was upset with other employees and taking it out on me. I don't believe I ever said that to him.
Q. What did you report to the safety hotline with respect to retaliation and harassment?
A. I can't remember. I don't believe I ever needed to tell him from some -- anything I knew that he was mad at another employee and taking it out on me. As far as the retaliation and harassment, it -- you know, there was a certain amount of Terry being totally humiliated when he called me up there on -- I believe the first call that he contended I missed. It was on a Sunday during the day, and I had the records from both phone companies that showed he wasn't telling the truth. And I think he was outraged when I called Jim Bracken and got Jim Bracken involved right after that before Jim Bracken saw this safety thing and actually came to Fort Worth. Maybe he was mad about that. Maybe that's what I mentioned. That's been so long ago. I didn't record all the words I used. My -- my intention was to let them know that this guy was changing my job. For some

Page 83

reason, I was the only IT guy that was having this change done to his job. I couldn't see why. I don't think anybody could.
Q. I've just shared what's been marked as Deposition Exhibit 12. Have you seen Exhibit 12 before?
(Exhibit No. 12 was marked.)
A. I may have seen this.
Q. (BY MR. ORTBALS) This is an e-mail from Terry Neal to yourself on November 17th, 2014; is that right?
A. Well, that's what it says here, yes.
Q. Okay. And do you recall having a conversation with Mr. Neal that morning about missing two calls that weekend?
A. It was always Monday morning. Yes, that's when he would have talked to me about this.
Q. Okay. What do you recall about that conversation?
A. I think it was at night after we agreed that I wouldn't be on call. And I think he -- he was going to claim that I had missed calls, you know. I think it was what, on a Sunday? I don't know. If I'd taken my medicine and didn't wake up for the call, I think I'd call back in the morning when I realized there was a call. I mean, I'm not contending there wasn't a call in

Page 84

the span of four or five years that they called me at night and I didn't cover because I didn't wake up. They knew I wouldn't. I was taking the medicine, and the provisions were that I was not to be called at night.
Q. Were you on call that weekend?
A. Probably for days, yes.
Q. And Terry Neal wasn't the person placing the car -- calls; is that right?
A. Well, its would have gone to -- any kind of trouble like this goes to a group in Omaha, either OSS or TRC, I think they call them, and those groups log and make tickets on trouble. And a lot of times, they don't have to call the supervisor. They call the tech directly. But the supervisor can put down per preference whether he wants to be notified on every ticket or certain types of tickets. So, you know, if it was one where -- and I think there was maybe one, maybe two in that four-year period where they called me at night once Terry changed the expectations of my job. They might have called me.
Q. Okay. Is this statement, I understand that when you take your sleep medicine, driving is out of the question, is that a true statement?
A. Are you asking was that Mr. Neal's understanding?

Page 85

Q. No. I'm asking, is it true that when you take your sleep medicine, driving is out of the question.
A. Well, I never had an emergency come up that was important enough for me to drive while I was under the influence of medicine. Maybe if somebody was dying or something.
Q. Isn't it true, sir, you told Mr. Neal that you couldn't drive under the influence of your medication?
A. It was against the company rules and it was against state law.
Q. So that's a yes, you said you couldn't drive under your medication?
A. Well, yeah. He would have to consider it that way.
Q. What did Mr. Neal tell you about needing to make sure that they had personnel available to cover after-hour emergency restoration of service?
A. What did Mr. Neal tell me about that?
Q. Yeah.
A. Well, he may have just mentioned that somebody has to cover these calls. And I told him, you know, we had our second backup when we were on call and somebody did. I've covered for other people that missed calls. I've covered nearly 100 calls for people that have missed calls in my employment out there. And that's --

Page 86

that's who covers this stuff. That's who makes sure the calls are covered. It's us covering for each other.
Q. When did you cover --
A. And --
Q. Go ahead with your answer.
A. Okay. I'm just saying that coverage was provided for the call.
Q. When did you cover those 100 calls?
A. There was one employee, a Mr. Ken Horton, who had a drinking problem in the years 1990 through '90-something. They sent him off a couple of years later to rehab under the company program for being caught on property under the influence. And before that time, I covered at least two calls a week for that man for two years. They considered that a medical condition. And they just assigned his calls to me, and I covered them.
Q. What did Mr. Neal tell you about needing to work with the Medical Department and submit a document to him stating your medical limitations?
A. Mr. Neal asking me to submit paperwork about my medical condition? Please say that again.
Q. Sure. Do you see the last sentence in Exhibit 12?
A. Okay. I need you to work with Medical

Page 87

Department and submit a document to me stating your medical limitations.
Well, within my job requirements, I didn't -- you know, I was able to do the job expectations as he outlined them in every piece of paperwork. And then once I worked with the Medical Department, they submitted him their restrictions.
Q. Well, what is -- well, Mr. Fulbright, that happened back -- that happened in 2015. I'm asking, what did you do in November 2014 to work with the Medical Department at Mr. Neal's request?
A. Well, he later clarified that. That's in the end of '14 when he said -- he went on to clarify this and say, you need to file under FMLA for yourself.
And they told me I didn't have enough time in. I mean, he actually clarified what he wanted me to do here.
Q. When did he do that?
A. Sometime at the end of 2014. I don't think I even wrote down when it was. I made the call, though, and they confirmed. I didn't have enough time in for that year to get FMLA filed on myself.
Q. And so you did not go to the Medical Department top get documentation regarding your medical limitation?
A. No, not after he clarified who he -- what he

Page 88

wanted me to do. That was probably a different group once he clarified it.
Q. How did you become aware that there was an issue with you missing a call in January of 2015?
A. Terry notified me, I think, when I came in Monday morning. He was contending I missed the call.
Q. Well, were you on call that weekend?
A. I was in rotation for that weekend, yes.
Q. I've shared what's been marked as Deposition Exhibit 13. Have you seen this document before?
(Exhibit No. 13 was marked.)
A. I think I have. I think I did, yes, years ago, but I think I saw the ticket. You're -- this is -- we go back up and it's 1-26 or -- it was concerning a call at 1-26 -- 2015 -- yeah, 1-25. Okay. 1-25, yeah, I've seen this ticket.
Q. (BY MR. ORTBALS) Okay. And you were given a call for this issue; is that right?
A. Yes, I was called and called them back within, I think, 20, 23 minutes, something like that. I forget the exact time.
Q. Who did you call back?
A. I called back their -- the number they had left for -- on my telephone that, you know, showed up on my phone. It may have been this number they show right

Page 89

here. It was a call tree that tells you you can notify NOC, TOC, OSS. And if you don't -- if you don't punch in a telephone number of whoever called you, then it just hangs up on you.
Q. Okay. Were you --
A. So I was never notified of who to call. It just tells me -- like this number here, when you call it back, the number I called back, it said, You can punch this group or that group.
And you need to pick a group or it will hang up on you. So at that point, I wasn't notified, if there was a problem, why they were calling me and who to call back. We had discussed that in a safety meeting, I think, a week before because it had happened to another tech. And Terry agreed that is not proper notification of a technician of a problem if you can't get a hold of a person that can look at the ticket. Without being able to talk to a person looking at the ticket, you don't even know if there is a ticket. They called us for things like information, wanted to know all kinds of information that doesn't even involve a problem.
Q. Were you left voice mails with callback numbers?
A. It was on my phone who called, and that's who I called. My phone had a phone call that I didn't answer

Page 90

20 minutes earlier, and I called it, got the Union Pacific Railroad, but it just tells you to pick a work group. If you call a work group and talk to them and say, Please find me this ticket, they'll -- you know, for years, they tell you, No, no, that's not how you handle this. When you're given a call like that and you're notified, you wait for them to call you back. And once a ticket is generated, you're the tech they're going to call. An actual person will call you at their number, and then you'll be able to converse about the ticket and the problem.
I think I waited like another hour for somebody to call me and nobody ever did. So I didn't -- my phone also showed -- had an application on it that Terry made mandatory that all techs have on their phone that showed tickets -- actual tickets that were generated in our work group that would be assigned to us in realtime. And I checked my phone and there was no ticket.
Q. And so you're saying that you called back the number on your phone that was the missed call on your caller ID; is that right?
A. Yes.
Q. You didn't --
A. Terry didn't --

Page 91

Q. You didn't check --
A. Didn't check what?
Q. You didn't check your voice mail?
A. I had my voice mail disabled on my phone. I don't want people thinking that -- I've had terrible trouble with these phones where the indication you have a voice mail is only a faint beep or it gets turned off. And somebody thinks they left you a voice mail and it will be four hours before I get to it. So I had that disabled. And that meant anybody -- that was to make sure people know that you need to call back to get a hold of me. Well, they didn't have to. I called them back in 20 minutes, and they should have -- they should have at least called back in that time if it was an important call. They didn't.
Q. Well, I'm confused. How are they supposed to know to call you back if you didn't talk to a person?
A. Well, that's kind of exactly the problem. They leave a number where you can't -- where you can call it back, but you don't get a person. You get a tree that tells you you can pick this work group, you can pick that group. Pick one, and then it tells you again, please pick a work group, I'm sorry, good-bye, and it hangs up on you.
Q. Well, how are they supposed to give you a

Page 92

callback number if you have no voice mail activated?
A. Well, it shows up on my caller -- on my log on my phone that somebody just called me at this number, and I called them back. But it wasn't a person. It was their -- it went to their generated voice tree thing. That happened to all of us.
Q. Well, exactly. The number they called on may be an automated number, but a person can give you a voice mail that has a live number to call, right?
A. Yeah, and they didn't.
Q. Well, because your testimony is you had no voice mail.
A. Well, they're going to get me. You know, if they call, they're going to get me. They don't need my voice mail.
Q. But you didn't answer the phone, sir.
A. No. I called back within 20 minutes the number that I had. Had a real person called me, it would have been a real person's number that I called back and I would have gotten that person.
MR. ULOTH: Bob, when you get to a good stopping point, I'm going to need to get a little lunch here.
MR. ORTBALS: Let me take a quick look at this exhibit. Yeah, let's go ahead and do a lunch

Page 93

break.
MR. ULOTH: You want to say 30 minutes, or do we need more time?
THE REPORTER: 30 is good.
MR. ORTBALS: That's fine with me.
MR. ULOTH: Joe, are you good with 30 minutes?
THE WITNESS: Yes.
MR. ULOTH: Okay.
THE VIDEOGRAPHER: Stand by. We're going off the video record. The time is 12:55 p.m.
(Break was taken.)
THE VIDEOGRAPHER: We are back on the video record. The time is 1:26 p.m.
Q. (BY MR. ORTBALS) Okay. We're back on the record following the lunch break. Mr. Fulbright, I'll remind you that you are still under oath.
I am sharing what's been marked as Deposition Exhibit 14. Are you able to see that on your screen?
(Exhibit No. 14 was marked.)
A. Yes, I am.
Q. (BY MR. ORTBALS) Okay. And have you seen Exhibit 14 before?
A. Yes.

Page 94

Q. That's your signature at the bottom of the first page on the Employee Signature section?
A. Yes.
Q. Okay. Is that Terry Neal who signed it in the Manager's Signature section?
A. I believe -- I believe that's his signature.
Q. And Exhibit 14 reflects a meeting that you had with Mr. Neal on January 26th, 2015; is that right?
A. Yes.
Q. And that was related to the missed call from the day before; is that right?
A. Well, yes, it's related to the incident.
Q. Was there anybody else present with you and Mr. Neal in this meeting?
A. The Union rep.
Q. Was that Jim Espinoza?
A. I don't remember his name. It's in my notes somewhere.
Q. And did you record this meeting?
A. Yes, I did.
Q. Okay. What did you use to record the meeting?
A. A small recording device in my pocket.
Q. And did you inform Mr. Neal or Mr. Espinoza that the meeting was being recorded?
A. I don't remember.

Page 95

Q. Did you ordinarily carry around a small recording device with you?
A. Yes. Once I realized Mr. Neal was recording all of our meetings with me and my representative a few months earlier -- maybe a year earlier, I started recording them too.
Q. How did you become aware that Terry Neal was recording your meetings with your Union representative?
A. He would set his recorder up on his desk while we were in his office talking to him.
Q. Okay. And you've produced a copy of that -- your recording of this meeting; is that right?
A. I -- I gave my lawyer a copy of it, yes.
Q. Okay. And the copy you turned over is a fair and accurate copy of the recording you made that day; is that right?
A. Yes.
Q. You didn't alter the recording in any way?
A. No.
Q. And it accurately reflects the events that were recorded?
A. Yes.
Q. Okay. Did you also write down some handwritten notes regarding the meeting as well?
A. Yes.

Page 96

Q. What was your reason for writing down handwritten notes?
A. To make sure I remembered, you know, points of contention, inaccuracies I thought were in the meeting.
Q. Any other reason you took the handwritten notes at that time?
A. No. Just to be sure I could remember certain points about the meeting.
Q. When did you write up your handwritten notes?
A. Probably a day or two after the meeting.
Q. And you had not been removed from service at that time; is that right?
A. That's correct.
Q. Were you contemplating any legal action against Union Pacific at that time?
A. No.
Q. Is Chris Ozuna your son-in-law?
A. Yes.
Q. How is that the case? I believe you testified earlier you have no children.
A. Well, he's not my child. I didn't get married until I was, you know, 52 years old -- 53 or -- 50 years old, somewhere in there. I've never had children.
Q. Then how is he your son-in-law?
A. Well, I don't consider a son-in-law one of my

Page 105

ticket or not on your phone?
A. Terry Neal ignored me the whole time I was talking about it. I explained it to him, and he just ignored it.
Q. And you say that because he didn't respond to it?
A. Excuse me?
Q. Are you saying that because he just didn't respond to what you were saying?
A. Yes. It was like I had never said it. He didn't respond. It was like he didn't care.
Q. And then what was the discussion about the issue of sleep medication on nights where you were subject to after-hour calls?
A. As far as I can tell, we never actually discussed that, by memory. I would have to listen to the conversation again, but I don't think we discussed my medicine.
Q. This next part, did Terry tell you he did not want to pursue discipline?
A. Yes.
Q. Okay.
A. I remember that.
Q. Did he explain that he wanted to clarify if there was a sleep disorder or a condition and what

Page 106

restrictions were needed?
A. No. I don't think those were the -- I don't think he used those words or discussed that. I think he told me at the end of our discussion concerning this call that he was turning me over to the Medical Department --
Q. Okay.
A. -- for maybe clarification on all of that. I don't think it was part of our discussion.
Q. And did he tell you that he was not pulling you from service?
A. Yes. He said I was not being pulled out of service and that my -- anything -- I think he -- I forget how he worded it. He said that once I was with Medical Department, I would be paid for my time off.
Q. Okay. And he told you to keep him informed if you needed to miss any work time to participate with the (inaudible) --
THE REPORTER: Participate with what, sir?
MR. ORTBALS: The Fitness-For-Duty review.
A. I don't think he ever said that. I think he just told me the Medical Department will call me.
Q. (BY MR. ORTBALS) I've posted what's been marked as Deposition Exhibit 15. Are you able to see that on your screen?

Page 107

(Exhibit No. 15 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) And did Mr. Neal share this Fitness-For-Duty request form with you during your January 26th meeting?
A. I think it was on the back of one of the pages he handed me at the conclusion of our meeting.
Q. Did you have any discussion with Mr. Neal about Exhibit 15?
A. What we're looking at right now?
Q. Correct.
A. No, there was no discussion. He handed me this information after the meeting was pretty much over.
Q. Have you discussed Exhibit 15 with anybody at Union Pacific?
A. I don't think I've discussed it specifically with anyone, no. I don't think so.
Q. I've shared what's been marked as Deposition Exhibit 16. Do you see that on your screen?
(Exhibit No. 16 was marked.)
A. Medical rules?
Q. (BY MR. ORTBALS) Yes.
A. Yes.
Q. Were you familiar with Union Pacific's medical rules?

Page 108

A. I don't think I'd ever dealt with Fitness-For-Duty medical rules before -- before this. So, you know, I'm kind of familiar with them now, I guess.
Q. At the time in 2015, when you were referred for fit for duty, were you familiar with the medical rules?
A. Not the medical rules. We weren't required to know the medical rules in our...
Q. Turn to Page 12 of Exhibit 16, which is Bates No. UPFulbright 917. You see at the top it says, Appendix B Reportable Health Events?
A. Yes.
Q. Okay. And your job was in the Engineering Services Department; is that right?
A. I think, at that time, we were.
Q. Were you aware that you were required to report certain health events to Health and Medical Services per the reportable health events policy?
A. Yeah, certain events, I was aware of.
Q. Okay. Did you report any type of loss of consciousness to Health and Medical Services?
A. No, not loss of consciousness.
Q. Have you ever suffered loss of consciousness?
A. Just when I sleep.
Q. And you're talking about intentionally going to

Page 121

being asked to do?
A. Well, when I first talked to her and she said sleep medicine evaluation, I asked her specifically what -- you know, What are you asking me to do?
She wanted a doctor to do a sleep medicine evaluation. And I believe, in one of the phone calls, she clarified that for me. It was the medicine they wanted evaluated and not me, and I thought that was unusual. I'd never heard of that. And no, she clarified. I think she said she talked to the -- or later on, she mentioned to the doctor that it was the medicine we were having evaluated. And I thought -- I had never heard of such a thing before.
Q. Did anybody in the Medical Department tell you that they were asking you to execute a release so they could talk to your doctor directly about what it was that they were requesting that you get with relation to your sleep disorder?
A. No, they never sent me a request for that.
Q. Okay. I've just shared what's been marked Deposition Exhibit 23. Have you seen this document before?
(Exhibit No. 23 was marked.)
A. I don't know. I don't know what's in it. I don't think I've seen that.

Page 122

Q. (BY MR. ORTBALS) Okay. You don't recall anybody at Union Pacific asking if they could talk to your doctor directly?
A. No.
Q. I've just shared what's been marked Deposition Exhibit 24. Are you able to see that, sir?
(Exhibit No. 24 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) It looks like you had a visit with your doctor at Kaner Medical Group on April 27th, 2015; is that right?
A. Yes.
Q. And that's Dr. D'Souza?
A. Uh-huh.
Q. Yes?
A. (No response.)
Q. Is that a yes?
A. Yes, Dr. D'Souza, that's correct.
Q. All right. And this was in an effort to be referred for -- to a sleep specialist; is that right?
A. I think so, based -- yes.
Q. Okay. And this was in order to get the evaluation of -- the sleep medicine evaluation that Union Pacific was requesting; is that correct?
A. Yes.

Page 123

Q. And did you have an understanding that Dr. D'Souza was going to refer you to a sleep specialist?
A. Yes. I believe I had to find a sleep specialist and she made the referral.
Q. Okay. I've just shared what's been marked Deposition Exhibit 25. Do you see that on your screen?
(Exhibit No. 25 was marked.)
A. Yes, I see -- I'm not sure where this is from -- Texas Medical Diagnostics, yes.
Q. (BY MR. ORTBALS) Is that the sleep specialist you were referred to?
A. Yes. The one in Bedford, I believe, sent me to the one in Arlington where I actually talked to doctors, but there was one in Bedford -- an office in Bedford. They had offices all over.
Q. And Dr. D'Souza gave you this referral the same day of your appointment, April 27th, 2015; is that right?
A. I believe so, yeah. I had to schedule an appointment with her to get the referral.
Q. Okay. I've just shared what's been marked Deposition Exhibit 26. Do you see that on your screen?
(Exhibit No. 26 was marked.)
A. Yes.

Page 124

Q. (BY MR. ORTBALS) Okay. Were you aware that Texas Medical Diagnostics had contacted Dr. D'Souza because you weren't returning their phone calls to schedule an appointment?
A. No. They never told me that.
Q. Okay. Did you have missed calls from Texas Medical Diagnostics?
A. No more than a day, maybe.
Q. You eventually did go to an appointment with Texas Medical Diagnostics on June 1st, 2016; is that right -- or June 1st, 2015; is that right?
A. Yes. That was the closest date that I could get after my first contact with them.
Q. I've shared what's been marked Deposition Exhibit 27. And these are records from Texas Medical Diagnostics that you produced in this case.
(Exhibit No. 27 was marked.)
Q. (BY MR. ORTBALS) Going to Page 4 of Exhibit 27, which is Bates numbered JF439 at the bottom, in the History of Present Illness section, it states that your employer is requiring documentation and assessment of medication usage and risk of daytime sleepiness the next day after sleep aid usage; is that right?
A. That's what it says here, yes.

Page 125

Q. And is that what you told the doctor at Texas Medical Diagnostics?
A. Well, I don't think I went in -- well, I can't remember exactly what I told them because, you know, I didn't record all that. They -- as soon as I told them I'm requesting a sleep medicine evaluation, they looked at me sideways. They had no idea what I was talking about. And so I made mention they were worried about the medicine causing sleepiness the next day or something. I don't remember what I told them. It was quite a bit because they wanted me to -- they didn't understand what the Railroad was asking for.
Q. Was it accurate that you were seeking an assessment of medication usage and risk of daytime sleepiness the next day after sleep aid usage?
A. Yes. That's what the Medical Department told me to get, was a sleep medicine evaluation.
Q. Okay. And is it accurate that you told them that your employer had concern because you were called in to go to work and you declined because you were using sleep medication?
A. I don't remember how I worded any of that.
Q. Okay.
A. I think she waited 30 minutes while I was in the waiting room before she started typing anything I

Page 126

told her.
Q. Is it accurate that you informed them that -- that you informed the -- them that you told Union Pacific if you went to work in the middle of the night, you could fall asleep driving because of your medication?
A. I don't think I speculated what would happen. I said the Union Pacific probably didn't want people driving under the influence of things because they might fall asleep while driving. I don't know I -- if I referred to myself.
Q. And then on the next page of Exhibit 27, Bates JF440, in the Impression -- Assessment and Plan second -- section, it looks like Texas Medical Diagnostics ordered you to do a home sleep study test to make sure that the maintenance portion of the insomnia is not secondary to an underlying sleep breathing disorder; is that right?
A. Yeah, that's correct.
Q. Okay. And then they also wanted to do a maintenance wakefulness test to objectively assess your level of alertness after you used your trazodone; is that right?
A. I don't remember them mentioning that, but that could have been in there.

Page 127

Q. Okay.
A. They wanted to do a sleep study was all I remembered from what they told me, which was pretty simple. I didn't need to know everything it entailed.
Q. And you didn't go through with this plan; is that correct?
A. Yeah. I didn't have the money.
Q. How much was it going to cost?
A. $600.
Q. And did you discuss that with Union Pacific?
A. Yes. I think Dr. Charbonneau, I mentioned to him that I didn't have the money. There was no way I'm going to put that out of pocket. I had to pay for that appointment. Was outraged. They had cut my insurance off and I didn't have the money. And they wanted it for --
Q. What did Dr. Charbonneau say in response?
A. I think he pretty much sidestepped the question -- or the statement or just ignored it. I...
Q. And that's a recorded conversation; is that right?
A. Yes.
Q. Did you ever turn in any of your records from Texas Medical Diagnostics to Union Pacific?
A. Turn in my records? I authorized the Union

Page 128

Pacific to have the records. I didn't turn in any. I think they were sent directly to the Union Pacific from Texas Diagnostics, but I'm not sure.
Q. So you didn't turn any records from Texas Diagnostics to Union Pacific; is that right?
A. I don't think so. I think they were sent directly from them to the Union Pacific.
Q. And you don't know one way or another whether or not Union Pacific would have received those records from them?
A. No. I could verify that. They had the release forms, though.
Q. So then what was going to be the outcome of you not going through the sleep evaluation?
A. Well, I couldn't tell you. Mr. Charbonneau kind of left off like -- he issued some basically work restrictions where I couldn't work there anymore, and I don't know if he did any follow-up or -- he didn't contact me about rescheduling anything or paying for the doctors, nothing.
Q. Did you have an understanding that Union Pacific couldn't complete its Fit-For-Duty evaluation without the information it was requesting?
A. No. They did complete their evaluation without the additional information being given.

Page 129

Q. Why -- what makes you say that?
A. Well, he issued these work restrictions and he made it sound like -- I mean, it almost sounded like he was concluding the whole matter. And I never received any word that he was ever going to schedule anything else or do anything else. He was going to conclude the whole thing and rule on his restrictions, and that was it.
Q. Well, what else was there to review if you weren't going to provide any additional information?
A. Well, I would have been more than willing to provide any information. What did he want me to provide?
Q. Well, you knew that he wanted you to provide -- you knew he wanted a sleep evaluation.
A. No. He never told me he wanted a sleep evaluation. That was this group that I went and saw that said they wouldn't do the medicine write-up without the sleep evaluation. The UP doctors and the UP nurses never asked me to do a sleep evaluation.
Q. They never asked you to do a sleep medicine evaluation?
A. A sleep medicine evaluation, not a sleep study. This group wanted to do $600 worth of sleep study stuff, and that was not what the UP Medical Department was

Page 130

asking. I clarified that with the nurse. She was more than willing to clarify that. They wanted the medicine evaluated.
Q. And did you provide that?
A. I went to a doctor that told me what it would take to get it provided, told Dr. Charbonneau and gave them the option if they wanted me to do that or not. They could pay for it or they could find their own doctor to do it. They had their own doctors that they kept, you know, that did the thing in '97 that they kept retained or whatever. They could -- they had all kinds of options if that's what they wanted to do. It was up to them. They had told me what to do every step of the way, and now they weren't telling me anything.
Q. I've shared what's been marked as Deposition Exhibit 28. Have you seen Exhibit 28 before?
(Exhibit No. 28 was marked.)
A. I don't know. They sent that to me what -- they sent that to me afterwards or something? I don't know.
Q. (BY MR. ORTBALS) It's a letter dated June 18th, 2015 addressed to you; is that correct?
A. Was that after my -- the day that -- the appointment with the sleep people in Arlington? I don't know.

Page 131

Q. My question is just that this is a letter dated June 18th, 2015 to you; is that right, sir?
A. Well, that's what it says it is, yes.
Q. And you don't have a recollection one way or another whether you received this letter?
A. No. I was talking directly to the Medical Department by this time.
Q. How were you notified that you were being issued medical restrictions?
A. By telephone. There was a conference with -- with the Dr. Charbonneau and the nurse online, and that was the first of the restrictions. They may have sent a letter later that, you know, said the same thing, but that's how I was notified.
Q. And you recorded that conversation?
A. Yes.
Q. And then I've just shared what's been marked Deposition Exhibit 30. Do you recall receiving Exhibit 30?
(Exhibit No. 30 was marked.)
A. I think I have seen this.
Q. (BY MR. ORTBALS) Did you contact anybody in Union Pacific's Disability Management Department about going through vocational rehabilitation?
A. I contacted somebody -- or was in contact with

Page 132

somebody that told me that they were in charge of trying to find jobs for people within Union Pacific or something, and he told me they didn't have anything at the time. And I wasn't too interested in that because I would have had to give up my rights to litigate to even get a job like that.
Q. What do you mean by that?
A. Well, my contention is that, you know, I should have been left on my job. And if they found me a job in Omaha, I'd have to move away from my mom, who I was in charge of taking care of. I couldn't do that. That was one of the things he mentioned specifically, A lot of times, we move people to these big locations, like Omaha.
And you -- I had talked to other people that had done that that had been injured and went through these people, and they make them sign agreements that they give up their rights to their old job and to litigate, and I'm not going to do that. But he didn't have anything anyway, so it never became an issue.
Q. How many times did you have a conversation with this person about other jobs within Union Pacific?
A. I think one time or -- I think one conversation.
Q. Was that a conversation that you recorded?

Page 137

impaired, that's in reference to having you be on call after taking trazodone; is that right?
A. Yes. Terry didn't care if I took the drug as long as I came out. But I thought that was dangerous. It was against the rules. I wasn't going to do it. That's not right.
Q. Okay. I've shared what's been marked Deposition Exhibit 32.
(Exhibit No. 32 was marked.)
Q. (BY MR. ORTBALS) Do you recognize this document?
A. Yes, I think so.
Q. Okay. This is the charge of discrimination that you filed?
A. Yes.
Q. Okay. And at the bottom of the first and second pages, there's a -- that's your signature?
A. Yes.
Q. All right. On the first page of Exhibit 32, under the Personal Harm section in the middle, complaining of discrimination by supervisor Terry Neal due to your disability in 2012, is that the safety line call that you made?
A. Yes.
Q. Did anyone at Union Pacific tell you that your

Page 138

job had been terminated?
A. I think the way they put it, they didn't have a job for me because of my restrictions, or at least that's, I think -- I don't think anybody told me that.
Q. They told you they couldn't accommodate your medical restrictions?
A. Yes.
Q. I've shared what's been marked Deposition Exhibit 33. Do you see that on your screen?
(Exhibit No. 33 was marked.)
A. Yes.
Q. (BY MR. ORTBALS) And this is a statement that you wrote out; is that correct?
A. Yes.
Q. Do you know why it was that you prepared this statement?
A. I forget who was -- this was in reference to -- I don't know who this was sent to. I've written up several of these summations. Some of them get a date slightly wrong or something, but it was just a general overview.
Q. What did you mean by your sleep disorder being life-threatening?
A. Well, it was explained to me by my doctor that if it went on for years, it would -- could cause

Page 139

diabetes, all kinds of problems. It would destroy you if it just was left untreated.
Q. When's the last time you've communicated with Union Pacific about your employment there?
A. I don't know.
Q. Have you had any communication with Union Pacific about your employment since you had the call with the person who told you that there weren't any jobs open?
A. No, not that I remember.
Q. Are you currently employed?
A. No.
Q. Have you held any jobs since you last performed work for Union Pacific?
A. No.
Q. After you last performed work at Union Pacific did you begin looking for another job right away?
A. Not right away, no.
Q. Why not?
A. I was organizing all my material and getting ready to present it to a lawyer. I spent three months doing that.
Q. And then after that three-month period, did you start looking for another job?
A. Yes.

Page 140

Q. What did you do to search for other jobs?
A. I got on Monster.com and some of the other online things. Nearly all the employers now, you have to apply online. So I began applying online, trying to find out what kind of jobs there were and also investigating what I would give up if I went to work outside of the Railroad. So I checked Railroads and specifically was trying to get a job with Burlington Northern Railroad. To maintain my Railroad retirement and not lose that, I would need to go to work for another railroad. And then I found out later when my wife got sick, she became deathly ill, if I worked for another company besides the Railroad, I would have lost my Railroad insurance too. And then I think, after checking for a number of months, I got cancer and couldn't work. Then I went through recovery with cancer for about eight months and didn't look for a job. And I -- yes, I looked for a job eventually.
Q. What Railroad insurance are you referring to?
A. Medical insurance. They finally reinstated my medical insurance. I was due medical insurance two years after I was severed, and my wife would get medical insurance a year after my last day at work. But if I filled out a W-2 with another employer, I would lose all my insurance in two weeks.

Page 141

Q. Does that insurance come through your -- through RRB or through just your medical plan through the Union?
A. It's the continuation of the medical insurance I had with the Union Pacific Railroad, which is a trust fund that we pay into the whole time we work out there. And it was to be continued two years on me and one year on my wife, the same insurance I had when I was working.
Q. When did that get reinstated?
A. It was about three or four weeks, I think, after my appointment with the medical diagnostics group -- sleep diagnostics group. The nurse said it had been cut off. That's why I couldn't pay these people. And she said that was mysterious that it got cut off. It wasn't supposed to be cut off. And so she did something, and two or three weeks later, it was working again.
Q. Which nurse are you referring to?
A. It may have been the nurse that I had been talking to -- I forget her name. I get all these people's names, but it may have been the nurse that -- you know, I've been scheduling all this doctor stuff that was approved.
Q. Was it a Union Pacific nurse?
A. Yes, yes.

Page 142

Q. So you think she helped get your insurance straightened out?
A. Yes.
Q. Well, once that had been reinstated, why didn't you go back to the Texas Medical Diagnostics now that you had insurance coverage?
A. Charbonneau had finished dealing with me. He had made an evaluation based on what he had. He made it clear he didn't need anything else.
Q. Did you see if, now being able to provide a sleep medicine evaluation, would have changed the outcome?
A. Well, no. The nurse knew. I mean, it was up to her. I'm sure I mentioned it to her, that, you know, If you can get my insurance going, that can all happen, or whatever. But this is months after he had made his -- you know, his final determination.
Q. And you didn't follow up to see if you could provide that information now and have your case reevaluated?
A. No. Within the time that my insurance was going, I was working pretty hot and heavy on my legal case and didn't even -- I didn't spend any time anymore on my medical issue.
Q. Have you received any job offers since you last

Page 143

performed work at Union Pacific?
A. Yes.
THE REPORTER: Sir, are you saying left/performed?
MR. ORTBALS: Last performed.
THE REPORTER: Okay. Thank you.
Q. (BY MR. ORTBALS) What company have you -- companies have you received job offers from?
A. One was a roofing company. They wanted me to install -- I say they're a roofing company. They wanted me to install roofing products. And another one was a car lot company that wanted me to walk around on an eight-acre car lot and move cars around. And those were the two job offers that I got in the first year. The application that I put online and the resume that I had online, they always came back and asked for my medical history, age and things like that, and I didn't get any offers but those two.
MR. ORTBALS: Are y'all able to hear me?
THE REPORTER: Yes.
MR. ULOTH: Yes.
MR. ORTBALS: Hello.
THE REPORTER: Yes.
THE WITNESS: Yes, we can hear you.
MR. ULOTH: I guess you can't hear us?

Page 144

MR. ORTBALS: Hello.
THE REPORTER: Off the record?
MR. ULOTH: Yeah, let's go off the record.
THE REPORTER: We are off the record.
(Break was taken from 3:21 p.m. to 3:33 p.m.)
THE VIDEOGRAPHER: We are back on the video record. The time is 3:33 p.m.
Q. (BY MR. ORTBALS) Okay. We're back on the record after a short break. Mr. Fulbright, I'll remind you you're still under oath.
And I apologize if I missed this in your last answer before my phone cut out, but why did you turn down the job offers that you had turned down?
A. Well, they were like seven, eight-dollar-an-hour jobs, and as soon as I filled out a W-2, I'd have lost my insurance. They also probably would have put my Railroad retirement into Social Security. I would have lost as much as a third of that. Would not have been in my interest to take a job like that.
Q. And then you mentioned a period of time where you were unable to work because of cancer; is that right?
A. Yes.
Q. What time period was that?

Page 145

A. I believe that was 2016, about the middle part of 2016.
Q. And when were you cleared to work again?
A. I was never cleared because I couldn't finish the treatment. My insurance ran out after two years. And I wasn't really cleared to work. I just had to wait until my back healed, and that took about -- that took about a year.
Q. Did you have to have surgery to remove the tumor?
A. Yes.
Q. Who treated you for the cancer?
A. There were two doctors. There was a dermatologist in North Richland Hills. I don't remember his name. And then there was the doctor in Dallas. Two surgeries done, one at each doctor. And the doctor in Dallas, I can just almost remember his name, but I can't -- I can't recall his name right now.
Q. Do you have records from those two doctors?
A. Yes.
Q. Since your back has been healed, have you been looking for work again?
A. Yes. I work -- looked for work for, I think, a brief period of time. And I got a hernia in my stomach that -- where I couldn't work. And I needed surgery for

Page 146

that, and I had that done here, I think, last year. It finally got so bad I couldn't walk, so I had to have that done.
Q. What period of time were you out of commission because of the hernia?
A. Oh, probably seven or eight months, just guessing. I'd have to go back and look at the records.
Q. Who was it that treated you for the hernia?
A. A doctor in North Alabama Medical Center. That was in Florence, Alabama -- or Muscle Shoals, Alabama. It's kind of the same town. And I don't recall the name of that doctor either. I've had quite a few doctors.
Q. Do you have records from that treatment?
A. Yes.
Q. Are you still unable to work, or are you healed?
A. As of the last few months, I'm able to work. And I've done some checking on jobs in the area, but they have to be Railroad jobs because I'll lose my Railroad retirement, a big chunk of it, if I severed my connection with the Railroad.
Q. So you're only looking for Railroad jobs?
A. Yes.
Q. Are you only looking from where you're at in Tennessee, or are you looking more broadly?

Page 147

A. From where I'm at here in Tennessee.
Q. What are you doing to look for the Railroad jobs?
A. Well, those are all done online, so I just -- they actually post the jobs that you're qualified for when you punch in a certain amount of information. I think there's four here in Tennessee that I keep looking at.
Q. And what do you keep looking at?
A. They post the jobs that are available on their website.
Q. Have you applied for any of them?
A. Well, no, not the ones I'm not qualified for. They haven't had any since I've been here that I'm qualified for. They list the qualifications on the job. They're not electronics jobs for a technician.
Q. Are you willing to relocate for a Railroad job?
A. Not this close to my retirement. My Railroad retirement will be here -- in less than two years, I'll have Railroad retirement, and I'll need that to start paying my wife's medical bills. If I move away from here, I'd have to sell the house and she would n't have any place to stay in an emergency once she's through taking care of her parents.
Q. Do you have any income coming in from any other

Page 148

sources?
A. No.
Q. Other than your cancer and hernia, have there been any other major illnesses or medical conditions you've had since you last performed work for Union Pacific?
A. Cancer, hernia and while I worked for the UP, there was a torn radial bicuspid in my knee that's getting progressively worse. As soon as we have money for a medical plan for me, I'm going to have that looked at in the next few years. It will probably be elective surgery.
Q. Does that prevent you from working at all?
A. Not now.
Q. Are you suffering from any mental or emotional problems that you attribute to Union Pacific?
A. Not severe problems, no.
Q. Have you suffered any emotional distress as a result of Union Pacific?
A. Well, sure. Emotional distress, sure.
Q. Have you --
A. I mean, my wife's -- well, we had to sell a house I was paying for in California. The house I owned in Texas, we had to sell. I had to move to Tennessee where the cost of living is less than half of what it

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | No. |
| UNION PACIFIC | ) | 3:20-cv-02392-BK |
| RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

****************************************

ORAL AND VIDEOTAPED DEPOSITION OF

TERRY D. NEAL

APRIL 28, 2021

(Reported Remotely)

****************************************

ORAL AND VIDEOTAPED DEPOSITION of TERRY D. NEAL, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on APRIL 28, 2021, from 9:27 a.m. to 12:08 p.m., before Stephanie M. Harper, RPR, CSR in and for the State of Texas, recorded by machine shorthand, at 520 Samuels Avenue, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure, the First Emergency Order Regarding the COVID-19 State of Disaster, and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

10

**Q. What names can you recall?**
A. Flag [phonetic] Helton, Tildon Kirkpatrick, Mike Boyd, I think Ed Hines.
**Q. Okay.**
A. To name a few.
**Q. And I believe you said the position was senior communication technician?**
A. Yes, sir.
**Q. Were you a member of -- of a union?**
A. Yes, sir.
**Q. What union?**
A. BRS.
**Q. And was Joe Fulbright also a senior communication technician?**
A. I believe so. Yes, sir.
**Q. Was he also a BRS member?**
A. Yes, sir.
**Q. Were all of the technicians BRS members that you worked with?**
A. Yes.
**Q. Okay. Now, at some point as I understand it -- and correct me if I'm wrong. I'm not testifying, I'm just asking, so you tell me -- was there a consolidation of locations that resulted in IBEW members working alongside BRS members?**

11

A. Consolidation of locations, I -- I don't quite understand what you mean by that.
**Q. It's my understanding that at some point in the late '90s some of the BRS-represented employees were somehow switched to where the IBEW contract would apply to them.**
**Does that sound like anything you're familiar with happening?**
A. Yes.
**Q. Can you explain what happened and why?**
A. I don't know why. That's above my pay grade why that happened. It was just -- I guess executive management felt it would be better to work under one collective -- you know, collective bargaining agreement and worked within, I guess, the two unions to come to sort -- some sort of agreement and dovetailed, you know, seniority in. I'm not sure how all of that played out.
**Q. Before that -- before that happened, do you know which collective bargaining agreement applied to you?**
A. When I was union, it was BRS.
**Q. Right. But what -- you know, what was the last year that that contract had been established; do you know?**

12

A. No, I do not.
**Q. Okay. After this change that we were just talking about, do you know what agreement applied to you?**
A. It was I -- I still paid my union dues, but at that point I -- it was just to hold my seniority. My seniority was dovetailed just like everyone else, you know, that was BRS dovetailed into the IBEW seniority roster.
**Q. Was it your understanding that the terms and conditions of the BRS collective bargaining agreement no longer applied to you?**
A. Can you repeat it one more time, please?
**Q. Was it your understanding that after this change we've been talking about, the terms and conditions of the BRS collective bargaining agreement no longer applied to you?**
A. I was a supervisor or manager after that, so it really -- the only thing that the BRS did to me was provide me a seniority roster.
**Q. When did you become supervisor?**
A. I don't -- I don't know dates. I was a supervisor for ten years after -- so let's see. '95 maybe. Somewhere in there. About -- around '95, '96 I became a supervisor.

13

**Q. Okay. What -- what position did you hold after being a supervisor?**
A. Assistant manager then manager.
**Q. So I'm guessing you became assistant manager around 2005, 2006?**
A. Yes. 2005.
**Q. Okay. When did you become manager?**
A. 2008.
**Q. Did you have any other job changes before you retired?**
A. No. No.
**Q. Okay. When did you leave Union Pacific?**
A. 2017.
**Q. When you were a manager, can you describe whether you were responsible for a certain geographic region or was it by department? You know, what were you manager over?**
A. It's a geographic region.
**Q. What was your region?**
A. At the time I took manager or at the time I retired?
**Q. Well, let's start with when you took it.**
A. I was assistant manager in Livonia, Louisiana. I had the territory all of Louisiana and northeast Texas to about Tyler, Texas.

14

**Q. Okay.**
A. Tyler, Mineola area.
**Q. What about 2008 when you became manager?**
A. It was pretty much all of north Fort Worth, northeast Texas, and all of Oklahoma.
**Q. Where was your office?**
A. Fort Worth, Texas.
**Q. At the Davidson Yard?**
A. Yes.
**Q. Did you stay in that location throughout the rest of your employment at Union Pacific?**
A. Yes, sir.
**Q. And did the region change for the rest of your employment at Union Pacific?**
A. I don't believe so. No. I believe it stayed pretty close to the same.
**Q. Was -- for most of this deposition, I'm going to try to focus on the time period leading up to and including, say, January of 2015. So if I ask you a question that may vary depending on what time frame we're talking about, if I'm asking a confusing question, please let me know and I'll try to clarify. Okay?**
A. Okay.
**Q. So let's say January 2015 was there any difference between a communications technician and an electronic technician?**

15

A. No, about the same. Electronic and communication were the same.
**Q. Were some of the employees titled senior communications technician and some senior electronic technician?**
A. They were all -- it was senior electronic technicians, I believe.
**Q. Okay. So there was no such things as a senior communication technician?**
MR. ORTBALS: I'm going to --
A. I don't --
MR. ORTBALS: -- object to form.
A. -- believe so.
MR. ORTBALS: It mischaracterizes his testimony.
(Reporter addresses crosstalk.)
**Q. (BY MR. ULOTH) The employees who worked there at the Davidson Yard, I'm asking about the job titles. Okay? Are you with me?**
A. Yeah, I'm here.
**Q. Were some of the employees, did they have the job title senior communications technician?**
A. No. I believe they were all senior electronic technicians.

16

**Q. Okay. Were some members of BRS and some members of IBEW?**
A. At that time they -- in 2015 the collective bargaining agreement was IBEW.
**Q. Okay. But were some of them members of BRS?**
A. You know, I do not know. I know that the BRS was still in effect. You know, they were still -- BRS is still there. The technicians fell under the IBEW contract.
Whenever -- I would say they fell underneath the IBEW contract. They still paid dues probably, I guess, to the BRS but they were underneath the IBEW contract.
**Q. So for Joe Fulbright in January of 2015, is it your understanding his job title was senior electronic technician?**
A. I would believe so. Yes.
**Q. And it would not have been senior communications technician; is that right?**
A. Underneath my understanding, no.
**Q. Okay. And were all of the -- let me ask a different question.**
**Were there some folks who didn't have the senior in front of the title who were just electronic technicians?**

17

A. I don't really know. I -- I don't remember.
**Q. Okay. And the group I'm focusing on now is the group that included Joe Fulbright. Do you know what other employees worked at that location in Fort Worth that also had the same job title as Fulbright?**
A. Ed Hines, Damon O'Bannon, I think Chris Ozuna. Jason Norgan was there at some point. John McKenzie worked in that area during that time. Some of the time there was with Joe. He was senior, so...
**Q. Okay. And those employees, what department were they considered to be in?**
A. Telecom.
**Q. Was the IT department considered to be a separate department?**
A. No. We -- telecom fell within the IT department.
**Q. Okay. What about communications department? Was that --**
A. Same. Telecom and communications -- I'm sorry. Telecom and communications are the same.

30

A. The call list for every location, it be -- Fort Worth, Longview, Palestine, they have a unique mnemonic. Fort Worth is FTWR. Underneath that Fort Worth location mnemonic, you would have Fort Worth proper. You would have Ney Yard. You would have Hillsborough. Everything that was incorporated within the Fort Worth location would have a mnemonic.

The call list -- all these mnemonics were broke down onto a list, and underneath that list we have itemized equipment that went along with these field mnemonics. And I could break out technicians that would cover certain types of equipment in certain locations in certain, you know, submnemonics of the Fort Worth territory.

**Q. For what purpose? Why would a technician be put on a list?**

A. For emergency restoration of service. When a telephone breaks in somebody's office, there has to be a process to where a technician is dispatched to work on that phone.

**Q. Okay. So the call list is something that associates a technician with responsibilities for certain equipment; is that correct?**

A. Yes, sir.

31

**Q. Okay. And so in this document, JF 11, you were telling Mr. Fulbright that starting May 7th, his responsibilities would include these things -- desktop, dispatcher, et cetera -- for these two yards, correct?**

A. Yes, sir.

**Q. And what was the central office?**

A. The central office is where we have the main computers and communication switching devices for the network.

**Q. Was that located somewhere other than the Davidson Yard?**

A. No, sir, Davidson Yard.

**Q. Okay. So the central office was a carveout from the assignment that you were conveying to him here, right?**

A. Yes.

**Q. And where you say on the next bullet point, "you will be on call Monday through Thursday for this work," can you specify are you talking about during business hours, all times? What were you referring to?**

A. Bullet item from our AVP is that all telecomm employees are subject to after-hour calls 24/7, seven days a weeks, 365 days a year, straight

32

from the AVP.

**Q. What's the AVP?**

A. Assistant vice president.

**Q. Who was the assistant vice president at this time?**

A. You know, I don't -- I don't remember.

**Q. Was -- was that -- you say from the AVP. Had there been some kind of a memo or a policy change?**

A. A memo.

**Q. So there's a 2012 memo about being subject to call?**

A. Yes.

**Q. And explain for me then -- you said the memo --**

**(Phone ringing.)**

**Q. (BY MR. ULOTH) -- talked about 24/7, but you're telling Mr. Fulbright here Monday through Thursday?**

A. Yes.

**Q. Was he not subject to call Friday, Saturday, and Sunday for this work?**

A. We had a -- the technicians came up with a voluntarily weekend rotation. And on this rotation each technician took their turn covering the whole

33

Fort Worth mnemonic. Not the submnemonics, the whole Fort Worth mnemonic. So one weekend out of every month approximately, depending on the number of technicians, they were on call for the whole mnemonic.

So Joe Fulbright underneath these responsibilities was on call Monday through Thursday. Friday night fell -- Friday night, Saturday night, and Sunday night fell within the voluntary rotation.

**Q. Wouldn't it also be Saturday and Sunday days?**

A. Yes.

**Q. Or were there other technicians who worked Saturdays and Sundays?**

A. No. No one actually worked Saturday and Sunday. The rotation was for the whole weekend. Friday night, Saturday morning, Saturday afternoon, Saturday night, Sunday morning, Sunday afternoon, Sunday night.

**Q. All the way up to 7:00 a.m. Monday?**

A. Yes, sir.

**Q. Okay. How would the folks who dispatched the technicians know who had volunteered on the rotation for any given weekend?**

A. Through the call list and their on-duty/off-duty status.
**Q. Okay. Explain to me how that would work. Now, if I'm a -- if I'm a dispatcher sitting in Omaha and I've got a report that there's a printer at a certain location in Fort Worth that needs attention, mechanics, what are the mechanics of how that dispatcher would know who to call?**
A. It was our networks operation center. They weren't called dispatchers.
**Q. Okay.**
A. The networks operations center would get a call from a customer that a telephone was out in Ney Yard. They would pull up the Ney Yard call list and they would have the -- there would be four to five gang numbers on that call list for 1 through 5.
They would look at the number one and they would look and see if he is on duty or off duty. If he is off duty, it rolls to the number 2. If he is on duty, then the number 2 on the call list will take the call. If he's off duty, then it rolls to number 3.
So if the technicians that were not on that weekend rotation all marked off duty and the one technician that was on call, then he got the



call through the call rotation, the call list, and it rotating down to the on-call technician.
**Q. How would a technician mark off duty?**
A. They go into their tie-up. There was a tie-up screen for every technician and they go on their tie-up screen and mark on duty or off duty. They can mark on vacation, on duty, off duty, and they had places in there to put any type of documentation, you know, notes and telephone numbers.
**Q. What's a tie-up screen?**
A. Just exactly what it sounds like. A place that they would go on a computer to tie up.
**Q. So marking off was something that was done on a computer system at Union Pacific?**
A. Yes, sir.
**Q. Did technicians ever neglect to mark off on the weekends that wasn't their volunteer weekend?**
A. People make mistakes. It happens.
**Q. And the rotation process that you've been describing, was that in place continuously from 2012 through 2015?**
A. Yes.
**Q. So if the caller -- I used the word "dispatcher," and you said that wasn't the right**



**term. What was the right term?**
A. It's fine. You can use dispatcher.
**Q. Okay. If the dispatcher went through that progression that you described and got down to somebody who is not marked off and called that person and wasn't able to reach them, was there a policy or procedure of what was supposed to happen next?**
A. They would leave that -- if they got all the way down the list, they would leave that person a voicemail and then they would call me.
**Q. Well, I mean, before they go all the way down the list. I'm still at Step 1 where they, you know, go through the list until they find the first person who's not marked off and that's the first person they call, and I'm asking what happens if that person doesn't pick up the phone line.**
A. If everybody else is marked off like they should be and he's the only person marked on duty, then they would leave him a voicemail and call me.
**Q. Okay. Would they call you immediately after leaving the voicemail or wait for some period of time?**
A. It may vary. But it would be shortly after that depending on the criticality of the call.



**Q. So there was not a standing specific -- specific rule about always call right away? They had discretion?**
A. I never worked in the network operations center. I don't know what their policies and procedures were at that time. I do know that I got a call when a technician did not, you know, answer the phone.
**Q. Did some of the calls go to another manager or supervisor besides you, or was it always to you for the people that were under you?**
A. It was me.
**Q. Okay.**
A. I believe if I didn't answer, it would go to a director. But that was rare.
**Q. But it happened sometimes?**
A. It has happened.
**Q. I'm going to go to the next page on the document that we were looking at, so this is going to be JF 12. Let me just go down to show you that's the case.**
**And I just have some questions about what these things mean. Where it says "check ecomms," what do you mean by that?**
A. Ecomms was a system for customers to do

42

A. I have no clue.
**Q. Was Bill Schumacher an electronic technician?**
A. Yes, sir.
**Q. Were all of these other folks who this was addressed to electronic technicians?**
A. Yes, sir.
**Q. And who was Stephen Hale?**
A. He was an ARASA supervisor that worked underneath me.
(Reporter clarification.)
**Q. (BY MR. ULOTH) What is ARASA?**
A. It is an association for supervisors.
**Q. Is that an acronym for something?**
A. Yes. I could -- I could take a stab at it, but it probably wouldn't be right.
**Q. Well, what was his job, then? How about that?**
A. He was a foreman.
**Q. Did he report directly to you?**
A. Yes, sir.
**Q. And some of these electronic technicians reported first to Stephen Hale; is that right?**
A. I do not believe so. No.
**Q. Okay.**

43

A. I believe they all reported directly to me.
**Q. At this time in February of 2012, do you know if Joe Fulbright reported to Hale?**
A. I think he would work for me. I don't believe he would work directly for Hale.
**Q. But it's possible his reporting assignment was first to Hale and then to you?**
A. It's possible.
**Q. And same for some of these other folks, is that a possible reporting arrangement for them?**
A. It's possible. Unlikely, given the nature of what I see here, but it's possible.
**Q. Okay. Well, let me go to the next document.**
**Do you remember the document 2012 Technician Expectations?**
A. I wrote out so many expectations, I could not tell you what it entailed. I do not remember. That's 2012.
**Q. I understand. And if we were -- if we were in person, I would hand you several pages to look at and you'd be able, I think, to better see the whole document. But given the technological limitations, I'm going to have to go one page at a**

44

**time. But I will tell you for the next little while the pages I'm going to show you, I think, are all the documents that were the attachment to this email.**
**So it's the document called 2012 Technician Expectations. But if you're unclear about what I'm showing you or disagree, please feel free to let me know, okay?**
A. Okay.
**Q. So the next page is going to be JF 14. And at the top it says "2012 Technician Expectations."**
**Was this the first page of the attachment to the email we were just looking at?**
A. Possibly. Like I say, I don't know the document.
**Q. Okay.**
THE REPORTER: I'm getting some feedback.
(Off-the-record discussion.)
**Q. (BY MR. ULOTH) Mr. Neal, the document we're showing you now talks about all the changes in the organization over the last couple of years.**
**Can you remember what you were referring to?**

45

A. Evidently, there were changes. I do not remember what changes took place, but I felt like it was necessary to make it clear.
**Q. Okay. Then a couple of lines down under Fort Worth organizational chart where it says "Steve Hale," can you explain what you were trying to communicate to the technicians here?**
A. What -- what Steve Hale's function in the organization was.
**Q. Can you explain some of these terms? When it says "responsibilities include safety," I mean, I would think that everybody has responsibilities that involve safety. So what -- what specifically about Hale are you saying when it says "main responsibilities include safety"?**
A. Safety is with the individual. And normally when I give out responsibilities, safety is foremost. So if you look under my responsibility, safety is right there first.
Safety starts with the person and that person looking after himself, looking after the team and down the line. Each person has their -- is responsible for their own safety.
**Q. Did Steve Hale have safety responsibilities for some of the people listed in**

50

month. Every safety captain or safety team leader would put together a safety meeting. They didn't always coincide with each other, but each region would have their own safety meeting. The team members were smaller, so it was -- team members were more frequent to talk openly when the team was smaller.

**Q. And what was the purpose of safety team meetings?**

A. To talk about safety issues.

**Q. Can you give me an example of a safety issue that might need to be discussed at a team meeting?**

A. Actually driving, driving in inclement weather, driving up to certain sites, a site might need road work done. Just whatever a team member thought that there was something that an issue that needed to be brought up and talked about.

**Q. Okay. Fair enough. I'm going to go down to the next page, which is going to be JF 15.**

**On the line that says "daily expectations for both ROS and IT personnel."**

**Who were the ROS personnel?**

A. That's our restore personnel.

**Q. Well, give me the names of the ROS personnel, if you can.**

A. I don't know off -- I couldn't name who was on restore at that time. I think if you go -- it's -- I think it's explained in that document somewhere probably.

**Q. What do you mean by "restore"?**

A. Restoration of equipment.

**Q. Okay. So there were certain specific people allocated the responsibility for restoration of equipment?**

A. Yes.

**Q. I thought earlier you told me that all of the technicians had responsibility for restoration of equipment.**

A. They can. It is everyone's responsibility. They can be dispatched on emergency restoration of service. All employees can.

**Q. So what -- what would be different about the ROS personnel versus all of the technicians?**

A. They're -- that's their primary responsibility.

**Q. Okay. So during -- during normal working hours, you're saying there's a group of people who were primarily doing restoration as opposed to other things?**

51

52

A. Yes.

**Q. Okay. And if you see that in this document, if you see those names broken out, feel free to identify that for me. I don't know if we're going to run across that or not or if I've already skipped past it. Do I need to go back a page?**

A. If you would like. If it's there, I'll clarify it. It may not be in this document. Like I say, I don't remember the document per se.

**Q. Okay. Well, I don't think it's here under meals. We looked at this page pretty thoroughly.**

**Do you see a list of the ROS personnel?**

A. No.

**Q. Who was Dana Messerschmidt?**

A. He was a general director of construction.

**Q. Okay. Now, I've gone all the way back up to the top, and we didn't see the ROS personnel list anywhere, did we?**

A. No.

**Q. Okay. Let me go back where I was. I asked you about ROS personnel.**

**Who would be considered IT personnel?**

A. Installation that -- it's employees that their main responsibility is installation of equipment.

53

**Q. Okay. So those are --**

A. It doesn't relinquish them from the fact that they could go out and have to work on equipment. It's just their main responsibility at this time would be the installation of equipment.

**Q. All right. And so there would be somewhere a separate list of who falls under that category, IT personnel, right?**

A. Yes.

**Q. And do you know if that was true going forward after 2012 all the way through January 2015?**

A. I don't know. I don't remember what the format was at -- in 2015.

**Q. Just above the line that we were looking at -- well, no. I'm sorry. It's a different line.**

**Just above where it says "weekly expectations," there's a part that says "help your buddy." Was there like an assigned buddy system, or is that more of a generic term, help all the other technicians?**

A. Just if you see somebody in need, lend a hand.

**Q. Okay. And I'm going to keep going. So this next page is going to be JF 16 that starts off**

82

(Phone ringing.)
MR. ULOTH: My apologies for that.
**Q. (BY MR. ULOTH) Let me ask you about that first part, "employees subject to call." I believe you've said that would include the technicians because they could be called at any time, right?**
A. Yes.
**Q. And so the next bit, "must indicate where they can be reached," how does that occur?**
A. I don't understand your question.
**Q. Well, this rule says an employee must indicate where they can be reached. I'm asking you how did the employees indicate where they can be reached?**
A. On their tie-up record.
**Q. What's a tie-up record?**
A. It is on their personal profile. There's a place where they can put their tie-up indication, you know, where they can be reached at.
**Q. Had Mr. Fulbright done that?**
A. I would assume.
**Q. Okay. Well, you didn't write him up for not having his contact information in his tie-up, did you?**
A. No. There's more to this rule than what

83

was stated there.
**Q. Well, it's -- let's get to what else it says.**
**"Employee must not be absent from their calling place without notifying those required to call them."**
**Are you saying that he was not at his calling place?**
A. No, I'm not saying that.
**Q. Okay. So explain to me then how Mr. Fulbright violated -- are you saying that he violated this Rule 1.16?**
A. At the time I wrote this, yes, I thought that was that -- that rule was what we used when employees missed calls.
**Q. Is it possible for an employee to miss a call without being in violation of that rule?**
A. No. I believe if you miss a call, that is a rule violation.
**Q. So if an employee goes to use the restroom and can't get to the phone when it rings, that's a rule violation?**
MR. ORTBALS: Objection to form. Hypothetical. You can answer the question.
A. What did you say?

84

**Q. (BY MR. ULOTH) I'm asking you if it would be a violation of this rule for an employee to use the restroom, hears the phone, but can't get to it.**
MR. ORTBALS: Objection.
**Q. (BY MR. ULOTH) He'd be in violation?**
MR. ORTBALS: Objection to form. Hypothetical. But you can answer the question, Terry.
A. Okay. Here -- here's the way I look at this. Is that a missed call is the individual did not get to the phone and he did not make absolute effort to get ahold of someone to take the call.
If you get a call -- if a technician gets a call from Omaha, they -- they know what it is. They know the call. And if they leave a voicemail, then they call them back and if they don't get ahold of them, then he's got to make, you know, every effort to find out what is going on, another call back, call your manager. And just because of one call is not going to bring out a disciplinary action.
**Q. (BY MR. ULOTH) And is that all laid out in a policy or a rule somewhere so that the employees have that same understanding?**
A. I can't -- I can't say there is a policy

85

written anywhere that says how many times they have to call back. It's -- it's more of respect for your job and respect for your fellow employees and respect for the company to make every effort that you can to make sure you cover your calls.
**Q. Was there some sort of system in place at the time that would alert an employee other than just a phone call from NOC?**
A. Repeat the question again, please, sir.
**Q. Other than receiving a phone call from NOC, was there a system that provided an alert by other means like by an email or through some kind of app on a phone?**
A. Yes. They -- on priority -- on Priority Tickets 1, I remember they got a phone call. Then they also got a text message on their phone that there was a ticket.
**Q. Do you remember whether this was a Priority 1?**
A. No. I don't recall the ticket.
**Q. I'm going to put up a document that's marked as Exhibit 8, so here's the sticker.**
**(Exhibit 8 marked/introduced.)**
**Q. (BY MR. ULOTH) And I think this may be related to the call that you're saying Joe missed.**

**had with Mr. Fulbright on January 26th, you had a -- you had another form written up and ready to go to hand him, did you not?**
A. Another form?
**Q. Yeah.**
A. I'm not sure what you're talking about.
**Q. Do you recognize Neal Exhibit 5?**
**(Exhibit 5 marked/introduced.)**
**Q. (BY MR. ULOTH) And I could zoom in if that will help.**
A. Yeah, that would be helpful. I know it's a fit-for-duty. I didn't have that ready to go. That was filled out afterwards.
**Q. Okay. But you do recognize Neal Exhibit 5?**
A. Yes.
**Q. And can you just explain in lay terminology what this form is?**
A. It is a -- it's the manager's response for Joe's medical. After our conference and he -- we decided that it would be in everybody's best interest if Joe referred to medical department for his medication. So he has to contact medical, and then as a manager I have to fill out this form and send it in to medical to get everything started.



**Q. And I'm going to go down to the box. I think you can see the little hand moving on the screen.**
A. Yes.
**Q. And this is to the right of something that says "unsteady walk" --**
A. No.
**Q. -- but that's not checked?**
A. No.
**Q. Where it -- the stuff in the -- the stuff written in the box that begins "I am requesting FFD eval," is that something that you typed into the form?**
A. No. I do not believe so. I guess it must have. I'm reading. Yes. I -- that's a -- I filled that in.
**Q. Okay. And the X's like where it says X next to yes and X next to sleeping, you would have put those X's there?**
A. Yes, sir.
**Q. And then going down a little bit where there's four numbered paragraphs, it looks like the typing that's in a little bit lighter shade, those are words that you typed in here; is that correct?**
A. I'm looking. Right below your cursor?



**Q. To the right of the cursor --**
A. Oh, right there. Okay. Let me read, please. (Reviewing document.)
Yes. I wrote those.
**Q. Look at No. 4. It begins "Please provide," and you wrote -- let me read this first sentence. "I am worried that the medicine could impair Mr. Fulbright further into his normal work shift."**
**That's what you wrote, correct?**
A. Yes.
**Q. Why were you worried that the medicine could impair Mr. Fulbright into his normal work shift?**
A. Well, during the conversation, Mr. Fulbright told me that he takes the sleep medication and it works for eight hours. Okay. And then he can drive -- he can get into his vehicle and drive. He stated that he could not drive his vehicle during, when he was taking the medicine, but after eight hours the medicine wears off and he could drive his vehicle and come to work and he was fine.
I'm not a doctor. I don't know how long this medication lasts. I don't know the



effects of it lingering in his body. I at that point felt that he needed to go to medical and have somebody evaluate what he's taking and how it affects him.
**Q. Had you observed him impaired during his normal work shift?**
A. No.
**Q. Had anybody reported to you that he might have been impaired during his normal work shift?**
A. No.
**Q. So the referral and the statement "I am worried" was, as you explained, because you're not a doctor and you're not an expert --**
A. That is correct.
**Q. -- is that right?**
**Okay. The next sentence "Is the medication UPRR approved." Did you know what medication he was taking?**
A. I -- no. I'm sure Mr. Fulbright told me what the medication was, but to this day I could not give you what he was taking. I do not know what it is.
**Q. Okay. And then I flipped forward to the second page of this deposition exhibit, and there's a box where it says "recap." And are those all**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action |
| | ) | No. 3:20-cv-02392-BK |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, Defendant. | ) | |

* * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION

DR. JOHN CHARBONNEAU

MARCH 25, 2021

(REPORTED REMOTELY)

* * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION OF DR. JOHN CHARBONNEAU, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on March 25, 2021, from 9:29 a.m. to 1:35 p.m., before Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR in and for the State of Texas, reported remotely by computerized stenotype machine, considered being taken at the witness's location of his residence located in Greeley, Colorado, Weld County, during the COVID-19 State of Disaster, pursuant to the Federal Rules of Civil Procedure.

34

medicine in order to sleep. The medicine prohibits his ability to fulfill his duties for restoration of service after normal business hours."

Okay. So that is a question of, you know, the medication appears to impact him when he's going to be on call.

MR. ULOTH: I'll object to your answer as not responsive.

**Q And please understand, Dr. Charbonneau, I don't mean to be argumentative. That's just a formal objection for the record. Let me clarify or reask my question because you're pointing to something that talks about after normal business hours and my question is different.**

**When you made the decision to pull Mr. Fulbright from duty, were you aware of any specific information that indicated to you he was unable to remain alert during his normal Monday through Friday business hours work shift?**

A Mr. Uloth, I too am not trying to be argumentative, but I didn't finish my last answer and I think it's important that we do. Okay? Because the second comment, if you look at question number 4 below that box is -- we ask for additional information, and he says "I am worried that the medication could impair

35

Mr. Fulbright further into his normal work shift. Is the medication UPRR approved? I would never ask Mr. Fulbright to work after he has taken his sleep medication. However that puts a hardship on his peers having to cover for his sleep condition."

So there you have a nonmedical person, his -- Mr. Neal, his manager, saying, "I am concerned about just his regular day shift work as well."

And then, finally, down at the bottom, there's a bigger block, if you go to page 2 of this document, it's easier to read on your projection here. "I am concerned about Mr. Fulbright's sleep condition. He must take" --

**Q Dr. Charbonneau, I'd like to stop you because I'm paying by the word or by the page here, and I really just want to know this: Can you -- can you tell me a day or a date or time where Mr. Fulbright was impaired during his normal business hours?**

A The short answer is no --

**Q Thank you.**

A -- but I don't have -- I'm just summarizing the information that we use to make that decision. I --

**Q And I don't need you to read everything in the documents. It's in the documents. I just wanted to know, when you decided to pull Mr. Fulbright from duty,**

36

**isn't it true that you were not aware of a specific safety issue during his normal business hours, correct?**

A No, that's not correct. What we have is the frontline manager telling us that he has a concern about that. It's fair to say --

**Q I understand that.**

A -- he's not a medical professional, and that's one of our problems when we work through manager referral cases. But we had somebody saying that there is a possibility that he might be impaired, please evaluate him.

**Q And you understand my question is not about possibility and it's not about concern. Dr. Charbonneau, my question is what evidence of a specific incident where Mr. Fulbright was impaired at work do you have prior to February 1, 2015?**

A I did not have any information about a specific incident. I just --

**Q Thank you.**

A -- had the manager's written concerns, I believe.

**Q I appreciate that. And, trust me, this will go faster if we just stick to the questions that I'm asking.**

MR. ORTBALS: I'm going to object.

37

That's argumentative.

**Q Before you made your decision on February 1, do you know if you looked back at any other information in the file that you had about Mr. Fulbright?**

A Per my routine, I would have looked at the documentation that was in the manager referral case only. I would -- wouldn't routinely go back and look at previous cases.

**Q Would you have had any access to human resources files or safety records?**

A Only if they were entered as part of a previous case. You know, the time frame we're talking about here is in the first week of this case, so I don't believe there was then any information in his file about -- from human resources or safety.

**Q I'm going back to Exhibit 1, your February 1 entry. It concludes with you telling Theresa to request two years of medical records from all providers who have treated this employee. Can you explain why that request was made?**

A Yes. Again, you have to understand we have a -- we have a concern raised by a layperson, not medically trained, and so what we try to do is develop information to understand what's going on at work. We don't automatically assume that the obvious is the only

38

cause of the observed behaviors at work or the observed concerns at work.

So it was our standard practice to ask for the last two years of records so that we could get a good understanding about the medical conditions that the employee has as we go forward in making the fitness-for-duty determination.

**Q As I understand your answer, then, it wasn't something specifically that had been observed about Mr. Fulbright during his normal business hours at work that caused you to request two years from all providers, correct?**

A Again, not trying to be argumentative, we have a certain body of information that comes from a nonmedical person. It is a serious safety concern, so what we try to do is understand that. Normally we get input from the employee, but that hadn't happened for the first week, so what we try to do is get information that gives us an understanding of their medical and functional status and then take that through the fitness-for-duty process.

MR. ULOTH: Objection, not responsive.

**Q I'm going to jump forward now and start moving through in reverse order on this document but chronological order for us. Susan Cassiday, an entry on**

39

**February 3, 2015, I'll move this to the middle of the screen, at 4:24:33. It looks like she had received a voicemail message from Mr. Fulbright. Am I reading that correctly?**

A Yes.

**Q And it says "Voicemail message received on 1/29/15," correct?**

A Correct.

**Q So on February 1, when you made the decision to pull Mr. Fulbright from service, Mr. Fulbright had already returned the call to Union Pacific, correct?**

A He had, obviously, called and left a voicemail message. I can't tell you what time it was. Ms. Cassiday was another nurse in Health & Medical Services. She didn't work there very long, but I think she helped with some of the manager referral day-to-day work.

**Q Well, I'm just wanting to make sure I'm reading this correctly. According to these notes, don't they indicate a call from Mr. Fulbright to Theresa Rodino on January 29, 2015?**

A I agree that that's what it says, yes.

**Q And looking down to the next to the last line of this note, this entry, translating EE to be employee, it indicates "Employee questioned need to be removed**

40

**from service," correct?**

A Yes.

**Q Would that trigger a reconsideration process by you, by Dr. Holland, Deb Gengler? Or did it?**

A No. Not [audio distortion]. I -- again, I -- part of my limitation, I acknowledge it, is that I don't know when that call was placed on 1/29. If it was after hours, then, you know, he wouldn't have expected to get Theresa, or if it was during business hours, maybe she just wasn't available. I don't know what that time -- time that return call happened on January 29th.

**Q I fear we may be miscommunicating. My question is this: My question is about the note typed in by Susan Cassiday where she says "Employee questioned need to be removed from service." And my question about that comment, which is a note to the medical file, would that note trigger a reconsideration by you?**

A Not just because he disagrees with being pulled from service, no.

**Q Did you reconsider whether he needed to be removed from service?**

A Give me one minute here. What page is that on?

**Q 14.**

A Okay. If you look at the entry above that,

41

February 3rd, 2015, 4:28 p.m., written by Ms. Cassiday, it looks like I and Deb Gengler, the DCS, looks like we reconsidered it, talked about it, but we didn't change the decision.

**Q Help me with that because I don't see any indication of a second conversation between you and Ms. Gengler, only the first one referred to in your note on February 1.**

A Look just above the -- look at the entry created on 2/3/15, 4:28:04.

**Q Okay, I see that.**

THE REPORTER: My computer is frozen. Hold on. Hold on. Y'all are frozen, I guess. He finished his answer, "it didn't change the decision," but if y'all talked after that, I didn't hear you.

MR. ULOTH: Okay. Let's reset.

**Q I think I see what you are talking about, Dr. Charbonneau. The entry on February 3 at 4:14 does seem to reflect a discussion that day between you and Ms. Gengler, correct?**

A I think it's likely that day. I can't say for certain.

**Q Okay. And let me just make sure I'm pointing you correctly to where I'm referring to. I don't know if you can see the little hand moving around on the**

50

**yourself, and possibly one of the fitness-for-duty nurses?**
A Usually that would be the case, yes.
**Q Okay. You write "The employee is not FFD," meaning it's your opinion that Mr. Fulbright was not fit for duty; is that correct?**
A Correct. At this point it was probably, I'll use this term, our opinion. It was out of my discussion with my medical boss and the Director of Clinical Services that he remained not fit for duty. We had already removed him from service, as you know, we talked about that earlier, so what I'm saying here is after the information submission and our case review, that nothing changed. He's staying off work.
**Q Why did you think he was not fit for duty?**
A Again, that was a continuation of the -- of the previous determination, and also it didn't tell us enough to -- to address all of the manager's original referring concerns.
**Q Well, explain, then -- I mean, you had received the fax with the medical records that indicated he was taking Trazodone for insomnia; is that correct?**
A Yes.
**Q Did you think he was not fit for duty because he was taking Trazodone or was there some other reason**

51

**as well?**
A Well, as I said, we got about half of the records that we asked for. Number two, this wasn't enough information to explain everything. And, number three, again, consistent with the approach of trying to do this amicably and problem solve, we felt that it would be good to get a sleep medicine evaluation to find out if there's -- weren't some way to ameliorate the -- the -- the concerns here about, you know, his inability to take calls when he had taken his medicine and his reported need to take the medicine, to get to sleep. So we just didn't feel that our medical investigative work was done.
**Q You use the term sleep medicine evaluation in your note. Can you tell me what a sleep medicine evaluation is?**
A Yes. I will tell you it's a relatively newer area of medicine. We -- when I started, we never did such evaluations, but now there are usually pulmonary medicine doctors or neurologists who get additional evaluation -- excuse me, certification in the field of what we call sleep medicine. And it is to -- they assess people who report problems with sleep, either quality of sleep, duration of sleep, whether it's restorative or not, things like that.

52

So in this case, the sleep medicine evaluation would be to kind of get a full understanding of the problems at hand and if -- find out if there were some way to overcome the problem of the employee needing to be able to take calls but reporting that he couldn't do it. So it's -- it was an attempt to problem solve.
**Q I guess my question is far more pedestrian than that. What is involved? What do they do?**
A In the good ones, we see a detailed medical history, clinical examination. Oftentimes a sleep study is part of that, and then a follow-up evaluation to put together the clinical pieces with the diagnostic testing and then determine what appropriate medical treatment is given the employee's circumstances or the patient's circumstances.
**Q Okay. Well, you've used a few terms that I'll need to follow up on, but maybe I can get it this way: Is it -- is there a Medicare code for a sleep medicine evaluation?**
A I'm pretty sure there is. I don't know it.
**Q Is it -- are you familiar with the term polysomnography?**
A That -- yeah, a polysomnography, or we abbreviate it PSG, that means a sleep study.
**Q Okay. How is a sleep study different from a**

53

**sleep medicine evaluation?**
A A sleep study is a subset or is part of a sleep medicine evaluation. You know, a lot of -- a lot of patients just say, "You know, I wake up. I'm not rested." Or "I wake up and I'm still foggy" or "it takes me two hours to get going in the morning" or things like that. It's a matter of whether sleep restores your energy level like the way it should. Or, taking Mr. Fulbright's case, "I can't fall asleep, Doc. Why?"
So you go through a detailed, medical evaluation, just like you would for hypertension or heart disease or things like that, wherein you fi- -- you do a general medical evaluation and then you focus in on the problem at hand. That clinical evaluation plus the PSG and maybe trying other kinds of treatment is what goes into a sleep medicine evaluation. And the polysomnography, or PSG, is one piece of a good, detailed sleep medicine evaluation.
**Q Okay. So a polysomnography is also called a sleep study, is that what you said?**
A Yes.
**Q What are the steps of a sleep study?**
A Well, there are a number of things that go into it. I mean, again, part of the reason why you

54

start with the clinical evaluation is that the sleep medicine doctor learns what he or she needs to learn from the PSG.

Now, the PSG can be done at home with, we call it an at-home sleep study, AHSS, or preferably, and certainly in Mr. Fulbright's condition -- or case, we'd want to see an in-lab sleep study because it's just done under more controlled circumstances. It's usually what we call attended. There's a sleep study professional there to hook up all the monitoring that has to go with, you know, their brain waves, their heart rate, whether they're snoring or not, so there's a microphone there, and there's some other parameters that get measured.

So that you get this real detailed look, if you will, at how long it takes them to fall asleep, how fast they fall deeply asleep, and whether or not they ever do, and how -- is their sleep interrupted. And that's the difference between sleep-onset insomnia or, you know, post onset problems with insomnia, are they continually waking up, things like that.

So there are many potential diagnoses. And, again, putting together the clinical evaluation, plus the sleep study tells you kind of where the problem is. And then the sleep medicine doc has the experience to say, "Okay. We can try X or Y or Z or we can

55

troubleshoot your problem." And they -- you know, they have knowledge of medicines and stuff that can be used.

So, again, it's an important, detailed process just like a cardiologist would do for your heart or an orthopedist would do for your back. It's just a detailed evaluation, a problem-specific evaluation.

**Q And that's what I'm trying to get you to explain to me is the detail; what are the steps, what is the process. It sounds like step one is connecting a person to some sort of equipment, monitors, things like that.**

A Correct. And usually it's best if it's done in a sleep lab.

**Q Okay. And the note here that you made doesn't indicate whether you wanted Mr. Fulbright to go to a lab or something else?**

A Well, I think it's common knowledge that in-lab studies are the most reliable and give the best information because they look at the most parameters of sleep and it's under the best controlled circumstances. But, equally important, is the in-clinic evaluation with the sleep medicine doc to try to troubleshoot the situation.

**Q Okay. But how is that an evaluation of the sleep medicine, or is it?**

56

A Well, when -- sleep medicine is a term that has to do with the physician specialty of knowing about sleep problems. It's not sleep medication evaluation. Sleep medicine is like pulmonary medicine evaluation or cardiovascular medicine evaluation. The medicine there is defining the specialist who's going to do the evaluation, not the medication that Mr. Fulbright's taking.

**Q Okay. So you weren't asking -- or you weren't raising the possibility at this point of having Trazodone evaluated, you were talking about this polysomnography and the clinical evaluation and all of that that you talked about earlier, correct?**

A Yes. Again, the clinical evaluation is a start, and then usually it's followed by a formal sleep study, either at home or in a lab. The best ones, because they are the most thorough, happen in lab.

**Q Okay. In the note immediately above the last one we were talking about, so I'm still on page 11, and this is the uppermost entry on the page under Activity Comments, I see the letters ROI. Do you know what ROI refers to?**

A Yes. Release of information. And it usually applies to a release of information form that we send to the employee to sign so that we can either get

57

information from their provider or talk to their provider, as in this case.

**Q And do you recall what happened in this case? Did Ms. Rodino send an ROI to Mr. Fulbright?**

A It says "Release of information sent to employee requesting information release of information that UP Company MD may speak with employee MD." So she was asking him for his authorization for me to talk to his primary care doctor.

**Q Okay. Let me go to the preceding page, which is the next chronological entries. Can you tell from the next few entries how that process proceeded from there after she sent the ROI to Mr. Fulbright?**

A It looks like he did not want to sign it initially. Theresa documented on April 20th, 2:15 p.m. that she had placed several calls to the employee asking about the release of information. I think that meant that she had called him to say, "Are you going to sign it or not or when is it coming," things like that. And she put on there "informed that our company MD asking to speak with his MD. Employee states that he was thinking about that." And that's okay. No judgment made there. That just -- he wanted to think about it.

And then at 4/20 -- excuse me, April 20, 2015, at 4:15 p.m., Theresa sends a message back to me

**the point of yes or no that you suggested an alternative?**

A I think that he was not comfortable signing a release of information. It came to a discussion of we still need it, and however the exact wording worked out, I'm not a hundred percent sure now six years later, or almost six years later, but my recollection is is that I acquiesced to his preference that he be allowed to talk to his doctor rather than we be allowed to talk to his doctor.

**Q Did Mr. Fulbright refuse to do something you asked him to do in this call?**

A I think generally he did not want to sign a release of information.

**Q Did you make -- did you ever tee it up to the point where it was "Yes or no, Mr. Fulbright, do I have your permission to talk to your doctor?"**

A I can't remember that much detail, sir. I'm sorry.

**Q Fair enough. And, getting back to the question I've asked now a couple of times, in the notes it seems like you asked Mr. Fulbright to do something. And my question is, simply, what did you ask Mr. Fulbright to do?**

A Mr. Uloth, I'm sorry, where are you talking



about now? What notes are you referencing?

**Q I think it's probably summarized -- well, before I get --**

**(Simultaneous speaking.)**

A -- where I was asking him to do something.

**Q Yeah. Before I get to that, let me ask you this: In the note, let's see, this is going to be about two or three lines up from the number 5, and it's the sentence that begins "He specifically charged." Do you see where I am?**

A Yes.

**Q Let me just read that. "He specifically charged that his manager had made false statements regarding his being impaired due to the medication and one other issue." Do you remember what the other issue was?**

A I don't. I have looked at that multiple times in preparation for this deposition. I have no independent recollection. I don't remember what that other issue was.

**Q That is absolutely fine and I appreciate the direct answer.**

**So my question -- next question would be about this next sentence. "We both assured the employee that no such statements had been made to us and no such**



**information had been sent to us."**

**Kind of my interpretation, putting these two sentences together, is this, and you tell me if I'm off base: Joe was telling you Terry Neal is making false statements about me being impaired due to the medication, and you and Theresa assured Joe he hadn't said that to you. Is that fair?**

A Well, the answer is two parts. First of all, many employees are upset that they're removed from service. As I said earlier, most cases comes to us, the employees have already been off -- been removed from service. So employees get upset, understandably. I'm not making a value judgment about that, but sometimes in the conversations we get far afield of our medical purpose.

You know, there's a labor relations process and people pay their union dues to represent them about these other things. All we can say is our body of information says this and this is why we're asking for the evaluation. And the charges about discriminatory, you know, selection against them because they were mad about something that happened two years earlier, there's -- we can't do that. We can't verify that.

So all we told him is, you know, he has



not made false statements to us or things that we know are false, and it's kind of an attempt to reign them back in and get them back onto the medical issues that are at hand. So --

**Q Let me --**

A -- I think that the two sentences are connected, and it was just kind of "Let's get back on task and talk about the medical stuff."

**Q Did Terry Neal ever report to you or to Theresa that Joe was impaired due to the medication?**

A If you go back and look at the manager referral paperwork, that was one of his concerns was he -- I don't know everything that went into his concern about the possibility of Mr. Fulbright being impaired at work, but both the underlying disease and the medications for it were among his concerns at the very start of the case.

**Q Are you saying yes is the answer to my question?**

A If you're asking me did he cite a specific instance of it, I haven't seen that. I don't know what has happened in his conversations directly with Theresa. All I know is that he wrote that he was concerned about the underlying condition and the medication that Mr. Fulbright was taking.

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br>**vs.**<br>**UNION PACIFIC RAILROAD COMPANY,**<br>**Defendant.** | **Case No. 3:20-cv-2392** |

**DECLARATION OF TAMMY R. POTTER**

I, Tammy R. Potter, declare as follows:

1. I am over eighteen years of age and am fully competent to make this statement.

2. I currently hold the position of Senior Manager Legal Support Services with Union Pacific Railroad Company and have held this position since 2006.

3. In my capacity as Senior Manager Legal Support Services, I am aware that Union Pacific is a Class I freight railroad linking 23 states in the western two-thirds of the U.S. by rail.

4. I am also aware that Union Pacific maintains its principal place of business in Omaha, Nebraska and employs more than 32,000 employees. The majority of Union Pacific's executive and administrative functions, including corporate finance, accounting, human resources, payroll, marketing, and legal are directed from its headquarters in Omaha, Nebraska.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

Executed on September 8, 2021.
(date)

Tammy R Potter
Tammy R. Potter

7739806v.1

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**UNION PACIFIC RAILROAD COMPANY,**<br>**Defendant.** | **Case No. 3:20-cv-2392** |

**DECLARATION OF TERRILL MAXWELL**

I, Terrill Maxwell, declare as follows:

1. I am over eighteen years of age and am fully competent to make this statement.

2. I currently hold the position of Director of Labor Relations with Union Pacific Railroad Company and have held this position since 2015.

3. In my capacity as Director Labor Relations, I am aware that a collectively bargained agreement executed on May 25, 1999 between Union Pacific, the Brotherhood of Railroad Signalmen ("BRS"), and the International Brotherhood of Electrical Workers ("IBEW"), also known as the Implementing Agreement, consolidated telecommunications facilities, work, territories, and seniority districts such that employees represented by the BRS were consolidated into Union Pacific's collective bargaining agreement with the IBEW governing telecommunications employees represented by the IBEW.

4. I am aware that under the Implementing Agreement, the job title of Communications Maintainer was changed to Senior Communications Technician under certain circumstances.

5. I am also aware that under the Implementing Agreement, the rates of pay and eligible benefits for BRS-represented telecommunication employees, including Mr. Fulbright,

remained governed by Union Pacific's collective bargaining agreement with the BRS so long as those employees remained on BRS-represented positions.

6. I am aware that Mr. Fulbright was a monthly-rated BRS-represented telecommunication employee and, as such, was paid a monthly rate of pay based on six days per week to cover a Monday through Friday work schedule and also account for being subject to call after hours at night and on weekends and holidays.

7. Additionally, I am aware that under the Implementing Agreement, the seniority dates of BRS-represented telecommunication employees transferred and dovetailed into a seniority roster governed by the IBEW, and Union Pacific's collective bargaining agreement with the IBEW, specifically for telecommunication employees, thereafter governed seniority, seniority districts, job bulletining, job abolishments, and classification of work and work scope.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

Executed on ____09/09/2021________________.
(date)

Terrill L. Maxwell
Terrill Maxwell

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br>**vs.**<br>**UNION PACIFIC RAILROAD COMPANY**,<br>**Defendant.** | **Case No. 3:20-cv-2392** |

**<u>DECLARATION OF STEPHEN HALE</u>**

I, Stephen Hale, declare as follows:

1. I am over eighteen years of age and am fully competent to make this statement.

2. I currently hold the position of Senior Manager Telecom Operations with Union Pacific Railroad Company, and have held this position since 2016.

3. Before I became Senior Manager Telecom Operations, I held the position of Regional Project Supervisor from 2009 to 2016 and, prior to that position, I held the position of Construction Supervisor from 2004 – 2009.

4. In 2015, I supervised Joe Fulbright.

5. In my capacity as Senior Manager Telecom Operations and as Mr. Fulbright's supervisor in 2015, I am aware that Mr. Fulbright held a monthly-rated position of Senior Communications Technician with a work schedule of Monday through Friday, 7 am to 4 pm, subject to after-hours call outs at night and on weekends and holidays.

6. I am also aware that communication technicians, Mr. Fulbright included, voluntarily created, amongst themselves, a weekend rotation schedule where each technician took turns covering after-hours call outs. However, regardless of assigned weekend coverage under a voluntary weekend rotation schedule, the applicable collective bargaining agreement between

Union Pacific and the IBEW-Telecommunications Employees requires that all monthly-rated employees report for work when called to perform emergency work.

7. I am also aware that in addition to all required technical competencies, as a Senior Communication Technician, Mr. Fulbright was required to operate a vehicle and drove a Union Pacific company vehicle for call outs. Senior Communication Technicians, Mr. Fulbright included, are also required to climb ladders at unprotected heights up to eight or nine feet. Senior Communication Technicians must able to be able to work alone or as a two-man team, performing work trackside or along the right-of-way and in rail yards, and around moving equipment and moving trains, locomotives, and railcars.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

Executed on September 10, 2021.
(date)

Stephen Hale

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,** <br> **Plaintiff,** <br> **vs.** <br> **UNION PACIFIC RAILROAD COMPANY,** <br> **Defendant.** | **Case No. 3:20-cv-2392** |

**DECLARATION OF DR. JOHN CHARBONNEAU**

I, Dr. John Charbonneau, declare as follows:

1. I am over eighteen years of age, am fully competent to make this statement, and have personal knowledge of the facts in this declaration.

2. I am the Associate Medical Director for Union Pacific Railroad Company. I am a board-certified Occupational Medicine physician. In my role as the Associate Medical Director, I am a self-employed contractor working with Union Pacific's Health and Medical Services Department. I am responsible for conducting and overseeing fitness-for-duty (FFD) evaluations to ensure that Union Pacific employees are medically and functionally capable of safely working in the railroad environment. I also work to ensure Union Pacific remains in compliance with various health, medical, and safety regulatory standards.

3. The purpose of Union Pacific's medical FFD evaluation is to determine if an individual has a health condition or functional impairment that poses a significant risk to the health or safety of the individual or others, or prevents the individual from safely performing the essential functions of the job. The FFD focuses on the safety risks in the railroad environment associated with the employee's specific health condition in light of the employee's essential job functions. Union Pacific works with the employee to gather medical records relevant to the

7739831v.1

condition that may have impacted or potentially impacts his or her ability to safely perform the job. Union Pacific's Health and Medical Services Department sometimes arranges for independent medical providers to review the employee's relevant medical records and assess the medical and functional significance of the employee's condition as related to the employee's essential job functions.

4. Supervisors and managers have the ability to refer an employee for a medical FFD evaluation "based on credible information which raises a concern about the employee's ability to safely perform his/her job duties."

5. In the case of a manager referral, when a concern has been raised by a manager, usually a layperson who is not medically trained, no assumptions are made that there is a medical cause for the observed behaviors or that the employee is unable to safely perform his or her job. In addition to the documented manager referral form, we obtain information directly from the employee and the manager. It is standard practice to request the last one to two years of medical records and information from the employee. From that point, the FFD evaluation continues until the FFD determination can be made.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief.

Dated 9/10/2021

Dr. John Charbonneau

7739831v.1

CONFIDENTIAL

# HR Reporting System

**Employee Personal Data**
**Name: JOE M FULBRIGHT**
**Empl Id: 0251592**

| | | | |
|---|---|---|---|
| Addr Eff Dt: | 06/28/2012 | Death Date: | |
| Home Addr: | 807 OAKWOOD DRIVE - EULESS TX 76040-5260 | | |
| Mail Addr: | 807 OAKWOOD DRIVE - EULESS TX 76040-5260 | | |
| Home Phone: | (817) 301-3981 | Cell Phone: | (817) 733-0427 |
| Marital Status: | | | |
| Original Hire Dt: | 03/25/1985 | Last Hire Dt: | 03/25/1985 |
| Adj Svc Dt: | 03/25/1985 | Years Of Svc: | 35 |
| Empl Status: | OFF WORK | Status Eff Dt: | 02/03/2015 |
| Exp Rtn Dt: | | | |
| Pos Eff Dt: | | Position Title: | Sr Comm Technician |
| Pos Number: | 00083664 | Job Code: | A38898 |
| Department: | 41: Engineering | Division: | |
| MOU: | 3650: Engineering-Trk Renewal/Construct South | Service Unit: | |
| Union: | 04: BRS | SBG: | 9761 |
| Work Location: | LAREDO, TX | | |
| Payroll: | | Cost Center: | ED896 |
| Supv Name: | TRAVIS R YATES | Supv Empl Id: | 0449928 |

**Report Generated on 09/22/20 12:29:52 by LADM279**
**Data copyright Union Pacific Railroad 2020**

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

Work History
Name: JOE M FULBRIGHT
Empl Id: 0251592

| EFF DATE | CHANGE TYPE | EMPL STATUS | JOB TYPE | POSITION TITLE | WORK LOCATION | UNION | DEPARTMENT | JOB CODE |
|---|---|---|---|---|---|---|---|---|
| 07/09/2015 | Agr-Layoff-Medically Disqual | OFF WORK | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/03/2015 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 10/24/2014 | Agr Return from Leave of Abs | ACTIVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 08/26/2014 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/24/2014 | Agr Return from Leave of Abs | ACTIVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/25/2014 | Agr LOA Health Reasons | LEAVE | AGR | Sr Comm Technician | LAREDO, TX | BRS | Information Technologies | A38898 |
| 03/01/2011 | Agr Return from Leave of Abs | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 02/22/2011 | Agr LOA-Fam Medic Leave | LEAVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 09/29/2010 | Both-Data Redesignation | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/26/2010 | Both-Data Redesignation | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 06/23/2009 | Agr Return from Leave of Abs | ACTIVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/16/2009 | Agr LOA-On Duty Pers Injury | LEAVE | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 04/07/2006 | Both-Version 8.8 Upgrade | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 01/26/2005 | Agr Change/Pos Title/Loc | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | Information Technologies | A38898 |
| 07/01/2004 | Agr Change/Pos Title/Loc | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | TRNSP SOUTHERN RGN | A38898 |
| 04/24/2000 | Agr Bid | TERMINATED | AGR | SR COMM TECHNICIAN | LAREDO, TX | BRS | TRNSP SOUTHERN RGN | A38898 |
| 09/02/1998 | Agr Discharge-Rule Violations | TERMINATED | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A38898 |
| 02/17/1998 | Agr Bid | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A38898 |
| 02/16/1998 | Agr Assignment Pending | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 04/01/1996 | Agr Bid | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 11/05/1993 | Agr Change/Pos Title/Loc | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 06/01/1993 | Agr Change/Pos Title/Loc | ACTIVE | AGR | SR COMM TECHNICIAN | FT WORTH, TX | BRS | Information Technologies | A41898 |
| 07/01/1991 | GENERAL INCREASE | ACT-A | AGR | COMM MAINT LIC | FT WORTH, TX | BRS | Information Technologies | |
| 04/07/1988 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MAINT LIC | FT WORTH, TX | UNKNOWN | Information Technologies | A41308 |
| 05/01/1987 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MAINT LICENSED | FT WORTH, TX | UNKNOWN | Information Technologies | A41308 |
| 07/02/1986 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMMUNICATIONS DEPT | FT WORTH, TX | UNKNOWN | Information Technologies | A91265 |
| 07/16/1985 | Agr Change/Pos Title/Loc | ACTIVE | AGR | COMM MNTR | FT WORTH, TX | UNKNOWN | INA-MISSOURI PACIFIC-HISTORY | A91261 |
| 03/25/1985 | Agr New Hire | ACTIVE | AGR | COMM MNTR | FT WORTH, TX | UNKNOWN | INA-MISSOURI PACIFIC-HISTORY | A91261 |

Report Generated on 09/22/20 12:29:52 by LADM279
Data copyright Union Pacific Railroad 2020

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

**Complete Training History**
**Name: JOE M FULBRIGHT**
**Empl Id: 0251592**

| COMPLETION DATE | CODE | DESCRIPTION | DURATION IN HRS |
|---|---|---|---|
| 01/31/2019 | HZ89 | Hazardous Materials Emergency Respo | 0.0 |
| 01/11/2016 | HZ89 | HAZARDOUS MATERIALS EMERGENCY | |
| 01/30/2015 | MEDRT | MEDICAL RULES TRAINING | 0.3 |
| 11/17/2014 | JEV001 | IOS DEVICE POLICY | |
| 07/16/2014 | TTN01 | TTN DATABASE IP INFRASTRUCTUR | 1.0 |
| 07/16/2014 | TTN03E | TTN DATABASE IP NETWORK MONIT | 1.0 |
| 04/29/2014 | ES00E | ON TRACK SAFETY | 1.0 |
| 12/09/2013 | HZ89 | HAZARDOUS MATERIALS EMERGENCY | |
| 12/05/2013 | FCPAW | FOREIGN CORRUPT PRACTICES ACT | 0.8 |
| 02/15/2013 | Q248 | RECORDS MANAGEMENT | 0.5 |
| 01/30/2013 | ES00E | ON TRACK SAFETY | 1.0 |
| 07/05/2012 | SAPTM4 | SAP TIME ENTRY PORTAL (TEP) TE | 1.0 |
| 07/02/2012 | PXBDE | HEAT STRESS TRAINING FOR EMPLO | 1.0 |
| 07/02/2012 | TIPD1E | PROFESSIONALISM | 1.0 |
| 05/31/2012 | PXBD | HEAT STRESS | 0.8 |
| 05/31/2012 | QS97 | QSM - HEAT STRESS QUALITY SAFE | 1.0 |
| 05/31/2012 | SA22 | RED ZONE CONTACT | 1.0 |
| 04/25/2012 | PXD6 | BASIC MEDIC FIRST AID/CPR-V6 | 4.5 |
| 03/07/2012 | IFDD | DEFENSIVE DRIVING | 8.0 |
| 02/22/2012 | Q248 | RECORDS MANAGEMENT | 0.5 |
| 01/27/2012 | ES00E | ON TRACK SAFETY | 1.0 |
| 12/12/2011 | EEO11W | EQUAL OPPORTUNITY: EQUAL RESPO | 0.5 |
| 07/28/2010 | HZ89 | HAZARDOUS MATERIALS EMERGENCY | |
| 06/24/2010 | PXD6 | BASIC MEDIC FIRST AID/CPR-V6 | 4.5 |
| 03/02/2010 | IFDD | DEFENSIVE DRIVING | 8.0 |
| 01/22/2010 | ES00E | ON TRACK SAFETY | 1.0 |
| 08/03/2009 | HZ89 | HAZARDOUS MATERIALS EMERGENCY | |
| 02/04/2009 | ES00E | ON TRACK SAFETY | 1.0 |
| 02/04/2009 | TTN01 | TTN DATABASE IP INFRASTRUCTURE | 1.0 |
| 05/20/2008 | OPSU | TOTAL SAFETY CULTURE | 8.0 |
| 11/01/2007 | CTEOT | NEXTGEN EOT TRAINING | 2.0 |
| 04/12/2007 | AED6 | AUTO EXTERNAL DEFIBRILLATOR | 2.0 |
| 04/11/2007 | PX86 | BASIC MEDIC FIRST AID/CPR WITH | 6.0 |
| 08/15/2006 | EEOQ | EEO BASICS | 1.0 |

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

| | | | |
|---|---|---|---|
| 03/21/2006 | HM68 | HM232 SECURITY AWARENESS TRNG | 0.3 |
| 03/21/2006 | Q212 | RAIL SECURITY AWARENESS (MEETS | 1.0 |
| 03/13/2006 | TTN01 | IP INFRASTRUCTURE | 1.0 |
| 02/02/2006 | ES00IT | ON TRACK SAFETY TRAINING | 8.0 |
| 10/27/2005 | MD43 | AFTRMTH RD TO RESILENCEHP08203 | 0.3 |
| 10/27/2005 | MD45 | QSM BOUNCING BACK - RESILIENCE | 0.5 |
| 10/27/2005 | MD51 | 0-1-2-4: HOW MUCH IS TOO MUCH | 0.3 |
| 06/22/2005 | PXD9 | CPR - CARE INITIATOR MEDIC FI | 4.0 |
| 03/10/2005 | EEOV | EEO: COMPLIANCE AND BEYOND (AL | 2.0 |
| 02/03/2005 | ES00IT | ON TRACK SAFETY TRAINING | 8.0 |
| 09/16/2004 | EV27 | ASBESTOSAWARENESS | 0.3 |
| 04/29/2004 | PX60 | DEFENSIVE DRIVING TRAINING | 4.0 |
| 05/21/2003 | PXD9 | CARE INITIATOR MEDIC FIRST AI | 4.0 |
| 04/23/2002 | CTLT | COMMUNICATIONS TRNG LOAD TEST | 5.0 |
| 05/23/2001 | PXD9 | CARE INITIATOR MEDIC FIRST AI | 4.0 |
| 06/14/2000 | OSDS | OPERATIONS SUPPORT DISPATCH SY | 2.0 |
| 05/28/1998 | GT05 | GEN. TRNG.: TECHNICAL SKILLS | 8.0 |
| 05/07/1997 | TV10 | DC BATTERY PLANT MAINT BTV-269 | 2.0 |
| 04/29/1997 | RXCD | LOCOMOTIVECOMPUTERSCREENSCARME | 2.0 |
| 08/14/1996 | ES00 | ON TRACK SAFETY TRAINING | 8.0 |
| 08/05/1996 | DDL1 | OPS: LOTUS NOTES USER LEVEL 1 | 4.0 |
| 04/17/1996 | VH44 | STREET SMART S-326-95 | 1.0 |
| 03/19/1996 | PXG8 | RISK MGMT./HEALTH -- BY THE NUMBERS | 1.0 |
| 03/19/1996 | PXG8 | 0124 | 0.5 |
| 03/01/1996 | SFE2 | ELECTRICALSAFETYLEVEL2 | 0.3 |
| 02/21/1996 | SFE2 | ELECTRICALSAFETYLEVEL2 | 0.3 |
| 11/01/1995 | EV20 | FIRE EXTINGUISHER ANNUAL TRNG | 0.3 |
| 11/01/1995 | SF47 | SAFETY -- CONFINED SPACES ENTR | 4.0 |
| 11/01/1995 | SF48 | SAFETY -- CONFINED SPACE ATTEN | 4.0 |
| 11/01/1995 | SF49 | CONFINEDSPACESENTATTENDENTRYSU | 0.3 |
| 08/03/1995 | EV27 | ASBESTOSAWARENESS | 0.3 |
| 06/28/1995 | GT05 | GEN. TRNG.: TECHNICAL SKILLS | 8.0 |
| 06/28/1995 | PX60 | DEFENSIVE DRIVING TRAINING | 4.0 |
| 04/12/1995 | SF44 | LOCKOUT/TAGOUTOTHEREMPLOYEE | 0.2 |
| 05/26/1994 | PXP1 | DELTA - OFFICE SUPERVISORS | 16.0 |
| 01/13/1993 | RX90 | CLEAN CAB RADIO CLASS-UNDER. P | 2.0 |
| 01/23/1992 | PXQM | DO NOT USE | 8.0 |
| 09/17/1991 | PXB1 | ON LINE REQUISITION SYS TRAINI | 4.0 |



UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

| | | | |
|---|---|---|---|
| 07/30/1991 | PXC5 | HRDT - PROBLEM SOLVING TRAININ | 7.0 |
| 07/30/1991 | PXCB | HRDT-QUALITY IMPROVEMENT TEAM | 8.0 |
| 02/27/1991 | PX83 | MEDIC FIRST AID/CPR | 8.0 |
| 09/21/1990 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 09/20/1990 | CTBR | RA1, FM BASE RADIO SYSTEMS | 80.0 |
| 09/29/1989 | PXE6 | PRO-BACK II, SESSION 1 FOR WOR | 2.0 |
| 09/28/1989 | SF03 | HAZCOMLINEEMPLOYEETRAINING | 0.5 |
| 05/17/1989 | PXBC | GMS TRAINING COMM/SIGNAL GANGS | 8.0 |
| 09/21/1987 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 06/05/1987 | CTTP | TELEPHONY-BASIC TELEPHONY CIRC | 80.0 |
| 06/04/1987 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 04/01/1987 | ES | ENGRG SVCS/MOW TRNG - MISC | 8.0 |
| 03/27/1987 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 12/18/1986 | CTMP | MULTIPLEX-ANOLOG MULTIPLEX CIR | 80.0 |
| 12/09/1986 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 05/23/1986 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 05/07/1986 | CT | COMMUNICATIONS TECHNOLOGY - MI | 8.0 |
| 04/17/1986 | PX97 | PRO-BACK | 8.0 |
| 05/03/1985 | PXBF | HRDT - BASICS OF COMMUNICATION | 8.0 |

Report Generated on 09/22/20 12:29:52 by LADM279
Data copyright Union Pacific Railroad 2020

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

Medical Exam History
Name: JOE M FULBRIGHT
Empl Id: 0251592

| EXAM CODE | EXAM DATE | EXAM TITLE | PASS/FAIL | SCORE | ACCURACY | END DATE |
|---|---|---|---|---|---|---|

Report Generated on 09/22/20 12:29:52 by LADM279

Data copyright Union Pacific Railroad 2020

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

**Skills Exam History**
**Name: JOE M FULBRIGHT**
**Empl Id: 0251592**

| EXAM CODE | EXAM DATE | EXAM TITLE | PASS/FAIL | SCORE | ACCURACY | END DATE |
|---|---|---|---|---|---|---|
| ITSRE | 04/29/2014 | Telecom Safety Rules Exam | PASS | 8 | 8 | |
| MWECE | 04/29/2014 | EMWECE - Employee in Charge Exam | PASS | 100 | 100 | |
| MWECEC | 04/29/2014 | MWECE-MOFW EMPL-IN CHARGE EXAM | PASS | 0 | 0 | |
| MWLOE | 04/29/2014 | Lookout Exam | PASS | 80 | 80 | |
| MWLOEC | 04/29/2014 | MWLOE-MOFW LOOKOUT EXAM | PASS | 0 | 0 | |
| MWLWE | 04/29/2014 | OTS Loneworker Exam | PASS | 100 | 100 | |
| MWLWEC | 04/29/2014 | MWLWE-MOFW LONE WORKER EXAM | PASS | 0 | 0 | |
| MWRWE | 04/29/2014 | MWRWE - OTS Roadway Worker Exam | PASS | 100 | 100 | |
| MWRWEC | 04/29/2014 | MWRWE-MOFW RDWAYWRKRES00E EXAM | PASS | 0 | 0 | |
| MWTWE | 04/29/2014 | MWTWE - OTS Train Approach Warning System Exam | PASS | 100 | 100 | |
| MWTWEC | 04/29/2014 | MWTWE-MOFW TRAINAPRCHWRN EXAM | PASS | 0 | 0 | |
| ITSRE | 02/06/2013 | Telecom Safety Rules Exam | PASS | 10 | 10 | |
| MWECE | 02/06/2013 | EMWECE - Employee in Charge Exam | PASS | 80 | 80 | |
| MWTWE | 01/31/2013 | MWTWE - OTS Train Approach Warning System Exam | PASS | 90 | 90 | |
| MWECE | 01/30/2013 | EMWECE - Employee in Charge Exam | PASS | 68 | 68 | |
| MWLOE | 01/30/2013 | Lookout Exam | PASS | 90 | 90 | |
| MWLWE | 01/30/2013 | OTS Loneworker Exam | PASS | 100 | 100 | |
| MWRWE | 01/30/2013 | MWRWE - OTS Roadway Worker Exam | PASS | 100 | 100 | |
| ITSRE | 02/22/2012 | Telecom Safety Rules Exam | PASS | 9 | 9 | |
| MWECE | 02/22/2012 | EMWECE - Employee in Charge Exam | PASS | 92 | 92 | |
| MWRWE | 02/22/2012 | MWRWE - OTS Roadway Worker Exam | PASS | 90 | 90 | |
| MWTWE | 02/22/2012 | MWTWE - OTS Train Approach Warning System Exam | PASS | 100 | 100 | |
| MWECE | 02/21/2012 | EMWECE - Employee in Charge Exam | PASS | 72 | 72 | |
| MWECE | 01/27/2012 | EMWECE - Employee in Charge Exam | PASS | 68 | 68 | |
| MWLOE | 01/27/2012 | Lookout Exam | PASS | 90 | 90 | |
| MWLWE | 01/27/2012 | OTS Loneworker Exam | PASS | 90 | 90 | |
| MWECE | 01/19/2011 | EMWECE - Employee in Charge Exam | PASS | 92 | 92 | |
| MWLOE | 01/19/2011 | Lookout Exam | PASS | 90 | 90 | |
| MWLWE | 01/19/2011 | OTS Loneworker Exam | PASS | 100 | 100 | |
| MWRWE | 01/19/2011 | MWRWE - OTS Roadway Worker Exam | PASS | 90 | 90 | |
| MWTWE | 01/19/2011 | MWTWE - OTS Train Approach Warning System Exam | PASS | 100 | 100 | |
| MWTWE | 02/19/2010 | MWTWE - OTS Train Approach Warning System Exam | PASS | 90 | 90 | |
| MWECE | 01/22/2010 | EMWECE - Employee in Charge Exam | PASS | 100 | 100 | |
| MWLOE | 02/04/2009 | Lookout Exam | PASS | 90 | 90 | |

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

| | | | | | | |
|---|---|---|---|---|---|---|
| MWRWE | 02/04/2009 | MWRWE - OTS Roadway Worker Exam | PASS | 80 | 80 | |
| MWTWE | 02/04/2009 | MWTWE - OTS Train Approach Warning System Exam | PASS | 100 | 100 | |
| ITSRE | 02/03/2009 | Telecom Safety Rules Exam | PASS | 85 | 85 | |
| MWLWE | 02/03/2009 | OTS Loneworker Exam | PASS | 7 | 7 | |
| MWECE | 01/28/2009 | EMWECE - Employee in Charge Exam | PASS | 64 | 64 | |
| ITSRE | 01/22/2008 | Telecom Safety Rules Exam | PASS | 90 | 90 | |
| ITSRE | 02/23/2007 | Telecom Safety Rules Exam | PASS | 90 | 90 | |
| ITOT | 01/25/2007 | ON TRACK SAFETY (RW,LO,LW,EC,TW) | PASS | 98 | 98 | |
| ITSRE | 06/22/2006 | Telecom Safety Rules Exam | PASS | 95 | 95 | |
| SECUR | 03/21/2006 | Q212 | PASS | 0 | 0 | |
| MWEC | 02/03/2005 | MWEC - EMPLOYEE-IN-CHARGE | PASS | 100 | 100 | |
| MWLO | 02/03/2005 | MWLO - LOOKOUT | PASS | 100 | 100 | |
| MWLW | 02/03/2005 | LONE WORKER | PASS | 100 | 100 | |
| MWRW | 02/03/2005 | MWRW - ROADWAY WORKER | PASS | 100 | 100 | |
| ITOT | 01/29/2002 | ON TRACK SAFETY (RW,LO,LW,EC,TW) | FAIL | 0 | 0 | |
| ITOT | 01/23/2001 | ON TRACK SAFETY (RW,LO,LW,EC,TW) | PASS | 0 | 97 | |
| ITOT | 08/14/1996 | ON TRACK SAFETY (RW,LO,LW,EC,TW) | PASS | 0 | 92 | 01/23/2001 |

Report Generated on 09/22/20 12:29:52 by LADM279
Data copyright Union Pacific Railroad 2020

UPFULBRIGHT

CONFIDENTIAL

HR Reporting System

**Employee Discipline History**
**Name: JOE M FULBRIGHT**
**Empl Id: 0251592**

**Current Snapshot Record:**

| | |
|---|---|
| MAPS Status Code: | |
| Attendance Status Description: | |
| Leniency Probation End Date: | |
| Leniency Probation MAPS Level: | |
| Leniency Retention Date: | |
| Last Event Date: | 09/29/2015 |
| Active: | N |

**History Record(s): 2**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Id** | 574861 | **Case Type Desc** | General Case (Upgrade) | **Effective Date** | 09-01-1998 | **Incident Date** | 08-17-1998 |
| **Charging Office** | RICHARD GREEN | **Supervisor Name** | RICHARD COLE | **Service Unit** | Track Programs | | |
| **Even Type Desc** | GN | **Waive Offered Flag** | N | **License Revoke Flag** | | **Result Summary** | Dschrg Violat Operg Rules/Regs |
| **MAPS Previous Start Date** | | **New Status Code** | | **Category Code** | | **Retention Date** | |
| **Event Comments** | | **Current Status Code** | | **Attendence Retention Date** | | **Discipline Flag** | |
| **Incident Description** | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case Id** | 574862 | **Case Type Desc** | General Case (Upgrade) | **Effective Date** | 02-07-1990 | **Incident Date** | 02-07-1990 |
| **Charging Office** | | **Supervisor Name** | RICHARD COLE | **Service Unit** | Track Programs | | |
| **Even Type Desc** | GN | **Waive Offered Flag** | N | **License Revoke Flag** | | **Result Summary** | |
| **MAPS Previous Start Date** | | **New Status Code** | | **Category Code** | | **Retention Date** | |
| **Event Comments** | | **Current Status Code** | | **Attendence Retention Date** | | **Discipline Flag** | |
| **Incident Description** | | | | | | | |

**Report Generated on 09/22/20 12:29:52 by LADM279**
**Data copyright Union Pacific Railroad 2020**

UPFULBRIGHT

4000337385

| | |
|---|---|
| Barcode No. | 4000337385 |
| Employee ID | 00251592 |
| Employee Name | Joe Fulbright |
| Case Number | 000001203305 |
| Service Number | 1001217472 |
| Document Type | FML |
| Physical Type | F99 |

Print the following document and fax or email this cover page and medical document (in that order) to the number or email address below:

Fax Number: 402-233-3305

Email: ehealthsafe@up.com

**Note:** Do not use or reuse same cover page for faxing multiple documents. A new cover page must be printed from eHealthsafe portal for each document that need to be faxed.

The only visible barcode in your transmission should be the one on this sheet.To avoid transmission errors conceal any other barcodes that may appear on the information being submitted.

4000337385

UPFULBRIGHT

# Supervisor Initiated Fitness-For-Duty Request Form

**Supervisors have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern that the employee can safely perform his/her job duties. Supervisors should complete the information below when requesting Health and Medical Services to complete a Fitness-for-Duty evaluation.**

| | | | |
|---|---|---|---|
| Date | January 26, 2015 | Employee Phone (best contact #) | 817-733-0427 |
| Employee Name | Joe M. Fulbright | Employee ID | 0251592 |
| Employee Job Title | Senior Communications Technician | Employee Job Location | Fort Worth, TX |
| Supervisor Who Observed Behaviors (If Different From Mgr) | | Supervisor Telephone # | 817-353-7237 |
| Manager Making Referral | Terry D. Neal | Manager Employee ID | 0166451 |
| Manager Telephone # | 817-353-7237 | Manager E-mail Address | tdneal@up.com |
| Is The Employee Removed From Service? | ☐ YES X NO | If No, Is Employee Being Provided Alternative Work Duties During Evaluation? | ☐ YES X NO |
| Has The Employee Been Informed Of Their Removal From Service? | ☐ YES ☐ NO X N/A | Have You Discussed These Observations and/or Unsafe Behaviors With The Employee? | X YES ☐ NO |
| | | | |

**I am requesting a Fitness-For-Duty evaluation for the above named employee as evidenced by: (check as many as are applicable):**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Absenteeism | | Confusion | | Decreased Alertness | | Deteriorating Performance |
| | Difficulty Climbing | | Difficulty Lifting | | Difficulty Recalling | | Disorientation |
| | Erratic Behavior | | Fatigue/Weakness | | Shortness of Breath | X | Sleeping |
| | Slurred Speech | | Staggering | | Stumbling | | Sudden Mood Swings |
| | Unsteady Walk | | I am requesting FFD Eval for Mr Fulbright for his sleeping issues. He has to take medicine in order to sleep. The Medicine prohibits his ability to fulfill his duties for Restoration of Service after normal business hours. | | | | |

**1. Provide details of specific behaviors: Descriptions, observations and circumstances of the events leading to the request for the FFD evaluation: Mr. Fulbright has missed After Hours Call outs due to the sleep medicine he takes. He has told me that he has to take this medication**

**2. How long has this been occurring? 2014, 2015**

**3. Has there been a prior behavioral incident(s) or problem(s)? No, just "sleep medicine/and subject to call rules"**

**4. Please provide any additional information which raises your concern that the employee may not be able to safely perform his/her job duties. I am worried that the medicine could impair Mr. Fulbright further into his normal work shift. Is the medication UPRR approved? I would never ask Mr Fulbright to work after he has taken his sleep medication; however that puts a hardship on his peers having to cover for his sleep condition**

| | |
|---|---|
| Does This Represent a Change in The Employee's Past Observed Behaviors? | ☐ YES X NO |
| If Yes, Please Describe: | |
| Were Environmental Conditions Pertinent or Related To The Observed Behaviors (i.e: size of cab; distance between handrails)? | ☐ YES X NO |
| If Yes, Please Describe: | |

UPFULBRIGHT

**Supervisor Initiated Fitness-For-Duty Request Form**

Recap:
I am concerned about Mr. Fulbrights sleep condition. He must take medication in order to sleep. This medication prohibits him from fulfilling his job responsibility for Emergency After Hour Restoration of Service. We have had several conversations about this condition and how it is effecting his job along with his peers (who are having to cover for him) I am also concerned about the medication having lingering effects into his daily duties. I am also concerned whether the medication is UPRR approved. Any future issues with missing calls will result in discipline being assigned. I would like to be proactive and try and to work this out before it comes to discipline.

Terry Neal

UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

**January 29, 2015**

**Joe M. Fulbright**
**807 Oakwood Drive**
**Euless, TX 760405260**

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

In accordance with UPRR Safety Rule 90.4, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence.** Please provide the following information within the next ten (10) business days.

**[X]** Copy ofyour last 1 years physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Theresa A. Rodino
Fitness For Duty Nurse



UPFULBRIGHT

Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 402-544-6769
Fax: 402-501-0067
Email: TARODINO@UP.COM

CC:

UPFULBRIGHT

**Union Pacific Railroad**
1400 Douglas Street, Stop 680
Omaha, NE 68179

**Information Technologies**

February 5, 2015

Joe Fulbright
807 Oakwood Drive
Euless, TX 76040

Employee ID: 0251592

Dear Joe:

Re: Medical Leave, Joe Fulbright, Employee ID: 00251592

You have been placed on Medical Leave effective February 3, 2015 through May 3, 2015. Please be advised that you may be requested by Health Services to provide additional medical documentation before you can return to work.

In addition, this is to advise that the approved medical leave will run concurrently with FMLA.

If you have any questions about your medical leave, please contact the Health Services Department at 1-877-275-8747.

Sincerely,

Maureen Halbur

Maureen Halbur
Director-HR Services

cc:
ehealthsafe@up.com, recctr@up.com, Stephen T. Hale/UPC, Terry D. Neal/UPC, Neal Spencer, Maureen Halbur

UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

~~January 29~~, 2015 February 26, 2015 (JR)

**Joe M. Fulbright**
**807 Oakwood Drive**
**Euless, TX 760405260**

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

In accordance with UPRR Safety Rule 90.4, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence**. Please provide the following information within the next ten (10) business days.

**[X]** Copy ofyour last ~~1~~ 2 (JR) years physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Theresa Rodino (JR)

Theresa A. Rodino
Fitness For Duty Nurse



UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 402-544-6769
Fax: 402-501-0067
Email: TARODINO@UP.COM

CC:

UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

**April 10, 2015**

**Joe M. Fulbright**
**807 Oakwood Drive**
**Euless, TX 760405260**

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

In accordance with Union Pacific Railroad Medical Rules, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence**. Please provide the following information within the next ten (10) business days.

**[X]** Please re-fax the Medical Information that you had sent in on 4/6/2015. You were sending Copies of physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition. Regarding the actual Kaner Medical Group Note we only received the page 1 of 4 we did not receive the full clinic note. Your fax from Office Depot indicates that you were sending 29 pages but this fax stopped at page 4 which was the first page of the Kaner Medical Group notes. Please re-fax, I will try to reach you by phone as well, thanks Theresa.

The requested medical records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

UPFULBRIGHT

Theresa A. Rodino
Fitness For Duty Nurse
Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 402-544-3640
Fax: 402-501-0067
Email: TARODINO@UP.COM

CC:

UPFULBRIGHT

**June 18, 2015**

**Joe M. Fulbright**
**807 Oakwood Drive**
**Euless, TX 760405260**

**Employee ID: 00251592**
**Employee Position: Sr Comm Technician**

Dear **Joe M. Fulbright:**

Union Pacific Health & Medical Services (HMS) has been notified of your request for time off due to a medical reason. Based on the information reviewed:

In accordance with Union Pacific Railroad Medical Rules, you will require a Fitness-For-Duty (FFD) review **prior** to your return to work. This involves a review by Health & Medical Services of medical information **related to your absence**. Please provide the following information at least ten (10) business days due July 1, 2015.

**[X]** Copy of the sleep evaluation study from your provider.
**[X]** Copy of physician clinic notes for the past 2 years (also known as office notes or progress notes) from the
provider treating you for this condition.
records may be submitted to **Health & Medical Services confidential fax line at 402-501-0067. Please use the enclosed bar coded cover sheet when faxing your information.**

If you are having difficulty in obtaining the medical records in the requested time frame, please contact your FFD nurse at number listed below. Following these steps will be helpful in ensuring that the medical records required are complete so the FFD review can take place as efficiently as possible. You and your manager will be notified when you have been medically cleared to return to work by Health & Medical Services.

If at any time you have questions regarding the Return to Work process, please contact your FFD nurse at Health & Medical Services at the number listed below.

Sincerely,

Mary Jean Lempke
Fitness For Duty Nurse

UPFULBRIGHT

Health & Medical Services
Union Pacific Railroad
1400 Douglas Street - STOP 0350
Omaha, NE 68179
Phone: 402.544.6485
Fax: 402-501-0067

CC:

UPFULBRIGHT

UPFULBRIGHT

**UNION PACIFIC RAILROAD – HEALTH & MEDICAL SERVICES**

**RESTRICTION REVIEW FORM**

**June 26, 2015**

To: Terry Neal   Manager Telecom Facilities

Regarding Employee: Joe M. Fulbright   Employee ID: 00251592

Job Title or Craft: Sr Comm Technician   Department: Information Technologies

Service Unit: Work Location: LAREDO , TX

**INSTRUCTIONS:** Your employee is released to return to work with restrictions. Please review the outlined restrictions and respond to the questions below.

**Restrictions & Accommodations:**

**Start Date 6/26/2015  End Date 12/31/9999  Description**

06/26/2015 - 12/31/9999  Not to Operate Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited

06/26/2015 - 12/31/9999  Operation of Cranes, Hoists, or Machinery - Prohibited

06/26/2015 - 12/31/9999  Not to work on rail trains or work trains dumping ballast. (Can perform work remaining between the rails of the occupied track or to the field side of the occupied track. Where there are adjacent tracks with less than 19 foot track centers, utilize on-track safety protection following normal safety and Maintenance of Way rules).

06/26/2015 - 12/31/9999  Work at Unprotected Heights Over 4 Feet Above the Work Surface-Prohibited (Can work on the beds of trucks, and occupy bridges following normal safety rules).

06/26/2015 -12/31/9999  Not to work on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang). Must have at least 2 additional employees on gang or at work area in order to use Train Approach Warning regulations (Lookout).

**Joe Fulbright** 00251592 Restriction Review Form

**1)** Do these restrictions interfere with the essential job functions? [ ] YES [ ] NO

**2)** If yes, can reasonable accommodations be provided to allow the employee to perform the essential job functions?

[ ] YES [ ] NO

**3)** If yes, how will the reasonable accommodation be provided?

[ ] Accessible Parking [ ] Assistive Technology [ ] Equipment

[ ] Job Reassignment [ ] Lift Assistance [ ] Modification of Job Duties

[ ] Modified Work Schedule [ ] Removal Of Non Essential Function

[ ] Tools [ ] Removal Of Architectural Barrier

[ ] Other(description required)

______________________________________________________________________

______________________________________________________________________

**4) If no**, please identify the specific reason(s) for the inability to return the employee to work or provide a reasonable accommodation for the outlined restrictions in relation to the employee's essential job functions?

[ ] Accommodation would require removal of an essential function.

[ ] Accommodation would require lowering performance or production standard.

[ ] Accommodation violates the applicable collective bargaining agreement.

[ ] Other (description required)_______________________________________

UPFULBRIGHT

**Joe Fulbright** 00251592 Restriction Review Form

Supervisor Signature

Supervisor Name Supervisor Title Date

Manager Signature

Manager Name Manager Title Date

Director Signature

Director Name Director Title Date

Superintendent Signature

Superintendent Name Superintendent Title Date

***A COPY OF THIS COMPLETED AND SIGNED DOCUMENT MUST BE FAXED TO HEALTH & MEDICAL SERVICES AT*** **402-501-0067 so a copy can be placed in the employee's personal medical record. This document may also be uploaded via the portal.**

UPFULBRIGHT

UPFULBRIGHT

**UNION PACIFIC RAILROAD – HEALTH & MEDICAL SERVICES**

**RESTRICTION REVIEW FORM**

June 26, 2015

To: Terry Neal Manager Telecom Facilities

Regarding Employee: Joe M. Fulbright Employee ID: 00251592

Job Title or Craft: Sr Comm Technician Department: Information Technologies

Service Unit: Work Location: LAREDO , TX ??

**INSTRUCTIONS:** Your employee is released to return to work with restrictions. Please review the outlined restrictions and respond to the questions below.

**Restrictions & Accommodations:**

**Start Date 6/26/2015 End Date 12/31/9999 Description**

"A"

06/26/2015 - 12/31/9999 Not to Operate Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited

06/26/2015 - 12/31/9999 Operation of Cranes, Hoists, or Machinery - Prohibited

06/26/2015 - 12/31/9999 Not to work on rail trains or work trains dumping ballast. (Can perform work remaining between the rails of the occupied track or to the field side of the occupied track. Where there are adjacent tracks with less than 19 foot track centers, utilize on-track safety protection following normal safety and Maintenance of Way rules).

"B"

06/26/2015 - 12/31/9999 Work at Unprotected Heights Over 4 Feet Above the Work Surface-Prohibited (Can work on the beds of trucks, and occupy bridges following normal safety rules).

"C"

06/26/2015 -12/31/9999 Not to work on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang). Must have at least 2 additional employees on gang or at work area in order to use Train Approach Warning regulations (Lookout).

Joe Fulbright 00251592 Restriction Review Form

1) Do these restrictions interfere with the essential job functions? [✓] YES [ ] NO

2) If yes, can reasonable accommodations be provided to allow the employee to perform the essential job functions?

[ ] YES [✓] NO

3) If yes, how will the reasonable accommodation be provided?

[ ] Accessible Parking [ ] Assistive Technology [ ] Equipment

[ ] Job Reassignment [ ] Lift Assistance [ ] Modification of Job Duties

[ ] Modified Work Schedule [ ] Removal Of Non Essential Function

[ ] Tools [ ] Removal Of Architectural Barrier

[ ] Other(description required)

________________________________________

________________________________________

4) If no, please identify the specific reason(s) for the inability to return the employee to work or provide a reasonable accommodation for the outlined restrictions in relation to the employee's essential job functions?

[✓] Accommodation would require removal of an essential function.

[✓] Accommodation would require lowering performance or production standard.

[ ] Accommodation violates the applicable collective bargaining agreement.

[ ] Other (description required)________________________

UPFULBRIGHT

UPRR Health and Medical Services

Restriction Review Form

Joe Fulbright
00251592

Manager:
Terry Neal
0166451

Manger Notes:
Joe Fulbright is a Senior Electrician Headquartered Fort Worth TX.
Work Schedule M-F Standby Saturday Rest day Sunday
Basic work scope

- Restoration of Service for all Communication facilities and infrastructure : Normal work days and hours, After hours Emergency restoration of service week days and weekends
- Maintenance of all Communication facilities and infrastructure
- Customer Ecomms System, and Project installation

A) "Not operate company vehicle….." Joe does not work in an Office or Bench type position. Driving a company vehicle is a must for his Sr ET Position

B) "Work at Unprotected heights over 4 feet" When working ecomms and projects it may be necessary to work on a ladder.

C) "Not to work on one or two man gangs……" Working Lone worker is a part of the Sr ET Position. Trackside AEI and CTC

UPFULBRIGHT

Joe Fulbright 00251592 Restriction Review Form

Supervisor Signature

Supervisor Name

Supervisor Title

Date

Manager Signature

Terry Neal

Manager Name

Mgr. Telecom

Manager Title

6/29/15

Date

Director Signature

Neal J. Spencer

Director Name

General Director Telecom

Director Title

6/28/2015

Date

Superintendent Signature

Superintendent Name

Superintendent Title

Date

*A COPY OF THIS COMPLETED AND SIGNED DOCUMENT MUST BE FAXED TO HEALTH & MEDICAL SERVICES AT* 402-501-0067 so a copy can be placed in the employee's personal medical record. This document may also be uploaded via the portal.

UPFULBRIGHT

UNION PACIFIC RAILROAD
1400 Douglas Street, STOP 0350
Omaha, Nebraska 68179-0350

P 877 275 8747, Option 4

Health & Medical Services

July 1, 2015

Joe Fulbright
807 Oakwood Drive
Eulesis, TX 76040

EID 0251592

Dear Mr. Fulbright:

The Union Pacific Medical Director has recently reviewed your medical condition and has issued a fitness for duty decision to your supervising department. A copy of that decision, listing your specific restrictions, is enclosed. Your supervising department has been unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position. As a result, you have been referred to the UPRR Disability Management Department (DP&M) for assistance.

I have enclosed a copy of a document entitled, "What are my options now that I am unable to return to my railroad job?" Please review this information carefully. Each employee's situation is different and some of the options listed may not apply to you and your unique circumstance.

Understanding that this may be a difficult time for you, assistance is available to you as you consider your options and you begin to develop a plan for your vocational future. The DP& M staff at UPRR is all experienced certified vocational rehabilitation professionals who can sit down with you and help you plan your next steps.

If you are interested in talking with one of the Union Pacific Railroad DP&M staff regarding your vocational future, please call the following toll free number 1-800-992-3901 between the hours of 7am and 7pm central time, Monday-Friday, and indicate your interest. You will be asked for your name, employee ID number and other basic contact information. Following your call, a member of the UPRR Disability Management staff will be in contact with you, typically within 5-10 business days after your call.

If we do not hear from you within 30 days from the date of this letter, we will assume that you are not in need of assistance and we will close out our referral. Thank you.

Sincerely,
Terry Owens

Terry Owens, MRC, LPE, CRC
Director Disability Management

cc: Theresa Rodino
Amanda Wright
Dan Fischer



UPFULBRIGHT

**Union Pacific Railroad**
Health and Medical Services

## HEALTH & MEDICAL SERVICES STATUS UPDATE

July 01, 2015

**To:** Michelle R. Thomason (00178735), Scott F. Ochsner (00006978), Shirley J. Fennen (00025372), Stephen T. Hale (00163148), Terry D. Neal (00166451)

**From:** Theresa A. Rodino/ Occ Health Nurse

**On behalf of Union Pacific Chief Medical Officer**

---

**Subject:** **Fitness for Duty Determination**

**Regarding:** Joe M. Fulbright

**Employee ID #:** 00251592

**Job Title:** Sr Comm Technician

**Regarding Health & Medical Service:** MANAGER REFERRAL ☑ Off Duty ☐ On Duty/Occupational

**Based on medical information available to Health & Medical Services at this time, the employee is:**

Medically Cleared with ☐ Temporary ☑ Permanent Restrictions (related to this service) effective July 01, 2015

| **Restrictions:** | **Start Date** | **End Date** |
|---|---|---|
| Operation of Comp. Vehicles/On-Track or Mobile Equip./Forklifts -Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Operation of Cranes, Hoists, or Machinery - Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Work Without Adherence to HMS Protocol - Prohibited | Jun 26, 2015 | Dec 31, 9999 |
| Work at Unprotected Heights Over 4 Feet Above the Work Surface-Prohibited | Jun 26, 2015 | Dec 31, 9999 |

**Additional Employee Information:**

| **Current Exam Restrictions:** | **Start Date** | **End Date** |
|---|---|---|
| REG CDL | Jun 26, 2015 | Dec 31, 9999 |
| REG CRANE | Jun 26, 2015 | Dec 31, 9999 |

If the above fields are not populated HMS does not have any current information on file.

**Comment:**

For questions, please contact, Theresa A. Rodino at 402-544-3640.

CC:

UPFULBRIGHT

**Business References:** BU004_Template Letter – RTW With Restrictions Accommodated
BU005_Template Letter – RTW With Restrictions Not Accommodated

UPFULBRIGHT

## What are my options now that I am unable to return to my Railroad job?

1. **Re-employment:**
   Assistance is available to help you look at your job options both inside the Union Pacific Railroad and outside of the railroad in your local community. You may access this assistance, by calling this toll free number 1-800-992-3901 between the hours of 7am and 7pm central time, Monday –Friday, and indicating your interest in vocational services. You will be asked for your name, employee ID number and other basic contact information. Following your call, a member of UPRR"s Disability Prevention and Management Team (DP&M) will be assigned to assist you for up to 60 days. All members of the UPRR DP & M team are UPRR employees who are Masters degreed vocational rehabilitation counselors and are trained to assist people with disabilities return to employment.

   <u>No one at UPRR can create a job specifically for you.</u> However, the DP & M staff can:

   A. Teach you how to access information about vacancies within the Union Pacific Railroad and help you match your current skills/level of function with available job openings within UPRR;

   B. Assist you with the application process for any UPRR jobs that you are interested & qualified for;

   C. Assist you with resume preparation and interview skills;

   D. Help you to identify sources of assistance for job leads within your local community; and

   E. Identify resources within your community that can assist you with retraining and/or longer term services.

2. **Railroad Retirement Board Occupational Disability Annuity:**
   If you have 20 years (240 months) or more credited railroad service, and you are unable to perform the duties of your regularly assigned railroad job, you may be eligible to apply for an occupational disability annuity that will provide you with a monthly income.

   If you have at least 10 years (120) months of credited railroad service, and are age 60 or older and unable to perform the duties of your regularly assigned railroad job you may be eligible for an occupational disability annuity.

   A 5 month waiting period beginning with the month after the month of the onset of the disability is required before any disability annuity payments may be made.

   An individual receiving an occupational disability annuity may earn up to an



UPFULBRIGHT

additional $780.00 per month in any employment or self employment, exclusive of disability related work expenses. All earnings must be reported to the RRB.

Please contact your local RRB office for further information. You can call the Railroad Retirement Board at 1-877-772-5772 from 9:00 a.m. to 3:30 pm Monday – Friday to speak to an RRB representative. Information is also available from the RRB web site at www.rrb.gov

3. **Railroad Retirement Board Total Disability Annuity:**
Total disability may be available at any age, if you are permanently disabled for all regular work and have at least 10 years (120 months) of credited railroad service. Employees with 5-9 years (60-119 months) of credited service, if at least 5 years were performed after 1995, may qualify for tier 1 benefits only.

Please contact your local RRB office for further information. You can call the Railroad Retirement Board at 1-877-772-5772 from 9:00 a.m. to 3:30 pm Monday – Friday to speak to an RRB representative. Information is also available from the RRB web site at www.rrb.gov

4. **Social Security Disability Insurance Benefits (SSDI):**
Social Security Disability insurance benefits may be paid to a disabled worker if earnings are lost or reduced due to the worker's disability and the worker has earned credit for a certain number of pay periods under Social Security standards (non-railroad employment). The amount of work credit needed depends upon the worker's age.

Please contact your local Social Security Administration office. You can find the phone number listed under the Federal Government section of your telephone book. Information is also available at the following internet address: http//www.ssa.gov

1/12

UPFULBRIGHT

From: Theresa A. Rodino/UPCTo: Sheila Gniffke-Pribyl/UPC@UP, Terry H.Owens/UPC@UP, Mary E. Gallardo/ UPC@UPDate: 07/01/2015 08:51AMSubject: Joe. M. Fulbright EID 0251592 requesting accommodation of jobreassignment.EE: Joe. M. Fulbright EID 0251592 requesting accommodationof job reassignment. Please see the Restriction Review Form below signedby management unable to accommodate his restrictions in his current job.See the accommodations tab completed below and medically cleared withrestrictions notification. Thank you, Theresa

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:43:02 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

LN to Sheila Gniffke Pribyl, Mary Gallardo and Terry Owens regarding EErequest. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:42:27 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

6.29.2015 Call with EE and AMD regarding determination and restrictions.EE interested in the accommodations committee for job reassignment. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:40:16 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Notification sent to work unit and received the signed restriction reviewfrom by managers with restrictions they are unable to accommodate. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jul 1, 2015 **Time:** 8:38:51 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

7.1.2015 received restriction review form unable to accommodate bymanagement. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 29, 2015 **Time:** 4:48:05 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, You and I contacted Mr. Fulbright this afternoon to advise himof the decision to impose sudden incapacitation restrictions.1 Youre-introduced me to Mr. Fulbright. He was aware of me and my position dueto our previous phone call of 4/21/15.2 I advise Mr. Fulbright that wewould pick up where we left off with the previous phone call. That wasacceptable to him.3 I reminded Mr. Fulbright that the plan leaving ourlast call was for him to contact his PCP and request a Sleep MedicineEvaluation. He stated that he had done so. He informed us that he went foran evaluation and was seen by an provider who was not a Sleep Medicinespecialist and could not address the medication issue. That providerwanted Mr. Fulbright to have a sleep study and some other tests before hesaw the specialist. Mr. Fulbright stated that his benefits had beenstopped and that he could not pay for the evaluations (He mentioned a costof $600.00), so nothing more has happened. Further, he made it clear thathe was not looking for someone to "take over my care." He reiterated fromour first call that he had gone to great lengths and significant expenseover the course of about 6 years to find the cause of his insomnia and geton the right treatment so he was not inclined to turn his care over tosomeone else. I advised him that we respected his choice and that wassomething between him and his doctor.4 I then advised the EE that basedupon the fact that there was no new information it was time to go forwardwith the Manager Referral FFD Process. I then summarized the suddenincapacitation restrictions.5 We then offered to answer any questionsthat he might have. He had only one. he wanted to know if we were awarethat he had been off work and not paid. I told him that we were aware thathe was off work. We had no information regarding his pay. Mr. Fulbrightthen explained that since 2010 he had volunteered to take call, with theunderstanding that he could refuse a call if he had taken his medication(Trazadone). He again stated that it is his position that the only thingthat has changed is the position of his new manager. He has had a meetingwith his manager and his union representative and that is theircontinuing position. It is his understanding that he cannot take Trazadoneand



UPFULBRIGHT

**Created on:** Jun 26, 2015 **Time:** 8:20:14 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

This is restriction Review Form Sent to Management. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:03:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent restriction form to Terry Neal due to system error.

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 8:02:28 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

resent this form since SPAN written by eHS system all over the form makingit unreadable. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:55:10 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Work Restrictions Sent to Work Unit Management for Review if able toaccommodate in EE given job. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Medical Conclusions

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 7:54:00 PM **Created by:** 00458844 ( Theresa Rodino )

**Medical Conclusions Comments**

1. Not to operate company vehicles,on-track or mobile equipment, orfork-lifts.2. Not to work on rail trainsor work trains dumping ballast.(Can perform work remaining between therails of the occupied track or tothe field side of the occupied track.Where there are adjacent tracks withless than 19 foot track centers,utilize on-track safety protectionfollowing normal safety and Maintenanceof Way rules).3. Not to operatecranes, hoists, or machinery, if theseactivities might create a risk ofharm to others or a risk of catastrophicinjury to the employee.4. Not towork at unprotected heights, over 4 feetabove the ground (Can work on thebeds of trucks, and occupy bridgesfollowing normal safety rules).5. Notto work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder orhelper job, 2-man section gang).Must have at least 2 additional employeeson gang or at work area in orderto use Train Approach Warning regulations(Lookout).

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 26, 2015 **Time:** 12:41:33 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, Per our case review discussion:A This EE has still notcomplied with the agreement that he would work with his doctor to have aformal sleep medicine evaluation. Please advise him that the sleepmedicine evaluation is still required.B Because Trazadone is so longacting, he cannot take that medication and work for the ensuing 24hours.C We will employ sudden incapacitation restrictions until wereceive information that the EE is no longer taking the Trazadone, or isnot using it within 24 hours of reporting for work.D The employee isgiven the following work restrictions:1. Not to operate company vehicles,on-track or mobile equipment, or fork-lifts.2. Not to work on rail trainsor work trains dumping ballast. (Can perform work remaining between therails of the occupied track or to the field side of the occupied track.Where there are adjacent tracks with less than 19 foot track centers,utilize on-track safety protection following normal safety and Maintenanceof Way rules).3. Not to operate cranes, hoists, or machinery, if theseactivities might create a risk of harm to others or a risk of catastrophicinjury to the employee.4. Not to work at unprotected heights, over 4 feetabove the ground (Can work on the beds of trucks, and occupy bridgesfollowing normal safety rules).5. Not to work on 1-man or 2-man gangs(i.e., switch oiler, inspector, welder or helper job, 2-man section gang).Must have at least 2 additional employees on gang or at work area in orderto use Train Approach Warning regulations (Lookout). 6. If a new jobassignment is considered, outside of the Engineering Department, Healthand Medical Services must review the job requirements and determine if theemployee can



UPFULBRIGHT

safely perform the essential functions of the job.E Therestrictions will be ongoing until the conditions outlined above have beenmet.F We will close the case if we have no response from the EE within areasonable period of time.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 19, 2015 **Time:** 11:14:51 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, This EE has not provided the medical records that we haverequested and we have not seen the results of a sleep medicine evaluationwhich we agreed to when you and I spoke directly with the EE.Action:1Remains NOT FFD.2 We still need the same information.3 Please calendarthis case for discussion with the CMO next week.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 1:56:09 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

C6/18/15 Document request letter sent:Copy of the last 2 years ofphysician clinic notes (also known as office notes or progress notes) fromthe provider treating you for this condition and the Sleep evaluationstudy records. JL

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 1:49:37 PM **Created by:** 00464275 ( Mary Jean Lempke )

**Activity Comments**

6/18/15 TC to EE re: needing medical records that have beenrequested--Copy of the last 2 years of physician clinic notes (also knownas office notes or progress notes) from the provider. Requested EE RTC toHMS, JL. JL

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jun 18, 2015 **Time:** 9:11:51 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- This EE had sent us this letter in eHS from 5/22/2015 it is letterfrom EE. We have this case on our Manager Referral Case Review fortomorrow morning but please see this letter and advise. We have beenwaiting for information from EE and this letter is his response but it isnow almost 1 month old. With your last review on the same date I believeyou addressed this letter but please advise.Thank you, Theresa

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 4:29:24 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We have worked diligently with this EE to get the information weneed. We were both on the call when we asked him to get a sleep evaluationdue to the performance problems that this EE had at work. We cannotcontrol the verbiage that the EE used during a hearing. Our informationneeds to make the final FFD determination have not changed. Pleasereassure the manager that we continue to investigate the medical issue inquestion and nothing more. When we get the sleep evaluation information weshould be able to complete the FFD Process.Thx. Dr. C

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 4:00:22 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

manager concern. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity



UPFULBRIGHT

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 22, 2015 **Time:** 3:59:54 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- we are reviewing this case for the sleep disorder/ medicationconcern and have new note from the manager regarding a statement that EEhad made during a hearing. This is for your review and noted as other /manager concern in eHS medical file. This is the email note from themaanger Terry Neal: From: Terry D. Neal/UPCTo: Theresa A. Rodino/UPC@UP,Neal J. Spencer/UPC@UPDate: 05/20/2015 12:17 PMSubject: Fw: Scan fromIB20280Theresa, Per our conversation today:Below is an excerpt from adocument sent via BRS and Joe Fulbright to Neal Spencer (Gen DirTelecom)As I stated, The reason I referred Joe into the FFD was to get aruling on the sleep medication and Joe's medical condition.I havehighlighted the areas that I referred to in our conversationThank youfor your time and service to ouremployees.*******************************Terry NealManager TelecomFacilities 1658 Rogers RoadFt. Worth, Tx 76107Office: 817 3537237Cell: 817-313-5317

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:40:19 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Call to EE discussed status of his Off Work EE states he has an apt onJune 1 2015 with Sleep specialist and this is for an evaluation not asleep test. EE will request the report and would anticipate HMS receiptof that report 7-10 business days after EE is seen. EE confirms that hehas HMS fax number and will send the report for his RTW determination. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:34:33 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

5.20.2015 Call to EE who states that he is to talk with a sleep medicinespecialist has an appointment on June 1, 2015 for the sleep specialistevaluation to talk about the drug that he is taking. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** May 20, 2015 **Time:** 10:31:50 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

5.20.2015 Spoke with EE manager Terry Neal informed that we had aconversation with EE and the UP Company MD. EE is complying and workingwith the company regarding a medical exam that our AMD requested normallythis will take a couple of weeks to set up so would expect the reportaround this time. Informed Terry that I have not spoken with EE sincelast month so will call him today regarding the status of this. Terrystates that EE has sent a note in part with his grievance regarding thismedical condition and that the RR has not been responsive to what the EEnotes in this note as "a life threatening medical condition" Terry statesthat this is the reason that EE was pulled from service and why the WorkUnit asking EE to be evaluated by HMS. Manager asking if we would likethat note from EE? Informed Manager sure that he could send the note,that the EE has spoken with our UP Company MD but Dr Charbonneau wouldalso look at the statement from EE own words regarding his condition.Informed Manager that EE is working with HMS regarding the medical andwould anticipate that we would have the report from the testing that EEwas having done soon and this should answer the questions that the companyMD had prior to his determination for this referral. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 21, 2015 **Time:** 6:20:03 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, You and I spoke directly to this EE this afternoon:1 Youintroduced me and I introduced myself and my position as a consultant toUPRR HMS.2 I briefly summarized the nature of the Manager Referral FFDProcess and the information which the EE had provided to this point.3 Iexplained that we were requesting permission to speak directly with hisPCP to request a Sleep Medicine Evaluation. I told the EE that we wantedto explain the safety considerations to his doctor and the reason that asleep medicine was needed.4 Without my asking for any medicalinformation, the EE explained that he has been dealing with depression andsleep problems for 10-15 years. After much frustration with lack ofefficacy, he found a psychiatrist who figured out that he had a vitaminB-12 deficiency. He reports that this caused a secondary low serotoninlevel in his hypothalamus. As a result, he was started on Trazadone andProzac, and presumably B vitamin

UP-FULBRIGHT

supplementation. He has done much betterwith his insomnia ever since. The EE went to great lengths to explain thathe would never report for work, or even drive his car (he cited Texasstate law about that issue) after taking the medication. He states that heis awake and alert during the day because he can sleep well at night. Hetakes the medication anywhere from 3 to 4 up to 8 to 10 nights at a time.He states that he has been working around the on call issue for the 3-4years and states that it has become a problem only due to his currentManager's perspective on the matter. He specifically charged that hisManager had made false statements regarding his being impaired due to themedication, and one other issue. We both reassured the EE that no suchstatements had been made to us and no such information had been sent tous.5 We ended the conversation by telling the EE that we needed a formalSleep Medicine consultation, and that we would be satisfied if he wouldrelay that information to his PCP. In that case, I do not need to speak tohis PCP and no ROI is required.6 The EE agreed to consult his MD andrequest a formal Sleep Medicine Evaluation. We both explained to him thatthe Evaluation had to be performed by a Sleep Medicine Specialist (youtold him that twice).7 That ended our call.Action:1 We will rely onthe EE to get the Sleep Medicine Eval request made to his PCP, as hecommitted to doing this afternoon.2 We will await the report.3 Nochange in the previous plan. We will further the FFD Process after wereview the Sleep Medicine Evaluation. Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 10:38:15 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, I will be happy to visit with you and the EE tomorrow late in theafternoon. Right now, that time appears to work for me. We can discuss thecase briefly on the case review call. Basically, I just want to explainthe situation to the EE's provider and notify the provider why we want tosee a Sleep Medicine consultation. Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 4:15:51 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- EE would like to talk with you before he signs ROI for you to speakwith his MD. He is available at 5:00pm CST tomorrow on 4/21/2015 doesthat time work for you? Please advise. Thanks, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 4:10:50 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.20.2015 several calls to EE asking about the ROI. Informed that ourcompany MD asking to speak with his MD. EE states that he will thinkabout that. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 20, 2015 **Time:** 3:57:34 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.20.2015 Update Manager Terry Neal informed that EE is working with usand current status is that our Company MD would like to speak with EECallto EE at 817-301-3981

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 16, 2015 **Time:** 10:05:30 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.16.2015 Call to EE informed of above and reason for request that EE hasapparent sleep onset insomnia and UP Company MD would like to talk with EEprovider about sleep specialist and what is the tx plan. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 15, 2015 **Time:** 9:34:10 PM **Created by:** 00458844 ( Theresa Rodino )



UPFULBRIGHT

**Activity Comments**

ROI mailed to EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 15, 2015 **Time:** 1:28:18 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

ROI sent to EE requesting information ROI that UP Company MD may speakwith EE MD regarding his Sleep Disorder. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 14, 2015 **Time:** 5:38:46 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, Per our case review discussion:1 The EE is NOT FFD.2 Pleaseinstruct the EE that he will need to have a Sleep Medicine Evaluation aspart of this FFD Process. It is his responsibility to arrange thisevaluation.3 Please ask the EE to sign a release of information so thatI can talk to his PCP to explain the reasons for the safety concern andthe requirement of the evaluation by the Sleep MedicineSpecialist.Thanks. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 13, 2015 **Time:** 9:26:18 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, It looks lie this EE has been treated for sleep onset insomniafor at least the last one year. He has also had problems with a severeskin rash. Treatment has included Benadryl, but I cannot tell if that wasfor the rash or as an OTC sleep aid. He has also been taking oral steroidsat times.Action:1 Remains NOT FFD.2 We should discuss this case atthe time of our next case review call. I think that we may want toconsider a sleep medicine consultation.Thx. Dr. C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 13, 2015 **Time:** 11:07:00 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- We now have 24 pages of medical information for your review.Please review and advise. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 13, 2015 **Time:** 11:06:21 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.413.2015 received 24 pages of medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 13, 2015 **Time:** 11:05:59 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

24 pages of medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Apr 10, 2015 **Time:** 10:04:17 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

UPFULBRIGHT

4.10.2015 Call to EE at phone provided by his fax. LVM informed onlyreceived 4 pages of the 29 page fax and that the only medical informationwas 1 pg to please re-fax or send the rest of his information. tr

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 10, 2015 **Time:** 6:59:49 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.10.2015 Plan to call EE during business hours, also sending EErequesting medical information only received page 1 of the apparent 4 pageclinic note, asking him to refax. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 7, 2015 **Time:** 4:38:52 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We discussed this case during our case review call today. As Iwrote immediately above, we need the complete note from this EE's clinicvisit.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 7, 2015 **Time:** 3:19:25 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, The EE has supplied only page #1 of a 4-page note. We cannot actwith inadequate/incomplete information. Let's discuss the case on the casereview call.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 6, 2015 **Time:** 1:18:09 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- this is the only note that EE has for his medical information.Please review and advise. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 6, 2015 **Time:** 1:17:23 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

4.6.2015 received 1 page clinic note. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Apr 6, 2015 **Time:** 1:17:04 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

1 page clinic note. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity
**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL
**Created on:** Mar 31, 2015 **Time:** 6:52:51 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

From: Theresa A. Rodino/UPCTo: Terry D. Neal/UPC@UPCc: Deb A.Gengler/UPC@UP, Babette A. Griffin/ UPC@UPDate: 03/31/2015 06:48PMSubject: Joe Fulbright ( 00251592 ) no response to request for MedicalInformation by Health & MedicalHi Terry. We have not received theMedical Information that we had requested. We had sent EE out 2



UPFULBRIGHT

letters,one in January and then a follow up request in February with no response.I will consult with our Director Deb Gengler to see what the next step is. Show cause is used for Medical Leave's but this is different scenariobeing a manager referral so will ask for assist and direction from Deb andBabette Griffin.I have called EE again today and left a voice messageasking for the information.Thanks, TheresaTheresa Rodino RN,CCMFitness-for-Duty NurseFrom: Terry D. Neal/UPCTo: Theresa A.Rodino/UPC@UPCc:Neal J. Spencer/UPC@UPDate:03/31/2015 12:47PMSubject: Re: Manager Referral Form attached Hello Theresa,Hasthere been any progress on the Fulbright Medical EvaluationThankYou*******************************Terry NealManager TelecomFacilities 1658 Rogers RoadFt. Worth, Tx 76107Office: 817 3537237Cell: 817-313-5317Fax: 402 997 3547

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Mar 31, 2015 **Time:** 6:51:49 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

3.31.2015 Call to EE cell phone, left detailed VM informing that we arewaiting for his medical information from last 2 years. Provided my callback number and fax number asking EE to please call back with statusupdate. LN to DCS and FFD Supervisor asking for direction no responsefrom EE by HMS requests for last 2 months. LN sent to Mgr Terry Nealinforming that EE has not responded to HMS request and asking Director andFFD Supervisor for direction. Awaiting medical records from EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 27, 2015 **Time:** 6:26:27 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

letter resent to EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 26, 2015 **Time:** 9:40:54 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.26.2015 Call to EE at 817-733-0427 answer machine confirms EE name. LVMasking EE for an update regarding where he is at in sending us his medicalrecords. Informed that we still do not have anything. Provided mycontact information again and call back phone number. Awaiting 2yrsMedical Information from EE. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 11, 2015 **Time:** 9:59:28 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.10.2015 VM from EE states that he is trying to get something in writingregarding what information is needed for his return to work. tr2.11.2015 Call to EE at number he provided 817-733-0427 LVM informing EE that weneed the last 2 years of medical records from his provider(s) to pleasefax his actual doctor notes, medical records to 402-501-0067 and providedmy call back phone number 402-544-6769. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 9, 2015 **Time:** 1:19:39 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

2.9.2015 CF EE at 12:51 pm 817-733-0427 and VM from EE regarding thismanager referral. 2.9.2015 1:00pm Call back to EE LVM asking EE to pleasecall me to discuss this concern. Provided the information from the letterthat we need the last 2 yrs of medical information and provided the faxnumber for EE to fax the information. Awaiting call from EE to discusswith EE and awaiting medication medical information. tr

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:56:58 PM **Created by:** 00472608 ( Susan Cassiday )



UPFULBRIGHT

CONFIDENTIAL

**Activity Comments**

Shirley J. Bear (00025372), Stephen T. Hale (00163148), Terry D. Neal(00166451), Scott F. Ochsner (00006978) notified of removal from service.RTC from Terry Neal and informed him. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:28:04 PM **Created by:** 00472608 ( Susan Cassiday )

**Activity Comments**

TC to EE and informed him of AMD and DCS decision to remove him fromservice. Left VM message for manager making referral, Terry Neal. Willsend out notifications. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:24:33 PM **Created by:** 00472608 ( Susan Cassiday )

**Activity Comments**

VM message received on 1/29/15 stating he was returning call fromTheresa. 2/2/15 RTC to EE regarding Manager Referral and AMDrecommendations. EE stated he does not have any issues being awake for hisregular work hours, but when he is on-call it is for 3 nights and he doesnot get good sleep without taking Trazadone. EE stated it is 75mg and hetakes it 3 out of 4 nights, except when he is on-call when he skips it thefirst 2 nights, but by the 3rd night EE stated he has to take it due tobeing too fatigued from lack of sleep. EE questioned need to be removedfrom service. I left VM message and e-mail message to AMD. sc

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 3, 2015 **Time:** 4:14:31 PM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Susan, Per our discussion with Deb Gengler, RN today, there is no changeto the previous plan:1 The EE should be pulled from service.2 Pleaserequest the last two years of medical records from the EE.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Feb 1, 2015 **Time:** 9:15:09 AM **Created by:** 00415695 ( John Charbonneau )

**Activity Comments**

Theresa, We discussed this case with Dr Holland and Deb Gengler, RN lastweek. The EE is reportedly taking medications which impair his ability toremain alert at work. He has not responded to your request for contact:1This EE is NOT FFD and should be pulled from Duty.2 Per our discuss withthe CMO and DCS, please request the last 2 years of medical records fromall providers who have treated this EE.Thx. Dr C

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 29, 2015 **Time:** 9:36:13 PM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**

Dr C- we have not been able to connect with this EE yet for the intakeassessment interview. However it is noted that EE is still working. Wehave sent a letter requesting medical information and medication list.Concerns are that EE cannot stay awake during the time that he is to be oncall and EE admits to manager taking medications that cause him to besleepy. Per our discussion and review of this manager referral pleaseadvise if the above is agreeable. Thank you, Theresa

---

**Case Number:** 000001293558 **Service Number:** 1001321869 **Category:** Activity

**Case Type:** FFD NON-REGULA **Service Type:** MANAGER REFERRAL

**Created on:** Jan 29, 2015 **Time:** 8:43:47 AM **Created by:** 00458844 ( Theresa Rodino )

**Activity Comments**


UP FULBRIGHT

CONFIDENTIAL

My name is Joe Fulbright. My hire date with the Union Pacific Rail Road is 03/25/1985. My job title is Sr. communications maintainer. I am the most senior union employee within the communications dept. in Texas. I have a perfect safety record with 30 yrs of service.

My treatment for a life threatening sleep disorder began ~ 2010. I was prescribed Prozac and Trazadone. The next work day I meet With my supervisor Terry Neal to report the drugs. He gave me the number of a company nurse. I called her that day, she noted the drugs by name and confirmed this was all that was necessary for proper reporting. In both safety meetings and meetings concerning job assignments It was decided with management that I needed no special consideration to defer overtime because of my seniority . I explained that I had to take care of my mom with advanced stage Alzheimers and could not drive safely on Trazadone. So for the next two years I was not called at night or expected to work overtime. In May of 2012 I filled for FMLA provisions to take care of my mother.

07/09/2012 I was accused of missing a call the day before, Sunday. It took me about 3 days to get the phone records from Verizon and AT&T. I called the regional director of communications ( Jim Bracken) and asked him to get involved. The phone records showed, no one tried to call me (cell phone or home phone ) that Sunday. *

07/24/2012 Safety meeting with two DPS troopers. They lectured us on the dangers of distracted driving and Driving under the influence of drugs including over the counter drugs and prescriptions. They now have special units to test drivers for prescription drugs.. If you know your impaired, your DUI.

08/13/2012 Terry talked to me and a witness about a missed call at night over the weekend. This seems to mark the end of his recognition of my seniority and necessary medical need. He made it clear I was responsible for overtime at night weather I was on medication or not. I reminded him it was illegal and unsafe for me to come out after taking this drug. I did not wake up to answer this call.**

08/16/2012 I called the safety hot line. I was routed through 2 people before being told to call the presidents hot line number. I explained just how clear it was made to me and a witness that I was asked to do something unsafe and against the law. Jim Bracken was again involved.

In November of 2013 I was told by terry to contact HR dept. about filling FMLA on myself for my medical condition. They told me I did not have enough time in to qualify for FMLA for myself. This was in response to me telling OSS one night I had already taken my medication and could not come out at that time. I had fully explained to Mr. Neal by Sunday night I had gone 2 nights without my medication and had to take it at some point to sleep. ***

01/25/2015 NOC group failed to notify me of a problem in the yard before I took my medicine that night ( Sunday night ).

01/26/15 Meeting with terry and my union rep.



UPFULBRIGHT



UPFULBRIGHT000290

CONFIDENTIAL

# Brotherhood of Railroad Signalmen

Joseph H. Doucet
Vice General Chairman
325 Cross Creek Dr.
Bossier City, LA. 71111
318-746-6513

Mike Sanders
Asst Vice General Chairman
29350 Highway U
Sedalia, MO. 65301
660-826-1484

John McArthur
General Chairman
P. O. Box 5100
Fallon, NV. 89407
775-423-2288

April 1, 2015

Mr. Neal Spencer
General Director Telecommunication Ops - UPRR
24125 Aldine Westfield Dr.
Spring, TX. 77373

Certified Return Receipt- 7012 3050 0002 4144 6452
E-Mailed – NISPENCE@UP.COM,

S- 2, 24- 1466

Dear Sir:

Please accept the following claim as a "continuous claim" on behalf of **Sr. Communication Maintainer Employee, Mr. J. Fulbright, EID # 0443299,** for the Carrier's violation of the current CBA Agreement and particularly Rules 2 & 24. Mr. Fulbright will be hereafter referred to as the Claimant.

(A) The Carrier violated the current CBA Agreement and particularly **Rules 2 & 24**, when the Carrier removed the Claimant from service without just cause.

(B) The Carrier should now be required to compensate the Claimant for all time lost including overtime starting on February 3, 2015 and go until the violation stops. This payment would be in addition to any other payment received on these dates.

On January 26, 2015, the Claimant, his Manager (Mr. Neal) and the Local Chairman (Mr. James Harris) had a meeting in Ft. Worth, TX. The group had a meeting to discuss the Claimant missing a trouble call the night before (1-25-2015) (See copy of Formal Conference sheet attached) Mr. Neal questioned Claimant as to why he didn't talk the trouble call. The Claimant told Mr. Neal that he did not hear the manager call due to taking sleeping medicine. Mr. Neal told Claimant that he would be written up on formal conference, and that he might want a Union Rep present. Mr. Neal went on to say that he was referring the Claimant into the Fit For Duty




UPFULBRIGHT000615
UPFULBRIGHT002391

UPFULBRIGHT

Mr. Neal Spencer
S- 2, 24- 1466
April 1, 2015
Page-2 of 3

program, and that he were not being pulled from service, and will be given time to work with the FFD program. (See copy of discussion attached) As of this date, the Claimant has not been notified of a FFD schedule for him. The Claimant was asked by Health Service for medical information, but all of this is in his medical file. The Claimant notified the manager several years ago when he started taking the medication, and his Manager referred him to health service, which cleared him to work. The Claimant only takes this medication at night to sleep, and it doesn't affect his ability to do his work during the day. (Please see letters from Mr. Fulbright documenting his taking of this medication attached)

Rule 2- Hours of Service- states in part: ***"Eight hours shall constitute a day's work. All employees coming under the provisions of this agreement, except as otherwise provided in this schedule of rules, or as may hereafter be legally established between the Carrier and the Employees, shall be paid on the hourly basis."*** The Claimant is not being paid while he is pulled out of service.

Rule 24 –Absent from work states in paragraph (b) states: ***"Employees who have absented themselves except in case of illness or other physical disability, without proper leave of absence, which must be in writing if in excess of ten working days, will automatically terminate their service and seniority."*** The Claimant has a prescription, and was approval to work by the Health Service Department. This is a medical condition.

The Carrier did violated the Agreement by pulling the Claimant out of service without just cause, and now should be required to compensate the Claimant as outlined in section (B) above.

Respectfully Submitted,

Joseph H. Doucet

Joseph H. Doucet
Vice General Chairman

Cc: John McArthur- General Chairman-emailed
Local Chairman
Claimant

UPFULBRIGHT

Organization's Exhibit No. 1
Page 2 of 6

CONFIDENTIAL

## ***FORMAL CONFERENCING/TRAINING***

Date: 01/26/15
Name: Joe M. Fulbright
Employee ID: 0443299

Check One:
__ Conference result of Employee option
X Conference result of Mutual Consent All Parties
__ Training result of Employee Option
__ Training result of Mutual Consent All Parties

Mr./Ms. Joe M. Fulbright
This is to confirm our conference on Jan 26, 2015 at ______AM/PM
At the Radio Shop Davidson Yard in connection with events described below.
Location

Description of Event:

- Failure to take after hour call on 01/25/15. Ticket #05352044 Omaha NOC called Joe Fulbright twice at 7:35 pm and left vm, Called again at 8:13 and left Vm. NOC called manager Terry Neal, who instructed to call Edgar Hines. Terry Neal called Joe Fulbright at 8:11 and left message.
- Terry Neal received a call from Joe Fulbright around 6:15 am on Jan 26, Joe stated he did not hear manager call due to taking sleep medicine. Manager Neal told Fulbright that we would be written up on formal conference, and he might want a Union Rep Present

Rules discussed:

**1.16:Subject to Call**

Employees subject to call must indicate where they can be reached and must not be absent from their calling place without notifying those required to call them.

Rule Updated Date

April 7, 2010

___ I agree to have a conference.
__ I decline to have a conference
__ I agree to C.O.R.E Training.
__ I decline C.O.R.E Training

______________________________ Employee signature

______________________________ Manager signature

______________________________ Title

NOTE: This letter is NOT a form of discipline and will not be used in any subsequent disciplinary proceedings as evidence the employee previously allegedly violated the rules cited (except as explained at NOTE on Page 4 of this policy

Organization's Exhibit No. 1
Page 3 of 6


UPFULBRIGHT002593
UPFULBRIGHT000317
UPFULBRIGHT

**Topics for discussion:**

- **Missed Call**
- **Issue of Sleep Medication on nights were Joe is subject to afterhours calls**
- **I do not want to pursue discipline, We need to clarify if there is a sleep disorder or condition and what restrictions are needed. Therefore I am Manager Referring Mr. Fulbright into the Fit For Duty Program. Mr. Fulbright is not pulled from service, and will be given time to work with the FFD program. Joe must keep me informed when he needs to take off or leave early for the program.**

UPFULBRIGHT

CONFIDENTIAL

My name is Joe Fulbright. My hire date with the Union Pacific Rail Road is 03/25/1985. My job title is Sr. communications maintainer. I am the most senior union employee within the communications dept. in Texas. I have a perfect safety record with 30 yrs of service.

My treatment for a life threatening sleep disorder began ~ 2010. I was prescribed Prozac and Trazadone. The next work day I meet With my supervisor Terry Neal to report the drugs. He gave me the number of a company nurse. I called her that day, she noted the drugs by name and confirmed this was all that was necessary for proper reporting. In both safety meetings and meetings concerning job assignments it was decided with management that I needed no special consideration to defer overtime because of my seniority . I explained that I had to take care of my mom with advanced stage Alzheimers and could not drive safely on Trazadone. So for the next two years I was not called at night or expected to work overtime. In May of 2012 I filed for FMLA provisions to take care of my mother.

07/09/2012 I was accused of missing a call the day before, Sunday. It took me about 3 days to get the phone records from Verizon and AT&T. I called the regional director of communications ( Jim Bracken) and asked him to get involved. The phone records showed, no one tried to call me (cell phone or home phone ) that Sunday. *

07/24/2012 Safety meeting with two DPS troopers. They lectured us on the dangers of distracted driving and Driving under the influence of drugs including over the counter drugs and prescriptions. They now have special units to test drivers for prescription drugs.. If you know your impaired, your DUI.

08/13/2012 Terry talked to me and a witness about a missed call at night over the weekend. This seems to mark the end of his recognition of my seniority and necessary medical need. He made it clear I was responsible for overtime at night weather I was on medication or not. I reminded him it was illegal and unsafe for me to come out after taking this drug. I did not wake up to answer this call.**

08/16/2012 I called the safety hot line. I was routed through 2 people before being told to call the presidents hot line number. I explained just how clear it was made to me and a witness that I was asked to do something unsafe and against the law. Jim Bracken was again involved.

In November of 2013 I was told by terry to contact HR dept. about filling FMLA on myself for my medical condition. They told me I did not have enough time in to qualify for FMLA for myself. This was in response to me telling OSS one night I had already taken my medication and could not come out at that time. I had fully explained to Mr. Neal by Sunday night I had gone 2 nights without my medication and had to take it at some point to sleep. ***

01/25/2015 NOC group failed to notify me of a problem in the yard before I took my medicine that night ( Sunday night ).

01/26/15 Meeting with terry and my union rep.



Organization's Exhibit No. 1
Page 5 of 6



UPFULBRIGHT

Dear Mr. Doucet. I wish to file claim for all back pay concerning my removal from service after 02/02/2015.

On 01/26/2015 I had a meeting with my supervisor Terry Neal and my local union rep. James Harris. This meeting concerned Mr. Neal's assertion that I missed a call. It was uncontested that I did return the call in a timely manor some 24 minuets later. But the number they left simply routed me to an automatic disconnect. I had no idea who called me. And my cell phone that documents all tickets in my name showed no trouble logs. Nor did it show this trouble log the next day. I waited over an hour to take my prescribed sleep medication after calling them back. Mr. Neal knows I have been on this medication since 2010. I was required to contact the company nurse at that time and it was approved. I do not take it during work hours. Mr. Neal pretends here that this all started in 2014. At this meeting on the 26th Mr. Neal raised no concerns about my fitness for duty during normal working hours. But does on the supervisor fitness for duty request form attached. Please note: he does not provide a date I was suspected of being impaired but simply speculates with no known time frame when this happened. The fitness for duty nurse that has contacted me confirms, Trazodone is not a drug on the companies ban list. Ultimately I was told, a doctor I have never talked to or seen in person ( in Omaha ) decided I might be impaired and put me on medical leave.

Mr. Neal stated on the form that I have put a burden on my peers because of my medical condition.

In my first 20 yrs of rail road service I worked mostly with older employees I spent hundreds of hours after normal working hours covering for there medical conditions. I was called out over a hundred times in a two year period ( 1990-1992 ) because a single employee had a documented dirking problem and could not be trusted to answer his calls. All of the older employees never answered for medical problems because it was well recognized there seniority applied 'preference to overtime' as stated in the BRS contract then. Its also in the contract I work under now, negotiated by the IBEW. This violates all past practice dealing with seniority and medical accommodation of older employees.

In short. I believe there position is clear. I can not get old or have medical conditions. I have no seniority. And any medical treatment confined to my own time must be approved by them. For the first four years it was accepted I would not be asked to come out under the influence of this drug. This is there policy not mine. In a safety meeting ~ a year ago we had a state trooper tell us its against the law to drive under the influence of any drug you know impairs your mental state . I was evaluated by a by a psychiatrist on a monthly basis after being put on this drug. My memory and cognitive function during the day was greatly improved. No one I work with has reported my mental state as being a concern. Attached also is the letter from Director-HR medical services. It was received 02/10/2015 seven days after I was removed from service. Note it says they may decide to give me the information I need to come back to work. I do not believe I can file for insurance or federal medical leave benefits as this might constitute fraud.

Joe M. Fulbright
807 Oakwood Dr.
Euless, Tx 76040
817-301-3981



UP FULBRIGHT



UPFULBRIGHT000320

CONFIDENTIAL

UPFULBRIGHT

SPECIAL BOARD OF ADJUSTMENT NO. 1047

AWARD NO. 29
NMB CASE NO. 29

**PARTIES TO THE DISPUTE:**

Brotherhood of Railroad Signalmen

- and -

Union Pacific Railroad

**STATEMENT OF CLAIM:**

Claim on behalf of Claimant J. M. Fulbright (SSN: to clear his record of discipline assessed September 1, 1998, resulting in his dismissal from service and return him to his former position with compensation for any actual wage loss.

**OPINION OF BOARD:**

At the time of the events leading to this claim, Claimant was employed by Carrier as a Communications Technician position, headquartered at Fort Worth, Texas. On August 14, 1998, Claimant had participated in a corrective action plan (an eight-hour paid workshop), stemming from a previous discipline for failing to take a call to cover service on a prior date. On August 17, 1998, Claimant was called to restore service and refused the call, alleging that he had not had enough sleep to be able to work safely. An investigation was held on August 27, 1998, following which Claimant was dismissed from Carrier's service.

The Organization asserts that Claimant was not afforded a fair and impartial hearing. The Board has reviewed the testimony on the record carefully and finds no basis for such an inference. The Organization also insists that Claimant was unreasonably charged and dismissed. They maintain that claimant did not refuse a direct order and, therefore, was not

Organization's Exhibit No. 7
Page 6 of 8



UPFULBRIGHT000344

insubordinate. The Organization also points out that Claimant had been treated for a sleep disorder and told the caller that he could not work safely because he had had only two hours sleep the previous night.

Unrefuted testimony on the transcript indicates that Claimant had been previously treated for a sleep disorder. However, testimony also establishes that he had been treated by his physician and returned to work with no restrictions. It is also clear from testimony on the transcript that Carrier did not "demand" that Claimant go out on the call (Tp. 33). However, Claimant testified that the Carrier officer had "made it clear" that they wanted him to go out on the call (Tp. 48). There is also evidence on the record that Claimant stated he would not be more able later, and "besides that [he was] not going to take that personal vehicle out, not being fully covered per Company policy on [his] vehicle insurance." Testimony on the record also reveals that Claimant was clearly instructed regarding the correct procedures and requirements regarding taking a call as a result of the "action plan" formulated for him following his previous discipline.

A thorough review of the transcript reveals problems on both the Carrier's and Claimant's part during the incident giving rise to this case. Carrier's representative did not ask Claimant to elaborate on the "safety issues" he was concerned about, and apparently did not give Claimant a direct order, per se. Notwithstanding, Claimant's excuses are not persuasive, and his testimony seeks to place the blame on the Carrier for failing to make the procedures for responding to calls clear to him.

In light of the obvious muddle of facts surrounding this case, the ultimate discipline of discharge is overly harsh. However, there is no question that Claimant shares a large measure





UPFULBRIGHT000345

UPFULBRIGHT

CONFIDENTIAL

AWARD NO. 29
NMB CASE NO. 29



of culpability in creating that muddle, and was not so naive regarding the proper procedures as he at first maintained in his testimony. Accordingly, the Board finds that he shall be returned to service on a last chance basis, but with no back pay for time out of service.

AWARD

Claim sustained only to the extent set forth in the above Opinion.

Elizabeth C. Wesman

Elizabeth C. Wesman, Chairman

J.O. McCarthy

Union Member

W.E. Naro

Company Member

Dated at 1/24/2000

Organization's Exhibit No. 7
Page 8 of 8

UPFULBRIGHT

rails of the occupied track or to the field side of the occupied track.
Where there are adjacent tracks with less than 19 foot track centers, utilize on-track safety protection following normal safety and Maintenance of Way rules).
3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.
4. Not to work at unprotected heights, over 4 feet above the ground (Can work on the beds of trucks, and occupy bridges following normal safety rules).
5. Not to work on 1-man or 2-man gangs (i.e., switch oiler, inspector, welder or helper job, 2-man section gang).
Must have at least 2 additional employees on gang or at work area in order to use Train Approach Warning regulations (Lookout).
6. If a new job assignment is considered, outside of the Engineering Department, Health and Medical Services must review the job requirements and determine if the employee can safely perform the essential functions of the job.
E The restrictions will be ongoing until the conditions outlined above have been met.
F We will close the case if we have no response from the EE within a reasonable period of time.
Thx. Dr. C

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Created on:** | Jun 19, 2015 | **Time:** | 11:14:51 AM | **Created by:** | 00415695 |

**Comment:**

Theresa, This EE has not provided the medical records that we have requested and we have not seen the results of a sleep medicine evaluation which we agreed to when you and I spoke directly with the EE.
Action:
1
Remains NOT FFD.
2 We still need the same information.
3 Please calendar this case for discussion with the CMO next week.
Thx. Dr. C

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Created on:** | Jun 18, 2015 | **Time:** | 1:56:09 PM | **Created by:** | 00464275 |

**Comment:**

C6/18/15 Document request letter sent:
Copy of the last 2 years of physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition and the Sleep evaluation study records. JL

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Created on:** | Jun 18, 2015 | **Time:** | 1:49:37 PM | **Created by:** | 00464275 |

**Comment:**

6/18/15 TC to EE re: needing medical records that have been requested--Copy of the last 2 years of physician clinic notes (also known as office notes or progress notes) from the provider. Requested EE RTC to HMS, JL. JL

| | | | | | |
|---|---|---|---|---|---|
| **Case Number:** | 000001293558 | **Service Number:** | 1001321869 | **Category:** | Activity |
| **Created on:** | Jun 18, 2015 | **Time:** | 9:11:51 AM | **Created by:** | 00458844 |

**Comment:**

Dr C- This EE had sent us this letter in eHS from 5/22/2015 it is letter from EE. We have this case on our Manager Referral Case Review for tomorrow morning but please see this letter and advise. We have been waiting for information from EE and this letter is his response but it is



UPFULBRIGHT

CONFIDENTIAL

Department:
Information Technologies

Electronic Technician
Classifications for IBEW and BRS

- ETC Electronic Technician without an FCC GROL. Must attain license within two years
- ETB Electronic Technician with an FCC GROL
- ETA is attained after being an ETB for two yrs
- Sr. ET Grandfathered IBEW and BRS
- Sr ET Pay code 101
- COM MTR BRS monthly rated

All IBEW and BRS Electronic Technicians are subject to "Emergency Restoration of Service"

This job description may not fully identify or describe all the essential job or requirements

Duties:
Electronic technicians are responsible for repair, maintenance, and installation of the following components and systems:

- inside and outside wire and cable plant, including CAT 5/6 and Fiber Cables
- support systems; LAN/WAN interconnect systems
- Computer systems: Routers, Switches, Servers
- Analog and Digital radios systems: including dispatcher, yard, rcl, eot repeater, desktop, Hand held, mobile, Mds (ctc), WOR
- Microwave and Fiber Optic transmission equipment: including the multiplexing of such equipment
- Work station, voice, MDf and data, including Horizontal cabling
- Phone and Pbx systems
- Connections; and similar work in connection with telecommunications equipment.
- AEI trackside
- Weigh and Scale
- Camera systems
- Intermodal systems: Gate and oasis
- GMOTD and Auto Ramp facilities
- DC Systems: 12, 24, 48vdc rectifiers, converters, inverters, and battery plants

UPFULBRIGHT

CONFIDENTIAL

Electronic technicians are responsible for repair, maintenance and installation of all the systems above at the following locations:

- Trackside Must be able to utilize OTS for their own protection from rolling stock Lone worker and Lookout
- Rail Yard Must be able to work around Yard operations, Hump, RCL, Track machines
- Office Must be able to function in an office environment, must be able to work closely with customers
- Remote Locations Must be able to work alone, at remote radio, ctc, aei, Microwave and Fiber Facilities.

Electronic Technicians must be competent in the operation of test equipment such as, but not limited to, multimeters, frequency counters, RF service monitors, wattmeter's, spectrum analyzers, signal generators, transmission test sets, frequency selective level meters, digital test sets, and other types of telecommunication test equipment.

Experience/Skills Required:
Must be 18 years of age or older. Individuals with felony and/or misdemeanor convictions may not be hired. Candidates must be able to read and comprehend regulations and instructions in English, as well as possess good oral communication skills.

Applicants
Must have at least a two-year Associates Degree in Electronic Technology from a generally recognized school, or, have equivalent military training or job experience. Extensive RF or microwave experience is desirable. An Electronic Technician shall possess a thorough knowledge of electronic theory, understand the operation of electronic components and circuits, and must be able to read and understand electronic schematics. Electronic Technicians shall posses advanced computer skills.
Successful applicants must be able to obtain a Federal Communication Commission General Radio telephone Operator License within the first 244 working days of service. Failure to obtain the FCC license will be considered as voluntary resignation from employment.
Applicants must have a valid driver's license and must be able to operate a vehicle for 2 to 3 hours per day minimum to cover their territory.
Applicants must be able to climb ladders, and perform work while on a ladder.
Applicants must be able to lift a 50 to 70 pound object such as a monitor or air conditioner, that requires two hands to move and carry a short distance.

UPFULBRIGHT



UPFULBRIGHT002662

CONFIDENTIAL

**Work Conditions:**
Outdoor work required, regardless of weather conditions.

Probationary Period:
90 Days.

Shifts:
Must be available to work all three shifts.

Union:
International Brotherhood of Electrical Workers and grandfathered BRS
Dues: Initiation and monthly dues required.

Travel Required:
Occasional; may be away from home one to five days per week..
Hours:
40-hour work week, subject to overtime, weekends. and holidays.

UPFULBRIGHT



UPFULBRIGHT000683

CONFIDENTIAL

Telecom Electronic Technician's Duties, Job Description, and Physical Performance Requirements
05/01/06

Attached below from a prior note is a list of routine duties that a telecom technician performs along with the job description we use for the position. We feel that the following tests could be used to help determine the probability of the employee being able to perform his routine daily duties.

1. Demonstrate lifting a 50 to 70 pound object like a monitor or air conditioner that requires two hands to move and carry a short distance.

2. Demonstrate the ability to carry a tool bag or test equipment (approx 15 to 30 pounds) up 1 to 2 flights of steps

3. Demonstrate the ability to climb ladders, and perform work while on a ladder. The best example might be to use a step ladder, climb half way up and perform a manual dexterity example requiring both hands, like installing a piece of equipment into a rack where one hand is holding the equipment and the other hand is screwing the equipment into the rack,

4. Fine motor skills of the hand, assemble something with several small part, we would have the person assemble a cat 6 jack, terminate it, and place into a wallplate. We would probably also do a soldering test to demonstrate how steady the persons hands are.

5. Demonstrate the ability to operate a motor vehicle for 2 to 3 hours.

6. Demonstrate the ability to perform the daily morning Union Pacifc Warm up to work exercises as directed on forms PB-20606

7. Demonstrate the ability to crawl under a desk and perfrom tasks such as plugging in devices, terminating cables, etc.

8. Demonstrate the ability to work on his feet for several hours at a time

9. Demonstrate the ability to use a computer (keyboard and mouse movements)

The employee must be able to operate a motor vehicle. They are often required to drive to a site that is up to 3 hours away and back in the same day. The employee must be able to operate the vehicle at night also.

The employee must be able to work on ladders and step stools. There may be times when a person would be required to work on a stepladder for several hours. The employee will require good balance when on a ladder as they will be using their hands to adjust equipment, install equipment, pull cable, etc.

The employee will be required to lift and carry equipment including up staircases when installing equipment in towers, The equipment could be a PC, 21'" monitor, radio gear, printer etc. Most of our equipment is less than 70 lbs.

The employee must be able to walk on uneven, and rough surfaces, as they are required to sometimes walk down the right of way of the track to reach our equipment.

The employee must be able to go up and down stairs, as several of our sites only have stairway access.

The employee will be required to work while on his knees (with knee pads or a kneeler) when installing equipment under desks or in low spaces.

UPFULBRIGHT

The employee will be responsible for installing cabling usually overhead. This will require the person to be able to pull the cable though the cabling management system.

The employee will be required to stand for extended periods of time while performing testing or doing installation work.

The employee will require good dexterity of the hands to be able to perform tasks of installing cable terminations, cable punches, assembly of small devices and connections. These tasks are performed almost every day.

The employee must be available for call out 24 x 7. The employee could have worked an entire shift, then be called out 9 PM to perform a restoration service and again at 3 AM to perform a different restoration of service task.

The employee must be able to work alone in remote areas during day or night.

Telecommunications Technician

Wide array of technical equipment covered on this job. After-hours call-outs at night, weekends and holidays. Equipment failures impacting train service must be restored in under 2.5 hours. Employee often works alone. All-weather environment.

Duties:

Electronic technicians are responsible for installing, maintaining and restoring service to our Telecommunications network. This includes Radio, Microwave, Fiber Optics, Data, Voice, LAN/WAN, PCs and any other technology we may use for Telecommunications, with or without immediate supervision.

Electronic technicians are responsible for building, repairing and maintaining pole lines and supports; running, connecting and maintaining line wires, service wires and cables, overhead and underground, together with their supports; the conduits for such wires and cables; microwave and radio tower work; and similar work in connection with telecommunications equipment.

INSPECT AND TEST ELECTRONIC OR MICROPROCESSOR-BASED SYSTEMS AND COMPONENTS (communication systems, analyzers, control systems, or logic controls). Perform electronic tests on electronic systems and components to ensure unit functions according to specifications: monitor functioning and calibration of electronic testing equipment; use electronic testing equipment per company and manufacturer standards; read technical information to determine appropriate testing procedures and equipment specifications.

TROUBLESHOOT MALFUNCTIONS IN ELECTRONIC OR MICROPROCESSOR- BASED SYSTEMS AND COMPONENTS. Analyze test results to troubleshoot equipment failures; identify or analyze defective units or parts and indicate necessary corrective actions; apply technical knowledge to develop troubleshooting procedures and solutions; gather and integrate information from various sources (manufacturer manuals, schematics, instrument readings and people) to troubleshoot problems.

REPAIR, INSTALL, OR DISMANTLE ELECTRONIC SYSTEMS AND COMPONENTS. Wire communication facilities; connect inbound/outbound lines to communication equipment; replace defective wiring and components (e.g. on printer boards) using tools described below and soldering iron; repair analog and digital circuitry.

WORK WITH TOOLS AND TESTING EQUIPMENT. Must safely and effectively operate the following: high precision measuring tools (electronic scales, voltmeters, micrometers); soldering irons; non-power tools (pliers, screwdrivers); off-highway motor vehicles (snow cats); motorized vehicles (cars, light trucks or vans).

UPFULBRIGHT

EEOC FORM 131-A (11/09)

# U.S. Equal Employment Opportunity Commission

| | |
|---|---|
| Union Pacific Railroad<br>Attn: Beth Wilderman<br>Director of EEO/Affirmative Action<br>1400 Douglas Street, MS 310<br>Omaha, NE 68179 | PERSON FILING CHARGE<br>**Joe M. Fulbright** |
| | THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**31A-2015-00151** |
| | FEPA CHARGE NO.<br>**31A-2015-148** |

## NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTION WHERE A FEP AGENCY WILL INITIALLY PROCESS

*(See the enclosed for additional information)*

THIS IS NOTICE THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[ ] Title VII of the Civil Rights Act (Title VII) [ ] The Equal Pay Act (EPA) [X] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA) [ ] The Genetic Information Nondiscrimination Act (GINA)

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to ____________________ *(FEP Agency)*

[X] The **Fort Worth Human Relations Commission** *(FEP Agency)* and sent to EEOC for dual filing purposes.

While EEOC has jurisdiction (upon expiration of any deferral requirement if this is a Title VII, ADA or GINA charge) to investigate this charge, EEOC may suspend its investigation and await the issuance of the Agency's final findings and orders. These findings and orders will be given weight by EEOC in making its own determination as to whether reasonable cause exists to believe that discrimination has occurred.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency will be considered by EEOC when it reviews the Agency's final findings and orders. In many cases EEOC will take no further action, thereby avoiding the necessity of an investigation by both the Agency and EEOC. This likelihood is increased by your active cooperation with the Agency.

As a party to the charge, you may request that EEOC review the final findings and orders of the above-named Agency. For such a request to be honored, you must notify EEOC in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by EEOC. Regardless of whether the Agency or EEOC processes the charge, the Recordkeeping and Non-Retaliation provisions of the statutes as explained in the enclosed information sheet apply.

For further correspondence on this matter, please use the charge number(s) shown above.

Enclosure(s): Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race [ ] Color [ ] Sex [ ] Religion [ ] National Origin [ ] Age [X] Disability [X] Retaliation [ ] Genetic Information [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| for<br>**August 13, 2015** | **Travis G. Hicks,**<br>**Director** | Rhonda David |

UPFULBRIGHT

*Enclosure with EEOC Form 131 (11/09)*

# INFORMATION ON CHARGES OF DISCRIMINATION

## EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14 Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

## NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

UPFULBRIGHT

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: Agency(ies) Charge No(s):

X FEPA 31A-2015-148

X EEOC 31A-2015-00151

Fort Worth Human Relations Commission and EEOC

State or local Agency, if any

2015 AUG 11 AM 11:23

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Joe M. Fulbright | (817) 301-3981 | 02-03-1961 |

Street Address: 807 Oakwood Drive
City, State and ZIP Code: Euless, TX 76040

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| UNION PACIFIC RAIL ROAD | 500 or More | (817) 353-7237 |

Street Address: 1658 Rogers Rail Road
City, State and ZIP Code: Fort Worth, TX 76107

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

Street Address:
City, State and ZIP Code:

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 01-26-2015 Latest: 06-28-2015
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):* ***Original Filed with TWC ON July 07, 2015***

## I. PERSONAL HARM

I complained of discrimination by Supervisor Terry Neal due to my disability in 2012. In retaliation for my complaint, I was falsely accused of being impaired in January 2015. I was involuntary removed from work and placed on a medical evaluation in February 2015. In June 2015 I was discharged from my position.

## II. RESPONDENT'S REASON FOR ADVERSE ACTION

On January 6, 2015, Mr. Neal alleged that I was impaired while at work and that I had failed to answer a call made my dispatch which was all proven to be false.
On June 28, 2015, human Resources said no longer had a job in communications due to the results of the medical evaluation.

## III. DISCRIMINATION STATEMENT

I believe I have been discriminated against and retaliated against because of my disability in violation of the Americans With Disabilities Act of 1990, as amended, the City of Fort Worth's Fair Employment Ordinance No. 7278, as amended, and the Texas Commission on Human Rights Act because:

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Jul 28, 2015
*Date*
*Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

07/28/2015

CLAUDIA D. PALACIOS
MY COMMISSION EXPIRES
August 17, 2015

UPFULBRIGHT

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA | 31A-2015-148 |
| | [X] EEOC | 31A-2015-00151 |

**Fort Worth Human Relations Commission** and EEOC

*State or local Agency, if any*

I complained of discrimination by Supervisor Terry Neal due to my disability in 2012. Mr. Jim Bracken Regional Director of Communications corrected Mr. Neal's actions of discrimination and all was well until Mr. Bracken retired in late 2014. In January 2015, Mr. Neal scheduled a conference with me and my union representative to discuss my job performance. He alleged that I was impaired while at work and that I had failed to answer to a call made by dispatch. All his allegations were proven to be false. Even though I had no previous write ups I was removed from my service on February 3, 2015. Human Resources said I was on a medical evaluation. On or around June 28, 2015, I was told that I no longer had a job in communications due to the results of the medical evaluation even though the company never contacted me to complete a medical evaluation. I believe that Mr. Neal is retaliating against me for my complaints of discrimination against him and that I am being treated in this manner due to my disability.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

Jul 28, 2015

*Date*

*Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(*month, day, year*)

CLAUDIA D. PALACIOS
MY COMMISSION EXPIRES
August 17, 2015





UPFULBRIGHT

BUILDING AMERICA®

# Equal Employment Opportunity & Policy Directives

Effective December 5, 2000 (Revised February 10, 2014)

## Purpose

Union Pacific is strongly committed to equal opportunity in all employment matters. Our work environment must always be one that respects differences, whether based on race, color, gender, national origin, age, disability, religion, veteran status, sexual orientation, gender identity or genetic information so that all employees can contribute to their fullest potential. These Policy Directives explain what Union Pacific expects of its employees in this important area.

## Prohibition of Discrimination or Harassment

Union Pacific strictly prohibits any discrimination or harassment based on a person's race, color, gender, national origin, age, disability, religion, veteran status, sexual orientation, gender identity, genetic information or any other ground prohibited by law ("protected status"). This policy covers all aspects of employment, including hiring, promotions, terminations, pay, and the work environment.

EEO is the Law Poster

EEO is the Law Poster Supplements

## Prohibition of Offensive Behavior and Remarks

Union Pacific is committed to providing a work environment free from offensive behavior or statements directed at a person's race, gender or any other protected status. This policy prohibits such offensive behavior and remarks in the presence of other employees, contractors, customers, visitors, and any other persons. Please note that this policy prohibits such offensive behavior or statements in the workplace, while representing Union Pacific, while contacting any Union Pacific vendor or customer, while using any social media provided by or sponsored by Union Pacific, or during travel or overnight stays paid for by Union Pacific that are derogatory of any person because of race, gender, or any other protected status even if no one who is present is offended by the behavior or remark.

The types of prohibited behavior include, but are not limited to, the following:

1. Any offensive or demeaning epithet or remark referring to race, gender, or other protected status, including that which is intended as humor;
2. Any offensive or demeaning comment, gesture, or other behavior directed toward another person because of that person's race, gender, or other protected status;
3. Use of Union Pacific Corporation property to display or store material that is demeaning or offensive on the basis of a protected status;
4. Sharing or displaying any item or material that is demeaning or offensive on the basis of a protected status, such as a noose, swastika, and the initials "KKK";
5. Defacing Union Pacific Corporation property or personal property of another person for purposes of conveying a demeaning or offensive message based on or referring to a protected status; or
6. Creating any graffiti or other anonymous communication that refers to race, gender, or any other protected status.

## Zero Tolerance

Union Pacific does not tolerate any type of discrimination, harassment, or offensive behavior based on a protected status. All proven violations of Union Pacific's policy against discrimination, harassment, and offensive behavior will result in appropriate discipline of the employee, up to and including termination. Graffiti or other anonymous communications in violation of this policy are particularly serious, and absent very compelling extenuating circumstances can result in dismissal on the first offense. Such anonymous communications will also be referred to the UP Police for an investigation.

UFULBRIGHT

## Reporting Violations and Questions

Any person who believes that he or she is being subjected to behavior of this nature, or is aware of such prohibited conduct directed toward another person, must report the matter at once. Employees must come forward when violations occur or there is a need for further information or assistance. Any alleged policy violations will be investigated, maintaining confidentiality to the fullest extent consistent with a thorough investigation.

You must call the EEO Department using the toll free number that is maintained on a 24 hour basis at 1-866-877-3362 [1-866-UPR-EEOC].

Please note that a report of harassment or discrimination to a member of management is not sufficient under this policy. Such behavior must be reported to the EEO Department, which will notify and involve appropriate management in the investigation. Also, anyone who learns about alleged harassment or discrimination, even if he or she did not personally witness the alleged discrimination or harassment, must immediately advise the EEO Department.

EEO Department
Union Pacific Center
1400 Douglas Street, Stop 0310
Omaha NE 68179

1-866-877-3362

## Prohibition of Retaliation

There will be no unlawful retaliation against any employee for making a good faith report of alleged violations of our Company's policy against discrimination, harassment, or offensive behavior; opposing any practice believed in good faith to be unlawfully discriminatory; or participating in an internal or government investigation of possible discrimination. Any employee who engages in prohibited retaliation will receive appropriate discipline, up to and including termination.

## Prohibition of Sexual Harassment

Union Pacific prohibits sexual harassment of employees, contractors, customers, visitors, and others that employees may come in contact with while working, representing the Company, or while on Company travel. Union Pacific prohibits unwelcome sexual advances, requests for sexual favors, and other verbal or physical behavior of a sexual nature when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;
2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile, or offensive work environment.

Complaints of sexual harassment MUST be reported at once to the EEO Department in Omaha at 1-866-877-3362.

## Pregnancy and Childbirth

As required by federal and state law, Union Pacific treats women affected by pregnancy, childbirth, or related medical conditions at least as well as other employees with temporary disabilities.

## Reasonable Accommodation of Disabilities and Religious Beliefs

As required by federal and state law, Union Pacific will make reasonable accommodations for persons with statutorily protected disabilities when this will permit the person to perform the essential functions of the job and does not impose an undue hardship. The Company will also make reasonable accommodation for the religious needs of employees where such accommodation can be made without undue hardship. Persons wishing to request reasonable accommodation of a disability or religious beliefs should contact the EEO Department at 1-866-877-3362.

## Confidentiality and Medical Records

All Union Pacific employees have a responsibility to maintain the confidentiality of medical information obtained in the course of one's job responsibilities pertaining to an employee's or dependant's health condition unless permission for further disclosure has been given. To that end, any materials containing medical information related to an employee's health





UPFULBRIGHT

condition, including, but not limited to, a request for accommodation, medical leave, FMLA leave, short-term disability leave, or fitness-for-duty evaluation, must be held in a separate employee medical file. Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations.

## Family and Medical Leave Act

Under the FMLA, Union Pacific Corporation provides eligible employees up to 12 weeks of unpaid leave each year (which in certain circumstances may be a combination of paid and unpaid leave) for qualifying FMLA-related conditions. Leave is provided for the birth or adoption of a child, placement of a foster care child, care of a spouse, child or parent with a serious health condition or for the employee's own serious health condition. Contact the HR Service Center at 1-877-275-8747, Option 1, for further information about FMLA.

## Family Military Leave

Under amendments to the FMLA, the Company provides eligible employees up to 12 weeks of unpaid leave each year (which in certain circumstances may be a combination of paid and unpaid leave) when certain family members are on, or will soon be called, to active duty and there is a qualifying exigency. The Company also provides eligible employees up to 26 weeks of unpaid leave each year (which in certain circumstances may be a combination of paid and unpaid leave) when certain family members suffer a serious injury or illness in the line of duty and the employee wants to care for them. Contact the HR Service Center at 1-877-275-8747, Option 1, for further information about Family Military Leave.

## Government Agencies

In addition to reporting complaints of discrimination or harassment to the EEO Department, you have the right to file a complaint with the federal Equal Employment Opportunity Commission or a local employment rights agency. Telephone numbers for these agencies may obtained from the posters at each facility or from the EEO Department.

## Compliance Expectations

Union Pacific expects each of its employees to be thoroughly familiar with the Policy Directives and make certain that their everyday actions are in compliance. Violation of these policies will result in appropriate discipline, up to and including termination.

UPFULBRIGHT

**From:** CN=Terry D. Neal/O=UPC
**To:** CN=Joe M. Fulbright/O=UPC
**Sent:** 11/17/2014 08:03:15 AM
**Cc:** CN=Neal J. Spencer/O=UPC@UP;CN=Stephen T. Hale/O=UPC@UP
**Bcc:** CN=Terry D. Neal/O=UPC
**Subject:** Expectations

Joe,
Per our conversation this morning.

You missed two calls this weekend.

**#24 UP-05270110**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ticket: | UP-05270110 | Location: | AEI1282 FH012 | City ST: | BISBEE - MIDLOTHIAN TX | Open D/T: | 16-NOV-14 |

**#31 UP-05270149**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ticket: | UP-05270149 | Location: | WEATHERFORD RADIO SITE | City ST: | WEATHERFORD TX | Open D/T: | 16-N |

I understand that when you take your sleep medicine, driving is out of the question. That is the reason that I dispatched Mr Hines on the two tickets.
You need to understand that I have a to make sure that we have personnel available to cover after hour emergency restoration of service. You also need to understand that other employees are covering for you when you cannot take your calls.

I need you to work within the medical department and submit a document to me stating your medical limitations.

******************************
Terry Neal
Manager Telecom Facilities
3250 Kimzey St
Ft. Worth, Tx 76107
Office: 817 353 7237
Cell: 817-313-5317
Fax: 402 997 3547
Do everything without grumbling or arguing (Philipians 2:14 NIV)

"A group becomes a team when each member is sure enough of himself and his contributions to praise the skills of others"

UPFULBRIGHT

UP-OSHA0046

## *FORMAL CONFERENCING/TRAINING*

Date: 01/26/15
Name: Joe M. Fulbright
Employee ID: 0443299

Check One:
__ Conference result of Employee option
X Conference result of Mutual Consent All Parties
__ Training result of Employee Option
__ Training result of Mutual Consent All Parties

Mr./Ms. Joe M. Fulbright
This is to confirm our conference on Jan 26, 2015 at 3:45 AM/PM
At the Radio Shop Davidson Yard in connection with events described below.
Location

Description of Event:

- Failure to take after hour call on 01/25/15. Ticket #05352044 Omaha NOC called Joe Fulbright twice at 7:35 pm and left vm, Called again at 8:13 and left Vm. NOC called manager Terry Neal, who instructed to call Edgar Hines. Terry Neal called Joe Fulbright at 8:11 and left message. Did Call back in 24min Phone Record JF
- Terry Neal received a call from Joe Fulbright around 6:15 am on Jan 26, Joe stated he did not hear manager call due to taking sleep medicine. Manager Neal told Fulbright that we would be written up on formal conference, and he might want a Union Rep Present

Rules discussed:

**1.16:Subject to Call**

Employees subject to call must indicate where they can be reached and must not be absent from their calling place without notifying those required to call them.

**Rule Updated Date**

April 7, 2010

X I agree to have a conference.
__ I decline to have a conference
__ I agree to C.O.R.E Training.
__ I decline C.O.R.E Training

[signature]
Employee signature

[signature]
Manager signature

Mgr Telecom
Title

NOTE: This letter is NOT a form of discipline and will not be used in any subsequent disciplinary proceedings as evidence the employee previously allegedly violated the rules cited (except as explained at NOTE on Page 4 of this policy

UPFULBRIGHT

Topics for discussion:

- Missed Call
- Issue of Sleep Medication on nights were Joe is subject to afterhours calls
- I do not want to pursue discipline, We need to clarify if there is a sleep disorder or condition and what restrictions are needed. Therefore I am Manager Referring Mr. Fulbright into the Fit For Duty Program. Mr. Fulbright is not pulled from service, and will be given time to work with the FFD program. Joe must keep me informed when he needs to take off or leave early for the program.

UPFULBRIGHT

FORT WORTH®

**Certified Return Receipt #**
**7015 1520 0002 8616 5308**

April 26, 2016

Kristin Rupprecht, EEO Investigator
Human Resources Department
Union Pacific Railroad
1400 Douglas Street, Stop 310
Omaha, Nebraska 68179-0310

**RE: Joe M. Fulbright vs. Union Pacific Railroad**
**HRC Charge No.: 31A-2015-148 EEOC Charge No.: 31A-2015-00151**
**Date Filed: 07-28-2015 Date Served: 08-07-2015**

**DETERMINATION**

Dear Ms. Rupprecht:

Pursuant to the City of Fort Worth's Fair Employment Ordinance No. 7278, as amended; the Americans with Disabilities Act of 1990, as amended; and the Texas Commission on Human Rights Act, as amended, it is determined that all jurisdictional requirements have been met and the following findings are issued.

The Charging Party contends that he was discriminated against based on his ***Disability*** and retaliated against because he complained of ***Disability*** discrimination, in violation of the City of Fort Worth's Fair Employment Ordinance No. 7278, as amended; the Americans with Disabilities Act of 1990, as amended; and the Texas Commission on Human Rights Act, as amended. The Charging Party takes sleep medication in the evenings. He states that he called Respondent's Safety Hotline in August 2012 and reported that his Supervisor was trying to get him to report for work while he was on medication. He claims that in retaliation for his complaint, he was falsely accused of being impaired while on duty and failing to answer an after-hours call from dispatch in January 2015. The Charging Party states that he was removed from service and placed on medical leave in February 2015. He claims he was discharged in June 2015 based on the results of a medical evaluation, even though he states that Respondent never contacted him regarding completing a medical evaluation.

Respondent denies that it discriminated or retaliated against the Charging Party and contends that there is no nexus between the Charging Party's complaint to the Safety Hotline in 2012 and his referral to the Fitness for Duty (FFD) program 2 ½ years later. Respondent claims that it referred the Charging Party to the FFD program in order to determine whether he could safely perform the essential functions of his job, after he



Printed on recycled paper

UPFULBRIGHT

failed to respond to after-hours emergency service calls because he could not work after taking his medication. Respondent's Health and Medical team pulled the Charging Party from service and imposed work restrictions after reviewing his health information. Given the nature of his restrictions, Respondent determined that he was unable to perform the essential functions of his job with or without a reasonable accommodation.

The Charging Party began employment with Respondent in March 1985 and became a Senior Electronic Technician in 1995. It is undisputed that Electronic Technicians are responsible for installing, maintaining, and restoring service to Respondent's Telecommunications network. Documentation shows that the essential functions of the position of Senior Electronic Technician include: (1) Building, repairing, and maintaining pole lines and supports; (2) inspecting and testing electronic or microprocessor based systems and components; (3) repairing, installing, or dismantling electronic systems and components within two and a half hours of reported failure; (4) being available on a 24/7 work hour basis; (5) working with tools and testing equipment; and (6) following safety precautions.

The Charging Party states that in August 2012, he called Respondent's Safety Hotline to report that his Supervisor was trying to get him to report to work while he was on medication. It is undisputed that the Charging Party takes medication for insomnia and cannot work once he taken his sleep medication.

Documentation shows that all Electronic Technicians are subject to "Emergency Restoration of Service" and must be available on a 24/7 hour basis when they are on call. It is undisputed that on Sunday, November 16, 2014, Respondent tried to reach the Charging Party to cover two after-hours troubleshooting calls. When the Charging Party did not answer, Respondent called another employee to cover the calls.

Documentation shows that on January 25 and 26, 2015, the Charging Party again was responsible for taking after-hour calls and that after multiple unsuccessful attempts to reach him Respondent once again called another employee to address the repairs. The Charging Party contends that he did return the call; however, documentation shows that he called his Supervisor the next morning and told him he did not hear the call due to taking his sleep medicine. His Supervisor then referred him for a Fitness for Duty (FFD) Evaluation in order to understand his ability to perform his duties while maintaining a safe workplace for himself and his co-workers. Documentation shows that on February 2, 2015, Respondent's FFD physician, Dr. Charbonneau, placed the Charging Party on temporary medical leave until May 3, 2015, to consider the effects of his medication.



UPFULBRIGHT

Documentation shows that beginning January 26, 2015, Respondent made multiple, repeated attempts to obtain medical information from the Charging Party in order to perform the FFD evaluation. Respondent finally received medical information regarding the Charging Party's treatment on April 13, 2015. It is undisputed that after reviewing his medical records, Dr. Charbonneau requested that the Charging Party undergo a Sleep Medicine Evaluation.

It is undisputed that on May 20, 2015, the Charging Party told the FFD nurse that he had an appointment with a Sleep Medicine Specialist on June 1, 2015. However, it is undisputed that he did not undergo the evaluation.

On June 26, 2015, Respondent's Health and Medical team conducted a medical review of the Charging Party's case and, due to his medication, imposed restrictions prohibiting him from: (1) Operating company vehicles/on-track or mobile equipment/forklifts; (2) operating cranes, hoists, or machinery; (3) working on rail trains or work trains dumping ballast; (4) working at unprotected heights over 4 feet above work surface; and (5) working on 1 man or 2 man gangs. Given the nature of the Charging Party's work restrictions, his department was unable to identify any reasonable accommodation that would allow him safely to perform the essential functions of a Senior Electronic Technician.

Examination of the evidence indicates that there is **not reasonable cause** to believe that Respondent violated the City of Fort Worth's Fair Employment Ordinance No. 7278, as amended; the Americans with Disabilities Act of 1990, as amended; or the Texas Commission on Human Rights Act, as amended. The investigation produced insufficient evidence of a causal connection between the Charging Party's call to Respondent's Safety Hotline in August 2012 and his referral to an FFD evaluation 2 ½ years later. Instead, the investigation produced evidence that the Charging Party was referred to the FFD program after missing two after-hours calls due to his medication. The investigation produced insufficient evidence that the Charging Party is able to perform the essential functions of his job with or without a reasonable accommodation, given the nature of his medical restrictions.

No finding is made to any other issue raised, or which might be construed to have been raised, by the subject charge.

This concludes the Fort Worth Human Relations Commission's processing of the subject charge.



UPFULBRIGHT

On Behalf of the Commission:

Angela Rush
Administrator
Fort Worth Human Relations Commission

AR:as

cc: File

UPFULBRIGHT

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: **Joe M. Fulbright**
**c/o TANNER & ASSOCIATES**
**Attn: Matt Pierce/Attorney**
**6300 Ridglea Place, Suite 407**
**Fort Worth, TX 76116-5706**

From: **San Antonio Field Office**
**5410 Fredericksburg Rd**
**Suite 200**
**San Antonio, TX 78229**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **31A-2015-00151** | **Jaime Valdez, State & Local Coordinator** | **(210) 281-7661** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

[signature]

**Travis G. Hicks, Director**

June 7, 2016
*(Date Mailed)*

Enclosures(s)

cc: **UNION PACIFIC RAIL ROAD**
**c/o Kristin Rupprecht/EEO Investigator-HR**
**1400 Douglas Street, Stop 310**
**Omaha, Nebraska 68179-0310**

UPFULBRIGHT

# MEDICAL DIRECTOR'S (FITNESS-FOR-DUTY STAFF) TRANSMITTAL TO MANAGER-EMPLOYEE ASSISTANCE

TO: Jan Curtis
MGR-EMPLOYEE ASSISTANCE fax 878-4449

TO: ______
DATE: ______

FROM: JEANNETTE RANDONE, RN (271-4219) (FAX x4616)

FROM: ______
DATE: ______

DATE: 8/14, 1997

EMPLOYEE NAME: Joe M Fulbright

SSN: ______

ADDRESS (PN380): 810 Oakland Dr. Euless, TX 76040

JOB TITLE: Communication tech

HOME PHONE: (___)______

DATE OF BIRTH: ______

HIRE DATE: 3-25-85

X 1. This employee's supervisor has requested a Fitness-for-Duty evaluation in accordance with the Medical Rules.

Supervisor's Observations of Unsafe Behaviors: Employee has told manager he probably would be missing some calls due to medication

___ 2. This employee has been referred to the Medical Director's office for a return-to-work medical clearance after:
- ___ On-Duty Personal Injury / Illness
- ___ Off-Duty Personal Injury / Illness
- ___ Other ______
- ___ Furlough
- ___ Discipline (Not Rule G)

X 3. Please conduct a general assessment and provide your recommendations for further evaluation needs. If a referral for special medical evaluation by a UP-Approved Psychiatrist or Psychologist is recommended, please schedule an appointment close to the employee's home. Please call me to advise appointment details (doctor name, address, phone, date and time) so I can work with the supervisor to notify the employee to attend.

___ 4. Other pertinent information
Employee has had recent addition to job duties which involves taking 24hr call. (see doctor's recommendations)

EA001
10/96

Thank you for your assistance. If you have any questions, please give me a call.

UPFULBRIGHT

JAMES M. HARDIN, PH.D.
1100 AIRPORT FREEWAY
SUITE 202
BEDFORD, TEXAS 76022
(817) 571-0885
FAX 571-9097

August 27, 1997

Medical Director
Union Pacific Railroad

Re: Joe Fulbright

Dear Doctor:

I have evaluated Mr. Fulbright at the request of his EAP. He was referred in following an incident at work. He is a signal/communication repair tech and has a long history working for the Union Pacific in this capacity. During the past month or so he has been in an "on call" capacity which has interfered with his sleep pattern. Recently, he was evaluated by his primary care physician, Dr. Jarvis Bull, who has documented a "stress anxiety related to a sleep disorder." Dr. Bull recommended paroxetine, 20 mg, to help with the sleep disorder. I have not found that medication as effective as one would hope in moderating sleep, and it is difficult to respond to the on call nature of his position while being sedated. Therefore, the patient has not continued with the medication for the same reason.

The primary issue in this case seems to be that the patient's sleep is being disturbed several times a week by railroad personnel calling him out on "emergency" calls during the night. This procedure occurs following and preceding his regular shifts, which he is expected to complete, as well. While it may be true he may have some mild sleep impairment, it is tolerated within normal limits in situations where he is not having his sleep interrupted on a regular basis. The overtime schedule which includes 24 hour call is not healthy for any employee due to the fatigue, much less one who has some sleep difficulties.

It is my recommendation that he be limited to 24 hour call no more than two days per week. If that will not work in the interest of Union Pacific, I believe it would be in everyone's best interest to remove him from being on call at this time. He is potentially dangerous while driving and working around hazardous equipment while being sleep deprived.
If I may be of further assistance, please contact me at the above address or phone number.

UPFULBRIGHT

Respectfully,

James M. Hardin, PhD
Clinical Psychologist

UPFULBRIGHT

Copy

January 26, 2009

Joe M. Fulbright
810 Oakwood Dr.
Euless, TX 76040-5260

EID: 0251592

Dear Mr. Fulbright,

Recently your medical conditions were reviewed by Union Pacific Railroad Health Services for return to work consideration. You and/or your treating physician made statements regarding your current medication use. As a Union Pacific Railroad employee, you are responsible for complying with the Union Pacific Railroad Drug and Alcohol Policy. If you need a copy of this policy booklet, please contact your manager.
Policy 5.3 Prescribed and over-the-counter drugs (49 CFR Part 219.103) states:

5.3.1 49 CFR Part 219.103 does not prohibit the use of a controlled substance (on Schedules II through V of the controlled substance list) prescribed or authorized by a medical practitioner, or possession incident to such use, if the treating medical practitioner or physician designated by the railroad has made a good faith judgment, with notice of the employee's assigned duties and on the basis of the available medical history, that use of the substance by the employee at the prescribed or authorized dosage level is consistent with the safe performance of the employee's duties/ The substance is used at the dosage prescribed or authorized; and in the event the employee is being treated by more than one medical practitioner, at least one treating medical practitioner has been informed of all medications authorized or prescribed and has determined that use of the medications is consistent with the safe performance of the employee's duties (and the employee has observed any restrictions imposed with respect to use of the medications in combination).
Policy 5.4 UP Policy which states:

5.4.1 Union Pacific requires employees to have a written copy of their treating medical practitioner's evaluation/determination (as above) available upon request of their manager or the Medical Review Officer (MRO).

5.4.2 Any use of another person's prescribed medicine is prohibited.

5.4.3 Any use of so-called "medical marijuana" is prohibited.
It is your responsibility to comply with Union Pacific's Drug and Alcohol Policy. If you have questions regarding your medication, please consult with your treating physician(s). If your medications are adversely

UP FULBRIGHT

affecting your alertness, judgment, or ability to safely work, please discuss this with your physician to explore alternative medications which you may be able to use.

Very truly yours,

Stephanie Mahaney, RN, for
Dr. Timothy McCormick

UPFULBRIGHT

(C) If it is found this Rule does not produce adequate compensation for certain of these positions by reason of the occupants thereof being required to work excessive hours, the salary for these positions may be taken up for adjustment by the General Chairman.

(D)

(1) Employees paid under this Rule shall be assigned one regular rest day per week, Sunday if possible. Rules applicable to other employees of the same craft or class shall apply to service on such assigned rest days.

(2) Work of a non-emergency nature and non-telecommunication related work not covered by the Scope Rule, performed after regular hours, on stand-by days, and holidays will be paid at one and one-half the straight time rate, however, no overtime of a non-emergency nature shall be worked except by direction of proper authority.

(3) All work performed in another seniority district will be paid at one and one-half the straight time rate, except when mutually agreed upon between the General Chairman and the designated Carrier Manager in cases where employees are granted leaves of absence to handle special projects in line with past practice.

(E) Ordinary maintenance or construction work not previously required on Sunday will not be required on the sixth day of the work week.

***NOTE 1:*** ***Employees will be required to report when called by proper authority to perform emergency work.***

***NOTE 2:*** ***Emergency work is defined as trouble calls from user departments involving service and repairs to telecommunications equipment needed for railroad operations and departmental communications service interruptions, failures and alarms, for example, would be considered emergency situations under this Agreement.***

***NOTE 3:*** ***See Appendix W for preserved monthly rated employees.***

(F) Employees paid under this Rule who are required to perform emergency work on holidays will be allowed additional compensation at pro rata rate with a minimum of two (2) hours. If required to work in excess of two (2) hours, a maximum of four (4) hours will be allowed.

***NOTE:*** ***Monthly rated employees who are required to work on the Day After Thanksgiving Holiday will be compensated as per Subsection (F) in addition to eight hours pro rata holiday pay, per the National Rule.***

(G) The pro rata overtime hourly rate for positions covered by this Rule is determined by dividing the monthly rate by two hundred thirteen (213).



UPFULBRIGHT

BUILDING AMERICA®

# Reasonable Accommodation Policy

Union Pacific's policy and procedures on reasonable accommodations fully comply with the requirements of federal and state employment laws. Under the law, Union Pacific must provide reasonable accommodations to otherwise qualified employees or applicants with disabilities, unless to do so would cause undue hardship. An individual with a disability is a person who: (1) has a physical or mental impairment that substantially limits one or more major life activities; or (2) has a record of such an impairment; or (3) is regarded as having such an impairment. Union Pacific is only obligated to provide reasonable accommodations to applicants and employees who have an actual current or recurring disability.

Union Pacific is committed to providing reasonable accommodations to its employees and applicants for employment to ensure that individuals with disabilities enjoy equal access to all employment opportunities. Union Pacific will provide reasonable accommodations:

- When an applicant with a disability needs a reasonable accommodation to have an equal opportunity to compete for a job.
- When an employee with a disability needs a reasonable accommodation to enjoy equal access to the benefits and privileges of employment (e.g., training, attending company sponsored events, access to lunch and coffee rooms).
- When an employee with a disability needs a reasonable accommodation to perform the essential functions of the job or to gain access to the workplace. Essential functions are the basic job duties that an employee must be able to perform.

An applicant or employee may request a reasonable accommodation at any time, orally or in writing, to the EEO Hotline. The EEO Hotline may be accessed in two ways:

1. An individual may call the EEO Hotline at (866) 877-3362 ((866) UPR-EEOC) and report an accommodation request.
2. An individual may file a written report by accessing the 24 Hour Online Reporting System at www.tnwinc.com/webreport.

**The reasonable accommodation process begins as soon as the oral or written request for accommodation is made to any manager or is made directly to the EEO Hotline. If an accommodation request is not made directly to the EEO Hotline, it is imperative that the Union Pacific Manager who has received the request report this to the EEO Hotline within 24 hours of receipt.**

A reasonable accommodation can include any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Reasonable accommodations can cover many things that enable an individual with a disability to apply for a job, perform a job or have equal access to the workplace and benefits of employment.

Common types of accommodations include:

- Modification of work schedules or supervisory methods
- Granting breaks or providing leave of absence
- Altering how, where or when job duties are performed
- Removing and/or substituting a nonessential or marginal job function
- Providing assistive technology, including information technology and communication equipment, specially designed furniture, or modified tools
- Removing an architectural barrier, including reconfiguring work spaces
- Providing accessible parking
- Providing job reassignment into another job in compliance with the applicable collective bargaining agreements

There are some things that are not considered reasonable accommodations. Examples include:

- Provision of personal items such as a hearing aid or prosthetic device that is needed both on and off the job
- Job assignment outside of an employee's seniority in violation of the collective bargaining agreement without the agreement of the union

UP FULBRIGHT
EXHIBIT 0

- Ignoring operating and safety rules, including but not limited to, requirements such as FRA or Union Pacific mandated safety equipment
- Altering the content of the job or job environment in such a manner as to alter the essential nature of the business purpose
- Allowing an employee to fail to meet numeric production or performance standards
- Changing an employee's supervisor
- Accommodations that would cause an undue hardship to the company or employees, defined as creating significant difficulty or expense
- Accommodations that would pose a significant risk of substantial harm to the health or safety of the employee or others

An employee may be required to provide medical documentation to substantiate the disability and need for an accommodation.

Union Pacific will process requests for reasonable accommodations and will provide reasonable accommodations where appropriate in a prompt and efficient manner. Union Pacific's EEO Compliance staff will administer the Reasonable Accommodation Policy. Health and Medical Services personnel will implement the reasonable accommodation program system-wide.

While the Health and Medical Services staff will oversee requests for reasonable accommodations, Union Pacific supervisors and managers will be responsible for the appropriate handling of requests made by their subordinates. Therefore, all management personnel must be familiar with this policy and with the internal resources within Union Pacific designated to assist them. Questions regarding the Reasonable Accommodation Policy should be directed to the Director EEO/AA at (402) 544-8808.

UPFULBRIGHT

related to the cardiovascular system including hypertension, coronary artery disease, stroke, cardiac arrhythmias like atrial fibrillation and right and left ventricular enlargement. Excessive daytime sleepiness produces a number of different problems for patients with sleep apnea, among which the most serious is vehicular crashes. The treatment for sleep apnea is simple with continuous positive airway pressure.

**Salient Features of Mr. Fulbright's case**

Now let me summarize the salient features of this case: Mr. Fulbright (date of birth: 2/3/1961) is a morbidly obese gentleman with a history of vitamin B12 deficiency, allergic rhinitis and insomnia. He was a senior communications technician at Union Pacific. He was diagnosed with insomnia in 2009 and initially treated with Prozac and Trazodone. Prozac was discontinued after one year but he remained on 75 - 100 mg of Trazodone to treat his chronic sleep onset insomnia.

Mr. Fulbright worked a set schedule five days a week at Union Pacific with on-call responsibility after hours and on the weekends. In November 2014, Mr. Fulbright missed an after-hours call despite repeated attempts to reach him. Mr. Fulbright stated at the time that he could not drive due to having taken Trazodone. In January 2015, Mr. Fulbright again missed an after-hours call, indicating again that he missed the call due to his Trazodone. Concerned about Mr. Fulbright's ability to safely perform his duties, his supervisor made a management referral to Union Pacific's Health and Medical Services Department for a fitness-for-duty evaluation. Based on the supervisor referral and Mr. Fulbright's self-reported side effects experienced when taking Trazodone, Union Pacific's Health and Medical Services Department removed Mr. Fulbright from service and placed him on medical leave pending a fitness-for-duty determination. As part of the fitness-for-duty evaluation, Union Pacific requested that Mr. Fulbright get a sleep medicine evaluation. Mr. Fulbright's general medical physician referred him to a sleep medicine specialist.

Mr. Fulbright was evaluated by Clint Bastile, PAC at Texas Medical Diagnostic, Inc. (Wellness in Sleep at Arlington) on June 1, 2015 for a sleep evaluation. At that time he was a 54-year-old morbidly obese gentleman (BMI 43.91 $kg/m^2$) who had a 6-year history of insomnia. He had been treated with Trazodone 75 - 100 mg that helped his insomnia. Of note at that time, he reported that he took a daytime nap for 1.5 hours per day, nocturia, and dreams of drowning and suffocation. The physical exam at that time: "morbidly obese body habitus with a neck size of 19.5 inches, class 4 Mallampati airway and a dependent soft palate." The assessment was "idiopathic insomnia." The impressions/recommendations were: 1) home sleep study to make sure the maintenance of his insomnia was not secondary to sleep disordered breathing; and 2) a maintenance of wakefulness test (a series of tests to see how long a patient can stay awake in a quiet room) to objectively assess his level of alertness after using Trazodone. Mr. Fulbright did not follow through on the recommended sleep tests and, because of Union Pacific's concerns about Mr. Fulbright's sleep disorders (insomnia, adverse effects of Trazodone on daytime functioning and likely sleep apnea), work restrictions were appropriately placed on Mr. Fulbright.

***Answers to Questions and Conclusions***

I focused on three different issues/questions: 1) the nature of Joe Fulbright's insomnia and the ramifications of using Trazodone as his treatment for insomnia; 2) the medical reasonableness of Union


3624 Market Street · Suite 205 · Philadelphia, PA 19104 · Tel 215.615.4875 · Fax 215.615.4874



UPFULBRIGHT

UNIVERSITY OF PENNSYLVANIA SCHOOL OF MEDICINE
Division of Sleep Medicine
Department of Medicine

Pacific's request for a sleep medicine evaluation; and 3) whether Mr. Fulbright had sleep apnea in addition to his insomnia. I will answer each of these issues/questions separately.

1) *The nature of Joe Fulbright's insomnia and the ramifications of using Trazodone as his treatment for insomnia.*

After reviewing all the records described above and based on my training, knowledge and experience as an expert on sleep disorders (insomnia, obstructive sleep apnea), I hold these opinions to a reasonable degree of medical certainty: Mr. Fulbright had chronic insomnia (mostly sleep onset) which was being treated with Trazodone but the Trazodone resulted in significant impairment. Although Trazodone is commonly used to treat insomnia, it has a long half-life and can cause daytime sleepiness. The after-hours calls he missed in November 2014 and January 2015 were related to the fact that he had taken Trazodone. Moreover, Mr. Fulbright told the sleep specialist that he took daytime naps for 1.5 hours. These naps were likely related to residual effects of Trazodone or unrecognized (undiagnosed and, therefore, untreated) sleep apnea.

2) *The medical reasonableness of Union Pacific's request for a sleep medicine evaluation.*

After reviewing all the records described above and based on my training, knowledge and experience as an expert on sleep disorders (insomnia, obstructive sleep apnea), I hold these opinions to a reasonable degree of medical certainty: it was medically appropriate for Union Pacific to request a sleep medicine evaluation for its fitness-for-duty determination. Mr. Fulbright had chronic insomnia, was on a long acting hypnotic, missed after-hour calls and had symptoms and physical findings consistent with sleep apnea. Although Mr. Fulbright followed through with an initial clinical evaluation, he did not follow through with the recommendations: 1) home sleep study to make sure the maintenance of his insomnia was not secondary to sleep disordered breathing; and 2) a maintenance of wakefulness test to objectively assess his level of alertness after using Trazodone. These tests were both noninvasive and medically indicated. If these tests had been performed and the results of such provided to Union Pacific, it would have allowed Union Pacific to make a more informed medical decision about Mr. Fulbright's fitness for duty. Without these sleep tests, Union Pacific made their fitness-for-duty determination based on Mr. Fulbright's clinical presentation (insomnia, Trazodone and likely sleep apnea) placing appropriately indicated work restrictions.

3) *If Mr. Fulbright had sleep apnea in addition to his insomnia?*

After reviewing all the records described above and based on my training, knowledge and experience as an expert on sleep disorders (obstructive sleep apnea), I hold these opinions to a reasonable degree of medical certainty: it is likely that Mr. Fulbright had sleep apnea and if he had undergone the sleep study it would likely had shown this condition. Mr. Fulbright was morbidly obese (BMI ~ 43 $kg/m^2$) and over 80% of morbidly obese patients have sleep apnea. Mr. Fulbright's obesity alone was a reason to perform a sleep study. In addition to his morbid obesity, Mr. Fulbright had other symptoms and findings consistent with sleep apnea. His symptoms included: 1) insomnia (10% of patients with insomnia present with sleep apnea); 2) taking daytime naps for 1.5 hours per day; 3) nocturia; and 4) dreaming of drowning and suffocation. All of these symptoms are commonly seen in patients with sleep apnea. His physical exam findings for sleep apnea included a neck size of 19.5 inches, a Class 4 Mallampati airway and a dependent soft palate. These physical findings are also commonly seen in patients with sleep apnea. Thus, if Mr. Fulbright had undergone the recommended


3624 Market Street · Suite 205 · Philadelphia, PA 19104 · Tel 215.615.4875 · Fax 215.615.4874

UPFULBRIGHT

UNIVERSITY OF PENNSYLVANIA
SCHOOL OF MEDICINE

*Division of Sleep Medicine*
*Department of Medicine*

sleep study, it would have likely shown sleep apnea. Mr. Fulbright had multiple sleep conditions adversely affecting his daytime functioning including a very high probability of having sleep apnea in addition to insomnia and the untoward effects of taking Trazodone.

In conclusion, I hold all of the above opinions to a reasonable degree of medical certainty. Mr. Fulbright had multiple sleep disorders (including chronic insomnia, the untoward effects of taking Trazodone and a very high probability of having sleep apnea), and each of these adversely affected his daytime functioning. The sleep evaluation suggested by Union Pacific was medically indicated, as were the clinical evaluation's recommended sleep study and maintenance of wakefulness test (to determine the effect of Trazodone on his daytime functioning). Mr. Fulbright did not follow through on the recommended sleep tests and because of Union Pacific's concerns about Mr. Fulbright's sleep disorders (insomnia, adverse effects of Trazodone on daytime functioning and likely sleep apnea), work restrictions were appropriately placed on Mr. Fulbright. The basis for my conclusions and opinions expressed in this report are derived from my education, training, research, clinical experience, expertise, medical literature and review of the documents listed above. I reserve the right to modify my conclusions and supplement my report upon the receipt of any additional information.

Sincerely,

Richard J. Schwab, M.D.
Professor, Department of Medicine
Chief, Division of Sleep Medicine
Diplomat of the American Board of Sleep Medicine
University of Pennsylvania Medical Center

***********************************************

References:

Clinical Practice Guideline for the Pharmacologic Treatment of Chronic Insomnia in Adults: An American Academy of Sleep Medicine Clinical Practice Guideline. Sateia MJ, Buysse DJ, Krystal AD, Neubauer DN, Heald JL .J Clin Sleep Med. 2017;13(2):307.

Winkelman JW. CLINICAL PRACTICE. Insomnia Disorder. N Engl J Med. 2015 Oct 8;373(15):1437-44. doi: 10.1056/NEJMcp1412740. PMID: 26444730.

Javaheri S, Redline S. Insomnia and Risk of Cardiovascular Disease. Chest. 2017 Aug;152(2):435-444. doi: 10.1016/j.chest.2017.01.026. Epub 2017 Jan 30. PMID: 28153671; PMCID: PMC5577359.

Morin CM, Colecchi C, Stone J, Sood R, Brink D. Behavioral and pharmacological therapies for late-life insomnia: a randomized controlled trial. JAMA. 1999 Mar 17;281(11):991-9. doi: 10.1001/jama.281.11.991. PMID: 10086433.



3624 Market Street · Suite 205 · Philadelphia, PA 19104 · Tel 215.615.4875 · Fax 215.615.4874



UPFULBRIGHT

# REDACTED

---------- Forwarded message ----------
From: **LiveCareer** <member@m.livecareer.com>
Date: Sat, Feb 13, 2016 at 9:27 PM
Subject: Your resume is waiting for you....
To: jmfjmf1961@gmail.com

This is a one-time Administrative email.
You can change your subscription preferences at any time.




**Dear jmfjmf1961@gmail.com**

Congratulations! Yesterday you took the first step towards achieving your career goals. Your resume will remain available for viewing as long as your account remains active.

Your account status is:

| **Your Account Status** | |
|---|---|
| Resume Builder | Create Resume |
| Career Interest Test | Take Test |
| Career Satisfaction Test | Take Test |
| Resume Test | Take Test |
| Salary Report | Get Report |
| Education Test | Take Test |
| Start a Business Test | Take Test |

You can view your resume by logging into your account at any time.

**Helpful Information About Your LiveCareer Account**

**Account Access**
Your account information has been saved and you may view it at www.livecareer.com Just log in as a return user in the upper right hand corner of the screen.
Your Username is:
jmfjmf1961@gmail.com

If you forgot your password, we can email it to you. Just enter your email address here.

**Email Updates**
**You are opted out of receiving other email communications from us and our partners.** You will only receive administrative emails regarding your

Thanks for being a LiveCareer member.

Sincerely,
The LiveCareer Team

account. You may change your preferences here

**Account Management**
If for any reason you do not want to take advantage of your free LiveCareer membership, you may delete this account.

LiveCareer periodically sends emails to its subscribed members. You subscribed as jmfjmf1961@gmail.com when you registered for your free account with LiveCareer on 2/12/2016 10:42:00 AM. To ensure the delivery of LiveCareer email, please take a moment to add member@m.livecareer.com to your email address book or safe list - Find out how. You can unsubscribe at any time. LiveCareer values your privacy; read our privacy policy.

N.A. LiveCareer Inc. 1 Hallidie Plaza, Suite 600, San Francisco, CA 94102

© 2015 LiveCareer Ltd. All rights reserved.

# REDACTED

---------- Forwarded message ----------
From: **Lockheed Martin** <donotreply@trm.brassring.com>
Date: Wed, Feb 17, 2016 at 12:13 AM
Subject: Your candidate reference number - Lockheed Martin.
To: jmfjmf1961@gmail.com

Joe Fulbright,

Thank you for your interest in Lockheed Martin. We appreciate the time and effort that you have taken to present your qualifications to us.

This e-mail serves as confirmation that your resume has been submitted for the following position(s):

Technician Sr 342600BR

Your skills and experience may be reviewed against the requirements of all open position(s), including the one(s) to which you have submitted.

Thank you for considering Lockheed Martin in your job search.

Lockheed Martin is an Equal Opportunity/Affirmative Action Employer. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, pregnancy, sexual orientation, gender identity, national origin, age, protected veteran status, or disability status.

**Please do not reply to this email.**

# REDACTED

---------- Forwarded message ----------
From: **Indeed** <myindeed@indeed.com>
Date: Wed, Feb 17, 2016 at 4:19 PM
Subject: Confirm your email address on Indeed
To: jmfjmf1961@gmail.com

Thanks for signing up at Indeed!
Please click on the following link to verify your email address:

**Confirm your Indeed account**

Or copy and paste the following into your browser:
https://secure.indeed.com/account/claim?v=660acc9468c7f1ea&e=wnp&hl=en&co=US&service=ia&cfb=

If you need further assistance, please contact us.

**Indeed** - one search. all jobs.

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Wed, Feb 17, 2016 at 4:19 PM
Subject: Indeed Application: Odor Control Technician - Field Service Rep.
To: jmfjmf1961@gmail.com

indeed

**You successfully applied for:**

Odor Control Technician - Field Service Rep.
West Industries - Grand Prairie, TX

**Applied**

---

Get job updates from **West Industries**

---

**More jobs like this**

Field Service Technician
Crown Equipment Corporation - Grand Prairie, TX

**For your records:**

Your Message:

Resume:
Joe Fulbright Resume 1.pdf

Name:
Joe

Email:
jmfjmf1961@gmail.com

Phone Number:
817-301-3981

Questions:
This employer will consider only local candidates. Are you in Grand Prairie, TX?

No

Do you have the following license or certification: must have valid Texas drivers license + good driving record?

Yes

Do you speak english?

Yes

Your application has been submitted. Good luck!

---

**Indeed** - one search. all jobs. | 7501 N. Capital of Texas Hwy, Building B. Austin. TX 78731

# REDACTED

---------- Forwarded message ----------
From: **Indeed Support** <support@indeed.com>
Date: Wed, Feb 17, 2016 at 4:21 PM
Subject: Your password on Indeed has been set
To: jmfjmf1961@gmail.com

The password associated with your Indeed account has been set. If you did not set the password or have any questions, please contact us.

**Indeed** - one search. all jobs.

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Thu, Feb 18, 2016 at 11:15 PM
Subject: Indeed Application: Scale Technician - calibration specialist
To: jmfjmf1961@gmail.com

indeed

**You successfully applied for:**

Scale Technician - calibration specialist
North Texas Scales - Dallas, TX

**Applied**

---

Get job updates from **North Texas Scales**

---

**For your records:**

Your Message:

Resume:
Indeed Resume

Name:
Joe Fulbright

Email:
jmfjmf1961@gmail.com

Phone Number:
817 301 3981

Your application has been submitted. Good luck!

---

Indeed - one search. all jobs. | 7501 N. Capital of Texas Hwy, Building B, Austin, TX 78731

# REDACTED

---------- Forwarded message ----------
From: **Abbott-HR-Workday** <abbott@myworkday.com>
Date: Thu, Feb 18, 2016 at 11:24 PM
Subject: Please verify your Account
To: jmfjmf1961@gmail.com

Please click the following link to confirm your email address and finish the account creation process:
https://abbott.wd5.myworkdayjobs.com/abbottcareers/activate/payqm9g2vus5ib6j8smrrqlghzr4dcvu8t1uhak031ptuwpsbvvpuadyr75bef1yi9ubrvvbary7ox2fwriji1s64n7h5bp22aq

# REDACTED

---------- Forwarded message ----------
From: **Abbott-HR-Workday** <abbott@myworkday.com>
Date: Thu, Feb 18, 2016 at 11:35 PM
Subject: Your Application to the Position of Associate Technician IV – 30020949
To: jmfjmf1961@gmail.com




Dear Joe -

We received your application for the position of Associate Technician IV – 30020949 and are reviewing your experience and qualifications. If you meet the requirements of the position, a member of our Talent Acquisition team will contact you.

Thank you for your interest in Abbott. Please feel free to learn more about our company, and continue to view open positions, by visiting our website at www.abbott.com.

To keep up to date with Abbott news, click the links and connect with us:

Best regards,
Abbott Talent Acquisition

# REDACTED

---------- Forwarded message ----------
From: **West Industries** <aerowestlady8_qfh@indeedemail.com>
Date: Mon, Feb 22, 2016 at 12:44 PM
Subject: Application for Odor Control Technician - Field Service Rep. at West Industries
To: Joe <jmfjmf1961@gmail.com>

Hi Joe,

Thanks for your interest in the Odor Control Technician - Field Service Rep. position at West Industries. We have reviewed your application. Unfortunately, you are not the right fit for the position at this time.

I am sorry for the disappointing news. Best of luck in your job search.

Sincerely,
Cindy Shumate

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Wed, Feb 24, 2016 at 3:40 PM
Subject: Indeed Application: Biomedical Technician
To: jmfjmf1961@gmail.com

indeed

**You successfully applied for:**

Biomedical Technician
SPBS INC - Arlington, TX

Applied

Get job updates from **SPBS, INC**

**For your records:**

Your Message:

Resume:
Joe Fulbright Resume 1.pdf

Name:
Joe Fulbright

Email:
jmfjmf1961@gmail.com

Questions:
Do you have at least 1 year of BMET experience?

No

Have you completed the following level of education: Associate?

Yes

Your application has been submitted. Good luck!

---

**Indeed** - one search. all jobs. | 7501 N. Capital of Texas Hwy, Building B, Austin, TX 78731

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Wed, Feb 24, 2016 at 3:53 PM
Subject: Indeed Application: Manufacturing Technician I
To: jmfjmf1961@gmail.com

indeed

**You successfully applied for:**

Manufacturing Technician I
NSC Technologies Inc. - Arlington, TX

Get job updates from **NSC Technologies Inc.**

**» Learn what it's like to work at NSC Technologies Inc..**

Read 36 employer reviews

NSC TECHNOLOGII
WORLDWIDE

**For your records:**

Your Message:

Resume:
Indeed Resume

Name:
Joe Fulbright

Email:
jmfjmf1961@gmail.com

Phone Number:
817 301 3981

Questions:
Do you have at least 1 year of Production Assembly Operations experience?

No

Have you completed the following level of education: High school or equivalent?

Yes

Your application has been submitted. Good luck!

---

**Indeed** - one search. all jobs. | 7501 N. Capital of Texas Hwy, Building B, Austin, TX 78731

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Mon, Mar 21, 2016 at 5:32 PM
Subject: Indeed Application: Metrology Calibration Technician
To: jmfjmf1961@gmail.com

indeed

**You submitted an application for:**

Metrology Calibration Technician
Nicol Scales & Measurement - Dallas, TX

**Submitted**

Get job updates from **Nicol Scales & Measurement**

**For your records:**

Your Message:

Resume:
Joe Fulbright Resume 1.pdf

Name:
Joe Fulbright

Email:
jmfjmf1961@gmail.com

Phone Number:
817-301-3981

Questions:

Do you have at least 3 years of 3-5 years performing calibration of instrument/measurement devices experience?

No

Your application has been submitted. Good luck!

---

**Indeed** - one search. all jobs. | 6433 Champion Grandview Way, Building 1, Austin, TX 78750

# REDACTED

---------- Forwarded message ----------
From: **Indeed Apply** <indeedapply@indeed.com>
Date: Mon, Mar 21, 2016 at 5:36 PM
Subject: Indeed Application: Service and Repair Technician
To: jmfjmf1961@gmail.com

indeed

**You submitted an application for:**

Service and Repair Technician
JP Bowlin - Fort Worth, TX

**Submitted**

Get job updates from **Nicol Scales & Measurement**

**For your records:**

Your Message:

Resume:
Indeed Resume

Name:
Joe Fulbright

Email:
jmfjmf1961@gmail.com

Phone Number:
817 301 3981

Questions:

This employer will consider only local candidates. Are you in Fort Worth, TX?

Yes

Have you completed the following level of education: High school or equivalent?

Yes

Do you have at least 1 year of Repairing or servicing industrial equipment experience?

Yes

Your application has been submitted. Good luck!

---

**Indeed** - one search. all jobs. | 6433 Champion Grandview Way, Building 1, Austin, TX 78750

REDACTED

---------- Forwarded message ----------
From: **Abbott-HR-Workday** <abbott@myworkday.com>
Date: Tue, Mar 22, 2016 at 3:41 PM
Subject: Your Application for the Position of Associate Technician IV – 30020949
To: jmfjmf1961@gmail.com

Abbott HUMAN RESOURCES

Dear Joe -

We received your application for the position Associate Technician IV – 30020949 . After careful consideration, we regret to inform you that you have not been selected for this position.

Because your experience is valuable to us, we will retain your information in our database and may contact you about future job openings that match your profile. We also invite you to visit our careers site on a regular basis:
Abbott Careers
This is the best way to ensure that you are considered for every position that aligns with your career goals.

We thank you for your interest in Abbott and wish you all the best in your career.

Best regards,
Abbott Talent Acquisition

Gmail

Joe Fulbright <jmfjmf1961@gmail.com>

## Online résumé/CV Submission for Electronics Technician I 102-139

1 message

**Fort Worth Transportation Authority** <no-reply@silkroad.com> Mon, May 2, 2016 at 12:30 AM
Reply-To: no-reply@silkroad.com
To: jmfjmf1961@gmail.com

Thank you for your interest in career opportunities with Fort Worth Transportation Authority!

We have received your resume and are currently reviewing your credentials. Should we determine that your background and experience meets our hiring needs, we will contact you with further instructions.

Again, we sincerely appreciate your interest in employment with Fort Worth Transportation Authority.

EOE/M/F/V/D

**Please do not reply to this automated e-mail message.**

Gmail

Joe Fulbright <jmfjmf1961@gmail.com>

## Indeed Application: RF Microwave & Electronics Calibration Technician

1 message

**Indeed Apply** <indeedapply@indeed.com> Sun, May 1, 2016 at 11:11 PM
Reply-To: indeedapply@indeed.com
To: jmfjmf1961@gmail.com

indeed

You submitted an application for:

RF Microwave & Electronics Calibration Technician
Accura Calibration - Dallas-Fort Worth, TX

Submitted

Follow Get job updates from **Accura Calibration**

### For your records:

Your Message:

Resume:
Joe Fulbright Resume 1.pdf

Name:
Joe

Email:
jmfjmf1961@gmail.com

Phone Number:
817-301-3981

Questions:
Are you in Dallas-Fort Worth, TX?
Yes

Do you have at least 1 year of RF Microwave Calibration experience?
No

Your application has been submitted. Good luck!
If you notice an error in your application, please contact Indeed.

Indeed - one search. all jobs. | 6433 Champion Grandview Way, Building 1, Austin, TX 78750

# AGREEMENT

Between The

UNION PACIFIC RAILROAD COMPANY

And The

BROTHERHOOD OF RAILROAD SIGNALMEN

And The

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

(Telecommunications)

The U. S. Department of Transportation, Surface Transportation Board ("STB") approved in Finance Docket 32760 the common control and merger of the rail carriers controlled by the Union Pacific Railroad Corporation (Union Pacific Railroad and Missouri Pacific Railroad), collectively referred to as "UP" and the rail carriers controlled by Southern Pacific Rail Corporation (Southern Pacific Transportation Company, St. Louis Southwestern Railway Company, SPCSL Corporation, and the Denver & Rio Grande Western Railroad Company), collectively referred to as "SP." In so doing, the ST13 imposed the New York Dock employee protective conditions.

The Interstate Commerce Commission (ICC) approved the merger of the Chicago and North Western Railway Company (CNW) into the UP effective April 6, 1995 in Finance Docket No. 32133. In so doing, the ICC imposed New York Dock employee protective conditions.

The Union Pacific Railroad posted notice pursuant to Section 4 of the New York Dock Conditions, under date November 24, 1997, (NYD 277) to consolidate the facilities, territories and seniority districts of the employees represented by the Brotherhood of Railroad Signalmen, under collective bargaining agreement effective January 1, 1984, into the collective bargaining agreement governing telecommunications employees represented by the International Brotherhood of Electrical Workers in effect and controlling as of the date of this agreement.

The Union Pacific Railroad Company (UP), the Brotherhood of Railroad Signalmen (BRS) and the International Brotherhood of Electrical Workers (IBEW) agree to resolve the notice to consolidate the telecommunications facilities, work and territories, served pursuant to the New York Dock conditions and the authority granted by the Interstate

JF 402

Commerce Commission in Finance Docket Nos. 32760 and 32133 in accordance with the following principles:

In accordance with Article 1, Section 4, of New York Dock Conditions,

**IT IS AGREED:**

Section 1.

A. As of the effective date of this Agreement, all Telecommunications work and territory of the employees represented by the IBEW and the BRS shall be consolidated pursuant to Section 2 paragraphs D and E. The Collective Bargaining Agreement between the Union Pacific Railroad Company and the International Brotherhood of Electrical Workers (CBA with IBEW), will be adopted as the new CBA with BRS effective June 15, 1999, for employees covered by the Brotherhood of Railroad Signalmen Collective Bargaining Agreement on the former Gulf District, former C&EI and former Texas & Pacific Railroad (as included in the former Missouri Pacific Railroad Company), effective January 1, 1984 (CBA with BRS). Thereafter, the January 1, 1984 Collective Bargaining Agreement will cease to exist.

B. All understandings, interpretations, side letters and agreements applicable to employees covered by the CBA with IBEW will apply to Telecommunications employees formerly covered by the CBA with BRS.

C. All understandings, interpretations and agreements previously in effect for employees covered by the CBA with BRS covering Telecommunications work are hereby nullified and superseded as provided in paragraphs A and B hereof as of the effective date of this Agreement, except those rules or provisions maintained under this Implementing Agreement.

D. The IBEW will continue to represent employees holding positions on the territory covered by the IBEW seniority rosters covering employees represented by the IBEW, in effect prior to the date of this Implementing Agreement. The BRS will continue to represent all employees holding positions on the territory covered by its former rosters covering employees represented by the BRS for as long as those employees hold any position covered by its former roster as outlined in Section 2, paragraphs D and E.

E. It is understood that the parties to this Agreement cannot serve a Section 6 notice to amend any provisions of this Implementing Agreement. At such time as the last BRS prior right position attrites, the new CBA with BRS (June 15, 1999) will cease to exist.

JF 403

Section 2.

A. On the effective date of this Agreement, the Telecommunication class seniority dates of all employees covered by the CBA with BRS shall be transferred and dovetailed into the applicable seniority rosters established pursuant to the CBA with IBEW (Attachment A). Subsequent to dovetailing, the BRS Telecommunications Seniority Rosters shall cease to exist. Within sixty (60) days of the effective date of this agreement, the parties will meet in Omaha on a mutually agreeable date to review the consolidated seniority rosters and the rosters shall remain open for correction until June 15, 2000.

B. All employees dovetailed as of the date of the consolidation will retain prior rights to positions on the territories covered by their former rosters, except as provided under paragraphs E and F below. Such prior rights will be denoted on the seniority roster with an (E) for IBEW and an (S) for BRS.

C. On the effective date of this Agreement, all BRS prior seniority rights held by employees on the Telegraph & Telephone Seniority Roster and the Southern District Seniority Roster shall cease to exist.

D. Concurrent with the dovetailing of the seniority dates as provided above, Rule 11 of the UPRR Collective Bargaining Agreements with BRS and IBEW shall be amended to include the new, expanded IBEW Telecommunications Seniority Roster No. 4 which shall be identified as including the territory from Watseka, Illinois (inclusive) south. Former C&EI employee J. L. Miller will have his seniority date dovetailed on Roster No. 4. Likewise, Rule 11 of the UPRR Collective Bargaining Agreements with BRS and IBEW shall be amended to include the territory of the former C&EI (identified as from Watseka, Illinois (exclusive) north) on IBEW Telecommunications Seniority Roster No. 9 former C&EI employee G. C. Barcik will have his seniority date dovetailed on Roster No" No. 9

E. On the effective date of this Agreement, Rule 11 of the UPRR Collective Bargaining Agreements with BRS and IBEW shall be amended to include the territory governed by the former Brotherhood of Railroad Signalman Collective Bargaining Agreement on the former Gulf District, C&EI and Texas & Pacific into UPRR IBEW Telecommunications Seniority Roster No 5 BRS Gang employees J. D. Cowan and R. L. Fuller will have their seniority dates dovetailed on Roster No. 5 It is understood that gang construction work is consolidated under the jurisdiction It CBA with IBEW as of the effective date of this Agreement.

F. This consolidation of, work will create four locations where both IBEW and BRS represented employees will be located: San Antonio, Texas; Houston (including Spring), Texas; Dallas, Texas; and Livonia, Louisiana. These four locations will not be considered as prior rights territory for either the IBEW or BRS and positions at these four locations will be assigned based on seniority on the consolidated roster, with no prior rights consideration. When future position abolishments occur at these locations, the position abolished will be determined by the seniority of the incumbent. It is understood that the junior employee's position will be abolished, as long as both Organizations represent employees at the location.

G. Subsequent to the effective date of this Agreement, all telecommunications positions that become vacant shall be open to bid to all employees on the consolidated rosters, subject to prior rights, as provided in this Agreement. If a vacancy occurs in a position on a former IBEW territory for which an employee represented by BRS is the successful bidder, upon assignment to such position the employee will forfeit all prior rights and be covered by the CBA with IBEW and be represented by the IBEW thereafter. Any vacancy that occurs in a position on a former BRS territory that is not filled by a BRSrepresented employee shall no longer be subject to prior rights and shall thereafter come under the jurisdiction of the CBA with IBEW. All new positions shall be bulletined under the CBA with IBEW.

H. Employees in a furloughed status on the rosters will not be able to activate their seniority until regular-assigned position is bulletined due to resignation, transfer, retirement, of any of the current assigned employees or increase in force, etc. Seniority rights of these employees in a furloughed status as of the effective date of this agreement and whose dovetailed seniority is greater than a junior employee holding a regular assignment at the time will not be subject to recall to service until such time that a permanent position becomes vacant which is not filled by an active employee holding a regular assignment as of the effective date of this Agreement. The furloughed employee's seniority shall be considered "activated" when assigned to a permanent position. This will not, however, preclude utilizing the furloughed employees on a temporary basis pending bulletin assignment or other temporary vacancies.

I. In the event two or more employees from different seniority rosters have identical seniority dates, the employees shall be ranked first by service dates, then, if service dates are the same, by date of birth, the oldest employee to be designated the senior ranking. This shall not affect the respective ranking of employees with identical seniority dates on their former seniority roster.

J. BRS-represented employees affected by a change in representation under this Implementing Agreement may exercise a one-time option within six (6) years of the effective date of this Agreement to request consideration for a vacancy in the Signal Department represented by the Brotherhood of Railroad Signalmen. Employees allowed to move to a Signal position under the BRS through this provision will have their seniority date removed from the IBEW roster and will attain seniority with the BRS under the applicable provisions of the controlling Collective Bargaining Agreement. Employees exercising this option will be credited with all prior continuous service for vacation, personal leave, and other present or future benefits which are granted on the basis of qualifying years of service. Any protective benefits acquired under this Agreement shall be forfeited should an employee elect to exercise this one-time option and return to a BRS represented position.

Section 3.

Upon ten (10) working days advance notice, the Carrier shall proceed with the following job changes:

1 Tower Gang Foreman position to be abolished at Fort Worth, TX (J. D. Cowan)
1 Technician position to be abolished at Tyler, TX (W. A. Talley)
1 Technician position to be transferred from Tyler, TX to Longview, TX (J. W. Pinkston)
1 Technician position to be abolished at San Antonio, TX (J. T. Sada)
1 Technician position to be abolished at Big Springs, TX (R. D. Tant)

Employees required to transfer pursuant to this transaction are eligible for the moving benefits of New York Dock (Attachment B) or the attached moving benefits (Attachment C) as an alternative to the New York Dock.

Section 4.

A. BRS-represented employees transferring to the new CBA with BRS pursuant to this Agreement shall maintain their current rates of pay for as long as they remain on a BRS represented position. Job titles will be changed in accordance with the new CBA with BRS, as shown on Attachment A.

B. With the exception of the abolishments listed in Section 3, at the time of implementation of this Agreement, each Telecommunications employee will remain on his current Telecommunications position and will not be entitled to a bump or displacement rights. As positions held by BRS represented employees are vacated, they will be filled according to the provisions of the CBA with IBEW.

Section 5.

A. BRS-represented employees transferring to the CBA with IBEW pursuant to this Agreement, shall be credited with all prior continuous service for vacation, personal leave, and other present or future benefits which are granted on the basis of qualifying years of service in the same manner as though all such time had been spent in the service of the UPRR, as appropriate.

B. The employees formerly covered by the CBA with BRS will continue coverage under the National Health and Welfare Plan and Supplemental Sickness benefits based on the Agreement with BRS.

Section 6.

The February 7, 1965 conditions will continue to apply to all employees represented by BRS on the date hereof, until such time as they leave the service of the Carrier or change to a craft other than the Signal craft.

Section 7.

A. The employee protective benefits and conditions as set forth in the New York Dock Conditions, attached hereto as Attachment B, shall be applicable. There shall be no duplication of benefits by an employee under this Agreement and any other agreement or protective arrangement. Active and regular-assigned employees failing to apply for a position available to them or failing to accept a position shall not be considered deprived of employment and shall not be entitled to the protective benefits contained in the New -York Dock Conditions.

B. Any employee determined to be a "displaced" or "dismissed" employee as a result of this transaction, who is otherwise eligible for protective benefits and conditions under some other job security agreement, conditions or arrangements shall elect in writing within sixty (60) days of being affected between the protective benefits and conditions of this Agreement and the protective benefits and conditions under such other arrangement (written notification is to be given Supervisor Protection Management, 1815 Capitol, PNG 06, Omaha, NE 68102-2920 with copy of such election to the employee's General Chairman). Should any employee fail to make an election of benefits during the period set forth in this paragraph B, such employee shall be considered as electing the protective benefits and conditions of this Agreement.

An employee currently covered by the protective benefits and conditions of another agreement may continue coverage under said agreement and upon expiration of said coverage elect the protective benefits and conditions remaining, if any, under this agreement, as set forth in Section 3, Article 1, of the New York Dock Conditions.

C. Each "dismissed employee" shall provide UPRR's designated Manager with the following information for the preceding month in which he is entitled to benefits no later than the tenth (10th) day of each subsequent month on a standard form provided by UPRR:

(1) The day(s) claimed by such employee under any unemployment insurance act.

(2) The day(s) claimed by such employee worked in other employment, the name(s) and address(es) of the employer and the gross earnings made by the dismissed employee in such other employment.

(3) The day(s) for which the employee was not available for service due to illness, injury or other reasons for which the employee could not perform service and the employee received sickness benefits.

D. If the "dismissed employee" referred to herein has nothing to report account not being entitled to benefits under any unemployment insurance law, having no earnings from any other employment, and was available for work the entire month, such employee shall submit, within the time period provided for in paragraph C of this Section, the form annotated "Nothing to Report."

E. The failure of any employee to provide the information as required in paragraphs C and D of this Section shall result in the withholding of all protective benefits during the month covered by such information pending receipt by UPRR's designated Supervisor Protection Management of such information from the employee. Except where an employee establishes that undue hardship delayed the filing of a claim, no claim for protective benefits shall be honored beyond sixty (60) days from the time specified in paragraph C of this Section.

Section 8.

A copy of this Implementing Agreement with attachments will be posted on bulletin boards accessible to employees affected by this transaction with sufficient number of copies to be made available to furnish individual copy to employees upon request.

Section 9.

For convenience, reference to gender, if any, in this Implementing Agreement and attachments are made in the masculine gender. It is understood and agreed by the parties to this Agreement that references to the masculine gender include both the masculine gender and the feminine gender.

Section 10.

A. This Agreement shall constitute the required Agreement as stipulated in Article 1, Section 4, New York Dock Conditions.

B. Any dispute arising out of this Implementing Agreement and the attached Letters of Agreement and/or Understandings will be handled by the appropriate General Chairman with the highest Labor Relations Officer designated to receive such claims and grievances for UPRR. Disputes not involving Section 3 or 7 of this Implementing Agreement, or Attachment C hereto, may be handled in accordance with Section 3 of the Railway Labor Act.

Section 11.

A. The provisions of this Implementing Agreement have been designed to address a particular situation. The parties exchanged various proposals and drafts antecedent to the adoption of this Agreement. It is our mutual understanding that none of such antecedent proposals and drafts will be used by any party for any purpose and that the provisions of this Agreement will be interpreted and applied as though such proposals and drafts had not been used or exchanged in the negotiations.

B. Therefore, the provisions of this Implementing Agreement and the attached Letters of Agreement and/or Understandings are without precedent or prejudice to the position of either party and shall not be referred to in any other transaction, nor within the context of negotiation (either National or Local) to which these crafts and this Carrier may be a party.

This Agreement shall become effective June 15, 1999.

JF 408

**Signed this 25th day of May, 1999.**

JF 409

**UNION PACIFIC RAILROAD COMPANY**
TELECOMMUNICATIONS DEPARTMENT
Seniority District No. 4
**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**
**Seniority Roster - Effective June 15, 1999**

| # NAME | POSITION | LOCATION | SENIORITY DATE | REPRESENTATION |
|---|---|---|---|---|
| 1 Hawkins, W. | Medical (2004) | Chester, IL | 2/19/62 | E |
| 2 Eaton, R. A. | ET Preserved/Monthly | N. Little Rock, AR | 9/20/63 | E |
| 3 Talley, W.A. | ET Preserved/Monthly | Tyler, TX | 8/19/64 | E |
| 4 Miller, J.L. | Sr. ET Preserved/Monthly | Salem, IL | 11/15/65 | S |
| 5 Apperson, F.L. | ET Preserved/Monthly | VanBuren | 2/1/66 | E |
| 6 Mason, D.W. | ETA Preserved Hourly | Marysville, KS | 6/1/66 | E |
| 7 Hammons, D.C. | Promoted | | 10/20/66 | E |
| 8 Bonham, M.E. | ET Preserved/Monthly | 0sawatomic, KS | 10/24/66 | E |
| 9 Grise, C.E. Jr. | ET Preserved/Monthly | Newport, AR | | 11/16/66 |
| E | | | | |
| 10 Wright, W.W. | ET Preserved/Monthly | Houston, TX | | 5/8/67 |
| S | | | | |
| 11 Heise, H.G. | ETA Preserved Hourly | Chester, TL | 11/01/67 | E |
| 12 Valentine, E.L. | ET Preserved/Monthly | Pine Bluff, AR | | 2/16/68 |
| E | | | | |
| 13 Burton, G.C. | ETA Preserved Hourly | Atchison, KS | | 6/18/68 |
| E | | | | |
| 14 Whitesell, W.E. | ET Preserved/Monthly | Livonia, LA | 9/1/68 | S |
| 15 Lynch, D.W. | ET Preserved/Monthly | Longview, TX | | 9/3/68 |
| Weir, D.E. | ET Preserved/Monthly | Houston, TX | | 11/18/68 |
| E | | | | |
| 17 Kline, R.J. | Medical (12/2003) | Salem, IL | 11/22/68 | S |
| 18 Gwyn, W.A. | ETA Preserved Hourly | St. Louis, MO | | 6/16/69 |
| E | | | | |
| 19 Stefaniak, T.E. | ETA Preserved Hourly | Dupo, IL | 7/1/69 | E |
| 20 Oliveral. H. | ET Preserved/Monthly | San Antonio, TX | 3/9/70 | E |
| 21 Brown, F.M. | ET Preserved/Monthly | Malden, MO | | 8/31/70 |
| E | | | | |
| 22 Cunningham, R.R. | Sr. ET Preserved/Monthly | Big Spring, TX | 10/23/70 | S |
| 23 Sykes, L.E. | Medical (2002) | | 11/16/70 | E |
| 24 Moss, R.E. | ETA Preserved Hourly | Livonia, LA | 11/23/70 | E |
| 25 Rice, G.L. | ETA Preserved Hourly | De Soto, MO | | 7/19/71 |
| E | | | | |
| 26 Boyd. M.L. | Sr. ET Preserved/Monthly | Fort Worth, TX | 12/13/71 | S |
| 27 Slansky, T.J. ## | Promoted | | 2/23/72 | E |
| 28 Inman, P.T. | ET Preserved/Monthly | E. St. Louis, IL | 7/10/72 | E |
| 29 Tate, A. | ET Preserved/Monthly | St. Louis, MO | | 12/19/72 |
| E | | | | |
| 30 Kemp. D.L. | ET Preserved/Monthly | Houston, TX | | 2/20/73 |
| S | | | | |
| 31 Mazurek, E. Jr. | ET Preserved/Monthly | San Antonio, TX | 3/12/73 | E |
| 32 Holden, C.L. | Promoted | San Antonio, TX | 3/14/73 | E |
| 33 Doiron, C.P. | ET Preserved/Monthly | Houston, TX | | 4/16/73 |
| E | | | | |
| 34 Ward, J.D. | ET Preserved/Monthly | San Antonio, TX | 5/3/73 | E |
| 35 Lombard, T.C. | ET Preserved/1\4onthly | Laredo, TX | 9/11/73 | E |
| 36 McMellen, A.L. | ET Preserved/Monthly | Springfield, IL | | 10/15/73 |
| Ballachino, R.A. | Sr. ET Preserved/Monthly | Fort Worth, TX | 5/13/74 | S |

JF 410



UPFULBRIGHT002662

| | | | | |
|---|---|---|---|---|
| 38 Woods, J.F. | ET Preserved/Monthly | Dallas, TX | 5/16/74 | E |
| Wiggins, F.D. | ETA Preserved Hourly | Kansas City, MO | 8/27/74 | E |
| 40 Belew, W.R. | ET Preserved/Monthly | Pine Bluff, AR | | 9/3/74 |
| E | | | | |
| 41 Legamaro, C. Jr. | Promoted | | 9/7/74 | E |
| 42 Mercer, C.M. | Promoted | | 5/5/75 | E |
| 43 Swanigan, R.A. | ET Preserved/Monthly | Pine Bluff, AR | | 10/6/75 |
| E | | | | |
| 44 Hoover, H.M. | Promoted | N. Little Rock, AR | 2/17/76 | E |
| 45 Hurt, M.D. | ETA Preserved Hourly | Kansas City, MO | 5/17/76 | E |



# UNION PACIFIC RAILROAD COMPANY

**TELECOMMUNICATIONS DEPARTMENT**

**Seniority District No. 4**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

**Seniority Roster - Effective June 15, 1999**

| # NAME | POSITION | LOCATION | SENIORITY DATE | REPRESENTATION |
|---|---|---|---|---|
| 46 Hanna, M.D. | ETA Preserved Hourly | St. Louis, MO | 8/4/76 | E |
| 47 White, J.P. | ET Preserved/Monthly | Alpine, TX | 10/26/76 | E |
| 48 Casper, J.T. | ETA Preserved Hourly | Dallas, TX | 4/4/77 | E |
| 49 Steele, J.M. | ET Preserved/Monthly | Houston, TX | 5/23/77 | E |
| 50 Appling, J.F. | ET Preserved/1\4onthly | Pine Bluff, AR | 7/26/77 | E |
| 51 Sorenson, R.D. | ET Preserved/Monthly | Kansas City, MO | 9/6/77 | E |
| 52 Weber, G.C. | ET Preserved/Monthly | Hearne, TX | 4/21/78 | E |
| Estill, D.L. | Sr. ET Preserved/Monthly | Fort Worth, TX | 5/4/78 | S |
| 54 Range, L. | ET Preserved/Monthly | Houston, TX | 5/4/78 | E |
| 55 Shadwick, T.J. | Promoted | | 6/12/78 | S |
| 56 Mayo, D.W. | ETA Preserved Hourly | Poplar Bluff, MO | 6/12/78 | E |
| 57 Spielbusch, G.E. | ET Preserved/Monthly | Kansas City, MO | 9/15/78 | E |
| 58 Breitenbach, R.S. | ET Preserved/Monthly | Monroe, LA | 10/16/78 | E |
| 59 Forbes, J.E. | ET Preserved/Monthly | Parsons, KS | 12/29/78 | E |
| 60 Ashley, T.E. | ET Preserved/Monthly | Houston, TX | 2/7/79 | E |
| 61 Lombard, R.B. | ET Preserved/Monthly | Del Rio, TX | 3/16/79 | E |
| 62 Deaver, J.G. | Promoted | | 4/11/79 | E |
| 63 Thom, L.H. | ET Preserved/Monthly | Avondale, LA | 1/3/80 | S |
| 64 Meza, L.A. | ET Preserved/Monthly | Del Rio, TX | 6/30/80 | E |
| 65 Haire, JW. | Sr. ET Preserved/1\4onthly | Fort Worth, TX | 9/10/80 | S |
| 66 Jackson, J.F. | ETA Preserved Hourly | Kansas City, MO | 10/25/80 | E |
| 67 Oerman, R.L. | ETA Preserved Hourly | Coffeyville, KS | 12/5/80 | E |
| 68 Busch, R.D. | Sr. ET Preserved/Monthly | San Antonio, TX | 1/5/81 | S |
| 69 Pinkston, J.W. | ET Preserved/T\4onthly | Tyler, TX | 1/22/81 | E |
| 70 Lane, K.E. | ET Preserved/1\4onthly | Houston, TX | 3/16/81 | E |
| 71 Hawkins, H.L. | ET Preserved/Monthly | Alexandria, LA | 3/17/81 | S |
| 72 Mansur, G.S. | Promoted | Spring, TX | 3/24/81 | S |
| 73 Janak, A.H. | Promoted | | 6/22/81 | S |
| 74 Ramsey, K.W. | ET Preserved/Monthly | Gurdon, AR | 7/16/81 | E |
| 75 Linbeck, L.J. | ET Preserved/Monthly | Houston, TX | 9/29/81 | S |
| 76 Williams, M.P. | ET Preserved/1\4onthly | N. Little Rock, AR | 10/16/81 | E |
| 77 Reece, G.D. | Promoted | | 2/26/82 | E |
| 78 Urban, R.R. | ETA Preserved Hourly | Kansas City, MO | 7/26/82 | E |
| 79 Larson, L.L. | ET Preserved/1\4onthly | Corpus Christi, TX | 9/7/82 | S |
| 80 Hawthorne, C.C. | ETA Preserved Hourly | Pine Bluff, AR | 10/4/82 | E |
| Drake, CW. | Promoted | | 10/31/82 | E |
| Menard, D.P. | Sr. ET Preserved/Monthly | Spring, TX | 11/8/82 | S |

| | | | | |
|---|---|---|---|---|
| 83 Pierce, L.C. | ET Preserved/Monthly | Wichita, KS | 12/6/82 | E |
| Johnson, B.D. ## | Promoted | | 12/14/82 | S |
| 85 Evans, T.L. | Medical (2011) | | 10/17/83 | E |
| 86 Moore, B.E. | ET Preserved/Monthly | Kansas City, MO | 2/6/84 | E |
| 87 Couch. S.V. | ET Preserved/Monthly | Kansas City, MO | 2/13/84 | E |
| 88 Corley, D.A. | Promoted | | 2/16/84 | S |
| 89 Ladd, E.P. | ET Preserved/Monthly | Angleton, TX | 3/12/84 | S |
| 90 Lombard, G.A. | ET Preserved/Monthly | Laredo, TX | 5/3/84 | E |



JF 412



UPFULBRIGHT002664

# UNION PACIFIC RAILROAD COMPANY

TELECOMMUNICATIONS DEPARTMENT

Seniority District No. 4

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

**Seniority Roster - Effective June 15, 1999**

| NAME | POSITION | LOCATION | SENIORITY DATE | REPRESENTATION |
|---|---|---|---|---|
| 91 Urban, R.M. | Sr. ET Preserved/Monthly | Palestine, TX | 7/23/84 | S |
| 92 Johnson, R.G. | Promoted | N. Little Rock, AR | 8/8/84 | S |
| 93 Connolly, J.A. | Sr. ET Preserved/Monthly | Beaumont, TX | 8/16/84 | S |
| 94 Lasswell, J.E. | Promoted | Kansas City, MO | 9/10/84 | S |
| 95 Venable, C.R. Jr. | ET Preserved/Monthly | Houston, TX | 10/1/84 | E |
| 96 Taylor, E.P. | Sr. ET Preserved/Monthly | Livonia, LA | 2/11/85 | S |
| 97 Christopher, R.F. | LOA (Medical) | Houston, TX | 3/1/85 | E |
| 98 Booth, D.A. | ET Preserved/Monthly | Denison, TX | 5/13/85 | E |
| 99 Schumacher, W.A. | Sr. ET Preserved/Monthly | Dallas, TX | 5/28/85 | S |
| 100 Williams, C.E. | ET Preserved/Monthly | Muskogee, OK | 4/1/86 | E |
| 101 Tant, R.D. | Sr. ET Preserved/Monthly | Big Spring, TX | 2/2/87 | S |
| 102 McMillan, M.L. | ETA | Chester, IL | 6/13/88 | E |
| 103 Kunz, R.M. | ETA | Kansas City, MO | 6/23/88 | E |
| 104 Siebert, T.A. | ETA | St. Louis, MO | 9/1/88 | E |
| 105 Hammons, D.C. Jr. | Sr. ET Preserved/Monthly | Shreveport, LA | 9/12/88 | S |
| 106 Garrett, L.A. | ETA | N. Little Rock, AR | 10/3/88 | E |
| 107 Horton, R.K. | Sr. ET Preserved/Monthly | Fort Worth, TX | 10/3/88 | S |
| 108 Nolind, M.D. | ETA | Marysville, KS | 12/14/88 | E |
| 109 McKenzie, J.D. ## | Promoted | | 2/28/89 | S |
| 110 Yates, D.C. | Promoted | | 3/1/89 | E |
| 111 Williams, L.L. | ETA | Jeff City, MO | 5/1/89 | E |
| 112 Burton, DR. | ETA | St. Louis, MO | 8/3/89 | E |
| 113 Ringwald, R.L. | Sr. ET Preserved/Monthly | Taylor, TX | 2/5/90 | S |
| 114 Oiler, S.V. | Sr. ET Preserved/Monthly | Longview, TX | 2/6/90 | S |
| 115 Richards, G.A. | Sr. ET Preserved/Monthly | Spring, TX | 2/12/90 | S |
| 116 Gray, R.B. | ETA | N. Little Rock, AR | 3/1/90 | E |
| 117 Brand, J.M. | Promoted | St. Louis, MO | 4/1/90 | E |
| 118 Sada, J.T. | Sr. ET Preserved/Monthly | San Antonio, TX | 8/13/90 | S |
| 119 Hendry, M.W. | (Medical) | | 9/4/90 | E |
| 120 Neal, T.D. | Promoted | Fort Worth, TX | 10/1/90 | S |
| 121 Nay, M.D. | ETA | Salina, KS | 10/8/90 | E |
| 122 Johnson, R.C. | ETA | N. Little Rock, AR | 10/16/90 | E |
| 123 Carlson, VR. | Sr. ET Preserved/Monthly | Spring, TX | 3/1/91 | S |
| 124 Bargmann, N.F. | ETA | Wichita, KS | 10/21/91 | E |
| 125 Helton, CW. | ET Preserved/Monthly | Taylor, TX | 10/21/91 | S |
| 126 Bracken, J.D. ## | Promoted | | 5/25/92 | S |
| 127 Goff, P.K. | Promoted | | 9/1/92 | E |
| 128 Wainz, E.K. | Promoted | | 10/1/92 | E |
| 129 Martin, J. A. | Sr. ET Preserved/Monthly | Houston, TX | 1/25/93 | S |
| 130 Pippen, G.A. | ETA (LOA) | Dolton, IL | 1/25/93 | S |
| 131 Clark, T.D. | ET Preserved/Monthly | Palestine, TX | 4/16/94 | S |
| 132 Hale, J.D. | ETA | N. Little Rock, AR | 9/1/94 | E |
| 133 Saldana, L.B. Jr. | ET Preserved/Monthly | Fort Worth, TX | 11/1/94 | S |
| 134 Widmer, J.T. | Sr. ET Preserved/Monthly | Houston, TX | 11/1/94 | S |
| 135 Bays, S.L. | ETA | Kansas City, MO | 12/5/94 | E |

# UNION PACIFIC RAILROAD COMPANY

**TELECOMMUNICATIONS DEPARTMENT**

**Seniority District** No. 4

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

**Seniority Roster - Effective June 15, 1999**

| # | NAME | POSITION | LOCATION | SENIORITY DATE | REPRESENTATION |
|---|---|---|---|---|---|
| 136 | Hotard, J.S. | ET Preserved/Monthly | E. St. Louis, IL | 3/15/95 | E |
| 137 | Haines, L.S. | Promoted | Fort Worth, TX | 5/1/95 | S |
| 138 | Balmilero, L. | ET Preserved/Monthly | Topeka, KS | 7/17/95 | E |
| 139 | Larson, R.S. | ETA | Memphis, TN | 12/21/95 | E |
| 140 | Cooper, B.A. | Promoted | | 8/5/96 | E |
| 141 | Wickerson, A.E. | ET13 | St. Louis, MO | 8/6/96 | E |
| 142 | Meiklqjohn, M.C. | ET Preserved/Monthly | Pratt, KS | 1/6/97 | E |
| 143 | Shulte, D.T. | ET Preserved/Monthly | Dalhart, TX | 1/7/97 | E |
| 144 | Triplo, D.M. | ETB | St. Louis, MO | 2/18/97 | E |
| 145 | Will, J.B. | ETB | St. Louis, MO | 3/17/97 | E |
| 146 | Carlson, D.A. | Promoted | | 4/4/97 | E |
| 147 | McKenzie, J.D. Jr. | ETA | St. Louis, MO | 8/8/97 | E |
| 148 | Hines, E.C. Jr. | ET Preserved/Monthly | Livonia, LA | 8/16/97 | S |
| 149 | Howard, J. A. | ETB | St. Louis, MO | 1/5/98 | E |
| 150 | Overschmidt, M.E. | ETC | Dupo, IL | 1/26/98 | E |
| 151 | Stanfill, J. L. | ETC | St. Louis, MO | 3/2/98 | E |
| 152 | Fries, M.L. | ETC | Herrington, KS | 12/1/98 | E |
| 153 | Hale, S.T. | ET Preserved/Monthly | Fort Worth, TX | 12/16/98 | S |
| 154 | Delly, D.L. | ETB | Houston, TX | 5/3/99 | E |
| 155 | Genteman, T.W. | ETC | St. Louis, MO | 5/3/99 | E |

Legend: ## Seniority date ceases to accumulate



JF 414



UPFULBRIGHT002666

# UNION PACIFIC RAILROAD COMPANY

TELECOMMUNICATIONS DEPARTMENT

Seniority District No. 9

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

**Seniority Roster - Effective June 15, 1999**

| # | NAME | POSITION | LOCATION | SENIORITY DATE | REPRESENTATION |
|---|---|---|---|---|---|
| 1 | Pilon. J.L. | Medical (3/2001) | | 6/8/59 | E |
| 2 | Veit, R. A. | Medical (4/2004) | | 8/24/60 | E |
| 3 | Meyer, G.G. | Medical (9/1999) | | 2/6/63 | E |
| 4 | Kricter, B.J. | ETA Preserved Hourly | W. Chicago, IL | 6/10/63 | E |
| 5 | Strobel, G.A. | Medical (11/2004) | | 8/1/63 | E |
| 6 | Ackerman, J.R. | Medical (11/2005) | | 3/1/64 | E |
| 7 | Corcoran, D.E. | ETA Preserved Hourly | Cedar Rapids, I | 5/25/64 | E |
| 8 | Gunderson, L.A. | ETA Preserved Hourly | St. Paul, MN | 10/5/64 | E |
| 9 | Blinkensop, D.A. | Medical (12/2007) | | 10/6/64 | E |
| 10 | Eggleston, A.D. | Medical (9/2006) | | 8/23/66 | E |
| 11 | Johannsen, R.D. | ETA Preserved Hourly | Clinton, IA | 10/30/67 | E |
| 12 | Nelson, L.D. | ETA Preserved Hourly | Boone, IA | 5/1/68 | E |
| 13 | Ignaszewski, R.L. | ETA Preserved Hourly | St. Paul | 10/19/69 | E |
| 14 | Aubry, S.L. | ETA Preserved Hourly | Waukegan, IL | 10/30/69 | E |
| 15 | Brennan. D.H. | ETA Preserved Hourly | Proviso, IL | 2/28/70 | E |
| 16 | Barcik, G.C. | Sr. ET Preserved/Monthly | Dolton, IL | 4/13/70 | S |
| 17 | Jensen, E. | Medical (6/2008) | | 6/17/70 | E |
| 18 | Willuweitt, H.W. | Medical (10/2006) | | 6/19/70 | E |
| 19 | Nemechek, T.W. | ETA Preserved Hourly | Des Moines, IA | 8/1/71 | E |
| 20 | Hickey. J. W. | ETA Preserved Hourly | Trenton, MO | 8/19/71 | E |
| 21 | Nugent, S.R. | ETA Preserved Hourly | Boone, IA | 8/3/72 | E |
| 22 | Beebe, D.R. | ETA Preserved Hourly | Peoria, IL | 1/6/73 | E |
| 23 | Phillips, J.M. | ETA Preserved Hourly | Butler, WI | 8/20/75 | E |
| 24 | Kester, K.A. | ETA Preserved Hourly | Clinton, IA | 6/22/77 | E |
| 25 | Kautzmarm, D.R. | ETA Preserved Hourly | Proviso, IL | 9/28/77 | E |
| 26 | Vlasak, W.F. | ETA Preserved Hourly | Proviso, IL | 12/5/77 | E |
| 27 | Lee, C.E. | ETA Preserved Hourly | Proviso, IL | 2/16/80 | E |
| 28 | Brenke, S.W. ## | Promoted | | 6/6/80 | E |
| 29 | Prins, G.R. | ETA Preserved Hourly | Mason, City, IA | 2/2/81 | E |
| 30 | Schneider, C.J. | ETA Preserved Hourly | Des Moines, IA | 4/4/83 | E |
| 31 | Whitelaw, JW. | ETA Preserved Hourly | Chicago, IL | 8/2/83 | E |
| 32 | Mauser, M.H. | Lead ETA Preserved | St. Paul, MN | 1/15/86 | E |
| 33 | Grosso, M.J. ## | Promoted | | 1/18/86 | E |
| 34 | Leacock, T.M. ## | Promoted | | 12/2/86 | E |
| 35 | Burden, D.B. ## | Promoted | | 6/1/88 | E |
| 36 | King, M.A. | Lead ETA Preserved | Chicago, IL | 9/1/89 | E |
| 37 | Carroll, D.B. | ETA Preserved Hourly | Proviso, IL | Il/1/89 | E |
| 38 | Postuchow, K.W. | ETA Preserved Hourly | Butler, W1 | 9/1/90 | E |
| 39 | Cashatt, S.W. | ETA Preserved Hourly | W. Chicago, IL | 3/4/93 | E |
| 40 | Henry, G.O. | ETA Preserved Hourly | Proviso, IL | 4/1/93 | E |
| 41 | Huszagh, R. | ETA Preserved Hourly | Proviso, IL | 12/19/94 | E |
| 42 | Braden, P.S. ## | Promoted | | 5/16/96 | E |



JF 415

# UNION PACIFIC RAILROAD COMPANY

**TELECOMMUNICATIONS DEPARTMENT**

**Seniority District** No. 5

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

**Seniority Roster - Effective June 15, 1999**

| | NAME | POSITION | GANG # | SENIORITY DATE |
|---|---|---|---|---|
| 1 | Whaley, G.L. | Medical (6/2005) | | 3/12/62 |
| 2 | Cochrun, O.D. | Lineman | 3B | 8/1/65 |
| 3 | Whatley, W.D. | Medical (11/2002) | | 12/5/66 |
| 4 | Wills, B.W. | Linernan | 4B | 1/3/67 |
| 5 | Silvam,, P. B. | Lineman | 4B | 10/19/70 |
| 6 | Alford, M.D. | Lineman | 2C | 11/20/70 |
| 7 | Allison, R.D. | Medical (1/2009) | | 5/1/71 |
| 8 | Terrell, R. S. | Lineman | 4B | 3/1/74 |
| 9 | Carter, J.B. | Lineman | 2C | 3/4/74 |
| 10 | Fowler, N. | Lineman | 2C | 7/15/74 |
| 11 | Mannolejo, M. | Lineman | 3A | 7/9/79 |
| 12 | Christner, A.V. | Lineman | 3A | 3/3/81 |
| 13 | McDaneld, M.R. | Lineman (LOA) | | 4/18/83 |
| 14 | Busby, M.J. | Lineman | 3B | 8/1/84 |
| 15 | Cowan, J.D. | Lineman | 2B | 9/10/84 |
| 16 | Rhoades, R.G. | Lineman | 4C | 10/1/86 |
| 17 | Tincher, JW. | Lineman | 3B | 12/20/86 |
| 18 | Bishop, R.L. | Lineman | 113 | 2/1/87 |
| 19 | Colby, M.S. | Lineman | IB | 1/1/88 |
| 20 | Allison, C.R. | Medical (10/2014) | | 6/1/88 |
| 21 | Paddick, J.R. | Lineman (LOA) | | 7/1/91 |
| 22 | Horn, D.W. | LOA (Military) | | 5/23/92 |
| 23 | Burstert, M.N. | Lead Lineman | 113 | 7/18/94 |
| 24 | Fuller, R.L. | Lineman | 2B | 2/1/95 |
| 25 | Sinclair, K. W. | Lineman | 2A | 6/8/98 |
| 26 | Hill, S. L. | Lineman | 2A | 6/8/98 |
| 27 | Rathbun, S.D. | Lineman | 1A | 6/16/98 |
| 28 | Hanke, P.L. | Lineman | IA | 6/16/98 |
| 29 | Simpson, W.B. Jr. | Lineman | 2A | 6/29/98 |
| 30 | Spivak, M. S. | Lineman | 4A | 9/21/98 |
| 31 | Rush, J.J. | Lineman | 4A | 12/1/98 |
| 32 | Price, S. L. | Lineman | IA | 2/1/99 |



JF 416



UPFULBRIGHT002668

UNION PACIFIC RAILROAD COMPANY ATTACHMENT A

1416 DODGE STREET
OMAHA NEBRASKA 68'7-

May 12, 1993

File: M-220-39

A. C. H.
JUN 11 1993

VICE PRESIDENT
JUN 01 1993
LABOR RELATIONS

MR E J ANOUSAKES
GENERAL CHAIRMAN BRS
6621 STONEHEDGE RD
North Little ROCK AR 72117

On several occasions we have discussed our shared concern with ways of encouraging employes to take full advantage of the Company's continuing technical training programs. In all functional areas of the Railroad, the Company is experiencing rapid technological change. Nowhere, however, is that change as widespread or as fast-paced as it is in the Communications area.

In order to encourage employes to make a commitment to what amounts to lifetime learning, and to recognize and reward employes who have made that commitment, we have agreed to the following:

(1) Any employe (Communications Maintainer, Maintenance Foreman or Communications Technician) who has taken a minimum of three voluntary Company advanced training classes in Communications; and
(2) Who has achieved a score of 90% or better in at least three such classes shall
(3) Be rewarded with the title of Senior Communications Technician.

When an employe becomes a Senior Communications Technician, the 65¢ an hour skill differential additive received by Communications Maintainers and Communications Technicians shall be made a part of the base salary rather than being handled as an additive. Thereafter, as part of the base salary, Oft additional 65¢per hour shall be part of the base for purposes of applying future percentage salary increases. Since the 65¢ an hour will have been bulk into the rate base for Senior Communications Technicians It is understood that the skill differential shall no longer apply to such positions.

If this proposal meets with your approval, please so indicate by signing in the space provided below.

Yours truly,

A. C. HALLBERG
Director Labor Relations
Maintenance of Way & Signal

F. J. Sevenants
General Director Telecommunications

AGREED:

E. J. Anousakes, General Chairman BRS

V. Van Artstalen, Vice President BRS

051293L:ACH

May 25, 1999

NYD 277

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

**SECTION ONE**

An employee who is required to change his place of residence as a result of his job being abolished or his work transferred under the Implementing Agreement effective June 15, 1999, and who, on the date of May 1, 1999, owned his home or was under contract to purchase a home and provides evidence of such ownership, shall be afforded one of the following options, which must be exercised within thirty (30) days from the date assigned to a position at the new work location:

Option 1: Accept the moving expense and loss in sale of home benefits provided by the terms of the New York Dock Conditions and paragraph (a) of this Attachment
C.

Option 2: As a homeowner, accept a lump-sum transfer allowance in Lieu of any and all
other moving expense and loss in sale of home benefits and allowances provided
under the terms of New York Dock Benefits. The lump-sum transfer allowance is based
on the shortest highway mileage from the old work location to the new work location,
as follows:

| Mileage | Amount |
|---|---|
| 30-449 | $18,000 |
| 450-899 | $18,500 |
| 900-1349 | $19,000 |
| 1350+ | $19,500 |

NOTE: A homeowner is defined as one who owns or is under contract to purchase their own home which is presently occupied as a principle place of residence. A copy of deed, with an original notary public signature must be submitted with election of Option 1 or 2. A contract, deed or lease for a given residence may be submitted/used only one time as proof of home ownership for entitlement to this homeowner relocation benefit.

## SECTION TWO

An employee that is a homeowner but does not sell his permanent place of residence will receive in lieu of any and all of the benefits contained in the above options to accept a lump-sum amount of Ten Thousand Five Hundred Dollars ($10,500.00). An employee electing this option will be considered as having relocated but will not be required to sell his permanent place of residence.

## SECTION THREE

An employee referred to above who does not own a home or is not obligated under contract to purchase his home shall be afforded one of the following options which must be exercised within thirty (30) days from the date assigned to a position at the new work location:

Option 1: Accept the moving expense benefits and allowance provided by the terms of New York Dock Conditions and paragraph (a) of this Attachment C.

Option 2: Accept a lump-sum transfer allowance in lieu of any and all other moving expense and allowances provided under the terms of New York Dock Benefits. The lump-sum transfer allowance is based on the shortest highway mileage from the old work location to the new work location, as follows:

| Mileage | Amount |
|---|---|
| 30-449 | $7,000 |
| 450-899 | $7,500 |
| 900-1349 | $8,000 |
| 1350+ | $8,500 |

If an employee holds an unexpired lease on a dwelling occupied by him as his home, UPRR shall protect such employee from all loss and cost in securing cancellation of said lease as provided in Section 12(a)(iii) of New York Dock Conditions in addition to .the benefits provided in this paragraph. In connection with this provision, the lease must have been in effect prior to May 1, 1999 and the employee must work with the Carrier to minimize any cost in securing cancellations of said lease.

JF 420



UPFULBRIGHT002672

**SECTION FOUR**

An employee who is required to change his place of residence as a result of the transfer of work and who, on May 1, 1999, owned a mobile home as his primary residence or is under contract to purchase the mobile home and provides evidence of such ownership, shall be afforded one of the following options which must be exercised within thirty (30) days from the date assigned to a position at the new work location:

Option 1: Accept the moving expense and loss in sale of mobile home* benefits provided by the terms of the New York Dock Conditions and paragraph (a) of this Attachment C.

Option 2: Accept a lump-sum transfer allowance in lieu of any and all other moving expense and loss in sale of home benefits and allowances provided under the terms of New York Dock Benefits. The lump-sum transfer allowance is based on the shortest highway mileage from the old work location to the new work location, as follows:

| Mileage | Amount |
|---|---|
| 30-449 | $10,000 |
| 450-899 | $10,500 |
| 900-1349 | $11,000 |
| 1350+ | $11,500 |

*NOTE: For purposes of this Agreement, mobile homes will be evaluated on an individual basis for the purposes of determining whether it should be considered a mobile home under this Section or as a home under Section One. Mobile home owners should furnish pictures of the mobile home and tax statements along withevidence of ownership to the employee's manager for his further handling.

(a) An employee electing the moving expense benefits under the New York Dock Conditions (Option 1) shall receive a transfer allowance of One Thousand Dollars ($1,000.00). Also, the provisions of Section 9, Moving Expenses, of the New York Dock Conditions which provides "not to exceed 3 working days" will be increased to "not to exceed 5 working days." An employee electing to take the lump-sum transfer allowance (Option 2) shall not receive the $1,000.00 payment nor be allowed payment for five (5) working days.

(b) Any relocation expenses claimed as a result of this Agreement must be submitted to the employee's manager at the location the employee is transferred to and must be accompanied by proper receipts within ninety (90) days after being billed or such expense will not be considered for payment.

(c) If an employee elects Option 2 of any of the above and does not report to his new assigned work point within thirty (30) days from the date released from employee's old work location, the employee shall be considered as having resigned from service unless there are extenuating circumstances warranting an extension which should be promptly reported to the manager at the new location where assigned prior to expiration of thirty (30) days as indicated herein.

ATTACHMENT C

This Agreement shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 423

May 25, 1999

NYD 277
Side Letter #1

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

Section 1 paragraph A of the Implementing Agreement states that Telecommunications employees represented by the BRS will adopt as the new CBA with BRS the CBA with IBEW as of the effective date of the Agreement. However, while it is understood that there shall be two separate CBAs in effect for Telecommunications (until such time as all BRS-represented employees are attrited), it is agreed that since all employees will be covered on appropriate seniority rosters, the Rules from the CBA with IBEW will govern seniority, seniority districts, bulletining, abolishments and classification of work.

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

JF 424

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 425

May 25, 1999

NYD 277
Side Lefter #2

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

Section 2 paragraph A of the Implementing Agreement states that the parties will meet within sixty days of the effective date of the Implementing Agreement to review the consolidated seniority rosters. At that time, the Organization and Carrier will review their records to identify all inactive employees who may possibly return to service in the future. The Carrier will send out copies of the Implementing Agreement, all attachments and side letters to such employees at their last known address.

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

JF 426

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 427

May 25, 1999

NYD 277
Side Lefter #3

Mr. V. L. Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

If an employee represented by the BRS is forced into an IBEW-represented position, he will have a one-time opportunity to assert his BRS prior rights in order to secure the first BRS-represented position available for which he has sufficient seniority to hold. If the employee fails to do this, he forfeits the opportunity to return to a BRSrepresented position.

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work

Sincerely,

D. J. Smith
AVP Labor Relations

JF 428

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

May 25, 1999

NYD 277
Side Lefter #4

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

Section 4 paragraph A of the Implementing Agreement states that BRS-represented employees shall maintain their BRS rates of pay. It is understood that these employees will receive their wage increases based on the Agreements reached with the BRS. Likewise, I B EW-rep resented employees will receive their wage increases based on the Agreements reached with the IBEW.

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

JF 430



UPFULBRIGHT002682

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 431

May 25,1999

NYD 277
Side Lefter #5

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. E. J. Anousakes
General Chairman BRS
6621 Stonehedge Rd.
North Little Rock, AR 72117

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Mr. S. P. Ramirez
General Chairman IBEW
P. 0. Box 381555
Memphis, TN 38183-1555

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

It is understood that employees who are promoted and maintained on the dovetailed rosters will continue to be covered under the retention of seniority agreement appropriate for their representation.

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

JF 432

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 433

May 25, 1999

NYD 277
Side Lefter #6

Mr.V.L.Janecek
General Chairman IBEW
620 North Custer
North Platte, NE 69101

Mr. S. P. Ramirez
General Chairman IBEW
P.O. Box 381555
Memphis, TN 38183-1555

Mr. R. Ramirez
General Chairman IBEW
844 Colorado Blvd., Ste 201
Los Angeles, CA 90041

Dear Gentlemen:

This is in reference to the Implementing Agreement, effective June 15, 1999, between the Brotherhood of Railroad Signalmen, the International Brotherhood of Electrical Workers and the Union Pacific Railroad, covering notice dated November 24, 1997, pertaining to the consolidation of Telecommunications work, rosters and Collective Bargaining Agreements.

Section 4 paragraph A of the Implementing Agreement preserved the BRS rate of pay for BRS-represented employees. It is the intent of the parties to allow IBEW-represented employees on Roster 4 to receive the benefit of the May 12, 1993 Lefter Agreement between the BRS and UPRR which created the position of Senior Communications Technician (Attachment A). Therefore, such IBEW-represented employees on Roster 4 with preserved monthly rates and who meet the requirements of the attached May 12, 1993 Agreement will be eligible to receive a monthly rate of $3717 (based on the current BRS Senior Communications Technician rate).

IBEW-represented employees who elect to be classified as Senior Communications Technicians in this manner will be governed under the conditions of Rule 7 of the CBA with IBEW.

JF 434

This Agreement has been made due to the unique circumstances of this situation and shall not be cited as a precedent nor be referred to in connection with any future transfers of work.

Sincerely,

D. J. Smith
AVP Labor Relations

**AGREED:**

**FOR BROTHERHOOD OF RAILROAD SIGNALMEN:**

GENERAL CHAIRMAN, BRS

**APPROVED:**

VICE PRESIDENT, BRS

**FOR INTERNATIONAL BROTHERHOOD OF OF ELECTRICAL WORKERS:**

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

GENERAL CHAIRMAN, IBEW

JF 435

**General**
**General Appearance** - Morbidly obese body habitus, patient in no acute distress.

**Head and Neck**
**Head**
**Head:** - Head is normocephalic.
**Neck**
**Neck:** - Neck is supple without thyromegaly or adenopathy, no carotid bruits are noted, trachea is mid-line.

**Eye**
**EYES:** - PERRL, inspection of external lids and conjunctivae appear normal, sclera anicteric.

**ENMT**
**Ears**
**Ears:** - External ears and pinna appear normal with no significant deformity and tympanic membranes are without erythema or bulging.
**Nose and Sinuses**
**Nose:** - Nose is clear, nares are patent bilaterally, no gross structural obstruction noted.
**Mouth and Throat**
**Palate:** - Visualization of the oral cavity reveals a normal hard palate. **Oropharynx:** - oropharynx within normal limits, no erythema, exudate, or ulcerations. **Soft palate:** - Dependent soft palate. Mallampati - class IV. **Uvula:** - Normal uvula. **Tongue:** - Normal size tongue.

**Chest and Lung Exam**
**Respiratory:** - Normal respiratory effort with normal rate, lungs clear without wheezes, rales, rhonchi, or crackles.

**Cardiovascular**
**CV:** - Heart is regular rate and rhythm without murmurs, gallop, or rub.

**Neuropsychiatric**
**Psychiatric:** - Appropriate judgment and insight, oriented to person, place and time, language normal.

Assessment & Plan (CLINT BASTIBLE, PAC; 6/2/2015 12:34 PM)

IDIOPATHIC INSOMNIA (307.42)
**Impression:** Patient's case was discussed with supervising provider. A home sleep study test was ordered to make sure that maintenance portion of insomnia is not secondary to underlying sleep related breathing disorders. A maintenance of wakefulness test to objectively assess level of alertness after usage of trazodone. Patient to follow-up with Dr. Grimes to review test results, sooner if needed. Patient cautioned not to drive or operate heavy machinery if drowsy.
Current Plans
- Home sleep testing (HST)
- MWT without overnight evaluation
- Follow up after study to review results with Dr. Grimes

Completed and submitted for review by CLINT BASTIBLE PAC (6/2/2015 12:35 PM)
Signed electronically by TATE A GRIMES, MD (6/2/2015 5:55 PM)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

---

| | |
|---|---|
| Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor, and Scott Zinn, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Union Pacific Railroad Company,<br><br>Defendant. | File No: 2:15-cv-01865-JCC<br><br>**FIRST AMENDED COMPLAINT (JURY TRIAL DEMANDED)** |

---

Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor, and Scott Zinn, on behalf of themselves and others similarly situated (collectively, "Plaintiffs"), by and through their attorneys, Nichols Kaster, PLLP, bring this action against Defendant Union Pacific Railroad Company ("Union Pacific"), seeking damages and other legal and equitable relief under the Americans with Disabilities Act as amended ("ADA"), and the Genetic Information Nondiscrimination Act ("GINA"). In addition to their ADA and GINA claims, certain Plaintiffs also seek relief under applicable state laws. The following allegations are based on personal knowledge as to Plaintiffs' own conduct and conduct witnessed by Plaintiffs; they are made on information and belief as to others' conduct.

## SUMMARY

1. In or around early 2014, Union Pacific made company-wide changes to its fitness-for-duty program ("Fitness-for-Duty") that put numerous qualified employees out of work on the basis of their disabilities. For one, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions–even if the health condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removed the employees disclosing these conditions from service. Union Pacific then subjected the employees to a Fitness-for-Duty evaluation—again regardless of whether the employee had been safely performing the essential functions of his or her job. The Fitness-for-Duty evaluations at issue do not in fact assess whether an employee is fit for duty. Union Pacific does not conduct physical evaluations; furthermore, it routinely disregards the opinions of outside doctors who do provide physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee—including genetic information—and conducts a "file review" that mines the medical information for bases to disqualify the employee from service, either by falsely determining that the employee is unfit for duty, or by issuing permanent, unnecessary work restrictions which it then refuses to accommodate.

2. This Fitness-for-Duty program was generated, and is executed, by Dr. John Holland ("Dr. Holland"), Union Pacific's Chief Medical Officer and director of the Health and Medical Services department. Dr. Holland operates out of Olympia, Washington, where he personally completes numerous Fitness-for-Duty evaluations for Union Pacific employees around the country, and oversees the medical team which completes the evaluations he does not complete himself. According to Union Pacific's own documents, Dr. Holland's department is the "final authority for determining an employee's Fitness-for-Duty designation."

3. Plaintiffs are victims of Union Pacific's discriminatory Fitness-for-Duty program. They are employees of Union Pacific, many of them with long careers on the railroad. Despite being qualified and performing their jobs without incident, Plaintiffs were suddenly removed from service for Fitness-for-Duty evaluations under the new program, and were excluded from their positions on the basis of disabilities that had no effect on their ability to perform the essential functions of their jobs.

## PARTIES

4. Plaintiffs are individuals with disabilities, as that term is defined under the ADA, who, at all times material to this lawsuit, were employed by Union Pacific.

5. Plaintiff Quinton Harris ("Harris") is an individual who resides in Dallas, Texas.

6. Plaintiff John Baker ("Baker") is an individual who resides in Little Rock, Arkansas.

7. Plaintiff Geoffrey Miller ("Miller") is an individual who resides in Kalama, Washington.

8. Plaintiff Norman Mount ("Mount") is an individual who resides in Kinmundy, Illinois.

9. Plaintiff Thomas Taylor ("Taylor") is an individual who resides in Homewood, Illinois.

10. Plaintiff Scott Zinn ("Zinn") is an individual who resides in Festus, Missouri.

11. Defendant Union Pacific, a corporation headquartered in Omaha, Nebraska, is the largest railroad in the United States, with tracks covering 23 states in the western two-thirds of the United States.

12. Union Pacific has, at all times material to this lawsuit, done business in the Western District of Washington. It operates 532 miles of track in Washington state, and serves many of the 75 ports across the state, notably Seattle, Tacoma, and Kalama.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

13. During all times material to this lawsuit, Plaintiffs were employees of Union Pacific within the meaning of the ADA, GINA, and the applicable state laws, and Union Pacific was Plaintiffs' employer within the meaning of those laws.

14. Union Pacific has, at all times material to this lawsuit, employed more than 500 employees.

## JURISDICTION AND VENUE

15. This action arises under the ADA, 42 U.S.C § 12101 et seq., and GINA, 42 U.S.C. § 2000ff et seq.—both federal laws. As such, jurisdiction is proper under 28 U.S.C. § 1331.

16. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in the Western District of Washington, and because Union Pacific operates its business in the Western District of Washington and is subject to the Court's personal jurisdiction with respect to this civil action.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

1. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

2. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services, and Mechanical positions), and Dispatcher positions, disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific label "Reportable Health Events":


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

**A. Cardiovascular Conditions including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty, or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**

1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3. Significant hearing loss or surgery on the inner ear.
4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.
2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

(Exhibit A.)

3. Employees who disclose one of these health conditions are required by the


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

Medical Rules to undergo a Fitness-for-Duty evaluation, regardless of whether the condition or treatment affects their ability to perform the essential functions of their jobs. (Exhibit A.)

4. Specifically, the employee must:

> **Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.
>
> **Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.
>
> **Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A (emphasis in original).)

5. Under the Medical Rules, Fitness-for-Duty evaluations are also automatic for an employee who transfers "from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective bargaining agreement . . . [t]o a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position – agreement and nonagreement), and/or (b) [t]o a position requiring regulatory certification, and/or (c) [t]o other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job".

6. Union Pacific's Fitness-for-Duty program is even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns that the employee has, or has had in the past, certain health conditions.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

7. The Fitness-for-Duty evaluations challenged by Plaintiffs are not individualized assessments of the employee's ability to safely perform the essential functions of his or her job.

8. Union Pacific does not physically examine the employee, and routinely disregards the opinions of the employee's treating doctor who *has* physically examined the employee.

9. Rather, Union Pacific's Health and Medical Services department makes broad requests for medical records from the employee that are likely to include, and often do include, genetic information of the employee such as family medical history.

10. Once Union Pacific receives an employee's medical records, Dr. Holland, along with his team in Health and Medical Services, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

11. Dr. Holland and his team routinely issue Fitness-for-Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employees' ability to perform the essential functions of their jobs.

12. One way Dr. Holland and his team do this is by issuing a determination that an employee is unfit for duty, or medically disqualified—even though he or she is in fact fit for duty.

13. Another way Dr. Holland and his team do this is to issue a determination that the employee is fit for duty but has medical restrictions that are neither accommodated by Union Pacific nor medically necessary.

14. The Fitness-for-Duty determinations at issue are driven by generalizations about health conditions and treatments, not by individualized assessments of the employees' performance of the essential functions of their job as required by the ADA.

15. Dr. Holland has standard protocols for employees with certain health conditions or treatments.

16. For example, Dr. Holland labels employees with a broad range of health conditions as "sudden incapacitation" risks and issues them stock restrictions that prohibit the


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

employees from: (1) operating company vehicles, on-track or mobile equipment, and forklifts; (2) working on or near moving trains, freight cars or locomotives, unless protected by barriers; (3) operating cranes, hoists, or machinery; and (4) working at unprotected heights over four feet above the ground ("Sudden Incapacitation Restrictions").

17. Dr. Holland automatically issues these Sudden Incapacitation Restrictions, and has authorized Health and Medical Services employees to do the same, when certain health conditions show up in an employee's medical history.

18. As another example, Dr. Holland automatically deems employees in certain positions unfit for duty if he discovers that they are taking any one of a long list of medications, regardless of how long and how ably the employee has been performing the essential functions of his or her position while taking the medication.

19. As a result of the conduct described above, numerous Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay out of work without pay, and many of them have lost their livelihoods.

***PLAINTIFF HARRIS***

20. Plaintiff Quinton Harris has been employed by Union Pacific since approximately September 2011, most recently as a Mechanical Service Operator in North Little Rock, Arkansas.

21. Mechanical Service Operators help move locomotives in the shop area; perform service, cleanup and fueling of locomotives; and operate forklifts.

22. Harris has epilepsy, which he disclosed to Union Pacific at his time of his hire. It is controlled through medication, and he has not had a seizure in over eight years.

23. Harris has never had a work incident related to his epilepsy.

24. In or around February 2014, Harris applied for a transfer to a Train Crew position, an entry-level position which assists with traffic control at railroad terminals.

25. As part of the application, Union Pacific required Harris to complete a "Health


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

History Form" which asked, among other things, whether Harris had ever had a "seizure of any kind"; a "diagnosis of epilepsy"; or "treatment with anti-seizure medication to prevent seizures."

26. Harris again disclosed his epilepsy and anti-seizure medication, but specifically stated that he had been seizure-free for multiple years.

27. Union Pacific took Harris out of service, requested additional medical information, and required him to undergo a Fitness-for-Duty evaluation.

28. Union Pacific requested medical information from Harris that included, or was likely to include, genetic information within the meaning of GINA.

29. In a letter dated March 14, 2014, Union Pacific determined that Harris was fit for duty, but had permanent Sudden Incapacitation Restrictions, and Union Pacific could not accommodate the restrictions. Union Pacific effectively disqualified Harris from both the Train Crew and Mechanical Service Operator positions.

30. On March 18, 2014, Harris' treating physician notified Union Pacific that Harris was clear to return to work with no restrictions.

31. Nevertheless, Union Pacific refused to reinstate Harris, and has refused subsequent requests by Harris to return to work as well.

32. To the extent Harris needed reasonable accommodations, Union Pacific failed to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.

33. Harris filed a charge of discrimination with the EEOC, asserting claims against Union Pacific under the ADA. Having exhausted his administrative remedies, he timely brings this action.

***PLAINTIFF BAKER***

34. Plaintiff John Baker has been employed by Union Pacific since May 17, 2004, most recently as a Switchman in Little Rock, Arkansas.

35. As the name suggests, Switchmen attend the switches in a railroad yard, switching trains from one track to another.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

36. In the fall of 2014, Baker experienced lightheadedness on a couple of isolated instances outside of work and underwent medical testing to investigate the incidents.

37. Baker has never had a work incident related to his lightheadedness.

38. Pending the results of the medical testing, Baker asked Union Pacific to be temporarily removed from the list of qualified hostlers.

39. Rather than doing so, Union Pacific took Baker completely out of service on or about November 5, 2014.

40. In a letter dated November 6, 2014, Union Pacific told Baker that he would need a Fitness-for-Duty evaluation before returning to work.

41. Union Pacific requested medical information from Baker including "diagnostic study reports including lab work (medication levels), EEG (awake and/or sleep deprived), Tilt table test, CT scan, MRI, etc."; "physician clinic notes (also known as office notes or progress notes) from the provider treating [him] for this condition"; and a "[l]ist of current medications."

42. Union Pacific requested medical information from Baker that included, or was likely to include, genetic information within the meaning of GINA.

43. Baker asked to be reinstated on multiple occasions, but Union Pacific refused to reinstate Baker until it received further medical information.

44. Believing he did not have a choice, Baker turned over the medical information.

45. In a letter dated March 2, 2015, Union Pacific notified Baker that Dr. Holland had, without examining or treating him, imposed permanent Sudden Incapacitation Restrictions on him which it could not accommodate.

46. Union Pacific refused to allow Baker to work for approximately a year.

47. During that time, Baker attempted to find other jobs at Union Pacific within Dr. Holland's restrictions, but was unsuccessful.

48. To the extent Baker needed reasonable accommodations, Union Pacific failed to provide them, and failed to even engage in an interactive process regarding what accommodations were possible.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

49. In or around late 2015, Union Pacific reinstated Baker to his former position on the condition that he provide ongoing medical updates. Union Pacific did not pay Baker for the compensation he lost during the time it kept him out of service.

50. Baker filed a charge of discrimination with the EEOC, asserting claims against Union Pacific under the ADA and GINA. Having exhausted his administrative remedies, he timely brings this action.

***PLAINTIFF MILLER***

51. Plaintiff Geoffrey Miller has been employed by Union Pacific since July 5, 2006, most recently as an Assistant Signalman in Delta, Utah.

52. Assistant Signalmen assist in the inspection, maintenance, and repair of railroad signal equipment and systems.

53. In 1996, Miller was diagnosed with ventricular myopathy—a condition causing portions of his heart muscle to become enlarged, thick, or rigid.

54. Miller's ventricular myopathy is completely controlled through medication; his heart doctors have never placed any work restrictions on Miller.

55. At the time of his hire, Miller disclosed that he had ventricular myopathy.

56. Miller held and maintained a commercial driver's license ("CDL") in his position with Union Pacific, along with the required medical certification to maintain the CDL.

57. In or around February 2014, Miller submitted his medical card and was medically certified to retain his CDL through February 2015.

58. Miller has never had an incident at work related to his ventricular myopathy.

59. In or about March 2014, Union Pacific's Department of Transportation Compliance Department requested updated medical information from Miller that included, or was likely to include, genetic information within the meaning of GINA. In response, Miller provided medical information to Union Pacific.

60. In or about November 2014, Union Pacific asked for further medical information from Miller.



NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

61. Union Pacific requested medical information from Miller that included, or was likely to include, genetic information within the meaning of GINA.

62. To comply with the request, Miller obtained an echocardiogram in December 2014 and submitted the results to Union Pacific.

63. On or about January 8, 2015, Union Pacific removed Miller from service based on Dr. Holland's determination that Miller was subject to permanent Sudden Incapacitation Restrictions that Union Pacific would not accommodate.

64. Through his union representative, Miller appealed the Fitness-for-Duty determination.

65. On or about March 3, 2015, Dr. Holland wrote Miller's treating physician without Miller's permission demanding that he agree with the work restrictions Dr. Holland had imposed. Dr. Holland threatened that Union Pacific would "not provide liability protection for you if, in the course of this appeal, the employee's work restrictions given by HMS are overturned, based in part on your opinion, and a subsequent accident or injury occurs attributable to Mr. Miller's cardiac condition."

66. On or about March 9, 2015 and again on March 16, 2015, Miller's doctor provided documentation to Union Pacific that Miller was cleared to work without restrictions.

67. Union Pacific continued to hold Miller out of service.

68. To the extent Miller needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

69. Miller filed a charge of discrimination with the EEOC asserting individual and class claims against Union Pacific under the ADA, GINA, and Utah law, which was cross-filed with the Utah Antidiscrimination and Labor Division. Having exhausted his administrative remedies, he timely brings this action.

***PLAINTIFF MOUNT***

70. Plaintiff Norman "Keith" Mount has been employed by Union Pacific since


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

September 14, 1981, most recently as a Signal Maintainer in Illinois.

71. As the name suggests, Signal Maintainers maintain signal equipment for the railroad.

72. Mount has had a pacemaker for 22 ½ of the 23 years he has been working for Union Pacific, and Union Pacific has known about Mount's pacemaker the entire time.

73. Mount has never had a work incident related to his pacemaker.

74. In or around 2014, Union Pacific requested medical information from Mount that included, or was likely to include, genetic information within the meaning of GINA.

75. In response, Mount provided extensive medical information to Union Pacific.

76. In a letter dated June 30, 2014, Dr. Holland determined, without ever physically examining Mount, that Mount needed work restrictions because of his pacemaker. Union Pacific notified Mount that it could not accommodate the imposed restrictions.

77. Mount attempted to find work within Dr. Holland's restrictions, even asking if he could have an office job, but Union Pacific refused to accommodate Mount.

78. To the extent Mount needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

79. Mount filed a charge of discrimination and an amended charge of discrimination with the EEOC, asserting individual and class claims against Union Pacific under the ADA, GINA, and Illinois law. His charges were cross-filed with the Illinois Department of Human Rights. Having exhausted his administrative remedies, he timely brings this action.

***PLAINTIFF TAYLOR***

80. Plaintiff Thomas Taylor has been employed by Union Pacific since approximately February of 2011, most recently as a Signalman in Berkeley, Illinois.

81. Signalmen inspect, maintain, and repair signal equipment and systems.

82. In the fall of 2014, Taylor had a few minor seizures at home, lasting only 5-30 seconds. Taylor was later diagnosed with a seizure disorder.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

83. Within weeks of his diagnosis, Taylor's symptoms were completely controlled with medication.

84. However, while Taylor's doctors were figuring out Taylor's medication, Taylor temporarily refrained from driving.

85. Taylor notified his foreman and team about his seizure disorder, and Taylor and his crew were easily able to accomplish their work while Taylor refrained from driving.

86. After approximately three months, when Taylor's symptoms had been under control for some time, Taylor resumed driving and has not had any restrictions since.

87. Taylor never missed any work because of his seizures, and never had any work incidents relating to his seizures.

88. On or about May 28, 2015, Union Pacific required Taylor to disclose details about his medical history. Taylor again disclosed that he had a seizure disorder.

89. Union Pacific requested even more medical information from Taylor, and threatened to fire Taylor if he did not provide it.

90. The following week, Union Pacific removed Taylor from service "based on medical documentation" and forced Taylor to take an unpaid "medical leave of absence" from June 4, 2015 to August 5, 2015.

91. Union Pacific notified Taylor that it would not reinstate him until his doctor released him and provided extensive medical records, including operative reports for all surgeries performed, any diagnostic studies completed, clinic notes from all treating physicians, therapy notes, and a full-duty release to return to work.

92. Union Pacific requested medical information from Taylor that included, or was likely to include, genetic information within the meaning of GINA.

93. On or about June 8, 2015, Taylor provided Union Pacific with his doctor's full release to return to work without restrictions. Union Pacific did not reinstate Taylor.

94. Instead, in a letter dated June 16, 2015, a Union Pacific nurse, on behalf of Dr. Holland, determined that Taylor was fit for duty but had at least 10 years of permanent medical


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

restrictions that prohibited Taylor from, among other things, operating vehicles and machinery, working on or near moving trains, working at unprotected heights over four feet, and working on one- and two-person gangs.

95. In a letter dated July 17, 2015, Union Pacific informed Taylor that it was unable to accommodate his restrictions.

96. To the extent Taylor needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

97. Taylor filed a charge of discrimination and an amended charge of discrimination with the EEOC, asserting individual and class claims against Union Pacific under the ADA, GINA, and Illinois law. His charges were cross-filed with the Illinois Department of Human Rights. Having exhausted his administrative remedies, he timely brings this action.

***PLAINTIFF ZINN***

98. Plaintiff Scott Zinn was employed by Union Pacific from approximately February 2012 to December 2015, most recently as a Ballast Tamper Operator in Wilcox, Arizona.

99. Ballast Tamper Operators operate on-track machinery in the railroad yard while working in small groups.

100. Zinn is an Iraq war veteran with post-traumatic stress disorder ("PTSD").

101. Zinn has never had any work incidents relating to his PTSD or any other mental health condition.

102. On or about February 13, 2014, Zinn tested positive for the prescription drug Benzodiazepine.

103. Zinn took a medical leave of absence to undergo a drug treatment program, as provided for in his union contract.

104. Zinn successfully completed the program on or about April 9, 2014 and was entitled to reinstatement upon doing so.

105. Union Pacific refused to reinstate Zinn.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

106. Instead, it kept Zinn on unpaid leave and required him to provide extensive medical information and submit to further medical examinations and treatment.

107. Union Pacific requested medical information from Zinn that included, or was likely to include, genetic information within the meaning of GINA.

108. In the following months, Zinn's treating doctors notified Union Pacific on numerous occasions that Zinn was cleared to return to work, including in July, October, and November 2014. In November 2014, one of Zinn's treating doctors even noted that Zinn's mental health was significantly improved when he worked.

109. Union Pacific ignored these opinions and kept Zinn out of work for an entire year.

110. Then, in a letter dated April 9, 2015, Dr. Holland—without ever having personally examined Zinn—issued him a "general Medical Disqualification" based on his mental health history, prohibiting him from working in a Ballast Tamper Operator position or any other position at Union Pacific.

111. Following the medical disqualification, Zinn's treating doctors refuted Dr. Holland's findings and reiterated that Zinn was cleared to return to work without restrictions. On August 5, 2015, one treating doctor, a PTSD specialist, wrote that Zinn no longer met the criteria for a diagnosis of PTSD or of "any other active mental health diagnosis."

112. Union Pacific still refused to reinstate Zinn.

113. To the extent Zinn needed reasonable accommodations, Union Pacific failed to accommodate him, and failed to even engage in an interactive process regarding what accommodations were possible.

114. In or around December 2015, Union Pacific notified Zinn that his employment was formally terminated.

115. Zinn filed a charge of discrimination with the EEOC, and an amended charge of discrimination, asserting individual and class claims against Union Pacific under the ADA, GINA, and Arizona law. His charges were cross-filed with the Arizona Civil Rights Division.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

Having exhausted his administrative remedies, he timely brings this action.

## CLASS ACTION ALLEGATIONS

### *THE ADA CLASS*

116. Plaintiffs Harris, Baker, Miller, Mount, Taylor and Zinn bring ADA claims pursuant to Federal Rule of Civil Procedure 23, seeking back pay, monetary relief, other compensatory relief, and injunctive and declaratory relief on behalf of themselves and the following class:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

These individuals are referred to as "the ADA Class" or the "ADA Class Members." Plaintiffs reserve the right to revise this class definition based on discovery or other legal developments.

117. Class treatment of the ADA Class is appropriate because the class is so numerous that joinder of all members is impracticable. The exact number within the class is unknown, but may be determined from records maintained by Union Pacific.

118. Class treatment of the ADA Class is appropriate because there are questions of law or fact common to the class, including but not limited to:

a. Whether Union Pacific discriminated against ADA Class Members on the basis of their disabilities;

b. Whether the Medical Rules violate the ADA on their face or as applied;

c. Whether Union Pacific's Fitness-for-Duty program violates the ADA;

d. Whether Union Pacific has a policy and practice of making disability-related inquiries to employees, in violation of the ADA;



NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

e. Whether Union Pacific's disability-related inquiries are job-related and consistent with business necessity under the ADA;

f. Whether Union Pacific's Fitness-for-Duty program is job-related and consistent with business necessity under the ADA;

g. Whether Union Pacific uses qualification standards relating to its Fitness-for-Duty program that screen out or tend to screen out qualified employees with disabilities;

h. Whether Union Pacific maintains policies and practices relating to its Fitness-for-Duty program that have a disparate impact on qualified employees with disabilities;

i. Whether monetary damages, injunctive relief, and other equitable remedies for the class are warranted; and

j. Whether punitive damages are warranted.

119. Union Pacific is expected to raise additional common defenses to the claims.

120. Class treatment of the ADA Class is appropriate because the named Plaintiffs' claims are typical of the claims of the class, and the named Plaintiffs will fairly and adequately protect the interests of the class.

121. The named Plaintiffs have retained competent counsel who are experienced in litigating class actions and will effectively represent the interests of the class.

122. Class treatment of the ADA Class is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Union Pacific, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

would substantially impair or impede their ability to protect their interests.

123. Class treatment of the ADA Class is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

124. Class treatment of the ADA Class is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

125. Finally, Class treatment of the ADA Class is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

***THE GINA CLASS***

126. Plaintiffs Baker, Miller, Mount, Taylor, and Zinn ("GINA Named Plaintiffs") bring GINA claims pursuant to Federal Rule of Civil Procedure 23, seeking relief on behalf of themselves and all individuals who are part of the following class:

> Individuals who, during their employment, were issued requests by Union Pacific for genetic information at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination with a GINA claim to the resolution of this action.

These individuals are referred to as "the GINA Class" or the "GINA Class Members." "Genetic information" and "requests", as used in this class definition, are defined as they are under GINA and its regulations. Plaintiffs reserve the right to revise this class definition based on discovery or other legal developments.

127. Class treatment of the GINA Class is appropriate because the class is so numerous


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

that joinder of all members is impracticable. The exact number within the class is unknown, but may be determined from records maintained by Union Pacific.

128. Class treatment of the GINA Class is appropriate because there are questions of law or fact common to the class. These questions include:

a. Whether Union Pacific had a policy and practice of requesting medical information that included genetic information as defined by GINA;

b. Whether monetary damages, injunctive relief, and other equitable remedies for the class are warranted; and

c. Whether punitive damages are warranted.

129. In addition, Union Pacific is expected to raise common defenses to the claims.

130. Class treatment of the GINA Class is appropriate because the claims of the GINA Named Plaintiffs are typical of the claims of the class, and they will fairly and adequately protect the interests of the class.

131. The GINA Named Plaintiffs have retained competent counsel who are experienced in litigating class actions and will effectively represent the interests of the GINA Class.

132. Class treatment of the GINA Class is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Union Pacific, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

133. Class treatment of the GINA Class is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

134. Class treatment of the GINA Class is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

135. Finally, Class treatment of the GINA Class is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## CAUSES OF ACTION

### COUNT I
### *VIOLATIONS OF THE ADA*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*
### *(NAMED PLAINTIFFS AND THE ADA CLASS)*

136. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

137. At all relevant times, named Plaintiffs and ADA Class Members were individuals with disabilities under the ADA.

138. At all relevant times, named Plaintiffs and ADA Class Members had the requisite skill, experience, education and other job-related requirements of their respective positions, and were therefore qualified individuals under the ADA.

139. At all relevant times, named Plaintiffs and ADA Class Members could perform the essential functions of their respective positions, with or without reasonable accommodations.

140. Section 12112(a) of the ADA prohibits employers from discriminating against a


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

141. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112 (b)(6).

142. Union Pacific discriminated against named Plaintiffs and the ADA Class on the basis of disability.

143. Because Union Pacific violated 42 U.S.C. § 12112, named Plaintiffs and the ADA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

144. Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are entitled to punitive damages.

**COUNT II**
***VIOLATIONS OF THE ADA***
***DISABILITY DISCRIMINATION—DISPARATE IMPACT***
***(NAMED PLAINTIFFS AND THE ADA CLASS)***

145. Named Plaintiffs and ADA Class Members are qualified individuals with disabilities under the ADA.

146. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

147. Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability". 42 U.S.C. § 12112(b)(3).

148. Union Pacific discriminated against named Plaintiffs and the ADA Class on the basis of disability.

149. Union Pacific's Fitness-for-Duty policies and practices disproportionately—and adversely—impact qualified individuals with disabilities.

150. Union Pacific uses qualification standards that screen out and tend to screen out individuals with disabilities.

151. Union Pacific cannot show that such qualification standards are job-related and consistent with business necessity.

152. Because Union Pacific violated 42 U.S.C. § 12112, named Plaintiffs and the ADA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

153. Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are entitled to punitive damages.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

**COUNT III**
***VIOLATIONS OF THE ADA***
***UNLAWFUL MEDICAL INQUIRIES***
***(NAMED PLAINTIFFS AND THE ADA CLASS)***

154. At all relevant times, named Plaintiffs and ADA Class Members were employees of Union Pacific.

155. Section 12112(d)(4)(A) of the ADA provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

156. Union Pacific violated 42 U.S.C. § 12112(d)(4)(A).

157. Because Union Pacific violated 42 U.S.C. § 12112(d)(4)(A), named Plaintiffs and the ADA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs and the ADA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

158. Union Pacific committed the above-alleged facts with reckless or deliberate disregard for the rights and safety of named Plaintiffs and the ADA Class. As a result, they are entitled to punitive damages.

**COUNT IV**
***VIOLATIONS OF THE ADA***
***FAILURE TO ACCOMMODATE***
***(NAMED PLAINTIFFS)***

159. Named Plaintiffs are qualified individuals with disabilities under the ADA.

160. Discriminating against a qualified individual with a disability includes:

> [N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 122112(b)(5)(A).

161. Union Pacific discriminated against named Plaintiffs by failing to provide them reasonable accommodations.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

162. Because Union Pacific violated the ADA, named Plaintiffs have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Named Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

163. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of named Plaintiffs. As a result, they are entitled to punitive damages.

**COUNT V**
***VIOLATIONS OF THE GENETIC INFORMATION NONDISCRIMINATION ACT (GINA NAMED PLAINTIFFS AND THE GINA CLASS)***

164. Section 2000ff-1(b) of GINA provides that it "shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member."

165. Requesting genetic information includes "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." 29 C.F.R. § 1635.8(a).

166. Genetic information includes family medical history. 42 U.S.C. § 2000ff(4); 29 C.F.R. § 1635.3(c)(iii).

167. GINA Named Plaintiffs and the GINA Class Members were employees of Union Pacific under GINA.

168. Union Pacific has engaged in a pattern and practice of making broad requests for information about its employees' current health statuses in a way that is likely to result in it obtaining genetic information.

169. Union Pacific violated 42 U.S.C. § 2000ff-1(b) with respect to GINA Named Plaintiffs and the GINA Class.

170. Because Union Pacific violated 42 U.S.C. § 2000ff-1(b), GINA Named Plaintiffs


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

and the GINA Class have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. GINA Named Plaintiffs and the GINA Class are also entitled to attorneys' fees and costs incurred in connection with these claims.

171. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of GINA Named Plaintiffs and the GINA Class. As a result, they are entitled to punitive damages.

**COUNT VI**
***VIOLATIONS OF THE UTAH GENETIC TESTING PRIVACY ACT***
***(PLAINTIFF MILLER)***

172. Section 26-45-105(1)(a) of Utah's Genetic Testing Privacy Act ("GTPA") provides that "an employer . . . may not . . . access or otherwise take into consideration private genetic information about an individual[.]"

173. Union Pacific violated the GTPA with respect to Plaintiff Miller.

174. Because Union Pacific violated the GTPA, Miller has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Miller is also entitled to attorneys' fees and costs incurred in connection with these claims.

175. Union Pacific intentionally and willfully or maliciously committed the above-alleged acts. As a result, he is entitled to $100,000 or punitive damages for each violation.

**COUNT VII**
***VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT***
***DISABILITY DISCRIMINATION—DISPARATE TREATMENT AND IMPACT***
***(PLAINTIFFS MOUNT AND TAYLOR)***

176. Plaintiffs Mount and Taylor are qualified individuals with disabilities under the Illinois Human Rights Act ("IHRA").

177. Section 5/2-102(A) of the IHRA provides that it is a civil rights violation for an employer to discriminate against an employee on the basis of disability.

178. Union Pacific discriminated against Mount and Taylor on the basis of their disabilities, in violation of the IHRA.


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

179. Because Union Pacific violated Section 5/2-102(A) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000 each. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT VIII**
***VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT***
***UNLAWFUL MEDICAL REQUESTS***
***(PLAINTIFFS MOUNT AND TAYLOR)***

180. Plaintiffs Mount and Taylor are qualified individuals with disabilities under the IHRA.

181. Section 5/2-102(J)(1) of the IHRA provides:

> The employer may request documentation from the employee's health care provider concerning the need for the requested reasonable accommodation or accommodations to the same extent documentation is requested for conditions related to disability if the employer's request for documentation is job-related and consistent with business necessity. The employer may require only the medical justification for the requested accommodation or accommodations, a description of the reasonable accommodation or accommodations medically advisable, the date the reasonable accommodation or accommodations became medically advisable, and the probable duration of the reasonable accommodation or accommodations.

182. Union Pacific violated section 5/2-102(J)(1) of the IHRA by making requests for disability-related information from Mount and Taylor.

183. Because Union Pacific violated section 5/2-102(J)(1) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT IX**
***VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT***
***FAILURE TO ACCOMMODATE***
***(PLAINTIFFS MOUNT AND TAYLOR)***

184. Plaintiffs Mount and Taylor are qualified individuals with disabilities under the IHRA.

185. Section 5/2-102(J)(1) of the IHRA provides:

> It is a civil rights violation . . . for an employer to not make reasonable


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

> accommodations for any medical or common condition of a job applicant or employee . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the ordinary operation of the business of the employer.

186. Union Pacific violated section 5/2-102(J)(1) of the IHRA by failing to provide reasonable accommodations to Mount and Taylor.

187. Because Union Pacific violated section 5/2-102(J)(1) of the IHRA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT X**
***VIOLATIONS OF THE ILLINOIS GENETIC INFORMATION PRIVACY ACT***
***(PLAINTIFFS MOUNT AND TAYLOR)***

188. Section 513/25(c)(1) of the Illinois Genetic Information Privacy Act ("GIPA") provides:

> An employer . . . shall not . . . solicit, request, require or purchase genetic testing or genetic information of a person or a family member of the person, or administer a genetic test to a person or a family member of the person as a condition of employment[.]

189. Union Pacific violated Plaintiffs Mount and Taylor's rights under GIPA.

190. Because Union Pacific violated GIPA, Mount and Taylor have suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Mount and Taylor are also entitled to attorneys' fees and costs incurred in connection with these claims.

191. Union Pacific intentionally and/or recklessly violated 410 Ill. Comp. Stat. 513/25. As a result, Mount and Taylor are entitled to $15,000 in liquidated damages for each violation or their actual damages, whichever is greater.

**COUNT XI**
***VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT***
***DISABILITY DISCRIMINATION—DISPARATE TREATMENT AND IMPACT***
***(PLAINTIFF ZINN)***

192. Plaintiff Zinn is a qualified individual with a disability under the Arizona Civil


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

Rights Act ("ACRA").

193. Section 41-1463(B)(1) of ACRA provides:

> It is an unlawful employment practice for an employer [t]o fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment . . . on the basis of disability.

194. Union Pacific discriminated against Zinn in violation of section 41-1463(B)(1) ACRA.

195. Because Union Pacific violated section 41-1463(B)(1) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT XII**
***VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT***
***UNLAWFUL MEDICAL REQUESTS***
***(PLAINTIFF ZINN)***

196. At all relevant times, Plaintiff Zinn was an employee of Union Pacific under ACRA.

197. Section 41-1466(C) of ACRA provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether the employee is an individual with a disability or as to the nature or severity of the disability, unless the examination or inquiry is shown to be job related and consistent with business necessity.

198. Union Pacific violated section 41-1466(C) of ACRA with respect to Zinn.

199. Because Union Pacific violated section 41-1466(C) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

**COUNT XIII**
***VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT***
***FAILURE TO ACCOMMODATE***
***(PLAINTIFF ZINN)***

200. Plaintiff Zinn is a qualified individual with a disability under ACRA.

201. Section 41-1466(F)(4) of the ACRA provides:

> It is an unlawful employment practice for a covered entity to [n]ot make reasonable


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

> accommodations to the known physical or mental limitations of an otherwise qualified individual who is an applicant or employee unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . .

202. Union Pacific violated section 41-1466(F)(4) of ACRA with respect to Zinn.

203. Because Union Pacific violated 41-1466(F)(4) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

## COUNT XIV
## *VIOLATIONS OF THE ARIZONA CIVIL RIGHTS ACT*
## *GENETIC INFORMATION*
## *(PLAINTIFF ZINN)*

204. Section 41-1463(B)(3) of ACRA provides:

> It is an unlawful employment practice for an employer [t]o fail or refuse to hire, to discharge, or to otherwise discriminate against any individual based on the results of a genetic test received by the employer . . . .

205. Union Pacific violated section 41-1463(B)(3) of ACRA with respect to Zinn.

206. Because Union Pacific violated section 41-1463(B)(3) of ACRA, Zinn has suffered and will continue to suffer loss of income in an amount in excess of $75,000. Zinn is also entitled to attorneys' fees and costs incurred in connection with these claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Harris, Baker, Miller, Mount, Taylor, and Zinn, on behalf of themselves individually and the respective classes, pray for judgment against Union Pacific as follows:

a) That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA, GINA, and the various applicable state laws pled herein;

b) An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices and policies set forth herein;


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

c) For an award of damages arising from loss of past and future income, and other damages, all in an amount in excess of $75,000 for each of the Plaintiffs, together with pre-judgment interest;

d) For an award of damages for mental anguish and emotional distress in an amount in excess of $75,000 for each of the Plaintiffs;

e) For all Plaintiffs' costs, disbursements and attorneys' fees;

f) For all relief available under the ADA, GINA, and the various applicable state laws, including punitive damages and reinstatement;

g) For such other and further relief available by statute;

h) For such other and further relief as the Court deems just and equitable; and

i) For leave to amend the complaint to add additional named Plaintiffs.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims for which a jury trial is available.

Dated: 02/19/2016

**BRENEMAN GRUBE OREHOSKI, PLLC**

s/***Joseph A. Grube***
Joseph A. Grube, #26476
Email: joe@bgotrial.com
s/***Karen K. Orehoski***
Karen K. Orehoski, #35855
Email: karen@bgotrial.com
1200 Fifth Avenue, Suite 625
Seattle, WA 98101
Tel: (206)770-7606
Fax: (206) 770-7607

**NICHOLS KASTER, PLLP**

James H. Kaster, MN 53946*
Email: kaster@nka.com, geving@nka.com
David E. Schlesinger, MN 0387009*
Email: schlesinger@nka.com
Jason P. Hungerford, MN 395908*
Email: jhungerford@nka.com
Nicholas D. Thompson, MN 389609*
Email: nthompson@nka.com


NICHOLS KASTER PLLP
80 South Eighth Street, Suite 4600
Minneapolis, Minnesota 55402
TEL. 612.256.3200 • FAX 612.215.6870

Bonnie M. Smith, MN 0391915*
Email: bsmith@nka.com
*admitted *pro hac vice*
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 338-4878

**HILDEBRAND MCLEOD & NELSON**

Bradley W. Wahrlich #39650
Email: wahrlich@hmnlaw.com
Kristoffer S. Mayfield, CA 241093*
Email: mayfield@hmnlaw.com
*admitted *Pro Hac Vice*
350 Frank H. Ogawa Plz, 4th Floor
Tel: (510) 451-6732
Fax: (510) 465-7023

**ATTORNEYS FOR PLAINTIFFS HARRIS, BAKER, MILLER, MOUNT, TAYLOR, AND ZINN**

**Medical Rules**

Roles and Responsibilities
Fitness-for-Duty Evaluations
Health and Medical Services Fitness-for-Duty Decisions
Medical Records and Confidentiality of Medical Information
Dispute Resolution
Appendix A: Definitions
Appendix B: Reportable Health Events

# Medical Rules

The Medical Rules are established to determine employees' Fitness-for-Duty. Health and Medical Services determines "Fitness for Duty" as the medical and functional, (i.e., physical, mental, and cognitive) ability to:

In addition to the Medical Rules, employees must also be aware of **Related Policies and Programs.**

- Safely perform a job, with or without reasonable accommodations, and
- Meet medical standards established by regulatory agencies in accordance with federal and state laws.

The Medical Rules apply to post-offer applicants and all employees. Application of these rules is based on regulatory requirements and safety standards established by Union Pacific.

## Medical Rules

**Roles and Responsibilities**
**Fitness-for-Duty Evaluations**
**Health and Medical Services Fitness-for-Duty Decisions**
**Medical Records and Confidentiality of Medical Information**
**Dispute Resolution**
**Appendix A: Definitions**
**Appendix B: Reportable Health Events**

EXHIBIT
tabbies
A

# Roles And Responsibilities

The responsibilities of Health and Medical Services, Employees and Post-Offer Applicants with regard to the Medical Rules are outlined below.

Top

Health and Medical Services
Employees
Post-Offer Applicants

## Health And Medical Services

Health and Medical Services (HMS) is responsible for establishing the scope, content, frequency, and delivery of medical evaluations. HMS is the final authority for determining an employee's Fitness-for-Duty designation. HMS will respond to supervisor concerns regarding an employee's ability to safely perform duties. HMS may delegate responsibilities to medical professionals not employed by Union Pacific. Delegated responsibilities may include but are not limited to the following:

- Performance of medical tests and evaluations; and/or
- Determination of medical status, and/or
- Determination of functional level

Top

## Employees

All employees are responsible for:

- Reporting to work fit for duty to safely perform their jobs with or without reasonable accommodations
- Notifying the supervisor when the employee becomes aware of or is concerned that a medical condition or symptom(s) exists which may affect his/her ability to safely perform his/her job
- Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS
- Providing, upon request, information from the employees health care provider including, but not limited to: medical documentation pertaining to medical tests, examinations, and/or evaluations, including lists of all prescription and over-the-counter medications taken by the employee. Employee may be required to provide information on a periodic basis for monitoring of continued fitness-for-duty.
- Providing, upon request, a statement from the employee's healthcare provider whether or not, or in what circumstances, any prescriptions or OTC medications currently taken by the employee is likely to impair the employee's perceptual abilities or alertness, or impair mental or physical functioning
- Performing all work in conformance with any medical restrictions that HMS has placed upon the employee
- Meeting the requirements, in a timely manner, of all federal and state laws and regulations applicable to the employee with regard to medical evaluations and testing and the use of personal protective equipment
- Providing accurate information to Health and Medical Services regaring health status and medical treatment

**Dispatchers and Operating Department field employees (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), all Telecom employees (agreement and nonagreement) and Supply Department Field employees (agreement and nonagreement) must also:**

- Notify HMS as soon as practicable if he/she experiences any of the health events listed in Appendix B of these Medical Rules. A reportable health event is defined as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea
- The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.
- If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS

Top

## Post-Offer Applicants

Post-offer Applicants are responsible for:

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS to determine if the applicant is fit for duty. The Pre-Placement Medical Evaluation and an appropriate Physical Ability Test may be performed after a conditional job offer has been made and before the applicant reports to work

Some costs associated with additional medical testing and evaluations deemed necessary by HMS to determine medical fitness

Providing accurate information to HMS regarding health status and medical treatment

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations
Health and Medical Services
Fitness-for-Duty Decisions
Medical Records and Confidentiality of Medical Information
Dispute Resolution
Appendix A: Definitions
Appendix B: Reportable Health Events

# Fitness-For-Duty Evaluations

Union Pacific maintains the final authority for determining whether an employee is fit for duty. To determine Fitness-for-Duty, employees may be required to participate in medical tests and evaluations.

Evaluations completed by Health and Medical Services (HMS) may include, but are not limited to various components such as: (1) regulatory medical certification requirements; (2) drug screen; (3) medical, psychological and/or functional evaluations, (4) obtaining additional medical records for review by HMS, and (5) other information as deemed necessary by HMS.

A Fitness-for-Duty evaluation may be initiated by HMS and/or a Supervisor. Employees requesting a Medical Leave may also be required to complete a Fitness-for-Duty Evaluation prior to returning to work or in the event of a change in a Reportable Health Event.

^Top

Health and Medical Services Initiated Fitness-for-Duty
Supervisor Initiated
Employee Requested Medical Leave and Reporting Requirements

## Health And Medical Services Initiated Fitness-For-Duty

### REGULATORY MEDICAL EVALUATIONS

Employees with designated job assignments may be required to have Regulatory Medical Evaluations, based on requirements of federal and/or state government regulations.

Applicable government regulations to be used by HMS as references in carrying out regulatory evaluations, may include, but not be limited to, the following:

**Federal Motor Carrier Safety Administration (FMCSA)**
Compliance with commercial motor vehicle licensing requirement

**Federal Aviation Administration (FAA)**
Compliance with FAA Regulations for Pilots

**Federal Railroad Administration (FRA)**
Compliance with medical certification requirements for Locomotive Engineers, Conductors, and Remote Control Locomotive Operators
Compliance with other FRA medical requirement for covered employees
Compliance with Hearing Conservation Program requirements for covered employees

**Occupational Safety and Health Administration (OSHA)**
Compliance with regulations on worker exposure to potential workplace hazards
Compliance with specific medical certification requirements, including but not limited to, hazardous materials workers and use of respirators and other personal protective equipment

New medical regulatory requirements that come into effect, and apply to Union Pacific employees, will automatically be included in these rules. HMS will apply applicable regulatory requirements regarding medical evaluations for employees. HMS may use additional guidelines or other materials produced by government agencies, or other sources, as references in carrying out regulatory evaluations. For certain jobs or tasks covered by regulatory medical requirements, HMS may utilize medical Fitness-for-Duty requirements that are more rigorous or stringent than the minimal requirements of a regulation.

**Job Transfer**

An employee who transfers from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective barganining agreement will be evaluated for Fitness-for-Duty before beginning the new job if the transfer is:

a. To a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position - agreement and nonagreement), and/or
b. To a position requiring regulatory certification, and/or
c. To other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job

**Pre-placement (post offer) and Return to Work After 1-Year Absence**

All post-offer applicants will be required to participate in a Pre-Placement Evaluation after a conditional job offer is made,

and before the applicant begins work. All post-offer applicants will be subject to a drug screen and evaluations deemed appropriate by HMS. In addition, some employees may also be subject to Regulatory Medical Evaluations based on requirements of federal and/or state government regulations.

An employee absent from work for a period of 12 months or longer for any medical or non-medical reason, must undergo the requirements of a pre-placement (post-offer) evaluation for the position before returning to work. Absences include, but are not limited to:

a. On-Duty injury
b. Off-Duty injury or illness
c. Employee Assistance Program participation
d. Reserve Board assignment
e. Furlough
f. Personal leave
g. Military service

**Other**

Additional Fitness-for-Duty Evaluations are conducted whenever it is deemed necessary to determine an Employee's Fitness for Duty on a case-by-case basis.

ˆTop

## Supervisor Initiated

Supervisor's have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern about the employee's ability to safely perform his/her job duties. The Supervisor may remove the employee from service during the review period.

ˆTop

## Employee Requested Medical Leave And Reporting Requirements

**AGREEMENT EMPLOYEES**

The purpose of the Medical Leave Evaluation is to determine the medical appropriateness of an employee's requested leave, due to a medical condition of the employee and ensuring the employee is medically and functionally able to perform his/her job.

Pursuant to Union Pacific policies, an employee must provide adequate medical documentation to verify the need for a medical leave:

Leaves less than 30 days can be approved by the appropriate supervisor without Health and Medical Services review.

Leaves requested for 30 days or more or a leave which becomes extended beyond 30 days, shall be referred to Health and Medical Services for review prior to approval by supervisor.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy on the Employees site for FMLA associated absences also processed by Health and Medical Services.

**Additional requirements for agreement Telecom employees, Supply Department field employees, and Operating Department field employees** (including all Transportation, Engineering Services and Mechanical employees)

All agreement Telecom employees, Supply Department field Employees, and Operating Department field employees (including Transportation, Engineering Services, and Mechanical employees) **must report** the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If an agreement Telecom employee, Supply Department field employee or Operating Department field employee (including all Transportation, Engineering Services, and Mechanical employees) has a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty

evaluation prior to employee returning to his/her job.

## NONAGREEMENT EMPLOYEES

All Nonagreement Employees requiring a medical absence should:

See the **Short-Term/Long-Term Disability (STD/LTD) policy for Nonagreement** for health related absences.

**Additional Requirements for nonagreement Telecom employees, nonagreement Supply Department field employees, and Dispatchers and nonagreement Operating Department field employees** (including all Transportation, Engineering Services, and Mechanical)

All nonagreement Telecom employees, nonagreement Supply Department field employees and Dispatchers and nonagreement Operating Department field employees (including all Transportation, Enginnering Services, and Mechanical) must report the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a Short Term Disability or other medical leave is requested (See Appendix B for more detail):

- Cardiovascular Conditions
- Seizure or Loss of Consciousness
- Significant Vision or Hearing Changes
- Diabetes Treated with Insulin
- Severe Sleep Apnea

If nonagreement Telecom employees, nonagreement Supply Department field employees, Dispatchers and nonagreement Operating Department field employees (including all Transportation, Engineering Services, and Mechanical) have a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to work.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty evaluation prior to employee returning to his/her job.

Family Medical Leave Act (FMLA): See the **Family Medical Leave Act (FMLA) policy** for FMLA associated absences also processed by Health and Medical Services.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

# Health And Medical Services Fitness-For-Duty Decisions

After a Fitness-for-Duty evaluation is complete, Health and Medical Services determines if the employee/applicant is medically and functionally able to safely perform his/her job and makes the following designations:

Fit for Duty

Fit for Duty - With Restrictions

1. A medical work restriction assigned by Health and Medical Services, may include a requirement that the applicant/employee agree to ongoing monitoring of a specific health condition, with ongoing reporting of such information to Health and Medical Services. The treatment for the specific health condition is conducted by the employee's health care provider.
2. Union Pacific determines whether work restrictions can or cannot be reasonably accommodated.

Not Fit for Duty

Health and Medical Services will notify supervisors of the Fitness-for-Duty designation.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services Fitness-for-Duty Decisions

Medical Records and Confidentiality of Medical Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health Events

# Medical Records And Confidentiality Of Medical Information

In the regular course of business, Health and Medical Services maintains confidential medical records for post-offer applicants and employees in accordance with applicable federal and state laws. Copies of documentation existing in those files are not released to anyone outside Health and Medical Services, except in the following instances:

When an employee submits a written request to Health and Medical Services which includes his/her name, employee ID, specific documents required, address where the records may be mailed, and the employee's signature.

When Health and Medical Services receives a release of medical information form signed by the employee stating that the employee has agreed the holder of the release may receive specific documentation contained in the employee's confidential Health and Medical Services medical file.

When Health and Medical Services receives a subpoena or other court order instructing the release of specific records.

When relevant documents from an employee's confidential Health and Medical Services medical record are required in order to prepare an appropriate defense of Union Pacific or any of its personnel.

When necessary to evaluate an employee's claim relating to a personal injury or illness if the employee is represented by legal counsel.

When necessary to provide medical information to an external medical practitioner performing an evaluation at Health and Medical Service's request.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services Fitness-for-Duty Decisions

Medical Records and Confidentiality of Medical Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health Events

# Dispute Resolution

If Health and Medical Services and the employee's treating medical practitioner disagree on the employee's current medical diagnosis, then the employee may appeal in accordance with applicable collective bargaining agreement(s).

In such an instance, the employee must provide documentation from his/her treating medical practitioner stating the medical justification and procedure(s) used to make the diagnosis.

Upon the Company's receipt of the appropriate medical release authorizing discussion of the employee's medical conditions or case with the appropriate labor union representative and Union Pacific Labor Relations Department representative, the labor union representative, or his designee, may discuss representative(s). If circumstances warrant, Health and Medical Services may request re-evaluation of the employee's case.

Health and Medical Services is the final authority for determining an employee's Fitness-for-Duty designation.

The table below outlines specific circumstances and associated process steps for when there is a disagreement regarding an employee's diagnosis:

| IF... | THEN ... |
|---|---|
| Re-evaluation by a medical practitioner, selected by Health and Medical Services indicates the employee's medical diagnosis is consistent with the Health and Medical Service's decision. | Health and Medical Services issues a Fitness for Duty decision and the supervisor confirms if reasonable accommodation is possible (if applicable). |
| Re-evaluation by a medical practitioner, selected by Health and Medical Services, indicates the employee's medical diagnosis is NOT consistent with the Health and Medical Service's decision. | Health and Medical Services completes a new medical review and issues an updated Fitness-for-Duty statement and advises the supervisor. The supervisor then notifies the employee. |
| The employee or union representative notifies the supervisor that he/she is not satisfied with re-evaluation results. | The supervisor notifies the appropriate Union Pacific Labor Relations representative. Labor Relations will then arrange a joint conference between the employee's union representative, appropriate treating medical practitioner and Health and Medical Services. (The employee may also be requested to participate if requested by Health and Medical Services.) |
| Consensus is reached at a joint conference between the employee, union representative, employee's appropriate treating medical practitioner and Health and Medical Services representative regarding employee's current diagnosis. | Health and Medical Services issues an updated Fitness for Duty statement to the supervisor, and the supervisor confirms whether reasonable accommodation is possible when work restrictions are applicable. |

## Request To Establish Medical Boards

If consensus is not reached during the joint conference, the employee's union representative may present a request to the appropriate Union Pacific Railroad Labor Relations representative, asking to establish a special medical board in accordance with applicable collective bargaining agreement(s), if any. In general, unless specific collective bargaining agreement provisions require otherwise, a special medical board review is conducted in the following manner:

Each physician selected to participate in the special medical board review must: 1) hold a Doctor of Medicine or Doctor of Osteopathic Medicine degree from an accredited medical school; 2) has practiced medicine for at least five years; and 3) is licensed by a State(s) to practice medicine.

Three physicians are chosen, one each by: 1) Union Pacific Railroad; 2) the Union/Employee; and by 3) joint Union Pacific Railroad and Union/Employee agreement.

A written document is prepared describing the appointment of a special medical board, timeframes for conducting the medical board hearing, limitation of evidentiary record to medical records/history of the involved employee and acceptance of its decision as it pertains specifically to the employee's medical diagnosis as binding, is signed by the employee, the employee's union representative, and the appropriate Union Pacific Railroad official(s).

The employee reports for the scheduled medical evaluation(s).

Within 15 days after evaluation of the employee, the special medical board issues a joint report of finding(s) and decision. One copy of the report is provided to: 1) the Union Pacific Railroad Health and Medical Services Department; 2) the employee's union representative, and 3) the employee.

Once the special medical board makes a finding regarding employee's medical diagnosis, Health and Medical Services will issue an updated Fitness for Duty statement and upon issuance of such statement, the special medical board will

automatically terminate. Health and Medical Services is the final authority in determining an employee's Fitness for Duty designation.

All claims for lost time will be handled in accordance with the employee's applicable Collective Bargaining Agreement provisions.

Union Pacific pays for the cost and expenses of its medical representative on the medical board; the union or employee pays for the cost and expenses of its medical representative on the medical board and each party (Union Pacific and Union/Employee) pays 50% of the cost and expenses of the 3rd medical representative on the board.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

# Appendix A: Definitions

The following definitions apply to the Medical Rules:

**EMPLOYEE** – Individual employed by Union Pacific Railroad.

**FITNESS FOR DUTY** – Ability to medically and functionally (including physical, mental, and or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws.

**HEALTH AND MEDICAL SERVICES (HMS)** – Employees and contracted personnel who provide professional services and make decisions on behalf of Union Pacific's Health and Medical Services.

**POST-OFFER APPLICANT** – Individual who has received a conditional offer of employment, and who is not currently working for Union Pacific. A post-offer applicant is required to undergo a Pre-Placement Medical Screening.

**REASONABLE ACCOMODATIONS** – As required by federal and state law, Union Pacific will make reasonable accommodations for persons with statutorily protected disabilities when this will permit the person to perform the essential functions of the job and does not impose an undue hardship on the company.

**REPORTABLE HEALTH EVENT** – Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees -agreement and nonagreement), Telecom employees (agreement and nonagreement), and Supply Department Field employees (agreement and nonagreement) must report to Health and Medical Services any new diagnosis, recent events, and/or change in the following conditions, cardiac, seizure or loss of consciousness, significant vision or hearing changes, diabetes treated with insulin, and/or severe sleep apnea. (See Appendix B for more information)

**SUPERVISOR** – Employee's first-line supervisor and other supervisors in the employing department.

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations
Health and Medical Services
Fitness-for-Duty Decisions
Medical Records and Confidentiality of Medical Information
Dispute Resolution
Appendix A: Definitions
Appendix B: Reportable Health Events

# Appendix B: Reportable Health Events

The Union Pacific Medical Rules state that Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), Telecom employees (agreement and nonagreement) and Supply Department field employees (agreement and nonagreement) must report the health events to Health and Medical Services listed at the bottom of the page so that a Fitness-for-Duty evaluation can be done to determine if the employee can safely perform his/her job. If an employee has a "Reportable Health Event", at work or off work, then the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event, and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

Reportable health event is defined as anew diagnosis, recent event, or change in a prior stable condition, for one of the following:

**A. Cardiovascular Conditions Including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**

1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3. Significant hearing loss or surgery on the inner ear.
4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.
2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

| | |
|---|---|
| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

QUINTON HARRIS; JOHN BAKER; GEOFFREY MILLER; NORMAN MOUNT; THOMAS TAYLOR; AND SCOTT ZINN; individually and on behalf of other similarly situated,

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

CASE NO. 8:16cv381-JFB-SMB

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

ORAL ARGUMENT REQUESTED

TO: THE ABOVE DEFENDANT AND ITS ATTORNEYS OF RECORD.

Pursuant to Federal Rule of Civil Procedure 23, Local Rule 7.1, and this Court's Fourth Amended Progression Order (ECF No. 205), Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor and Scott Zinn ("Plaintiffs") respectfully move this Court for an order certifying the following class (or in the alternative, such other class or sub-classes as the Court may deem appropriate):

> All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action.

Plaintiffs request that the Court approve notice to the class by U.S. mail, in the form proposed by Plaintiffs as Exhibit 97 to this motion. In addition, Plaintiffs move the Court to appoint Plaintiffs as class representatives, and to appoint Plaintiffs' counsel Nichols Kaster, PLLP, as class counsel.

Pursuant to Local Rule 7.1(d), Plaintiffs respectfully request thirty (30) minutes of oral argument per side on their motion for class certification. Oral argument is necessary because this

motion involves certification of a nationwide class action pursuant to Fed. R. Civ. P. 23, alleging an ongoing pattern or practice of discrimination affecting several thousand current and former Union Pacific employees. Plaintiffs believe that oral argument would assist the Court with any questions concerning the developed factual record in this case.

This motion is based upon all the files, records, and proceedings herein, Plaintiffs' Memorandum in Support of Motion for Class Certification, and such other points and authorities as may be subsequently presented to the Court.

Date: August 17, 2018

NICHOLS KASTER, PLLP

s/Robert L. Schug
James H. Kaster* (MN #53946)
kaster@nka.com
David E. Schlesinger* (MN #387009)
schlesinger@nka.com
Charles A. Delbridge* (MN #386639)
cdelbridge@nka.com
Robert L. Schug* (MN #387013)
schug@nka.com
Neil D. Pederson* (MN #0397628)
npederson@nka.com
Laura A. Baures* (MN #0392081)
lbaures@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878
* *admitted pro hac vice*

ATWOOD, HOLSTEN, BROWN
DEAVER & SPIER, P.C., L.L.O.

Corey L. Stull (21336)
cstull@atwoodlawyers.com
575 Fallbrook Boulevard, Suite 206
Lincoln, Nebraska 68521
Telephone: (402) 817-2717

HILDEBRAND MCLEOD & NELSON

Anthony S. Petru (CA 91399)*
petru@hmnlaw.com
250 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
Telephone: (510) 451-6732
Fax: (510) 465-7023
* *admitted pro hac vice*

MOODY LAW FIRM

Nicholas D. Thompson (MN 389609)*
nthompson@moodyrrlaw.com
500 Crawford Street
Portsmouth, VA 23704
Telephone: (757) 477-0991
* *admitted pro hac vice*

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 17, 2018, he electronically filed the forgoing **Plaintiffs' Motion for Class Certification.** Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

s/Robert L. Schug
Robert L. Schug

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

QUINTON HARRIS; JOHN BAKER; GEOFFREY MILLER; NORMAN MOUNT; THOMAS TAYLOR; AND SCOTT ZINN; individually and on behalf of other similarly situated,

Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

CASE NO. 8:16cv381-JFB-SMB

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

[redacted]

Bob Hosutt, Regional Senior Manager
Health & Medical Department
Email attachment, March 8, 2017

Plaintiffs challenge Union Pacific's policy of removing employees from their jobs based on an arbitrary and scientifically-unsound "1% Rule" regarding the risk of "sudden incapacitation." Under Union Pacific's reportable health events policy, employees in "safety sensitive" positions are required to disclose certain medical conditions, turn over their medical records, and submit to a fitness-for-duty evaluation. These "evaluations," however, are not based on an individualized analysis of the employees' job duties, work history, or other relevant factors. Instead, Union Pacific relies on broad, population-based risk assessments, routinely

resulting in the imposition of standard work restrictions and the employee's removal from work. This single policy—promulgated at the highest levels of the company and carried out uniformly by a small team of decision-makers—has led to widespread violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.

Early on in this case, Union Pacific brought a motion to dismiss Plaintiffs' Rule 23 class action allegations, asking the Court to strike—with no discovery—allegations that the company engaged in a pattern or practice of disability discrimination. In denying the motion, the Court noted that "[t]here appear to be issues capable of class-wide resolution presented in the Amended Complaint." (Order, ECF No. 111 at 7-8.) The Court reasoned that it has a variety of tools at its disposal for managing class actions, and that "it may turn out that a class action is the 'superior' method of adjudicating the controversy." (*Id.*) The Court concluded that "[t]he case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4)." (*Id.*)

Discovery has confirmed that the Court was correct. Over the past year-and-a-half, Plaintiffs have deposed the Union Pacific employees charged with carrying out the company's reportable health events policy, reviewed hundreds of thousands of documents and emails detailing the contours of that policy, and obtained volumes of data regarding the affected employees. Through this evidence, Plaintiffs have now shown significant proof of:

- A uniform fitness-for-duty and reportable health events policy based on a scientifically unsound "1% Rule" regarding the risk of sudden incapacitation;
- Uniform implementation of the policy by a small group of decision-makers, including Chief Medical Officer Dr. John Holland and his three Associate Medical Directors, who are guided in their decision-making by standardized policies and practices;
- Evidence that Union Pacific's policy is invalid because, among other things, it is based on incorrect generalizations about the risk of sudden incapacitation posed by certain health conditions, including the scientifically unsound "1% Rule" and inapplicable FMCSA materials governing commercial truck drivers;

- Internal Union Pacific documents showing that the company was aware of the discriminatory intent and outcomes of its policy;
- Numerous specific instances of discrimination suffered by class members who were subject to the policy; and
- Data showing that thousands of workers have suffered adverse outcomes as a result of Union Pacific's policy.

This case is well-suited for class treatment. Plaintiffs' challenge to Union Pacific's reportable health events policy raises common questions that will generate common answers and drive the resolution of Plaintiffs' claims, as well as those of the putative class. These common questions—including both (a) the existence of a pattern or practice of discrimination, and (b) the viability of Union Pacific's affirmative defenses—dwarf any individualized issues. As suggested at the motion to dismiss stage, this Court should employ "hybrid" certification of liability/injunctive relief under Rule 23(b)(2) and damages under Rule 23(b)(3), using *Teamsters* proceedings to resolve any individualized issues. Plaintiffs' motion for class certification should be granted.

## BACKGROUND AND PROCEDURAL HISTORY

### I. THE PARTIES

Defendant Union Pacific Railroad Company is the country's largest railroad, with headquarters in Omaha, Nebraska. (*See* Ex. 2 (Form 10-K) at 5.)[1] The company spans twenty-three states and employs over 40,000 workers. (*Id.* at 5, 8.) Named Plaintiffs Quinton Harris, John Baker, Geoffrey Miller, Norman Mount, Thomas Taylor, and Scott Zinn are current and former Union Pacific employees. (ECF No. 20 (First Am. Compl.) ¶¶ 4, 20-115.) They were all

[1] All exhibits and deposition excerpts are attached to the Declaration of Robert L. Schug filed in support of this motion.

removed from service pursuant to Union Pacific's fitness-for-duty and reportable health events policy at issue in this litigation. (*Id.* ¶¶ 1-3, 20-115.)

## II. PROCEDURAL HISTORY

On November 25, 2015, Plaintiff Quinton Harris filed a Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. (ECF No. 1.) On February 19, 2016, Plaintiffs filed a First Amended Complaint, adding additional named plaintiffs, and converting the case to a class action under Fed. R. Civ. P. 23. (ECF No. 20.) Plaintiffs alleged that Union Pacific, through its fitness-for-duty and reportable health events policy, had engaged in a pattern or practice of ADA violations, including disparate treatment (Count I), disparate impact (Count II), and unlawful medical inquiries (Count III). (*Id.* ¶¶ 136-158.)

After transferring the action to the District of Nebraska, (ECF Nos. 51, 52), Union Pacific brought a motion to dismiss or strike Plaintiffs' class action allegations, largely based on the Third Circuit's decision in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009). (*See* ECF No. 87.) The Court denied the motion. (*See* ECF Nos. 92, 94, 111.) The Court concluded that "[t]here appear to be issues capable of class-wide resolution presented in the Amended Complaint." (ECF No. 111 at 8-9.) The Court reasoned:

> Class-action treatment is not prohibited just because there may be some matters that will have to be tried separately. The plaintiffs challenge a single cohesive policy and a single injunction under Fed. R. Civ. P. 23(b)(2) could arguably provide relief to each member of the class.

(*Id.* at 9.) The Court commented that it had a variety of tools at its disposal for managing class actions, and that "it may turn out that a class action is the 'superior' method of adjudicating the controversy." (*Id.*) The Court concluded that "[t]he case is potentially a candidate for hybrid class action treatment under Rule 23(c)(4)." (*Id.*)

## III. UNION PACIFIC'S UNIFORM FITNESS-FOR-DUTY AND REPORTABLE HEALTH EVENTS POLICIES

### A. Union Pacific's "1% Rule" of Sudden Incapacitation

Union Pacific's fitness-for-duty and reportable health events policies are overseen by the Health and Medical Services Department ("HMS"), and specifically by Chief Medical Officer Dr. John Holland. (Holland 30(b)(6) Dep. (3-28-17) 13:17-14:11.) Upon his appointment as Chief Medical Officer in 2010, Dr. Holland began to implement an ultra-conservative approach to employee fitness-for-duty. (*See* Holland Dep. (4-28-16) 18:23-25, 25:15-26:12; Ex. 3 at 2 (memo describing "more stringent" work restrictions).) Dr. Holland and Union Pacific view their approach to fitness-for-duty as a "new paradigm" in the field. (*See* Holland Dep. (8-9-18) 245:17-247:12; Ex. 5 (memo re fitness-for-duty guidelines) at 3.)

One of the central tenets of this "new" approach to fitness-for-duty is a "1% Rule" regarding an employee's risk of sudden incapacitation. Any employee who is deemed to have more than a 1% per year probability of sudden incapacitation is considered to be an unacceptable safety risk for the company. (Holland 30(b)(6) Dep. (3-28-17) 183:6-23; *see also* Ex. 6 at 2 ("As a general principal, HMS now considers a worker in a safety sensitive position who has health conditions associated with greater than 1% per year probability of sudden incapacitation to have an unacceptable safety risk, and the worker is given ongoing restrictions.").) Among other things, this policy is based on inapplicable guidelines from the Federal Motor Carrier Safety Administration ("FMCSA"). (*See* Holland 30(b)(6) Dep. (3-28-17) 118:5-124:23, 130:9-12, 133:7-20; *see also* Ex. 7 ("[redacted]").) The company embraces these FMCSA guidelines even though they apply to and are intended for commercial truck drivers who primarily drive alone. (*See* Holland

Dep. (3-28-17) 118:5-119:5.) Railroad employees rarely work in one-person crews and many never drive commercial trucks or trains as part of their jobs. (*See* Ex. 8 (Trangle Rpt.) at 8.) Union Pacific's process for making the fitness-for-duty determinations at issue in this litigation is outlined below.

**B. Union Pacific's Fitness-for-Duty and Reportable Health Events Policies are Uniformly Carried Out by a Small Group of Decision-Makers**

Union Pacific's fitness-for-duty and reportable health events policies are carried out by Dr. Holland and a small team of doctors and nurses. Three doctors, referred to as "Associate Medical Directors," each with his own dedicated areas of responsibility, assist Dr. Holland in performing fitness-for-duty evaluations. (Holland 30(b)(6) Dep. (3-28-17) 24:4-25:17.) Dr. John Charbonneau covers the western and southern regions, on-duty injuries, and preplacement exams. (Charbonneau Dep. 13:15-20.) Dr. Matthew Hughes covers the northern region. (Hughes Dep. 20:20-22.) Dr. Donald Lewis covers manager referrals, Federal Railroad Administration ("FRA") certifications, and FMCSA certifications. (Lewis Dep. 8:25-9:18.)

The Associate Medical Directors report directly to Dr. Holland, and their fitness-for-duty determinations are subject to his ultimate approval. (Holland Dep. (4-28-16) 19:9-17; Holland Dep. (8-9-18) 401:17-21; *see also* Hughes Dep. 106:3-10 ("I send a lot of emails to Dr. Holland and get his final approval on things I do."); Lewis Dep. 24: -13--14, 28:8-11, 32:1-4 (testifying that Dr. Holland ultimately has the final say); Charbonneau Dep. 47:3-12 ("[Dr. Holland] is the final decision maker.").)

Dr. Holland and the Associate Medical Directors are assisted by six or seven Fitness-for-Duty Nurses. (Holland 30(b)(6) Dep. (3-28-17) 38:7-20, 41:21-42:7.) The nurse is the "primary person that contacts the employee, [and] talks to them about what their medical issues might be." (Holland 30(b)(6) Dep. (3-28-17) 41:21-23.) They also make medical records requests, schedule

medical exams when directed by the doctors, and maintain contact with employees' supervisors. (Holland 30(b)(6) Dep. (3-28-17) 41:23-42:11.) Like the Associate Medical Directors, Fitness-for-Duty Nurses are grouped by region or type of review. (Holland 30(b)(6) Dep. (3-28-17) 44:1-47:17; Ex. 9 (listing nurse assignments).)

Standardization is a critical component of the fitness-for-duty process. (Holland Dep. (3-28-17) 137:4-13 ("Q: Is there a standard process that's followed when a fitness-for-duty exam is initiated in each of those situations? A: Yes.").) As Dr. Holland himself has explained it, "Almost everything we do in [Health and Medical Services] is a team effort, and relies on common understandings and standard processes." (Ex. 10 (2014 Dr. Holland Perf. Eval.) at 3.) Union Pacific uses detailed workflow documents dictating how fitness-for-duty evaluations should be conducted. (*See* Ex. 11 at 6-28 ("Health and Medical Standard Work"); Exs. 12-16 (fitness-for-duty process flowcharts); *see also* Exs. 17- 23 ("HR, Health and Medical, Clinical Services Standard Work").)

### C. <u>Employees Subject to Union Pacific's Fitness-for-Duty Policy are Required to Disclose "Reportable Health Events"</u>

The fitness-for-duty policy is outlined in Union Pacific's Medical Rules. (Ex. 24.) The rules require employees in so-called "safety sensitive" positions to disclose new diagnoses, events, or changes in certain conditions, which the company refers to as "reportable health events."[2] (*Id.*, App. B; *see also* Ross Dep.47:7-48:8.) Well over three-fourths of Union Pacific's 40,000+ employees are categorized as working in safety sensitive positions, and therefore are subject to the reportable health events policy. (Holland 30(b)(6) Dep. (3-28-2017) 104:21-

[2] The company uses "safety critical" and "safety sensitive" interchangeably, as well as "reportable health conditions" and "reportable health events."

106:21; Ex. 27 at 3.) These workers must self-report, for example:

**A. Cardiovascular Conditions including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral).
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**

1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode cause by insulin reaction).

**C. Significant Vision or Hearing Change including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).
2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).
3. Significant hearing loss or surgery on the inner ear.
4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.
2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person.

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

(Ex. 24, App. B.) The policy also applies to certain prescription drugs, and other conditions that are deemed to pose an increased risk for sudden incapacitation. These additional drugs and conditions are also specifically identified in policy documents. (*See* Ex. 28 (HMS Guidelines) at 3-5 ([redacted]); Ex. 29 ("Restricted Prescription Drugs").)

**D. <u>Employees with Reportable Health Events are Removed from Work Pending Evaluation and Issued Requests for Medical Records</u>**

Once Union Pacific discovers that an employee has a reportable health event or condition, the employee is required to undergo a fitness-for-duty evaluation. (Ex. 28 at 3 ("FFD evaluation is required[.]"); *see also* Ex. 24 (Medical Rules), App. B.) A Fitness-for-Duty Nurse initiates the evaluation and places the employee on leave. (Holland 30(b)(6) Dep. (3-28-17) 142:24-143:7.) "[T]he system automatically sends out notification to the supervisor that this person[] [is] considered not fit for duty pending evaluation." (*Id.*; *accord* Ex. 30 ("If [] you have a Reportable Health Condition[], you <u>must</u> be cleared by Union Pacific Health and Medical Services before you can return to work."); *see also* Exs. 30-33 (template leave of absence letters); Ex. 11 at 6-12 ("Standard Work" processes for medical leave).)

Once the employee is placed on leave, Union Pacific requires them to turn over years of medical records. A Fitness-for-Duty Nurse issues template requests to both the employee and their treating physician. (Holland 30(b)(6) Dep. (3-28-17) 150:21-23; *see also* Exs. 34-37 (employee); Exs. 38-40 (treating physician).) The medical records are entered into a database called eHealthSafe, after which a Fitness-for-Duty Nurse contacts an Associate Medical Director to review the employee's status. (Holland 30(b)(6) Dep. (3-28-17) 56:18-58:7, 144:3-7.) The Associate Medical Director either instructs the nurse to request additional records, or issues a

fitness-for-duty determination. (Holland 30(b)(6) Dep. (3-28-17) 144:8-16; *see also* Exs. 41-43 (template follow up letters).)

**E. <u>Instead of Conducting Individual Assessments of Whether Employees Can Perform the Job, Union Pacific Uses Uniform Work Restrictions to Disqualify Employees on the Basis of Their Medical Condition</u>**

Once medical records are obtained, Dr. Holland or one of his Associate Medical Directors reviews the records and conducts a fitness-for-duty evaluation. (Holland 30(b)(6) Dep. (3-28-17) 144:14-16, 148:9-14.)

But this "evaluation" is not an individualized assessment of the employee's ability to perform the essential functions of their job. The evaluation does not take into account the employee's specific job duties, whether they work alone or with a team of other workers, or the amount of time they have worked with the condition without incident. (*See* Ex. 44 at 4 [redacted]."); Holland Dep. (8-9-18) 342:2-18 (whether employee works alone or as part of a "gang" is not relevant); Holland Dep. (7-12-18) 78:14-79:6 (length of time an employee safely performed with a condition is not routinely collected).) The employee is never physically examined by Dr. Holland, or by his Associate Medical Directors. (Holland 30(b)(6) (3-28-17) 184:19-21; *see also* Charbonneau Dep. 74:9-75:3; Hughes Dep. 21:5-8; Lewis Dep 41:19-21).) Union Pacific does not give deference to the opinions of the employees' treating doctors who actually *have* examined them. (Holland Dep. (8-9-18) 287:25-288:19.)

Instead, Union Pacific relies on broad, population-based risk assessments to determine whether—under its standards—a certain health condition is deemed a safety risk. (*See* Holland

Dep. (7-12-18) 85:2-86:87:12) (development of a "standard approach" on how to address specific conditions); Holland Dep. (8-9-18) 246:5-247:12 ("The paradigm, you know, we've used is to use evidence-based guidance to determine if a specific health condition is a safety risk and then put functional work restrictions . . ."); Ex. 5 (memo regarding fitness-for-duty guidelines) at 3; *see also* Greenberg Dep. 105:5-106:10.) The doctor merely looks at the employee's medical records, references materials for their suspected condition or diagnosis, and decides whether or not the employee poses a greater than 1% risk of sudden incapacitation within the next year. (*See, e.g.*, Holland Dep. (8-9-18) 320:5-321:12; 324:20-325:16, 335:15-339:24, 344:17-345:8, 351:22-352:13, 382:6-384:7 (Dr. Holland purporting to explain calculations for various named Plaintiffs and class members).)

When the review is complete, the employee is issued a fitness-for duty determination. (Holland 30(b)(6) Dep. (3-28-17) 42:20-24 ("The end point is to come up with a fitness-for-duty determination to decide if the person can go back to their job, or if they need work restrictions[.]").) The result is that the employee is (a) returned to work, (b) subject to ongoing monitoring, (c) issued standard work restrictions, or (d) issued a general medical disqualification. (Holland 30(b)(6) Dep. 137:22-138:11; Holland Dep. (8-9-18) 387:21-389:4.) A nurse inputs the decision into eHealthSafe, which automatically notifies the employee's supervisor. (Holland 30(b)(6) Dep. (3-28-17) 145:10-18).)

Employees who are found to be a sudden incapacitation risk are issued "standard work restrictions."[3] (Holland 30(b)(6) Dep. (3-28-17) 179:13-180:12; *see also* Ex. 45 (process memo) at 2; Lewis Dep. 112:20-23.) The restrictions typically prohibit employees from:

---

[3] Dr. Holland authored the standard work restrictions with input from other groups, including the legal department. (Holland Dep. (4-28-16) 25:1-7; Holland Dep. (7-12-18) 36:2-13.)

Case 3:20-cv-02392-BK Document 96-2 Filed 08/13/21 Page 253 of 281 PageID 5221

(1) Operating company vehicles;

(2) Working on or near moving trains, freight cars or locomotives;

(3) Operating cranes, hoists, or machinery; and

(4) Working at unprotected heights over four feet above the ground.

(*E.g.*, Ex. 46 ("Standard Work Restrictions – for Sudden Incapacitation Risk"); *see also* Ex. 47 (Template "Work Restrictions for Electric and Magnetic Force (EMF) exposures"); Ex. 48 ("Standard Work Restrictions – for Hearing Impairments"); Ex. 49 ("Standard Work Restrictions for failed [Color Vision Field Test]").)

These work restrictions are categorized broadly by health condition, and do not take into account the employee's unique medical circumstances, or their specific job duties. (*See* Holland Dep. (8-9-18) 246:5-247:12 (explaining the approach of applying "functional" work restrictions, by health condition, to a "broad variety of jobs"); Ex. 44 at 4 ("[ [redacted] ."').) Because of their extremely broad scope, these work restrictions effectively make it impossible for an employee to continue working. (*See, e.g.*, Harris Decl. ¶ 6; Baker Decl. ¶ 6; Miller Decl. ¶ 6; Mount Decl. ¶ 6; Taylor Decl. ¶ 6; *see also* Ex. 95 (declarations of example class members issued work restrictions) at ¶ 6.)

Union Pacific also applies "minimum waiting periods" based on an employee's medical condition. (*See* Exs. 50-59.) These include, for example:

[redacted]

[redacted]

[redacted]

(*See* Exs. 52, 54, 58.)

## IV. UNION PACIFIC DOES NOT HAVE A VALID RATIONALE FOR ITS FITNESS-FOR-DUTY AND REPORTABLE HEALTH EVENTS POLICIES

Union Pacific does not have a valid medical or regulatory rationale for its ultra-conservative approach to fitness-for-duty. Plaintiffs' expert witnesses confirm that the policy is far more restrictive than necessary and lacks scientific support. Not surprisingly, Union Pacific has engaged its own experts who disagree with Plaintiffs' experts, and who state that Union Pacific's policy is reasonable. (*See, e.g.*, Exs. 60-63.) The opinions of Plaintiffs' experts are summarized below.

First, Plaintiffs' expert in occupational medicine, Dr. Kevin Trangle, analyzed Union Pacific's reportable health events policy, and the use of the policy to remove employees from service. (*See* Exs. 64, 65).) Dr. Trangle's opinions include:

- That Union Pacific's policy is not based on scientific evidence or reasonable medical practice guidelines and standards. (Ex. 64 at 1.)
- That fitness-for-duty decisions were predicated on "unfounded assumptions about specific illness and risk, which led to unnecessary exclusion, restrictions and termination of qualified workers." (*Id.*)
- That individuals with certain conditions were treated "uniformly as if belonging to groups and not in an individual manner." (*Id.* at 4.)
- That the "1% Rule" is arbitrary and lacks scientific justification. (Ex. 64 at 7; Ex. 65 at 6-9.)
- That Union Pacific's reliance on FMCSA guidelines is inappropriate because (a) they were designed for commercial truck drivers, not railroads, and (b) were devised for solo truck drivers, not railroad professionals who rarely work in one-person crews, and many of whom never drive trucks or trains. (Ex. 64 at 7-8.)

In sum, Dr. Trangle concluded that Union Pacific's fitness-for-duty and reportable health events policy is "more restrictive than necessary, and would tend to cause workers to be unnecessarily prevented from working." (Ex. 64 at 8.)

Second, Plaintiffs' expert transportation safety consultant Paul Dillard analyzed whether "the companywide changes to the [] Fitness-for-Duty program conformed to industry standards and to determine if anyone acted in an unreasonable manner." (Ex. 66 at 1.) He has opined that "the medical standards of the FMCSR's are exclusive to a driver of a CMV [commercial motor vehicle] and not established to govern the physical requirements of non-CMV employees." (*Id*. at 6). Moreover, the majority of relevant conditions "are not mandatory disqualifying conditions for a CMV driver at all[,]" but require the individualized input of a certified medical examiner (*Id*.) He concluded that Union Pacific's fitness-for-duty decisions are not appropriately individualized. (*Id*.)

Third, Plaintiffs have also retained Dr. Jay Neitz, an ophthalmology expert, to address the validity of Union Pacific's vision requirements. (Ex. 67 at 1.) [redacted] (*Id*. at 8-9). Union Pacific "did not seemingly offer a reasonable, scientific based reliable and comparable test to determine if accommodation was possible and reasonable." (*Id*. at 12.)

On August 9, 2018, the Magistrate Judge granted Union Pacific's motion to exclude Dr. Neitz's report, and granted a protective order regarding the validity of Union Pacific's light cannon test. (ECF No. 238.) Plaintiffs will file objections to the exclusion Order, and will request that the Court consider those issues at the same time and within the full context of Plaintiffs' motion for class certification.

## V. UNION PACIFIC'S FITNESS-FOR-DUTY PROGRAM HAS LED TO THE SYSTEMATIC REMOVAL OF WORKERS WITH DISABILITIES

### A. Thousands of Workers Have Been Subjected to Fitness-for-Duty Examinations as a Result of Union Pacific's Reportable Health Events Policy

Over 7,000 Union Pacific employees have been subjected to a fitness-for-duty evaluation due to a "reportable health event" during the applicable statutory period, from September 18, 2014 to the present. (Ex. 96 (Wise Decl.) ¶¶ 4, 5 & Schug Decl. ¶¶ 15-18; *see also* Ex. 68).) The available data confirms the extent to which these workers were subject to adverse outcomes:

- The available data reveals that at least 3,145 of the workers were designated as not cleared to work or were issued work restrictions as a result of their fitness-for-duty determinations.
- For workers identified in Union Pacific's records as having a "critical diagnosis," the data reveals that they were not cleared to work or were given work restrictions at very high rates, often exceeding 50%.
- Workers were commonly given long-term restrictions, often lasting hundreds of days, if not years.

(Ex. 96 (Wise Decl.) ¶¶ 6-12, Tables 1-2 & Schug Decl. ¶¶ 15-18.)

The company's own documents further confirm that Union Pacific's new fitness-for-duty policies led to a dramatic increase in intrusive medical exams, records requests, and medical disqualifications. As one high-level Health & Medical Services employee noted in an attachment to a March 8, 2017 email:

[redacted]

(Exs. 3, 4.) Other documents confirm the same trend. (*See, e.g.*, Ex. 69 at 23("[redacted]"); Ex. 70 at 12 (noting "[redacted]

[redacted]"); Ex. 71 at 4 ("[redacted]"); Ex. 72 at 10 ("[redacted]"); Ex. 71 at 4 ("[redacted]").)

Union Pacific has continued to implement this policy despite the absence of any evidence that the policy has led to fewer events of sudden incapacitation. (*See* Holland Dep. (8-9-18) 409:25-410:7.)

**B. Union Pacific Adopted and Applied its Fitness-for-Duty Policies with the Intent of Excluding Individuals with Disabilities**

Internal Union Pacific documents and analysis also reveal that the reportable health events policy was adopted for the specific purpose of removing individuals with disabilities from their jobs, and was applied in a discriminatory manner. For instance:

- A high-level presentation shows that Union Pacific used its reportable health events policy to systematically weed out workers with disabilities. [redacted]

- Other documents and testimony show instances of Union Pacific initiating searches of its medical records databases to seek out employees with reportable health conditions, with the aim of imposing standard work restrictions. (*See* Holland 30(b)(6) Dep. (3-28-17) 103:12-104:20); Holland Dep. (7-12-18) 29:22-34:18; Willis Dep. 42:3-12; Gengler Dep. 120:2-121:22 & Exs.

74-75 (count of employees with seizure disorders pulled for sudden incapacitation work restrictions).)

- Internal documents reveal that Union Pacific adopted and applied the reportable health events policy with an eye toward future litigation involving violations of the Americans with Disabilities Act. (Ex. 76 at 3 (“[redacted]”).) [redacted]. (*See* Ex. 69 at p.26-27).)

- Union Pacific paid and indemnified consultants—at least one of whom it has also hired as an expert in this case—to help Dr. Holland develop and publish Union Pacific’s fitness-for-duty “guidelines” in order to make them appear more credible in court. (*See* Ex. 77 at 15 (“[redacted]”); Ex. 78 (“[[redacted] Exs. 79-86; *see also* Holland Dep. (7-12-18) 149:12-18 (acknowledging dual role of Dr. Matthew Rizzo as panel member and expert witness).) During the attempts to obtain peer review for Union Pacific proposed “guidelines,” Dr. Holland received pushback, with one industry member refusing to have her name associated with the proposal. (Ex. 87 (“[redacted]”).) Dr. Holland views the “audience” for his fitness-for-duty materials as “lawyers and judges.” (*See* Ex. 88 (noting that “[redacted]”); Ex. 89 (“[redacted]

Case 3:23-cv-02393-BK Document 42-6 Filed 09/13/21 Page 59 of 81 PageID 1594

[redacted]").)

- Discovery has revealed that Dr. Holland enforces Union Pacific's fitness-for-duty policy in a discriminatory manner. On at least one occasion, Dr. Holland contacted an employee's treating doctor and threatened him with potential liability when that doctor did not concur with Dr. Holland's assessment of the employee's ability to work. (Ex. 90 at 1 ("Note that UPRR does not provide liability protection for you if, in the course of this appeal, the employee's work restrictions given by HMS are overturned, based in part on your opinion, and a subsequent accident or injury occurs attributable to Mr. Miller's cardiac condition."); *see also* Holland Dep. (7-12-18) 219:10-19 (Dr. Holland admitting that he is unaware of any treating physician ever found liable for an accident due to giving their opinion that an employee is fit for work).) On another occasion, Dr. Holland refused to honor a union arbitration decision ordering that Union Pacific convene a panel of doctors to assess an employee's ability to return to work. (*See* Exs. 91-92.)

### C. <u>The Experiences of the Named Plaintiffs and Class Members Confirm the Consequences of Union Pacific's Fitness-for-Duty and Reportable Health Events Policies</u>

The consequences of Union Pacific's fitness-for-duty-program are further illustrated by the experiences of the named Plaintiffs and putative class members, summarized below. Also attached are the declarations of 44 class members who have experienced similar discrimination. (Ex. 95, Alarcon Decl.; Barkmeier Decl.; Barrera Decl.; Bartels Decl.; Brasier Decl.; Bray, Mathew Decl.; Bray, Mike Decl.; Brollini Decl.; Bullock Decl.; Carlton Decl.; Cervera Decl.; Corrington Decl.; Cushman Decl.; Daniel Decl.; DeGeer Decl.; Derr Decl.; Donahue Decl.; Fegler Decl.; Freed Decl.; Garrett Decl.; Hagar Decl.; Harpster Decl.; Hawkins Decl.; Hoffman

Decl.; Hunt Decl.; Hurd Decl.; Hyatt Decl.; Jenkins Decl.; Kane Decl.; Karrick Decl.; Kirk Decl.; Koci Decl.; Loeher Decl.; Malone Decl.; Mayer Decl.; McDonald Decl.; Mendrun Decl.; Meza Decl.; Moore Decl.; Parker Decl.; Powell Decl.; Pruitt Decl.; Rivera Decl.; Soreng Decl.)

Plaintiffs' experts, Dr. Trangle,[4] Dr. Robert Goldstein, and Dr. Michael Devereaux have opined that each of the named Plaintiffs was incorrectly taken out of service pursuant to the policies at issue. (*See* Ex. 64 at 8-21 & App. 1-4; Ex. 93 at 4-5, 7-8, 8-9; Ex. 94 at 4-9.)

**Norman "Keith" Mount** – Norman Mount has worked for UP since 1981, most recently as a Signal Maintainer in Illinois. (Mount Decl.) Mr. Mount has had a pacemaker since 1992, which he disclosed to UP. (*Id.*) Mr. Mount is certified to drive under the FMCSA, and never had related work incidents. (*Id.*) In 2014, UP requested information about Mr. Mount's pacemaker, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent work restrictions, disqualifying Mr. Mount from work. (*Id.*) Mr. Mount's doctor cleared Mr. Mount to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**Quinton Harris** – Plaintiff Quinton Harris has worked for UP since 2011, most recently as a Mechanical Service Operator in Arkansas. (Harris Decl.) Mr. Harris has medication-controlled epilepsy, which he disclosed when hired. (*Id.*) He has not had a seizure in more than ten years. (*Id.*) In March 2014, Mr. Harris applied for a work transfer and again disclosed his condition. (*Id.*) UP took Mr. Harris out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying Mr. Harris from work. (*Id.*) Mr. Harris' treating physician notified UP that Mr. Harris was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

[4] Dr. Trangle also analyzes several additional employees, who he concludes were incorrectly taken out of service. (*See* Ex. 64 at 8-21, App. 1-4.)

**Geoffrey Miller** – Geoffrey Miller has worked for UP since 2004, most recently as a Signalman in Utah. (Miller Decl.) Mr. Miller has medication-controlled ventricular myopathy, which he disclosed when hired. (*Id.*) He is asymptomatic, is certified to drive under the FMCSA, and has never had a related work incident. (*Id.*) In January 2015, UP took Mr. Miller out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying him from work. (*Id.*) Mr. Miller's treating physicians notified Union Pacific that Mr. Miller was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**Thomas Taylor** – Thomas Taylor has worked for UP since 2011, most recently, as a Signalman in Illinois. (Taylor Decl.) In 2014, Mr. Taylor developed a mild seizure disorder, and within weeks of his diagnosis, his symptoms were completely controlled with medication. (*Id.*) Although Mr. Taylor never had a related work incident, he disclosed his condition to UP. (*Id.*) In June 2015, UP took Mr. Taylor out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying Mr. Taylor from work. (*Id.*) Mr. Taylor's treating physicians notified UP that Mr. Taylor was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**Scott Zinn** – Scott Zinn has worked for UP since 2012, most recently as a Ballast Tamper Operator in Arizona. (Zinn Decl.) Mr. Zinn is an Iraq war veteran with PTSD, and no related workplace incidents. (*Id.*) In February 2014, Mr. Zinn tested positive for Benzodiazepine, and took medical leave to undergo treatment. (*Id.*) When Mr. Zinn completed treatment, UP refused to return him to work, requested medical information and testing, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued a "general medication disqualification"—disqualifying him from ever holding any position at UP. (*Id.*) Mr. Zinn's treating physician

Case 3:23-cv-02392-BK Document 96-6 Filed 03/25/21 Page 262 of 281 PageID 5927

notified UP that Mr. Zinn was cleared to work with no restrictions, but UP refused to reinstate him. (*Id.*)

**John Baker** – John Baker has worked for UP since 2004, recently as a Hostler in Arkansas. (Baker Decl.) In the fall of 2014, Mr. Baker experienced lightheadedness outside of work. (*Id.*) Although Mr. Baker never had a related work incident, he disclosed the lightheadedness. (*Id.*) In late 2014, UP took Mr. Baker out of work, requested medical information, and subjected him to a fitness-for-duty evaluation. (*Id.*) UP issued permanent restrictions, disqualifying him. (*Id.*) Mr. Baker's treating physician cleared Mr. Baker to work with no restrictions, but UP refused to reinstate him for one year. (*Id.*)

## LEGAL ARGUMENT

### I. PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23

A class action "saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quotations and modifications omitted). The party seeking certification must demonstrate that Rule 23 is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Every class action must meet the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). A class action must also be maintainable under Rule 23(b). *See* Fed. R. Civ. P. 23(b).

The district court may grant certification only after conducting a "rigorous analysis" confirming that the requirements are met. *Wal-Mart*, 564 U.S. at 351. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be

considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*.

Here, Plaintiffs seek certification of Count I, ADA disparate treatment, of the Amended Complaint, and request that the Court certify the following class: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action."[5] (*See* ECF No. 20, Am. Compl. ¶ 116.) Plaintiffs have demonstrated that each of the requirements of Rule 23(a) is satisfied, as well as the requirements of Rules 23(b)(2) and 23(b)(3).

**A. Rule 23(a)(1) – Plaintiffs Have Satisfied Numerosity**

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the putative class contains more than 7,000 members. (*See* Wise Decl. ¶¶ 4, 5; *see also* Ex. 68).) Numerosity is satisfied.

**B. Rule 23(a)(2) – Plaintiffs Raise Common Questions Central to the Validity of the Claims of the Putative Class**

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). All questions need not be common—"even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotation marks and modifications omitted). What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350. There must be a contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

[5] The class definition has been narrowed from the Amended Complaint. A trial court has broad discretion in determining whether a class action may be maintained, including "defining the scope of the class." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980).

stroke." *Id.* "Significant proof" that a company operates under "a general policy of discrimination" satisfies commonality. *Id.* at 353.

Here, Plaintiffs challenge Union Pacific's uniform, company-wide policy of removing employees from their jobs based on a "1% Rule" regarding the risk of sudden incapacitation. The evidence includes:

- A uniform fitness-for-duty and reportable health events policy based on a "1% Rule" regarding the risk of sudden incapacitation;
- Uniform implementation of the policy by a small group of decision-makers, including Chief Medical Officer Dr. John Holland and his three Associate Medical Directors, who are guided in their decision-making by standardized policies and practices;
- Evidence that Union Pacific's policy is invalid because, among other things, it is based on incorrect generalizations about the risk of sudden incapacitation posed by certain health conditions, including the scientifically unsound "1% Rule" and inapplicable materials governing commercial truck drivers;
- Internal Union Pacific documents showing that the company was aware of the discriminatory intent and outcomes of its policy;
- Numerous specific instances of discrimination suffered by class members who were subject to the policy; and
- Data showing a pattern of thousands of workers who have suffered adverse outcomes as a result of Union Pacific's policy.

(*See generally supra* §§ III-V.) This general policy of discrimination under the fitness-for-duty and reportable health events program presents common questions that will generate common answers, driving resolution of the claims of Plaintiffs and the class members.

Plaintiffs' ADA disparate treatment claims involve common questions of law and fact. Plaintiffs allege that Union Pacific, through its reportable health events policy, engaged in a pattern or practice of discrimination, including the implementation of qualification standards and

Case 3:23-cv-02392-X Document 42-6 Filed 03/25/21 Page 25 of 40 PageID 2233

other criteria that screen out individuals with disabilities.[6] *See* 42 U.S.C. §§ 12112(a), (b)(6). The common questions driving these claims include: (1) whether, under the reportable health events policy, Union Pacific has engaged in a pattern or practice of disability discrimination; (2) whether Union Pacific can carry its burden of proof on its "direct threat" defense; and (3) whether Union Pacific's removal of employees based on alleged safety risks is job-related and consistent with business necessity.[7] (*See* Answer, ECF No. 113 at 32-33 (affirmative defenses).)

Each of these questions will be answered with common proof. Plaintiffs will prove, through common evidence, that disability discrimination is "standard operating procedure" at Union Pacific, "the regular rather than the unusual practice." *See Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 360 (1977). This includes evidence of a uniform and standardized fitness-for-duty and reportable health events policy, carried out by a small group of decision-makers following standardized procedures, with the discriminatory effects confirmed by internal documents and the experiences of the Plaintiffs and class members.

Plaintiffs will also defeat Union Pacific's direct threat and business necessity defenses with common evidence. With respect to direct threat, Union Pacific bears the heavy burden of proving that it *individually* examines whether an employee poses "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," based on the "best current medical or other objective evidence[.]" *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571-72 (8th Cir. 2007) ("Specific factors to be considered include (1) the duration of risk, (2) the

[6] Pattern-or-practice claims are litigated under the well-worn framework established by the Supreme Court in *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360 (1977) and reaffirmed in *Wal-Mart*. *See Wal-Mart*, 564 at 366-67.

[7] Although Union Pacific has raised the defense of business necessity in its Answer, Plaintiffs do not concede that this defense can be properly raised in the context of a pattern-or-practice claim of discrimination.

nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.") (quotations and citations omitted); *see also E.E.O.C. v. Hibbing Taconite Co.*, 720 F.Supp.2d 1073, 1082 (D. Minn. 2010) ("[A] slightly increased risk is not enough to constitute a direct threat, there must be a high probability of harm."); 29 C.F.R. § 1630.2(r) (definition of direct threat).

With respect to business necessity (if the defense is proper), the company will be required to prove that the reportable health events policy "fairly and accurately measures the individual's actual ability to perform the essential functions of the job" and meets the high standard of whether the policy "substantially promotes[s] the business's needs." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) ("For a safety-based qualification standard, in evaluating whether the risks addressed by the qualification standard constitute a business necessity, the court should take into account the magnitude of possible harm as well as the probability of occurrence.") (quotations and modifications omitted); *see also Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) ("An employer urging a business necessity defense must validate the test or exam in question[.]").

Plaintiffs will invalidate both defenses using class-wide proof. This includes the opinions of Plaintiffs' expert witnesses—Dr. Trangle, Dr. Neitz, and Mr. Dillard—who have opined that Union Pacific's policy is invalid because, for instance, it is far more conservative than necessary, it relies on an inappropriate and scientifically unsound "1% Rule" for evaluating the risk of sudden incapacitation, and it is based on (and often even stricter than) inapplicable FMCSA trucking guidelines. (*See supra* § IV.)

Notably, Union Pacific has engaged its own team of expert witnesses who have given opinions on the purported across-the-board reasonableness of the policy at issue. They have

taken positions directly contrary to Plaintiffs' experts, and their opinions conclusively demonstrate that the central question—whether Union Pacific's reportable health events policy is valid under the ADA—can be litigated on a class-wide basis. (*See, e.g.*, Ex. 44 at 5 ("The reason that UPRR can apply its fitness-for-duty program broadly to cover all UPRR workers in safety critical positions is because once an unacceptable risk of sudden incapacitation or impairment is identified, the worker is given functional work restrictions."); Ex. 61 at 19-20; Ex. 62 at 4.)

The decision in *Ellis v. Costco Wholesale Corp.* is instructive. 285 F.R.D. 492 (N.D. Cal. 2012). There, the plaintiffs sought to certify nationwide claims of gender discrimination in promotions within Costco's warehouses. *Id.* at 496. With respect to commonality, the court found that the plaintiffs had identified a common, companywide promotion system "made up of numerous common components" and imposing "consistent substantive criteria." *Id.* at 511-514. The evidence also showed "a close-knit, centralized management team," which oversaw the process. *Id.* at 512-513. Testimony from the plaintiffs' expert further confirmed a "common culture" of "unwritten rules" that allowed for bias against women in promotions. *Id.* 520. Finally, the court found that the plaintiffs had provided statistical evidence showing class-wide gender disparities in promotions. *Id.* at 521.

Here, as in *Ellis*, Plaintiffs have shown evidence of a uniform policy, carried out by a small group of decision-makers, following standardized procedures. As in *Ellis*, the discriminatory effect of Union Pacific's reportable health events policy is confirmed by the company's internal documents, the testimony of Plaintiffs' experts, and the available data demonstrating the effects on the workforce. Significantly, the evidence here is even *stronger* than the evidence at issue in *Ellis*. While that case involved a system comprised of various

"unwritten" rules, the reportable health events system at issue here is undisputedly well-documented and uniformly applied.

Other courts have reached the same conclusion in finding commonality in claims involving allegations of systemic discrimination. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 487 (7th Cir. 2012) (finding commonality in nationwide race discrimination class action); *United States v. City of New York*, 276 F.R.D. 22, 43-44 (E.D.N.Y. 2011) (discussing commonality in action challenging biased testing procedure); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 445-46 (N.D. Cal 2001) (commonality in ADA disability discrimination class); *Hendricks-Robinson v. Excel Corp.*, 164 F.R.D. 667, 671 (C.D. Ill. 1996) (certifying ADA class because "the common question of law and fact at the heart of this case is whether Excel's policy on its face and/or its common application violated the employee's rights under the ADA"); *Potsawko v. Mo. Dep't of Corrections*, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017), *appeal filed* Sept. 19, 2017 (certifying ADA class because alleged "policies or customs are the 'glue' that holds together the putative class").

### C. Plaintiffs' Claims are Typical of the Claims of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "[Typicality is] satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561-62 (8th Cir. 1982). "Factual variations in the individual claims will not normally preclude class certification[.]" *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

Here, each of the named Plaintiffs seek to remedy the same legal violations, under the same legal theory of disparate treatment under the ADA. (*See* Am. Compl.; Harris Decl.; Baker

Decl.; Miller Decl.; Mount; Decl.; Taylor Decl.; Zinn Decl.).) As explained above, the same core evidence will be used to prove that Union Pacific's policy is discriminatory, and to rebut its core affirmative defenses. Typicality is satisfied. *See Ellis*, 285 F.R.D. at 535.

**D. <u>The Named Plaintiffs Will Fairly and Adequately Represent the Interests of the Members of the Putative Class</u>**

The adequacy inquiry ensures that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P 23(a)(4). The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562-63. The inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 (1997).

There are no antagonizing interests here. Plaintiffs and the class share a common interest in putting a stop to the practices at issue, returning to work, and recovering lost wages and other relief. The named Plaintiffs have demonstrated a commitment to the class by assisting with the preparation of the Complaint, sitting for depositions, and responding to discovery. (Schug Decl. ¶ 3.) They have maintained regular contact with counsel. (*Id.* ¶ 3.) Plaintiffs are committed to representing the class. (*See, e.g.*, Baker Dep. 153:2-14 (testifying that he is "working on behalf of my fellow brotherhood of railroad workers"); Mount Dep. 158:11-16 ("[I'm] [h]oping when this is all settled that there is a different way that UP will conduct having put people out like they did. I'm here for compensation, but I'm also here to help other people to make sure this doesn't happen to them."); *see also* Harris Decl. ¶ 10; Baker Decl. ¶ 10; Miller Decl. ¶ 11; Mount; Decl. ¶ 11; Taylor Decl. ¶ 11; Zinn Decl. ¶ 11.)

Counsel will likewise fairly and adequately represent the members of the putative class. Counsel from Nichols Kaster, PLLP are well-qualified, experienced, and able to conduct this litigation on behalf of the proposed classes. (Schug Decl. ¶¶ 5-13 & Ex. 1.) Counsel have been class or collective counsel in numerous class and collective actions around the country, and are willing to put forward the resources necessary to pursue the case through trial. (Schug Decl. ¶¶ 5-6 & Ex. 1.) The Court should appoint Nichols Kaster as class counsel. *See* Fed. R. Civ. P. 23(g) (listing relevant considerations).

**E. The Case Can Be Properly Certified Using a Hybrid Approach Under Rule 23(b) and Plaintiffs Have Proposed a Manageable Trial Plan**

Class actions involving claims for class-wide injunctive relief and individual monetary relief are commonly certified under both Rule 23(b)(2) and Rule 23(b)(3). These are referred to as "hybrid" class actions. *See* 2 W. Rubenstein, Newberg on Class Actions § 4:38 (5th ed. 2012) (noting that hybrid certification "is frequently viewed as the most attractive of the alternatives"). As explained in Plaintiffs' trial plan, Plaintiffs propose that the parties litigate liability and injunctive relief in the first phase of the trial. Then, damages and other remaining issues will be resolved through individual hearings in the second phase. *See Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (noting the hybrid approach is available and "gaining ground"). The framework described above is consistent with the model for litigating class discrimination cases established by the Supreme Court in *Teamsters v. United States*, 431 U.S. 324 (1977), and explicitly reaffirmed in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366 (2011) (outlining the procedure for litigating pattern-or-practice cases).

Under *Teamsters*, the plaintiff has the initial burden "to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer[.]" 431 U.S. at 360. In other words, discrimination was "standard operating procedure,"—the regular, rather

than the unusual practice. *Id.* at 336. At this initial liability stage, the plaintiff "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* at 360. "[The] burden is to establish a prima facie case that such a policy existed." *Id.* "The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant." *Id.* If the plaintiff prevails, the court can conclude that a violation has occurred and issue the appropriate remedy—usually injunctive relief. *Id.* at 361.

"When the [plaintiff] seeks individual relief for the victims . . . a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Id.* at 361. Proof of the pattern or practice typically "supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The burden is on the employer to show that the particular employment decisions at issue were made for lawful reasons." *Id.*

**1. Liability and injunctive relief are properly certified under Rule 23(b)(2)**

The Court should certify liability and injunctive relief under Rule 23(b)(2), which provides for certification where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court clarified in *Wal-Mart*, certification under (b)(2) is appropriate where "a single injunction or declaratory judgment would provide relief to each member of the class." 564 U.S. at 360. The Eighth Circuit requires that claims certified under this rule must be "cohesive." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1035 (8th Cir. 2010).

Plaintiffs' claims are well-suited for class treatment under Rule 23(b)(2). Plaintiffs seek to address one common policy, applicable to the entire class. A single injunction will provide relief to the class members by stopping Union Pacific's use of its reportable health events policy and 1% Rule to remove workers with disabilities. Many courts have certified liability and injunctive relief under Rule 23(b)(2) in these circumstances, with individual issues reserved for second-stage proceedings. *See, e.g., Ellis*, 285 F.R.D. at 536-37 (certifying hybrid (b)(2)/(b)(3) action because "liability turns on Defendant's alleged patterns or practices"); *Floyd v. City of New York*, 283 F.R.D. 153, 173 (S.D.N.Y.2012) ("[E]ven after *Wal–Mart*, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member.") (citations omitted).[8]

**2. Back pay and compensatory damages are properly certified under Rule 23(b)(3)**

The Court should certify back pay and compensatory damages under Rule 23(b)(3). Under Rule 23(b)(3), the district court must determine whether common issues predominate over individual issues, and whether class treatment will be manageable and the superior method of resolutions of the class members' claims.

[8] *See McReynolds*, 672 F.3d at 491-92 ("We have trouble seeing the downside[.]"); *U.S. v. City of New York*, 258 F.R.D. 47, 68 (E.D.N.Y. 2009) ("This class is certified for the liability phase of the disparate treatment and disparate impact claims asserted by the Intervenors."); *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 448-49 & n.35 (D.D.C. 2002) ("The Court will therefore bifurcate the case, certifying a (b)(2) class for liability. If the liability is established, the Court will then determine the most appropriate mechanism for determining remedies."); *see also Potsawko*, 2017 WL 3185155, at *12-13 (certifying ADA (b)(2) class because "Defendant's policies apply generally to the class[.]"); *Murphy v. Piper*, 2017 WL 4355970, at *15 (D. Minn. Sept. 29, 2017) (certifying (b)(2) ADA class because "this case centers on Defendant's conduct in administering the disability Waivers statewide").

Case 3:23-cv-02392-BK Document 9-6 Filed 09/13/21 Page 33 of 40 PageID 8241

***Common Issues Predominate –*** A class may be certified under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623. Individual questions are those where class members "will need to present evidence that varies from member to member," while common questions are those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (quotations and modifications omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045.

Here, the common questions of whether Union Pacific engaged in a pattern of ADA violations, and whether the reportable health events policy is valid under the rubric of Union Pacific's direct threat and business necessity affirmative defenses, far outweigh the individual issues. Under the *Teamsters* framework, the first stage of the proceedings is focused on the policy or practice at issue, not on which members of the class suffered harm. *See Teamsters*, 431 U.S. at 336. The plaintiffs' burden is "to establish a prima facie case that such a policy existed." *Id*. at 336. It is not to prove the elements of each and every class member's individual

discrimination claims. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) ("[A]t the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking."); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772 & n.32 (1976) (no requirement at first stage to prove that all unnamed class members were a victim of the discrimination at issue).

Any remaining individual issues can be managed through second-stage proceedings. After a first-stage liability finding, a second notice will be mailed to the class members informing them of the trial result, and the process for pursuing individual relief. As it did at the motion to dismiss stage, the Court should reject Union Pacific's contention that the Third Circuit's decision in *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169 (3d Cir. 2009) prevents certification of ADA disparate treatment claims. Issues that may be resolved in these second-stage proceedings include damages questions for individual class members and, where necessary, whether they were "qualified individuals" under the ADA. *See Bates*, 204 F.R.D. at 448-49 (resolving questions regarding class members' "particular limitations and essential job functions" in second-stage proceedings); *Easterling v. Conn. Dep't of Corrections*, 278 F.R.D. 41, 50 (D. Conn. Nov 22, 2011) (need to establish qualification for position less substantial than issues "subject to generalized proof"); *Employees Committed For Justice v. Eastman Kodak Co.*, 407 F.Supp.2d 423, 427-32 (W.D.N.Y. 2005) (finding hostile work environment claims compatible with the pattern-or-practice framework); *E.E.O.C. v. Nw. Airlines, Inc.*, 216 F.Supp. 2d 935, 935 (D. Minn. 2002) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice disability discrimination).[9]

[9] *See also E.E.O.C. v. Mitsubishi Mfg. of Am., Inc.*, 990 F.Supp. 1059, 1069-70 (C.D. Ill. 1998) (approving *Teamsters* approach in EEOC action alleging pattern-or-practice claims of hostile work environment); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 876 (D. Minn. 1993)

The *Ellis* decision is again instructive. There, in light of the plaintiffs' identification of specific practices causing discrimination, the court found that "[r]esolution of Plaintiffs' challenge to those practices will resolve significant issues with respect to the class as a whole, and this dwarfs individualized issues as to particular employment decisions." 285 F.R.D. at 538. The court held that "whether Defendant has engaged in a pattern or practice of discrimination such that all class members are entitled to a presumption of discrimination under the *Teamsters* method of proof is a common issue subject to classwide resolution." *Id.* Although there would necessarily be individualized questions presented by the plaintiffs' claims, the court found that the plaintiffs' proposed trial plan "addresses these concerns by employing the *Teamsters* framework, in which individual class members will present their claims for relief in a second phase of trial if liability is established, and Defendant will have an opportunity to present individualized defenses with respect to each class member." *Id.* at 539.

Here, as in *Ellis*, the core questions of whether Union Pacific engaged in a pattern or practice of discrimination, along with the validity of the company's affirmative defenses, dwarfs any individual issues. Likewise, as explained above, Plaintiffs' proposed trial plan and utilization of the *Teamsters* framework will provide a mechanism for class members to present their claims for damages, and for Union Pacific to assert any individualized defenses. *See, e.g.*, *Rollins v. Traylor Bros.*, 2016 WL 258523, at *15 (W.D. Wash. Jan. 21, 2016)[10] (approving the use of individual second-stage proceedings in race discrimination class action); *City of New York*, 276 F.R.D. at 48 ("Individual proceedings will be necessary to determine a particular claimant's

---

(burden of persuasion on individual class members at second stage of hostile work environment claim).

[10] The court in *Rollins* ultimately decertified the case due to numerosity issues. *See Rollins*, Civ. No. 14-1414 (W.D. Wash. May 3, 2016). Numerosity is not an issue here.

eligibility to receive individual relief and what relief is available, questions relating to a claimant's mitigation efforts, and to determine whether and to what extent the City's discrimination has caused a claimant noneconomic losses compensable under federal and state law.").

***A Class Action is Superior –*** A class action may be certified under Rule 23(b)(3) if the court finds that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant considerations include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

A class action here is superior. The two-stage *Teamsters* approach proposed by Plaintiffs provides an effective mechanism for managing this litigation. It achieves efficiencies by deciding in a single proceeding whether Union Pacific engaged in a pattern of discrimination, along with the validity of the company's direct threat and business necessity defenses. As set forth above, each of these issues will depend largely on the same common proof, along with extensive testimony by the same expert witnesses. In the absence of a class action, each individual class member would be required to present—over and over again—the same evidence and testimony, resulting in unnecessary duplication of effort, squandered time, and wasted resources. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 492 (7th Cir. 2012) ("[T]he lawsuits will be more complex if, until issue or claim preclusion sets in, the question whether [defendant] has violated the antidiscrimination statutes must be determined anew in each case."); *City of New York*, 276 F.R.D. at 49 ("In deciding whether class certification will achieve

substantial efficiencies, the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members.").

Plaintiffs' proposed approach also provides the benefit of allowing each class member to pursue personal relief in second-stage hearings designated to resolve damages and other individual issues. This includes, where necessary, whether a class member was "qualified" within the meaning of the ADA. Plaintiffs' counsel have already been retained by approximately 193 individual class members affected by the practices at issue in this litigation, and whom counsel will represent in any second-stage proceedings. (Schug Decl. ¶ 4.) That these class members have chosen collective action instead of filing hundreds of individual lawsuits weighs heavily in favor of consolidating their claims before this Court.

**F. In the Alternative, the Court Can Certify Particular Issues Under Rule 23(c)(4)**

In the alternative, Rule 23(c)(4) allows the court to certify a class "with respect to particular issues." Although the Eighth Circuit has not squarely addressed the question,[11] the use of Rule 23(c)(4) to certify issue classes, or at minimum liability only classes, has been approved

[11] In 2008, the Eighth Circuit noted (in dicta) that there was a "conflict in authority" regarding whether class certification may be limited to specific issues amenable to class-wide resolution. *In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). The court cited the Fifth Circuit's decision in *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745-46 n.21 (5th Cir. 1996) as the lone example of a more conservative interpretation of Rule 23(c)(4). *See id.* The Fifth Circuit has since changed its approach, recognizing that the presence of individualized damages will not defeat class certification where liability issues are common and may be severed through Rule 23(c)(4). *See In re Deepwater Horizen*, 739 F.3d 790, 817 (5th Cir. 2014); *see also* Patricia Bronte et al., "Carving at the Joint": The Precise Function of Rule 23(c)(4), 62 DePaul L. Rev. 745, 752 (2013) (analyzing recent Fifth Circuit decisions and concluding the court is aligning with the consensus approach of permitting Rule 23(c)(4) certification when the requirements of Rule 23 are satisfied with respect to the issue certified).

by the overwhelming majority of appellate courts to consider the issue.[12] For the reasons outlined above, the issues of injunctive relief and class-wide liability are appropriately certified under Rules 23(c)(4). Thereafter, class members would be free to pursue damages on their own in separate litigation, having obtained the benefit of class-wide litigation of liability and Union Pacific's core affirmative defenses. *McReynolds*, 672 F.3d at 492 (certifying discrimination class action under Rule 23(c)(4) for purposes of liability and injunctive relief and allowing subsequent individual suits for back pay and other damages).

**C. Trial Plan**

Plaintiffs propose the following trial plan:[13]

**First Stage – Liability and Injunctive Relief**

First, the jury will decide:

- Whether Union Pacific has engaged in a pattern or practice of disability discrimination;
- Whether Union Pacific's practices were justified by "direct threat";
- Whether Union Pacific's practices were justified by business necessity (if allowed);
- Whether Union Pacific's conduct meets the standard for an award of punitive damages; and
- Whether Union Pacific is liable to the named Plaintiffs, as well as their damages.

Second, the Court will decide:

- Injunctive relief.

---

[12] *See, e.g., Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 41 (1st Cir. 2003); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219m 226-27 (2d Cir. 2006); *Gunnels v. Healthplan Servs. Inc.*, 348 F.3d 417, 428 (4th Cir. 2003); *Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272-73 (3d Cir. 2011).

[13] A similar plan was affirmed by the district court in *Ellis*, 285 F.R.D. at 445-46.

**Second Stage – *Teamsters* Hearings**

- Individual Hearings on reinstatement, back pay and compensatory damages, ADA "qualification," and individual defenses; and
- In the event of a punitive damages finding, the aggregate amount of punitive damages owed and the distribution to each class member.

**CONCLUSION**

For all of the reasons set forth herein, Plaintiffs request that their motion for class certification be granted in full. Plaintiffs request that the Court adopt the proposed class attached as Exhibit 97.

Date: August 17, 2018

NICHOLS KASTER, PLLP

s/Robert L. Schug
James H. Kaster* (MN #53946)
kaster@nka.com
David E. Schlesinger* (MN #387009)
schlesinger@nka.com
Charles A. Delbridge* (MN #386639)
cdelbridge@nka.com
Robert L. Schug* (MN #387013)
schug@nka.com
Neil D. Pederson* (MN #0397628)
npederson@nka.com
Laura A. Baures* (MN #0392081)
lbaures@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878
* *admitted pro hac vice*

ATWOOD, HOLSTEN, BROWN
DEAVER & SPIER, P.C., L.L.O.

Corey L. Stull (21336)
cstull@atwoodlawyers.com
575 Fallbrook Boulevard, Suite 206

Lincoln, Nebraska 68521
Telephone: (402) 817-2717

HILDEBRAND MCLEOD & NELSON

Anthony S. Petru (CA 91399)*
petru@hmnlaw.com
250 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
Telephone: (510) 451-6732
Fax: (510) 465-7023
* *admitted pro hac vice*

MOODY LAW FIRM

Nicholas D. Thompson (MN 389609)*
nthompson@moodyrrlaw.com
500 Crawford Street
Portsmouth, VA 23704
Telephone: (757) 477-0991
* *admitted pro hac vice*

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 17, 2018, he electronically filed the forgoing **Plaintiffs' Memorandum of Law in Support of Motion for Class Certification**. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

s/Robert L. Schug
Robert L. Schug

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-2392 |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Joe M. Fulbright ("Fulbright" or "Plaintiff") complains of his former employer, Union Pacific Railroad Company ("Union Pacific" or "Defendant") seeking damages and injunctive relief for the company's violations of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended (the "ADA").

INTRODUCTION

1. In 2014, Union Pacific changed its fitness-for-duty program. The changes required employees in certain positions disclose whether they had certain health conditions, even if the condition did not affect the employee's ability to safely perform his or her job. This requirement was needlessly invasive, and it violated the ADA.

2. If an employee disclosed one of the listed health conditions, Union Pacific automatically removed the employee from service. Again, doing so violated the ADA.

3. Next, Union Pacific required the employee to undergo a Fitness-for-Duty evaluation, even if the employee had been safely performing his or her job for years without incident, and even when there was no reason to believe the safe job performance would not continue going forward. Although the ADA calls for an individualized assessment, Union