**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **JOE M. FULBRIGHT,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**UNION PACIFIC RAILROAD COMPANY**,<br>**Defendant.** | **Civil Action No. 3:20-cv-02392-BK** |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

# Table of Contents


**I. INTRODUCTION** ..... 1

**II. DISPUTED FACTUAL ISSUES** ..... 1

**A. Fulbright's Safety-Sensitive Senior Communications Technician Position** ..... 1

**B. Immateriality of Fulbright's Life Before and Immediately After Trazodone** ..... 3

**C. Fulbright's Performance, 2009-2015** ..... 4

**D. Fulbright's 2014 FFD Evaluations for a Rash and his Elbow** ..... 5

**E. Union Pacific's 2015 Fitness-for-Duty Evaluation** ..... 6

**F. Fulbright's "job search" can barely be considered a search.** ..... 11

**III. ARGUMENT AND AUTHORITIES** ..... 13

**A. Standard of Review** ..... 13

**B. Fulbright Has Not, As a Matter of Law, Established Each Element of his Disability Discrimination Claim** ..... 14

**C. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Defense of Failure to Mitigate** ..... 22

**D. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Direct Threat Defense** ..... 24

**E. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Undue Hardship Defense** ..... 24

**IV. CONCLUSION** ..... 25

Table of Authorities

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 13
*Armitage v. BNSF Ry. Co.*, 2021 WL 2805860, at *4 (N.D. Tex., 2021) ........ 20
*Blanks v. Sw. Bell Commc'ns, Inc.,* 310 F.3d 398 (5th Cir.2002) ........ 18
*Bohner v. Union Pac. R.R. Co.*, 2021 WL 3363063, at *4 (E.D. Mo., Aug. 3, 2021) ........ 16
*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536 (5th Cir. 2005) ........ 13
*Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, at *4 (E.D. La., 2018) ........ 20
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 13
*Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570 (5th Cir. 2020) ........ 14, 16
*EEOC v. Lyondell-Citgo Refining, L.P.*, 2008 WL 961909, at *6 (S.D. Tex. 2008) ........ 18
*EEOC. v. Chevron Phillips Chem. Co.,* 570 F.3d 606 (5th Cir.2009) ........ 17
*Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219 (1982) ........ 23
*Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 1996) ........ 23
*Gober v. Frankel Family Trust*, 537 Fed. Appx. 518 (5th Cir. 2013) ........ 20
*Golden Rule, Ins. Co. v. Lease*, 775 F. Supp. 948 (D. Colo. 1991) ........ 14
*Hardmon v. U.L. Coleman*, No. 17-1118, 2021 U.S. Dist. LEXIS 28564, *8-9 (W.D. La., Feb. 16, 2021) ........ 20
*Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364 (5th Cir. 2005) ........ 22
*Hoskins v. GE Aviation*, 803 Fed. Appx. 740 (5th Cir. 2020) ........ 22
*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir. 1991) ........ 14
*Jiles v. Wright Med. Tech., Inc.*, 313 F. Supp. 3d 822 (S.D. Tex. 2018) ........ 19
*Jones v. Kerrville State Hosp.*, 142 F.3d 263 (5th Cir. 1998) ........ 20, 21
*Kitchen v. BASF*, 952 F.3d 247 (5th Cir. 2020) ........ 14, 16
*Lyondell-Citgo*, 2008 WL 961909, at *6 ........ 18
*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........ 13
*McDonald v. Pa. State Police*, No. 02:09-cv-00442, 2012 WL 5381403, at *10 (W.D. Pa. Oct. 31, 2012) ........ 21
*Mitchell v. Sikorsky Aircraft*, 533 Fed. Appx. 354 (5th Cir. 2013) ........ 22
*Owen v. Union Pac. R.R. Co.*, 2020 WL 6684504, at *1 (D. Neb., Nov. 12, 2020) ........ 16
*Robinson v. Global Marine Drilling Co.,* 101 F.3d 35 (5th Cir. 1996) ........ 18
*Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759 (5th Cir. 2016) ........ 14
*Sanchez v. City of San Antonio*, 794 Fed. Appx. 444 (5th Cir. 2020) ........ 22
*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893 (5th Cir. 2002) ........ 14
*Sellers v. Delgado College*, 902 F.2d 1189 (5th Cir. 1990) ........ 23
*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909 (5th Cir. 1992) ........ 13
*St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425 (5th Cir. 2000) ........ 23, 25
*Stewart v. AutoRevo, Ltd.*, 2017 WL 5177119, at *4 (N.D. Tex., 2017) ........ 19
*Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d. Cir. 2010) ........ 18, 21
*Troutman v. Williamson County*, 2016 WL 1257989, at *5 (W.D. Tex., 2016) ........ 21
*Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090 (5th Cir. 1996) ........ 20
*West v. Nabors Drilling USA, Inc.*, 330 F.3d 379 (5th Cir. 2003) ........ 18, 23
*Williams v. AT&T Mobility Servs., LLC.*, 186 F.Supp.3d 816 (W.D. Tenn., 2016) ........ 19
*Willis v. Noble Envtl. Power, LLC*, 143 F.Supp.3d 475, 479 (N.D. Tex., 2015) ........ 17

## Statutes

29 C.F.R. § 1630.14(c) ........................................................ 22
29 C.F.R. § 1630.2(g)(1)(i) ........................................................ 17
29 C.F.R. § 1630.2(h) ........................................................ 17
29 C.F.R. § 1630.2(i)(1)(i) ........................................................ 17
29 C.F.R. § 1630.2(j)(1)(ii) ........................................................ 17
29 C.F.R. Pt. 1630 App. § 1630.14(c) ........................................................ 21
42 U.S.C. § 12102 (3)(A) ........................................................ 19
42 U.S.C. § 12111(8) ........................................................ 19
42 U.S.C. § 12112(a) ........................................................ 14

## Rules

Fed. R. Civ. P. 56(c) ........................................................ 13

## I. INTRODUCTION

Plaintiff Joe Fulbright ("Fulbright") filed the current action on August 20, 2020 (Doc. 1), which he amended on March 11, 2021 (Doc. 40), for three causes of action under the Americans with Disabilities Act, including disability discrimination based on disparate treatment, failure to accommodate, and unlawful medical inquiries, arising out of Union Pacific's alleged unlawful evaluation and determination of Fulbright's fitness for duty and ability to safely perform the essential job functions of a Senior Communications Technician. Fulbright now seeks partial summary judgment on his first cause of action, disability discrimination, and on three of Union Pacific's defenses: (1) failure to mitigate; (2) direct threat; and (3) undue hardship.

