IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-02392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

**Table of Contents**

Summary of the Response ………………………………………………………… 1

The Relevant Facts ……………………………………………………………… 1

    I.   Fulbright was not on call 24 x 7 ……………………………………………… 1

    II.  Fulbright's on-call expectations after he began taking Trazodone ………………... 2

    III. Fulbright cooperated with the fitness-for-duty evaluation, and there
          was nothing asked of him that he refused to do ……………………………………… 4

    IV. Miscellaneous Corrections ………………………………………………… 8

Argument and Authorities ……………………………………………………… 8

    I.   The motion fails to prove that Defendant is entitled to judgment as a matter
       of law on Plaintiff's first cause of action ………………………………………… 8

        A. The direct and undisputed evidence proves Defendant took two adverse
           actions because of its unfounded concerns about Fulbright's disability,
           and the medication he took for it ……………………………………………... 9

        B. A McDonnell Douglas analysis leads to the same result - Defendant is
           not entitled to summary judgment on Plaintiff's first cause of action …………….. 11

           1.  Plaintiff had a disability – actual, record of, and regarded as ………………… 12

           2.  Plaintiff was qualified to do his job, with or without accommodations ……….. 12

           3.  Defendant took adverse employment actions against Plaintiff because
              of his disability by removing him from his job and imposing permanent
              work restrictions that disqualified him from returning to work ……………… 16

              a.  Defendant took two adverse employment actions …………………………. 16

              b.  Defendant took the adverse employment actions because
                 of Fulbright's disability ……………………………………………… 18

              c.  Proof of bias or ill will towards persons with disabilities is not
                 required to prove the actions were because of disability …………………... 20

4.  Union Pacific's alleged reason for terminating Fulbright is pretext
to cover its overt disabilities discrimination ……………………………….. 21

C.  Plaintiff's claim based on 42 U.S.C. § 12112(b)(6) is a viable disparate treatment
claim that has been recognized by federal courts ………………………… 23

II. Because of *American Pipe* tolling of the statute of limitations, Plaintiff's
second and third causes of action are timely …………………………………… 24

A.  A class action tolls limitations on the claims of all putative class members …….. 24

B.  Federal courts are divided on the scope of the claims tolled by the class action … 25

C.  Defendant applies dicta from *Johnson* out of context …………………………… 29

D.  Fulbright was a putative class member in *Harris*, and Defendant was
on notice of Fulbright's claims ……………………………………………….. 31

III. Plaintiff's charge of discrimination was sufficient to exhaust administrative
remedies on his second cause of action, failure to accommodate …………………… 35

A.  *Sanchez v. Standard Brands* set the standard used in the Fifth Circuit
to determine an exhaustion of remedies issue …………………………… 35

B.  Fulbright's EEOC charge meets the *Sanchez* standard ………………………….. 37

1.  The scope of the investigation would have reached the facts and
legal issues that form the basis of the failure-to-accommodate claim ………. 38

2.  The investigation of Fulbright's charge <u>did</u> reach the issue of
Accommodations …………………………………………………………… 39

IV.  Defendant made an unlawful request for a medical examination, and made
an unlawful disability-related inquiry ………………………………………… 41

Conclusion ………………………………………………………………………… 43

## Table of Authorities

Cases                                                                                  Page(s)

Aguilar v. Ocwen Loan Servicing, LLC, No. 3:17-cv-1165-B,
    2018 WL 949225 (N.D. Tex. Feb. 20, 2018) ……………………………..          27-28

American Pipe & Constr. Co. v. Utah,
    414 U.S. 538 (1974) ……………………………………………………          1, 24-29, 34

Barnebey v. E.F. Hutton & Co.,
    715 F. Supp. 1512 (M.D. Fla. 1989) ……………………………………..          29

Blankinship v. Union Pac. R.R. Co., No. CV-21-00072-TUC-RM,
    2021 WL 3290453 (D. Ariz. Aug. 2, 2021) ………………………………          30

Bouchard v. Gen. Elec. Co., No. 1:14-CV-236-NT,
    2015 U.S. Dist. LEXIS 154954 (D. Me. Nov. 17, 2015) …………………          20

Breaux v. Bollinger Shipyards, LLC, No. 16-2331,
    2018 U.S. Dist. LEXIS 116351 (E.D. La. Jul. 5, 2018) …………………..          9, 19

Burns v. Nielsen, No. EP-17-CV-00264-DCG,
    2020 U.S. Dist. LEXIS 229998 (W.D. Tex. Dec. 8, 2020) ………………..          41-42

Byes v. Telecheck Recovery Services, Inc., No. 94-3182,
    1996 WL 22686 (E.D. La. Jan. 19, 1996) …………………………………          26-27

Cannon v Jacobs Field Services, N.A.,
    813 F.3d 586 (5th Cir. 2016) ……………………………………………..          11

Central Va. Community College. v. Katz,
    546 U.S. 356 (2006) ……………………………………………………..          30

City Select Auto Sales, Inc. v. David Randall Assocs., Inc.,
    2012 WL 426267 (D.N.J. 2012) …………………………………………          29

Clark v. Kraft Foods, Inc.,
    18 F.3d 1278 (5th Cir. 1994) ……………………………………………..          37

Cohens v. State of Virginia,
    19 U.S. 264 (1821) ………………………………………………………          30

iv

Cullen v. Margiotta,
    811 F.2d 698 (2d Cir. 1987) ……………………………………………… 28-29

Crown, Cork & Seal Co., Inc. v. Parker,
    462 U.S. 345 (1983) …………………………………………………… 25, 30

Dark v. Curry County,
    451 F.3d 1078 (9th Cir. 2006) ………………………………………… 10

DeFries v. Union Pac. R.R. Co.,
    No. 3:21-cv-205-SB, 2021 WL 3007254 (D. Or. July 15, 2021) …………... 30

Derrick v. UPS, Inc., No. 18-8744,
    2019 U.S. Dist. LEXIS 54109 (E.D. La. Mar. 28, 2019) …………………… 17

Donahue v. Union Pac. R.R. Co., No. 21-cv-00448-MMC,
    2021 WL 2458351 (N.D. Cal. June 16, 2021) ……………………………… 30

Dye v. IASIS Glenwood Reg'l Med. Ctr. LP,
    No. 18-0981, 2018 WL 5660319 (W.D. La. Oct. 9, 2018) ………………… 38-39

EEOC v. BNSF Ry. Co.,
    570 F.3d 606 (5th Cir. 2009) …………………………………………….. 9-10

EEOC v. Chevron Phillips Chem. Co.,
    570 F.3d 606 (5th Cir. 2009) …………………………………………….. 11, 38

EEOC v. Gulf Logistics Operating, Inc.,
    371 F. Supp. 3d 300 (E.D. La. 2019) …………………………………….. 41

EEOC v. Kronos, Inc.,
    694 F.3d 351 (3d Cir. 2012) …………………………………………… 24

EEOC v. Union Carbide Chems. & Plastics Co., No. 94-103 SECTION "L",
    1995 U.S. Dist. LEXIS 12444 (E.D. La. Aug. 18, 1995) …………………… 16

Ganousis v. E.I. du Pont de Nemours & Co.,
    803 F. Supp. 149 (N.D. Ill. 1992) ………………………………………… 32

Garcia v. Garland Indep. Sch. Dist., No. 3:11-CV-0502-N-BK,
    2012 U.S. Dist. LEXIS 136251 (N.D. Tex. Aug. 29, 2012) ………………… 17

Green v. Adm'rs of Tulane Educ. Fund,
    284 F.3d 642 (5th Cir. 2002) ………………………………………… 16, 17

Griffin v. Breckenridge,
    403 U.S. 88 (1971) ……………………………………………………… 21

Hannah P. v. Coats,
    916 F.3d 327 (4th Cir. 2019) …………………………………………… 42

Harris v. Union Pac. R.R. Co.,
    953 F.3d 1030 (8th Cir. 2020) ………………………………………….. 34

Hayes v. MBNA Tech., Inc., No. 3:03-CV-1766-D,
    2004 WL 1283965 (N.D. Tex. June 9, 2004) ………………………… 37

Huffman v. Turner Indus. Grp., LLC, CIV.A. 12-1061,
    2013 U.S. Dist. LEXIS 71842 (E.D. La. May 21, 2013) ……………….. 20

In re Cmty. Bank of N. Va., 622 F.3d 275
    (3d Cir. 2010), as amended, (Oct. 20, 2010) ………………………… 28

In re Indep. Serv. Orgs. Antitrust Litig.,
    1997 WL 161940 (D. Kan. Mar. 12, 1997) ………………………… 29

International Union v. Johnson Controls, Inc.,
    499 U.S. 187 (1991) …………………………………………….. 20-21

J.I. Case Co. v. NLRB,
    321 U.S. 332 (1944) …………………………………………….. 13

Johnson v Ry. Express Agency, Inc.,
    421 U.S. 454 (1975) ………………………………………………… 29-30

Johnson-Morris v. Santander Consumer USA, Inc.,
    194 F. Supp. 3d 757 (N.D. Ill. 2016) ………………………………… 29

Kapche v. City of San Antonio,
    176 F.3d 840 (5th Cir. 1999) …………………………………………… 15

King v. Georgia Power Co.,
    295 F. Supp. 943 (N.D. Ga. 1968) ………………………………….. 36

Krehbiel v. Union Pac. R.R. Co., No. 2:19-CV-02002-JAR-JPO,
    2019 WL 3387049 (D. Kan. July 26, 2019) ………………………………… 30

Leskovisek v. Ill. DOT, No. 17-cv-3251,
    2020 WL 7323840 (C.D. Ill. Dec. 11, 2020) ………………………………… 24

Local No. 1 v. Int'l Bhd. of Teamsters,
    419 F.Supp. 263 (E.D. Pa. 1976) …………………………………………… 21

Loulseged v. Akzo Nobel Inc.,
    178 F.3d 731 (5th Cir. 1999)………………………………………………... 22, 38

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973) ………………………………………………………... 8-11

Mota v. Univ. of Houston Health Sci. Ctr.,
    261 F.3d 512 (5th Cir. 2001) ……………………………………………… 17

Newby v. Enron Corp. (In re Enron Corp. Secs),
    465 F. Supp. 2d 687 (S.D. Tex. 2006) ……………………………………… 26-26

Order of Railroad Telegraphers v. Railway Express Agency,
    321 U.S. 342 (1974) ………………………………………………………… 24

Presta v. Omni Hotels Mgmt. Corp., No. 4:17-CV-912,
    2018 U.S. Dist. LEXIS 60998 (S.D. Tex. 2018) ……………………………… 17

Radick v. Union Pac. Corp., No. 4:14-cv-02075,
    2016 U.S. Dist. LEXIS 19622 (S.D. Tex. Jan. 25, 2016) …………………….. 17

