IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-02392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

| Page(s) | Description |
|---|---|
| 3 - 12 | Declaration of Joe Fulbright |
| 13 – 20 | Ex. 1 - Transcript of 4/21/15 call from Charbonneau and Rodino to Fulbright |
| 21 – 24 | Ex. 2 - Transcript of 5/20/15 call from Rodino to Fulbright |
| 25 – 26 | Ex. 3 - Transcript of 6/14/15 call from Fulbright to U.P. |
| 27 – 35 | Ex. 4 - Transcript of 6/29/15 call from Charbonneau and Rodino to Fulbright |
| 36 | Ex. 5 – 4/27/15 referral to Texas Medical Diagnostics |
| 37-38 | Declaration of Chris Ozuna |
| 39 - 40 | Declaration of Donald E. Uloth |
| 41 - 75 | Collective Bargaining Agreement between Union Pacific Railroad and the International Brotherhood of Electrical Workers effective January 1, 2003 |
| 76 – 77 | Email exchange between Terry Neal and Kristin [last name redacted by U.P] dated September 17, 2015 regarding EEOC Questions |

| | |
|---|---|
| 78 – 82 | First Amended Notice of Intent to Take the Oral Deposition of Union Pacific Railroad Company |
| 83 – 93 | Excerpts from the deposition of Dr. John Charbonneau |
| 94 – 113 | Excerpts from the deposition of Terry Neal |
| 114 – 116 | Excerpts from the deposition of Jason Ensign |
| 117 – 122 | Excerpts from the deposition of Dr. John Charbonneau testifying as Defendant's designated 30(b)(6) representative |
| 123 | Excerpts from the deposition of Stephen Hale testifying as Defendant's designated 30(b)(6) representative |


Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

On October 1, 2021, I served a copy of this document to Heather M. Miller, counsel for Defendant, by email to hmiller@constangy.com, and to Robert L. Ortbals, Jr., counsel for Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth
Donald E. Uloth

DECLARATION OF JOE M. FULBRIGHT

1. My name is Joe M. Fulbright. I am over twenty-one (21) years of age and I am competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I was an employee of Union Pacific Railroad Company from March 1985 through approximately July 1, 2015. There was a gap in there because I was terminated in 1998, but an arbitrator ruled that I should not have been terminated, and I was reinstated and returned to work in early 2000. My title from then though the end of my employment was Senior Communications Technician. This was a union job covered by the terms of a Collective Bargaining Agreement (a "CBA"). My duties included installing, maintaining, and sometimes repairing various devices and communications equipment. I did not work on moving trains.

3. In the late 2000s (in 2008 or 2009, but I am sure that it was after 2006) the company reallocated the duties and the on-call requirements of my position for the technicians who worked in Fort Worth, Texas (there were six or seven of us at the time). They created a new position called Restoration Technician to be primarily responsible for restoration of service, fixing broken equipment. The rest of us were classified as Installation Technicians and we were mainly responsible for projects, installing equipment, and maintaining equipment (like replacing dead batteries and doing computer updates).

4. The new Restore Technician was a bid position. There were two openings and we could bid for the jobs, and they were awarded based on seniority. I was the most senior technician and I would have been awarded the position if I had bid, but I did not, so I became an Installation Technician. My formal job title did not change, but internally in Fort Worth, this was the terminology.

5. The Restore Technician job came with an extra dollar per hour in pay, but in exchange the Restore Technicians were on call nights, weekends, and holidays, whereas the Installation Technicians were not on call outside of our normal weekday shift (Monday through Friday).

6. To ease the load on the Restore Technicians, the other Installation Technicians and I came up with a voluntary rotation covering weekends and holidays. On any given weekend or holiday, a volunteer was on call, and he would be the first person contacted if something was needed – all of the other technicians, Restore and Installation, were not on call, and they could do whatever they wanted. When a technician was not on call he was not required to answer a call and there was no discipline for missing a call or deferring the call to someone less senior.

7. In January 2009, I began taking Trazodone for my insomnia. On January 26, 2009, I told my immediate supervisor, Terry Neal, that I would be taking Trazodone at night to help me sleep. Neal told me to call a nurse in the company's Health and Medical Services Department ("HMS" or "Medical" for short) to let them know. I called HMS that day, and I told a nurse in that department I would be taking Trazodone. It was not on the company's list of prohibited prescription medications, and since I would be taking it on my own time, I was not asked to or required to do anything further. I got a letter reminding me to comply with Union Pacific's Drug and Alcohol Policy, and a true and correct copy of this letter is Bates numbered UPFULBRIGHT 1074-1075, but Union Pacific did not impose any work restrictions. This letter was not sent in connection with a return-to-work, but rather because I told HMS about the medication.

8. We had monthly safety meeting, and at the first monthly safety meeting after I started taking Trazodone, I told all of my coworkers that I would be taking it most nights to sleep. My coworkers, plus Hale and Neal, all agreed that I would not have to go out on calls at night if I had already taken Trazodone that night.

9. I could have chosen not to participate in the rotation, and I would never have been on call outside of my regular shift. However, I did volunteer for the rotation with the understanding that I would not have to go out on calls at night if I had already taken Trazodone that night.

10. When it was my weekend to be on call, I did not take Trazodone on Friday or Saturday night, so I would be available to go to work if I was called. However, I always took Trazodone on Sunday night so I would be rested for work. I told all my coworkers, and I told Hale and Neal I was doing this and no one ever objected or said that I should do anything differently. If one of the other technicians had objected to this accommodation for Sunday nights I would have agreed to even things out by covering someone else's night on their weekend. It never came up, so we never even discussed doing it that way.

11. This arrangement for Sunday nights on my volunteer weekends was in effect for the last few years of my employment, and it did not place any burden on Union Pacific. It was only necessary once every three or four weeks, when it was my turn, and the only burden was on one of the other technicians if someone was needed on a Sunday night, which did not happen very often. I had covered for other coworkers many times before when they needed accommodations. For example, in the mid-1990s one of my coworkers, Ken Horton, was an alcoholic, and I covered several of his calls per month.

12. During my last six years of work, from January 2009 through February 3, 2015, I do not remember ever being called to go work on something after 7 p.m., with one exception. I was on call the weekend of January 23-25, 2015. A little after 7:00 p.m. on January 25, 2015, I noticed I had missed a call a few minutes earlier from headquarters in Omaha, so I called the number that showed up on my caller ID. An automated system answered, and I was unable to reach a live person. I had not yet taken Trazodone that evening, and I could have responded if necessary, but it was close to my normal bedtime for Sunday of my on-call weekend, so after another twenty minutes or so when I did not get another call, I took Trazodone and went to sleep.

13. The daytime drowsiness I have experienced since I began taking Trazodone happened on days when I was up for much of the night before. I was taking care of my mother who had Alzheimer's, so I was frequently up with her when I would have normally been sleeping, so I sometimes did not get enough sleep and was tired the next day.

14. On January 26, 2015, Terry Neal scheduled a meeting with me, and he said I might want a union representative present. That afternoon, I met with Terry Neal in his office, along with my BRS (Brotherhood of Railroad Signalmen) union representative, Jim Espinoza. Neal handed me a two-page document called Formal Conferencing/Training. Neal told me this was not disciplinary, but I disagreed with something that it said, so I made a handwritten note on the document before I signed it. A true and correct copy of this document has been Bates numbered by Defendant as UPFULBRIGHT 951-952.

15. Neal also told me he was referring me to HMS for an evaluation. He said he was not removing me from service pending the results of the evaluation so I would keep working, and that was even noted on the second page of the Formal Conferencing/Training form. Neal even told me two or three times in this conversation that I was doing a good job, some of my best

work ever. Neal explained that he just wanted something in writing from HMS indicating they were aware of my sleep disorder and medication, and saying whether there were any changes or work restrictions required. Neal even stated they might come back with something like a suggestion that I not work nights.

16. At the end of the meeting, Neal handed me a Supervisor Initiated Fitness-For-Duty Request Form. A true and correct copy of this document has been Bates numbered by Defendant as UPFULBRIGHT 182-183.

17. I worked my regular shift the rest of that week (January 26-30, 2015) plus the following Monday and Tuesday (February 2 and 3, 2015).

18. As I was getting home from work on February 3, 2015, I received a call from a company nurse telling me I would no longer be allowed to work while the fitness-for-duty evaluation was going on. I was placed on a medical leave, and I was not paid after that.

19. Union Pacific later asked me to provide "physician clinic notes (also known as office notes or progress notes) from the provider treating you for this condition." I had not seen Dr. Kelly since 2010, she retired, so there really wasn't anyone treating me for the sleep condition except for my primary care doctor, Veemal D'Souza at Kaner Medical Group, who refilled my Trazodone prescription. I therefore asked Kaner for their records. I called and asked them within a day or two after being asked for records. It was a small clinic, and there was just one lady there responsible for providing records, and it took her several weeks to get them ready. When they were ready near the end of March she asked me to sign an authorization form, and I got the records in early April 2015. I tried faxing the records on April 2, 2015, but there was a problem with the fax and most of the pages did not go through. On April 10, 2015 I was able to send all the records to Union Pacific.

20. Union Pacific had previously obtained my medical records from Kaner and other doctors in 2014, when they did two fitness-for-duty evaluations. With the records from these prior evaluations and what I faxed in April 2015, Union Pacific had all my physician clinic notes from Kaner and D'Souza going back a full two years from when they were requested. In other words, I provided Union Pacific with all medical records they asked me to provide. I spoke to several people in HMS after I faxed the records, and no one ever asked me if there were more records, and no one ever said they didn't think they had received everything they needed.

21. On April 21, 2015, I received a phone call from Theresa Rodino and Dr. John Charbonneau. By this time I had started to record all my calls with HMS so I would have a record of what we discussed. I recorded each of the telephone calls mentioned in the remaining paragraphs of my declaration using a digital recorder that functions properly and made accurate recordings of the calls. The recordings have been in my possession continuously from the time I recorded them through now. I recently had the recordings transcribed by an online service (rev.com) that does not certify the transcript, so I then carefully reviewed each transcript while listening to the recording that I made, and I corrected the transcripts where necessary for accuracy and completeness. The transcripts attached to my declaration as Exhibits 1, 2, 3, and 4 are true and accurate written texts of the words spoken during each of the respective calls. I recognize the voices to be the person identified in each of the transcripts, and this includes the Exhibit 3 – I did not get the person's name, but I recognize the voice as the person who answered when I called HMS on June 14, 2015. A true and correct transcript of the April 21, 2015 call with Theresa Rodino and Dr. John Charbonneau is attached to this declaration as Exhibit 1.

22. During this April 21, 2015 call, I explained to Charbonneau that my psychiatrist who originally prescribed Trazodone retired, so I was not sure what information they wanted

from Dr. D'Souza. Charbonneau said he wanted me to tell my primary care doctor that I was supposed to have a "sleep medicine evaluation" done by a "sleep medicine specialist," and if I carry that message to my doctor, he would not need to speak to her. He never asked me for permission to speak to my doctor and if he had, I would have been fine with that and given him her phone number. No one at Union Pacific ever asked me to sign a release to allow Dr. Charbonneau to speak to my doctor – not by phone or by letter, never.

23. I was not familiar with the term sleep medicine evaluation, but it sounded like Charbonneau was asking for an evaluation of the sleep medicine, the Trazodone. Charbonneau did not explain the term, he just said he wanted "some documentation that supports the nature of the problem, the risks and benefits are of the medicine you take, and things like that." He never said he wanted a sleep study, or testing of any kind. I thought I understood what he was asking for, an evaluation of the medicine, I agreed that I would do what he had asked.

24. And I did what Charbonneau had asked me to do. I made an appointment to see my primary care physician, Dr. Veemal D'Souza, to get a referral to a sleep medicine specialist, and I went to see her on April 27, 2015. I told her what Charbonneau told me to say, that I was supposed to go to a sleep medicine specialist for a sleep medicine evaluation.

25. D'Souza told me to make an appointment to see a sleep medicine specialist at Texas Medical Diagnostic, Inc. ("Texas Medical"). She signed a form giving me the referral, and a true and correct copy of this form is attached to my declaration as Exhibit 5, Bates numbered UPFULBRIGHT 2104.

26. I called Texas Medical and explained by phone that I needed to see a sleep medicine specialist for a sleep medicine evaluation. The person I spoke to scheduled me for their next available appointment, which was for June 1, 2015.

27. On May 20, 2015, I received a phone call from Theresa Rodino. A true and correct transcript of this phone call is attached to this declaration as Exhibit 2. She asked me for an update on getting the sleep medicine evaluation, and I told her about my appointment at Texas Medical on June 1, 2015. Rodino did not say anything about needing more medical records.

28. On June 1, 2015, I went to my appointment at Texas Medical. At the front desk I have them my insurance card for the health-care coverage I had through my employment with Union Pacific, and I paid the $35 co-pay. While I was waiting in a room to be seen, the lady at the front desk came in and told me my insurance was cancelled and I would have to pay another $40 to proceed with the appointment. I did not have that much so I borrowed $20 from Chris Ozuna, who drove me to the appointment that day, and paid the rest so we could proceed. I have no idea whether insurance would have covered the cost of the sleep study and testing that was later recommended. My lawyer has tried to get this information from Union Pacific, but they have refused to produce any information or documents that would show what was and was not covered by the insurance I had through Union Pacific in 2015.

29. The person I met with had me fill out some paperwork, and he told me that before seeing a specialist I had to undergo some sort of overnight sleep testing where I would be connected to various monitors while I slept. He also said the testing would cost about $600.00. This made no sense to me because I had only been asked to have the medicine evaluated. I had not been paid for about four months, and I did not have the money available to pay for this testing. Furthermore, because Dr. Charbonneau did not tell me to have a sleep test or undergo any testing, I did not see any reason to pay the money and have the testing done when that's not what he told me to do.

30. On June 14, 2015 I called HMS. I recorded this conversation and have recently had it transcribed. A true and correct transcript of this phone call is attached to this declaration as Exhibit 3. The lady I spoke to by phone told me that Pam Pachaud would contact Texas Medical, get the records, and call. Having been told by HMS they would get the records, I never thought to get them and send them myself.

31. On June 29, 2015, I received a phone call from Theresa Rodino and Dr. John Charbonneau. A true and correct transcript of this phone call is attached to this declaration as Exhibit 4. I explained the Dr. Charbonneau that Texas Medical would not do an evaluation of the medicine unless they did a sleep study first, which would cost me $600 that I did not have. I explained that for two reasons -- (1) Charbonneau never asked me to have tests done, and (2) I did not have the money – I was not going to have the test done. I then offered to try to find some other specialist who would do the evaluation of the sleep medicine.

32. Charbonneau did not say anything more about what he was asking for. He did not give me an explanation about what a sleep study was, and he did not ever tell me that a sleep study is part of a sleep medicine evaluation so it was required before I could return to work.

33. I have never spoken to John Charbonneau except for the two phone calls described above on April 21 and June 29, 2015. I have never communicated with him in writing.

34. If Charbonneau had told me he wanted me to have a sleep study, I would have agreed to do that so I could get back to work. But Charbonneau did not explain, and he did not say anything about having the company cover the cost of the testing. Rather, when he called me on June 29, 2015, he had already made up his mind, and he proceeded to tell me that he was imposing sudden incapacitation work restrictions on me. Rodino then explained that I would not be allowed to return to my job.

35. Charbonneau did say he would consider any additional medical information should I provide any, but he did not explain to me what he believed he was missing that might change the outcome. If he had explained, if he told me I might be able to come back to work if I had a sleep study done, I would have done it if at all possible, anything to get my job back. At that time, I was just two years short of full retirement, so I would not have refused any reasonable request.

36. A few days after this call with Charbonneau, I got a July 1, 2015 letter summarizing the work restrictions and confirming that I would not be allowed to return to work. Union Pacific never told me I was fired, but they did make it clear that I had no job and was no longer going to be paid, so to me it's the same thing. The July 1, 2015 letter talked about vocational assistance from Union Pacific finding some other job within the company, and not long after I got the letter I spoke by phone to someone about the company's offer of assistance finding another position. He told me there were no jobs available for me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2021.

Joe M. Fulbright

Telephone call on April 21, 2015

Theresa Rodino:

Hello, Mr. Fulbright?

Joe Fulbright:

Yes.

Theresa Rodino:

Hi it's Theresa with UP health and medical.

Joe Fulbright:

Yes.

Theresa Rodino:

And I have Dr. Charbonneau on the other line, and I'm sorry we're a little bit late. I had another call I had to make before yours. Is this still a good time for you?

Joe Fulbright:

Yes.

Theresa Rodino:

Okay. Here we go. I'm going to put him on the phone.

Joe Fulbright:

Okay. Dr. Charbonneau?

John Charbonneau:

Yes.

Theresa Rodino:

Oh, hi. It's Theresa again. I have Mr. Fulbright on the line, and Mr. Fulbright, you wanted to talk about the, the release of information, getting that signed with Dr. Charbonneau, to be able to speak to your doctor about your, your case.

Joe Fulbright:

Well, yeah. What I was wanting to get clear is this doctor that took over the prescription of the medication that my psychiatrist had originally prescribed for me, she doesn't have much in, by the way of evaluation of anything, other than being able to prescribe the drugs after my doctor retired. So I'm not sure what they want from her.

Theresa Rodino:

And this is the Dr. D'Souza? The one that…

Joe Fulbright:

Right.

Theresa Rodino:

... we're asking for the release from?

Joe Fulbright:

Right.

Theresa Rodino:

Okay.

John Charbonneau:

First of all, good afternoon Mr. Fulbright. Thanks for the opportunity to visit with me about this. I want to introduce you, myself to you, tell you what I do and who I am. And then I'll tell you the reasons for the request that you sign the release of information. And then if you're not comfortable with it, I think I'm going to be comfortable with that. I'll just tell you what we need and why we need it. Is that okay?

Joe Fulbright:

Yes, that's fine.

John Charbonneau:

Okay. First of all, my name is John Charbonneau. I'm a board certified occupational medicine doc. I have been working in the field for 38 years. And I've been a consultant to Health and Medical Services for 26 years. I work with Theresa as a fitness for duty nurse and some of the other nurses, and basically our job can be summed up by saying that we work on fitness for duty issues. We try to make sure that when employees are coming back, either from injuries or from off-duty medical illnesses, things like that, that they're ready to be back to work. That the medical supports that. Okay?

In some cases, such as yours, we get a request from a manager to, based on variable amounts of information, about whether or not it's safe for someone like you to be at work. And that's how Theresa and I became involved in requesting information from you. You were kind enough to make about a year's worth, as I recall, of medical information available, and it clearly documents that you've got about... I don't know how long it's been going on... but for at least a year, you've had a problem with what we call sleep onset insomnia and have required some medication for that.

Joe Fulbright:

Yeah. Four years... four years ago was when I first was prescribed that medication. I've been taking it continuously since that time, almost every night.

John Charbonneau:

Okay. Has it been Trazodone all of that time?

Joe Fulbright:

Yeah. Trazodone, at least three out of four nights, and for long stretches, eight and sometimes 10 nights in a row.

John Charbonneau:

Yeah. And as you know, Trazodone is an old anti-depressant medicine.

Joe Fulbright:

Right.

John Charbonneau:

We don't use for depression a whole lot anymore, but it is a great sleeping medicine. It's a very effective sleeping medicine. Again, I don't know everything about your circumstances, but I know that it's been prescribed to help you fall asleep.

And if Theresa and I understand the issues right, there is a concern, perhaps shared by you, but certainly on the part of your management, that if you have to take those medicines on a night when you're still on-call, are you going to be able to answer the bell, so to speak. And also will you be able... we'll be taking to medicine on board, that's supposed to make you drowsy and put you to sleep.

So, that's where we were when we discussed this case. Theresa and I both have superiors to whom we report and we discussed it with them and we decided that the best perceptive way to handle this, was to ask you to have a sleep evaluation.

And that's when the issue came up about, okay, we don't want his doctor to think that we're second-guessing them, because we only know a little bit about your situation. Your doctor knows more than we do about it. But we wanted to make, help them understand why we were requesting that you have a formal sleep medicine evaluation, and our hope from that, Mr. Fulbright is that you'll get whatever medication regimen or whatever you need, that will allow you to do your regular work. And then we're all done with this situation.

I just wanted to convey to your doctor that we weren't second guessing them, and secondly explain the reason for the sleep medicine evaluation. Just because there is, you know, some safety issue in that. That's it. If you want to carry that message to your doctor, we're good with that. I don't have to speak with your doctor. So, that's where we are. Please ask any questions you have.

Joe Fulbright:

Well, I think y'all need to understand some history about this. Four years ago, when I went to a psychiatrist, you know, I had to learn everything I could about my medical condition. And I think it's important to understand how thoroughly we went over this problem, and how well my doctor was able to understand what had happened to me.

I had gone through about a 10 to 15 year severe shortage of B12. And that causes, you know, it causes neurological degradation, all over your body and in your brain, and what, whatever it did, the psychiatrist, one of the first things she said was that's, you know, B vitamin deficiencies are a fast track to mental illness. And since there was no, there were no problems with my personality. There were no personality disorders. It was the hypothalamus. That part of the brain that seems to have took the hit, and that regulates sleep, body temperature. I read through all the stuff that it regulates. My appetite was strange enough, but when I was put on Prozac and Trazodone, within two weeks, the Prozac started to have an effect with me, but Trazodone was immediate. You know, it was the first night I took it.

