**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOE M. FULBRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:20-cv-2392-BK** |
| | ) | |
| **UNION PACIFIC RAILROAD COMPANY** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

# DEFENDANT UNION PACIFIC RAILROAD COMPANY'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

# TABLE OF CONTENTS


**I.** **Summary** .....1

**II.** **Reply to Fulbright's Response to Union Pacific's Statement of Relevant Material Facts** .....2

**A.** **Senior Communication Technicians must be available 24 x 7.** .....2

**B.** **Fulbright's use of Trazodone did not modify the on-call responsibilities and 24 x 7 nature of his Senior Communications Technician position.** .....3

**C.** **Union Pacific made its fitness-for-duty determination regarding Fulbright based on limited and incomplete information submitted by or on behalf of Fulbright.** .....4

**D.** **Fulbright's "Miscellaneous Corrections" are more accurately described as clarifications, not corrections.** .....9

**III.** **Argument** .....10

**A.** **Plaintiff's claims remain ripe for summary judgment.** .....10

**B.** **Fulbright's disparate treatment claim fails.** .....12

**1.** **Fulbright's FFD referral, which led to removing him from service, and the FFD determination, which resulted in medical restrictions, are not direct evidence of disability discrimination.** .....12

**2.** **Fulbright has not met his burden of proof under the indirect evidence framework because he has not established that he was qualified to do his job, with or without accommodations.** .....13

**3.** **Fulbright has not proven discriminatory intent.** .....18

**4.** **Fulbright cannot prove pretext for discriminatory intent.** .....18

**C.** **Fulbright's disparate impact claim cannot be brought under a disparate treatment theory.** .....20

**D.** **Fulbright's failure-to-accommodate and unlawful medical inquiry claims fail as a matter of law.** .....20

**E. Fulbright has not administratively exhausted his failure-to-accommodate claim.** ....................24

**F. Fulbright's unlawful medical inquiry claim fails to create a fact issue.** ....................25

**IV. Conclusion** ....................25

## TABLE OF AUTHORITIES

**Cases**

Aguilar v. Ocwen Loan Servicing, LLC,
2018 WL 949225, *6 (N.D. Tex. 2018) ........ 21, 22
American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974) ........ 1, 21, 22, 23
Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........ 11
Autry v. Fort Bend Indep. Sch. Dist., 704 F.3d 344 (5th Cir. 2013) ........ 18
Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503 (5th Cir. 1988) ........ 11
Blankinship v. Union Pac. R.R. Co., 2021 WL 3290453, at *4 (D. Ariz. 2021) ........ 22
Breaux v. Bollinger Shipyards, LLC, 2018 WL 3329059, *10 (E.D. La. 2018) ........ 13
Byes v. Telecheck Recovery Services, Inc., 1996 WL 22686, *1-*3 (E.D.La. 1996) ........ 23
Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc., 137 S.Ct. 2042 (2017) ........ 21
Campbell v. Union Pac. R.R. Co., 2020 WL 5300734 (D.Idaho 2020) ........ 13
Cannon v. Jacobs Field Servs. N. Am., Inc., 813 F.3d 586 (5th Cir. 2016) ........ 24
Carrillo v. Union Pac. R.R. Co., 2021 WL 3023407, at *6-*7
(W.D. Tex. July 16, 2021) ........ 22, 23
China Agritech, Inc. v. Resh, 138 S. Ct. 1800 (2018) ........ 21
Cicalese v. Univ. of Tex. Med. Branch, 924 F.3d 762 (5th Cir. 2019) ........ 18
Clark v. Champion Nat'l Sec., Inc., 952 F.3d 570 (5th Cir. 2020) ........ 12
Commonwealth Oil/Tesoro Petroleum Corp. Securities Litig., 467 F. Supp. 227
(W.D. Tex. 1979) ........ 22
DeFries v. Union Pac. R.R. Co., 2021 WL 3007254, at *2 (D. Or. 2021) ........ 22, 23
Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) ........ 5
Donahue v. Union Pac. R.R. Co., 2021 WL 2458351, at *2 (N.D. Cal. 2021) ........ 22, 23
Duffie v. U.S., 600 F. 3d 362 (5th Cir. 2010) ........ 2, 4
EEOC v. BNSF Ry. Co., 902 F.3d 916 (9th Cir. 2018) ........ 13
Enron Corp. Securities, 465 F. Supp.2d 687 (S.D.Tex. 2006) ........ 23
Fuzy v. S&B Eng'rs & Constructors, Ltd., 332 F.3d 301 ........ 25
Ganousis v. E.I. du Pont de Nemours & Co., 803 F. Supp. 149 (N.D. Ill. 1992) ........ 22
Gober v. Frankel Family Trust, 537 Fed. Appx. 518 (5th Cir. 2013) ........ 14
Hall v. Variable Annuity Life Ins. Co., 727 F.3d 372 (5th Cir. 2013) ........ 23
Hamar v. Ashland, Inc., 211 Fed. Appx. 309 (5th Cir. 2006) ........ 24
Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246 (1994) ........ 16
Hirras v. National R.R. Passenger Corp., 44 F.3d 278 (5th Cir. 1995) ........ 16
Hunter v. Am. Gen. Life & Acc. Ins. Co., 384 F. Supp. 2d 888 (D.S.C. 2005) ........ 22
Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force,
379 F.3d 293 (5th Cir. 2004) ........ 2
Johnson v. Ry. Express Agency, 421 U.S. 454 (1975) ........ 21
Krehbiel v. Union Pac. R.R. Co., 2019 WL 3387049, at *4 (D. Kan. 2019) ........ 22, 23
Mayberry v. Vought Aircraft Co., 55 F.3d 1086 (5th Cir. 1995) ........ 19
Milton v. Scrivner, Inc., 53 F.3d 1118 (10th Cir.1995) ........ 12
Owen v. Union Pac. R.R. Co., 2020 WL 6684504, *8 (D. Neb. 2020) ........ 25
Phillips v. Leggett & Platt, Inc., 658 F.3d 452 (5th Cir. 2011) ........ 21
Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n,
491 U.S. 490 (1989) ........ 16
Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) ........ 18

Rizzo v. Children's World Learning Centers, Inc., 84 F. 3d 758 (5th Cir. 1996) ........................ 12
Spindle v. CKJ Trucking, LP, 2020 WL 1283519, *2 (E.D. Tex. 2020) .................................... 24
Tate v. Farmland Industries, Inc., 268 F.3d 989 (10th Cir. 2001) ............................................... 12
Thompson v. Air Transp. Int'l Ltd. Liab. Co., 664 F.3d 723 (8th Cir. 2011) .............................. 16
Turco v. Hoechst Celanese Corp., 101 F.3d 1090 (5th Cir. 1996) ............................................... 14
United States v. Biggins, 551 F.2d 64 (5th Cir. 1977)..................................................................... 6
Windhauser v. Bd. of Supervisors for La. State Univ.,
360 Fed. Appx. 562 (5th Cir. 2010)............................................................................ 22