Fulbright has failed to establish that he is entitled to judgment as a matter of law on his disparate treatment claim. To the contrary, Union Pacific is entitled to summary judgment on this claim. *See* Docs. 94-95. As for Union Pacific's defenses, Fulbright has not carried his burden of proof as to Union Pacific's direct threat defense and genuine issues of material fact exist regarding Fulbright's diligence in his efforts to fully mitigate his damages and Union Pacific's position as to the undue hardship it would incur by accommodating Fulbright in the manner he requested.

## II. DISPUTED FACTUAL ISSUES

### A. Fulbright's Safety-Sensitive Senior Communications Technician Position

Fulbright's stated facts and self-serving declaration incorrectly imply that he worked consistently as a technician from 1985 to 2015, holding the Senior Communications Technician position for the "last fifteen years or more." Doc. 89 at 1-2, Pl.'s App. 149-152.[1] Union Pacific

[1] Union Pacific objects to the Declaration of Joe Fulbright under the "sham-affidavit doctrine," insofar as his declaration conflicts with his prior testimony and in that a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380,

does not dispute Fulbright's initial job progression beginning in 1985 as a Communications Maintainer in Fort Worth, Texas and that he last worked as a Senior Communications Technician in 2015. App. 50, 61, 51-52. However, Fulbright omits that Union Pacific fired him in 1998 after he refused a call to work and was later reinstated. App. 74-76, 77-78.

Moreover, Fulbright generically describes his job as "install[ing], maintain[ing], and repair[ing] various devices and communications equipment" and states specifically that "[h]e did not work on moving trains," but the pages of his declaration that he cites do not support his description. Doc. 89 at 1-2, Pl.'s App. 149 and 152. In fact, his declaration is void of any statements that describe the nature of his job or his job duties and responsibilities, essential or not. Union Pacific does not dispute that a Senior Communications Technician installs, maintains, and repairs various communications-related components and systems, but Fulbright's claim that he specifically does not work on moving trains is unsupported and mischaracterizes the evidence in the record. A Senior Communications Technician is a safety-sensitive position that performs work inside and outside (regardless of weather conditions), overhead and underground, in and around live rail yard operations (meaning, in and around live, moving railcars and locomotives), trackside along the railroad's right-of-way, around heavy moving equipment, and requires operating a vehicle, climbing and working on ladders, and working alone, sometimes at remote facilities, all of which the employee must be available to perform after hours, 24 x 7.[2] App. 141, 62-67, 68-73.

---

386 (5th Cir.2000). The fact that Fulbright provided a declaration and not an affidavit is immaterial for purposes of the sham-affidavit rule because a formal affidavit is no longer required under Fed. R. Civ. P. 56(c)(4). 28 U.S.C. § 1746 allows written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute an affidavit.

[2] Although not stated in Fulbright's discussion regarding his "30 years as an employee of Union Pacific," (Doc. 89 at 1-2), he discusses the on-call requirements of his position as related to his performance during January 2009 to February 2015 and concedes in a respective footnote that Union Pacific has the right to call technicians [to report for work] "any time on any day." Doc. 89 at 5-6, n. 2.

### B. Immateriality of Fulbright's Life Before and Immediately After Trazodone

Fulbright spends a considerable amount of time discussing the "several years before" his appointment with Dr. Marie Kelly on January 23, 2009, during which Dr. Kelly prescribed Trazodone to Fulbright "to help [him] sleep." Doc. 89 at 2-4. His discussion and the supporting documents cited, most of which are self-serving declarations,[3] go to great length to create a record likely intended to demonstrate the before and after effect of Trazodone on Fulbright. *Id.* Unfortunately, Fulbright's recollection and self-reflection (and that of Chris Ozuna, a former Union Pacific Communications Technician who is also Fulbright's son-in-law (Pl.'s App. 147; App. 9.)) on his life during the "several years" before Trazodone and the week or two after he started taking Trazodone are immaterial for purposes of summary judgment.

Per Fulbright, "the adverse actions at issue in this case were taken during the first six months of 2015." Doc. 89 at 14. As such, the experiences he claims that prompted him to seek medical attention for his sleeping troubles before 2009 and reactions to his initial 2009 Trazodone prescription are simply not relevant to the allegedly unlawful actions he claims Union Pacific took during the first six months of 2015. The purpose of Union Pacific's fitness-for-duty ("FFD") evaluation is to determine if an individual has a health condition or functional impairment that poses a significant risk to the health or safety of the individual or others, or prevents the individual from safely performing the essential functions of the job. App. 47. Per its purpose, an FFD evaluation assesses conditions or impairments that pose present or potential risk, not past risk, not

---

[3] Union Pacific further objects to the declaration of Joe Fulbright and adds objection to the declaration of Christopher Ozuna on the grounds that they offer improper lay witness opinion under Fed. R. Evid. 701 to the extent their respective declarations provide testimony regarding the effects of Trazodone on Fulbright as they are not qualified to opine or speculate on a matter reserved for expert medical opinion. *See Pinkston v. Miss. Dep't of Corrections*, 2020 WL 6121945, at *3 (N.D. Miss., 2020) (finding that "the general side effects of anti-psychotic drugs— is clearly an expert opinion").

as related to an employee's ability to safely perform essential job functions six or more years earlier. Whatever Fulbright experienced in the "several years" before January 2009, when Dr. Kelly – according to him – prescribed Trazodone and whatever changes he or his former peers claim they witnessed in the immediate week or two following, are immaterial to the actions Union Pacific took in 2015.