Renati v. Wal-Mart Stores, Inc.,
    2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) ……………………………… 28

Rizzo v. Children's World Learning Centers, Inc.,
    84 F.3d 758 (5th Cir. 1996) ………………………………………………… 9, 10

Salgado v. Iqvia, Inc.
    459 F.Supp. 3d 1318 (S.D. Cal. 2020) ……………………………………… 8

Sanchez v. Standard Brands, Inc.,
    431 F.2d 455 (5th Cir. 1970) ……………………………………………….. 35, 37

Scruggs v. Berg Spiral Pipe Corp., No. 14-339-CG-B,
    2015 LEXIS 80374 (S.D. Ala. June 22, 2015) ………………………………… 20

Shirey v. Portfolio Recovery Assocs., LLC,
    2019 WL 3842391 (E.D. Wash. Aug. 14, 2019) ………………………………… 28

Smith v. Pennington,
    352 F.3d 884 (4th Cir. 2003) ……………………………………………………….. 32

Stinson v. Nissan N. Am., Inc., No. 3:18-cv-0145,
    2019 U.S. Dist. LEXIS 202195 (M.D. Tenn. 2019) …………………………… 18

Taylor v. City of Shreveport,
    798 F.3d 276 (5th Cir. 2015) ……………………………………………………… 42

Thompson v. City of Waco,
    764 F.3d 500 (5th Cir. 2014) ……………………………………………………… 16-17

Tosti v. City of Los Angeles,
    754 F.2d 1485 (9th Cir. 1984) …………………………………………………… 28

Wallace v. County of Stanislaus,
    245 Cal. App. 4th 109, 199 Cal. Rptr. 3d 462 (2016) ………………………… 9

Williams v. FedEx Corp. Servs.,
    849 F.3d 889 (10th Cir. 2017) …………………………………………………… 42

Williams-Hopkins v. Allied Interstate, LLC,
    2020 WL 2731101 (D.N.J. May 26, 2020) ……………………………………… 29

Yanoski v. Silgan White Cap Americas, LLC,
    179 F.Supp. 3d 413 (M.D. Pa. 2016) …………………………………………….. 22-23

<u>Rules</u>

Fed. R. Civ. P. 24 ……………………………………………………………………….. 25

Fed. R. Civ. P. 30(b)(6) …………………………………………………………………… 15

Fed. R. Civ. P. 37(c)(1) …………………………………………………………………… 15

Statutes and Regulations

42 U.S.C. § 12112(a) ……………………………………………………………   11, 22

42 U.S.C. § 12112(b)(6) ……………………………………………………... 11, 23-24

42 U.S.C. § 12112(d)(4)(A) ………………………………………………….   41

42 U.S.C. § 12112(b)(5)(A) ………………………………………………….   37

42 U.S.C. § 12117(a) ………………………………………………………….   35

29 C.F.R. § 1630.2(n)(3) ……………………………………………………...   15

29 C.F.R. § 1601.12(b) ……………………………………………………….   36-37

## Summary of the Response

There is no evidence that Plaintiff was ever unsafe or not qualified to do his job. Defendant's "not qualified" argument rests solely on a 2006 job description that no longer applied after the technician duties were reallocated, and the facts refute Defendant's argument that the adverse actions were not taken because of disability.  Defendant is therefore not entitled to summary judgment on Plaintiff's first cause of action, discrimination because of disabilities.

Plaintiff's other claims are timely because of *American Pipe* tolling and the fact that Union Pacific was on notice of Plaintiff's claims by virtue of the *Harris* class action.  Defendant has not argued that it was surprised or that relevant evidence was lost, so the purpose behind statutes of limitations does not apply, and these claims should proceed to trial.

Plaintiff exhausted administrative remedies on his failure-to-accommodate claim by describing in his EEOC Charge what was done to him and what he was complaining about.  The Court should reject Defendant's invitation to use a hypertechnical standard for determining if the claim was exhausted and allow this claim to proceed.

On the third claim for unlawful medical examinations and inquiries, the facts prove Union Pacific made the inquiries, and Defendant has failed to prove the business necessity affirmative defense as a matter of law.  Defendant is therefore not entitled to summary judgment on this claim.

## The Relevant Facts

## I.      Fulbright was not on call 24 x 7.

Fulbright was an employee of Union Pacific Railroad Company from March 1985 until roughly July 1, 2015.  There was a gap in his employment because Defendant wrongfully terminated Fulbright in 1998, and an arbitrator reinstated him in January 2000.  App. 3 at ¶ 2.

1

From his return to work in 2000 through July 1, 2015, Fulbright's job title was Senior Communications Technician. His duties included installing, maintaining, and sometimes repairing various devices and communications equipment. Fulbright did not work on moving trains. App. 3 at ¶ 2; App. 94. This was a union job covered by the terms of a Collective Bargaining Agreement (a "CBA"). App. 3.

A job description dated 05/01/06 that may have applied to employees in Fulbright's position stated: "The employee must be available for call out 24 x 7." *See* Doc. 96 at 108 (Def's App.). Around 2008 or 2009, but definitely after 2006, the company reallocated the duties and the on-call requirements of the position held by Fulbright and the technicians he worked with in Fort Worth, Texas. There were six or seven of them at the time. App. 3 and App. 37.

Defendant created a new position called Restoration Technician to be primarily responsible for restoration of service, fixing broken equipment. App. 97 and 106-7 (Neal Dep.). The rest of the technicians were classified as Installation Technicians and they were not on call, except for when they volunteered to be. To help out the Restoration Technicians, Installation Technicians took turns covering weekends and holidays. On any given weekend or holiday, a volunteer was on call, and he would be the first person contacted if something was needed – all of the other technicians, Restoration and Installation, were not on call, and they could do whatever they wanted. When a technician was not on call he was not required to answer a call, and there was no discipline for missing a call or deferring the call to someone less senior. App. 3-4 (Fulbright Dec.) and App 37-38 (Ozuna Dec.).

## II.   Fulbright's on-call expectations after he began taking Trazodone.

In January 2009, Fulbright began taking Trazodone for his insomnia. He told his coworkers, plus their supervisors Stephen Hale and Terry Neal, and a nurse in Health and

Medical Services ("HMS") that he would be taking it.  The coworkers, along with Hale and

Neal, all agreed that Fulbright would not have to go out on calls at night if he had already taken

Trazodone that night.  App. 4-5.

Fulbright could have chosen not to participate in the voluntary rotation, and he would

never have been on call outside of his regular shift.  However, he continued to volunteer for the

rotation with the understanding that he would not have to go out on calls at night if he had

already taken Trazodone.  App. 5.

Furthermore, when it was Fulbright's weekend to be on call, he did not take Trazodone

on Friday or Saturday night so he would be available to go to work if he was called.  However,

he always took Trazodone on Sunday night so he would be rested for work.  Fulbright told all his

coworkers, and told Hale and Neal, he was doing this, and no one ever objected or said that he

should do anything differently.  If one of the other technicians had objected to this arrangement

Fulbright would have agreed to even things out by covering someone else's night on their

weekend.  It never came up, so they never even discussed doing it that way.  App. 5.

This arrangement for Sunday nights on Fulbright's volunteer weekends was in effect for

the last few years of Fulbright's employment, and it did not place a burden on Union Pacific.  It

only applied once every three or four weeks, when it was Fulbright's weekend, and the only

burden was on one of the other technicians if someone was needed on a Sunday night, which did

not happen often.  Furthermore, there was precedent for the technicians covering for each other

as needed.  For example, in the mid-1990s one of the technicians, Ken Horton, was an alcoholic,

and Fulbright covered several of his calls per month.  App. 5.

### III. Fulbright cooperated with the fitness-for-duty evaluation, and there was nothing asked of him that he refused to do.

Fulbright fully cooperated with the fitness-for-duty process, and Defendant's claims to the contrary are wrong.

Fulbright provided all medical records requested of him no later than April 10, 2015. Defendant requested records "from the provider treating you for this condition," but there was no such provider because the original prescribing psychiatrist had retired years earlier. Fulbright therefore sent about one year of records from his primary care doctor because she refilled his prescriptions, and Defendant already had earlier records from two fitness-for-duty evaluations Charbonneau did in 2014. App. 7-8. Charbonneau's notes in the Medical Comments History suggest he did not think Fulbright had provided everything, Doc. 96 at 86 ("This EE has not provided the medical records we have requested), but during the two phone calls they had Charbonneau did not ever mention it, or ask if there were records missing. App. 6 (Fulbright Dec. ¶ 20); App. 13-20 (transcript of the April 21, 2015 call) and App. 27-35 (transcript of the June 28, 2015 call).[1]

Fulbright asked his doctor's office for their records within a day or two of Defendant's request for the records, but he did not sign an authorization form until the documents were ready a few weeks later. App. 5 (Fulbright Dec. ¶ 19). The authorization form was not signed until March 31, 2015, but that does not mean Fulbright delayed until then before asking for the records.

---

[1] Fulbright's Declaration authenticates these transcripts, but even if the Court found the authentication to be technically deficient the evidence must still be considered because Plaintiff could play the recordings at trial, and he and the other persons whose voices were recorded can be called at trial to confirm the accuracy of the actual recordings and what was said. *See* Fed. R. Civ. P. 56(c)(2) (and the 2010 comments discussing same).

Defendant never asked for permission to speak to Fulbright's primary care doctor, so it is inaccurate for Defendant to argue that Fulbright was not responsive to this request. Fulbright never got something in writing asking for permission, App. 7 (Fulbright Dec. ¶ 22), and Charbonneau did not ask when he spoke to Fulbright by phone on April 21, 2015. App. 13-20 (transcript of the discussion).

On this April 21, 2015 call, Charbonneau asked Fulbright to see a sleep medicine specialist for a "sleep medicine evaluation." Charbonneau did not explain what this was, other that stating: "We just need to get some documentation that supports the nature of the problem, the risks and benefits are of the medicine you take, and things like that." App. 18. Fulbright believed Charbonneau was asking for an evaluation of the sleep medicine, the Trazodone. App. 9.

Fulbright promptly complied with Charbonneau's request and he made an appointment to see his primary care doctor so he could get a referral to a sleep medicine specialist, and he went to see his doctor on April 27, 2015. She gave him a referral to Texas Medical Diagnostics ("Texas Medical"). The first available appointment was on June 1, 2015. App. 7-8.

At the June 1, 2015 appointment, Texas Medical did not "order" testing, they only said it would be required before Fulbright could see the sleep medicine specialist. App. 8. Fulbright decided not to have the tests for two good reasons: (1) he could not afford it, and (2) Charbonneau had not asked for testing. App. 28. Fulbright's decision was not a refusal or lack of cooperation with anything Union Pacific asked for.