Joe Fulbright (cont'd):

The Prozac, after about four weeks of taking it, I could taste food again. And I don't know what you know about serotonin, but that's one of the more common things people notice when serotonin levels are made normal again in the brain. And I really noticed that. And I had all this input and you know, seeing my psychiatrist over a period of about a year, and we verified all this stuff you know... that it was, uh, it had something to do with the relationship of serotonin and the brain. And it was normalized to some degree. I don't know how much, but I was able to sleep.

I went from being just almost, you know, dysfunctional, to being evaluated by not only my psychiatrist, but everybody that I took, everybody that, you know, that I worked with, were noticing an improvement on these drugs. And so over four years, you have to understand that I was evaluated continuously by people around me, family members, everybody, including three doctors.

And there is no question that that's what's causing me to be functional now and to maintain a sleep schedule where I don't have something like narcolepsy, where I fall asleep during the day, is something that allows me to sleep at night.

And the real issue here is I was totally approved to take this drug, knowing that they could not call me while I was on this drug, four years ago. Now I've got a manager now that's got some kind of problem with some of his other people and they, I don't know if they've complained, or whatever, but the understanding was that even on a call weekend, I would try not to it for two nights in a row. But the third night, he understands I'm going to have to take it. And he's trying to say that, that I'm either going to give up this medicine, so that I can take calls, or I'm not going to have a job there.

And you have to understand that my job... I have assigned work hours during the day. My job doesn't depend on me being called out to do my job. We answer calls typically for emergency restoration of service. But over the years, through medical accommodations, some people can't do it at night. And, like I told my boss, the medical accommodation for the modification of their job, where they didn't take calls, wasn't provided by the Union Pacific Railroad. It was provided by employees like me that came out and covered their calls. That's how their medical accommodation was provided.

I've basically got a boss that's told me that if I start having the same medical problems everybody else had out there in the history of working there at 54-years-old, that I'm not going to be able to work there. And that's the real issue here.

He's saying, "During the day, you know, you've got to keep up with these 20-year-olds and at night, you're going to take the same amount of calls all the rest of the people have." So there's some real issues here where... I got, I got pretty upset about this thing the first time I talked to the medical department, because my boss somehow slipped in, or somebody in the medical department, slipped in an accusation that I was coming out under the influence of this drug, where... to the point where I was impaired. Nobody has ever seen me on property impaired from anything other than the residual effects of a drug that allowed me to be much more awake and alert. Like sleep. You know, it allows me to sleep really good.

And somebody originally told me from the medical department, "Hey, we have concerns that you might be impaired while you're on property with this drug," but nobody's seen me on property impaired. If he would have seen me, he would have drug tested me. I would have been pulled out of service, pending a drug test, whatever. None of that was done.

So I hear this accusation now that I was on company property impaired, when in fact, the accommodation I have is to make sure that I'm not on property impaired. So, you know, somebody is trying to kind of twist this thing around and I think y'all have a big problem with this manager that told

Joe Fulbright (cont'd):

you he wanted the evaluation. He's not, I don't think he's telling you, I don't think he's telling you the truth about all this.

John Charbonneau:

Mr. Fulbright, I think there's a lot of information you've just shared with us. So that's good. I appreciate you doing so.

John Charbonneau:

What I'm not sure of is that anyone has told me or Theresa, and Theresa, you correct me, because you've talked to more people than I have. I'm not sure anyone has said that you have been out there impaired. I think the concern is that if you get called in, after having taken some medication, you might be. That's the only aspect, you know, of that that's akin to what you just described. Theresa, am I wrong in that statement?

Theresa Rodino:

No, no. And I think sometimes non-medical people, they may use that word in a different way, you know, impaired. That a medication could impair you from doing your normal work. And not that anybody's accusing you that you have said that, but I didn't see that at all in the manager referral. Just that concern from what you told the manager.

Joe Fulbright:

Okay. Well it come, you know, maybe it comes down to this issue then. He's saying that if I take a medication on my own time at home, because I might be called, I have to stop taking it, or I don't have a job there. And that's ridiculous.

Theresa Rodino:

And I haven't heard that either. I haven't heard that, because you have to take it you might not have a job.

John Charbonneau:

That's not been part of my information Mr. Fulbright.

Joe Fulbright:

No. He met with me, see, before this happened, and a Union representative, and that's one of the things he said. "I can't have you taking this medication, missing calls." That was stated specifically... that's almost an exact quote.

Well, that's not going to work for me at all. And as far as a medical evaluation, doing a physical and all this, none of that tests for serotonin levels. None of that... any of that has anything to do with how well I sleep at night.

You're not going to be able to test for this. It was the input, you know from somebody that knows how to evaluate a person. Like I said before, that has, you know borderline levels of serotonin, a brain chemical, that's hard to even test for. I don't know there is a test for that. It's when you notice the subtle things.

I was diagnosed with depression, I think Marie Kelly was the psychiatrist that treated me. She at one point stated that it probably is depression. And, you know it's a form of, at least temporarily, degenerative condition in the brain, that has to do with brain chemicals.

And that, you know, they want, I was told originally, I'm going to have to do this medical evaluation with blood being drawn and test for all this stuff. That's not going to do a single thing to determine my fitness for duty. In fact, on property, he said that my job was excellent. I was doing an excellent job and there was, you know he let on nothing about the impairment that I guess he makes reference to in some of my other paperwork. He's concerned that I may be impaired while I'm on property, I believe, is the way he states that.

Theresa Rodino:

I think the concern for us was just the sleeping issues and Dr. C, I think that's what we're reviewing here. And Mr. Fulbright, is, you know, that the medication could prohibit your ability to fulfill your duties for the restoration of service after normal business hours. So it's for the sleeping, the medical sleep issues for us to address. That's what we're tasked with.

Joe Fulbright:

Right, and here's the issue the manager has. If I take anything that's going to help me sleep, it's going to be illegal for me to drive in the state that I live in. That's been made very clear. If you know something's impairing your alertness, in the state of Texas, and you drive under the influence, you are in violation of the law. Period.

Now it was a safety meeting about, I don't know, two years ago, that I went to, where they invited the Department of Public Safety, the county law enforcement there, to give us a discourse on what constituted impaired driving. Over-the-counter, prescription drugs, anything you know impairs you, it's illegal to drive under the influence of it.

Theresa Rodino:

Well, Mr. Fulbright, in order to move your case along and to get the questions answered that we need to get answered for your fitness for duty, Dr. Charbonneau, what I understood you to say, is that if Mr. Fulbright goes to his physician and request this, that that would answer your question.

John Charbonneau:

Yes.

Theresa Rodino:

So I guess, to bring this to a, to where we need to go from here, what's the next step?

John Charbonneau:

Well, again, Mr. Fulbright may have come to the conclusion that if... to help sort it out, that we're going to ask you to get a sleep medicine evaluation. A consultation. And again, that's something that we would like you to talk with your doctor about. And you can use local resources, so just so we can see if there are any ways to work around it. And I'm not trying to tell you, you have to change your medicine. We just need to get some documentation that supports the nature of the problem, the risks and benefits are of the medicine you take, and things like that. So that's why we request that, and as I said to start

this, if you'll carry that forward to your doctor and get a sleep medicine evaluation, I don't need to talk to your doctor.

Joe Fulbright:

Okay. Well, that's what I'll do. I'll schedule appointment with my doctor. My doctor's not a sleep expert or a psychiatrist. My psychiatrist is retired and I'll talk with her about this medicine. I'll find out what she would be comfortable with to give you an evaluation of how well I'm doing on this medicine.

Theresa Rodino:

And it's called a sleep and medicine evaluation.

Joe Fulbright:

Okay.

Theresa Rodino:

Right, Dr. Charbonneau?

John Charbonneau:

Right. There's a group of doctors, most of them belong to the... it's called then AASM, American Academy of Sleep Medicine. There are a couple of certifying agencies. So again, we want you seen by a Sleep Medicine Specialist. Mr. Fulbright, is there a big city near you? I'm sorry, I don't know where you live.

Joe Fulbright:

What was that?

Theresa Rodino:

He said, are you in Fort Worth? Is that where you live?

Joe Fulbright:

No, I live in between Dallas and Fort Worth, in a little town called Euless.

Theresa Rodino:

Euless.

John Charbonneau:

Okay. Yeah. I mean, with those two major metropolitan areas, there'll be plenty of sleep medicine docs around... and your doctor will have a consultant that he or she usually uses, so... but it won't be a problem. If you give your primary care doctor the okay of getting a sleep medicine evaluation.

Theresa Rodino:

By a specialist. So, yea you'd ask for a referral.

Joe Fulbright:
Okay.

Theresa Rodino:
Okay.

Joe Fulbright:
Okay. Thank you.

Theresa Rodino:
All right.

John Charbonneau:
Thank you Mr. Fulbright.

Joe Fulbright:
Okay. Bye-bye.

Theresa Rodino:
Thank you Mr. Fulbright, thanks Dr. Charbonneau.

John Charbonneau:
Thanks.

Theresa Rodino:
Bye-bye.

John Charbonneau:
Bye.

Telephone call on May 20, 2015

Joe Fulbright:

Okay, you said this is Theresa?

Theresa Rodino:

Yep, with health and medical. I'm the nurse for fitness for duty. Was just checking to see where we're at and how you're doing? I think you were setting up a test through your doctor.

Joe Fulbright:

Well, I was going to talk to a sleep medicine specialist, and she got that set up. And earliest appointment they had was the 1st of this next month.

Theresa Rodino:

Oh, okay. All right. Well, let me put this in here because I could not remember. Sleep medicine specialist, the first available appointment is the first, I'll just put here the first week of June. Did they give you a date yet?

Joe Fulbright:

June 1st.

Theresa Rodino:

Oh, okay. I know that it takes about a month. So June 1st, it took you a little bit over that.

Joe Fulbright:

What's that?

Theresa Rodino:

I said I think it took you a little bit longer than that, because it seemed like we talked with you last April. So, but it usually does take at least a month to get in. First available...this appointment...

Joe Fulbright:

Yeah. I had to go to another town because the only one they had here locally was even two or three weeks later. So I got one for another town.

Theresa Rodino:

Okay. And is that just to meet with a sleep specialist? That's not for the actual test?

Joe Fulbright:

Well, they're not supposed to do any tests. I was supposed to talk to them about the drug I was on.

Theresa Rodino:

Let me check my agenda, make sure. That might be right. I was thinking that you were having a test too. Let me see what he put on here, with Dr. Charbonneau is down here April 21st. Okay, now this is from Dr. Charbonneau. He says on here, oh, you're going to have a sleep medicine evaluation.

Joe Fulbright:

Yes.

Theresa Rodino:

And then he just wants to wait on that report from the sleep medicine evaluation. Let me see what it says, Dr. Charbonneau, he says "We had a conference call with the employee. I summarized the nature of the manager referral and the process." And then of course he asked about talking to your doctor. Employee explained that he's been dealing with depression and sleep problems for 10 to 15 years. Frustration with a deficiency, he found a psychiatrist that found out he had a vitamin B12 deficiency, low serotonin in the hypothalamus, started on Trazodone and Prozac and presumably B12... Or B vitamin B supplements.

He's done much better with the insomnia ever since... Until he… Stated that he would never report to work or even drive his car after taking the medicine. States that he's awake, alert during the day because he can sleep well at night. Takes the medicine anywhere from three to four up to eight to 10 nights at a time. I just want to make sure that I get everything in here that the doctor wanted you to have. I have to read through the notes. I'm sorry. We both, okay... I'm going to start from... He charged that his management made false statements about him being impaired due to the medication, but we noted that no such statements have been made to us. Number five, we need an... Okay, the end of the conversation is that we need a formal sleep medicine consultation and would be satisfied if he would relay that information to his primary care doctor.

And this was in lieu of Dr. Charbonneau, the company doctor, speaking your doctor, but you did that. So number six, the employee is to consult his doctor and request a formal sleep medicine evaluation. Okay. We explained to him that the evaluation has to be fulfilled by a sleep medicine specialist, <u>which you're doing. And that was it. So we just need that report</u>.

Joe Fulbright:

Okay.

Theresa Rodino:

Isn't that interesting? All right.

Joe Fulbright:

Okay, thank you very much.

Theresa Rodino:

No, yeah, I just wanted to make sure. Okay. And so the appointment is on the 1st, normally it takes your doctor anywhere from five to 10 days to get me that report. So if you could go ahead and request it as soon as possible, when you meet with them. And then our doctor can make a determination for your return to work. So what else? If you have any questions where you're at, because it looks like your

Theresa Rodino (cont'd):

medical leave ended May 3rd. So it sounds like if you have your appointment on June 1st, I should extend that. Right? Let me change the... Did you say your appointment is June 1st?

Joe Fulbright:

Yes.

Theresa Rodino:

So if we go out seven days, that'd be June 8th, 10 days would be the June 10th. Why don't we just say June 15th to be safe? Does that sound okay?

Joe Fulbright:

Yeah, whatever y'all have to do.

Theresa Rodino:

To extend your leave, your medical leave? Because they had you in a medical leave. Normally I'll put you in TP status, but I'll just keep going the way that you have been going. It extends your benefits, that type of thing. So, especially since we talked with our doctor, I'm going to say this. We'll just do it till June 15th, because I'm sure that you'll have the report by then. And I would think we'd have a determination for your return to work after doctor gets that report.

Joe Fulbright:

Okay.

Theresa Rodino:

All right. Now do you have any questions for me or anything that we need to do?

Joe Fulbright:

Um, no.

Theresa Rodino:

Okay. All right. Well, give me a call if there is. And you have the fax number to fax the report to us as soon as you get it. So we'll be watching for that, okay?

Joe Fulbright:

Okay.

Theresa Rodino:

Let me know if there's anything that comes up or you have some questions, okay?

Joe Fulbright:

Okay. Thank you, Theresa.

Theresa Rodino:

Thank you. Bye-bye.

[Theresa Rodino hangs up]

Joe Fulbright:

And that's Theresa, I guess, with health medical services for the Union Pacific Railroad. It's Wednesday, May 20th, 10:39.

Telephone Call on June 14, 2015

Joe Fulbright:

Okay. Yeah, I'm calling about, they told me to go to a diagnostic center to have my sleep medicine evaluated. I've done that. And they had the release for the Union Pacific Railroad that wanted the information, and I have their number here.

Speaker 2:

Okay, and UP was requesting this information?

Joe Fulbright:

Yes.

Speaker 2:

Okay. And so which that diagnostic center did you go to, sir?

Joe Fulbright:

It's Texas Medical Diagnostics.

Speaker 2:

Okay. And their number?

Joe Fulbright:

Their number is (817) 820-0427.

Speaker 2:

Okay. And then may I grab your employee ID number as well?

Joe Fulbright:

It's 0251592.

Speaker 2:

Okay, let me just get you verified really quickly and then I will let our nurse know that's managing this for you, okay? Last four of your social?

Joe Fulbright:

It's 4726.

Speaker 2:

Address and telephone number as well, please.

Joe Fulbright:

The address is 807 Oakwood Drive, Euless, Texas. And the zip, zip code is 76039.

Speaker 2:

Perfect. Okay, let me put you on a short hold here for a moment. I'll be right back.

[on hold music plays]

Okay sir, thanks for holding. So Pam is the nurse who will be handling this for you. I'm going to get information over to her. Would you like her to call you back then once she receives the information from the Texas Medical Diagnostics Center?

Joe Fulbright:

Yes, please.

Speaker 2:

Okay. And then is it better to call your cell or your home?

Joe Fulbright:

Uh, cell phone.

Speaker 2:

Okay, let me just get that changed here. Okay, I have this sent over to Pam, and I would anticipate her either giving you a call later this afternoon or first thing tomorrow morning, okay?

Joe Fulbright:

Okay. Thank you.

Speaker 2:

Anything else I might be able to help you with?

Joe Fulbright:

That's it.

Speaker 2:

Okay, you have a great day then.

[Speaker 2 hangs up]

Joe Fulbright:

See, that wasn't so hard, was it? And that is June 14th, 2015.

Telephone call on June 29, 2015

Joe Fulbright:

Hello.

Theresa Rodino:

Oh, hello. Mr. Fulbright?

Joe Fulbright:

Yes.

Theresa Rodino:

Hi, this is Theresa again, with UP Health and Medical Services.

Joe Fulbright:

Yes.

Theresa Rodino:

And I have Dr. Charbonneau on the line. Dr. Charbonneau is the UP company doctor, he's our associate medical director that's been reviewing your case, and I think that you spoke with him before. And I'm going to go ahead and put myself on mute and I'll turn over the call to Dr. Charbonneau and he'll talk to you about your determination. Okay?

Joe Fulbright:

Okay.

Theresa Rodino:

Okay, here we go. Dr. Charbonneau?

John Charbonneau:

Good morning, Mr. Fulbright. John Charbonneau here, okay?

Joe Fulbright:

Yeah, how are you doing, John?

John Charbonneau:

Good, good. We, um, last spoke on April 21st in preparation for Theresa and I calling you to get that note. I guess I'm going to just, outline, keep my comments kind of restricted to what we've done since the last time you and I and Theresa spoke, if that's okay with you.

Joe Fulbright:

Yeah, that's fine.

John Charbonneau:

Okay. When we spoke on April 21st, when we left that call, we had a plan to ask you to ask your physician to refer you to a sleep medicine doctor for an evaluation. So I guess the first question I have for you is, have you made headway on that or you plan on going forward with, with that evaluation?

Joe Fulbright:

Yes, I went and had an appointment and made the appointment and called back the medical department and gave them their telephone number so that they could arrange to get that information from them. My medical benefits have run out, so I can't pay them for another appointment. And the last thing they told me is they will not do a write up on their determine, you know, anything they think about the medicine. They're not going to do a write up on any of it without, you know, more work done. Well, they want about, they want a sleep study done, which is not happening. They want, you know, to take over, I guess, my medical care on this issue. And they don't just do write ups based on you paying them $75 for an appointment to come in and have a medicine evaluated. They want about $600 and I don't have any benefits anymore, and I'm not paying for that.

John Charbonneau:

Okay. Mr. Fulbright, just so, I want to make sure that I understand what you just said. So you're telling me, if my understanding is correct, you have your initial evaluation of the sleep medicine doctor that's in-office. Is that true?

Joe Fulbright:

I had a meeting with a doctor and that doctor told me that he wasn't qualified to make the evaluation on my medicine. And he told me the doctor that worked there that did, and we explained to them before we ever went there, that's what this appointment was for. To evaluate that medicine. They didn't have the doctor on hand that would eventually do the write up and the evaluation. They had me talk to another doctor wait in the room for 30 minutes, talk to another doctor that told me that all he's going to do is schedule me more appointments with this other doctor. And he's going to want to do all these tests and a, and a sleep study and, you know, all this stuff that's unnecessary. And that's not what we talked about. We talked about evaluating that one medicine, and I, I'm not going through all that. I'm not paying for that. I don't have any money to pay for that anymore.

Theresa Rodino:

Right, and Mr. Fulbright, I will put you on a medical leave so your benefits will be okay. So I'll go ahead and do that today. I didn't know your benefits had run out. This is the first I heard of that.

Joe Fulbright:

But yeah, I can go back there and ask them for the evaluation, but from what they're telling me, I would have to go to my doctor and get another referral to find a doctor, start trying to find a doctor that will do an evaluation of that medicine, because they won't do it unless I go through who know, schedule a month out of sleep study and start doing, you know, letting them taking over my medical treatment for a sleep disorder. And I'm not doing that. See they, you know, for people that don't know and don't understand, my sleep disorder is related to brain chemicals like serotonin. It's not related to interrupted breathing. It's not related to anything like that.

Joe Fulbright (cont'd):

So I already know where my problem's coming from. And the treatment that I'm on is, is something that took about six years to find. I had to pay for it out of pocket, because most psychiatrists will not accept our insurance. They've run them through too many hoops and they won't pay them even $150 for an appointment that most of them demand. So I had to pay for that. And that was about a six year battle to find a doctor that knew what was wrong with me. And these people are on the wrong track. They want to do the breathing study and the EKG while you sleep to find out everything that's going on. I don't need that.

John Charbonneau:

Okay. Mr. Fulbright, the last time when we talked you offered, and we appreciated it very much, and the history that you have with depression, sleep disturbance, things like that, vitamin deficiency. So that's why I kind of wanted to move forward because you very eloquently explained that last time, so that fine. And you know what, we're not trying to tell you what to do. It's you, that's up to you and your physician. They're just telling you what they needed to help us with our decision. Now, so let me just explain that because we haven't received any follow-up information, we went forward with what we feel is an appropriate fitness-for-duty determination. And what that is, is because of that medicine and the effects, and you explained last time about how you managed that quite a bit.

We are going to implement what we call sudden incapacitation restrictions. That's for someone who might, could or might be impaired from medication and things like that. But again, you've explained to us well how you used the medication. So this call was just to find out if there has been any movement or any additional information, and for Theresa and I to let you know about what we call sudden incapacitation restrictions. We will direct a list of them at some point but if you think about it, but I think you mentioned that Texas state law precludes driving while impaired on any medication be it a legal or an illegal drug, and so the sudden incapacitation restrictions that we use are kind of in keeping with that frame of reference meaning that they keep you out of activity that might be impacted by medication effects. There again, you can think of them about operating equipment, working above a certain level off the ground, things like that. There's a list of them. And we will always review additional information that you make available to us, and just like this call, we'll be happy to have another review with you after we, after you submit it. So if you have any other questions for me, I'll be happy to try to answer them. If not, Theresa can talk to you about some nuts and bolts details about keeping your MLOA current and things like that.