**Statutes**

42 U.S.C. § 12111(8) ......................................................................................................... 24
45 U.S.C. §§ 151.................................................................................................................. 16

## I. Summary

Plaintiff Joe Fulbright filed a response to Defendant Union Pacific Railroad Company's summary judgment motion in which he unsuccessfully attempts to controvert that he is not a qualified individual under the ADA. Fulbright offers only self-serving declarations prepared solely for the purposes of his response and self-authenticated transcriptions of recorded telephone conversations. As for Fulbright's § 12112(b)(6) disparate impact claim under his first cause of action, Fulbright's only supporting evidence is a Union Pacific pleading terminated as moot, his own pleading that remains pending, and a discussion that shows he clearly misread Union Pacific's motion. Fulbright does not dispute Union Pacific's argument that he failed to administratively exhaust a disparate impact claim. Moreover, nothing in Fulbright's response changes the outcome of his second and third causes of action for failure-to-accommodate and unlawful medical inquiries because *American Pipe* tolling does not apply, so those claims are time barred. Fulbright's reliance on *Sanchez* in arguing that he administratively exhausted his failure-to-accommodate claim is misguided, in that he overlooks binding precedent that says otherwise and relies on assumption and speculation regarding the administrative stage investigation. He also does not dispute Union Pacific's argument that even if timely and administratively exhausted, his failure-to-accommodate claim fails as a matter of law. Fulbright attempts to demonstrate that the evidence establishes a prima facie case of his unlawful medical inquiry claim and that Union Pacific failed to address business necessity as an applicable affirmative defense. However, Union Pacific argued exactly that and Fulbright has now not refuted.

In sum, Fulbright's response claims that Union Pacific failed to comply with its legal obligations "when it was obvious that Fulbright was attempting to comply." Fulbright's response is baffling given that when Union Pacific attempted to engage with Fulbright to return him to work, he said, according to his own evidence, "I'm not doing that."

## II. Reply to Fulbright's Response to Union Pacific's Statement of Relevant Material Facts[1]

A nonmoving party cannot survive summary judgment without identifying specific evidence in the record and articulating the manner in which that evidence supports its claim. *Duffie v. U.S.*, 600 F. 3d 362, 371 (5th Cir. 2010) (citing *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Union Pacific set out 125 specific fact paragraphs its summary judgment motion. Fulbright does not specifically respond to the organized facts and instead lumps his "relevant facts" into four categories, one of which he describes as "miscellaneous corrections" and all of which attempt unsuccessfully to establish a genuine dispute of material fact. Union Pacific responds here to the facts Fulbright attempts to dispute:

### A. Senior Communication Technicians must be available 24 x 7.

Fulbright's first lumped category of "relevant facts" asserts that he "was not on call 24 x 7." Doc. 105 at 10-11. Fulbright's asserted facts do not create a genuine dispute and, in some cases, fail entirely to dispute Union Pacific's facts. Case in point, Fulbright does not dispute: he held the position of Senior Communications Technician from 2000 to 2015 (Doc. 95, ¶ 19); Senior Communications Technician was (and is) a union position (Doc 95, ¶ 18); Fulbright was a union represented employee (Doc. 95, ¶ 18); Fulbright's employment as a Senior Communications Technician, including his pay, eligible benefits, seniority, classification work, and work scope, is subject to collective bargaining agreements between Union Pacific and the Brotherhood of Railway Signalmen (BRS) and between Union Pacific the International Brotherhood of Electrical Workers (IBEW) (Doc. 95, ¶¶ 20-21); Fulbright's Senior Communications Technician position was a "BRS monthly rated position" and as a "monthly rated" employee he was paid a monthly

[1] Union Pacific has generally replied only to those facts from its opening brief that Fulbright attempts to controvert in whole or in part as opposed to those which Fulbright merely adds additional information or argument.

rate of pay based on six days per week to cover scheduled work Monday through Friday, accounting for being available after hours at night, on weekends, and holidays (Doc. 95, ¶¶18, 23).

Furthermore, Fulbright does not necessarily dispute but grossly understates the essential job functions of a Senior Communications Technician. *Compare* Doc. 95, ¶¶ 24-37 with Doc. 105 at 11. Fulbright incorrectly claims that Union Pacific relies solely on a 2006 job description (Doc. 105 at 10), ignoring Union Pacific's well-supported assertion regarding the on-call responsibilities and 24 x 7 nature of the Senior Communications Technician position (supported by: a job description (Doc. 96 at 104-105, 108), declaration of Labor Relations Director Terrill Maxwell (Doc. 96 at 45-46), declaration of Senior Manager Telecom Operations Stephen Hale (Doc. 96 at 47-48), deposition testimony of Terry Neal (Doc. 96 at 32-33, 35), the UP-IBEW CBA (Doc. 96 at 129)), Rather than dispute Union Pacific's ample evidence, Fulbright offers two declarations prepared for his response – his own and that of his son-in-law, Chris Ozuna. Doc. 106 at 3-12, 37-38; *see also* Doc. 99 at 9. Fulbright asserts that due to a new position created "[a]round 2008 or 2009, but definitely after 2006," his position, Senior Communications Technician, was reclassified as Installation Technician and he was only expected to be on-call when he volunteered to cover weekends and holidays and when not on call, he was not required to answer. Doc. 105 at 11. Fulbright's assertion is supported by two declarations (Doc. 106 at 3-4, 37-38), a scintilla in comparison to Union Pacific's evidence regarding the on-call responsibilities and 24 x 7 nature of his Senior Communications Technician position. In sum, Fulbright's fails to establish a genuine dispute as to whether he "was on call 24 x 7" or the general 24 x 7 nature of his position.

### B. Fulbright's use of Trazodone did not modify the on-call responsibilities and 24 x 7 nature of his Senior Communications Technician position.

In Fulbright's second lumped category of "relevant facts," he asserts that when he started taking Trazodone in January 2009, he told his coworkers and supervisors, Stephen Hale and Terry

Neal, that he would be taking it and "all agreed that [he] would not have to go out on calls at night if he had already taken Trazodone that night." Doc. 105 at 11-12. He further asserts, relying exclusively on his own declaration, that on weekends when he had volunteered to be on call, he only took Trazodone on Sunday, an arrangement he claims was in effect for the last few years of his employment and which did not place a burden on Union Pacific or cause objections from coworkers or supervisors. Doc. 105 at 12. Fulbright's own declaration is the sole evidence of this asserted fact. Reliance solely on his own declaration is akin to reliance on allegations set forth in a pleading, which cannot establish a genuine dispute of material fact. *Duffie*, 600 F.3d at 371.

Moreover, the record is clear that weekend coverage included the entire weekend up to Mondays at 7 am, Manager Telecom Facilities Terry Neal has no recollection of Fulbright's use of Trazodone before 2015, regardless of who volunteered for what weekend, any technician could be called for after-hour emergencies, and when Fulbright missed calls because of his Trazodone, other employees were burdened by having to cover. Doc. 96 at 32; Doc. 99 at 31-32, 36, 80, 83; and App. 7-8.