**C. Fulbright's Performance, 2009-2015**

Fulbright claims that "for six years after he began taking Trazodone, [January 2009 to 2015], he was "qualified for his job [ ]," "did his job well, and he did it safely, with a perfect safety record." Doc. 89 at 5-6. However, Fulbright's job performance and safety record after he began taking Trazodone in 2009 and before his 2015 FFD evaluation, as well as whether Union Pacific had knowledge in 2009 that he was taking Trazodone, is immaterial for the purposes of summary judgment given that his disability discrimination claim alleges adverse actions in 2015, not in the years prior. That notwithstanding, Fulbright hones in on his assertion that during "the first safety meeting after [he] was prescribed Trazodone (Doc. 89 at 5), he informed everyone about his prescription, that it would make him drowsy, and "would be best if he did not have to drive for a few hours after taking [Trazodone], and that everyone "agreed that [he] would not have to go out on calls." He specifically states that supervisor Terry Neal, who led those meetings, agreed. Doc. 89 at 5-6, Pl.'s App. 152, 154. Fulbright's recollection, which he supports solely with his own declaration, ignores Neal's testimony that he has no recollection that during a safety meeting in 2009 or any other time in 2009, Fulbright's prescription medication was discussed during the meeting or between Neal and Fulbright. App. 31-32.

As for Fulbright's claim that "[h]e did his job well, [ ] safely, with a perfect safety record" (Doc. 89 at 6), he relies on his own declaration and his unartfully mischaracterized testimony of Neal. Neal did not testify that Fulbright did his job well or safely or that he had a perfect safety

record. Neal testified, in response to questions with no temporal boundaries, that he did not know if Fulbright "had anything on his record about being unsafe," that he did not remember Fulbright "being brought up [on discipline] as unsafe for any reason," and that he had no recollection of Fulbright being "written up for a safety violation or that he was frequently the subject of complaints [on safety]." Pl.'s App. 91-92. The testimony excerpts Fulbright cited simply do not support his claim. Moreover, Fulbright ignores undisputed evidence that proves that during those six years, he did not always do his job well and his record is not flawless. In May 2012, Fulbright left work during on-duty hours without authority, violating Rules 1.6 and 1.13 of the General Code of Operating Rules ("GCOR"). App. 177, 87-88. In November 2014, Fulbright missed two after-hours calls. App. 80. In January 2015, Fulbright missed another after-hours call. App. 83. Missed calls violated GCOR Rule 1.16. App. 89.

### D. Fulbright's 2014 FFD Evaluations for a Rash and his Elbow

Fulbright's evidence unsuccessfully attempts to suggest that Union Pacific Associate Medical Director Dr. John Charbonneau cleared Fulbright to return to work with no restrictions twice in 2014, knowing that Fulbright took Trazodone for insomnia. Doc. 89 at 6. Both the claim and the evidence relied on mischaracterize the record. Fulbright conveniently fails to include Dr. Charbonneau's testimony that whether he knew Fulbright was talking Trazodone when he determined he was fit for duty in April 2014, "assumes that [he] saw that [information] in [Fulbright's] record" and "that [he] knew or had that piece of information and would have looked at it." Pl.'s App. 34. Dr. Charbonneau testified to an assumption, not to knowledge.

Moreover, Fulbright relies on one page of a nine-page fax from his doctor to Union Pacific's Health and Medical Services Department ("HMS") as related to his FFD evaluation and return to work after treatment for a rash in March 2014. Pl.'s App. 195. His one page lists Trazodone as an "active medication," not that his doctor verified why he takes Trazodone or that

he was taking it as directed. Trazodone is not mentioned elsewhere in the fax, nor is there any reference to insomnia. App. 109-117. Fulbright also relies on a three-page excerpt of a much larger batch of documents provided to HMS for his return to work after an elbow procedure in August 2014. Pl.'s App. 196-198. Union Pacific does not dispute that the document is part of Fulbright's medical records, but it is unknown who submitted the documents to Union Pacific, or when. The balance of documents regarding the August 2014 procedure do not reference Trazodone or insomnia, and, in fact, list no medications, no insomnia diagnosis, and state that Fulbright denied any major medical problems. App. 118-120. In short, Fulbright's attempt to portray Dr. Charbonneau's assumption as knowledge fails.

**E. Union Pacific's 2015 Fitness-for-Duty Evaluation**

**i. Neal's Manager Referral**

Fulbright begins his discussion regarding the crux of this lawsuit with statements that conflict with record. As a starting point, he claims that on January 25, 2015, he had not yet taken Trazodone that evening when he missed a call around 7 pm. Doc. 89 at 6, Pl.'s App. 154. However, other documents show that Union Pacific called him twice on January 25, 2015, at 7:35 pm and again at 8:13 pm. App. 81-82. His own union, the Brotherhood of Railway Signalmen ("BRS"),[4] later stated in a grievance appealing Union Pacific's actions related to his 2015 FFD evaluation, that Fulbright had taken his medication, went to sleep, and did not hear the phone, but woke up shortly after the call, saw the missed call, and called back 24 minutes later.[5] App. 138. Union Pacific does not dispute that Fulbright and Neal met the next day or that Neal provided Fulbright

---

[4] Fulbright was a member of the BRS. App. 49. However, under a 1999 collective bargaining agreement between Union Pacific, the BRS, and the International Brotherhood of Electrical Workers ("IBEW"), Fulbright's BRS seniority date transferred to an IBEW roster and the IBEW, thereafter, governed seniority, seniority districts, job bulletining, job abolishment, and classification of work and work scope. App. 143.

[5] Union Pacific restates and incorporates its objections set out in Footnote 1.

with documents about his missed call and the applicable rule and told Fulbright, as well as gave him meeting notes, that this was not discipline. Neal also told Fulbright that he would be referring him to HMS for an FFD evaluation and gave him a form regarding the same. Doc. 89 at 7, Pl.'s App. 103-104. Fulbright's characterization that Neal wanted him to keep working (Doc. 89 at 7, citing Pl.'s App. 104) is inaccurate. Neal did not remove Fulbright from service. However, Neal testified that he did not want him to keep working and told him to go home but that he would still pay him as if he were working. App. 37-38.

**ii. Removal from Service, Pending Fitness-for-Duty**

Union Pacific does not dispute that Dr. Charbonneau stated that Fulbright was not fit for duty shortly after Neal referred Fulbright for an FFD evaluation. Fulbright ignores, however, that Neal referred Fulbright in the first place because Fulbright had missed multiple calls over the last few months because of sleep medication, Fulbright had told him that his sleep medication works for eight hours and he cannot drive his vehicle when he was taking the medication, and because Neal is not a doctor and does not know how long the medication lasts or the lingering effects it may have. App. 39-40, 122-123. Fulbright downplays Neal's safety concerns as "a worry." Doc. 89 at 7. Fulbright omits that HMS had been unable to connect with him for the initial intake assessment. Pl.'s App. 53-54. With manager referrals, HMS does not assume a medical cause or that the employee is unable to safely perform his or her job. App. 48. With nothing more than Neal's valid concerns for Fulbright's safety, HMS removed Fulbright from service and placed him on medical leave, pending the FFD determination.