Defendant's comments regarding reinstatement of Fulbright's health insurance are irrelevant because there is no evidence insurance would have covered the cost of the sleep study. Plaintiff has been seeking this information in discovery, but Defendant has refused to produce

any information about the coverage.  *See, e.g.*, Doc. 64-1 at 13-14, 20; Doc. 84 at 6 (argument in support of Plaintiff's motion to compel information regarding insurance benefits).

Defendant faults Fulbright for not sending the records of his June 1, 2015 appointment at Texas Medical, but there is no reason he would have even thought to do that.  On June 14, 2015, Fulbright called HMS.  He told the lady that answered he had been to Texas Medical and he gave her the phone number.  The lady confirmed Fulbright's employee ID number and said "Pam is the nurse who will be handling this for you."  She agreed to have Pam call Fulbright once Union Pacific had the documents from Texas Medical.  App. 26.  In these circumstances, the fact that Fulbright did not independently get the documents on his own and send them to Union Pacific does not show a lack of cooperation, as Union Pacific suggests.

Charbonneau's notes in the Medical Comments History indicate he erroneously believed (1) that Fulbright had not provided all requested medical records (he had), and (2) that Fulbright was not following through with his request for a sleep medicine evaluation (he was).  *See* Doc. 96 at p. 86 (notes from June 19, 2015).  Rather than contacting Fulbright with his concerns, he decided to bring the fitness-for-duty evaluation to a close and impose "sudden incapacitation restrictions."  Doc. 96 at p. 85-6 (Charbonneau's note dated June 26, 2015).  These were not customized restrictions based on an individualized assessment of Fulbright's situation, and Charbonneau had no medical evidence indicating that Fulbright was a sudden-incapacitation risk.

Charbonneau called Fulbright on June 28, 2015 to inform him of the work restrictions. He began the discussion by asking Fulbright if he had made any headway on getting the evaluation he had requested, and Fulbright explained the steps he had taken – that he had been to the appointment; that he had called the medical department and provided the phone number so medical could get the information from the clinic; that the clinic would not do a "write up"

6

without first doing a sleep study and charging $600, which Fulbright would have to pay out-of-

pocket.  Charbonneau then asked: "So you're telling me, if my understanding is correct, you have

your initial evaluation of the sleep medicine doctor that's in-office. Is that true?  App. 28.

Fulbright's answer was:

> I had a meeting with a doctor and that doctor told me that he wasn't qualified <u>to</u>
> <u>make the evaluation on my medicine</u>. And he told me the doctor that worked there
> that did, and we explained to them before we ever went there, <u>that's what this</u>
> <u>appointment was for. To evaluate that medicine</u>. They didn't have the doctor on
> hand that would eventually do the write up and the evaluation. They had me talk
> to another doctor wait in the room for 30 minutes, talk to another doctor that told
> me that all he's going to do is schedule me more appointments with this other
> doctor. And he's going to want to do all these <u>tests and a, and a sleep study</u> and,
> you know, all this stuff that's unnecessary. <u>And that's not what we talked about.</u>
> <u>We talked about evaluating that one medicine</u>, and I, I'm not going through all
> that. I'm not paying for that. I don't have any money to pay for that anymore.

App. 28.

At this point, Charbonneau knew his assumption about Fulbright not cooperating with the

sleep medicine evaluation was mistaken, he was cooperating according to his own understanding

of the term sleep medicine evaluation.  If Charbonneau really wanted the results of a sleep study

and sleep medicine evaluation, he could have clarified what he was asking for.

Charbonneau did not clarify.  Instead, he moved forward with the decision he already

made and told Fulbright he was imposing sudden incapacitation restrictions.  App. 29.  A fitness-

for-duty nurse, Theresa Rodino, explained to Fulbright this meant he was not going to be

allowed to return to work, he was out of a job.  App. 32.

Defendant's Brief explains the term sleep medicine evaluation in some detail, and states

that it includes a sleep study, but no one ever explained this to Fulbright.  If they had, Fulbright

would have done whatever he could so that he could get back to work.  App. 11.  On these facts,

a reasonable jury could easily find that it is pretextual and untrue to claim Fulbright was

uncooperative.  He was cooperative, but Defendant used the alleged lack of cooperation to justify

the decision Charbonneau had already made – a decision based on incomplete information and

assumptions about Fulbright's sleep disorder, and based on speculation concerning the possible

(but unknown) side effects of Trazodone.  This is precisely the kind of decision the ADA

prohibits, because it was not based on an individualized assessment and objective evidence.

## IV.    Miscellaneous Corrections.

Defendant sent a letter to Fulbright on January 26, 2009 because he called HMS that day

to say he would be taking Trazodone, not because of a return-to-work evaluation.  There was no

such evaluation in 2009.  App. 4.

Fulbright sometimes had daytime drowsiness after being up at night taking care of his

mother, who had Alzheimer's disease.  There is no evidence that Fulbright experienced daytime

drowsiness because he took Trazodone.  App. 6.  To the contrary, as Fulbright explained to

Charbonneau, Trazodone allowed him to sleep and he felt rested the next day.  App. 16

(transcript).

Charbonneau's notes concerning his April 21, 2015 phone call with Fulbright are

inaccurate in some respects.  For example, Charbonneau wrote: "He states that he has been

working around the on call issue for the 3-4 years."  App. 88.  The recording of this call, and the

transcript of the recording, include no such comment.

**Argument and Authorities**

## I.    The motion fails to prove that Defendant is entitled to judgment as a matter of law on Plaintiff's first cause of action.

No matter which analysis is applied, direct-evidence or *McDonnell Douglas*, the proof

required to defeat summary judgment is the same, and the evidence does not support summary

judgment for Defendant on this claim.

**A.    The direct and undisputed evidence proves Defendant took two adverse actions because of its unfounded concerns about Fulbright's disability, and the medication he took for it.**

Direct evidence is not uncommon in disability discrimination cases, and when there is direct evidence, there is no need for a *McDonnell Douglas*[2] analysis to evaluate possible motives. *Salgado v. Iqvia, Inc.*, 459 F.Supp. 3d 1318, 1332 n. 5 (S.D. Cal. 2020), citing *Wallace v. County of Stanislaus*, 245 Cal. App. 4th 109, 123, 199 Cal. Rptr. 3d 462 (2016).

For example, in *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758 (5th Cir. 1996), the plaintiff worked at a day care center and sometimes drove children in the school van. *Id.* at 760.  The employer stopped letting her drive because of its concerns about her hearing impairment, which reduced her hours and her income.  *Id.* at 760-1.  She filed suit for disabilities discrimination, and the employer moved for summary judgment.  The district court evaluated the defendant's motion using the *McDonnell Douglas* analysis, and granted the motion.  *Id.* at 761.

On appeal, the Fifth Circuit held the district court erred by applying the *McDonnell Douglas* analysis because there was direct evidence.  The employer was clear that that plaintiff "was removed from driving duties because of her hearing impairment."  The Court found this to be direct evidence the employer "made an employment decision because of disability," *i.e.* the employer discriminated, so the only question was whether the employer had a defense based on its safety concerns.  *Id.* at 762.

Similar cases include *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 927 (9th Cir. 2018) (no need for the burden-shifting analysis "where it is clear that an action was taken because of an impairment or perception of an impairment"); *Breaux v. Bollinger Shipyards, LLC*, No. 16-2331, 2018 U.S. Dist. LEXIS 116351, at *30 (E.D. La. Jul. 5, 2018) (no need for the *McDonnell*

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Douglas* analysis because there was direct evidence the employer made the employment decision because of a disability); and *Campbell v. Union Pac. R.R. Co.*, No. 4:18-cv-00522-BLW, 2020 U.S. Dist. LEXIS 162638, at \*9 (D. Idaho Sept. 4, 2020) ("There is also no material dispute that Union Pacific removed Campbell from the Trainman position because of his disability.")

In Fulbright's case, Dr. Charbonneau made both of the adverse employment decisions in question.  Charbonneau has been deposed, and like the employer in *Rizzo*, Charbonneau was clear in his deposition about the reasons for his decisions.  As discussed in greater detail below, with citations to Charbonneau's sworn testimony, Charbonneau removed Fulbright from service and later imposed permanent work restrictions because of his safety concerns related to Fulbright's disability (insomnia) and the medication he took for his insomnia.  No one disputes this, so a *McDonnell Douglas* analysis is not necessary.

Under either analysis, Plaintiff must prove the same three elements (disability, qualified, and adverse action because of disability).  Under the direct evidence approach, however, there is no need to consider pretext, because the employer's proffered reason for its action is not a legitimate *nondiscriminatory* reason.  A "valid nondiscriminatory explanation" must be "one that 'disclaims any reliance on the employee's disability in having taken the employment action.'" *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006).  It can be a defense under the ADA "that the challenged action is justified by a legitimate, nondiscriminatory reason." 29 C.F.R. § 1630.15(a). But to be "nondiscriminatory," the reason must be "unrelated to the individual's disability." 29 C.F.R. § pt. 1630, App. (emphasis added.).  In each of the following cases, the court found direct evidence of discrimination, and denied the employer's motion for summary judgment without discussing pretext: *Montgomery v. Union Pac. R.R. Co.*, No. CV-17-00201-TUC-RM, 2018 U.S. Dist. LEXIS 198593, at \*12 (D. Ariz. Nov. 21, 2018) (direct evidence

10

plaintiff's job offer was rescinded because of plaintiff's prior aneurysm); *EEOC v. Crain Auto. Holdings, LLC*, 372 F. Supp. 3d 751, 756-7 (E.D. Ark. 2019) (supervisors comment was direct evidence); and *Hamilton v. Ortho Clinical Diagnostics*, No. 4:12CV00670 JLH, 2014 U.S. Dist. LEXIS 90212, *15  (E.D. Ark. July 2, 2014) (memorandum stating employee's termination was due to lifting restrictions constituted direct evidence of disability discrimination).

The facts of the present case show that both employment decisions were related to, and indeed because of, Fulbright's disability, so there is no need for a *McDonnell Douglas* burden-shifting analysis.  Plaintiff further contends that he has proved his first cause of action as a matter of law and he is therefore entitled to summary judgment.  *See* Doc. 88, Plaintiff's Motion for Partial Summary Judgment.  Without waiving this position, Plaintiff will address the evidence supporting this contention below, in connection with the discussion of his prima facie case.