Joe Fulbright:

Okay. Well, the only question I have is, were you all under the impression that I was being pulled out and still being paid?

John Charbonneau:

Well, we knew that you were pulled from service, yes.

Theresa Rodino:

We don't really deal with the, whether or not you're paid or not. We look at the medical.

Joe Fulbright:

Okay. Well, I need to understand why, I still have the question. Why was I pulled out of service when I was never on company property impaired? We don't have anybody that would state they saw me impaired. I wasn't drug tested. What kind of procedure is this?

John Charbonneau:

I can give you what I think is the appropriate answer, and that is, we feel the medical facts as they are presented to us. You provided some information. There were some records and things like that that were provided and so what we have to do is kind of cover the bases from a standpoint of safety being at work. And the report came to us that, you know, after the few days that you don't the medicine, when you do take it, you know, you don't feel that you can safely work, and I have no reason to disagree with that. So that's the perspective from which we have to assess the ____.

Joe Fulbright:

Okay, well, here's, let me fill you in with a little bit of details why, I'm really upset about this. My supervisor was the one that did the write up and I have it in writing that he's concerned that I'm impaired while I'm at work. Now I was evaluated, like I said before, four years under this type of medicine. It only, it only affects me at night. I take it about 10 hours before I have to get up and go to work. And there is no, you know, when, once you figure out within the first week how much of this medicine to take, there, there is no residual effect from this medicine the next day. And this is hundreds of users report the same thing taking this medicine. I've looked into it. It's one of the best medicines for helping people like me sleep and it's prescribed, well, I think you went over that last time, you mentioned that you knew that. Well, there's no reason for anybody to believe that I've ever been out on company property under the influence of anything that would impair me other than maybe having to be up with my mom in the middle of the night. I take care of my mom and I had family medical leave act for that. You know, all of us come out sometimes when something woke us up in the middle of the night. All of us work like that.

Theresa Rodino:

Mr. Fulbright, I was thinking that your referral was because when you took the medicine and you're supposed to be on call, and you might get called out to restore service after normal business hours. And I think that we even had that conversation too, that you weren't able to do some of the after-hours calls when you take that medicine. Is that right?

Joe Fulbright:

Well, on Sunday night, that's when I start making, taking the medicine again on my weekend, when they, you know I volunteered to stand by for the people that are on call. I'm on a job where I'm not on call. They divided the jobs up in a strange way where I'm an install tech and I'm not subject to call on that job.

Theresa Rodino:

I thought you had after hours call? That there were after hours call outs?

Joe Fulbright:

Yeah, they do. I volunteered to try and cover a weekend as long as they understood. And this goes back to about 2010, when all this started, as long as they didn't make an issue out of this medicine I'm taking. And it was well understood. We talked about it in safety meetings and job assignment meetings that I would not be expected to come out while taking this medicine. Well, for two nights in a row, I don't take it. Friday and Saturday night is how I've been doing it. And sometimes I can sleep pretty good and sometimes I can't without it. But by Sunday night after I've been off of it for two days, I need to take it.

John Charbonneau:

You know, excuse me, Mr. Fulbright, I'm sorry to interrupt you. Got allergies acting up. It's clear that there are two kind of components to this. You expressed, that you just expressed now to Theresa and me when we talked last time. But let me summarize the things, these two things. Number one, there's a medical issue here. And that medical issue is for a problem with chronic ongoing problems with sleep and the medication that you and your doctor manage that condition with. And that's kind of what Theresa and I just called to talk to you about. And you have very, again articulately, expressed the fact that there's maybe you know, what's the word a labor-management issue here about just understanding what went on in 2010, that Theresa and I had no information about that hopefully there should be some record of. And that's something that you and your manager need to talk about, or you and your representative and your manager need to talk about. Because that's not something that Theresa and I can do anything about. You know we weren't involved back in 2010. So I guess for that piece of things I would recommend that you talk to your manager about it, if you agree that that's appropriate, because that's just not something that Theresa and I can impact.

Joe Fulbright:

Yeah, me and my manager with my union rep have had numerous conversations about this very issue. And finally, he made it very clear in the last meeting about three or four days before I was pulled out of service by medical department, that I'm not going to take this medicine and miss calls, period. So he drew the line there and said that I can't take this medicine if I'm going to work there.

John Charbonneau:

Your supervisor said that?

Joe Fulbright:

Yes.

John Charbonneau:

Okay. Well, I mean, it sounds to me, you know, I only do the medical case in this, but there is an administrative piece that you and your union rep need to carry forward if you choose to accept. It's not, again, it's not something that Theresa and I can impact, but, you know, you have a collective bargaining agreement and those kinds of things, your union representation is going to do exactly that, represent you.

Joe Fulbright:

Yeah, I understand that. I don't expect y'all to resolve this.

John Charbonneau:

Well, that's about all I have. Theresa will talk with you about the administrative piece of this going forward and the medical leave of absence and things like that and then we'll continue to look any information you submit if there is a follow up call will do it, okay?

Joe Fulbright:

Okay, thank you.

John Charbonneau:

All right, thank you, Mr. Fulbright. Thanks, Theresa.

Theresa Rodino:

Thank you, Dr. Charbonneau. And Mr. Fulbright, if you'll stay on the phone, I'll talk to you about what the specific restrictions are and then moving to accommodations. Thanks, Dr. Charbonneau.

[Charbonneau leaves the call]

Theresa Rodino:

Okay, now I have the specific restrictions on here as far as what they are, and Dr. Charbonneau talking a little bit about them. First one's not the operate company vehicles, on track or mobile equipment, or forklifts. The second one is not to operate cranes, hoists, or machinery. And then the next one is not to work on rail trains or work trains, dumping ballast. And he has on here can perform work remaining between the rails of the occupied track or to the field side of the occupied track where there are adjacent tracks with less than 19 front track centers, utilize on track safety protection, following normal safety and maintenance of way rules.

So basically it's talking about where you're at in location to live track. Okay. The next restriction is not to work at unprotected heights over four feet above the work surface. It says on here that you can work on the beds of trucks and occupy bridges, following normal safety rules. And then the next one, and I don't know that this pertains to you, but he wrote this on here, not to work on one man or two man gangs, switch oiler inspector, welder or helper job or two man section gang. Must have at least two additional employees on a gang or work area in order to use the train approach warning regulation, or he puts in parentheses, look out. So those are your restrictions. We did send those to the work unit to see if they could accommodate that, if you could do your regular job, what you do now, given those restrictions and see what they have on here.

They say that these do interfere with your essential job function. And so in here it says accommodation would remove, would require removal of an essential function. So they're not able to accommodate you with these restrictions in your current job. So what that means is that we can work with you through the DPM group, the accommodations group for another position, given these restrictions, another position here at UP, given these restrictions. Now, I did hear what you said about that your benefits are no longer active and that shouldn't have happened. So I'll go ahead and get that rectified and send a note to Stephanie Mahaney, make sure that we get that turned back on for you. But do you have any questions about your restrictions?

Joe Fulbright:

No.

Theresa Rodino:

No. Something happened here, let me get back here. Okay. So let me go ahead as I already have this form back from the work unit. Let's just go ahead and fill out the accommodations screen. This is the disability prevention management group, or voc-rehab's another name for them. You were in the Southern region. I'm trying to think of who your return to work manager is, because that's normally the person that would work with you. But what we'll do is we'll go ahead and put in an accommodation request. They will send a letter to you that has an 800 phone number on it. And as soon as you get that letter, give them a call so that they can start the process. They don't guarantee you another job, but they move you up to the front of the line to see what other positions might be available for you given these restrictions. And again, like Dr. Charbonneau said, if anything changes with your medical piece or you want to have this restrictions revisited, we can just submit your medical information and we will take another look at them.

Joe Fulbright:

Okay,

Theresa Rodino:

Let me see. Give me just a quick second, let me get to that screen, I hope he's out of there. But I know one of the questions are, is do you agree with your restrictions? And it's just a yes, no. If it's no, they want me to enter a reason.

Joe Fulbright:

No, I don't agree with that at all.

Theresa Rodino:

Okay.

Joe Fulbright:

Well, you know, I think it's outrageous. It's ridiculous. I've proven I can safely do that job in the four years and I know when I'm incapacitated and don't need to be on company property and don't need to drive. And I don't need work restrictions.

Theresa Rodino:

Okay. I don't need restrictions. Okay. And then I know another question is, are you willing to relocate if they had a different job open for you?

Joe Fulbright:

No. I've got to be here to take care of my mom.

Theresa Rodino:

Okay.

Joe Fulbright:

You know, I was under family medical leave act to take care of my mom. That's another reason why I didn't want any overtime. I had restricted my overtime work after hours because of that too. And he, you know, my manager just had to run over all of it and throw me off the property, cut my paycheck off.

Theresa Rodino:

And I don't know, I, you know, you have a union rep that you're working with because as far as the pay is concerned, I don't know how that works. And Dr. Charbonneau has the block, okay, so I put on here, no on the relocation. And I'll go ahead and ask for accommodations for job reassignment for you. And again, as soon as you get that letter, give that phone number a call. And I think that there's one other question. The doctor has your case blocked so I can't get in there, but let me, I'm going to pull somebody else up here real quick. I just want to make sure I get all the questions so that we can move forward with your case and you can start accommodations. Give me five seconds.

Joe Fulbright:

The only accommodation I've asked for and needed out there, I'm 55 years old. And everybody that hits as old as 40 years old that does installation work on track machines and some of the other roughneck work we do out in the sun always has somebody helping them. My boss is mad over this medicine and virtually threatening me with discipline if I don't quit taking it. And one of the things he started doing, I guess at some point, I don't know for sure that that's what he did, but he, he sends me out by myself to do them and he's violating my seniority by forcing me to do the installs and doesn't want the young people doing them. Well that's ridiculous.

Theresa Rodino:

And that was the next question. That was it, is what was your seniority date?

Joe Fulbright:

My seniority date is 03/25/1985.

Theresa Rodino:

1985. And that's for telecoms?

Joe Fulbright:

Yes.

Theresa Rodino:

Okay. And do you have any other seniority date?

Joe Fulbright:

No, that's it.

Theresa Rodino:

Okay. All right. I'll put that in there. And I don't know, you don't know, or maybe you do, who your return to work manager is?

Joe Fulbright:

My return to work manager?

Theresa Rodino:

Yes, for the Southern region?

Joe Fulbright:

No, I don't. I don't know who that is.

Theresa Rodino:

Okay, I don’t either. Well, and it doesn't matter. As soon as you get that, that letter in the mail from UP, and you certainly can have these restrictions too, or your determination, the doctor will put the note in. But as soon as you get the letter in the mail for the accommodations, it's an 800 number that will be on there. I don't have the number because we have to send this to the committee and then they send you out the letter, but you should have it yet this week. Make sure and give that number a call to start the process so that we can continue to move forward.

Joe Fulbright:

Okay. Thank you.

Theresa Rodino:

All right. Thanks, Mr. Fulbright. You take care. Bye bye.

**PHYSICIAN PRESCRIPTION FOR SLEEP TESTING**

# Texas Medical Diagnostic, Inc.

**SLEEP LAB**

**1912 Central Dr. Suite C, Bedford, TX**

*Toll Free Phone (800) 657-1920*

[illegible] (Demographics, Insurance Card, History & Physical), & Epworth Sleepiness Scale

Patient Name: (Last) Fulbright (First) Joe (MI)___

DOB: REDACTED Male X Female ___

Best Daytime Phone #: ____________ Best Evening Phone #: ____________

**Symptoms:**

- ☐ [illegible] of loud snoring and/or sudden awakening, struggling to breathe (witnessed by partner)
- ☐ [illegible] awake driving/during periods of inactivity
- ☐ Poor sleep quality/restless sleep
- ☐ Patient has obstructive sleep apnea and is currently on CPAP/BiPAP therapy

**Diagnosis:**

- ☐ Excessive daytime sleepiness/Hypersomnolence (307.43)
- ☐ Unspecified Sleep Disturbances (327.20)
- ☐ Obstructive Sleep Apnea (327.23)
- ☐ Restless Leg Syndrome (333.99)
- ☐ Narcolepsy (347.00)
- ☐ REM Behavioral Disorder (327.42)
- ☒ Other: Isomnia

**Services Requested:**

- ☐ Complete Sleep Testing-Includes Polysomnography (95810) & CPAP Titration (95811)
- ☐ Polysomnography Only (95810)
- ☐ CPAP Titration Only (95811) ( Include copy of previous diagnostic PSG )
- ☐ Multiple Sleep Latency Testing (95805)
- ☐ Maintenance of Wakefulness Testing (95805)

**Consultations:**

- ☒ YES Consultations and/or Follow-up with Sleep Specialist
- ☐ NO Consultations and/or Follow-up with Sleep Specialist
- ☐ Wrist Ox Serial #: _____ If positive, continue with other services requested
  - ☐ Special Instructions/Other: _____

DME - Please indicate equipment provider for set-up if you have a specific preference: _____

**Letter of Medical Necessity**

Today's office visit indicates that the above listed symptoms are consistent with the presence of a sleep disorder, potentially a life-threatening one. These findings warrant the medical necessity of sleep testing and evaluation of this patient to assess the presence and severity of obstructive sleep apnea or other related sleep disorders.

Signature: V M D'Souza MD Date: 4/27/15

Print Physician Name: Veemal D'Souza NPI: 1306898911

Address: 412 N. Main St, Suite 100 City: Euless State: TX Zip: 76039

Phone: 817-358-5800 Fax: 817-546-8672 Email: ____________

Marketer: GDM

FAXED

**PLEASE SIGN AND FAX**

**(817) 820-0430 OR (214) 638-4426**

**TOLL FREE FAX (877) 820-0430 OR EMAIL: tmdsleep@sts-tmd.com**

UPFULBRIGHT002104

UP-FULBRIGHT

DECLARATION OF CHRISTOPHER OZUNA

1. My name is Christopher Ozuna. I am over twenty-one (21) years of age and I am competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I worked with Joe Fulbright at Union Pacific Railroad Company from August 2008 through January 2015. At first I was a District Install Technician, and for the last few years I was a Senior Electronic Technician. I was a member of the International Brotherhood of Electrical Workers (IBEW).

3. Around 2009 (maybe 2008, but I am certain it was after 2006) Union Pacific reallocated the job duties and the after-hour on-call requirements of the technicians. I attended the safety meetings where Terry Neal explained the new position, and how the duties and on-call requirements were being changed. The company created a new position called Restore Senior Electronic Technician. This was a bid position, and there were two openings, meaning the technicians could apply for the positions by bidding for it, and the two most senior employees to apply would get the positions. The job would pay $1.00 more per hour and required the technician to be on-call after hours (nights, weekends, and holidays) as needed. Jason Norgan and Ed Hines were awarded these two positions. The rest of the technicians, were classified as Install (or Installation) Technicians, who were not required to be on call after hours.

4. After I became an Electronic Technician B, in 2010 I became part of the voluntary rotation helping out the Restore Technicians. We took turns covering weekends and holidays, and the technician on call for that weekend or holiday would be the first person to be called by the Operations Center in Omaha if something needed to be done. On these weekends and holidays when a volunteer was on call, the rest of the technicians were not on call and could

do whatever they wanted, they did not have to answer the phone if called and there would be no discipline if they were called but did not answer or come in.

5. Fulbright could have decided not to volunteer, and he would not have been on call, but he volunteered, subject to a modification for the fact that he took Trazodone most nights to help him sleep. The other volunteer technicians and I all agreed that Fulbright would not have to take a call and go to work at night if he had already taken Trazodone that night. We told our immediate supervisors, Stephen Hale and Terry Neal, that this is what we were doing, and they had no objection and they did not ask us to do it any differently.

6. When it was his turn to be on call over a weekend or holiday, Fulbright skipped taking Trazodone for the first two nights (so Friday night and Saturday on his weekends). However, he always took it on Sunday nights so he would be rested for work. Again, the other technicians and I agreed to this, it was not something that placed a burden of any kind on Union Pacific.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2021.

[signature]

Christopher Ozuna

DECLARATION OF DONALD E. ULOTH

1. My name is Donald E. Uloth. I am over twenty-one (21) years of age and I am competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I am counsel for Joe Fulbright in this case, Joe Fulbright v. Union Pacific Railroad Company, Civil Action No. 3:20-cv-02392-BK.

3. The following documents are true and correct copies of documents of Bates-numbered documents produced by Defendant in this case.

a. a Collective Bargaining Agreement between Union Pacific Railroad and the International Brotherhood of Electrical Workers effective January 1, 2003 (without the attachments) Bates numbered UPFULBRIGHT 1503 – 1537 (note however that the Bates numbers did not print when these pages were printed to be attached);

b. Email exchange between Terry Neal and Kristin [last name redacted by U.P] dated September 17, 2015 regarding EEOC Questions, Bates numbered UPFULBRIGHT 2466 – 2467;

c. Plaintiff's First Amended Notice of Intent to Take the Oral Deposition of Union Pacific Railroad Company.

4. After that are true and correct copies of excerpts from depositions taken in this case. The last two are excerpts from depositions of Defendant's designated corporate representatives, Charbonneau and Hale, who testified on the specific matters listed in the amended deposition notice referenced above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 30, 2021.

Donald E. Uloth

PB-90161

# AGREEMENT BETWEEN THE UNION PACIFIC RAILROAD

# AND THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (TELECOMMUNICATION EMPLOYEES)

UPFULBRIGHT

## EFFECTIVE JANUARY 1, 2003

| Rule | | Page |
|---|---|---|
| Rule 1 | Scope | 4 |
| Rule 2 | Hours of Service | 4 |
| Rule 3 | Shift Work | 8 |
| Rule 4 | Classification of Work/Qualifications | 9 |
| Rule 5 | Rates of Pay | 12 |
| Rule 6 | Skill Differentials | 13 |
| Rule 7 | Monthly Compensated Employees | 13 |
| Rule 8 | Hourly Compensated Employees | 15 |
| Rule 9 | Seniority | 16 |
| Rule 10 | Seniority Classes | 17 |
| Rule 11 | Seniority Districts | 17 |
| Rule 12 | Seniority Rosters | 18 |
| Rule 13 | Working off District | 19 |
| Rule 14 | Bulletining Positions | 19 |
| Rule 15 | Filling Vacancies | 19 |
| Rule 16 | Exercise of Seniority | 20 |
| Rule 17 | Promotion | 20 |
| Rule 18 | Transfers | 20 |
| Rule 19 | Reduction in Force | 21 |
| Rule 20 | Applicants for Employment | 22 |
| Rule 21 | Claims and Grievances | 22 |
| Rule 22 | Discipline - Investigations | 23 |
| Rule 23 | Leave of Absence | 25 |
| Rule 24 | Absent from Work | 25 |
| Rule 25 | Vacations | 26 |
| Rule 26 | Personal Leave | 26 |
| Rule 27 | Bereavement Leave | 27 |
| Rule 28 | Holidays | 27 |
| Rule 29 | Attending Court | 28 |
| Rule 30 | Jury Duty | 28 |
| Rule 31 | Per Diem Allowance | 28 |
| Rule 32 | Travel Allowance | 29 |
| Rule 33 | Personal Injury | 32 |
| Rule 34 | Movement of Household Goods | 32 |
| Rule 35 | Faithful Service | 32 |
| Rule 36 | Paying Off | 33 |
| Rule 37 | Assignment of Work | 33 |
| Rule 38 | Distribution of Agreement | 33 |
| Rule 39 | Conformity to Agreement | 33 |
| Rule 40 | Effective Date of Agreement | 33 |


UFULBRIGHT

## APPENDICES

Appendix


Union Shop Agreement ........ A
Dues Deduction Agreement ........ A-1
Political Contributions Deduction Agreement ........ A-2
Maintenance of Membership 3/05/81 ........ A-3
Clarify Maintenance of Membership Agreement ........ A-4
Retention of Maintenance of Membership Agreement ........ A-5
National Vacation Agreement ........ B
Daily Vacation Agreement ........ B-1
Daily Vacation Agreement Understanding ........ B-2
Non-Operating National Holiday Provisions ........ C
Health and Welfare Benefits ........ D
Supplemental Sickness Benefits ........ E
National Dental Plan ........ F
National Vision Plan ........ G
Off-Track Vehicle Accident Benefits ........ H
Employee Information ........ I
Bereavement Leave Q & A ........ J
Personal Leave Examples ........ K
Washington Job Agreement May 21, 1936 ........ L
September 25, 1964 Mediation Agreement ........ M
Memorandum of Understanding RE: Article VI ........ M-1
Letter of Understanding # 7, November 27, 1991 ........ M-2
Incidental Work Rule, November 27, 1991 ........ N
Guidelines for Administration of Differentials ........ O
Understanding dated July 16, 1963 – Hours of Holiday for Monthly Rated Positions ........ P
Understanding dated November 10, 1975 – Observation of Holiday ........ Q
Understanding dated January 25, 1986 – Overtime Calling Procedures ........ R
Establishment of Uniform Collective Bargaining Agreement On UPRR & MPRR ........ S
Understanding dated October 17, 1986 – Work on Corporation Equipment ........ T
Understanding dated March 17, 1992 – Work on Computers ........ U
Understanding dated November 16, 1996 Incentive Program TSC ........ V
Employees with Preserved Rates Of Pay ........ W
401(K) Agreement 8/5/1992 ........ X
UP Shares Agreement dated 4/30/1998 ........ Y
C.O.R.E. Agreement 11/19/1998 ........ Z


UNFULBRIGHT

***THE OBLIGATION THAT RESTS UPON THE MANAGEMENT TO PROVIDE AND THE EMPLOYEES TO RENDER HONEST, COURTEOUS AND EFFICIENT SERVICE IS RECOGNIZED.***

***A SPIRIT OF COOPERATION BETWEEN THE EMPLOYEES AND THE MANAGEMENT IS ESSENTIAL TO SAFE AND EFFICIENT MAINTENANCE AND OPERATIONS, AND BOTH PARTIES AGREE TO SO CONDUCT THEMSELVES. THE RESPONSIBILITY FOR SUCCESS RESTS EQUALLY WITH THE EMPLOYEES AND THE MANAGEMENT.***

***WHENEVER TERMS ARE USED WITHIN THIS AGREEMENT REFLECT THE MASCULINE GENDER, SUCH TERMS SHALL BE CONSTRUED AS THOUGH THEY ARE ALSO IN THE FEMININE GENDER.***

***EFFECTIVE JANUARY 1, 2003***
***SUPERSEDES AGREEMENT EFFECTIVE JULY 1, 1977, AS AMENDED***

UPFULBRIGHT

**RULE 1. SCOPE.**

This Agreement governs the rates of pay, rules and working conditions of Electronic Technicians, Shop Technicians, and Installation Technicians who perform Telecommunications work coming under the scope of this Agreement.