### C. Union Pacific made its fitness-for-duty determination regarding Fulbright based on limited and incomplete information submitted by or on behalf of Fulbright.

Fulbright's third lump of "relevant facts" asserts that he cooperated with Union Pacific's fitness-for-duty (FFD) evaluation and that there was nothing asked of him that he refused to do. First, Fulbright fails to dispute several material facts relevant to Union Pacific's FFD evaluation and respective determination. For example, Fulbright does not dispute that the purpose of Union Pacific's FFD evaluations are to ensure that its employees are medically and functionally capable of safely working in the railroad environment and that the purpose of a medical FFD evaluation is to determine if an individual has an impairment that poses a significant risk to the health and safety of themselves or others, or prevents them from performing the essential functions of their job. Doc.

95, ¶ 41. Fulbright does not dispute that the FFD focuses on safety risks associated with the employee's individual health in light of the employee's essential job functions, and in furtherance of that focus, Union Pacific's Health and Medical Services Department (HMS) works *with* the employee. Doc. 95, ¶ 42.

Additionally, Fulbright does not dispute: he experiences drowsiness for four to six hours when he takes Trazodone (Doc. 95, ¶ 55); he experiences daytime drowsiness when taking Trazodone (Doc. 95, ¶ 56);[2] he never discussed his job duties with the doctor who prescribed Trazodone and that same doctor never provided him with any document that his use of Trazodone was consistent with the safe performance of his job as a Senior Communications Technician (Doc. 95, ¶ 57); a physician has never certified that his use of Trazodone is consistent with the safe performance of his duties (Doc. 95, ¶ 58); he told Neal that he could not drive a vehicle, an essential function of his job, when he was under the influence of Trazodone (Doc. 95, ¶¶ 28-29, 59); and that he missed after-hours calls on multiple occasions, requiring Union Pacific to dispatch another technician, because he had taken Trazodone when he was on call (Doc. 95, ¶¶ 60-63).

Second, of the asserted facts Fulbright offers, with the exception of one document in the record, he relies entirely on his own recollection set out in his declaration and self-authenticated transcripts of telephone conversations that Fulbright recorded unbeknownst to other participants.[3]

---

[2] Fulbright contends, supported by his declaration, that there is no evidence of this fact. However, as discussed *supra*, Fulbright's deposition testimony directly contradicts his contention. Union Pacific, therefore, objects to the Declaration of Joe Fulbright (Doc. 106 at 3-12) under the "sham-affidavit doctrine," insofar as his declaration conflicts with his prior testimony and in that a party "may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches prior testimony without explanation." *See Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000).

[3] Fulbright claims that his declaration authenticates the transcribed recordings, but that even if the Court found authentication to be technically deficient, the evidence must still be considered because he could authenticate at trial by calling the other persons whose voices were recorded to confirm accuracy. Doc. 105, n.1. First, Fulbright ignores that the recordings are rampant with

That said, to support his overarching assertion that he fully cooperated with the FFD evaluation, he makes several claims that are merely speculation. For example, Fulbright states that he provided all medical records requested of him no later than April 10, 2015. Doc. 105 at 13. Fulbright does not dispute that Union Pacific requested two years of medical records at least five times between February 9, 2015 and June 18, 2015 (Doc. 95, ¶¶ 74, 76-78; Doc. 96 at 70-71), yet in the same paragraph he claims to have fully complied, he states that he only sent "about one year of records." Doc. 105 at 13. He rationalizes the incomplete records by asserting that the original physician who prescribed his Trazodone retired years earlier, "and Defendant already had earlier records from two [FFD] evaluations [ ] in 2014." *Id*. Fulbright's suggestion that HMS should have used whatever records he previously submitted is illogical. He tellingly omits that his two prior FFD evaluations concerned a rash and an elbow procedure. Doc. 98 at 9-10. HMS's 2015 records request concerned the underlying condition at that time, from the provider treating him for that condition. *Id*.; and Doc. 95, ¶¶ 74, 76-78; Doc. 96 at 70-71.

Fulbright states Union Pacific never asked, either in writing or verbally, for permission to talk with his primary care doctor, and so it is inaccurate to state the he was non-responsive to such a request. Doc. 105 at 14. Yet, Fulbright's own evidence shows otherwise. Fulbright's transcription of an April 21, 2015 call with Union Pacific Associate Medical Director Dr. John Charbonneau,

---

hearsay in violation of Fed. R. Evid. 801. Second, Fulbright ignores that proving a recording is true and accurate does not satisfy authentication requirements. Fulbright must also prove, among other things, that the device or mechanism used to record was capable and reliable, that the recording has not been altered or modified, and the manner in which he preserved the recording. *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977). Nonetheless, Union Pacific objects to all four of his recorded telephone calls (attached to his declaration as Exhibits 1 (Doc. 106 at 13-20), 2 (*Id*. at 21-24), 3 (*Id*. at 25-26), and 4 (*Id*. at 27-35)), on the grounds that his transcriptions violate the Best Evidence Rule under Fed. R. Evid. 1001-1003. Fulbright did not inform the other call participants that he was recording the call and has declared that he had the recorded call transcribed "recently [ ] by an online service (rev.com)," but admitted that he made changes to the transcript where necessary. *Id*. at 8.

shows that Dr. Charbonneau stated, "[ ] I'll tell you the reasons for the request that you sign the release of information" and "if you'll carry that forward to your doctor and get a sleep medicine evaluation, I don't need to talk to your doctor." Doc. 106 at 14, 18-19. Fulbright's assertion fails to create a genuine dispute, especially when combining his evidence with the fact that Fulbright does not dispute that Dr. Charbonneau asked HMS Nurse Theresa Rodino to ask Fulbright to sign a release form to allow him to speak to Fulbright's primary care physician, that Rodino sent Fulbright a blank release form for that purpose, that Rodino called Fulbright and informed him of the request and reasons for, that Rodino called him several times on April 20, 2015 asking again about the release form, and that the reason they had a call on April 21 was because in that exchange on April 20, Fulbright asked to talk with Dr. Charbonneau first. Doc. 106 at 88-90.

Although minor, it's worth noting that Fulbright's assertion that his June 1, 2015 appointment with Texas Medical Diagnostics (TMD) was the first available appointment is implausible and conflicts with the record. Doc. 105 at 14. The record shows that on May 6, 2015, TMD contacted his primary care doctor who had referred Fulbright to TMD, because TMD attempted to schedule Fulbright but he had not returned their calls. Doc. 105 at 14; Doc. 100 at 10.