**iii. Fulbright's Noncooperation and Noncompliance with HMS Requests**

Fulbright's claim that Dr. Kelly retired in 2010 and, therefore, he had no physician clinic notes to provide, is irrelevant because Union Pacific requested the last two years of notes, not Dr.

Kelly's notes from 2009.[6] Kaner Medical Group had taken over his Trazodone prescription. App. 121. Nonetheless, Fulbright cruises past the first three months of his FFD evaluation, during which HMS requested many times (two letters, five voicemails, and one discussion) the last one to two years of "physician clinic notes [ ] from the provider treating [him] for this condition." App. 124-125, 126-127, 100-102, 104. Fulbright's claim that "it took Kaner several weeks to get their records to Fulbright," is untrue. Kaner's documentation shows that Fulbright submitted a patient authorization for Kaner to release his records to him on March 31, 2015 (two complete months after HMS' initial request), which Kaner noted as being "Done" on April 1, 2015. App. 128.

Union Pacific does not dispute that, based on the documentation Fulbright submitted to HMS, Dr. Charbonneau requested a sleep medicine evaluation. Union Pacific does dispute, however, Fulbright's characterization of his April 21, 2015 call with Dr. Charbonneau and Rodino. Fulbright claims that Dr. Charbonneau never asked Fulbright for permission to speak to his doctor. Yet, Fulbright's own transcription of the recorded call shows where Dr. Charbonneau stated that he "wanted to convey to [Fulbright's] doctor that we weren't second guessing them, and secondly explain the reason for the sleep medicine evaluation." Pl.'s App. 173. Fulbright repeatedly implies fault by Dr. Charbonneau for not explaining the term, "sleep medicine evaluation," yet he admits his own assumptions of what he thought the term meant (Doc. 89 at 9) and his transcription of the April 21, 2015 call confirms that he never asked for an explanation (but instead ranted about Neal and gave them – the medical professionals – a long-winded explanation as to why a medical

[6] Fulbright relies on his self-verified and unauthenticated transcription of his recorded telephone call with Dr. Charbonneau and Union Pacific Nurse Theresa Rodino on April 21, 2015 (Pl.'s App. 171-178). Union Pacific objects on the grounds that his transcription violates the Best Evidence Rule under Fed. R. Evid. 1001-1003. Fulbright did not inform them he was recording the call and states now that he had the recorded call transcribed but does not state by whom, when, or in what manner, and admits that he made changes to the transcript where he felt was necessary. Pl.'s App. 156. Union Pacific also objects on the grounds that statements purportedly made by Charbonneau or Rodino are hearsay under Fed. R. Evid. 801.

evaluation would not work for him, why HMS would not be able to test him, that there might not even be a test for his condition). Pl.'s App. 173-176. After some further conversion, Dr. Charbonneau stated that if Fulbright would carry that purpose back to his doctor, then he would not need to talk directly with Fulbright's doctor. Pl.'s App. 176-178.

Fulbright eventually saw his primary doctor on April 27, 2015, who then referred him to Texas Medical Diagnostics, Inc. ("TMD") Sleep Lab, and he scheduled an appointment with TMD for June 1, 2015. On May 20, 2015, Rodino talked with Fulbright about his upcoming TMD appointment. However, Fulbright's version of events skips the fact that TMD contacted his doctor because Fulbright had not returned their calls. App. 130. Fulbright also skips the part where he described his sleep disorder as "life threatening." App. 129.

It is impossible for Union Pacific to respond to the accuracy of Fulbright's purported facts regarding his recollection about his June 1, 2015 appointment with TMD and his communication with Union Pacific two weeks later regarding the same. His recollection is supported entirely by his own declaration and an unverified and unauthenticated transcription of a phone call he recorded on June 14, 2015, made to an unspecified phone number, where he talked with an unidentified participant ("Speaker 2").[7] Doc. 89 at 10, Pl.'s App. 157-158, 183-184. To the extent Fulbright suggests Union Pacific did not make a record of the call (Doc. 89 at 10), Union Pacific wonders why Fulbright did not call Rodino directly seeing as she had provided her direct phone number (and email). App. 124-125, 126-127, 100-102, 104. Nonetheless, one of Rodino's team members called him on June 18, 2015, and sent him a letter requesting the sleep medicine evaluation results and, again, the last two years of physician clinic notes (because he had previously only submitted one year (Pl.'s App. 172)). App. 97, 131-132.

---

[7] Union Pacific incorporates the objections set out in Footnote 6 as equally applicable to the transcribed call at Pl.'s App 183-184.

### iv. Fitness-for-Duty Determination and Work Restrictions

On June 26, 2015, after another week passed and now word from Fulbright, Dr. Charbonneau concluded that Fulbright had not complied with their April 21, 2015 verbal agreement that he would work with his own doctor to have a sleep medicine evaluation. The evaluation was still required, and so in the interim "because Trazodone is so long-acting" and because without the evaluation Union Pacific did not know the duration of the effects of Trazodone on him, Dr. Charbonneau issued work restrictions. App. 96-97, 24-27. Fulbright again implies fault by Dr. Charbonneau for not explaining the term, "sleep medicine evaluation" and claims that during a call with Dr. Charbonneau and Rodino on June 29, 2015, he offered to go back to his doctor and try again. Doc. 89 at 12, Pl.'s App. 186.[8]

Fulbright tellingly omits the part where he decided for himself that the tests TMD recommended were "unnecessary," that he was "not going through all that," that his "sleep disorder is related to brain chemicals [ ] not related to interrupted breathing," that he "already know [*sic*] where [his] problem's coming from," that he's "looked into it," "the hundreds of users reports" and "there's no residual effect from [Trazodone] the next day." Pl.'s App. 186-187. His own evidence disputes his own claim that he "never objected to having a sleep medicine evaluation." Doc. 89 at 12. Plus, Union Pacific never had the chance to consider TMD's recommended testing because Fulbright never provided them documentation. App. 10-11, 178-188.