**B.    A *McDonnell Douglas* analysis leads to the same result – Defendant is not entitled to summary judgment on Plaintiff's first cause of action.**

On Plaintiff's first cause of action, discrimination because of disability in violation of 42 U.S.C. § 12112(a),[3] the prima facie case requires evidence that Fulbright: (1) had a disability (actual, record of, or regarded as); (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability.  *Cannon v Jacobs Field Services, N.A.*, 813 F.3d 586, 590 (5th Cir. 2016) (listing the elements of proof for this claim); *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 618 (5th Cir. 2009) (the relevant period is the time of the adverse actions complained of).  The evidence in this case establishes all three of these elements.

---

[3] Plaintiff's claim based on 42 U.S.C. § 12112(b)(6) (using qualification standards that screen out) is discussed separately, later in this Response.

1.     **Plaintiff had a disability – actual, record of, and regarded as.**

Union Pacific does not dispute that Fulbright had a disability.  Defendant argues that the side effects of a medication do not constitute a disability, s*ee* Doc. 95 at 25-27, but Fulbright is not arguing this as his disability.  Plaintiff therefore has no comment on this argument, or the cases cited by Defendant in this section of its brief.

It is therefore undisputed that the first element of the prima facie case is satisfied.

2.     **Plaintiff was qualified to do his job, with or without accommodations.**

Union Pacific does not dispute that Fulbright had the skills, experience, and ability to do his job, and to do it safely.  Instead, Defendant relies solely on its assertion that Fulbright was required to be on call at all times, but Defendant has not proved this as a matter of law.

The technicians in Fulbright's position were not on eternal standby or subject to discipline if they missed an emergency after-hours call.  As Fulbright's former coworker Jason Ensign testified in his deposition, if the technician was not on call, he could do whatever he wanted.  App.  114.  Union Pacific could in theory call a technician who was not on call, but he was not required to answer.  App. 115.  "Is it possible that they could call you when you – when you weren't on call that week? I guess.  But the understanding was that there was no repercussion for you not answering those calls."  App. 116.

In support of its argument to the contrary, Union Pacific relies on three documents, but they do not prove Defendant's 24 x 7 contention.  The first document is a two-page job description from 2006.  Doc. 96 at 107-108.  It states: "The employee must be available for call out 24x7."  Doc. 96 at 108.  This document is not controlling with respect to Fulbright's position nine years later in 2015, for two reasons.

First, after 2006, the duties of the technicians were split up between a newly-created Restore Technician position and the Installation Technicians, and the on-call requirement for the positions were different. App. 97 and 106-7 (Neal Dep.); App. 3-4 (Fulbright Dec.); App 37-38 (Ozuna Dec.). Second, Fulbright's position was a union job, and the terms and conditions of his employment were governed by a Collective Bargaining Agreement ("CBA"). By law, the company could not impose requirements on Fulbright that were more onerous that the applicable terms of the applicable CBA. *J.I. Case Co. v. NLRB*, 321 U.S. 332, 337-39 (1944).

The second document relied on by Defendant is a page from the allegedly applicable CBA. *See* Doc. 96 at 129, which is page 14 of a CBA between Union Pacific and the International Brotherhood of Electrical Workers ("IBEW") with an effective date of January 1, 2003 (the "2003 CBA"). This page includes the same language used in the Declaration of Stephen Hale (the third document relied on by Defendant) about reporting for work if called in for an emergency. *Compare* Doc. 96 p. 48 (last sentence of paragraph 6) to Doc. 96 p. 129 (under Note 1). However, this language conflicts with a much more specific provision applicable to Fulbright's job title.

Defendant contends Fulbright was a "Senior Communications Technician, also referred to as a Senior Electronic Technician." Doc. 95 (Def's Brief at 4). Regarding this position, the 2003 CBA states: "Senior Electronic Technicians will make themselves available for after hour calls, unless other arrangements have been made with proper authority." App. 51. The summary judgment evidence proves that "other arrangements" were made for the Installation Technicians, which included Fulbright.

Again, after 2006, a new position was created that was referred to as a Restore

Technician.[4]  App. 106.  Two of the technicians became Restore Technicians, and they were

primarily responsible for restoration of service.  The rest of the technicians were classified as

Install Technicians, and they were not on call outside of their normal weekday shift except for

certain weekends and holidays according to a voluntary rotation the Install Technicians worked

out between themselves.  App. 97 and 106-7 (Neal Dep.); App. 3-4 (Fulbright Dec.); App 37-38

(Ozuna Dec.)

In his deposition, Terry Neal explained what being "on call" meant.  "On call means that

you are making yourself available for after-hour emergencies."  App. 112.  Therefore, after these

changes went into effect, it is clear that "other arrangements" had been made with "proper

authority" whereby Fulbright did not have to make himself available for after-hours calls

regarding emergency restoration of service.  Union Pacific could call him, but he did not have to

answer or come in, so being on standby and coming in when called were not essential job

functions.

Even the sworn deposition testimony of Union Pacific's 30(b)(6) representative does not

support Defendant's argument.  Union Pacific designated Stephen Hale on topic 1.C.iv, which

was: "When Plaintiff could be asked to or required to work outside of his regular weekday shift."

App. 80.  Hale testified:

> Q.     Then let's go to Number IV. When could Mr. Fulbright -- you know, back
>        when he was a Union Pacific employee during the time period we're
>        talking about, which is June 15, '99 through the end of his employment, so
>        Number C IV, what were the expectations about Mr. Fulbright being
>        asked to work outside of his regular weekday shift?
>
> A.     I'm not sure at what point they went to every third weekend that he was a
>        part of the restoration weekend duty, on-call duty.

---

[4] Plaintiff has not been able to determine the date when this happened, which is in part the subject of a pending
motion to compel discovery.  However, the evidence shows it was in 2008 or 2009.

Q.      And other than his weekends, was he expected to be on call?

A.      I can't answer that with -- with a definite.

App. 123.

Pursuant to Fed. R. Civ. P. 30(b)(6), Union Pacific was required to present a witness to testify regarding the information known or reasonably available to the company on this topic. Defendant presented Hale on this issue, and he was not able to answer.  Because the designated representative on this topic could not say when Fulbright could be asked to or required to work outside of his regular weekday shift, Rule 37(c)(1) precludes Defendant from using information about the on-call requirements that it failed to provide, unless the Defendant shows Hale's failure to provide the requested information "was substantially justified or is harmless."  Defendant has not made this showing.

Furthermore, in an ADA case, there are several factors a court should consider when determining if a job function is essential.  The job description is just one of the factors, *see* 29 C.F.R. § 1630.2(n)(3), but it is the only one addressed by Defendant.  Without addressing the other factors, Defendant cannot conclusively establish that being on call 24 x 7 was an essential job function.

Other relevant factors include "(iii) The amount of time spent on the job performing that function; … (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.").  29 C.F.R. § 1630.2(n)(3).  *See also Kapche v. City of San Antonio*, 176 F.3d 840, 843 (5th Cir. 1999) ("a court may consider as evidence … (3) the amount of time spent on the job performing the function, and (4) the work experience of both past and current employees in the job.").  Defendant has not supplied any evidence about how frequently persons in Fulbright's position were actually called to come in to work for an

emergency when they were off duty, thus leaving open a question of fact that a jury could resolve in Plaintiff's favor.

Determining whether a function is essential is a fact-specific inquiry that is normally a question for the jury to decide on a case-by-case basis. *See, e.g.*, *EEOC v. Union Carbide Chems. & Plastics Co.*, No. 94-103 SECTION "L", 1995 U.S. Dist. LEXIS 12444, at *6 (E.D. La. Aug. 18, 1995) (whether the alleged function is essential "is a fact specific issue which is properly determined by the trier of fact after a trial on the merits and not by the Court on a motion for summary judgment."). Plaintiff contends he is entitled to summary judgment in his favor on the "qualified" issue based on his years of safe and satisfactory performance, but in the alternative, this is a question of fact and Defendant has not proved its position as a matter of law.

### 3. Defendant took adverse employment actions against Plaintiff because of his disability by removing him from his job and imposing permanent work restrictions that disqualified him from returning to work.

Defendant seems to dispute whether there were any adverse actions, and does dispute whether the actions in question were taken because of disability. Plaintiff will therefore address the issues separately.

### a. Defendant took two adverse employment actions.

In a disability-discrimination case in the Fifth Circuit, the term adverse employment action refers to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002). It also includes the functional equivalent of such actions. *Thompson v. City of Waco*,

764 F.3d 500, 503 (5th Cir. 2014) (removal of key duties as a police detective was the equivalent of a demotion, which is an adverse employment action).[5]

Defendant took two materially adverse actions against Fulbright.  First, in February 2015, the company removed Fulbright from service and forced him into an involuntary and unpaid leave of indefinite duration.  App. 5.  Defendant does not dispute that this was an adverse action.[6]

For five months, Fulbright remained in limbo about his job and he was not paid, which easily qualifies as an adverse employment action.  *See, e.g.*, *Mota v. Univ. of Houston Health Sci. Ctr.*, 261 F.3d 512, 521 (5th Cir. 2001) (discontinuation of $2,500 stipend was a compensation decision, thereby qualifying as an adverse action); *Garcia v. Garland Indep. Sch. Dist.*, No. 3:11-CV-0502-N-BK, 2012 U.S. Dist. LEXIS 136251, at *12 (N.D. Tex. Aug. 29, 2012) ("Being placed on unpaid leave necessarily affected Plaintiff's compensation, and is, therefore, an adverse employment action"); *Radick v. Union Pac. Corp.*, No. 4:14-cv-02075, 2016 U.S. Dist. LEXIS 19622, at *23 (S.D. Tex. Jan. 25, 2016) (employment restriction that "resulted in a loss of income" was an adverse action and satisfied this element of the prima facie case).  There is therefore, at a minimum, a question of fact whether this was an adverse action.

The second adverse action complained of was even more severe, and also meets the standards required by the Fifth Circuit.  Union Pacific imposed permanent work restrictions against driving a company vehicle or climbing a ladder above four feet, along with other things.  Doc. 96 at 85-86.  HMS then asked Fulbright's supervisors if he would be able to do his job

---

[5] *Green* and *Thompson* were both Title VII cases, but the same standard also applies to ADA cases.  *See, e.g.*, *Derrick v. UPS, Inc.*, No. 18-8744, 2019 U.S. Dist. LEXIS 54109, at *4-5 (E.D. La. Mar. 28, 2019) ("both of these claims require an adverse employment action, sometimes referred to as an adverse employment decision.").

[6]   Defendant argues that Terry Neal's decision to refer Fulbright for an evaluation was not an adverse action, but Plaintiff does not contend otherwise.

without having to perform these tasks, and Terry Neal said he could not.  Doc. 96 at 72-78.