***NOTE: Installation Technicians were formerly titled Linemen.***

**RULE 2. HOURS OF SERVICE.**

Eight (8) hours shall constitute a day's work. All employees coming under the provisions of this Agreement, except as otherwise provided in this Schedule of Rules, or as may hereafter be legally established between the Carrier and the Employees, shall be paid on the hourly basis.

**ESTABLISHMENT OF SHORTER WORK WEEK**

***NOTE: The expressions "positions" and "work" used in this rule refer to service, duties or operations necessary to be performed the specified number of days per week, and not to the work week of individual employees.***

(A) GENERAL. The provisions of this Rule are the result of the (so-called) Chicago Agreement of March 19, 1949, which provided for all employees, subject to the exceptions contained in Article II thereof, a work week of 40 hours, consisting of five days of eight hours each, with two consecutive days off in each seven; and that work weeks may be staggered in accordance with the Carrier's operational requirements, but that so far as practicable the days off shall be Saturday and Sunday.

(B) FIVE-DAY POSITIONS. On positions the duties of which can reasonably be met in five days, the days off will be Saturday and Sunday.

(C) SIX-DAY POSITIONS. Where the nature of the work is such that employees will be needed six days each week, the rest days will be either Saturday and Sunday or Sunday and Monday.

(D) SEVEN-DAY POSITIONS. On positions which are filled seven days per week any two consecutive days may be the rest days with the presumption in favor of Saturday and Sunday.

UNLAWFUL BRIGHT

(E) REGULAR RELIEF ASSIGNMENTS. All possible regular relief assignments with five days of work and two consecutive rest days will be established to do the work necessary on rest days of assignments in six or seven-day service or combination thereof, or to perform relief work on certain days and such types of other work on other days as may be assigned under this Agreement. Where no guarantee rule now exists such relief assignments will not be required to have five days of work per week. the inclusion or non-inclusion of the foregoing sentence shall be without prejudice to the determination of the question of whether or not a guarantee exists.

Assignments for regular relief positions may on different days include different starting times, duties and work locations for employees of the same class in the same seniority district, provided they take the starting time, duties and work locations of the employee or employees whom they are relieving.

(F) DEVIATION FROM MONDAY-FRIDAY WEEK. If in positions or work extending over a period of five (5) days per week, an operational problem arises which the Carrier contends cannot be met under the provisions of Subpart (B) of this Rule, and requires that some of such employees work Tuesday to Saturday, instead of Monday to Friday, and the employees contend the contrary, and if the parties fail to agree thereon, then if the Carrier nevertheless puts such assignments into effect, the dispute may be processed as a grievance or claim.

(G) NONCONSECUTIVE REST DAYS. The typical work week is to be one with two consecutive days off, and it is the Carrier's obligation to grant this therefore, when an operating problem is met which may affect the consecutiveness of the rest days of positions or assignments covered by Subparts (C), (D) and (E), the following procedure shall be used:

(1) All possible regular relief positions shall be established pursuant to Paragraph (E) of this rule.

(2) Possible use of rest days other than Saturday and Sunday, by agreement or in accordance with other provisions of this Agreement.

(3) Efforts will be made by the parties to agree on the accumulation of rest time and the granting of longer consecutive rest periods.

(4) Other suitable or practicable plans which may be suggested by either of the parties shall be considered and efforts made to come to an agreement thereon.

(5) If the foregoing does not solve the problem, then some of the relief men may be given nonconsecutive rest days.

UP FULL BRIGHT

(6) If after all the foregoing has been done there still remains service which can only be performed by requiring employees to work in excess of five days per week, the number of regular assignments necessary to avoid this may be made with two nonconsecutive days off.

(7) The least desirable solution of the problem would be to work some regular employees on the sixth or seventh days at overtime rates and thus withhold work from additional relief men.

(8) If the parties are in disagreement over the necessity of splitting the rest days on any such assignments, the Carrier may nevertheless put the assignments into effect subject to the right of employees to process the dispute as a grievance or claim under the rules of this Agreement, and in such proceedings the burden will be on the Carrier to prove that its operational requirements would be impaired if it did not split the rest days in question and that this could be avoided only by working certain employees in excess of five days per week.

(H) REST DAYS OF FURLOUGHED EMPLOYEES. To the extent furloughed employees may be utilized under applicable rules of this Agreement or practices, their days off need not be consecutive; however, if they take the assignment of a regular employee they will have as their days off the regular days off of that assignment.

(I) BEGINNING OF WORK WEEK. The term "**work week**" for regularly assigned employees shall mean a week beginning on the first day on which the assignment is bulletined to work.

(J) CHANGE IN REST DAYS. Regular assigned rest days shall not be changed except after such advance notice to the employee as is now required under applicable rules.

(K) COMPRESSED WORK HALF, WORK WEEK AND WORK MONTH.

(1) District 6 gangs to which telecommunications employees are assigned may work a consecutive compressed work half. The consecutive compressed half will consist of consecutive workdays that may be regularly assigned with eight (8) or more hours per day (i.e. 8, 9, 10, 11, or 12 hour workdays) and accumulated rest days. Such consecutive compressed half arrangement will equal the number of hours worked as if the assignment was for a normal half with 8-hour workdays. Accumulated rest days for employees assigned to a gang working a consecutive compressed half arrangement will consist of the remaining days in the payroll period.

(2) As an alternative to paragraph (1), the gangs to which telecommunications employees are assigned may work a consecutive compressed workweek. The employees in the gang may commence work earlier than the assigned starting time and/or work beyond the normal quitting time during the work week to equalize hours not worked on the remaining days of the work week. Make-up time accumulated for this purpose to be worked at the applicable pro-rata rate will not exceed four (4) hours per–day on preceding



UNFULBRIGHT

regular workdays. The compressed workweek will equal the number of hours worked as if the assignment was for a normal workweek of forty (40) hours.

(3) Where it would be required to work a fraction of a day on a consecutive compressed work period arrangement under (1) or (2) in order to equal the number of hours in the period, respectively, the remaining hours will be distributed and worked throughout the compressed work period unless agreed to work a partial day at the end thereof.

(4) Rules in effect covering payment for service performed on rest days will apply to those accumulated rest days provided within this rule.

(5) Except for any distributed hours provided for in paragraph (3), time worked prior to or after the assigned daily hours will be paid at the overtime rate in accordance with the overtime provisions of the Agreement.

(6) Observance of holidays will be handled as follows:

(a) Unless agreed otherwise by a majority of the gang members and the appropriate Manager, if a holiday falls on other than a Saturday, the holiday will be observed at the end of the compressed work period and the amount of service hours ordinarily scheduled in line with the terms of this Agreement will be reduced by eight (8).

(b) If a holiday falls on a Saturday, there will be no reduction in the amount of service hours ordinarily scheduled in line with the terms of this Agreement.

(c) With the concurrence of the Manager, accumulated rest days provided herein may be used for workdays to make up time and observe the Thanksgiving and Christmas holidays, but not limited to these holidays, on their normal observed days. Under this same approval process, rest days may be worked in exchange for time off on workdays immediately preceding and/or following such holidays. Any rest days worked under this provision will be in the pay period the holiday is observed and will be paid for at the straight time rate.

(d) Employees who qualify for holiday allowances under existing rules will be compensated eight (8) hours at the straight time rate for the holiday involved.

(e) If required to perform service during the hours at the end of the compressed work period observed as the holiday, employees will be compensated at the overtime rate.



UPFULBRIGHT

(7) For vacation qualifying purposes, employees assigned to a compressed work period arrangement as provided herein will be allowed credit for each day worked during the calendar year as follows:

| Work Hours | Credit |
|---|---|
| 8 | 1 |
| 9 | 1.125 |
| 10 | 1.25 |
| 11 | 1.375 |
| 12 | 1.5 |

(8) Where the hours of the fraction of a day contemplated in paragraph (c) of this Agreement are distributed throughout the compressed work period, there will be no additional vacation credit allowed. If at the end of the calendar year an employee's vacation qualifying days would be adversely affected as a result of this provision, upon presentation of proof of an adverse impact, vacation qualifying days will be adjusted accordingly.

(9) Employees who observe their vacation while assigned to a gang working a compressed work period arrangement will be compensated on the basis of the gang's regular assigned hours, at the pro rata rate and will be charged the number of vacation days based upon the ratio in paragraph 7.

(10) If a gang is working a compressed work period and all or some of the positions in such gang are to be abolished, the Carrier will have satisfied the advance notice requirement of Rule 19 by giving a five (5) working days' notice of abolishment of such positions.

(11) A compressed work period established pursuant to this rule may be terminated by serving a thirty-six (36) hours' advance notice. Such change will not take effect until the first scheduled workday of a work period.

(12) Should any disputes arise regarding the application of this Agreement, the General Chairman and the highest designated Labor Relations officer will meet in an attempt to resolve any and all issues.

**RULE 3. SHIFT WORK.**

(A) When one shift is employed, the starting time shall not be earlier than 7:00 a.m., nor later than 8:00 a.m. The time and length of the lunch period shall be arranged by agreement within the limits of the fifth hour.

(B) Where two shifts are employed the starting time of the first shift shall be governed by Section A above, and the second shift shall start immediately following the close of the first shift, or no later than 8:00 p.m. The spread of the second shift shall consist of eight



UPFULBRIGHT

consecutive hours including an allowance of twenty minutes for lunch within the limits of the fifth hour.

(C) Where three shifts are employed, the starting time of the first shift shall be governed by Section A, above, and the second and third shifts shall start immediately following the end of the preceding shift. The spread of each shift shall consist of eight consecutive hours including an allowance of twenty minutes for lunch within the limits of the fifth hour.

***NOTE: Other assigned starting times may be established by agreement between the designated Carrier Manager and the General Chairman.***

## **RULE 4. CLASSIFICATION OF WORK AND QUALIFICATIONS.**

(A) ELECTRONIC TECHNICIAN

(1) An Electronic Technician shall possess a thorough knowledge of electronic theory, understand the operation of electronic components, and circuits, and must be able to read and understand electronic schematics. Electronic Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, multimeters, frequency counters, watt meters, service monitors, spectrum analyzers, frequency generators, frequency selective level meters, transmission test sets, digital transmission testers, and other types of telecommunications test equipment. Electronic Technicians shall be required to operate any hand and power tools needed to accomplish the work. Electronic Technicians shall possess advanced computer skills. Electronic Technicians will perform their assigned work without direct individual supervision.

(2) An Electronic Technician must possess a two (2) year Associate degree or greater in Electronic Technology from a generally recognized school. An Electronic Technician shall be classified as an Electronic Technician C until the completion of all required training and has obtained a Federal Commission General Radiotelephone Operator license at which time the employee will be promoted to Electronic Technician B. However, any Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator License, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

If a new hire has obtained a Federal Communication Commission General Radiotelephone Operator license and has a two (2) year Associate degree or greater in Electronic Technology from a generally recognized school or equivalent experience, management shall place the new hire as an Electronic Technician B.

(3) An Electronic Technician shall be classified as an Electronic Technician B for four hundred eighty-eight (488) working days of service. An employee completing four hundred eighty-eight (488) working days of service as an Electronic Technician B shall be promoted to position of Electronic Technician A. It is understood the



UP FULBRIGHT

promotion from Electronic Technician B to Electronic Technician A is based only on time in grade.

(4) An Electronic Technician A shall be classified as a Senior Electronic Technician after completion of two hundred forty-four (244) working days as an Electronic Technician A and who has passed the required three (3) of Union Pacific Telecommunications training labs. Senior Electronic Technicians will make themselves available for after hour calls, unless other arrangements have been made with proper authority. Senior Electronic Technicians must further successfully complete any new technology training labs as required with a passing grade. The employee will be given two (2) opportunities to do so, except as otherwise agreed to by the General Director of Telecommunications and the General Chairman.

Any Senior Electronic Technician who fails to maintain the requirements listed above will revert to their former Electronic Technician position. It is understood that such reversion is not considered discipline and that the Carrier is not subject to any claim on behalf of an Electronic Technician who fails to maintain the requirements listed above. The Senior Electronic Technician program is based on voluntary participation and an employee who has been promoted to Senior Technician may upon thirty (30) days written notification to his manager and local chairman, return to their former Electronic Technician classification. Senior Technicians who elect to return to their former Electronic Technician classification, will not be able to make application for promotion to Senior Technician for a period of one (1) calendar year from the date of reverting to Electronic Technician.

(5) Electronic Technicians' work shall consist of building, installing, assembling, dismantling, inspecting, testing, adjusting, restoring and maintaining, *other than leased*, telephone, telephone switching, and telephone networking equipment (excluding portable equipment such as cellular phones and pagers); public address and intercom systems, electronic and radio communication equipment; industrial closed circuit television equipment, centralized radio control equipment; radios used for two-way communication or control (except application and removal on rolling stock); microwave, multiplex, and related equipment in microwave sites; electronic recording or playback equipment; fiber optic, digital multiplex, and related equipment; automatic car identification and weighing equipment; EOTs, MDS and ATCS equipment, under the supervision of the Telecommunications Department, and wiring, cabling, and conduits related to above Carrier-owned, stationery telecommunications equipment, inside and outside, overhead and underground,and similar work, without individual supervision, in connection with Telecommunication Plants.

***NOTE: It is understood between the parties that the Carrier may allow other entities to put their equipment on Carrier property (including their own fiber optics and their own microwave dishes) as long as that equipment is not being utilized for Railroad operations. Such agreements between the Carrier and outside companies to allow them access to Carrier property for the purpose of installing, maintaining or dismantling such equipment is not in violation of this Agreement.***





UPFULBRIGHT

(B) SHOP TECHNICIAN.

(1) Shop Technicians shall possess a thorough knowledge of electronic theory, understand the operation of electronic components and be able to read and understand mechanical and electrical schematics. Shop Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, oscilloscopes, frequency counters, service monitors, spectrum analyzers, frequency generators and other types of telecommunications test equipment. Shop Technicians shall have basic computer skills.

(2) Shop Technicians shall possess a two-year Associate Degree in Electronic Technology or greater from a generally recognized school. Applicants must demonstrate their technical ability by passing an examination and must demonstrate alignment and troubleshooting techniques.

(3) The Carrier shall have the right to assign the position of Senior Shop Technician, based on seniority and ability, to any Shop Technician who has sufficient practical experience in Shop Technicians' work, who is capable of working on all products, capable of training other Shop Technicians on all products and capable of organizing the work load for Shop Technicians.

(4) Shop Technicians work shall consist of inspecting, testing, adjusting, repairing, *other than leased*, base station analog radios, base station analog radio modules, FOTs, hot box radio repair (including RF link radios), locomotive voice radios (except installation and removal of rolling stock), mobile radios, portable radios, Teklogic equipment, Data South printers, MDS radios, analog multiplex equipment associated with microwave radios, EOTs and EOT module, and similar work, without individual supervision.

(5) Shop Technicians shall be required to operate any hand and power tools needed to accomplish the work. In addition, they shall have skills sufficient to use soldering equipment such as hot air equipment utilized in the repair of surface mount component removal and replacements on printed circuit boards.

(6) Shop Technicians shall also be required, at the direction of the designated Carrier Manager, to assist in construction and/or installation of facilities outside of their seniority district at the straight time rate of pay. Shop Technicians required to work outside of their seniority district under this provision shall be considered on Leave of Absence from their seniority district during the duration of work. The designated Carrier Manager and the General Chairman shall cooperate in granting leaves of absence as in the past.

(C) INSTALLATION TECHNICIAN.

(1) Installation Technicians shall be qualified and assigned to building, installing, repairing and maintaining (other than leased) line wires, service wires, cables, overhead and underground conduits, cable termination, cable protection, grounding, building wiring, together with their supports, cable trays, cable ladders, wiring



UPFULBRIGHT

closets, equipment racks; batteries, rectifiers and radio antennas, coax, heliax, wave guide connectors and mounting brackets; microwave and radio tower work; and all similar work in connection with Telecommunication plants.

(2) Installation Technician B employees must complete four hundred - eighty-eight (488) work days of service as Installation Technician B and also satisfactorily complete required training and demonstrate the ability and aptitude to become an Installation Technician A.

***NOTE:*** ***Any individual who has had three (3) years of practical experience in Installation Technician's work and is capable of executing same to a successful conclusion within a reasonable amount of time will be considered as an Installation Technician A.***

(3) Installation Technicians shall be required to operate any hand and power tools needed to accomplish the work. Installation Technicians must be familiar and competent in the operation of test equipment such as, but not limited to, voltmeters, ground meters, time domain reflectometers, optical time domain reflectometers, cable locators, wave guide analyzers, LAN/DATA cabling meters, amp meters, battery testers, SWR meters, optical fiber meters and other types of telecommunications test equipment utilized to accomplish the work, and similar work, without individual supervision.

(D) It is not intended that this Rule 4 has anything contained herein that would infringe upon other crafts' classification of work rule or practices.

**RULE 5. RATES OF PAY AND ENTRY RATES.**

A) RATES OF PAY. Effective January 1, 2003, the rates of pay for the classifications set forth in Rule 4 are as follows:

| | | Hourly |
|---|---|---|
| Senior Electronic Technician | $ | 22.07 |
| Electronic Technician A | $ | 19.39 |
| Electronic Technician B | $ | 18.38 |
| Electronic Technician C | $ | 16.85 |
| Shop Technician | $ | 17.13 |
| Installation Technician A | $ | 18.88 |
| Installation Technician B | $ | 16.54 |

***NOTE 1:*** ***For employees with preserved rates of pay, please see Appendix W***

***NOTE 2:*** ***None of the above rates include any skill differential however, the above rates reflect cost of living adjustments.***

UPFULBRIGHT

**RULE 6. SKILL DIFFERENTIALS.**

(A) Senior/Electronic Technician. Senior & Electronic Technicians with a valid FCC license (or equivalent) who regularly perform repairs and adjustments to electronic equipment shall receive a differential of eighty-five (85) cents per hour for all hours worked.

(B) Shop Technician. Shop Technicians with a valid FCC license (or equivalent) in the Telecommunications Service Center at Council Bluffs shall receive a differential of eighty-five (85) cents per hour for all hours worked within the Telecommunications Communications Center.

(C) Leading Workman. Installation and Shop Technicians may be assigned as a leading workman to lead, direct and work with such other technicians. When assigned as such, will be paid fifty (50) cents per hour over the highest rated employee who is directed. The assignment of employees to such positions will be governed by seniority and ability.

(D) HDC. Electronic Technicians assigned to Harriman Dispatch Center, pursuant to agreement dated July 2, 2001, shall receive a differential of $2.85 per hour for all hours worked.

(E) The differentials set forth in subparts (A), (B) and (D) above shall not be applicable to any employee assigned to perform installation technician covered work.

(F) There shall be no compounding of the differentials identified above, nor with any other differential payable under any Agreement between the parties.

(G) Any differential referenced above, that by its terms is payable to a covered employee for each hour actually spent performing the work for which the differential is granted is not payable for any non-working time for which the employee receives enumeration, except that such differential shall be included in vacation pay with respect
to any employee who is regularly assigned to a position for which that differential is paid for the entire day.

***NOTE: See: Appendix O, National Agreement Language.***

**RULE 7. MONTHLY COMPENSATED EMPLOYEES.**

(A) For monthly rated positions, the monthly rate is based on two hundred and thirteen (213) hours per month and except as hereinafter provided, no overtime is allowed for time worked in excess of eight hours per day on the assigned days of the week. On the other hand, no time is to be deducted unless the employee lays off of his own accord.