Fulbright goes so far as to re-characterize TMD's office notes from his June 1, 2015 appointment. He claims that TMD did not "order" testing. Doc. 105 at 14. However, TMD's notes, as electronically signed by the TMD physician, state, "A home sleep study test was ordered to make sure that maintenance portion of insomnia is not secondary to underlying sleep related breathing disorders." Fulbright's suggestion that the unnamed "lady" he spoke to on June 14, 2015 would somehow coordinate or handle retrieving his TMD records for HMS is more of convenient assumption than a valid suggestion, especially since HMS requested a copy of the sleep evaluation study four days later. Doc. 105 at 15; Doc. 96 at 70. If Fulbright was confused about who was

handling what, he could have called the HMS nurse who sent the letter per the letter's instructions and contact information. *Id.* at 70-71.

Fulbright does not dispute that HMS requested two years of medical records, but that he only provided "about one year" or that he did not follow through with TMD's recommended testing, stating that his decision to not follow through "was not a refusal or lack of cooperation." Doc. 105 at 13-14; Doc. 95, ¶¶ 74, 76-78; Doc. 96 at 70-71; Doc 95 at 21. Relying on Dr. Charbonneau's June 26, 3025 notes compared to his September 30, 2021 declaration, Fulbright claims that Dr. Charbonneau "erroneously believed [ ] that Fulbright had not provided all requested medical records and [ ] was not following through with his request for a sleep medicine evaluation [ ]." Doc. 105 at 15. Fulbright suggests that Dr. Charbonneau should have contacted him "with his concerns." *Id.* His only evidence is his own belief based on his comparison of what he recalls six-plus years later to what Dr. Charbonneau notated that day. Fulbright ignores the overwhelming evidence in the record that contradicts his claim (and which he has not disputed) – that HMS had been requesting two years of medical records since February 2015 (Doc. 95, ¶¶ 74, 76-78; Doc. 96 at 70-71); that HMS had been requesting a sleep medicine evaluation since April 21, 2015 (Doc. 99 at 98-99); Doc. 106 at 13-20); that Rodino called him to follow up on the request on May 20, 2015 (Doc. 106 at 21-24); and that HMS sent him a letter requesting the same on June 18, 2015 (Doc. 96 at 70-71). Fulbright's further assertion that the "sudden incapacitation restrictions" described in Dr. Charbonneau's June 26, 2015 notes "were not customized restrictions based on an individualized assessment [ ] and [Dr.] Charbonneau had no medical evidence indicating that Fulbright was a sudden incapacitation risk," is an unsupported, conclusory statement.

Finally, Fulbright asserts, or rather assumes, that Dr. Charbonneau mistakenly assumed Fulbright was not cooperating with HMS's requests. Doc. 105 at 16. He goes on to suggest that if

Dr. Charbonneau "really wanted the results of a sleep study and sleep medicine evaluation, he could have clarified what he was asking for." *Id*. Fulbright's suggestion ignores the fact that for the two-plus months since HMS had initially requested a sleep medicine evaluation, he could have sought clarification during any of the many telephone calls and used the provided contact information to ask questions. Doc. 106 at 13-35; Doc. 96 at 63-64, 66-71. The biggest assumptions, however, were during Fulbright's June 29, 2015 call with Dr. Charbonneau and Rodino. In efforts to provide clarification, Dr. Charbonneau attempted to understand what steps Fulbright had already taken per the request for a sleep medicine evaluation or what plan he had going forward for the evaluation. Doc. 106 at 28. In explaining what he had done and could do, he said, "[ ] yeah, I can go back there and ask them for the evaluation [ ] start trying to find a doctor that will do an evaluation of that medicine, because they won't do it unless I go through who know, schedule a month out of sleep study and start doing, you know, letting them taking over my medical treatment for a sleep disorder. And I'm not doing that." *Id*. He went on to explain, in his non-medical opinion, the cause of his sleep disorder, claiming that "these people [TMD] are on the wrong track" with their recommended testing. *Id.* at 28-29. In sum, it is a ridiculous assertion that Dr. Charbonneau should or could have clarified what he was asking for in terms of a sleep medicine evaluation (setting aside his attempts to do just that), when Fulbright very clearly said, "I'm not doing that."

**D. Fulbright's "Miscellaneous Corrections" are more accurately described as clarifications, not corrections.**

Fulbright's final lump of "relevant facts" are a set of three random facts. First, as to his explanation on why HMS sent him a letter on January 26, 2009, the reasons are immaterial. Nonetheless, Fulbright states, based on his recollection only, that HMS sent the letter because he had called HMS that same day to self-report that he would be taking Trazodone, not because of a return-to-work evaluation. Doc. 105 at 17. Immateriality aside, the letter states, "Recently your

medical conditions were reviewed [ ] for return to work consideration. You and/or your treating physician made statements regarding your current medication use." Doc. 96 at 127.

Second, he claims there is no evidence that he experienced daytime drowsiness because he took Trazodone. Doc. 105 at 17. He supports this claim with his own declaration, which directly contradicts his prior testimony in violation of the "sham-affidavit doctrine." Fulbright testified that he has experienced daytime drowsiness:

> **Q.** Have you experienced any daytime drowsiness since taking the Trazodone?
> **A.** Daytime drowsiness or fatigue? Is it, like, just regular fatigue from –
> **Q.** Well, let's do it – how about daytime drowsiness? Have you experienced any of that from taking the Trazodone?
> **A.** Since taking Trazodone, yeah. A lot of times.

Doc. 96 at 10.

Third, Fulbright claims that Dr. Charbonneau's April 21, 2015 notes "are inaccurate in some respects" because Dr. Charbonneau wrote "[Fulbright] states that he has been working around the on call issue for the 3-4 years." Doc. 105 at 17. Fulbright improperly cites to an excerpt from Dr. Charbonneau's March 25, 2021 deposition in this matter. Setting aside the citation error, Dr. Charbonneau's April 21, 2015 notes are clearly a summary of the call when compared to Fulbright's self-authenticated transcription of his recording, so it's particularly insignificant that "no such comment" is reflected verbatim in Fulbright's transcript or recording of the call. More plausible is that Dr. Charbonneau's summary of the call very accurately reflects a summary of the history lesson Fulbright gave Dr. Charbonneau and Rodino regarding his condition and use of Trazodone, including Fulbright's details about learning everything he could about his condition beginning four years earlier and that he was "totally approved to take [Trazodone], knowing that they could not call me while I was on this drug, four years ago." Doc. 106 at 15-16.

## III. Argument

### A. Plaintiff's claims remain ripe for summary judgment.

An overarching problem with Fulbright's response is his position that a genuine issue exists because he does not like the evidence in the record that Union Pacific relies on. Fulbright repeatedly invites the Court to rely on his recollection and interpretation of the facts as "evidence," conveniently crafted to support his response. As the Court knows, however, a factual dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court does not "weigh the evidence and determine the truth of the matter," but must solely "determine whether there is a genuine issue for trial." *Id.* at 249. "If the evidence is merely colorable [ ] or is not significantly probative [ ] summary judgment may be granted." *Id.* (citation and internal quotation marks omitted). Thus, Fulbright's reliance on self-serving declarations, self-authenticated transcriptions of recorded telephone conversations, assumptions, and supported suggestions of what he believes or thinks should or could have been done or not done, is insufficient to avoid summary judgment.