While Fulbright claims that Union Pacific should have offered to pay (because his benefits had allegedly been cut off (Pl.'s App. 186)), there is no evidence that he ever asked Union Pacific to pay and he testified that his insurance was reinstated about three or four weeks after his TMD

---

[8] Union Pacific incorporates the objections set out in Footnote 6 as equally applicable to the transcribed call at Pl.'s App 185-193.

appointment, which would have been before or the same week of his June 29, 2015 call with Dr. Charbonneau and Rodino. App. 15-16.

Moreover, much like the April 21, 2015 conversation, Fulbright deflected with a rant about management and insistence that while he's subject to after-hours call, there's an "understanding" in his work group that he personally is not expected to report if called after he takes Trazodone. Pl.'s App. 188-189. Dr. Charbonneau astutely separated the medical issues from Fulbright's apparent discontent with management, to which Fulbright said, "I don't expect y'all to resolve this." Pl.'s App. 189-190. Before Dr. Charbonneau left the call, he told Fulbright that "we will always review additional information that you make available to us [ ] we'll be happy to have another review with you after we, after you submit [additional information]." Pl.'s App. 187.

**v. Accommodating Fulbright's Work Restrictions Required Eliminating Essential Job Functions**

Fulbright's claim that the work restrictions "meant he had lost his job," (Doc. 89 at 12) is incorrect and mischaracterizes the record. First, his "work unit" did not simply or thoughtlessly say they "were not able to accommodate." Neal considered the restrictions and concluded that to accommodate the restrictions would require eliminating multiple essential job functions, for which he provided detailed notes regarding which restrictions and why. App. 133-136. Second, the restrictions are only effective so long as Fulbright uses Trazodone within 24 hours of reporting for work. App. 96. Third, as discussed, Dr. Charbonneau extended an open invitation for reconsideration if Fulbright submits additional information. Fourth, Fulbright did not lose his job in the sense that Union Pacific terminated him. He remains employed in an "off work" status. App. 49.

**F. Fulbright's "job search" can barely be considered a search.**

Fulbright claims that he looked for jobs, found nothing, railroads were laying off technicians because of "technological advances in the industry," and there is no evidence indicating comparable positions were ever available. Doc. 89 at 11-12. Rather than rely on the record, Fulbright relies on his own declaration and the testimony of one of his former peers who left Union Pacific a decade ago and is not an expert on the railroad industry.

Fulbright did search for jobs – eight months after HMS issued his work restrictions. He searched for 12 days in February 2016, one time in March 2016, once in May 2016, and sometime during November 2020. App. 189-233. Except for his isolated one-time efforts in March and May 2016, his job search efforts coincidentally (or conveniently) align with the February 2016 ADA class action filed against Union Pacific, of which Fulbright claims to be a putative class member (Doc. 40, ¶¶ 57-58), and the date he served Union Pacific with Rule 26 Initial Disclosures. Doc. 14 at 5.

Lackluster efforts and questionable timing aside, Fulbright's reliance on his interpretation of Jason Ensign's testimony is misguided. Ensign testified that Precision Scheduled Railroading ("PSR") started with huge layoffs and that when he was laid off, 700 other people were laid off. Pl.'s App. 111. However, Ensign testified that he was laid off from Canadian National Railway ("CN"), around 2019-2020 (based on his testimony that he left Union Pacific in 2011, then worked for BNSF Railway Company ("BNSF") for seven years, and then CN for about two years). App. 44-45. CN, however, implemented PSR in the 1990s. *See* Deep Dive, 6 charts show how PSR changed rail (April 22, 2020), https://www.supplychaindive.com/news/6-charts-psr-rail-speed-dwell-OR/571792/. Ensign's suggestion that his layoff was related to PSR, which he then relates to a lack of technician opportunities for Fulbright, is flawed.

Furthermore, Fulbright testified that he was not interested in Union Pacific's efforts to find him an opportunity within Union Pacific "because [he] would have had to give up his rights to litigate." App. 12-13. He also testified that he did not begin looking for another job because "[he] was organizing all [his] material and getting ready to present it to a lawyer." App. 12-13. He testified that he did not search for jobs in 2016 or 2020 medical of medical issues, and he is unwilling to relocate, so he's limited his search area to Tennessee, where he's lived since 2019. App. 17-20.

## III. ARGUMENT AND AUTHORITIES

### A. Standard of Review

Summary judgment is only appropriate when the moving party can show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The materiality determination rests on the substantive law of the case, of which identifies the critical and irrelevant facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where the record taken as a whole could not lead to a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When ruling on a motion for summary judgment, the Court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The Court is not, however, required to sift through the record in search of evidence to support a party's position. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record," and articulate the precise manner in which that evidence supports their claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

Moreover, where the mover bears the burden of proof at trial on the issue for which he seeks summary judgment, as Fulbright does in this matter, his burden is particularly heavy. Unlike the typical situation where the mover does not bear the burden of proof at trial, he must come forward with evidence, which if uncontroverted, would entitle him to a direct verdict at trial. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264 (5th Cir. 1991) (citing *Golden Rule, Ins. Co. v. Lease*, 775 F. Supp. 948, 951 (D. Colo. 1991)).

**B. Fulbright Has Not, As a Matter of Law, Established Each Element of his Disability Discrimination Claim**

The Americans with Disabilities Act ("ADA") prohibits "discrimination against a qualified individual on the basis of disability in regard to job application, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

"In a discriminatory-termination action under the ADA, the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (brackets in original and quotation omitted). The Fifth Circuit has said, "[d]irect evidence is rare." *Id.* (brackets in original and quotation omitted). It is evidence that, "if believed, it proves the fact of 'discriminatory animus without inference or presumption.'" *Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (quoting *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)). Nonetheless, citing to a Ninth Circuit decision, Fulbright boldly claims that it is "not necessary to employ the *McDonnell Douglas* burden shifting-analysis in this case because the motive for [Union Pacific's] [alleged] adverse actions in question is undisputed." Doc. 89 at 14.