Fulbright was permanently removed from his job, which is the functional equivalent of

termination even if he was not technically fired.  *See, e.g.*, *Presta v. Omni Hotels Mgmt. Corp.*,

No. 4:17-CV-912, 2018 U.S. Dist. LEXIS 60998, at *26-27 (S.D. Tex. 2018) (employee placed

on call with no job responsibilities, no right to return to work, who received no compensation or

benefits suffered an adverse employment action); *Stinson v. Nissan N. Am., Inc.*, No. 3:18-cv-

0145, 2019 U.S. Dist. LEXIS 202195, at *29 (M.D. Tenn. 2019) (refusal to allow employee to

return to work due to work restrictions was an adverse action).

### b. Defendant took the adverse employment actions because of Fulbright's disability.

Dr. John Charbonneau made both decisions that resulted in the adverse actions against

Fulbright.

On February 1, 2015, just a few days after Neal requested the fitness-for-duty evaluation,

Charbonneau decided to remove Fulbright from service.  *See* Doc. 96 at 92 (the Medical

Comments History, Charbonneau's note dated Feb 1, 2015 stating: "This EE is NOT FFD and

should be pulled from duty.").  Charbonneau testified he did this "because of the serious safety

concern of the underlying medical condition and the medication and the no response, we felt that

it was time to remove him from service and ask for records so we could get to the bottom of the

problem."  App. 84.

Charbonneau was deposed a second time as the company's designated representative, and

he reiterated that he removed Fulbright from service based in part on his concern that Fulbright

"had some type of significant medical – underlying medical condition."  App. 117.

Fulbright permanently lost his job because of Charbonneau's decision in June 2015 to

impose sudden incapacitation restrictions.  Doc. 96 at 85 (Medical Comments History,

18

Charbonneau's note dated Jun 26, 2015 stating: "We will employ sudden incapacitation restrictions"), and Doc. 96 at 79-83 (July 1, 2015 letter to Fulbright).   Charbonneau testified that he imposes these restrictions "when there is a lack of clarity about a person's ability to stay awake and alert and upright… If someone had, like Mr. Fulbright, a serious underlying condition, he used the term life-threatening condition, and medicine that precludes his working but we don't know the duration of the effects of that medicine, then we don't know if he's always going to be awake and alert and in full control of his senses at work." App. 85-86.  When listing the reasons for his June 2015 decision to impose work restrictions, Charbonneau stated: "Number one is we found out that he had a sleep disorder."  App. 92.  Charbonneau thought Fulbright might "have an accident while driving, a fall while climbing, things like that." App. 89.

In his second deposition, testifying as a corporate representative, Charbonneau reiterated he decided to impose the work restrictions because Fulbright had "a very serious sleep disorder" and "he was taking a medication."  App. 121.  Charbonneau added: "We reached a point where we decided that based on the currently available information, we could not certify him as medically fit for duty without restrictions. So we decided that he needed these restrictions." App. 122.

This testimony shows Charbonneau had concerns about both the underlying condition (insomnia) and the medication (Trazodone).  Employers sometimes defend such cases by arguing they did not discriminate because of the disability, but only because of the side effects of the medication.[7]  This argument is routinely rejected.  *See, e.g.*, *Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 U.S. Dist. LEXIS 116351, at *30 (E.D. La. July 5, 2018) (employee's disability was opioid dependency which he treated with Suboxone – employer's admission that it

---

[7] Union Pacific has not made this argument.

fired plaintiff because he did not wean himself off of Suboxone was direct evidence of an employment decision because of Plaintiff's disability); *Bouchard v. Gen. Elec. Co., No.* 1:14-CV-236-NT, 2015 U.S. Dist. LEXIS 154954, at *22 (D. Me. Nov. 17, 2015) ("A reasonable jury could find a close enough nexus between being on prescribed medication and being disabled to find that discrimination on the basis of taking medication constitutes discrimination on the basis of disability"); *Scruggs v. Berg Spiral Pipe Corp.*, No. 14-339-CG-B, 2015 LEXIS 80374, at *14 (S.D. Ala. June 22, 2015) (decision not to hire employee who took muscle relaxers could be pretext for discrimination based on his back condition); *Huffman v. Turner Indus. Grp., L.L.C.*, No. CIV.A. 12-1061, 2013 U.S. Dist. LEXIS 71842, at *53 (E.D. La. May 21, 2013) (employer refused to hire because the employee took pain medications for an impaired hand – a reasonable jury could conclude the employer refused to hire Plaintiff because of an alleged or perceived disability).

A reasonable jury could conclude from Charbonneau's testimony that Defendant took two adverse actions because of disability.  This element of the prima facie case is therefore satisfied.

        **c.**       **Proof of bias or ill will towards persons with disabilities is not required to prove the actions were because of disability.**

Defendant seems to misconstrue the applicable causation standard.  Defendant argues there is a lack of evidence showing it acted because of "bias against his medical condition" or "out of discriminatory animus against Fulbright's alleged disability."  Plaintiff is not required to show that Defendant's decision-makers were biased against persons with disabilities, Plaintiff is only required to show that the adverse actions were taken because of his disability.

Employment discrimination laws prohibit discrimination because of a protected trait, even if the person making the decision is not prejudiced or biased against persons in the

protected category.  For example, in *International Union v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), the employer excluded women who were pregnant, or might become pregnant, from jobs where they might be exposed to lead, but the policy did not also apply to men capable of reproduction.  There was no evidence of prejudice or ill will towards women, but the Supreme Court nevertheless found the practice to be discriminatory, stating: "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.  Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."  *Id.* at 499 U.S. 199.

Appellate opinions often refer to the need to show that the employer acted with a "discriminatory animus," a term used by the U.S. Supreme Court in *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).  The meaning of the term is often misconstrued to include bias or prejudice, but as one court observed: "The term 'animus' as used in the *Griffin* opinion seems to be synonymous with 'motivation,' a term employed interchangeably with it in the same paragraph. We do not think the Supreme Court meant 'animus' in its secondary sense of personal hostility or enmity."  *Local No. 1 v, Int'l Bhd. of Teamsters*, 419 F.Supp. 263, 277 n.23 (E.D. Pa. 1976).

The evidence in this case shows Defendant took two adverse actions against Fulbright because of his disability.  There is at least a question of fact as to this third element of the prima facie case.

### 4. Union Pacific's alleged reason for terminating Fulbright is pretext to cover its overt disabilities discrimination.

Union Pacific's Brief never explicitly states why they permanently removed Fulbright from his job.  Defendant seems to blame Fulbright for not getting the sleep medicine evaluation Charbonneau asked for, and without the results of the evaluation, Charbonneau did not have the

21

information needed to determine if Fulbright was fit for duty: "I didn't determine that he couldn't work safely.  I couldn't – I couldn't say that he was safe to be at work and, until we had more medical information, we were going to impose sudden incapacitation restrictions."  App. 87.  "[W]e made the determination that we couldn't answer the question originally asked of us because we didn't get all of the information that we asked for."  App 87.

Whatever Defendant's reason or reasons were, it all stands or falls on the premise that Fulbright was to blame for not getting the sleep medicine evaluation.  The evidence disproves this premise.

Fulbright told Charbonneau he wanted to return to work and keep taking Trazodone because it worked for him.  App. 16.  Union Pacific therefore had an obligation to engage in an interactive process to determine if this, or some other accommodation, was reasonable.  *See, e.g.*, *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735–36 nn.4–5 (5th Cir. 1999) (employer has a duty to interact when it has notice, even if there is no explicit request from the employee).

When an employer unreasonably terminates the interactive process and fails to accommodate, the employer can be liable not only on a failure-to-accommodate claim, but on a section 12112(a) discrimination claim as well.  For example, in *Yanoski v. Silgan White Cap Americas, LLC*, 179 F.Supp. 3d 413 (M.D. Pa. 2016) a doctor wanted to do a diagnostic procedure (a full functional capacity evaluation), before deciding if the employee was fit for duty, but she first needed the employer's approval to pay the additional cost.  *Id.* at 422.  The company did not approve, so the employee offered to pay if the company first agreed he could return to work if he passed.  *Id.* at 424.  The company never responded to his request and terminated him, allegedly because he had been out on medical leave the maximum allowed under the applicable CBA.  *Id.*  The court found a question of fact on pretext because on these facts, a

reasonable jury could infer the medical leave limit was not the real reason, but rather the employee's disability, which the employer had been questioning.  *Id.* at 436.

The duty to engage in the interactive discussion exists at the time, so even of the Court ruled against Fulbright on his claim for failure to accommodate, it is still highly relevant to know whether Defendant fulfilled its legal obligations.  On these facts, a reasonable jury could find that Union Pacific's reason or reasons, whatever they may have been, were just a pretext for getting rid of an employee they were not comfortable with because of their concerns about his disability and medication.  Union Pacific considered the disability and medication to be disqualifying unless Fulbright proved otherwise, but they never told him what they would accept as proof.  These facts would support a jury's finding that the alleged refusal to have a sleep medicine evaluation was a pretext for disabilities discrimination.

## C.   Plaintiff's claim based on 42 U.S.C. § 12112(b)(6) is a viable disparate treatment claim that has been recognized by federal courts.

Plaintiff has briefed this argument twice before in this case.  *See* Doc. 30 at pp. 19-21, and Doc. 44 at pp. 4-6.  Rather than repeating the arguments in full, Plaintiff incorporates them here by reference and summarizes the main points as follows.

The cases Defendant cites for support of its argument do not actually support its argument.  The cases do support two propositions that are not in dispute: (1) that disparate treatment and disparate impact are different and separate types of claims, and (2) a section 12112(b)(6) claim can be asserted as a disparate impact claim.  However, none of Defendant's cases support the notion that a section 12112(b)(6) claim is not, and can never be, a disparate treatment claim.  None of the cases cited by Defendant dismiss or grant summary judgment on this claim based on a finding that there is no such claim, which is what Defendant is asking the Court to do in the present case without a precedent.

23

Plaintiff, however, has cited two cases that recognize section 12112(b)(6) can be used by a single plaintiff to assert a disparate treatment claim. *EEOC v. Kronos, Inc.*, 694 F.3d 351, 357 (3d Cir. 2012), and *Leskovisek v. Ill. DOT*, No. 17-cv-3251, 2020 WL 7323840, at *13 (C.D. Ill. Dec. 11, 2020). Defendant attempts to minimize the significance of these cases by pointing out they are not binding authorities, but Defendant has not addressed the legal reasoning of these opinions on the merits. The reasoning is sound, and in the absence of precedent supporting the outright dismissal of the 12112(b)(6) claim without a trial, Defendant's motion should be denied.

## II. Because of *American Pipe* tolling of the statute of limitations, Plaintiff's second and third causes of action are timely.

The holding of *American Pipe*[8] can be paraphrased as: if the reason for the rule does not apply, then the rule should not apply. In the present case, the rationale underlying the limitations defense would not be served by dismissing Plaintiff's claims, because Defendant was placed on notice of all claims by virtue of the *Harris* class action.