(B) Where meals and lodging are not furnished by the Carrier or when the service requirements make the purchase of meals and lodging necessary while away from home point, employees will be paid necessary expenses.



UPFULBRIGHT

(C) If it is found this Rule does not produce adequate compensation for certain of these positions by reason of the occupants thereof being required to work excessive hours, the salary for these positions may be taken up for adjustment by the General Chairman.

(D)

(1) Employees paid under this Rule shall be assigned one regular rest day per week, Sunday if possible. Rules applicable to other employees of the same craft or class shall apply to service on such assigned rest days.

(2) Work of a non-emergency nature and non-telecommunication related work not covered by the Scope Rule, performed after regular hours, on stand-by days, and holidays will be paid at one and one-half the straight time rate, however, no overtime of a non-emergency nature shall be worked except by direction of proper authority.

(3) All work performed in another seniority district will be paid at one and one-half the straight time rate, except when mutually agreed upon between the General Chairman and the designated Carrier Manager in cases where employees are granted leaves of absence to handle special projects in line with past practice.

(E) Ordinary maintenance or construction work not previously required on Sunday will not be required on the sixth day of the work week.

***NOTE 1:*** ***Employees will be required to report when called by proper authority to perform emergency work.***

***NOTE 2:*** ***Emergency work is defined as trouble calls from user departments involving service and repairs to telecommunications equipment needed for railroad operations and departmental communications service interruptions, failures and alarms, for example, would be considered emergency situations under this Agreement.***

***NOTE 3:*** ***See Appendix W for preserved monthly rated employees.***

(F) Employees paid under this Rule who are required to perform emergency work on holidays will be allowed additional compensation at pro rata rate with a minimum of two (2) hours. If required to work in excess of two (2) hours, a maximum of four (4) hours will be allowed.

***NOTE:*** ***Monthly rated employees who are required to work on the Day After Thanksgiving Holiday will be compensated as per Subsection (F) in addition to eight hours pro rata holiday pay, per the National Rule.***

(G) The pro rata overtime hourly rate for positions covered by this Rule is determined by dividing the monthly rate by two hundred thirteen (213).



UP FULBRIGHT

UPFULBRIGHT

**RULE 8. HOURLY COMPENSATED EMPLOYEES.**

(A) Persons temporarily employed for emergency work will be compensated on an hourly basis.

(B) Meal Period. Employees required to work during or any part of the lunch period shall receive pay for the length of the lunch period at straight time and will be allowed necessary time to procure lunch [not to exceed thirty (30) minutes] without loss of time.

(C) All overtime continuous with regular bulletin hours will be paid for at the rate of time and one-half until relieved, except as may be provided in rules hereinafter set out.

(D) For continuous service after assigned hours, employees will be paid time and one-half on actual minute basis, with a minimum of one (1) hour for any such service performed.

(E) Employees shall not be required to work more than two hours overtime without being permitted to go to meals. Time taken for meals will not terminate the continuous service period and will be paid for up to thirty (30) minutes.

(F) Employees called or required to report for work, and reporting but not used, will be paid a minimum of four (4) hours at straight time rates.

(G) Employees called or required to report for work and reporting will be allowed a minimum of four (4) hours for two (2) hours and forty (40) minutes work or less.

(H) Where meals and lodging are not furnished by the Carrier or when the service requirements make the purchase of meals and lodging necessary while away from home point, employees will be paid necessary expenses, unless employee is receiving per diem under the provisions of Rule 31.

(I) Employees will be allowed time and one-half on the minute basis for service performed continuously in advance of their regular assigned hours, with a minimum of one hour.

(J) Except as otherwise provided for in this Rule, all overtime for employees beyond sixteen hours service in any twenty-four (24) hour period, computed from starting time of employee's regular shift, shall be paid for at rate of double time.

(K) Work in excess of forty (40) straight time hours in any work week shall be paid for at one and one-half times the basic straight time rate except where such work is performed by an employee due to moving from one assignment to another or to or from a furloughed list, or where days off are being accumulated under Subpart (G) of Rule 2, or where system gang employees are working on a compressed work schedule.

(L)

(1) Employees worked more than five days in a work week shall be paid one and one-half times the basic straight-time rate for work on the first and second rest days of their work week, except (1) where such work is performed by an

employee due to moving from one assignment to another or to or from a furloughed list, (2) where days off are being accumulated under Subpart (G) of Rule 2, or (3) where the following double time provision is applicable on the second rest day.

(2) Service performed by a regularly assigned hourly or daily rated employee on the second rest day of his regular assignment shall be paid at double the basic straight time rate, provided the employee (1) has worked all the hours of his assignment in that work week, and (2) has worked on the first rest day of his work week. However, emergency work paid for under the call rules will not be counted as qualifying service hereunder, nor will it be paid for under this provision.

(M) There shall be no overtime on overtime; neither shall overtime hours paid for, other than hours not in excess of eight paid for at overtime rates on holidays or for changing shifts, be utilized in computing the forty (40) hours per week, nor shall time paid for in the nature of arbitraries or special allowances such as attending court, deadheading, travel time, etc., be utilized for this purpose, except when such payments apply during assigned working hours in lieu of pay for such hours, or where such time is included under existing rules in computations leading to overtime.

(N) Work performed by employees on their assigned rest days and on holidays recognized by the parties' national agreement shall be paid for at the rate of time and one-half.

(O) All work performed in another seniority district will be paid at one and one-half the straight time rate, except when mutually agreed upon between the General Chairman and the designated Carrier Manager in cases where employees are granted leaves of absence to handle special projects in line with past practice.

***NOTE 1:*** ***This Rule does not include employees paid on monthly basis. <u>See</u>: Appendix C for "Holiday" provisions relating to the qualification for, and the allowance of, holiday pay for hourly-paid employees.***

***NOTE 2:*** ***When any of the referenced holidays falls on Sunday, the day observed by state, nation or by proclamation shall be considered the holiday.***

## <u>RULE 9</u>. <u>SENIORITY</u>.

(A) Seniority will date from the time the employee's pay starts in seniority class in the seniority district in which employed, except that individuals employed for temporary work will not be accorded a seniority date until completion of ninety (90) working days continuous service; seniority to date from date such continuous service commenced in the seniority district in which it accrued.



UP FULBRIGHT

(B) When two (2) or more employees commence work on the same day, their respective seniority ranking shall be determined on the basis of their length of continuous service with the Carrier with the employee having the most service ranked first. If service dates are the same, the employees shall be ranked by the last four digits of the Social Security Number, with the employee with the lowest number ranked first.

(C) Effective June 1, 1981, all employees promoted subsequent thereto to official, supervisory, or excepted positions from the craft shall be required to pay an appropriate monthly fee, not to exceed monthly union dues, in order to retain and continue to accumulate seniority. A promoted employee whose payments are delinquent shall be given a written notice by the appropriate General Chairman, with copy to the Director Labor Relations, of the amount owed and thirty (30) days from the date of such notice to cure the delinquency in order to avoid seniority forfeiture.

Employees promoted prior to June 1, 1981, to official, supervisory, or excepted positions from the craft shall retain their current seniority but shall be required to pay an appropriate monthly fee, not to exceed monthly union dues, in order to accumulate additional seniority.

(D) Employees voluntarily leaving the service will, if they re-enter, be considered as new employees.

## RULE 10. SENIORITY CLASSES.

Seniority classes shall be as follows:

| | |
|---|---|
| CLASS 1 | Senior Electronic Technician<br>Electronic Technician (Class A, B and C) |
| CLASS 2 | Shop Technician |
| CLASS 3 | Installation Technician (Class A and B) |

## RULE 11. SENIORITY DISTRICTS.

Seniority districts shall be as follows:

| Seniority District No. | Territory: |
|---|---|
| 1 | All tracks east of Echo , Utah (exclusive ) to Logan, Iowa (inclusive) including Cheyenne, Wyoming to Pueblo, Colorado (inclusive) to Green River, Utah (inclusive) to Hayes, Kansas (exclusive) and Sioux City, Iowa (inclusive) south to a line at Falls City, Nebraska (exclusive); Beatrice, Nebraska (exclusive) and Belvidere, Nebraska |



UPFULBRIGHT

(exclusive); from O'Fallons, Nebraska to Joyce, Nebraska, To Egbert, Colorado.

2 South of the California/Oregon state line to and including El Paso, Texas and to Tucumcari, New Mexico (inclusive). From Oakland/Stockton, California east to Argenta Rim, Nevada and from Los Angeles, California east to Nevada/Utah state line.

3 All track in Oregon, Washington, Idaho and Montana and from Argenta Rim, Nevada east to Echo , Utah (inclusive) and Green River, Utah (exclusive); from the Utah/Idaho border south to the Utah/Nevada border; and, from McCommon, Idaho to Granger, Wyoming.

4 Starting at Hayes, Kansas (inclusive), Beatrice, Nebraska (inclusive), Belvidere, Nebraska (inclusive), Falls City, Nebraska (inclusive) and Bloomington, Illinois (exclusive) going south and territory east of El Paso, Texas (exclusive) and east of Tucumcari, New Mexico (exclusive).

5 East of Logan, Iowa (exclusive) to Chicago, Illinois; north of Bloomington, Illinois (inclusive) and north of Nettleton, Missouri (inclusive) and north to Duluth, Minnesota (inclusive).

6 Telecommunications Installation Teams (Entire UP system)

7 Terminal Specialists - System

8 Shop Technicians - Council Bluffs (Seniority Point)

**<u>RULE 12</u>. <u>SENIORITY ROSTERS</u>.**

(A) Seniority rosters showing name, position and seniority date of employees entitled to seniority date in accordance with Rule 9 will be maintained for each seniority district. Seniority rosters will be brought up to date in January of each year and copies furnished Local Chairmen and General Chairman and made available to the employees.

(B) Seniority rosters will be open for correction of error for a period of 90 days from issuance. Upon presentation of proof of error, correction will be made by agreement between the General Chairman and the designated Carrier Officer, and seniority dates established by such agreement will not be subject to further protest.

(C) The seniority of an employee who establishes seniority after December 18, 1987 and who is furloughed for 365 consecutive days will be terminated if such employee has less than three (3) years of seniority at the time of furlough. The "*365 consecutive days*" shall exclude any period during which a furloughed employee receives compensation pursuant to an I. C. C. employee protection order or an employee protection agreement or arrangement.

UNFULBRIGHT

**RULE 13. WORKING OFF ASSIGNED SENIORITY DISTRICT.**

Employees may be required to afford reasonable assistance to employees on adjoining seniority district, otherwise will not be required to work outside of seniority district except in cases of emergency or as provided in Rule 7 (D-3) & 8 (O).

**RULE 14. BULLETINING POSITIONS.**

(A) All vacancies, changes in headquarters or new positions created, except temporary positions of thirty (30) days or less duration, shall be bulletined for a period of ten (10) days before being permanently filled. Positions may be continued as temporary in excess of thirty (30) days without bulletining by agreement with the General Chairman.

(B) Applications for positions bulletined will be made to designated Carrier Officer with copy to the local chairman. Applications must reach the designated Carrier Officer and local chairman on or before midnight of the tenth day after date of bulletin.

**RULE 15. FILLING VACANCIES.**

(A) When new positions are created or bulletined vacancies occur, senior employees shall, if sufficient ability is shown by fair trial, be given preference in filling such new positions or vacancies that may be desirable to them.

(B) Consideration will be given senior qualified employees in filling temporary positions of thirty (30) days or less duration.

(C) When an employee is required to fill the place of another employee receiving a higher rate of pay, he shall receive the higher rate; but if required to fill temporarily the place of another employee receiving a lower rate, his rate will not be changed.

(D) Regularly assigned employee required by the management to relieve another employee for a period of thirty (30) days or less will be allowed expenses while away from his home point on such relief work.

(E) An employee who applies for and is assigned to a bulletined position can not apply for or be assigned to his former position on the bulletin issued due to his vacating such position. If there is no other qualified applicant, the employee who has just vacated the position may be assigned if he makes application for it.

UNFULBRIGHT

**RULE 16. EXERCISE OF SENIORITY.**

(A) The exercise of seniority shall be limited to seniority districts as defined in Rule 11. Seniority may be exercised only in case of vacancy, new position, position abolishment, or reduction in force. When assigned headquarters, working hours, or rest days are changed, the employee affected will have the option of accepting the change or, within five (5) days thereafter, request in writing that the position be bulletined.

Note: A change in headquarters referred to above, is defined as moving the headquarters of a position within the current geographical metropolitan area.

(B) An employee exercising seniority rights under this Rule will lose rights to former position and, if after a fair trial, fails to qualify for the new position, such employee will displace the junior assigned employee in the classification from which seniority was exercised.

(C) Employees transferring when exercising their seniority rights shall do so without expense to the Carrier, but will be furnished free transportation for themselves and dependent members of their families and their household goods, consistent with federal or state laws.

(D) An employee absent on account of sickness, suspension or leave of absence, will upon returning to service, have the right to return to former position if it still exists, or if senior and qualified, may displace a junior employee from position that has been bid in during such absence, provided application is made within four (4) days after returning to service.

**RULE 17. PROMOTION.**

Subject to the employee's compliance with the appropriate Maintenance of Membership and Seniority Retention Agreements, an employee promoted to supervisory or official position, or assigned to special duties, and who subsequently leaves such position due to abolishment or voluntary relinquishment, shall have the right to exercise seniority in the classification and seniority district from which promoted. An employee disqualified from such position may only displace the junior employee in the classification and seniority district from which promoted. An employee exercising seniority as herein provided must provide written notice of such exercise of seniority to the employee's supervisor within twenty-four (24) hours of the shift last worked.

**RULE 18. TRANSFERS.**

(A) Employees transferred from one district to another, with a view of accepting a permanent transfer, will, after thirty (30) days lose their seniority in the district they left, and their seniority in the district to which transferred will begin on the date of transfer, seniority to govern. Employees will not be compelled to accept a permanent transfer to another point.





UPFULBRIGHT

(B) All applications for transfer must be submitted in writing to the employee's supervisor with a copy to the Local Chairman of the seniority district from which transferring and to the employee's supervisor and Local Chairman of the seniority district to which transferring.

**RULE 19. REDUCTION IN FORCE.**

(A) Except as provided for hereinafter, five (5) working days advance notice of reduction in force of regularly assigned positions, or abolition of regular positions will be given to Local Chairman and employees affected. Employees displaced shall exercise their rights to any position to which their seniority entitles them, subject to qualifications. Employees will give written notice to the Local Chairman and the designated Carrier Manager of intention to exercise seniority rights within four (4) days after receiving notice of force reduction.

(B) In restoration of forces, senior laid off employees will be given preference in returning to service. Employees, desiring to protect their seniority rights and avail themselves of this Rule, must file their name and address with the designated Carrier Manager and the Local Chairman prior to the actual time the furlough is effective. Furloughed employees must promptly advise the designated Carrier Manager and the General Chairman of any changes in address. Failure of the employee to comply with the provisions of this Rule shall constitute forfeiture of all service and seniority rights except in case of personal illness or other causes beyond the control of the employee. Employees failing to return to service within ten days after being notified (by mail or telegram sent to the last address given), or give satisfactory reason for not doing so, will automatically forfeit their service and seniority.

(C) The Local Chairman and General Chairman will be furnished a list of men to be restored to service.

(D) When reducing forces, if furloughed employees are needed on other districts, they will be given preference to transfer, with privilege of returning to home district when force is increased, such transfer to be made without expense to the Carrier, seniority and qualifications to govern.

(E) Rules, Agreements or practices, however established, that require advance notice of employees before temporarily abolishing positions or making temporary force reductions are hereby modified to eliminate any requirement for such notices under emergency conditions, such as flood, snow storm, hurricane, tornado, earthquake, fire or labor dispute other than as covered by the ensuing paragraph, provided that such conditions result in suspension of the Carrier's operations in whole or in part. It is understood and agreed that such temporary force reductions will be confined solely to those work locations directly affected by any suspension of operations. It is further understood and agreed that notwithstanding the foregoing, any employee who is affected by an emergency force reduction and reports for work for his position without having been previously notified not to report, shall receive four hours pay at the applicable rate for his position.



FULBRIGHT

(F) Rules, Agreements or practices, however established that require advance notice before positions are temporarily abolished or forces are temporarily reduced are hereby modified so as not to require advance notice where a suspension of Carrier's operations in whole or in part is due to a labor dispute between Carrier and any of its employees.

**RULE 20. APPLICANTS FOR EMPLOYMENT.**

(A) Employment in the craft or class shall be considered temporary for ninety (90) working days, pending approval or disapproval of application, during which period an employee's employment relationship may be terminated without formal investigation by disapproval of application. If the applicant is not notified of the disapproval of application within ninety (90) working days from date thereof, application will be considered approved, but this clause shall not operate to prevent the removal from service of such applicant if subsequent to the expiration of ninety (90) working days it shall be proved that the information given in the application is false, provided such action is taken by the Carrier within two (2) years from the date the employee enters the service.

(B) In addition to the conditions contained in (A), any new employee hired as Electronic Technician C who fails to complete the required training and/or fails to obtain a Federal Communication Commission General Radiotelephone Operator license, or equivalent within the two hundred forty-four (244) work days of service will relinquish any and all seniority rights and the employee will be considered as voluntarily resigned from the service of the Carrier.

**RULE 21. CLAIMS AND GRIEVANCES.**

(A) All claims or grievances shall be handled as follows:

(1) All claims or grievances must be presented in writing by or on behalf of the employee involved, to the officer of the Carrier authorized to receive same within sixty (60) days from the date of the occurrence on which the claim or grievance is based. Should any such claim or grievance be disallowed, the Carrier shall, within sixty (60) days from the date same is filed, notify whoever filed the claim or grievance (the employee or his representative) in writing of the reasons for such disallowance. If not so notified, the claim or grievance shall be allowed as presented, but this shall not be considered as a precedent or waiver of the contentions of the Carrier as to other similar claims or grievances.

(2) If a disallowed claim or grievance is to be appealed, such appeal must be in writing and must be taken within sixty (60) days from receipt of notice of disallowance, and the representative of the Carrier shall be notified in writing within that time of the rejection of his decision. Failing to comply with this provision, the matter shall be considered closed, but this shall not be considered as a precedent or waiver of the contentions of the employees as to other similar claims or grievances. It is understood, however, that the parties may, by agreement, at any stage of the



UPFULBRIGHT

handling of a claim or grievance on the property, extend the 60-day period for either a decision or appeal, up to and including the highest officer of the Carrier designated for that purpose.

(3) The requirements outlined in paragraphs (1) and (2) pertaining to appeal by the employee and decision by the Carrier, shall govern in appeals taken to each succeeding officer, except in cases of appeal from the decision of the highest officer designated by the Carrier to handle such disputes. All claims or grievances (including discipline) involved in a decision by the highest designated officer shall be barred unless within nine (9) months from the date of said officer's decision proceedings are instituted by the employee or his duly authorized representative before the appropriate Division of the National Railroad Adjustment Board or a system, group or regional Board of Adjustment that has been agreed to by the parties hereto as provided in Section 3 Second of the Railway Labor Act. It is understood, however, that the parties may by agreement in any particular case extend the nine (9) months period herein referred to.

(B) A claim may be filed at any time for alleged continuing violation of any agreement and all rights of the claimant or claimants involved thereby shall, under this Rule, be fully protected by the filing of one claim or grievance based thereon as long as such alleged violation, if found to be such, continues. However, no monetary claim shall be allowed retroactively for more than sixty (60) days prior to the filing thereof. With respect to claims and grievances involving an employee held out of service in discipline cases, the original notice of request for reinstatement with pay for time lost shall be sufficient.

(C) This Rule recognizes the right of representatives of the Organization to file and prosecute claims and grievances for and on behalf of the employees they represent.

(D) This Agreement is not intended to deny the right of the employees to use any other lawful action for the settlement of claims or grievances provided such action is instituted within nine (9) months of the date of the decision of the highest designated officer of the Carrier.

(E) Prior to the assertion of grievances as herein provided, and while questions of grievances are pending, there will neither be a shut down by the Carrier nor a suspension of work by the employees.

(F) All conferences between local officials and local committees to be held during regular working hours without loss of time to committeemen, except when committeemen are required to leave home point.

**<u>RULE 22</u>. <u>DISCIPLINE - INVESTIGATIONS</u>.**

(A) Except as provided in Rule 20, no employee shall be disciplined without a fair hearing by designated officer of the Carrier. Suspension in proper cases pending a hearing, which shall be prompt, shall not be deemed a violation of this Rule. The employee shall have the right to be represented at the hearing by a duly accredited representative of

UNFULBRIGHT

the craft. At a reasonable time prior to the hearing, such employee and his duly authorized representative will be apprised of the precise charge and given reasonable opportunity to secure the presence of necessary witnesses. If it is found that an employee has been unjustly suspended or dismissed from the service, such employee shall be reinstated with his seniority rights unimpaired and compensated for the wage loss, if any, resulting from said suspension or dismissal and the employee's discipline record shall be cleared of such suspension or dismissal.

(B) Except as provided in Rule 20, no employee who has been in the service of the Carrier ninety (90) working days shall be dismissed for incompetency, neither shall an employee be discharged for any cause without first being given an investigation.

(C) The Carrier will not discriminate against any committeemen who from time to time are delegated to represent other employees, and will grant them leave of absence and free transportation.