Fulbright has the burden to point to actual evidence to avoid summary judgment, not his own disagreement with or dislike of Union Pacific's evidence. Fulbright asks the Court to essentially second-guess Union Pacific's actions and determination regarding his fitness for duty based on his disagreement about whether working on-call was an essential function of his Senior Communications Technician position. The Fifth Circuit has directed, however, that employment discrimination laws "are not intended to be a vehicle for judicial second-guessing of business decisions, or [ ] to transform courts into personnel managers." *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507-08 (5th Cir. 1988). In cases arising under the ADA, the question of whether a job requirement is an essential job function "is not intended to second guess the employer or to require the employer to lower company standards." *Tate v. Farmland Industries, Inc.*, 268 F.3d

989, 993 (10th Cir. 2001) (*cf. Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995)); *see also* H. Rep. No. 101–485(II), at 55 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 337 (The ADA "does not undermine an employer's ability to choose and maintain qualified workers."). Thus, the Court should decline Fulbright's request to second-guess Union Pacific's legitimate business judgment, find that there is no genuine issue of material fact, and grant Union Pacific's motion for summary judgment.

### B. Fulbright's disparate treatment claim fails.

In a disability discrimination action under the ADA, the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (brackets in original and quotation omitted). Fulbright fails to meet his burden under either evidentiary framework.[4]

#### 1. Fulbright's FFD referral, which led to removing him from service, and the FFD determination, which resulted in medical restrictions, are not direct evidence of disability discrimination.

Fulbright contends that Dr. Charbonneau's decisions to (1) remove from Fulbright form service and (2) later impose permanent work restrictions "were related to, and indeed because of, Fulbright's disability, so there is no need for a *McDonnell Douglas* burden-shifting analysis." Doc. 105 at 11. Fulbright relies on cases that are distinguishable from Fulbright's facts and, except for one, are not binding. For example, *Rizzo*, the only potentially binding case, found that the employer removed the plaintiff from driving duties because of her hearing impairment. *Rizzo v. Children's World Learning Centers, Inc.*, 84 F. 3d 758 (5th Cir. 1996). Here, Union Pacific did not remove

[4] Union Pacific has briefed this argument not only in its motion for summary judgment (Doc. 95), but also in its Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 98). Rather than repeating its arguments and respective relevant facts, Union Pacific incorporates them here by reference.

Fulbright from service because of an impairment, but because of well-supported and documented safety concerns, which Fulbright did not dispute in his "relevant facts." In fact, Neal documented that he did the FFD manager referral "to clarify if there is a sleep disorder or condition." Doc. 96 at 117-18. The contrast is the same for *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 927 (9th Cir. 2018) (action was taken because of an impairment or perception of an impairment) and *Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, *10 (E.D. La. 2018) (employer made employment decision because of a disability). The issues in *Breaux* are further distinguishable from this case in that the defendant did not dispute plaintiff was disabled and conceded that it fired plaintiff because he did not wean himself off of Suboxone. *Id*. Fulbright's reliance on *Campbell v. Union Pac. R.R. Co.* is also misguided because the Court still analyzed whether plaintiff was a qualified individual, regardless of a material dispute on whether Union Pacific removed him from his position because of his disability. 2020 WL 5300734 (D. Idaho 2020).

Fulbright then argues, relying on a Ninth Circuit case, that under the direct evidence approach, there's no need to consider pretext where the employer's proferred reason for its action is not a legitimate nondiscriminatory reason, stating that to be "nondiscriminatory," the reason must be "unrelated to the individual's disability." Fulbright cites several nonbinding cases, but fails to relate the cases to facts, apparently reserving his theories for arguments regarding indirect evidence. In short, Fulbright has not produced direct evidence to support his case or that effectively refutes Union Pacific's arguments set out in its summary judgment motion.

**2. Fulbright has not met his burden of proof under the indirect evidence framework because he has not established that he was qualified to do his job, with or without accommodations.**

Fulbright fails to establish a *prima facie* case of disability discrimination because he fails to establish a genuine issue as to whether he was qualified for his position and he cannot prove discriminatory intent.

**a. Whether Fulbright has a disability.**

First, the issue at the crux of Fulbright's FFD evaluation was his use of Trazodone, not his sleep disorder. As such, Union Pacific did not argue in its summary judgment motion that Fulbright does or does not have a disability, but as Fulbright points out, Union Pacific argued that Fulbright has not demonstrated that his use of Trazodone is disabling or that its side effects are impairments under the ADA.[5]

**b. Whether Fulbright is qualified, with or without accommodations.**

Second, and most importantly, it is Fulbright's burden to prove that he is a qualified individual under the ADA. Fulbright must show "(1) 'that he could perform the essential functions of the job in spite of his disability' or (2) 'that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job.'" *Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 521 (5th Cir. 2013) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)). Fulbright claims at the outset that Union Pacific's argument that Fulbright is not qualified relies solely on its assertion that Fulbright was required to be on call at all times. Fulbright not only ignores a good part of Union Pacific's argument that goes beyond the on call requirements but he also ignores Fifth Circuit authority that contradicts his argument.

Fulbright is simply wrong regarding the on-call requirements of the Senior Communications Technician position. Fulbright's evidence fails to create a fact issue. Former Technician Jason Ensign's testimony does not call into question whether being available for after-hours calls and reporting for work when called is an essential function. Ensign's testimony only establishes that if a technician was not on call, they could do whatever they wanted, were not

---

[5] As the Court knows, the parties cross-filed summary judgment motions. In its brief in support of its Response in Opposition to Plaintiff's Motion for Partial Summary Judgment, Union Pacific set out a lengthy argument regarding Fulbright's failure to demonstrate that he has an actual disability, record of disability, or has been regarded as disabled. Doc. 98 at 16-19.

required to answer a call if called, and there were no repercussions if the technician did not answer. Beyond Ensign's testimony, Fulbright unsuccessfully attempts to rebut Union Pacific's evidence. Fulbright's claim that a 2006 change to job duties makes a 2006 job description irrelevant is insufficiently supported by two conveniently prepared declarations by him and his son-in-law, Chris Ozuna, and sound bites taken out of context from Neal's deposition testimony. Relying on a 1944 NLRB case, Fulbright also claims that because his position was a union job, the terms and conditions of which were governed by a CBA, Union Pacific "could not impose requirements on [him] that were more onerous that [*sic*] the applicable terms of the applicable CBA." Doc. 105 at 22. Fulbright fails to explain, however, what requirements were imposed on him that were allegedly more onerous than the applicable CBA.