**i. Fulbright has not produced direct evidence of disability discrimination.**

Union Pacific's discussion of disputed factual issues (*supra* at pp. 21-22) relies on "specific evidence in the record" and "articulate[s] the precise manner" as to how that evidence disputes Fulbright's claims and supports Union Pacific's claims. *Forsyth*, 19 F.3d at 1537. Union Pacific demonstrates that Fulbright's argument cannot rely exclusively on direct evidence. Here, Fulbright worked as a Senior Communications Technician, a safety-sensitive position. App. 141, 62-67, 68-73. Neal referred Fulbright for an FFD evaluation based on credible mounting safety concerns: Fulbright had missed multiple calls over the last few months because of sleep medication; Fulbright had told Neal that his sleep medication works for eight hours during which he cannot drive; Neal is not a doctor and does not know how long the medication lasts or the lingering effects it may have. Based on Neal's concerns, Dr. Charbonneau removed Fulbright from service and placed him on medical leave pending the FFD evaluation. App. 39-40, 122-123, 103. Dr. Charbonneau issued work restrictions when he concluded that Fulbright had not provided the requested sleep medicine evaluations for his FFD evaluation and, "because Trazodone is so long-acting," without the evaluation Union Pacific did not know the duration of the effects of Trazodone on Fulbright. App. 96-97, 9. Neal considered the restrictions as related to Fulbright's essential job functions and concluded that accommodating the restrictions would require eliminating essential job functions. App. 133-136. Referring Fulbright for an FFD evaluation to ensure he could safely perform his essential job functions—and later concluding that he could not do so within certain medical restrictions—is not the same as acting based on prejudice against his condition or whatever treatment is employed for his condition.

An inferential leap is required to arrive at the conclusion that Union Pacific took any of the alleged adverse actions out of discriminatory animus against Fulbright's alleged disability. Thus,

Fulbright's argument that he need not employ the *McDonnell Douglas* burden shifting-analysis argument is flawed, as he cannot produce direct evidence to support his claim. *See, e.g.*, *Clark*, 952 F.3d at 579-82 (finding no direct evidence of disability discrimination); *Kitchen*, 952 F.3d at 252 (no direct evidence of disability discrimination based on employee's alcoholism where employee was discharged for failing a breath alcohol test); *Bohner v. Union Pac. R.R. Co.*, 2021 WL 3363063, at *4 (E.D. Mo., Aug. 3, 2021) (finding no direct evidence of disability discrimination where plaintiff was referred by his manager for an FFD evaluation and not permitted to RTW after being issued medical restrictions during the FFD evaluation); *Owen v. Union Pac. R.R. Co.*, 2020 WL 6684504, at *1 (D. Neb., Nov. 12, 2020) (applying *McDonnell Douglas* when the plaintiff suffering from arthritis was issued an FFD evaluation after supervisor saw him stumble at jobsite).

**ii. Fulbright has not met his burden of proof under the indirect evidence framework.**

Perhaps Fulbright sensed that his motion for partial summary judgment cannot survive on a direct evidence approach because he provides no evidence under a direct evidence theory and instead sets out the *prima facie* elements for a disability discrimination claim and proceeds to argue how he's proven each element. Doc. 89 at 14. Indeed, to establish a *prima facie* case of disability discrimination, Fulbright must show that: (1) he is disabled; (2) he is qualified for his job; and (3) he suffered an adverse employment action because of his disability. *Clark*, 952 F.3d at 582 (quotation omitted).

**(1) Fulbright has not demonstrated that he has an actual disability, record of disability, or has been regarded as disabled.**

Fulbright argues that he is disabled because he has an actual disability, a record of a disability, and has been regarded as disabled.

As to whether Fulbright had an actual disability, the ADA and the EEOC define "actual disability" as "a physical or mental impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(g)(1)(i). A physical or mental impairment includes a physiological disorder or condition that affects one or more body systems. 29 C.F.R. § 1630.2(h). However, not every impairment will establish a disability. 29 C.F.R. § 1630.2(j)(1)(ii). To qualify as an ADA disability, plaintiffs must prove the impairment substantially limits a major life activity. *Id.* The regulations provide a non-exhaustive list of major life activities. 29 C.F.R. § 1630.2(i)(1)(i). "[T]he key determination is whether Plaintiff produced sufficient evidence to establish a genuine issue of material fact showing the [ ] impairment *substantially limited* one or more major life activities." *Willis v. Noble Envtl. Power, LLC*, 143 F.Supp.3d 475, 479 (N.D. Tex., 2015). Union Pacific does not dispute that a sleeping disorder may substantially limit the major life activity of sleeping. However, under the "actual disability" prong, "the relevant determination is whether the plaintiff was disabled at the time of the adverse employment action." *Id.* at 480 (citing *EEOC. v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 618 (5th Cir.2009)). Fulbright's evidence is comprised entirely of anecdotal recollections of his life during the "many years" before January 2009 and the six years between January 2009 and Neal's manager referral and Dr. Charbonneau's removal from service (pending an FFD evaluation) in 2015.

Moreover, the issue at the crux of Fulbright's 2015 FFD evaluation was his use of Trazodone, not his sleep disorder and, as such, Fulbright does not meet the standards for demonstrating that the side effects from Trazodone constituted an impairment under the ADA. "For a treatment's side effects to constitute an impairment under the ADA, it is not enough to show just that the potentially disabling medication or course of treatment was prescribed or recommended by a licensed medical professional." *Sulima v. Tobyhanna Army Depot*, 602 F.3d

177, 187 (3d. Cir. 2010). Courts have regularly concluded that medication side effects are not disabling under the ADA. *Id.* In short, the evidence Fulbright presents to prove he had an actual disability predates the alleged adverse actions taken during the first six months of 2015.

As for Fulbright's claim of "record of disability,", "[a]lthough an individual may show that he or she has a record of impairment, if he or she fails to show that the impairment is substantially limiting, the individual may not qualify as disabled under this prong." *EEOC v. Lyondell-Citgo Refining, L.P.*, 2008 WL 961909, at *6 (S.D. Tex. 2008) (citing *Blanks v. Sw. Bell Commc'ns, Inc.,* 310 F.3d 398, 402 (5th Cir.2002). Fulbright contends that he has a record of a disability because Union Pacific had records from two 2014 FFD evaluations that showed Fulbright took Trazodone for insomnia, Fulbright's other 2014 medical records indicated treatment for sleep onset insomnia, because Neal's referral stated that Fulbright had sleeping issues and might be impaired the next day at work and Dr. Charbonneau had stated that the work restrictions were "for someone who [ ] might be impaired from medication. Pl.'s App. 187. Setting aside Fulbright's flip comment that "most people in the general population do not need sleep medicine to help them sleep," Fulbright's evidence fails to demonstrate an impairment that actually posed substantial limitations. His assumption that historical documents showing a prescription for insomnia and Neal's concerns for potential impairment constitute a disability per se, but disregards the individualized case-by-case proof of disability required for an ADA claim. *Lyondell-Citgo*, 2008 WL 961909, at *6 (citing *Deas v. River West, L.P.,* 152 F.3d 471, 477-78 (5th Cir.1998); *see also Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir. 1996) (holding diagnosis and documentation of asbestosis in plaintiff's personnel file reflected an impairment, but failure to present evidence that plaintiff was substantially impaired in a major life function warranted summary judgment for the employer).