### A.    A class action tolls limitations on the claims of all putative class members.

In *American Pipe*, the Supreme Court examined the purpose behind statutes of limitation: they prevent the surprise assertion of belated claims, by which time "'evidence has been lost, memories have faded, and witnesses have disappeared.'" *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), quoting *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348-349 (1974).

The Court then considered whether the reason for the rule would be served by applying it to the facts of the case before it, and found it would not. An earlier class action made the defendants aware, within the limitations period, "of the subject matter and size of the prospective litigation." Thus, because the reason for the rule did not apply, the Court held the rule should not

---

[8] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

apply: "Since the imposition of a time bar would not in this circumstance promote the purposes of the statute of limitations, the tolling rule we establish here is consistent both with the procedures of Rule 23 and with the proper function of the limitations statute." *Id.* at 555.

In *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983), the Supreme Court expanded the doctrine of class action tolling, allowing all putative class members to assert tolling in later individual lawsuits, not just intervenors in the original case. The *Crown, Cork* decision increased the number of claims that can be brought against a defendant under *American Pipe* tolling by removing the hurdle of requiring a party to intervene in the class action pursuant to Fed. R. Civ. P. 24. Indeed, Justice Powell drafted a concurrence precisely to address the broad implications of the holding, and it makes no mention of requiring an identity of claims. Instead, it instructs courts to "take care to ensure that the suit raises claims that 'concern the same evidence, memories, and witnesses as the subject matter of the original class suit[.]'" *Crown, Cork*, 462 U.S. at 355 (*American Pipe*, 414 U.S. at 562).

## B. Federal courts are divided on the scope of the claims tolled by the class action.

Some federal courts have held that for tolling to apply, the claims filed in a later case by a former class member must be identical to the claims asserted in the class action. Defendant's brief cites cases from these jurisdictions only, without mentioning that there is a circuit split of authority, and no definitive ruling on the issue by the Fifth Circuit Court of Appeals. Defendant's brief therefore fails to mention that district courts within the Fifth Circuit have embraced the approach described by Justice Powell, which does not require the later claims to be identical if the earlier class action placed the defendant on notice of the claims.

For example, in *Newby v. Enron Corp. (In re Enron Corp. Secs)*, 465 F. Supp. 2d 687 (S.D. Tex. 2006), the court stated:

> The majority of courts have followed Justice Powell's reasoning and concluded that subsequent individual claims … need not be identical to the original class action's for tolling to apply as long as they share a common factual basis and legal nexus so that the defendant would rely on the same evidence and witnesses in his defense.

*Newby*, 465 F. Supp. 2d at 718.

In *Newby*, the class action plaintiffs alleged violations of federal securities laws by Enron, but two class members opted out and sought leave to file an amended complaint asserting violations of Ohio state securities laws.  Their state-law claims would have been barred by limitations unless *American Pipe* tolling applied, and although the state-law claims were not precisely the same as claims asserted on a class-wide basis before, the court found the claims were factually similar enough for tolling to apply.  *Id.* at 722.  The district court ruled that the class action put Enron on notice it was facing securities fraud claims, so it was not unfair to allow somewhat different securities fraud claims to be filed after limitations would have otherwise expired.  *Id.*

In *Byes v. Telecheck Recovery Services, Inc.*, No. 94-3182, 1996 WL 22686 (E.D. La. Jan. 19, 1996), a single plaintiff brought a class action suit against a debt collection company.  She alleged the company violated a federal debt-collection statute by sending five specific collection letters, which she attached as exhibits to her complaint.  The complaint also alleged that other letters were also sent that violated the federal law.  *Id.* at *1.

More than one year later (after the one-year statute of limitations would bar new claims) plaintiff filed a motion for leave to amend her complaint to allege four additional letters were sent in violation of the statute.  The district court therefore considered whether *American Pipe* tolling applied, stating:

> Tolling operates if the defendant has notice of the substantive claims being brought against it, as well as the number and generic identities of the potential

26

plaintiffs who may participate in the judgment, so that within the period set by the statute of limitations, the defendant has the "essential information necessary to determine both the subject matter and the size of the prospective litigation."

*Id.* at *2, quoting *American Pipe*, 414 U.S. at 555.

Although no new cause of action was being asserted, the court noted that the addition of the four letters as a basis for liability would "undoubtedly enlarge the number of potential class members." *Id.* Nevertheless, the court found the defendants had been put on notice that persons who received those four letters were already part of the class. Based on the earlier complaint, the defendant "had notice of the essential information necessary to determine both the subject matter and the size of the litigation." *Id.* Therefore, since there would be no unfair surprise or prejudice to the defendant, tolling applied, and the new allegations describing claims of additional plaintiffs were not barred by limitations. *Id.* at *2-3.

The case is significant because it shows the minority rule is not being applied in the Fifth Circuit. If it were applied, the court would not have allowed an amended pleading allowing claims by plaintiffs who had not received one of the five letters attached to the original complaint. However, because the original complaint put the defendant on notice that other persons who received other letters had claims too, there was no surprise, and limitations did not bar their claims. By focusing on the question of notice and the lack of surprise to the defendant, this case supports the conclusion that later claims need not be identical for *American Pipe* tolling to apply, as long as there is no unfair surprise to the defendant.

In *Aguilar v. Ocwen Loan Servicing, LLC*, No. 3:17-cv-1165-B, 2018 WL 949225 (N.D. Tex. Feb. 20, 2018), cited in Defendant's brief on page 15, the facts compelled a different outcome. A class action asserted claims based on one federal statute, and several putative class members later filed a separate lawsuit asserting Texas state-law claims that involved different

27

facts and different standards of proof.  In this posture, the district court found the state law

claims would be considered untimely under both the majority and minority rules.  "Even under

the reasoning of courts that have not restricted *American Pipe* tolling to causes of action identical

to those of the putative class, the plaintiffs' Texas claims raise are too different from the *Snyder*

TCPA claims for *American Pipe* tolling to apply to them." *Id.* at *6.

Since notice to defendant is the touchstone, most courts—including district courts within

the Fifth Circuit—have held that the proper analysis for class action tolling is whether the claims

in the class action share a common factual and legal nexus with the claims in the subsequent

individual action. *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1984) (tolling

applied to a different claim because the class suit involved the same allegations and "[t]he City

had ample notice of the nature of Tosti's discrimination claims."); *Renati v. Wal-Mart Stores,

Inc.*, 2019 WL 5536206, at *13–14 (N.D. Cal. Oct. 25, 2019) (subsequent claims tolled because

they relied on same legal theory and were thus "similar enough"); *Shirey v. Portfolio Recovery

Assocs., LLC*, 2019 WL 3842391, at *1–3 (E.D. Wash. Aug. 14, 2019) ("substantially similar"

claims of member outside scope of class were still tolled because "requiring plaintiffs to

intervene in order to seek inclusion [] would lead to the very multiplicity of intervenors and

actions that *American Pipe* sought to curb"); *see also In re Cmty. Bank of N. Va.*, 622 F.3d 275,

300 (3d Cir. 2010), *as amended*, (Oct. 20, 2010) (noting that some "[c]ourts have reasoned that,

where claims brought in a subsequent suit share a common factual and legal nexus with those

brought in the prior class action, there is no persuasive reason for refusing to apply class action

tolling, as the defendant will already have received adequate notice of the substantive nature of

the claims against it and likely would rely on the same evidence and witnesses in mounting a

defense"); *Cullen v. Margiotta*, 811 F.2d 698, 720 (2d Cir. 1987) ("Notwithstanding the

differences between the legal theories advanced by plaintiffs in the state court action and those advanced in the present action, we are persuaded that the *American Pipe* doctrine has applicability to the present action."), *overruled on other grounds by Agency Holding Corp. v. Malley- Duff & Associates, Inc.*, 483 U.S. 143(1987); *Williams-Hopkins v. Allied Interstate, LLC*, 2020 WL 2731101, *4 (D.N.J. May 26, 2020) (recognizing tolling where prior and subsequent claims share a "common factual and legal nexus"); *Johnson-Morris v. Santander Consumer USA, Inc*., 194 F. Supp. 3d 757, 762 (N.D. Ill. 2016) (claims not raised in class action were tolled because they relied on substantially similar facts and legal theories); *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 2012 WL 426267, *3 (D.N.J. 2012) ("Generally speaking, there is a sufficient connection between the actions when the claims brought in a subsequent suit share a common factual and legal nexus with those brought in the prior class action sufficient to notify the defendants and thereby satisfy the policy goals of the statute of limitations."); *In re Indep. Serv. Orgs. Antitrust Litig.*, 1997 WL 161940, *4 (D. Kan. Mar. 12, 1997) (stating that requiring the allegations of both suits to be identical "would be illogical because one of the primary reasons a member will opt out of a class suit is that she has strong individual claims against the defendant that she believes will not be redressed by the overall class settlement" (internal quotation marks omitted)); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1552 (M.D. Fla. 1989) (allowing claims not alleged in class action to be tolled because defendant on notice "to preserve witnesses, exhibits, and evidence").

### C.   Defendant applies dicta from *Johnson* out of context.

Defendant's contention that claims must be identical for tolling to apply relies heavily on non-binding language from *Johnson v Ry. Express Agency, Inc.*, 421 U.S. 454 (1975).  But *Johnson* had nothing to do with class action tolling.  It involved a narrow issue: whether a

claimant's timely filing of an EEOC charge also tolls that claimant's state-law statute of limitations for a § 1981 claim. *Id.* at 455.  In *Johnson*, there was no class, meaning class action tolling was not at issue.  *Id.*  Moreover, the claimant in *Johnson* sought to assert tolling of a Tennessee state law statute of limitations (the Supreme Court noted § 1981 relies on relevant state law for its statute of limitations) after asserting federal rights under Title VII.  *Id* at 462*.*  By contrast, the issue here is not whether Plaintiff's state law statutes of limitations were tolled, but whether a prior federal class action tolled claims in a subsequent federal case with substantially the same facts and legal issues for a former class member.  Because of this, *Johnson* is non-controlling dicta.  *See Central Va. Community College. v. Katz*, 546 U.S. 356, 363 (2006) ("we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated"); *Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

Only a minority of federal circuits have adopted the stricter standard urged by Defendant, including the Tenth Circuit where the *Krehbiel*[9] case cited by Defendant was decided, and the Ninth Circuit where *Blankinship*, *DeFries,* and *Donahue* were decided.[10]  This Court should therefore apply the more logical standard, confirmed by *Crown, Cork*, which looks to the overlap of facts and legal issues in the earlier class action and the subsequent lawsuit.  If the claims

_____

[9] *Krehbiel v. Union Pac. R.R. Co.*, No. 2:19-CV-02002-JAR-JPO, 2019 WL 3387049 (D. Kan. July 26, 2019). Krehbiel was a putative class member in *Harris*, but because a different legal standard applies in the Tenth Circuit, the outcome of this issue in that case has no bearing or relevance to the present motion.
[10] *Blankinship v. Union Pac. R.R. Co.*, No. CV-21-00072-TUC-RM, 2021 WL 3290453 (D. Ariz. Aug. 2, 2021); *DeFries v. Union Pac. R.R. Co.*, No. 3:21-cv-205-SB, 2021 WL 3007254 (D. Or. July 15, 2021); and *Donahue v. Union Pac. R.R. Co.*, No. 21-cv-00448-MMC, 2021 WL 2458351 (N.D. Cal. June 16, 2021)

asserted by the putative class member in a later lawsuit come as no surprise, and Defendant is not prejudiced by the loss of evidence or witnesses, then limitations should not apply.