(D) An employee who is suspended or dismissed from service and is thereafter awarded full back pay for all time lost as a result of such suspension or dismissal will be covered under the current Health Benefits Plan as if he or she had not been suspended or dismissed in the first place.

(E) If the Carrier's decision to discipline an employee is to be appealed by the duly authorized representative or the employee involved, the duly authorized representative or the employee shall submit a written claim directly to the Carrier's highest designated officer within sixty (60) days from the date the discipline is issued. The written appeal will contain a full statement of the Organization's or employee's objections to the discipline issued and a request to discuss the Carrier's decision in conference with the Carrier's highest designated officer to handle such claims or grievances.

(F) If the discipline issued by the Carrier is appealed by written claim and a conference is requested in writing to discuss the claim or grievance, the General Chairman and the Carrier's Highest Designated Officer or their designees shall meet in conference within sixty (60) days from receipt of such request at a mutually agreeable time and place. Within sixty (60) days from the date of the conference, the Carrier shall notify the duly authorized representative (or the employee in cases where the employee has filed the claim of grievance) of the results of the conference. If not so notified, the appeal shall be allowed as presented, but this shall not be considered as a precedent or waiver of the contentions of the Carrier as to other similar claims or grievances. It is understood, however, that the parties may, by agreement, extend the sixty (60) day periods established herein at any stage of the handling of the claim or grievance.

(G) All discipline claims or grievances shall be barred unless within nine (9) months from the date of the Carrier's highest officer's decision proceedings are instituted by the employee or the duly authorized representative before the appropriate division of the National Railroad Adjustment Board or a system, group, or regional board of adjustment that has been agreed to by the parties hereto as provided in Section 3, Second, of the Railway Labor Act. It is understood, however, that the parties may agree in any particular case to extend the nine (9) month period herein referred to.



UNFULBRIGHT

(H) Paragraphs (E), (F) and (G) shall not apply to requests for leniency and acceptance of discipline.

(I) The one-step appeal process contained in paragraphs (E), (F) and (G) shall remain in effect until such time that either party serves a thirty (30) day notice to the other party indicating their desire to cancel the agreement and revert to the appeal process in Rule 21.

**RULE 23. LEAVE OF ABSENCE.**

(A) When the requirements of the service will permit, employees, on request, will be granted leave of absence for a limited time, with privilege of renewal, an employee absent on leave who engages in other employment will lose his service and seniority rights unless special provisions shall have been made therefor by the designated manager and the General Chairman.

(B) Failure to report for duty at the expiration of leave of absence shall terminate an employee's service and seniority, unless a reasonable excuse for such failure is presented not later than ten (10) days after expiration of leave of absence.

(C) In cases where employees transfer from one craft to another craft, leave of absence shall be for a period of ninety (90) days or ninety (90) days from the date of the transferring employee completes any required probationary or training period, whichever is longer. In those cases where an employee is granted a leave of absence under this provision, the employee shall maintain the appropriate membership dues.

(D) Employees accepting full time positions with their labor organization will be considered on leave of absence and will continue to accumulate seniority. Seniority rights must be asserted within 30 days after release from such position, unless such period is extended by mutual agreement between the parties signatory hereto.

A full time officer of the Organization who returns to active service shall receive credit for the purpose of the continuous service qualification requirements for an annual vacation under applicable vacation rules, for all service time as a full time employee while on leave from the Carrier.

**RULE 24. ABSENT FROM WORK.**

(A) In case an employee is unavoidably kept from work he will not be discriminated against. An employee detained from work on account of sickness or for any other good cause, shall notify the proper authority as soon as possible.

(B) Employees who have absented themselves except in case of illness or other physical disability, without proper leave of absence, which must be in writing if in excess of ten (10) days, will be considered as having resigned from service and seniority rights will be terminated.

UPFULBRIGHT

**RULE 25. VACATIONS.**

Employees shall be granted vacations with pay, or payment in lieu thereof, in accordance with the synthesis of National Vacation Agreements or as hereafter amended.

The following chart, subject to the interpretation of the National Vacation Agreement, will apply:

| Vacation Weeks | Number of Qualifying Years |
|---|---|
| 1 | 1 year (120 working days during preceding calendar year) |
| 2 | 2 or more years of continuous service subject to qualifying years |
| 3 | 8 or more years of continuous service subject to qualifying years |
| 4 | 17 or more years of continuous service subject to qualifying years |
| 5 | 25 or more years of continuous service subject to qualifying years |

***NOTE 1:*** ***See: "National Vacation Synthesis" @ Appendix B.***

***NOTE 2:*** ***See also: Memorandum Agreement dated March 12, 1992 @ Appendix B-1, allowing one week of vacation to be taken on a daily basis rather than as an entire week.***

**RULE 26. PERSONAL LEAVE.**

(A) A maximum of two days personal leave will be provided on the following basis:

(1) Employees who have met the qualifying vacation requirements during eight calendar years under vacation rules in effect on January 1, 1982 shall be entitled to one day of personal leave in subsequent calendar years;

(2) Employees who have met the qualifying vacation requirements during seventeen calendar years under vacation rules in effect on January 1, 1982 shall be entitled to two days of personal leave in subsequent calendar years.

(B) Personal leave days provided in Subpart (A) may be taken upon 48 hours' advance notice from the employee to the proper carrier officer provided, however, such days may be taken only when consistent with the requirements of the carrier's service. It is not intended that this condition prevent an eligible employee from receiving personal leave days except where the request for leave is so late in a calendar year that service requirements prevent the employee's utilization of any personal leave days before the end of that year.

(C) Personal leave days will be paid for at the regular rate of the employee's position or the protected rate, whichever is higher.



UP|FULBRIGHT

(D) The personal leave days provided in Subpart A shall be forfeited if not taken during each calendar year. The carrier shall have the option to fill or not fill the position of an employee who is absent on a personal leave day. If the vacant position is filled, the rules of the agreement applicable thereto will apply. The carrier will have the right to distribute work on a position vacated among other employees covered by such agreement.

(E) When an employee takes a personal leave day either immediately preceding or following a holiday then the work day (or day, in the case of other than a regularly assigned employee) immediately following the personal leave day is considered as the qualifying day for holiday purposes.

## RULE 27. BEREAVEMENT LEAVE.

Bereavement leave, not in excess of three (3) calendar days, following the date of death will be allowed in case of death of an employee's brother, sister, parent, child, spouse or spouse's parent. In such cases, a minimum basic day's pay at the rate of the last service rendered will be allowed for the number of working days lost during bereavement leave. Employees involved will make provision for taking leave with their supervising officials in the usual manner.

***NOTE: See: "Agreed Upon Questions and Answers" @ Appendix J.***

## RULE 28. HOLIDAYS.

Subject to the provisions of this Agreement, employees shall be granted holidays as set forth below, subject to the provisions of the National Holiday Agreement (see Appendix C).

New Year's Day
Presidents' Day
Good Friday
Memorial Day
Fourth of July
Labor Day
Thanksgiving Day
Day after Thanksgiving Day
Christmas Eve (the day before Christmas is observed)
Christmas Day
New Year's Eve (the day before New Year's Day is observed)

UPFULBRIGHT

**RULE 29. ATTENDING COURT.**

When attending court as witness for the Carrier, employees will be reimbursed for actual expenses and paid for eight (8) hours for each day away from work and rest days and holidays when away from home point. When necessary, the Carrier will furnish transportation and will be entitled to certificates for witness fees in all cases.

**RULE 30. JURY DUTY.**

When a regularly assigned employee is summoned for jury duty and required to lose time from his assignment as a result thereof, he shall be paid for actual time lost with a maximum of a basic day's pay at the straight time rate of his position for each day lost less the amount allowed him for jury service for each such day, excepting allowances paid by the court for meals, lodging or transportation, subject to the following qualification requirements and limitations:

(A) An employee must furnish the Carrier with a statement from the court of jury allowances paid and the days on which jury duty was performed.

(B) The number of days for which jury duty pay shall be paid is limited to a maximum of sixty (60) days in any calendar year.

(C) No jury duty pay will be allowed for any day as to which the employee is entitled to vacation or holiday pay.

(D) When an employee is excused from Carrier service account of jury duty, the Carrier shall have the option of determining whether or not the employee's regular position shall be blanked, notwithstanding the provisions of any other rules.

(E) Except as provided in Subpart (F), an employee will not be required to work in his assignment on days in which jury duty: (1) ends within four (4) hours of the start of his assignment; or (2) is scheduled to begin during the hours of his assignment or within four (4) hours of the beginning or ending of his assignment.

(F) On any day that an employee is released from jury duty and four (4) or more hours of his work assignment remain, he will immediately inform his supervisor and report for work if advised to do so.

**RULE 31. PER DIEM ALLOWANCE – DISTRICT 6 ON-LINE POSITIONS**

(A) Employees assigned to District 6 positions may elect during the months of June and December of each calendar year to receive either personal expenses provided in Rule 7 (B) or 8 (H), or receive the daily per diem allowance provided in Section (B) of this Rule. This election must be in writing and given to the employees manager with copy to the local chairman. The election made in December of the preceding year will be applicable January 1 through June 30 and the election made in June will be applicable July 1 through December 31. Such election is irrevocable during the succeeding six-month period. An



UNFULBRIGHT

employee failing to make an election during the designated month will be treated for expenses under their election for the preceding six month period.

(B) Employees who are assigned to a District 6 position and working in excess of thirty-five (35) highway miles (by the most direct route) from their home point may elect to be provided one of the two following daily per diem allowance options:

(1) $52.00 in lieu of expense reimbursement provided for in Rule 7 (B) or 8 (H), or;

(2) $28.50 in lieu expense reimbursement provided for in Rule 7 (B) or 8 (H), other than lodging which is to be handled on expense form in the normal fashion. Employees electing this options will be required to show proof of overnight stay at approved CLC or other authorized hotel for the day per diem is claimed in order to be eligible for this option.

(3) Per diem is payable for each calendar day service is actually performed in lieu of expense reimbursement provided for in Rule 7 (B) or 8 (H). A day of service for the purpose of this allowance is considered to be a preponderance of the regular assigned work day.

**RULE 32 TRAVEL ALLOWANCE – DISTRICT 6 POSITIONS**

District 6 positions may be established with fixed headquarters or as on-line Installation Teams. The following travel provisions will apply to such Installation Teams.

**(A) Headquarters positions**

Employees assigned to District 6 positions established with fixed headquarters, will be allowed necessary expenses when held away from their headquarters. The Company may at its option provide lodging facilities and/or meals. Such expenses will be paid only on those days the employee is working and/or traveling to and from the CLC or other designated suitable lodging facilities.

**(B) On-Line positions**

Employees assigned to on-line District 6 positions will not have a fixed headquarters. The employees' time will begin and end at the work site designed by management. The following provisions will apply to such on-line positions.

(1) (a) Employees assigned to District 6 positions required to operate and transport company equipment outside of assigned hours from the former assembly point to the new assembly point will be compensated pursuant to the applicable agreement rules for such service performed outside of assigned hours.

UPFULBRIGHT

(b) If the employee is required to operate a company vehicle to the new assembly point, the Carrier will provide reasonable assistance in the movement of the employee's personal vehicle to the new assembly point.

(2) (a) For the purposes of allowing employees to make Rest Period trips home between their home station and their assembly points, the Carrier, at its option, may arrange transportation for employees by:

(1) company vehicle;
(2) airline;
(3) rental car;
(4) or any other suitable alternative means of transportation;
(5) authorize the employee to use their personal vehicle and pay Carrier's current authorized mileage reimbursement rate.

NOTE: Mileage rate is paid for each mile actually traveled on a round trip basis for weekend travel by the most direct highway route between the lodging site nearest the assembly point and the employee's home station and from the employees home station to the lodging site nearest the assembly point. The employees must utilize their personal vehicle and actually make the trip to their home station and proof of the trip may be required to receive this reimbursement.

(6) The home station is considered to be the closest city to the employee's residence in the states encompassed by Seniority District

(b) Air transportation may be provided more than once per calendar month, at the Carrier's discretion, to employees working over 400 miles from their home station, as long as a twenty-five (25) calendar day advance notice is given to the employee's Supervisor, reasonable air fare can be obtained and a major airport is located within a reasonable distance from the employee's lodging site and residence. Employees will be responsible for their own travel arrangements to and from the airport. Employees requesting this option must make themselves available for work on at least ninety-five percent (95%) of the regularly scheduled workdays during the work period preceding the use of this air transportation option. During the 30 day period preceding and following the rest period where air transportation is provided, employees will only be allowed one other rest period travel allowance reimbursement in each of the preceding and following thirty (30) calendar day periods.

(c) Travel allowance as provided herein will be allowed in the event of emergency situations such as death in the employee's immediate family as defined in the bereavement rule, imminent life treating illness/injury to an employee's immediate family member or child birth. The intent of this provision is to assist the employee in making trips home, however, it cannot be used more than once per overall event. Employees utilizing this allowance will not be able to use any other weekend travel during the current calendar month.

UP FULBRIGHT

(3) When the air transportation provided in Section (B) above is not utilized, in a sixty (60) calendar day period, the weekend travel allowance referenced in Section (B) above will only be allowed every other weekend and no more than twice in a calendar month subject to the qualifying provisions of Section (4) of this Rule. The Carrier has the prerogative to stagger employees weekend travel to meet operational requirements. Consideration will be given to seniority when staggering weekend travel.

(4) The weekend travel allowance referenced in Section (B) above will not be allowed in cases of an employee:

1. to an employee who moves their home station to enhance the amount of weekend travel allowance they would be eligible for;
2. to an employee exercising their seniority rights either through recall, bidding or displacement;
3. to an employee going home to serve a disciplinary suspension;
4. to an employee who declines to work planned overtime on any of their rest days; or,
5. to an employee who is absent from work on either the last day or the first day of the work period preceding the rest days for which the travel allowance is being claimed.

(5) Weekend travel allowance referred to in Section (B) above will be allowed when a bereavement day(s), personal leave day(s), or holiday(s) or a one-day vacation day falls on the last day or on the first day of the work period the employee is assigned. Additionally, the weekend travel allowance referenced in Section (B) above will be allowed to employees observing vacations in weekly increments providing the employee returns to their home station. A one way allowance based on miles traveled by the most direct highway route will be allowed for the start of the vacation period and a one way allowance based on the miles traveled by the most direct highway route will be allowed at the end of the vacation period, however, this does not apply to employees taking one-day vacations that are not consecutive with the weekend. Also, the weekend travel allowance referenced in Section (B) above will be allowed employees to go to training or company schools (the start of) and for the employee to return to their home station from the training or company school (at the end of) when weekend travel is required.

(6) A Post Office Box will not suffice as a home station for the purpose of the weekend travel allowance referenced in Section (B) above unless the employee has a letter on file from the Post Office that there is not a street address associated with his personal residence.

(7) Employees who do not elect the rest period travel on assigned rest days the allowance under Section (2) above, will be entitled to the provisions of Section A of this Rule.



UPFULBRIGHT

(8) Employees will not be entitled to such reimbursement of expenses or the daily per diem allowance during the rest days they are claiming the travel allowance provided herein.

(9) There shall be no duplication or combination of the reimbursement of actual expenses, per diem and/or travel allowances on any day such allowances are payable. Employees receiving a weekend travel allowance provided in Section (2) above will not be considered to be on duty and/or under pay during the time they are traveling to and from their home station and assembly point.

**(C) Change in designation**

Installation Teams may be changed from fixed headquarters to on-line, and vice versa, on ten (10) days written notice. An employee affected by such change or by a change in headquarters location may make request within five (5) days of such notice that his or her position be readvertised for bid. Such employee will remain on the position until the assignment is made, and the employee will then make a displacement in accordance with Rule 16 (A).

## RULE 33. PERSONAL INJURY.

Employees injured while at work are required to make a detailed written report of the circumstances of the accident as soon as they are able to do so after receiving medical attention. Proper medical attention shall be given at the earliest possible moment, and employees shall be permitted to return to work as soon as they are able to do so, pending final settlement of the case, provided, however, that such injured employees remaining away from work after recovery shall not be held to be entitled to compensation for wage loss after they are able to return to work. All claims for personal injuries shall be handled with the designated department.

## RULE 34. MOVEMENT OF HOUSEHOLD GOODS.

Employees required to relocate to obtain a permanent position under this agreement, due to an involuntary move which necessitates a change of residence, will receive free transportation of their household goods.

## RULE 35. FAITHFUL SERVICE.

Employees who have given long and faithful service in the employ of the Carrier, and who have become unable to handle heavy work to advantage, will be given preference of such light work in their line as they are able to handle.

UPFUBRIGHT

UPFULBRIGHT

**RULE 36. PAYING OFF.**

Except in those situations where employees have voluntarily elected to be paid by electronic direct deposits or mail service, employees will be paid off during the regular working hours semi-monthly. Where existing state laws provide a more desirable paying off condition, such conditions shall govern. Where there is a shortage equal to one day's pay or more in the pay of an employee, if requested, a voucher will be issued to cover the shortage. Employees leaving the service of the Carrier will be furnished with a time voucher covering all time due.

**RULE 37. ASSIGNMENT OF WORK.**

None but mechanics employed as such shall do mechanic's work. This Rule does not prohibit supervisors in the exercise of their duties to perform work.

**RULE 38. DISTRIBUTION OF AGREEMENT**

The Carrier will have copies of this Agreement printed and available to each employee affected.

**RULE 39. CONFORMITY TO AGREEMENT**

The management agrees that officers and supervisors will see that matter of wages and working conditions are handled in strict conformity with the rules of this Agreement.

**RULE 40. DATE EFFECTIVE AND CHANGES.**

(A) This Agreement shall be effective January 1, 2003 and shall continue in effect until it is changed in accordance with the provisions of the Railway Labor Act.

(B) Should either of the parties to this Agreement desire to revise or modify these rules, thirty days (30) written advance notice, containing the proposed changes, shall be given, and conference held immediately upon expiration of said notice unless another date is mutually agreed upon.

(C) In printing this Agreement to include applicable part of the several national agreements and other memoranda, it is not the intention of the parties to change, or modify, the application and/or interpretation of such agreements and memoranda. Should a dispute arise through the omission of, or slight change in, language used in such agreements or memoranda, the original language shall be controlling, unless such language has been subsequently changed, revised or canceled by agreement between the parties.

(D) It is understood that this Agreement is superseded by and subordinate to federal, state or municipal legislation.

**FOR THE UNION PACIFIC RAILROAD COMPANY**:

/s/ Neal J. Spencer
N. J. SPENCER
GENERAL DIRECTOR-TELECOMMUNICATION SERVICES

/s/ Dan Moresette
D. A. MORESETTE
GENERAL DIRECTOR OF LABOR RELATIONS-SHOP CRAFTS

**FOR THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS:**

/s/ Vic Janecek
V. L. JANECEK
GENERAL CHAIRMAN

UPFULBRIGHT

UPFULBRIGHT

| | | |
|---|---|---|
| **Terry D. Neal/UPC** | To | Kristin |
| 09/17/2015 01:54 PM | cc | |
| | bcc | Terry D. Neal/UPC |
| | Subject | Re: EEOC Questions |

Please note my responses in RED

Example of a Weekend Holiday Rotation for the technicians headquartered in Ft Worth

2012 week end rotation.docx

This rotation is developed and maintained by the technicians. You cannot go by the document, because the guys are always swapping weekends and holidays. It is merely a place to start. As mentions before: The 4 Electronic Technicians in Fort Worth are the only group that rotates weekends and holidays. All other headquartered locations cover there territory 24x7.

Kristin ---09/17/2015 09:15:33 AM---Hi Terry, I have a few follow up questions:

From: Kristin
To: Terry D. Neal/UPC@UP
Date: 09/17/2015 09:15 AM
Subject: EEOC Questions

Hi Terry,

I have a few follow up questions:

I know you mentioned the Fort Worth Team rotates weekends and holidays...is there a schedule for the weekend coverage that I could show as an exhibit? I've also attached a daily wage report on Fulbright, however it looks like it notates almost every Saturday, I'm hoping you can help me understand the report.
The BRS (Brotherhood of Railway Signalmen) are monthly rated and are paid 8 hours for every Saturday, whether they work or not using pay code 054. If they are called out for emergency restoration of service on a Saturday, they do not get paid and use pay code 908 (work not paid). They do however get overtime for a Sunday call out.

Fulbright,JM_eid-0251592_daily.wages.2013-thru-2014.pdf

I don't remember if you indicated how long Fulbright has been working the Monday - Friday schedule, only responsible for one wknd per month. Can you let me know when this schedule started and what the schedules are for the other 3 technicians. Also, in one document Fulbright makes a statement that when he is on call he is on-call for 3 nights straight; is that correct?
I have been the Manager for Team Fort Worth since 2008. During that time the 4 technicians in Fort Worth have rotated weekends and holidays.
3 of the 4 electronic technicians are on call Monday- Thursday every week for "Emergency Restoration of Service". Mr. Fulbright for the last couple of years has only been on call during his weekend or holiday. The weekend rotation starts on Friday evening and concludes on Monday morning at 7 am. So, yes when Mr. Fulbright is on his weekend rotation, he will be on call 3 nights in a row. However lets say Technician has this weekend on duty: He has already been on call for Monday through Thursday. He now has to cover the weekend, Friday through Monday morning, then back on Monday night to Thursday night. So that technician has been on call 12 days in a row. This never happens to Mr. Fulbright.

indicates Fulbright missed a call on November 16, 2014, is that correct? Are

CONFIDENTIAL

there other weekends that he missed calls? I'm wanting to understand how many weekends he worked in the past year.