As for the CBA, Fulbright does not dispute the CBA's controlling provision regarding responsibility for reporting after-hours when called for emergency work, but he implies the CBA itself is not controlling. Fulbright did not dispute in his "relevant facts" that the CBA in question governs Fulbright's classification of work and work scope. Neither did Fulbright dispute that he is a "monthly-rated employee" and that the excerpt in question falls under Rule 7 – Monthly Compensated Employees. Doc. 106 at 54-55. Fulbright instead contends that the language set out in this CBA conflicts with a more specific provision under the CBA's Rule 4 – Classification of Work and Qualifications, Part (A)(4), which states that "Senior Electronic Technicians [synonymous with Senior Communications Technicians] will make themselves available for after hour calls, unless other arrangements have been made with proper authority." *Id*. at 51. Fulbright claims that summary judgment evidence proves that "other arrangements" were made that included Fulbright. Such a conclusion omits the "proper authority" element, but also first requires interpretation of the CBA as to the meaning of "other arrangements" and "proper authority." There

is no evidence in the record that interprets this language and this Court lacks subject matter jurisdiction to interpret this CBA because such a matter is precluded by the Railway Labor Act (RLA) pursuant to the RLA's mandatory arbitral mechanism for handling disputes. 45 U.S.C. §§ 151 *et seq.*, 153(i); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 256 (1994); *Hirras v. National R.R. Passenger Corp.*, 44 F.3d 278, 281 (5th Cir. 1995) (citing *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n*, 491 U.S. 490, 501 n. 12, 109 S.Ct. 2584, 2592 n. 12, 105 L.Ed.2d 415 (1989) ("Minor disputes are those involving the interpretation or application of existing contracts."); *see also Thompson v. Air Transp. Int'l Ltd. Liab. Co.*, 664 F.3d 723, 725 (8th Cir. 2011) (emphasis added) ("The RLA preempts review [ ] of any claims that require a court to interpret a collective bargaining agreement.").

Finally, Fulbright incorrectly argues that Union Pacific addressed only the 2006 job description, and nothing else, in regards to Fulbright's essential job functions. Union Pacific produced the job description, two declarations, witness testimony, and the controlling labor agreement. Doc. 96 at 104-105, 108; Doc. 96 at 45-46; Doc. 96 at 47-48; Doc. 96 at 32-33, 35; and the UP-IBEW CBA (Doc. 96 at 129). While Fulbright ignores Union Pacific's argument that Fulbright was also not qualified because he could not perform several other undisputed essential functions of his job (Doc. 95 at 30; acknowledged and not disputed at Doc. 105 at 26), he contends that Union Pacific failed to proffer evidence regarding how much time Fulbright had spent working on call, the work experience of past incumbents in the job, or current experience of incumbents in similar jobs. Doc. 105 at 24. Fulbright has secured two declarations from one former technician and deposed another former technician (Doc. 106 at 37-38; Doc. 90 at 147-148, 105-121), and has deposed two former supervisors (Doc. 96 at 29; App. 9-12); one current supervisor (Doc. 106 at 123), and a Labor Relations Director (App. 13-16), so it seems Fulbright had ample opportunity

to build a dispute but instead only points to an absence of any evidence presented by Union Pacific.

**c. Whether Fulbright suffered an adverse action because of his disability.**

Fulbright fails to create any fact issue as to whether Fulbright suffered an adverse action because of his disability. Fulbright contends that the two events that support his direct evidence argument are also the two adverse actions at issue. As a starting point, Fulbright dramatically mischaracterizes Union Pacific's decision in February 2015 to remove him from service pending the FFD evaluation, describing the action as "forc[ing] him into an involuntary and unpaid leave of indefinite duration." Fulbright may not have agreed with the decision and for that it was involuntary, but the unpaid nature should not have shocked him seeing as he has taken medical leave several times in recent years and the leave was not indefinite. (Doc. 96 at 52, 65). Fulbright incorrectly claims that Union Pacific did not dispute that the removal from service was an adverse action. Union Pacific discussed at great length that the manager referral for an FFD evaluation, which resulted in a removal from service based on the concerns set out in the manager referral, was not an adverse action. Doc. 95 at 26-27, 32-34. Moreover, Union Pacific's Medical Rules clearly state that an employee may be removed from service during a FFD evaluation subsequent to a manager's referral. App. 17-18. Fulbright's subsequent discussion regarding the medical work restrictions formally issued on July 1, 2015 ignores the Fifth Circuit's repeat position (and the Ninth and Sixth Circuit's position) that an employer can act in response to an employee's failure to provide requested medical information. Doc. 95 at 34-35. Additionally, as discussed *infra*, although Fulbright maintains that he fully cooperated with Union Pacific's requests during his FFD evaluation, his own evidence demonstrates that he also emphatically stated that he would not comply.

Ultimately, Fulbright fails to create a fact issue that Union Pacific's actions – Dr. Charbonneau's decisions – in removing him from service pending a FFD evaluation and in issuing

medical work restrictions because of his disability. Indeed, he does not dispute, and in fact, he presents evidence in support, that Dr. Charbonneau based his decisions on concerns about safety, the medical effect of his condition and medication as related to essential undisputed job responsibilities such as driving or climbing a ladder, and currently available information at hand.[6]

**3. Fulbright has not proven discriminatory intent.**

Finally, Fulbright claims that Union Pacific misconstrued the applicable causation standard and cites to Union Pacific's argument that Fulbright cannot produce direct evidence to support his case. Fulbright seems to have missed Union Pacific's argument that Fulbright cannot meet his burden of proving discriminatory intent. Doc. 95 at 27, 36-39. In doing so, Fulbright argues that proof of bias or ill will towards disabled persons is not required to prove that adverse actions were based on disability. Union Pacific does not disagree with Fulbright's analysis. That said, Fulbright must prove discriminatory intent, *i.e.*, pretext designed to mask discrimination. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-55 (2003); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (disparate treatment claims require "proof and finding of discriminatory motive").

**4. Fulbright cannot prove pretext for discriminatory intent.**

The Fifth Circuit has made clear that on summary judgment, "the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013). "The question is not whether the employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th

[6] Fulbright adds to his argument a discussion regarding an employer defense strategy of asserting that the employer did not discriminate because of disability, but because of the side effects of medication. He notes that Union Pacific has not this argument. Doc. 105 at 28-29, n. 7. In fact, Union Pacific has argued the opposite, that the side effects of medication do not implicate disability. Doc. 95 at 30-32.