Moreover, Fulbright's reliance on *Williams v. AT&T Mobility Servs., LLC.* is misplaced because while the Tennessee court did grant summary judgment for the plaintiff based on plaintiff's undisputed facts that AT&T was aware that plaintiff was in treatment for depression and records demonstrated an ongoing need for treatment, the facts were only undisputed because AT&T failed to file a separate response disputing plaintiff's statement of facts (which was based on over 8,000 pages of discovery) with citations to the record. *Williams v. AT&T Mobility Servs., LLC.*, 186 F.Supp.3d 816, 819, 826. (W.D. Tenn., 2016).

Finally, under the regarded-as-disabled definition, Fulbright must establish that he has been subject to discrimination because of an "actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102 (3)(A). *See also Stewart v. AutoRevo, Ltd.*, 2017 WL 5177119, at *4 (N.D. Tex., 2017). Neal's referral for Fulbright to have an FFD evaluation "for his sleeping issues" is insufficient to establish that Neal regarded him as disabled. Dr. Charbonneau's knowledge that Fulbright's records stated he had insomnia and that Fulbright took Trazodone for his insomnia is insufficient. *Id.* (finding that plaintiff failed to establish he was regarded as disabled based on his statements that defendant "regarded his taking 'sedative medications' as so physically or mentally impairing that he could not make telephone calls or drive a car" because it was plaintiff's alleged back and neck condition that constituted the perceived impairment, not the medication).

**(2) Fulbright is not qualified for his job.**

"A qualified individual 'is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds.'" *Jiles v. Wright Med. Tech., Inc.*, 313 F. Supp. 3d 822, 834 (S.D. Tex. 2018) (quoting 42 U.S.C. § 12111(8)). "To avoid summary judgment, [Fulbright] must show (1) 'that he could perform the essential functions of the job in spite of his disability' or (2) 'that a reasonable accommodation of

his disability would have enabled him to perform the essential functions of the job.'" *Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)). However, "[i]f the disabled person must be exempted from performance of an essential function of the job, then [ ] he is not otherwise qualified and not protected by the ADA." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998). Fulbright claims that because he safely performed his job in the past, he is a qualified individual. He relies on his own self-proclamation, the testimony of a former peer, and mischaracterized testimony of Dr. Charbonneau and Neal. Furthermore, the four cases he relies on to support his theory that past performance of essential job functions is acceptable evidence that an employee is a qualified individual, are distinguishable and therefore not controlling. In *Armitage*, the employer argued that plaintiff was not qualified because employees who use opioids are no longer qualified to work roles with safety-sensitive duties and to be qualified, an employee must be able to safely perform the duties of his employment. *Armitage v. BNSF Ry. Co.*, 2021 WL 2805860, at *4 (N.D. Tex., 2021). Union Pacific has not argued that a policy or list acts as a qualification all its own. *Hardmon* is not an ADA case. Its holding as to whether plaintiff was "qualified" was in regards to a race discrimination claim, which puts "qualified" in a very different context than the ADA. *Hardmon v. U.L. Coleman*, No. 17-1118, 2021 U.S. Dist. LEXIS 28564, *8-9 (W.D. La., Feb. 16, 2021). The defendant's asserted in *Breaux* that plaintiff was "rendered unqualified by Suboxone that causes problems with coordination, dizziness, and impaired cognitive function." *Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, at *4 (E.D. La., 2018). Union Pacific has not argued that Trazodone renders Fulbright unqualified. Rather, Union Pacific argues that his unavailability for required after-hours calls makes him unqualified. In *Troutman*, the court found no genuine issue of material fact that he "could" perform the essential functions of his job. *Troutman v.*

*Williamson County*, 2016 WL 1257989, at *5 (W.D. Tex., 2016). Fulbright is distinguishable from all four cases because, in his case, Union Pacific would have had to eliminate several essential job functions to accommodate his restrictions – including exempting him from after-hours on-call requirements, a requirement he as much as admits to in his brief (Doc. 89 at 5, n. 2), which makes him otherwise unqualified. *See Jones*, 142 F.3d at 265.

**(3) Union Pacific did not subject Fulbright to any adverse actions.**

Courts have recognized "that an alleged disability due to the side effects of a medication is different than a disability resulting from the underlying health problem the medication was meant to treat." *McDonald v. Pa. State Police*, No. 02:09-cv-00442, 2012 WL 5381403, at *10 (W.D. Pa. Oct. 31, 2012). As discussed *supra* in regards to Fulbright's failure to demonstrate he is disabled, "[f]or a treatment's side effects to constitute an impairment under the ADA, it is not enough to show just that the potentially disabling medication or course of treatment was prescribed or recommended by a licensed medical professional." *Sulima*, 602 F.3d at 187; *see also McDonald*, 2012 WL 5381403, at *10-*11 (employer only refused to certify McDonald due to concern over the side effects of his medication; McDonald did not demonstrate that his medication was the only efficacious medication."). Fulbright argues that "both of the adverse actions at issue in this case," meaning Dr. Charbonneau's decision to remove him from service in February 2015, because of safety concerns and pending an FFD evaluation, and issuing work restrictions in June 2015, were because of Fulbright's disability. Doc. 89 at 22-23. However, Fulbright does not cite to a single legal authority to support his claim. In the absence of any actual legal argument, his argument fails.