> **D.      Fulbright was a putative class member in *Harris*, and Defendant was on notice of Fulbright's claims.**

Union Pacific cannot, and does not, claim to be unfairly surprised by Fulbright's lawsuit or his second and third causes of action (failure-to-accommodate, and unlawful medical inquiries). These identical claims were asserted in the *Harris* class action on a class-wide basis. *See* Doc. 42-4 (the amended complaint, pages 17-24). Union Pacific was on notice it was being sued for disabilities discrimination under multiple theories, by all employees involuntarily removed from service, or otherwise subjected to an adverse employment action, because of a Fitness-for-Duty evaluation after a certain date. *See* Doc. 31-3 at ¶ 116 (defining the proposed class). The date specified was from "300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action." *Id.*

Fulbright was a member of this proposed class. The original Complaint in *Harris* states that named plaintiff Quentin Harris filed his charge of discrimination with the EEOC on or around July 22, 2014. *See* Defendant's Exhibit C (ECF Doc. 42-3 at ¶ 22). The discrimination against Fulbright took place later, in 2015, so he satisfies the temporal component of the proposed class. Fulbright's Amended Complaint alleges he was involuntarily removed from service and terminated because of a Fitness-for-Duty evaluation, so he also meets the substantive component of the proposed class.

The claims now being asserted by Fulbright are all identical to those initially asserted in the *Harris* amended complaint on a class-wide basis. Although the claims for failure-to-accommodate and unlawful medical inquiries were not ultimately certified for class treatment, this is not required in the majority of circuits that do not require claims to be identical.

31

The discussion of *Smith v. Pennington*[11] and *Ganousis v. E.I. du Pont*[12] on pages 46-47 is misplaced because it conflates two separate analyses – class members and claims.  In both *Smith* and *Ganousis*, a narrower definition of the class meant that some class members became excluded from the class.  From this premise, Defendant erroneously argues that a narrower class definition excludes claims, but neither *Smith* nor *Ganousis* supports this proposition.

The question to be decided by this Court therefore becomes: whether the facts and legal issues in *Harris* put Union Pacific on notice of possible claims by putative class members for failure-to-accommodate and unlawful medical inquiries, such that relevant evidence could be preserved, and key witnesses could have been contacted.  That standard is easily met in the present case, as evidenced by the arguments Defendant made opposing class certification.

In its brief opposing class certification in *Harris*, *see* Doc. 45 pp. 3-100, Defendant argued certification was improper because there were thousands of individual, employee-specific issues to resolve that could not be decided on a class-wide basis.  These employee-specific inquiries included the issues at the core of Fulbright's claims for failure to accommodate (Plaintiff's second cause of action) and the claim for unlawful medical inquiries (Plaintiff's third cause of action).  Defendant was therefore aware that the facts of the claims now being asserted by Fulbright were part of the earlier class action.

Regarding failure to accommodate, Union Pacific submitted a declaration from its company Medical Director, John Holland, who testified that whenever work restrictions were imposed on an employee, an "individualized assessment is conducted to determine whether those restrictions can be accommodated."  *See* Doc. 45 at p. 7.  A nurse in charge of the fitness-for-duty program testified that if restrictions were imposed on an employee, the medical department

---

[11] *Smith v. Pennington*, 352 F.3d 884 (4th Cir. 2003).
[12] *Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149 (N.D. Ill. 1992).

would notify the employee and his or her supervisor to determine "whether the employee can perform the essential functions of the job within those restrictions, either with or without reasonable accommodation." *See* Doc. 45 at p. 9 (citing Gengler declaration).  If the company decided the employee could perform the essential functions, with or without accommodation, the employee was allowed to return to work. *See* Doc. 45 at p. 9. As for those who were not accommodated and returned to work, Union Pacific knew there could be litigation, and its brief went on to discuss the facts relevant to these individual claims, which it knew would be part of the coming lawsuit (or lawsuits, if class certification was denied).  *See* Doc. 45 at pp. 9-10.

Having claimed that it always considered accommodations for anyone given work restrictions, Union Pacific argued that each employee's situation would have to be decided one-by-one in the lawsuit(s) to come:

> [C]lass members claiming an actual or record of disability must demonstrate that they were qualified with or without a reasonable accommodation. And whether an employee could be accommodated depends on a variety of factors, including the specifics of their particular collective bargaining agreement, whether the employee was qualified for reassignment to a vacant position, or whether an employee reasonably refused DPM's offer of assistance to find an alternative position. These are all individualized inquiries regarding the essential functions of the job at issue and whether the particular class member can satisfy those essential functions.

*See* Doc. 45 pp. 70-71 (internal citations omitted).

Regarding unlawful medical inquiries, Defendant's brief shows Union Pacific knew that the facts underlying this claim would be relevant in the lawsuit.  Defendant argued that when requesting medical records in connection with a fitness-for-duty evaluation, "The type of records requested depends upon the employee's particular medical condition and the employee's specific job duties."  Doc. 45, p. 7.  In some cases, the employee was referred to a specialist for further evaluation and possibly testing.  Doc. 45, p. 10.  Defendant argued: "The appropriateness of

Union Pacific's medical requests to employees as part of their FFD evaluations is also not an issue that can be evaluated classwide. Union Pacific tailors its requests for medical information to the individual's medical condition or other reason he/she was required to undergo an FFD evaluation in the first place." Doc. 45, pp. 82-83.

On appeal of the class certification decision, the Eighth Circuit was obviously influenced by these arguments.  In its opinion reversing class certification, the Court reiterated many of these points. *See, e.g.*, *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020) (stating that each employee given work restrictions is evaluated by Union Pacific "'to determine whether the employee can perform the job with or without reasonable accommodation despite the restrictions.'").

Union Pacific defeated the class action by emphasizing that the lawsuit would require an individualized consideration of accommodations and medical inquiries.  Now that Union Pacific got what it asked for, the company should not be heard to complain that it has to defend single-plaintiff cases involving these precise issues.  Defendant is not surprised by Fulbright's failure-to-accommodate claim or his unlawful medical inquiries claim.  *American Pipe* tolling therefore applies, so these claims are not barred by limitations.

Fulbright was informed of his right to sue in 2016 while the class action was pending. *See* Doc. 42-2 (exhibit B to Defendant's brief).  Therefore, when certification was reversed, he still had ninety days to file suit.  Furthermore, Union Pacific entered into a written Tolling Agreement that provided class members an additional sixty days (150 total) to file their claims in court.  *See* Doc. 45 165-167. Therefore, as long as Fulbright filed on or before August 21, 2020, his claims were timely.  Fulbright's claims are timely, and are not barred by limitations, because he filed the present suit on August 20, 2020.

**III.    Plaintiff's charge of discrimination was sufficient to exhaust administrative remedies on his second cause of action, failure to accommodate.**

Defendant's argument on this issue runs contrary to the intent of federal anti-discrimination laws, and contrary to controlling Fifth Circuit precedent on exhaustion of administrative remedies.

**A.    *Sanchez v. Standard Brands* set the standard used in the Fifth Circuit to determine an exhaustion of remedies issue.**

In *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970), the Fifth Circuit established the standard used ever since to determine if a plaintiff has exhausted administrative remedies on discrimination claims that require exhaustion.  *Sanchez* was a Title VII case, but it applies to ADA claims because the ADA incorporates the remedies and enforcement provisions of Title VII.  *See* 42 U.S.C. § 12117(a).

The Court began its analysis by providing some context, stating: "Mindful of the remedial and humanitarian underpinnings of Title VII and of the crucial role played by the private litigant in the statutory scheme, courts construing Title VII have been extremely reluctant to allow procedural technicalities to bar claims brought under the Act."  *Id.* at 460-61 (footnote omitted).[13]

The Court then emphasized that a charge of discrimination is a simple one-page form designed to be user-friendly, so "even the most unsophisticated and unlettered layman" may file a charge that meets the minimum requirements.  *Id.* at 468.  Next, the Court said a charge meets the minimum requirements if it states the facts answering the question: "what unfair thing was done to you[?]."  *Id.* at 458-463.

---

[13] The omitted footnote is a powerful explanation of the role of the private litigant, the individual victim of discrimination who files a charge and brings a lawsuit. The footnote ends with the statement: "Thus it is obvious that the private litigant's right of access to the courts must be vigilantly protected, for if the courthouse door closes in his face, enforcement of the Act ceases to exist."  *Sanchez*, 431 F.2d at 460 n.1.

The EEOC charge form allows for "amplification of the factual allegations" *id.* at 462, but the factual allegations are the key:

> The selection of the type of discrimination alleged, *i.e.*, the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged.  In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations.  Surely the only procedural requirement which should confront a Title VII complainant is the requirement that he state, within the ninety-day period, *facts* sufficient to trigger a Commission investigation.

*Id.* at 462 (emphasis in original).

Then, after reviewing the wording of the statute, the intent of Congress, and applicable EEOC regulations, the Fifth Circuit declared the standard to be used to decide a failure-to-exhaust argument:

> In *King v. Georgia Power Co.*, N.D. Ga. 1968, 295 F. Supp. 943,[14] Judge Smith held that the allegations in a judicial complaint filed pursuant to Title VII "may encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission." 295 F. Supp. at 947. In other words, the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Id.* at 465-66.  Expanding on this point, the Court added:

> Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation.  Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Id.* at 466.

Also relevant here is 29 C.F.R. § 1601.12(b), applicable to ADA claims, providing that a charge is "sufficient" when it "describe[s] generally the action or practices" complained of.  29

---

[14] *King v. Georgia Power Co.*, 295 F. Supp. 943 (N.D. Ga. 1968).

C.F.R. § 1601.12(b).  Fulbright's charge meets and exceeds the threshold in this Circuit for

exhaustion of administrative remedies.