Mr Fulbright also missed a call on Jan 25th 2015. Mr Fulbright was given a formal conference on Jan 26th. His union rep was present.
I really have no way to look up when Mr Fulbright was on weekend call, unless he actually worked the weekend.(payroll). I do not keep track of their weekend rotation schedule, it is there document to maintain. I just need weekend coverage.

The Priority 1 call indicates Antenna 1 not reading tags, Antenna 0 missing tags here and there...causes site to not recognize trains. Can you help me understand what all of that means? I know you mentioned "delays building of a train". I would like to be able to provide more detail about the urgency of the call and what the risks/results of not attending to the call in a timely manner are.

AEI Automatic Equipment Identifier is a very fickle beast. There are two antennas, one on each side of the track. There should be RFID tags on both sides of the box cars, but that is not guaranteed. If one antenna is missing or bad, it can lead to incorrect consist, and direction of the train. This particular aei site is imperative to Hump yard operations. Quite simply put it can and will cause delay in the building of a train. If you need I can get an aei engineer to explain the importance of this site. AEI has a very high visibility to our operation folk and our customers. Mr Cameron Scott has put a great pressure on keeping ALL of our AEI sites in operational status. AEI is just behind CTC in order of importance for Technician Restore of Service

My conclusion:
Mr Fulbright was investigated and fired on level 5 charges from Aug 1998 to April 2000 for failure to respond to Emergency Restoration of Service (Missed Call)
The arbitrators brought him back to work with, no back pay, no reinstatement of seniority, on last chance aggreement. During my tenor here in Fort Worth, I have tried to
manage with a hand slap and handshake policy. Normally when Mr. Fulbright would miss his calls, I would make him work it out with the Technician that had to take the call. Mr. Fulbrights's last formal document for missed call was not discipline. I just needed to get to the root cause, with that being "Mgr referral fit for duty"

Please let me know if you have questions.

Thanks,
Kristin

**I build the foundation. What will you build?**
**UP.jobs**

**Build with us:**

UFULBRIGHT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

| | | |
|---|---|---|
| JOE M. FULBRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No: 3:20-cv-02392-BK |
| | § | |
| UNION PACIFIC RAILROAD COMPANY, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S AMENDED NOTICE OF INTENT TO TAKE THE ORAL DEPOSITION OF UNION PACIFIC RAILROAD COMPANY**

TO: Union Pacific Railroad Company, through its attorney, Heather M. Miller, Constangy, Brooks, Smith & Prophete, 2600 Grand Boulevard, Suite 750, Kansas City, Missouri 64108.

Pursuant to the Federal Rules of Civil Procedure, Plaintiff Joe M. Fulbright notifies you that he intends to take the oral deposition of Defendant, Union Pacific Railroad Company. The topics for the deposition are attached to this deposition notice.

Defendant has previously notified Plaintiff it has designated three persons to testify on the topics, and the parties have agreed to the following schedule for the depositions:

August 20, 2021 starting at 10:00 a.m. CDT - Dr. John Charbonneau, Associate Medical Director – Topics 5, 6, and 7.

August 24, 2021 starting at 9:30 a.m. CDT - Terrill Maxwell, Director Labor Relations – Topics 1(b) and 4.

August 26, 2021 starting at 1:30 a.m. CDT - Stephen Hale, Senior Manager Telecom Operations - Topics 1(a), 1(c), 2, and 3.

Place: The deposition will be taken using the Zoom webcast platform. The undersigned counsel or the court reporter will email the link to access the meeting.

Method of recording: A certified court reporter will record the deposition by stenographic means, and the court reporter and/or the undersigned counsel will record the audio and video on Zoom.

The court reporter will report the deposition from a location separate from each witness.

Counsel for the parties and their clients will be participating from various, separate locations.

The court reporter will administer the oath to each witness remotely.

/s/ Donald E. Uloth

Donald E. Uloth
Law Office of Donald E. Uloth
Texas Bar No. 20374200
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

CERTIFICATE OF SERVICE

On August 18, 2021, I served a copy of this document to Heather M. Miller, counsel for Defendant, by email to hmiller@constangy.com, and to Robert L. Ortbals, Jr., counsel for Defendant, by email to rortbals@constangy.com.

/s/ Donald E. Uloth
Donald E. Uloth

Fulbright v. Union Pacific
Topics for 30(b)(6) Deposition of Union Pacific Railroad Company

1. <u>The terms and conditions of Plaintiff's employment.</u>

a. The witness should be prepared to explain what documents concerning the terms and conditions of Plaintiff's employment (documents that established and/or described Plaintiff's duties and terms of employment) applied to Plaintiff from June 15, 1999, when the agreement Bates numbered JF 402-435 went into effect, through the end of his employment, and prepared to answer questions about how the terms in these documents applied Plaintiff.

b. For the period mentioned above, the witness should be able to identify any Collective Bargaining Agreement that applied to Plaintiff, along with any side letters, letter agreements, understandings, interpretations, job descriptions, company policies, work rules, and safety rules that applied to Plaintiff.

c. The witness should be able to testify on the following issues and identify the specific language in the documents relevant to these matters:

i. Plaintiff's work schedule;

ii. Plaintiff's duties and what he spent his working hours doing;

iii. What percentage of Plaintiff's working hours were spent doing the things he was restricted from doing after Defendant imposed work restrictions on him at the end of June 2015;

iv. When Plaintiff could be asked to or required to work outside of his regular weekday shift;

v. Whether seniority affected the obligation of Plaintiff and his coworkers (the Communications Technicians and Electronic Technicians he worked with at his location) to take work calls outside of the regular weekday shifts;

vi. What geographic territory was Plaintiff was supposed to cover, and whether it the same from 2009 through 2015 or did it change;

vii. The establishment of the Restore Technician and Install Technician positions circa 2009, who bid on the positions, and the differences if any in the positions.

2. Plaintiff's performance

For the period from January 23, 2009 through the end of his employment, the witness should be prepared to testify about the quality of Plaintiff's performance and the specifics of any instance when Plaintiff was impaired at work, unsafe, or his performance was less than satisfactory.

3. Calls to Plaintiff and his coworkers when they were off duty

a. For the period from January 23, 2009 through the end of Plaintiff's employment, the witness should be prepared to testify about all calls to Plaintiff and his coworkers (the Communications Technicians and Electronic Technicians he worked with at his location) outside of the person's regular work shift.

  i. The witness will be asked what the expectations and requirements were of each employee for this period to respond to calls placed to the employee when he or she was off duty.

  ii. The witness will be asked if there are documents showing the dates and times of such calls (when he or she was off duty), what the calls were about, if the person called responded or not, and if not, whether another employee had to be called to handle the issue.

  iii. The witness will be asked about any procedures Union Pacific used to determine when and who to call at a time the person was off duty.

  iv. The witness will be asked to testify about any technology involved with such off duty calls and whether it involved email or some other kind of notification system.

  v. The witness will be asked if there are documents relating to discipline of one of these employees (Plaintiff and his coworkers) for missed calls, and what they show.

4. Economic Damages/Plaintiff's compensation and benefits

a. For the period from January 1, 2009 through the present, the witness should be prepared to testify about the compensation paid to Plaintiff, changes in his compensation, and what compensation Plaintiff could have reasonably expected to receive if he had remained employed through the date of the deposition.

b. For 2015, the witness should be able to testify whether applicable policies and procedures could have allowed Plaintiff to receive compensation while he was out on an involuntary medical leave of absence.

c. For 2015, the witness should be prepared to testify about Plaintiff's health-insurance benefits, what was/was not covered, what costs Plaintiff could be required to pay such as co-pays and deductibles, and whether there were any lapses in coverage (a period of time where the benefits were not in effect).

d. The witness should be able to say if the sleep study/sleep medicine evaluation Charbonneau asked for would have been covered by insurance.

e. Regarding retirement benefits, the witness should be prepared to say what Plaintiff can expect to receive once he becomes eligible for retirement benefits payments, and what Plaintiff would have received if he had continued working and qualified for a full benefits (a full age and service annuity with 30 years or more of service).

f. The witness should be prepared to testify about what effect, if any, it would have had on Plaintiff's health and retirement benefits if he had taken another job after he was terminated at Union Pacific.

5. <u>Defendant's Medical Rules and Prohibited Medications</u>

The witness should be prepared to testify about the company's Medical Rules, UPFULBRIGHT 906 – 918, how they are used to determine employees' Fitness-For-Duty, and the decision of what include as Reportable Health Events, UPFULBRIGHT 917 – 918.

The witness should be prepared to testify about the decision of what medications to include or not include in the company's list of Restricted Prescription Medications.

The witness should be able to identify the documents referred to on page UPFULBRIGHT 906 as "regulatory requirements and safety standards established by Union Pacific."

6. <u>Fitness for duty decisions about Plaintiff</u>

For the period from January 23, 2009 through the termination of his employment, the witness should be prepared to testify about the fitness for duty decisions made about Plaintiff, and the basis for the decisions.

7. <u>Medical Information on company employees and the EHealthSafe system</u>

The witness should be able to explain how Union Pacific handles medical information and medical records of its employees, and to explain what the EHealthSafe system is, what it can be used for and how it is used.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOE M. FULBRIGHT, )
Plaintiff, )
)
vs. ) Civil Action
) No. 3:20-cv-02392-BK
)
UNION PACIFIC RAILROAD COMPANY,)
Defendant. )

* * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION

DR. JOHN CHARBONNEAU

MARCH 25, 2021

(REPORTED REMOTELY)

* * * * * * * * * * *

ORAL VIDEOTAPED DEPOSITION OF DR. JOHN CHARBONNEAU, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on March 25, 2021, from 9:29 a.m. to 1:35 p.m., before Christy Fagan, CSR, CRR, RMR, TMR, RPR, CLR in and for the State of Texas, reported remotely by computerized stenotype machine, considered being taken at the witness's location of his residence located in Greeley, Colorado, Weld County, during the COVID-19 State of Disaster, pursuant to the Federal Rules of Civil Procedure.

Services and decided that, okay, a week with no contact is long enough. And when you can contact him, ask him for the two years of medical records. And until we hear from him and start this process, he's pulled from service, he's removed from service.

Q So, if I understand your testimony, you're saying the reason you decided to pull Mr. Fulbright from service is that you hadn't been able to get him to return a call during the prior week?

A Well, that's part of it, but that isn't what I -- what I was trying to convey. There's a serious safety concern. The gentleman has a sleep problem, he's taking medication which impairs his ability to be there. Theresa has reached out and tried to contact him and he's not responding.

We have no idea at that point how long it's going to take him to respond, but because of the serious safety concern of the underlying medical condition and the medication and the no response, we felt that it was time to remove him from service and ask for records so we could get to the bottom of the problem.

Q So help me out with the information that you had available to you as of 9/15 on February 1, 2015. By this point, you would have seen Exhibit 2, the manager

A We made it on the basis of the then available medical information.

Q Which did not include the results of a sleep medicine evaluation, right?

A That's right.

Q And Mr. Fulbright told you he couldn't afford to pay for that sleep medicine evaluation, correct?

A That's what this note says, yes.

Q And Union Pacific never offered to cover the cost of that evaluation, correct?

A As I said before, I don't know. I would not have the authority to authorize that payment.

Q Why did you decide to impose sudden incapacitation restrictions?

A We do that when there is lack of clarity about the employee's ability to stay awake and alert and upright. And that may sound kind of off-the-cuff, but it's -- it's not. It's -- it's about ability, again, to be awake and alert and fully in control of your senses and things like that at work.

So, in that sense, if somebody had serious cardiovascular disease that might lead to a syncopal episode, they would get sudden incapacitation restrictions. If someone had a seizure disorder, they would get sudden incapacitation restriction. If someone

had, like Mr. Fulbright, a serious underlying condition, he used the term life-threatening condition, and medicine that precludes his working but we don't know the duration of the effects of that medicine, then we don't know if he's always going to be awake and alert and in full control of his senses at work. So --

Q Well --

A -- those are three different categories of medical condition that end up with the same grouping of restrictions.

Q What were the three?

A I think I just used seizure disorder or bad cardiovascular disease or a serious sleep problem such as in this case. I was just using those -- the other two as examples.

Q Joe didn't have a cardiovascular disorder, did he?

A I don't believe so, no.

Q He didn't have a seizure disorder, did she?

A Not to my knowledge.

Q What was his serious sleep problem?

A Well, I mean, he called it a life-threatening sleep condition. Those are his words, not ours. And there are documents here that talk about how, you know, after one or two days of work he's just worn out, can't

Trazodone to the list of prescription drugs that Union Pacific prohibits?

A Okay. First, as a foundation of your question, I didn't determine that he couldn't work safely. I couldn't -- I couldn't say that he was safe to be at work and, until we had more medical information, we were going to impose sudden incapacitation restriction.

The second part of my answer to your kind of combined question there is that I did not talk to anybody about putting Trazodone on the list. I don't know if Dr. Holland considered it or not. I did not talk to him about it.

Q To clarify something you just stated, it's my understanding that you just said you did not make a determination that Joe could not safely work for 24 hours after taking Trazodone; is that accurate?

A Nope. You added more to that question now than you had before. You said that I made the determination he couldn't safely work. Maybe I was being picayune, but we made the determination that we couldn't answer the question originally asked of us because we didn't get all of the information that we asked for. So that's why we implemented the southern -- sudden incapacitation restrictions. The Trazodone

taking Trazodone?
A Our basis, Trazodone was long acting and that he had stated that it made him impaired. So he --
Q When did he say that?
(Video interruption.)
MR. ULOTH: I think we're losing Dr. Charbonneau.
A In the statements about, you know, you could be -- while on the medication, that's why he would never go out and -- I'm sorry?
Q We're -- you're cutting out. Your picture is freezing and we don't hear you, so Christy cannot possibly write down what you're saying.
And I'm trying to ask something simple. I think I'm trying to reiterate something you've said and asked if I've stated it correctly.
I think you told me that you never made a finding or a decision that Joe could not safely work for an entire 24-hour period after taking Trazodone. Is that accurate?
A That is accurate. That is accurate.
Q Thank you. Let me ask another question. Are you aware of any medical journal articles or studies that you find to be authoritative concerning Trazodone?
A I have looked at the FDA information on

decision that I wrote up.
Q So the concern and the reason that Mr. Fulbright was declared not fit for duty was a safety concern, correct?
A That was the underpinnings of this case, correct.
Q What did you think might happen, what bad thing might happen?
A Well, again, keep in mind when we made this decision, they are kind of two major concerns. Number one is his underlying disease, severe insomnia, appeared to be sleep-onset insomnia. So that severe insomnia condition was part of the concern, and the other part was the medication which he was taking. So it was twofold, both the underlying condition and the medication and duration of action of the medication.
Q What were you concerned might happen?
A That he would be impaired at work.
Q And do what?
A Perhaps have an accident while driving, a fall while climbing, things like that.
Q How often did he drive?
A I think he had to drive routinely.
Q Did you have his job description?
A I would have had access to his job

perspective, he felt like it got him to sleep and therefore was not a problem. Well, that -- that addresses the falling asleep part, but we don't know how long the duration of action was in his case.

Again, I want to reiterate, the sleep medicine evaluation may have been able to give us some additional information in that -- in that realm or in that line. We didn't get it.

Q When you were making your fitness-for-duty determination -- and I believe you said it was based on concerns about safety, right?

A That's correct.

Q Did you do any kind of probability assessment about how likely it was that something bad was going to happen during Joe's shift at work because he had taken Trazodone the night before?

A I can't tell you that there was that kind of science applied to the decision-making, no.

Q So let me ask you a little bit about sudden incapacitation restrictions. What are sudden incapacitation restrictions?

A I think we touched on it earlier, but it has to do with keeping employees out of situations/circumstances in which they would be injured or hurt somebody else, risk to the general public in

Q And in the conversations -- you had two conversations total with Joe Fulbright, right?
A Right.
Q And in one or both of those conversations, he told you that the sleep disorder was well controlled by the Trazodone?
A I believe that he felt that it was well controlled, yes.
Q And, as I understand it, it was not simply the fact that he took Trazodone that caused Union Pacific to impose work restrictions on him, correct?
A It was after analysis of all the information that was available to us, not purely because of taking that medication.
Q In fact, you yourself had declared Mr. Fulbright fit for duty in 2014, knowing that he took Trazodone, correct?
A It is true that that medicine was listed in his medical records that I looked at, yes.
Q Okay. So the issue in 2015 was, it seems to me, primarily two things. And I don't mean to exclude anything, so add if I oversimplify. One would be you had information from Terry Neal. You had the manager referral form and he had spoken by phone to Theresa Rodino. And then, two, you never got the sleep medicine

evaluation that you wanted done.

So it sounds to me that it was the combination of those three things. You had -- you knew he took Trazodone, you had information from Terry Neal, and you hadn't gotten the results of the sleep medicine evaluation, and those together resulted in the work restrictions being imposed on Mr. Fulbright. Is that correct or did I leave something huge out?

A Well, there -- there -- there are corollaries to the three things that you said. Number one is we found out that he had a sleep disorder. And, again, his description that it was a very severe sleep disorder and, independently, it caused him to call off work because after a few nights he couldn't continue working.

And, secondly, his pretty strong statement that when he took his medicine, he felt himself impaired to the point that, you know, he -- he -- he referenced this safety meeting with the Texas State Troopers about being impaired due to prescription medicines and things like that.

So it wasn't just that there was a sleep disorder and that he took a medicine, but it was the degree to which he himself stated that his underlying condition and his medication impacted his ability to safely work.

Q And he took the medicine to go to sleep, right?
A Correct.
Q So he shouldn't work while he's asleep, should he?
A We agree about that.
Q And, I guess, the point of him taking the Trazodone was to make him drowsy, right?
A Yes.
Q Okay. And --
A Wait. Mr. Uloth, I answered that reflexly.
As it appears now, it looks like that. But he was also diagnosed with depression, so it could have been used for his depression as well. It was prescribed initially by a psychiatrist, so -- but it looked like, at the time we were interacting with him, primarily it was taken for sleep.
Q Right. I've seen that as well, and I -- but I haven't, like you, heard that as much of a driver, the depression, it was more the insomnia. But, as I understand it -- well, you covered that. We've covered that.
Bear with me. Let's go back to Deposition Exhibit 1, and I have a few boring questions for you. Well, that's 2. Give me one second.

A. Yes.
Q. So what is an end of train device and what does it do?
A. It monitors air pressure throughout the cars and it has a motion sensor on it that lets the conductor know when the back car is moving.
Q. Okay. What's E-procurement?
A. We had at that time -- it was like an ordering system and that's how you ordered equipment. It was like supply requisitions.
Q. Okay. What's FOT?
A. Front of train.
Q. So where this document says that Fulbright's primary duties will include FOT, what does that mean?
A. Joe would do work, repair front of train devices, and that front of train device talked to the end of train device.
Q. Did he work on moving trains?
A. No, not -- not in 2015.
Q. What about in 2012?
A. No.
Q. Do you know if he worked on moving trains at any point in between 2012 and 2015?
A. In 1984 we still got on trains, but I did

call through the call rotation, the call list, and it rotating down to the on-call technician.
Q. How would a technician mark off duty?
A. They go into their tie-up. There was a tie-up screen for every technician and they go on their tie-up screen and mark on duty or off duty. They can mark on vacation, on duty, off duty, and they had places in there to put any type of documentation, you know, notes and telephone numbers.
Q. What's a tie-up screen?
A. Just exactly what it sounds like. A place that they would go on a computer to tie up.
Q. So marking off was something that was done on a computer system at Union Pacific?
A. Yes, sir.
Q. Did technicians ever neglect to mark off on the weekends that wasn't their volunteer weekend?
A. People make mistakes. It happens.
Q. And the rotation process that you've been describing, was that in place continuously from 2012 through 2015?
A. Yes.
Q. So if the caller -- I used the word "dispatcher," and you said that wasn't the right

term. What was the right term?
A. It's fine. You can use dispatcher.
Q. Okay. If the dispatcher went through that progression that you described and got down to somebody who is not marked off and called that person and wasn't able to reach them, was there a policy or procedure of what was supposed to happen next?
A. They would leave that -- if they got all the way down the list, they would leave that person a voicemail and then they would call me.
Q. Well, I mean, before they go all the way down the list. I'm still at Step 1 where they, you know, go through the list until they find the first person who's not marked off and that's the first person they call, and I'm asking what happens if that person doesn't pick up the phone line.
A. If everybody else is marked off like they should be and he's the only person marked on duty, then they would leave him a voicemail and call me.
Q. Okay. Would they call you immediately after leaving the voicemail or wait for some period of time?
A. It may vary. But it would be shortly after that depending on the criticality of the call.

worked for me at a certain point in his career.
Q. Did he -- did that happen prior to 2012 -- I mean 2015? I'm sorry.
A. Somewhere in there, yes.
Q. Do you recall about when?
A. No, sir, I do not.
Q. Okay. Skipping down to the paragraph that begins "Terry Neal," it uses the phrase "restoration of service." Can you explain what that is?
A. Basically fixing a broken piece of equipment.
Q. And then under Bob Herring in quotation marks, I see FTWR. Is that one of those mnemonics that you told me about?
A. Yes, sir.
Q. What is FTWR the mnemonic for?
A. Fort Worth.
Q. That would include Davidson and Ney and other stuff?
A. Yes, sir.
Q. Okay. And then some of these other people, it assigns out safety team leaders. What's a safety team leader?
A. Basically a safety captain.
Q. Okay. And next to Jerry Cowan it says

"safety team leader east."