Cir. 1995). Fulbright's response does not dispute Union Pacific's argument that he cannot prove discriminatory intent. Instead, Fulbright ponders the scope of Dr. Charbonneau's determination about his fitness for duty and then essentially throws his hands in the air and flatly asserts that, "[w]hatever [Union Pacific's] reason or reasons were, it all stands or falls on the premise that Fulbright was to blame for not getting the sleep medicine evaluation." Doc. 105 at 31. Fulbright then makes an awkward transition to a discussion regarding Union Pacific's obligations to engage in an interactive process with Fulbright because he had told Dr. Charbonneau that he wanted to return to work and keep taking Trazodone. Fulbright's theory is flawed because he asserts that Union Pacific blames Fulbright for not getting the sleep medicine evaluation, suggesting that such blame is why Union Pacific "permanently removed Fulbright from his job." But the evidence he cites is of the April 21, 2015 telephone call during which Dr. Charbonneau initially discussed the sleep medicine evaluation with Fulbright. The FFD determination and medical work restrictions were issued (and discussed with Fulbright) more than two months later. Doc. 96 at 75-78; Doc. 106 at 27-35. When Neal determined that Fulbright's restrictions could not be accommodated without eliminating essential job functions (Doc. 96 at 75-78; Doc. 95, ¶¶ 107-108), Union Pacific did not unreasonably terminate the interactive process, but immediately contacted Fulbright to discuss return-to-work options. Doc. 96 at 79; Doc. 95, ¶¶ 113-116. Fulbright does not dispute these facts. Lastly, Fulbright's unsupported statement that Union Pacific considered "the disability and medication to be disqualifying unless Fulbright proved otherwise," contradicts the record. Union Pacific informed Fulbright that it would review subsequent, updated, or changed medical information. Doc. 99 at 93, 95.

In sum, Fulbright's disparate treatment claim fails because he has not established a genuine dispute of material fact. Thus, the Court should grant summary judgment in Union Pacific's favor.

**C. Fulbright's disparate impact claim cannot be brought under a disparate treatment theory.**

Fulbright contends that because none of the cases Union Pacific relied on to support its argument that there is no disparate treatment claim under § 12112(b)(6) dismiss or grant summary judgment, they fail to support a theory that a § 12112(b)(6) claim is not, and never can be, a disparate treatment claim. Union Pacific argues that the facts alleged by Fulbright – that Union Pacific imposed a qualification standard that screens out individuals with disabilities (Doc. 40, ¶¶ 77, 79) – improperly presents a disparate impact claim under a cause of action for disparate treatment. Fulbright also misreads Union Pacific's cases, describing them as supporting two propositions, one being that a § 12112(b)(6) claim can be asserted as a disparate impact claim. More accurately, Union Pacific's cases state that a claim under § 12112(b)(6) is a disparate impact claim. Plaintiff mysteriously contends that Union Pacific minimized the significance of and failed to address the legal reasoning of two non-binding cases that recognize § 12112(b)(6) can be used by a single plaintiff to assert a disparate treatment claim. However, Union Pacific never relied on either of the two referenced cases as they conflict with Fifth Circuit authority and, in fact, presented its own example of binding authority that found the ADA provides a screen out *disparate impact theory* under § 12112(b)(6) that applies to individual plaintiffs. Moreover, Fulbright fails to respond entirely to Union Pacific's argument that his § 12112(b)(6) has not been administratively exhausted. Thus, he concedes the argument and his disparate impact claim under § 12112(b)(6) should be dismissed.

**D. Fulbright's failure-to-accommodate and unlawful medical inquiry claims fail as a matter of law.**

It is undisputed that the EEOC issued and mailed Fulbright its right-to-sue notice on June 7, 2016. See Doc. 40, ¶ 56; Doc. 42-2; Doc. 95, ¶ 123. The latest Fulbright could timely file suit was September 12, 2016. Fulbright did not do so and instead filed this action nearly four years

later. Thus, Fulbright's complaint affirmatively shows that his claims are time barred. Fulbright could only overcome this outcome if *American Pipe* tolling applies—which it does not for his accommodation claim, and ended on August 7, 2018, for his unlawful medical inquiry claim.[7]

Fulbright proposes a broad tolling standard in which tolling is applied regardless of whether claims were pursued in a class action so long as the same evidence and witnesses apply. Doc. 105 at 34-38. But *American Pipe* tolling is equitable tolling. *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 137 S.Ct. 2042, 2051–52 (2017). It is Fulbright's burden to show a factual basis to equitably toll the limitations period. *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 457 (5th Cir. 2011). "The purpose of *American Pipe* tolling is to further the purpose of class actions without defeating the purpose of statutes of limitations." *Aguilar v. Ocwen Loan Servicing, LLC,* 2018 WL 949225, *6 (N.D. Tex. 2018) (citing *American Pipe*, 414 U.S. at 555). "A key consideration in *American Pipe* was that the putative class member seeking to intervene had the exact same cause of action as the named plaintiff who originally brought the class action." *Id.* (citing *Johnson v. Ry. Express Agency*, 421 U.S. 454, 467 (1975). As the Supreme Court recently emphasized:

> *American Pipe* tolls the limitations period for individual claims because economy of litigation favors delaying those claims until after class-certification denial. If certification is granted, the claims will proceed as a class *and there would be no need for the assertion of any claims individually*. If certification is denied, only then would it be necessary to pursue claims individually.

*China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806–07 (2018) (emphasis added).

Thus, the Court recognizes there would be no need for any individual claims where a class is certified because the individual claims are *identical* to the certified class claims. *Cf. Johnson*, 421 U.S. at 467. Indeed, "[t]he watchwords of *American Pipe* are efficiency and economy of litigation [ ]." *China Agritech*, 138 S. Ct. at 1811. Allowing tolling of claims not pursued for

[7] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

certification on a class-wide basis undermines judicial economy and the purposes underlying *American Pipe* tolling. *See, e.g.*, *Aguilar*, 2018 WL 949225 at *6.

Here, it is undisputed that a failure-to-accommodate claim was not brought on a class-wide basis in *Harris*. Doc. 96 at 215-216. "A failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment." *Windhauser v. Bd. of Supervisors for La. State Univ.*, 360 Fed. Appx. 562, 565 (5th Cir. 2010). Consequently, the claim should be dismissed as untimely because *American Pipe* does not apply. *See, e.g., Carrillo v. Union Pac. R.R. Co.*, 2021 WL 3023407, at *6-*7 (W.D. Tex. July 16, 2021) (finding failure-to-accommodate claim time-barred because *Harris* did not provide Union Pacific with fair notice of the claim); *Blankinship v. Union Pac. R.R. Co.*, 2021 WL 3290453, at *4 (D. Ariz. 2021) (same); *DeFries v. Union Pac. R.R. Co.*, 2021 WL 3007254, at *2 (D. Or. 2021) (same); *Donahue v. Union Pac. R.R. Co.*, 2021 WL 2458351, at *2 (N.D. Cal. 2021) (same); *Krehbiel v. Union Pac. R.R. Co.*, 2019 WL 3387049, at *4 (D. Kan. 2019) (tolling did not apply to a *Harris* putative class member's untimely failure-to-accommodate claim and dismissing the claim); *see also Aguilar*, 2018 WL 949225 at *6; *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litig.*, 467 F. Supp. 227, 259-60 (W.D. Tex. 1979).