Moreover, the ADA expressly "permits employers to make inquiries or require medical examinations (fitness-for-duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630 App. § 1630.14(c); *see also Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005). Similarly, the ADA

allows employers to lawfully consider physician-imposed medical restrictions and whether an applicant or employee can perform the essential functions of the position within those restrictions. *See, e.g.,* 29 C.F.R. § 1630.14(c); *Sanchez v. City of San Antonio*, 794 Fed. Appx. 444, 445 (5th Cir. 2020). Additionally, just as employers can lawfully require medical evaluations under the ADA, it is also lawful for them to act in response to an employee's failure to provide the requested medical information. *See, e.g., Hoskins v. GE Aviation*, 803 Fed. Appx. 740, 745-46 (5th Cir. 2020) (no discriminatory discharge based on disability where employee failed to provide requested medical documentation); *Mitchell v. Sikorsky Aircraft*, 533 Fed. Appx. 354, 360 (5th Cir. 2013) (discharging plaintiff for failing to provide requested medical information was legitimate and non-retaliatory).

Here, Neal referred Fulbright for an FFD evaluation due to legitimate and credible concerns for his safety. Based on Neal's concerns, Dr. Charbonneau removed Fulbright from service and placed him on medical leave pending an FFD evaluation. App. 39-40, 122-123, 103. Dr. Charbonneau issued work restrictions when he concluded that Fulbright had not provided the requested sleep medicine evaluations, without which Union Pacific did not know the duration of the effects of Trazodone on Fulbright. App. 96-97, 9.

**(4) Fulbright has not, as a matter of law, established each element of his disability discrimination claim.**

Fulbright has not carried his burden of showing the court that there are no disputed, material facts creating a genuine issue for trial and that he is entitled to judgment as a matter of law on his first cause of action for disability discrimination based on disparate treatment.

**C. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Defense of Failure to Mitigate**

An ADA plaintiff has a duty to mitigate his damages. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 1996). A plaintiff must use reasonable diligence to seek substantially similar

employment. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 232 (1982). "A plaintiff may not simply abandon his job search and continue to recover back pay." *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003). "[I]f an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment." *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990). Fulbright contends that Union Pacific has not produced evidence in support of its defense. It is "not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 440 (5th Cir. 2000). That said, while Union Pacific does not dispute that Fulbright searched for employment at intermittent times since June 2015, the record demonstrates that Fulbright has not fully mitigated his damages and that genuine issues of material fact exist in this regard.

Fulbright claims that he fulfilled his obligation to look for work because he asked Jason Ensign, a former peer who left Union Pacific in 2011 for BNSF, "to keep an eye out for any openings." Doc. 89 at 28. Ensign testified that "there were never such openings." Pl.'s App. 110-111. It is implausible that BNSF, a company operating in 28 states, employing 35,000 people, has not posted any job openings in the last six year that Fulbright might qualify for. Today alone, BNSF has two telecom positions publicly posted on their website. App. 234-243. BNSF's telecom postings also disprove Fulbright's "evidence" that technological advances are displacing technician jobs, which BNSF refutes in its discussion of Disputed Factual Issues. Fulbright testified that he will not relocate, but now claims that he searched for jobs that would have required him to relocate (App. 17-20.),[9] BNSF has open entry level jobs in Tennessee. App. 244-248.

[9] Union Pacific incorporates the objections set out in Footnote 1 as equally applicable to conflicting testimony described here.

In sum, it may be undisputed that Fulbright looked for work, but there is a significant dispute as to whether his efforts in looking for work were reasonable.

### D. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Direct Threat Defense

Federal courts are divided on the question of whether "direct threat" is an affirmative defense and which party has the burden of proof. Neither the Fifth Circuit nor this Court specifically have ruled on the issue. Fulbright claims that the Court does not need to rule on this issue because even if it's Plaintiff's burden, which Union Pacific argues it is, Fulbright has carried his burden. Doc. 89 at 29. He bases this assertion on the "undisputed" evidence that he did his job safely for six years while taking Trazodone and that it is undisputed that Union Pacific's alleged adverse actions were not because Fulbright was a direct threat, but because of the Trazodone alone. Doc. 89-29. This is an inaccurate interpretation of the evidence. Union Pacific's actions were not based on the fact that Fulbright took Trazodone, it was based on the concerns and unknown variables of how Trazodone affected him when he took it, as discussed *supra* at pp. 21-22.

Fulbright characterizes Dr. Charbonneau's decision as that he never reached a conclusion about whether Fulbright could or could not safely perform his job, because he had insufficient evidence and "assumed [Fulbright] might have an accident while driving, or fall while climbing." Doc. 89 at 30. Fulbright undermines the importance of safety by recklessly describing these scenarios as assumptions, when they are the very safety risks for which Dr. Charbonneau issued work restrictions and that could not be accommodated because driving and climbing at unprotected heights are essential job functions. App. 133-136.

### E. Fulbright Has Not, As a Matter of Law, Carried his Burden of Production With Respect to Union Pacific's Undue Hardship Defense

Fulbright argues again that Union Pacific has no evidence to prove its position. Such a conclusory statement is insufficient. *St. Paul Mercury*, 224 F.3d at 440. Nonetheless, evidence has

developed during the course of discovery that demonstrates the undue hardship described of in Union Pacific's interrogatory answers. Pl.'s App. 132, 134. Neal's manager referral stated that Fulbright's inability to cover his after-hours duties puts a hardship on his peers who have to cover any calls. App. 122-123. Fulbright oversimplifies the debacle by claiming that Union Pacific just calls the next person on the list. Doc. 89 at 31. Fulbright ignores the fact that the next person on the list may not be on-call, and so it creates a hardship for that person to cover, which is what happed in November 2014 and again in January 2015 when Fulbright missed multiple calls. App. 80, 83. To that end, there is certainly a question of fact on this affirmative defense.

## IV. CONCLUSION

Fulbright has failed to carry his burden of production and cannot demonstrate affirmatively that there is no genuine dispute as to any material fact concerning his first cause of action for disability discrimination based on disparate treatment or Union Pacific's affirmative defenses of failure to mitigate, direct threat, and undue hardship.

For these reasons, Union Pacific asks the Court to deny Fulbright's motion for partial summary judgment.

Respectfully submitted this 17th day of September, 2021.

*/s/ Heather M. Miller*
Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that on the 17th day of September, 2021, I electronically transmitted the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to all counsel of record.

*/s/ Heather M. Miller*
An Attorney for Defendant

7758526v.1