> **B.    Fulbright's EEOC charge meets the *Sanchez* standard.**

Applying these standards to the present case shows Defendant's overly-technical

arguments fail.  A non-lawyer might know something about the ADA, and may even know it

says an employer should not discriminate because of a disability.  However, a non-lawyer is

unlikely to know the statute well enough to know the various types of discrimination claims

available under the ADA, such as failure-to-accommodate.[15] It is therefore unreasonable, and

contrary to the standard established in *Sanchez*, to require a charging party to use specific magic

words, or to specifically assert legal theories he doesn't know exist.

Furthermore, a court is not limited to the four corners of the EEOC charge when

evaluating exhaustion of administrative remedies.  The Court may also consider issues that were

part of the actual investigation. *See Clark v. Kraft Foods, Inc*., 18 F.3d 1278, 1280 (5th Cir.

1994) ("Albeit mindful that the actual scope of an EEOC investigation does not determine

whether a claim is exhausted, we are also mindful that investigation of a particular claim creates

a strong inference that such a claim was presented.") (footnote omitted); *Hayes v. MBNA Tech.,

Inc.*, No. 3:03-CV-1766-D, 2004 WL 1283965, at *6 (N.D. Tex. June 9, 2004) (court may look

beyond the four corners of the charge and "consult related documents… when (1) the facts set

out in the document are a reasonable consequence of a claim set forth in the EEOC charge, and

(2) the employer had actual knowledge of the contents of the document during the course of the

EEOC investigation.")  The Court may consider the company's position statement, and the

---

[15] A failure-to-accommodate claim is based on 42 U.S.C. § 12112(b)(5)(A).

documents it submitted to the investigator along with the position statement.  *See* Doc. 45 at 101-159.

### 1. The scope of the investigation would have reached the facts and legal issues that form the basis of the failure-to-accommodate claim.

Fulbright's charge alleged he was falsely accused by a supervisor of being impaired while on duty, and even though he had no previous write ups, he was involuntarily removed from work and placed on a medical evaluation.  This shows a supervisor knew of or suspected some medical issue, which can give rise to an obligation on the part of an employer to consider accommodations, even if the employee has not specifically asked.[16]  *See, e.g., EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d at 621 (noting that employee must make a request "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent"); *Loulseged*, 178 F.3d at 735–36 nn.4–5 (there are circumstances when an employer is deemed to be on notice).

Fulbright's charge states that he ended up losing his job "due to the results of the medical evaluation," even though no one from the company had ever contacted him "to complete a medical evaluation."  *See* Doc. 96 at 109-112 (the EEOC charge).  This shows that the employer, with knowledge of a possible medical condition, terminated Plaintiff without fulfilling its obligation to investigate and consider accommodations for the condition.

In short, the EEOC charge explains the "unfair thing" that was done to Fulbright.  The fact that he did not expressly mention specific company policies, or use the magic words "failure to accommodate," should not keep Plaintiff from being allowed through the courthouse door, as illustrated by the factually analogous case *Dye v. IASIS Glenwood Regional Medical Center*.[17]

---

[16] Defendant's brief (pages 12-13) seems to suggest that if an EEOC charge does not say the employee requested an accommodation, there can be no exhaustion.  Fifth Circuit case law does not support this position.
[17] *Dye v. IASIS Glenwood Reg'l Med. Ctr. LP*, No. 18-0981, 2018 WL 5660319 (W.D. La. Oct. 9, 2018).

In *Dye*, the charge of discrimination did not mention failure to accommodate, but the Court found a failure to accommodate claim "is related to and grows out of the allegations contained in the EEOC charge." *Id.* at \*7.  The charge in *Dye* alleged "that she was terminated after she requested, and was granted, leave from work due to her medical condition."  The court found this sufficient to provide the EEOC notice that her employer failed to provide her with a reasonable accommodation for her disability.  *Id.*

Likewise, Fulbright's charge alleged that he had a disability, it shows the employer knew of or suspected a medical condition, and the employee went out on a medical leave because of the condition.  Unlike the plaintiff in *Dye*, Fulbright was not the one to request leave from work, the employer required it.  If anything, the fact that Fulbright was involuntarily placed on a medical leave makes it more obvious than it was in *Dye* that the company was aware of circumstances where the ADA mandates and requires the employer to consider accommodations. And like the plaintiff in *Dye*, Fulbright was terminated without accommodations.  As in *Dye*, this Court should conclude Fulbright exhausted his administrative remedies on this claim and deny the motion to dismiss.

### 2. The investigation of Fulbright's charge <u>did</u> reach the issue of accommodations.

Defendant does not claim to be unfairly surprised by the reasonable accommodation claim, nor could it.  During the investigation, Defendant submitted a position statement to the investigator explaining how it followed company fitness-for-duty policies in connection with the medical examination of Plaintiff, and according to Defendant, consideration of reasonable accommodations is inherently a part of its standard company policies.

Defendant's position statement explains the medical evaluation was triggered by a Supervisor Initiated Fitness-for-Duty Request Form submitted by a supervisor, Terry Neal.

Defendant attached this form to the position statement it sent it to the investigator.  *See* Doc. 45, p. 104 (citing the manager referral form), and Doc. 45 pp. 131-133 (the referral form).  On the form, Terry Neal made it clear he was asking the medical department to investigate to see if reasonable accommodations were possible.  On page two of the form, Neal stated: "I am concerned about Mr. Fulbrights sleep condition.  He must take medication in order to sleep… We have had several conversations about his condition and how it is effecting his job along with his peers… I am also concerned about the medication having lingering effects into his daily duties.  I am also concerned whether the medication is UPRR approved…  I would like to be proactive and try to work this out before it comes to discipline."  [sic].  *See* Doc. 45 at 132.

Also attached to the position statement was exhibit 14, a Restriction Review Form.  *See* Doc. 45, pp. 153-55.  The document is addressed to Terry Neal, and it lists work restrictions the medical department decided to impose on Fulbright.  The form asks Neal if the restrictions interfere with essential job functions, and Neal checked "Yes."  Next it asks: "can reasonable accommodations be provided to allow the employee to perform the essential job functions?"  Neal checked "No."  On the next page, Neal provided some notes concerning the job and the proposed restrictions, and then the last page shows he signed the form and dated it June 29, 2015.  *See* Doc. 45, pp. 152-55.

Defendant knew the investigation included an assessment whether the company had failed to provide reasonable accommodations, because the Defendant argued it had in fact done so.  Union Pacific claims it made "many efforts to accommodate [Fulbright] over the course of several years" by providing him with a "modified work schedule."  *See* Doc. 45 at pp. 102 and 108.  More specifically, in 2015 Union Pacific claimed the company doctor (Charbonneau) conferred with Fulbright's department "to determine whether a reasonable accommodation exists

which would permit Charging Party to safely return to work in his assigned position. Unfortunately, given the nature of the work restrictions, Charging Party's department could not identify any such accommodation." *See* Doc. 45, p. 106.

Without question, a central issue within the scope of the investigation was whether Union Pacific failed to provide reasonable accommodation. Because this was within the scope of the investigation, and is the investigation that defines the scope for purposes of determining exhaustion, Fulbright exhausted his administrative remedies on this claim. Plaintiff's failure-to-accommodate claim therefore should not be dismissed.

## IV. Defendant made an unlawful request for a medical examination, and made an unlawful disability-related inquiry.

Plaintiff's third cause of action is based on the following section of the ADA:

A covered entity [an employer] shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

This section prohibits an employer from requiring medical examinations, or making disability-related inquiries of employees, unless the need is justified. The Fifth Circuit has not squarely addressed a cause of action for unlawful inquiries/examinations under this statute, so district courts in this circuit have looked to decisions from other circuits for guidance. *United States EEOC v. Gulf Logistics Operating, Inc.*, 371 F. Supp. 3d 300, 312 (E.D. La. 2019) ("with no binding precedent regarding the interpretation of §12112(d)(4)(A) in this Circuit, the Court looks to how other circuits have interpreted the provision.").

In *Burns v. Nielsen*, No. EP-17-CV-00264-DCG, 2020 U.S. Dist. LEXIS 229998 (W.D. Tex. Dec. 8, 2020), the district court used the prima facie case as defined by the Tenth Circuit. A

plaintiff establishes a prima facie claim based on this statute by presenting evidence "(1) that he is an employee of the defendant-employer, and (2) that the defendant-employer . . . made a disability-related inquiry [or required a medical examination] of him." *Id.* at *51-52 (quoting *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 901 (10th Cir. 2017)).[18]  If the plaintiff establishes a prima facie case, "'the employer may avoid liability by demonstrating that the . . . disability-related inquiry [or medical examination] was job-related and consistent with business necessity.'" *Burns* at *53 (quoting Williams, 849 F.3d at 901).

"Business necessity is an affirmative defense." *Taylor v. City of Shreveport*, 798 F.3d 276, 286 (5th Cir. 2015).  "[B]usiness necessity is an objective inquiry," and a court does not consider an employer's subjective motives for making an inquiry or requesting a medical examination. *Burns* at *53, citing *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019).

Union Pacific made a disability-related inquiry in February 2015, when it requested medical records from Fulbright about his sleeping issues and the medication he took for it.  *See* Doc. 96 at 92 (Charbonneau asking for 2 years of medical records from all providers); and letters at pages 63-64 and 66-67.  Union Pacific requested a medical examination in April 2015 when Dr. Charbonneau asked Fulbright to undergo a sleep medicine evaluation.  App. 18.  The evidence in this case establishes a prima facie case on Plaintiff's third cause of action, so Defendant is not entitled to summary judgment on this claim unless it proves its affirmative defense as a matter of law.  Union Pacific's motion and brief do not even address this as grounds for summary judgment.  Defendant's motion should therefore be denied with respect to this claim.

---

[18] The Court need not address the questions whether Fulbright was qualified or even if he had a disability because this statute covers all employees, not just persons with disabilities.

**Conclusion**

Joe Fulbright had a disability, but he never let it stop him from doing his job.  Union

Pacific, however, failed to comply with its legal obligations to conduct and individualized

inquiry and to continue an interactive discussion when it was obvious Fulbright was attempting

to comply with the company's requests.  Instead, the company made unfounded assumptions

about his condition and medication, abruptly terminated the discussion, and fired him because

Fulbright had not proved their assumptions wrong.  These facts show discrimination because of

disability, a failure to accommodate, and that the company made unlawful requests.  Defendant's

motion should be denied to these claims may proceed to trial.


Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff


CERTIFICATE OF SERVICE

On October 1, 2021, I served a copy of this document to Heather M. Miller, counsel for
Defendant, by email to hmiller@constangy.com, and to Robert L. Ortbals, Jr., counsel for
Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth
Donald E. Uloth