Was that a geographic division, a subset of the Fort Worth area?

A. It was just a term you put in for the safety captain. He handled the technicians that were on the eastern end of our territory.

Q. Did those folks work at a location other than the Davidson Yard?

A. Yes.

Q. Is that in Palestine?

A. Palestine, Longview, Mesquite, Dallas.

Q. Okay.

A. Texarkana. It's east.

Q. All right. And then in the paragraph below those safety team leaders' names, it mentions meeting if a safety team -- scratch that.

I'm looking at this line that begins "if at any time a team member wants to attend another team's meeting."

What -- what meeting is that referring to?

A. Safety meeting.

Q. Were there regularly scheduled safety meetings?

A. We tried to have a safety meeting once a

month. Every safety captain or safety team leader would put together a safety meeting. They didn't always coincide with each other, but each region would have their own safety meeting. The team members were smaller, so it was -- team members were more frequent to talk openly when the team was smaller.

Q. And what was the purpose of safety team meetings?

A. To talk about safety issues.

Q. Can you give me an example of a safety issue that might need to be discussed at a team meeting?

A. Actually driving, driving in inclement weather, driving up to certain sites, a site might need road work done. Just whatever a team member thought that there was something that an issue that needed to be brought up and talked about.

Q. Okay. Fair enough. I'm going to go down to the next page, which is going to be JF 15.

On the line that says "daily expectations for both ROS and IT personnel."

Who were the ROS personnel?

A. That's our restore personnel.

Q. Well, give me the names of the ROS

personnel, if you can.
A. I don't know off -- I couldn't name who was on restore at that time. I think if you go -- it's -- I think it's explained in that document somewhere probably.
Q. What do you mean by "restore"?
A. Restoration of equipment.
Q. Okay. So there were certain specific people allocated the responsibility for restoration of equipment?
A. Yes.
Q. I thought earlier you told me that all of the technicians had responsibility for restoration of equipment.
A. They can. It is everyone's responsibility. They can be dispatched on emergency restoration of service. All employees can.
Q. So what -- what would be different about the ROS personnel versus all of the technicians?
A. They're -- that's their primary responsibility.
Q. Okay. So during -- during normal working hours, you're saying there's a group of people who were primarily doing restoration as opposed to other things?

A. Yes.
Q. Okay. And if you see that in this document, if you see those names broken out, feel free to identify that for me. I don't know if we're going to run across that or not or if I've already skipped past it. Do I need to go back a page?
A. If you would like. If it's there, I'll clarify it. It may not be in this document. Like I say, I don't remember the document per se.
Q. Okay. Well, I don't think it's here under meals. We looked at this page pretty thoroughly.
Do you see a list of the ROS personnel?
A. No.
Q. Who was Dana Messerschmidt?
A. He was a general director of construction.
Q. Okay. Now, I've gone all the way back up to the top, and we didn't see the ROS personnel list anywhere, did we?
A. No.
Q. Okay. Let me go back where I was. I asked you about ROS personnel.
Who would be considered IT personnel?
A. Installation that -- it's employees that their main responsibility is installation of

equipment.
Q. Okay. So those are --
A. It doesn't relinquish them from the fact that they could go out and have to work on equipment. It's just their main responsibility at this time would be the installation of equipment.
Q. All right. And so there would be somewhere a separate list of who falls under that category, IT personnel, right?
A. Yes.
Q. And do you know if that was true going forward after 2012 all the way through January 2015?
A. I don't know. I don't remember what the format was at -- in 2015.
Q. Just above the line that we were looking at -- well, no. I'm sorry. It's a different line.
Just above where it says "weekly expectations," there's a part that says "help your buddy." Was there like an assigned buddy system, or is that more of a generic term, help all the other technicians?
A. Just if you see somebody in need, lend a hand.
Q. Okay. And I'm going to keep going. So this next page is going to be JF 16 that starts off

again there's that term "ROS team," and you've explained that already, correct?

A. Yes.

Q. Where it says "all technicians from ITB to Sr ET," can you explain what is ITB?

A. Installation tech, Classification B.

Q. And then Sr ET is what?

A. Senior electronic technician.

Q. The next line in quotation marks mentions Lynn Andrews' version of ROS/IT. Can you explain what that is?

A. Yes. Lynn Andrews was our vice president, I believe, and he had visions of splitting technicians into restore and install. And Fort Worth, like it says there, the only place that we're running to split the vision was in Fort Worth. It wasn't something that was a mandate or a contractual, you know, stipulation.

It was just a formation of the technicians into certain roles. And individuals could -- we could roll one technician from one side to the other side. It was not anything that was set in stone.

Q. What was the purpose of doing that?

A. To try to maximize a project and getting

the projects out on time.

Q. A few lines down on the line that begins "main responsibility," and then in parentheses it says, I guess, "senior ET pay code 101."

What is that referring to?

A. I don't -- I don't remember. The pay code is how much they get paid. Certain senior electronic technicians make more than others, and they have different pay codes. I -- I don't know what that's referring to.

Q. Did the ROS positions that the people who had the ROS assignment make a different amount than the IT group, installation team?

A. Not necessarily, because I could have -- I could have a senior ET on the IT side doing projects and they would make approximately close to the same money as the senior ET on the restore side.

Q. Okay. I'm just trying to understand this parenthetical here. You talk about the ROS positions with a certain pay code.

Would there be -- would there have been employees in ROS positions that didn't have that pay code?

A. Yes. I believe so.

Q. Do you know if there was a different pay

code used for installation team personnel?

A. Each -- like the IT B, there's also an IT A. IT Bs have a different pay code from an IT A. Communication -- electronic technicians, there's A, B, C. They all have different pay codes.

Q. Okay. And do you recall why you needed to specify on this line ROS positions, parenthetical, senior ET pay code 101?

A. No, I don't -- I don't remember why. I don't remember what pay that -- what that pay code was.

Q. Were -- were you trying to be more specific about who you were talking about that, you know, these -- these four priorities and main responsibility are for these people, ROS positions with this pay code but not others?

A. I don't know. I don't -- I don't remember what the pay code was, so I can't state.

Q. Okay.

MR. ULOTH: Why don't we take five? I'm kind of going to shift gears, and I'll probably be able to go a little faster if I can regroup for a second.

MR. ORTBALS: Sounds great.

(Break from 10:48 a.m. to 10:55 a.m.)

similar to what Mr. Ozuna describes in his first sentence in this document?

A. We did have an area, a time frame that we did reorganize. I don't recall the particulars here. I don't remember the 2009 meeting.

Q. Does this have anything to do with the Lynn Andrews version that you testified about a few minutes ago?

A. It's possible.

Q. Was this -- scratch that.

When the Lynn Andrews version was going into effect, did you have a meeting with the technicians?

A. Yes. Anytime there was a structural change, I would have a meeting with the technicians.

Q. Okay. Do you remember explaining to technicians that there was going to be a position called restore senior electronic technician?

A. No. I don't remember the conversation. I'm sure I did, but I don't remember the conversation.

Q. Was there a position that y'all were going to refer to as restore senior electronic technician?

A. Yes.

Q. And do you recall if that was going to be

a bid position?
A. Yes.
Q. It was going to be a bid position?
A. Yes.
Q. And do you recall whether it was going to be paid an extra dollar an hour?
A. That's what I remember.
Q. That it would get more money?
A. Yes.
Q. And then do you recall if the rest -- if the restore senior electronic technicians were going to have a different line of reporting than the other technicians?
A. Can you please repeat?
Q. I'm focusing on the last sentence of the top paragraph just trying to figure out if -- if what Mr. Ozuna is saying here is consistent with what you recall, that if you were --
A. Yes, sir.
Q. -- if you were --
A. Yes, sir.
Q. So where he says if you were a restore tech, you would report to Mr. Neal directly, do you remember that being correct?
A. Yes.

Q. And that if you were an install tech, you would report to project supervisor Steve Hale. That's correct?

A. Yes.

Q. And then after the bidding, is it correct that Jason Norgan and Ed Hines were going to be the restore techs?

A. I don't remember. I don't remember who got the jobs.

Q. Would that be the ROS personnel as that term was used in the document we were looking at a minute ago?

A. Yes. They would be -- I don't know if that refers to the previous document, but that would refer to these two individuals being restore technicians.

Q. Okay. And in the second paragraph near the bottom, he uses the term "weekend rotation."

Is that the same rotation that you were describing before we took our break?

A. Yes.

Q. And in the second paragraph, that first sentence, it talks about install technicians were not responsible for being on call. Do you see that?

A. Yes.

Q. Do you agree with that statement?
A. Under a normal circumstance that -- that was not their -- they weren't going to be on a call list and that would not be their primary duty. But as I've stated before, all employees in the telecom department are subject to call 24/7, seven days a week on emergency restoration.
Q. So you're saying that under normal circumstances, a restoration-of-service call would not have gone to the people who were classified as install technicians?
A. On a normal circumstance, yes.
Q. And then in the last paragraph, he talks about Mr. Fulbright and sleeping medication. And I'm wondering if this, reading this brings back any memories of any prior discussion before 2015 about Fulbright and sleeping medication.
A. No.
Q. Do you believe that it could have happened and you just aren't recalling it here now in 2021?
A. I don't remember. I can't speculate on something I don't remember.
Q. Fair enough.
Let's go to -- there's another --
A. There is -- excuse me. I'm sorry.

There is something on the bottom of that paragraph to where it says that Mr. O'Bannon would be available for the day on the weekends when Joe was not taking his medication. That doesn't say anything about the nights on the weekends. It didn't make sense to me.

Q. Let me go to the next page, scroll down to show you the Bates number. JF 192.

And this is another statement or narrative, if you will. And I'm going to do the same thing here. Is this something you've ever seen before?

A. No.

Q. Okay. Do me a favor and take a minute to read it to yourself, and when you're finished, let me know. Okay?

A. (Reviewing document.) Okay. I'm finished.

Q. I think I'll just go through this, you know, a few sentences or ask you about a few sentences starting, I guess, on the third line there's a sentence that begins "around the end of 2009."

Do you agree with what he says here in that sentence?

A. I don't remember exactly when the switch took place and the bids went out. It's possible it's around that time.

Q. Okay. But it's correct that at some point the jobs in the department were divided into restore tech and install tech?

A. Yes.

Q. And that there were two restore tech positions?

A. Yes.

Q. And the restore tech positions were awarded by a bid process, correct?

A. Yes.

Q. Skipping to the next paragraph, do you remember was it correct that Mr. Fulbright did not bid one of those jobs?

A. I -- I don't know if he bid or not. He was a senior employee, so if he would have bid it, he would have gotten one of the jobs. But I don't remember who bid the job and who didn't.

Q. Did Fulbright become a restore tech after this bidding process?

A. No.

Q. Isn't it true that around -- when did -- when did he start taking care of his mom with

Alzheimer's or whatever her issue was? Do you remember?

A. No.

Q. Do you recall a time where Fulbright really didn't want overtime because he was busy taking care of his mom?

A. He never discussed it with me that I can remember.

Q. Okay. All right.

In the last paragraph, the sentence that begins "he did make it clear," do you remember this being discussed --

A. No.

Q. -- in 2009?

A. No.

Q. You have said that all of the technicians were subject to call for emergencies, but is it correct that after the division between the restore and install tech, the install technicians were not going to be on call -- if you know, does on call have a specific meaning for you?

A. Yes, it does.

Q. What does that term mean to you?

A. On call means that you are making yourself available for after-hour emergencies.

Q. And is that different from being subject to call if a really bad emergency came up?

A. If a really bad emergency came up, it was all hands on deck.

Q. That's -- that's kind of what I'm getting at. It sounds like the things we read and what you've testified to, that if one of the technicians had volunteered to cover calls for the weekend, then the other technicians would not be on call, correct?

A. They're not on call, but that does not mean that they are not responsible to come out if needed. And it has happened that off-duty personnel were called in to assist with on-call personnel.

Q. Okay. But just to clarify, then, the way the rotation worked, the tech who had volunteered to take calls for that weekend would be the only one who was on call for that weekend; is that right?

A. That would be correct.

Q. But anybody could be called if an emergency arose --

A. Yes.

Q. -- also correct?

Okay. I think I get it.

You talked about safety, and I understand safety was a priority for the railroad,

available.

Q. And if it wasn't your week, what was the expectation?

A. That you could do whatever you want.

Q. Okay. Was Mr. Fulbright in this rotation that you're describing?

A. To the best of my knowledge, yes, sir.

Q. Okay. Were there -- do you remember group meetings where it was discussed openly that Mr. Fulbright was taking trazodone?

A. I do believe in some of our safety meetings that was brought up.

Q. What's a safety meeting? Tell me about that.

A. So we would have monthly safety meetings. We would go over any new safety rules and we would normally have a safety topic. Hey, this -- this month we're going to cover on track safety or this month we're going to cover dealing with high voltage equipment. And so they would -- it would be a training and it would be also a time to cover any new safety topics or anything that had happened over the past month if we'd had any safety instance, like somebody getting injured or something, we would -- we would cover that.

Q. And was it at one of those meetings or maybe more than one that there was discussion about

Q. What kind of positions were you looking for?
A. Electronic technician positions.
Q. Did he give you any type of parameters in terms of geography or anything?
A. Not that I remember. No.
Q. So did you interpret that as meaning he'd go -- go anywhere geographically?
A. He just -- he just wanted to work again.
Q. Okay. All right. One more question. Well --
A. Okay.
Q. There might be some follow-ups. There's never just one more question, as Mr. Uloth knows.
In regards to working on call, the rotations that were discussed during the prior deposition record here, you said that if you weren't on the rotation, if it wasn't your week, you could do whatever you want. Was there ever a situation in which you actually could be called even if it wasn't your week on the rotation?
A. You weren't required to answer.
Q. Could you be called though?
A. You could -- I -- they could probably call -- I don't see how they would know to call you because the -- so every -- all the calls originated from Omaha and they would have a list of who was on call during that time.

Is it possible that they could call you when you -- when you weren't on call that week? I guess. But the understanding was that there was no repercussion for you not answering those calls.

Q. Could -- could -- was there ever a situation or could there be a situation, I guess, when there's a circumstance that requires kind of all hands on deck, you know, some catastrophic emergency situation that even though it's not your week, you could be called?

A. The only time I recall that was there was a hurricane down in the Houston area, but, of course, we had advance -- we knew the hurricane was coming. We kind of knew stuff was going to get destroyed, so they were looking for people to -- not just leave them on call but be available for work for that, but that was a natural disaster kind of thing. That wasn't a -- a normal occurrence of work.

Q. Okay.

MS. MILLER: I don't think I have any more questions. Thank you.

THE WITNESS: Okay.

MR. ULOTH: Nor do I. So Mr. Ensign, we appreciate your time and we can wrap it up and go off the record. Thank you.

THE WITNESS: All right. Thank you, sir.

half years ago, I just thought I'd ask if there was something specific about Mr. Fulbright's case that prompted you to be up at 9:15 on Sunday morning working on his case. Do you recall anything?

A No. I think it would be much less likely to be about his case than about my workweek. I was still seeing patients then, so I had a pretty active practice and, you know, we tried to responsibly reply to requests for eHealthSafe activities. So if I knew that I had some work to do, it -- I might have just started early on that particular Sunday.

Q Now, on February 1, when you made your first entry, you decided that Mr. Fulbright was not fit for duty, correct?

A I did. I recommended that since there was a serious safety concern and we weren't making all of the contacts that we needed to make, that the appropriate action would be to remove him from service and continue the process, continue trying to contact him and get medical information from him.

Q Tell me why you made the decision that he was not fit for duty.

A First of all, we had a sense that he had some type of significant medical-- underlying medical condition. Secondly, there was the report that

medications might be impacting his safety at work. And then, finally, there had been two or three or four days' worth of effort in trying to get in touch with him.

So at some point you have to make sure that you're not taking too much risk with letting the employee be out there and working when he's got, again, a significant underlying medical condition and taking a medicine which may impair or sedate him.

Q You knew at the time, on February 1, that Mr. Fulbright was still working, correct?

A Yes. The manager referral paperwork that we talked about earlier said that he had not been removed from service.

Q And you did not talk to the manager who made that referral before you made your decision to pull him away from his job, right?

A That is correct. I never talked to his manager.

Q Why would you override the manager's decision without talking to him first?

A Well, the manager did his job in referring the case to us and now we were trying to do our part in this process, so I don't look at it as overriding. It was -- I was making a then current decision about Mr. Fulbright's fitness-for-duty.

And the decision I made is that given that underlying condition, given the medication concern, that it was most safe and the appropriate thing to do to remove him from service. So I don't see it as overriding or conflicting with what the manager had determined. Just based on the information that was available to me at the time, I felt that was the right course of action.

Q Skipping forward quite a bit, after you got some medical records concerning Mr. Fulbright, it's my understanding you decided that you wanted him to have a sleep medicine evaluation. Is that correct?

A Yes, that's right. I think it's important to point out that we never received a full two years' worth of medical records so that we were still in the dark somewhat about all of his medical history.

And we were also reviewing this case intermittently with the Chief Medical Officer, and it was based on those reviews that we felt that a sleep medicine evaluation was appropriate as a way to try to break the impasse here about having inadequate information and still wanting to, in an appropriate time frame, get the fitness-for-duty case moving forward.

Q Mr. Fulbright had gone through two fitness-for-duty evaluations in 2014, hadn't he?

answer, Doctor.

THE WITNESS: Okay.

A In our case review, we kind of found out that we weren't going forward with this process, and we felt that the right thing to do was to get good medical information about his sleep disorder and maybe troubleshoot. Maybe there's a way forward to get additional information about alternatives or just any objective information from somebody who does this every day.

So that was the reason we decided we needed a sleep medicine evaluation, and so these notes are about talking to him about that and explain to him why we were requesting that he sign a release of information so that I could explain that to his doctor.

MR. ULOTH: Okay. I will just reiterate my objection to everything after "yes" as nonresponsive.

Q Give me one moment to get to my next note that I want to ask you about.

Okay, Dr. Charbonneau, I'm showing you a note from the Medical Comments History on -- the way the document came to me, this is on page 7 out of 19, and I'm going to direct your attention to a comment that you typed in on June 26, 2015, at around 12:41 a.m.

Is it correct that on June 26 when you

made this note, you had made the decision that the company was going to employ sudden incapacitation restrictions?

And I'm moving the cursor here to where that term appears.

A Yes.

Q Okay. Tell me why you decided to bring things to a close in the evaluation process and make this decision to impose sudden incapacitation restrictions.

A It was because we were essentially functionally at the same place we were at the start. We knew that he had what he described as a very serious sleep disorder. We knew that he was taking a medication that provided substantial sedation to him. We had tried to move forward by suggesting getting a sleep medicine doctor involved and, for whatever reason, he wasn't comfortable with doing that. So we weren't going anywhere and this is months after we started.

Q Why do you say he wasn't comfortable? Because when you spoke to him and asked him to have the sleep medicine evaluation, he agreed to do that, correct?

A Yes, he agreed to do it. He talked to somebody, unidentified even now, in the office there and decided that he didn't want to go forward because it might involve a sleep study and he didn't want to do

that. So we really didn't get any information out of that process.

Q When you decided to impose the sudden incapacitation restrictions, had you reached a decision that Mr. Fulbright could not safely perform his job?

A We reached a point where we decided that based on the currently available information, we could not certify him as medically fit for duty without restrictions. So we decided that he needed these restrictions, which are later in this note that you're asking questions about right now.

Q But my question, Dr. Charbonneau, is when you made the decision to impose the work restrictions, did you have the information you needed and had you decided that Mr. Fulbright could not safely perform his job?

A We did not have the information we needed to certify him as fit for duty, so we could only take the second option, if you will, that's saying he was fit for duty with medical restrictions.

Q Let me ask it a different way. Did you impose work restrictions because you had decided he was not safe to do his job?

A We imposed work restrictions because of the totality of the information that was available to us from his manager, from him personally, and from the

A. No, not with any specifics.
Q. Okay. And can you recall any other work restrictions that were imposed by Union Pacific?
A. No.
Q. Then let's go to Number IV. When could Mr. Fulbright -- you know, back when he was a Union Pacific employee during the time period we're talking about, which is June 15, '99 through the end of his employment, so Number C IV, what were the expectations about Mr. Fulbright being asked to work outside of his regular weekday shift?
A. I'm not sure at what point they went to every third weekend that he was a part of the restoration weekend duty, on-call duty.
Q. And other than his weekends, was he expected to be on call?
A. I can't answer that with -- with a definite.
Q. Okay. I know a lot more about the railroad and Mr. Fulbright's job now than I did when I initially wrote these out, so I don't think I have any questions for you about Number V, but if you -- if you gathered any specific information that you have on that topic, C, Roman numeral V, tell me what you know.
A. No.
Q. All right. What about VI, or Roman numeral