Similarly, it is undisputed that the *Harris* plaintiffs did not pursue class certification of the unlawful medical inquiry claim. Doc. 96 at 237, 263. The claim should be dismissed as untimely because tolling for that claim stopped on August 7, 2018 when the *Harris* plaintiffs filed their motion for class certification excluding that claim. *See, e.g.*, *Hunter v. Am. Gen. Life & Acc. Ins. Co.*, 384 F. Supp. 2d 888, 893 (D.S.C. 2005); *Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149, 155–56 (N.D. Ill. 1992).

*Carrillo* provides further support for dismissing Fulbright's unlawful medical inquiry

claim. The *Carrillo* court found that tolling ceases for claims that are voluntarily abandoned, specifically holding that equitable tolling ended for plaintiff's disparate impact claim when the *Harris* class voluntarily abandoned the claim's class certification. *Carrillo*, 2021 WL 3023407, at *5. *Carrillo* elaborated in that, "[o]nce [*Harris*] plaintiffs moved to certify only their disparate treatment claim, the court in *Harris* no longer presided over the disparate impact cause of action on a class-wide basis. Therefore, at the time the class moved for certification, the named plaintiffs ceased to be representatives for those putative class members with only disparate impact and unlawful medical inquiry claims." *Id*. The *Carrillo* court's reliance on the Fifth Circuit's reasoning in *Hall* (that actions taken by the court that are the "functional equivalent of a decertification" cause tolling to stop), in concluding that plaintiff's disparate impact claim ceased to be tolled when the class moved for certification, applies analogously to an unlawful medical inquiry claim. *Carrillo*, 2021 WL 3023407, at *5 (citing *Hall v. Variable Annuity Life Ins. Co.*, 727 F.3d 372, 376 (5th Cir. 2013). Thus, Fulbright's unlawful medical inquiry claim should be dismissed as untimely.

The cases on which Fulbright relies are inapposite and do not mandate a different outcome. Unlike here, the court in *In re Enron Corp. Securities* considered whether *American Pipe* tolling applied under Texas and Ohio state law, concluding that it did not. 465 F.Supp.2d 687, 719–22 (S.D. Tex. 2006). Likewise, *Byes v. Telecheck Recovery Services, Inc.* did not involve asserting a cause of action different from the class allegations; rather, the issue was whether the plaintiff's amended complaint should relate back to her original class complaint. 1996 WL 22686, *1–*3 (E.D. La. 1996). Moreover, Fulbright does not cite any authority supporting his contention that the Tenth or Ninth Circuits follow a different *American Pipe* tolling rule that would make *Krehbiel*, *Blakinship*, *DeFries*, or *Donahue* inapplicable. *See* Doc. 105 at 39, n. 9-10; *see also Carrillo, 2021*

*WL 3023407, at *6-7*. Thus, the Court should dismiss Fulbright's failure-to-accommodate and unlawful medical inquiry claims as time-barred.

### E. Fulbright has not administratively exhausted his failure-to-accommodate claim.

Fulbright contends that because the FWHRC considered whether he could perform the essential functions of his job with or without reasonable accommodation, then his charge exhausted his failure-to-accommodate claim. See Doc. 105 at 48-50. Fulbright ignores that all disparate-treatment claims under the ADA involve an analysis of whether an employee can perform their essential job functions with or without reasonable accommodation, as that is the standard for whether an employee is a qualified individual. See 42 U.S.C. § 12111(8); *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 592 (5th Cir. 2016). Disparate-treatment and failure-to-accommodate claims "represent distinct categories of disability discrimination under the ADA." *Hamar v. Ashland, Inc.*, 211 Fed. Appx. 309, 309 (5th Cir. 2006). "An EEOC charge alleging only acts supporting a claim of discriminatory discharge does not exhaust a claim of failure to reasonably accommodate." *Spindle v. CKJ Trucking, LP*, 2020 WL 1283519, *2 (E.D. Tex. 2020).

Here, the FWHRC's determination only considered Fulbright's disparate-treatment and retaliation allegations raised in his charge. Doc. 96 at 119-122. To the extent it discussed reasonable accommodations, it was in the context of determining whether Fulbright was qualified for his job. *Id*. The FWHRC did not investigate whether Union Pacific failed to accommodate Fulbright. *Id*. Thus, his charge failed to exhaust his administrative remedies for his failure-to-accommodate claim and the claim should be dismissed.[8]

---

[8] Fulbright fails to respond to Union Pacific's argument that, regardless of whether he exhausted administrative remedies for his failure-to-accommodate claim, the claim still fails because, as

### F. Fulbright's unlawful medical inquiry claim fails to create a fact issue.

Fulbright's response asserts an overly simple argument that Union Pacific made a disability-related inquiry when it requested medical records from Fulbright in February 2015 and requested a medical exam when it asked him to under a sleep medicine evaluation in April 2015, thus establishing a prima facie case. Doc. 105 at 51. However, "an employer may inquire and make medical examinations if they are shown to be job-related and consistent with business necessity." *Fuzy v. S&B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (citing 42 U.S.C. § 12112(d)(4)(A)-(B)). Fulbright claims that Union Pacific failed to address business necessity as an affirmative defense. However, Union Pacific's brief addressed business necessity, in detail, relating Fulbright's facts to similar circumstances presented in *Owen v. Union Pac. R.R. Co.*, 2020 WL 6684504, *8 (D. Neb. 2020). Doc. 95 at 52-53. The *Owen* court granted summary judgment in Union Pacific's favor, holding that plaintiff's FFD evaluation was "job-related, vital to Union Pacific's business, and 'no broader or more intrusive than necessary.'" To the extent Fulbright contends that Union Pacific's argument focused on the FFD referral, rather than the records or evaluation request, Union Pacific's facts regarding the importance of Fulbright's essential job functions as related to Neal's concerns equally support the finer elements of the overall FFD evaluation, such as the records and evaluation request. Thus, Fulbright's unlawful medical inquiry claim fails and summary judgment should be entered in Union Pacific's favor.

## IV. Conclusion

For all these reasons, the Court should grant Union Pacific summary judgment on all of Fulbright's claims.

---

discussed, he is not (and has not proven) that he is a qualified individual, thus he concedes the argument and his failure-to-accommodate claim should be dismissed.

Respectfully submitted this 15th day of October, 2021.

*/s/ Heather M. Miller*
Heather M. Miller (TX Bar No. 24062897)
Constangy, Brooks, Smith & Prophete, LLP
2600 Grand Boulevard, Suite 750
Kansas City, Missouri 64108
Telephone: 816-329-5917
Facsimile: 816-472-6401
hmiller@constangy.com

Robert L. Ortbals, Jr. (MO Bar No. 56540)*
Constangy, Brooks, Smith & Prophete, LLP
7733 Forsyth Boulevard, Suite 1325
St. Louis, Missouri 63105
Telephone: 314-338-3740
Facsimile: 314-727-1978
rortbals@constangy.com

ATTORNEYS FOR DEFENDANT UNION
PACIFIC RAILROAD COMPANY

* Admitted *Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that on the 15th day of October, 2021, I electronically transmitted the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing to all counsel of record.

*/s/ Heather M. Miller*
An Attorney for Defendant